Paul W. Shakespear (14113)
Cameron Cutler (15116)
Natalie Beal (18311)
SNELL & WILMER L.L.P.
15 West South Temple
Suite 1200
Gateway Tower West
Salt Lake City, Utah  84101
Telephone:  801.257.1900
Facsimile:  801.257.1800
pshakespear@swlaw.com
ccutler@swlaw.com
nbeal@swlaw.com

Abram I. Moore (pro hac vice pending)
Christian A. Zazzali (pro hac vice pending)
K&L GATES LLP
70 West Madison St., Suite 3100
Chicago, IL 60602
Telephone: 312.781.6010
Facsimile: 312.827.8175
abe.moore@klgates.com
christian.zazzali@klgates.com

*Attorneys for Plaintiff Eric Schiermeyer*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ERIC SCHIERMEYER, Derivatively on Behalf of Nominal Defendant, BLOCKCHAIN GAME PARTNERS, INC. D/B/A BGP GAMES,<br><br>Plaintiff,<br><br>vs.<br><br>WRIGHT THURSTON and TRUE NORTH UNITED INVESTMENTS, LLC,<br><br>Defendants,<br><br>BLOCKCHAIN GAME PARTNERS, INC. D/B/A BGP GAMES,<br><br>Nominal Defendant. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Case No.  2:23-cv-00589-HCN |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Eric Schiermeyer ("Plaintiff"), by and through his undersigned attorneys, hereby

submits this Verified Shareholder Derivative Complaint (the "Derivative Complaint") on behalf

of and for the benefit of Blockchain Game Partners, Inc. ("Gala Games" or "Company") and states as follows:

## SUMMARY OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of Gala Games against Wright Thurston and his investment vehicle, True North United Investments, LLC ("True North").  Thurston is one of two directors of Gala Games and he controls True North, a 40.927% shareholder in the Company.

2.      In early 2021, Thurston and/or True North stole cryptocurrency from Gala Games, in the form of 8,645,014,077 GALA tokens ("GALA").  GALA is the core utility token for the Gala Games ecosystem developed by the Company.

3.      When confronted about his theft of Company GALA, Thurston falsely stated that he simply intended to hold the GALA in secure wallets for the benefit of Gala Games.  However, last year Thurston and/or True North began moving the stolen tokens from those wallets and exchanging or selling them in a complex web of obfuscatory transactions.  He was able to exchange, hide or sell approximately $130,000,000 worth of the stolen GALA before Gala Games could stop him.

4.      Thurston also stole licenses to operate "nodes" on the Gala ecosystem from the Company.  These nodes can be operated to earn valuable GALA tokens.  Thurston sold those stolen node licenses to others while keeping the proceeds of those sales for himself and/or True North.  Thurston and True North have been sued by the purchasers of those stolen licenses, who have accused Thurston of defrauding them.

5.     The United States Securities and Exchange Commission (the "SEC") also sued Thurston and True North earlier this year, alleging that Thurston defrauded purchasers of "Green Boxes" by falsely representing that they mined an energy-efficient GREEN crypto token and making other fraudulent representations.

6.     Indeed, Thurston has founded numerous companies, most of which have ended up in litigation, insolvent, bankrupt, and/or sued by the SEC. Gala Games appears to be the only legitimate enterprise in which Thurston has an interest, although Thurston has no involvement in the day-to-day operations of the Company.  In fact, while Plaintiff has dutifully managed the Company's operations and Thurston has been an absentee director, Thurston has now effectively paid himself, via theft, more than ten times the total compensation Plaintiff has received from the Company.

7.     In this action, Plaintiff, who has been a shareholder in Gala Games since its inception, seeks disgorgement of or restitution for the millions of dollars' worth of cryptocurrency stolen by Thurston and/or True North, compensation for the damage Thurston has caused Gala Games, and removal of Thurston as a director of Gala Games.  Today, Gala Games suffers from its association with Thurston.

<u>**JURISDICTION AND VENUE**</u>

8.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because (i) complete diversity exists between Plaintiff, the Company and Defendant Thurston, and (ii) the amount in controversy exceeds $75,000.  This is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

9.      This Court has jurisdiction over each Defendant named herein.  Thurston resides in this District, and True North is a Utah limited liability company with its principal place of business in this District.  The Company has sufficient minimum contact with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because Defendants reside in this District and a substantial portion of the transactions and wrongs complained of herein, including Defendant Thurston's participation in the wrongful acts detailed herein occurred in this District.

## PARTIES

11.     Nominal Defendant Gala Games is incorporated under the laws of Wyoming and maintains its principal place of business at 680 S Cache Street, Suite 100, Jackson, Wyoming, 83001.  Gala Games develops and provides decentralized games in which players own their own content.

12.     Plaintiff is a resident of California.  Plaintiff is currently a director and shareholder of Gala Games and has continuously been a shareholder of Gala Games since the inception of the Company.  Plaintiff is also the President and Chief Executive Officer of the Company.  Prior to forming the Company, Plaintiff was the co-founder of Zynga, Inc., a successful social video game development company that went public in 2011 and was acquired last year in a deal valued at $12.7 billion.

13.     Defendant Wright Thurston is a resident of Utah.  Thurston is currently a director of Gala Games.  Prior to forming the Company, Thurston was primarily involved in multi-level

marketing companies (e.g. "pyramid schemes") and founded a number of failed companies that spawned considerable litigation.

14.     True North is a Utah limited liability company with its principal place of business in Midway, Utah.   According to its Statement of Authority, Thurston was True North's sole manager when True North was formed.   In March 2022, Thurston's wife, Stephanie Thurston, replaced him as manager.   In June 2023, Thurston was again listed as the sole manager of True North.   Upon information and belief and based on the available public record, no member of True North resides in Wyoming or California.

## **FACTS**

### A.     **Thurston's history of failed companies, alleged fraud, and litigation**

15.     Thurston is a person who comes across as earnest and convincing.   He does favors for people.   In online profile pictures, he often appears cuddling his wife.   He calls himself a "dedicated member of his community" who "frequently volunteers with his church."   This persona has enabled him to fool many people, at least initially, and he has enriched himself through his pattern of deception.

16.     ***Firstline Security, Inc.***   Thurston formed Firstline Security, Inc. in or about 2002. Firstline was accused of recruiting college students to sell its products door-to-door by falsely promising that the students would appear on reality television shows and potentially win one million dollars.[1]   The California Department of Consumer Affairs revoked Firstline's license to operate in California.   The company filed for bankruptcy in 2008.

---

[1] *See, e.g.,* ABC 7 News, *Reality show contestants duped into selling*, (Mar. 8, 2008), https://abc7news.com/archive/5954507/.

17.     ***Elevate, Inc.*** Thurston was a founder and CEO of Elevate, Inc., a multi-level marketing company in the business of selling solar energy products.  The shareholders of this company sued Thurston for fraud in 2016.  (Superior Court of California, County of Los Angeles, Case No. BC644655.)

18.     According to a filing in a federal court in Nevada, Thurston purportedly resigned from Elevate in 2015 but remained in "functional control of Elevate, its records, and its litigation." (See D. Nev. Case No. 17-cv-01924, Doc. No. 2.)  In 2017, that Nevada court found that Elevate, Inc. "abandoned its business and has failed within a reasonable time to take steps to dissolve" and appointed a shareholder of Elevate as a custodian with the right to obtain any and all of the company's financial records.

19.     The custodian of Elevate subpoenaed financial records from Thurston in 2017. Rather than produce the financial information, Thurston has engaged in six years of litigation over whether that subpoena was validly served.  (D. Utah Case No. 2:18-mc-00023.)  The court in that case found that Thurston had evaded service and provided a false residential address.  (See *Id.* at Dkt. 34.)  On July 10, 2023, the court ordered Thurston to produce responsive documents.

20.     ***Elevate Solar, Inc.***  Elevate Solar, Inc. appears to have been a subsidiary of Elevate, Inc., involved in multi-level marketing.  As one online commenter noted about this company: "Wright Thurston will not tell you the truth or make anything clear. He moves from place to place scamming clients and investors. He does not pay his employees and then moves to a new town. He takes investors' money and then moves to a new town."[2]

---

[2] BehindMLM, *Elevate Solar Review: Confusing solar panel installations*, (Jul. 10, 2015), https://behindmlm.com/mlm-reviews/elevate-solar-review-confusing-solar-panel-installations/.

21. ***Elevate Communications, LLC***. In 2008, Thurston founded Elevate Communications, a multi-level marketing company that sold bundled telephone, television and internet services. By 2009, the company had been sued by its creditors, was insolvent, and ceased active operations.

22. An online commenter who claimed to have been a salesperson for Elevate Communications wrote: "After [customers] were contracted, Elevate's service crashed and these poor people's homes and business were locked in to lousy service that never worked. Wright ran away to another state taking the equipment he could carry and all the money of the investors. Wright Thurston Jr. is not to be trusted in any form of business. I know him personally and have spent a lot of time with him. He has ruined the lives of thousand[s] of young people as well as seasoned investors."[3]

23. ***Block United, LLC.*** Thurston formed a cryptocurrency mining company called Block United, LLC with a partner in 2017. At least two default judgments were entered against that company for failing to pay its bills, including judgment for nearly one million dollars owed to Rocky Mountain Power. (See D. Utah Case No. 2:19-cv-00302.)

24. According to an appellate court filing by Thurston's partner in Block United, "[a] number of disputes subsequently arose [with Thurston] concerning, among other things, *the whereabouts of a large number of Bitcoin* as well as the management and operation of the company." (See *Thurston v. Block United, LLC*, 2021 UT App. 80.) Litigation ensued and the parties immediately settled.

---

[3] I Speak of Dreams, *A New Scam Targeting College Students*, (Jul. 21, 2007), https://lizditz.typepad.com/i_speak_of_dreams/2007/07/my-pal-karoli-1.html.

25.     According to public records, while Blockchain United upheld its end of the settlement agreement, paying Thurston specified sums of money and assets, Thurston "continually declined to sign the required dismissal and release papers."  He initially premised his "delay on being too busy," then claimed he needed more information, then claimed he was fraudulently induced into settling.

26.     The company moved to enforce the settlement agreement, and the court held oral argument on the motion.

> There, the court asked Thurston why, if his intention was to rescind the settlement agreement, he had 'kept all the money . . . paid as part of' that same agreement. Thurston answered that, 'unless the court order[ed] otherwise,' his intention was to keep the proceeds he received under the settlement agreement because it *was never [Block United's] in the first place' and was instead 'always [his].'*

The court disagreed, found that Thurston's claim that he was defrauded was entirely baseless, and enforced the settlement agreement.  The appellate court affirmed and ordered Thurston to pay Block United's attorneys' fees.  (See *Thurston v. Block United, LLC*, 2021 UT App. 80.)

27.     In March 2022, Thurston purchased a $40 million house on the Caribbean island of Puerto Rico.

**B.     Formation of the Company, the GALA token, and the Gala Games ecosystem**

28.     In early 2019, Plaintiff and Thurston formed Gala Games.  At the time, Plaintiff was not aware of Thurston's history of litigation, failed companies, and alleged fraud.

29.     The Company developed the Gala Games platform, a blockchain-based gaming infrastructure.  The currency used in the games is the GALA token, which is used for in-game purchases and as a medium of exchange between players in the Gala Games ecosystem.

30.     A blockchain is a distributed ledger shared among a computer network's nodes, which are linked together in a peer-to-peer network.  The computer nodes work together to create and maintain a public digital ledger of transactions in a way that makes it difficult or impossible to change, hack, or cheat the system's records.

31.     The nodes of a blockchain check and validate each other by a consensus mechanism before adding a transaction to the distributed ledger.  Once the nodes add a "block," or transaction, to the "chain," or ledger, the block cannot be changed.

32.     GALA is an "ERC-20" token, which means that it is created using the Ethereum blockchain pursuant to its technical standard for creating fungible tokens.  Transfers of ERC-20 tokens, like GALA, are recorded on the Ethereum blockchain and are visible to the public using online tools like Etherscan.

33.     Transactions on the Ethereum blockchain generally require the payment of "gas" — a small amount of the native Ethereum token: Ether or "ETH."  The "gas" is paid as an incentive to an Ethereum node owner to process a transaction.  The price of the "gas" required for a given transaction fluctuates depending on how busy the Ethereum network is.

34.     Unlike Ethereum nodes, which process and validate token transactions (including minting and transfers of GALA), Gala Nodes currently provide computational resources required to perform actions requested by the GALA network and also provide storage for the GALA network.  The Gala Nodes are therefore the core of the Gala Games ecosystem.

35.     Gala Nodes are available to the public to purchase.  When a person buys a Gala Node, they receive software and a license from the Company to operate the Gala Node.  The number of available Gala Nodes is capped at 50,000.

36.     Owners of Gala Nodes are able to "mint" GALA as a reward for operating their nodes and supporting the Gala Games ecosystem.  Node owners are also able to vote regarding certain matters that affect the Gala Games ecosystem.

37.     Every day, there is an emission of GALA, and the amount of GALA emitted is dependent upon the then-current circulating supply of GALA (previously, GALA was emitted pursuant to a set emission schedule).  That daily emission of GALA is distributed in part to the Gala Node owners and in part to the Company.

38.     Prior to July 21, 2021, 25% of the daily emission of GALA was distributed to the Gala Node owners and 75% was distributed to the Company.  The Gala Node owners then voted to change that distribution, and since July 21, 2021, the daily emission of GALA has been distributed evenly (50/50) between the Company and Gala Node owners.

39.     The portion of the daily emission of GALA that is distributed to Gala Node owners is distributed among GALA Node owners whose nodes have been active for the minimum required time during the previous 24-hour period.

40.     GALA distributed to a Gala Node owner is sent into the owner's "treasure chest" as a mint allowance.  The GALA does not exist on a blockchain until the owner "mints" the GALA from the treasure chest, at which time it is written to the Ethereum-based blockchain (this minting requires the payment of gas and puts the GALA into the circulating supply).

41.     The GALA distributed to the Company is distributed into a Company account, or "wallet."  A cryptocurrency wallet is software that allows a user to communicate with the blockchain system, and that provides its user with a private key that may be used to authorize a "spend" or transaction of assets controlled by that wallet to another address on the blockchain.

42.     The Company's GALA is used to fund various Company purposes, including administration and ecosystem development.

43.     Since at least January 2023, the Company planned to upgrade from GALA v1 tokens to GALA v2 tokens and published the rationale for the upgrade in its 2023 Vision Paper in January 2023.  The 2023 Vision Paper was publicly announced and widely distributed.

44.     As promised in its 2023 Vision Paper, the forthcoming GALA v2 implementation was publicly announced on April 18, 2023 and took place on May 15, 2023.

**C.     Management of the Company**

45.     Since the Company's inception, Plaintiff and Thurston have been the only two directors of the Company.

46.     Plaintiff is the President and Chief Executive Officer of the Company and under the Company bylaws exercises general supervision over the business of the corporation and over its several officers.

47.     Since the Company's formation, Plaintiff has dutifully managed the operations of the Company and performed his obligations to act in the best interest of the Company.

48.     Thurston has held the nominal title of "Chief Blockchain Officer."  Thurston himself has admitted that he does not act in the capacity of Chief Blockchain Officer and recently resigned.

49.     Thurston was involved in the Company early on.  He initially implemented a multi-level marketing structure for the sale of Gala Nodes, similar to the sales structure he implemented in his prior failed businesses.  The Company has since moved away from Thurston's model and no longer has a multi-level marketing structure.

11

50.     Indeed, much of the Company's effort over the past several years has been to move away from problematic ideas or structures implemented by Thurston in the early days of the Company.

51.     At the inception of the Company, Thurston (or a company under his control) received 7,000 Gala Nodes and Plaintiff also received roughly 7,000 Gala Nodes.

52.     Thurston and Plaintiff agreed not to operate these nodes, as this concentration of nodes in two founders was contrary to the Company's foundational goal of decentralization (i.e. thousands of Gala Nodes operated by thousands of node owners, providing computational resources and making decisions about the protocols governing the Gala Games ecosystem).

53.      Apart from directing the preparation of the Company's annual tax returns, Thurston has had no legitimate involvement with the Company for years, by his own choice.

54.     Thurston has not been involved in the day-to-day operations of the Company.  In fact, Thurston has been an absentee director.

55.     In recent years, Thurston was virtually unreachable for many months at a time, failing to respond to communications from Plaintiff or the Company regarding corporate issues.

**D.     Thurston's theft and dumping of the Company's GALA tokens**

56.     In the early days of the Company, the Company kept its GALA tokens (received from sales on its website and from its portion of the daily distribution) in a single wallet that the Company used to engage in day-to-day business.  The Company accumulated billions of GALA in this wallet, which caused concern that it could be viewed as a target for hackers.

57.     On September 12, 2020, the Company moved 19,972,134,815 of the Company's GALA from the single Company wallet into many Company wallets.  The sole purpose of moving

the Company's GALA into these wallets was to keep the Company's assets more secure.  This was analogous to moving funds from a checking account to multiple savings accounts.

58.     When the Company moved its GALA into these numerous wallets (the "Company Savings Wallets"), Plaintiff and Thurston were given the private keys to those Company wallets.

59.     The Company Savings Wallets sat untouched between September 2020 and February 2021.

60.     Then the Company discovered that one of the Company Savings Wallets was empty.

61.     Upon examination, the Company discovered that many of the Company Savings Wallets holding the Company's GALA were empty.

62.     In total, Gala Games learned that 8,645,014,077 of the Company's GALA tokens were missing from the Company Savings Wallets (the "Stolen GALA").

63.     It initially appeared that the Company Savings Wallets had been hacked by an outside threat actor.  But it was not a hacker who stole the GALA.  It was Thurston and/or his company True North.

64.     Specifically, on February 3, 2021, in a series of 43 rapid transactions, Thurston and/or True North (at Thurston's direction) transferred the Stolen GALA from 43 of the Company Savings Wallets into 43 separate wallets controlled by Thurston and/or True North (the "Thurston Wallets").  Gala Games has no access to the Thurston Wallets into which the Stolen GALA was transferred.

65.     Gala Games personnel confronted Thurston, who explained that he had simply moved the Stolen GALA to the Thurston Wallets for safe keeping.

66.     Plaintiff demanded that Thurston return the Stolen GALA to the Company Savings Wallets, but Thurston refused.

67.     The Stolen GALA represented approximately 20% of the total GALA minted and more than 100% of the total amount of GALA in circulation at that time (according to market data aggregators, which deduct the issuing company's holdings from circulating supply).  If Thurston sold all of the Stolen GALA ("dumped" it in the market), the Gala Games ecosystem would have collapsed, as the total GALA in circulation would have more than doubled.

68.     Thurston effectively held the Company hostage.  Blowing the whistle on Thurston could have caused him to liquidate the Stolen GALA (known as a "rug pull").

69.     The Company was forced to rely upon Thurston's representation that he intended to act as a secure custodian of the Company GALA, and Plaintiff refrained from contacting the authorities or filing suit at that time.

70.     Instead, the Company tracked the Thurston Wallets to see if Stolen GALA was moved from those wallets.

71.     Thurston's statements that he intended to keep the Company's GALA secure were false.

72.     More than a year after having transferred the Stolen GALA into the Thurston Wallets, in 2022 Thurston and/or True North (at Thurston's direction) began quietly moving the Stolen GALA out of the Thurston Wallets in a complex and obfuscatory web of transactions.  The vast majority of these transactions occurred between September 2022 and May 2023.

73.     The complex web of transactions Thurston and/or True North used to transfer the Stolen GALA was intended to obfuscate the location of the Stolen GALA and prevent the Company from recovering its stolen assets.

74.     Thurston and/or True North could have simply transferred the Stolen GALA directly from the Thurston Wallets to a centralized exchange, minimizing the effort and gas fees expended.  Instead, they directed hundreds of transfers and exchanges of the Stolen GALA to and from hundreds of wallets, paying a fee for each transfer and exchange.

75.     Each of the transfers of Stolen GALA (or the cryptocurrency for which it was exchanged) is visible on the Ethereum blockchain — up to a point.  When the digital asset is transferred to a centralized exchange (e.g. Coinbase or Kraken), it is no longer visible via a blockchain explorer.  Instead, records of transactions are held by those centralized exchanges and are generally not publicly available in the absence of court process requiring disclosure.

76.     Nearly all of the Stolen GALA (or the cryptocurrency for which it was exchanged) ultimately ended up at a centralized exchange.  The total value of the Stolen GALA (or the cryptocurrency for which it was exchanged) at the time it reached a centralized exchange was at least $130,129,779.60.

77.     Plaintiff sent numerous messages to Thurston asking him why he was moving GALA tokens and demanding that he stop selling the Stolen GALA and return the remaining Stolen GALA to the Company.

78.     Thurston first responded that he was selling some of the GALA tokens in order to purchase ammunition for firearms.  Then he stopped responding.

79.     Ultimately, Plaintiff sent Thurston a text message, stating, "[your] selling GALA on coinbase is being watched by our community and it's hurting the business. you need to stop. we never agreed that you would do this. please send the funds to the company bank account."

80.     Again, Thurston failed to respond.  Thurston ignored all demands to return the Stolen GALA and kept selling the Stolen GALA.

81.     Unable to secure the Stolen GALA from Thurston and unable to make any public disclosures regarding the Stolen GALA without the fear of initiating a panic, the Company was forced to seek an engineering solution to the problem at hand.

82.     That solution involved the issuance of GALA v2 in May 2023.  When GALA v2 was issued, it was distributed into the wallets of users who held GALA v1 on a one-for-one basis on most platforms.

83.     When GALA v2 was issued to replace GALA v1, the GALA v2 tokens were not deposited into the Thurston Wallets and he was left with obsolete GALA v1 tokens in those wallets.  After that, Thurston was no longer able to sell the Stolen GALA from the Thurston Wallets.

84.     By taking this action, the Company was able to mitigate some of the damage caused by Thurston and to prevent Thurston from further enriching himself by transferring, exchanging and liquidating the Stolen GALA.  At that time, Thurston and/or True North had already moved approximately half of the 8.6 billion stolen tokens, valued at approximately $130 million dollars at the time.

85.     Thurston's story regarding the tokens he stole from the Company has been inconsistent.  He initially claimed that he had moved the Stolen GALA from the Company Savings

Wallets merely to keep the assets secure for the Company.  Other times, when asked about the Stolen GALA, he has pretended not to know anything about it.

86.     It appears that Thurston's new story is that the GALA he stole from the Company treasury actually belonged to him or True North.  Like so much of what Thurston has said over the years, this story is entirely false.

87.     The Company's accounting reports (accessible by Thurston) have always reflected the Company Savings Wallets as belonging to Gala Games.

88.     Further, the Company's public-facing statements have always and consistently stated that a portion of all GALA goes to the Company (not to Thurston or True North).  Indeed, upon information and belief, Thurston's other companies have utilized the same model of token distribution.

89.     Finally, if the Stolen GALA actually belonged to Thurston, he would not have secretly and rapidly moved the GALA from the Company Savings Wallets into the Thurston Wallets, would not have claimed that he did so in order to keep the Company's GALA secure, and would not have engaged in a complex web of transactions in order to obfuscate the whereabouts of the Stolen GALA.

90.     Thurston's claim that Company assets actually belonged to him, rather than to the Company, echoes the similar claim he made in the Block United litigation (which claim was rejected by the court and Thurston was ordered to pay the company's attorneys' fees).

91.     Plaintiff has demanded that Thurston return the Stolen GALA and any proceeds therefrom and Thurston has refused.

**E.      Thurston's theft of Gala Node licenses and alleged defrauding of investors in "Smart Boxes"**

92.      Thurston has also stolen Gala Node licenses from the Company and sold the stolen licenses to third parties for his own enrichment.

93.      In or around November 2021, Plaintiff noted that the Company's GALA distribution report showed a new licensee named Jason Anderson ("Anderson") with 672 operational Gala Nodes earning GALA tokens.

94.      At the time, Anderson had more active Gala Nodes that anyone else on the distribution reports.

95.      Upon examining the records for this licensee, the Company discovered that there was no sales information in the system for the licenses under which Anderson was operating.

96.      The Company found that a false entry had been made in the system, in which Anderson's 672 node licenses (the "Stolen Licenses") were activated without anyone having paid for them.

97.      The Company disabled the Stolen Licenses because it again appeared that the Company had been hacked by an outside threat actor.

98.      In fact, it was not an outside hacker who stole these Gala Node licenses; it was Thurston who directed that that the false entry be made.

99.      The Company ultimately learned that there was a lawsuit between Thurston and Anderson's company, Blox Lending, LLC ("Blox"), pending in Utah.  (District Court of the Third Judicial Circuit, Salt Lake County, Case No. 210903079.)

100.     Blox, like many others who had done business with Thurston, had sued Thurston for fraud.  Many of Thurston's other ventures (including Gala Games) were included as "alter ego"

defendants.  The allegations tell a familiar story of Thurston's deception.  (Blox Third Amended Counterclaim attached as **Exhibit A**.)

101.    According to the Blox Counterclaim, Thurston falsely represented to Blox that he had "developed new and improved cryptocurrency mining equipment, which mined GALA, GREEN, and GALA NFT cryptocurrency rewards." *Id*. ¶ 20.

102.    Thurston allegedly called the equipment a "Smart Box," and falsely claimed that it was superior to the existing Bitcoin mining equipment owned by Blox.  *Id*.

103.    Thurston allegedly promised to provide Smart Boxes plus a rebate to Blox in exchange for the Bitcoin mining equipment then owned by Blox.  According to Blox's Counterclaim, Thurston texted Anderson pictures of phony boxes with blinking lights, falsely claiming that they were operable Smart Boxes.  *Id*. ¶¶ 24-25.

104.    Blox alleges that the promised Smart Boxes were never delivered, and claims damages of approximately $200 million.  *Id*. ¶74

105.    Blox also alleges that it paid Thurston $134,400 for licenses to operate nodes on the fraudulent Smart Boxes, which appear to have been the Stolen Licenses.  Thurston told Blox that he would run the Stolen Licenses remotely for Blox until the Smart Boxes arrived.  *Id*. ¶ 52.

106.    According to Blox, Thurston operated the 672 promised GALA Nodes on Blox's behalf for a period of time but conveyed only a portion of the GALA rewards that they earned to Blox.  *Id.* ¶¶ 52-56.  As set forth above, the Company disabled these Stolen Licenses once it discovered them.

107.    Thurston was never authorized to sell GALA Nodes or the Stolen Licenses to Anderson or Blox.

108.     The Company never received any proceeds from the sale of GALA Nodes or the Stolen Licenses to Anderson or Blox.

109.     The Blox lawsuit, which associates the Company with one of Thurston's many fraudulent schemes, has caused the Company reputational damage.

110.     Incredibly, Thurston failed to disclose to the Company that it had been sued in the Blox lawsuit and instead hired attorneys to represent both himself and the Company (from whom he had stolen the GALA Node licenses).

111.     When the Company learned of the Blox lawsuit it retained its own counsel.

112.     The lawsuit has caused the Company to incur legal fees and face potential legal exposure based upon Thurston's alleged conduct.

113.     Another plaintiff, Derrick Hope ("Hope"), has also sued Thurston in Utah for selling Gala Node licenses.

114.     Hope alleged that he paid Thurston $400,000 in exchange for, among other things, mining equipment and 268 Gala Node licenses.

115.     The Company never received any portion of the funds paid by Hope to Thurston and never authorized Thurston to sell Gala Node licenses to Hope.

**F.     Thurston is sued by the SEC for alleged defrauding investors in "Green Boxes"**

116.     Thurston has improperly used Gala Games's reputation to promote Green United, LLC ("Green"), a venture Thurston founded, falsely promoting Green as a venture related to the Company.

117.    The Securities and Exchange Commission ("SEC") has sued Thurston, alleging that Thurston defrauded investors in Green.  That case is pending.  (*SEC v. Green United, LLC et al.*, Case No. 2:23-CV-00159, D. UT).

118.    Specifically, the SEC alleges that, from April 2018 until at least December 2022, Thurston "raised more than $18 million through the sale of investments in the form of so-called Green Boxes" and "Green Nodes" by "falsely stat[ing] that these products mined a crypto asset called GREEN on a purported blockchain called the 'Green Blockchain'."  (Complaint, ¶ 2, *SEC v. Green United, LLC et al.*, Case No. 2:23-CV-00159, D. UT.)

119.    The SEC alleges that GREEN was not even a mineable crypto asset and that the "Green Blockchain" promoted by Thurston did not exist.  *Id.* ¶ 3.  The SEC further alleges that Thurston created the total supply of GREEN tokens in 2018 through a smart contract on the Ethereum blockchain.  *Id.* ¶ 45.

120.    Upon information and belief, Thurston supported his alleged fraudulent scheme by exchanging some portion of the Stolen GALA for GREEN tokens to pay off investors in his Green scheme.

121.    In order to lure investors into Green, Thurston relied upon his association with Gala Games, used the Gala Games name to promote Green, and falsely suggested that Gala Games was somehow involved with the Green entity.

122.    Indeed, Green was not the only questionable venture that Thurston falsely associated with Gala Games in an effort to lure investors.  He has promoted his entire "Connect United, Inc." family of companies, including "Give Blockchain," "Liberty Blockchain," "Elevate Blockchain," "Win Blockchain," "Switch Blockchain," "Element Blockchain," "Galvan

Blockchain," and "Grow Blockchain," by falsely associating them (or instructing others to falsely associate them) with Gala Games. On information and belief, each of these entities has a business model similar to Green's.

123.    Just as Green purported to solve environmental problems, many of Thurston's other entities purport to use blockchain technology to address a social or environmental issue, promising investors that by purchasing nodes in these companies they would be performing a social good. These companies typically utilize a multi-level marketing business model.

124.    Gala Games is not, and has never been, in any way associated with Green or any of Thurston's other ventures - including any of the Connect United, Inc. family of entities.

125.    As a result of the false association of Gala Games with Thurston's other schemes, Plaintiff and the Company have been forced to field inquiries from numerous parties regarding Gala Games's potential involvement with Thurston's allegedly-illicit ventures, when in fact there is no such involvement.

126.    On June 8, 2023, Coinbase sent the Company a series of questions concerning the SEC's lawsuits against Thurston and inquiring about the Company's continued involvement with Thurston. After Thurston stole and began liquidating the Stolen GALA, Coinbase refused to support the GALA v2 upgrade.

127.    Thurston's allegedly fraudulent conduct has caused significant damage to the Gala Games reputation, brand, and goodwill.

**G.     Plaintiff's demand upon the Company to take action against Thurston**

128.     Under the Company bylaws, an action cannot be taken by the Gala Games board of directors without the affirmative vote of Thurston, as one of two directors of the Company.

129.     On June 6, 2023, Plaintiff, as a shareholder in the Company, served a demand on the Company to take action against Thurston as a director of the Company and called for a vote of the Company's board of directors (consisting of Plaintiff and Thurston) on June 8, 2023.

130.     On June 7, 2023, Plaintiff and Thurston, through counsel, agreed to postpone the June 8, 2023 special meeting until June 15, 2023 so that counsel could discuss resolving the matters set forth in Plaintiff's demand.

131.     On June 16, 2023, Plaintiff and Thurston, through counsel, agreed to postpone the June 15, 2023 special meeting until June 22, 2023 so that counsel could discuss resolving the matters set forth in Plaintiff's demand.

132.     On June 21, 2023, Plaintiff and Thurston, through counsel, agreed to postpone the June 15, 2023 special meeting until June 29, 2023 so that counsel could discuss resolving the matters set forth in Plaintiff's demand;

133.     Plaintiff and Thurston, through counsel, then agreed to postpone the June 29, 2023 special meeting until July 18, 2023 so that counsel could discuss resolving the matters set forth in Plaintiff's demand;

134.     On July 18, 2023, Plaintiff and Thurston, through counsel, agreed that the directors could record their votes on the proposals in Plaintiff's demand in writing.

135.     On August 3, 2023, Thurston, through counsel, sent a written proposal confirming (a) that Thurston voted against calling for a shareholder vote to remove Thurston as a director and

23

(b) that Thurston voted against the Company filing a lawsuit against Thurston as demanded by Plaintiff.

136.   Any demand that Thurston vote to take action against himself was futile.

137.   Because Thurston has demonstrated that he can and will attempt to dissipate and hide the Stolen GALA, irreparable injury to the Company would result from any further delay in filing this action.

## COUNT I -- (DERIVATIVE CLAIM) BREACH OF FIDUCIARY DUTIES

138.   Plaintiff restates, realleges, and incorporates by reference the foregoing paragraphs as if the same were set forth herein verbatim.

139.   As a director, Thurston owes fiduciary duties of care, good faith, loyalty, and candor to the Company.

140.   Thurston breached his fiduciary duties by his actions recounted herein, including but not limited to:

a.   Misusing his access to the Company Savings Wallets in order to transfer approximately 8,645,014,077 GALA tokens from the Company Savings Wallets to the Thurston Wallets;

b.   Making false statements to the Company and Plaintiff regarding his intent to keep the Stolen GALA as a secure custodian for the Company;

c.   Refusing to return the Stolen GALA to the Company;

d.   Selling or exchanging billions of the Stolen GALA and keeping the proceeds to enrich himself directly and/or indirectly (including via his company, True North);

e.      Failing and refusing to return the proceeds received from his unauthorized sale and/or transfer of the Stolen GALA;

f.      Using his position and control to improperly sell GALA licenses to third parties without Company authorization;

g.      Failing and refusing to return the proceeds received from his unauthorized sale of the Stolen Licenses;

h.      Concealing from the Company the fact that he sold GALA licenses and kept the proceeds of the sale for himself;

i.      Concealing from the Company the fact that Blox sued Thurston and the Company for selling the Stolen Licenses;

j.      Misusing his position of control to promote his "Green" venture using the Company's reputation, brand, and goodwill; and

k.      Damaging Gala Games's brand by associating the Company with the alleged conduct in the lawsuits investors and the SEC brought against Thurston.

141.    The foregoing breaches of fiduciary duties have caused harm to the Company.

142.    As a direct and proximate result of Thurston's breaches of his fiduciary duties to the Company, the Company is entitled to a disgorgement of ill-gotten gains from Thurston and companies under his control (including True North), the imposition of a constructive trust over any and all ill-gotten gains; the recovery of direct damages from Thurston in an amount to be proven at trial but believed to be in excess of $130 million, to incidental and consequential damages, to pre-judgment and post-judgment interest, to attorneys' fees, and to such other and further relief as the Court deems just and proper.

## COUNT II -- (DERIVATIVE CLAIM) CONVERSION

143.    Plaintiff restates, realleges, and incorporates by reference the foregoing paragraphs as if the same were set forth herein verbatim.

144.    Thurston and/or True North intentionally deprived the Company of its GALA tokens and licenses by knowingly exercising control over them without authorization.

145.    The Company owned the GALA tokens in the Company treasury and the node licenses that cannot be distributed without Company authorization.

146.    Thurston and/or True North converted the Company's property for his own use and gain.

147.    The Company demanded that Thurston and/or True North return the GALA tokens and he refused.

148.    Neither Thurston nor True North has ever returned the Stolen GALA or the proceeds of the sale of Stolen Gala or the Stolen Licenses to third parties.

149.    Thurston and True North's actions deprived the Company of possession and use of its tokens and licenses.

150.    Thurston and/or True North was unjustly enriched and the Company was damaged by Thurston's conversion.

151.    The Company is entitled to restitution in the amount that Thurston and/or True North was unjustly enriched as a result of their wrongful conduct.  This amount includes, but is not limited to, the proceeds Thurston and/or True North received from his sale of the Stolen GALA and licenses.

## COUNT III -- (DERIVATIVE CLAIM) FRAUD

152.    Plaintiff restates, realleges, and incorporates by reference the foregoing paragraphs as if the same were set forth herein verbatim.

153.    Thurston made knowingly false statements of fact to the Company.  Specifically, in phone calls to Plaintiff and others at the Company in early 2021, Plaintiff falsely stated that he had moved GALA tokens from the Company wallets to his own wallets in order to act as a secure custodian of the Company assets.

154.    Thurston's statements that he intended to keep the Company's assets secure were knowingly false.

155.    After making these false statements, Thurston began selling the Stolen GALA and keeping the proceeds for himself.

156.    Thurston's false statements regarding acting as a secure custodian of the Stolen GALA were made with the intent to deceive the Company or with reckless disregard for the truth.

157.    The Company justifiably relied on Thurston's false statements.

158.    In reliance on Thurston's insistence that he intended to act as a secure custodian of the Company's tokens, the Company did not contact the appropriate authorities to report the theft of GALA and Plaintiff refrained from making demand of the Company to file an action against Thurston.

159.    Thurston's fraudulent statements provided him a personal benefit to the detriment and financial loss of the Company.

## COUNT IV -- (DERIVATIVE CLAIM) UNJUST ENRICHMENT

160.    Plaintiff restates, realleges, and incorporates by reference the foregoing paragraphs as if the same were set forth herein verbatim.

161.    By taking the Stolen GALA and Stolen Licenses from the Company, Defendants conferred a benefit upon themselves.

162.    Defendants are aware that they have received the benefit of the Stolen GALA and Stolen Licenses.

163.    It would be unjust to allow the Defendants to retain the benefit of the Stolen GALA and Stolen Licenses without requiring payment to the Company for the Stolen GALA and Stolen Licenses or the return of the Stolen GALA and proceeds of the Stolen Licenses.

164.    Society's reasonable expectations of security of property would be defeated if Defendants were permitted to retain the benefit of the Stolen GALA and Stolen Licenses.

## COUNT V -- (DERIVATIVE CLAIM) EQUITABLE ACCOUNTING

165.    Plaintiff restates, realleges, and incorporates by reference the foregoing paragraphs as if the same were set forth herein verbatim.

166.    Thurston owed the Company fiduciary duties as a director.

167.    Thurston breached those fiduciary duties as set forth herein, including by taking the Stolen GALA from the Company and taking the Stolen Licenses from the Company and selling them to third parties for his own gain.

168.    After taking the Stolen GALA, Thurston dissipated the Stolen GALA in a complex web of transactions.

169.     Thurston has failed to disclose amounts or property that he received in exchange for selling the Stolen Licenses.

## COUNT VI -- (DERIVATIVE CLAIM) REMOVAL OF THURSTON AS DIRECTOR

170.     Plaintiff restates, realleges, and incorporates by reference the foregoing paragraphs as if the same were set forth herein verbatim.

171.     Since 2019, Plaintiff has been a shareholder of the Company.  Plaintiff is currently a shareholder of the Company, and has been a shareholder of the Company during all of the events complained of herein.

172.     Thurston is a director of the Company.

173.     On June 6, 2023, Plaintiff issued a written demand to the Company seeking, among other things, removal of Thurston as a director.

174.     As set forth above, Thurston (through counsel) confirmed that he voted against calling for a shareholder vote to remove himself as a director.

175.     Removal of Thurston as a director is in the best interests of the Company and its shareholders because Thurston engaged in fraudulent conduct with respect to the Company, grossly abused the position of director and intentionally inflicted harm on the Company, and has demonstrated a pattern of fraudulent conduct that has damaged the Company's reputation as set forth herein, including in the following ways:

a.     Thurston harmed the Company by stealing 8,645,014,077 GALA tokens from the Company treasury, selling a substantial portion of the Stolen GALA without authorization, and keeping the proceeds for himself.

b.      Thurston harmed the Company by stealing GALA licenses, selling them without authorization, and keeping the proceeds for himself.

c.      Thurston harmed the Company by falsely associating the Company with his allegedly fraudulent "Smart Box" venture.

d.      Thurston harmed the Company by using the Company's reputation, brand, and goodwill to promote the "Green" venture, which the SEC is prosecuting as fraudulent, without the Company's authorization.

e.      Thurston's continued involvement in the Company harms the Company as his involvement calls the Company's legitimacy into question by third parties, including, but not limited to, Coinbase, the largest exchange in the United States.

176.    As described above, Thurston, in his capacity as a director of the Company, has improperly stolen corporate assets for his own use, used the Company's property and resources for his own personal benefit and individual advantage to the detriment and financial loss of the Company.

177.    As described above, Thurston has repeatedly and knowingly acted outside of the scope of his authority and without Board approval to the financial loss and detriment of the Company and Plaintiff.

178.    Considering Thurston's course of conduct and the inadequacy of other remedies, removal as a director is in the best interest of the Company.

WHEREFORE, Plaintiff prays the Court enter judgment against Defendants Thurston and True North and grant the following relief:

1. Ordering Defendants to return the Stolen GALA and any proceeds from the exchange or sale of the Stolen GALA;

2. Ordering Defendants to pay restitution to the Company in the amounts of their ill-gotten gains, including the amounts received in exchange for stolen GALA tokens and Stolen Licenses;

3. Imposing a constructive trust over any and all ill-gotten gains held by Thurston and/or True North;

4. An award of actual damages suffered by the Company resulting from Defendants' misconduct, including the conversion of GALA tokens and licenses, fraud, and breaches of fiduciary duties to the Company;

5. Ordering that Thurston be removed as a director of the Company;

6. An award of pre-judgment and post-judgment interest as permitted by law;

7. An award of punitive damages;

8. An award of the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

9. Ordering Thurston to prepare an accounting of the Stolen GALA and any proceeds from the exchange or transfer of the Stolen GALA; and

10. Ordering Thurston to prepare an accounting of the proceeds of the Stolen Licenses.

11. Such other and further relief the Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury for all issues so triable.

DATED this 31st day of August, 2023.

SNELL & WILMER L.L.P.


/s/ Paul W. Shakespear
Paul W. Shakespear
Cameron Cutler
Natalie Beal

 K&L GATES LLP
Abram I. Moore
Christian A. Zazzali

*Attorneys for Plaintiff Eric Schiermeyer*

## **VERIFICATION**

Pursuant to Section 28 U.S.C. § 1746, I, Eric Schiermeyer, declare under penalty of perjury that I have read the foregoing Verified Complaint, and do hereby verify that the factual statements contained therein are true, based on my personal knowledge, information, and/or belief, and upon my position as President and Chief Executive Officer of Blockchain Game Partners, Inc.

Dated: August 31, 2023

*/s/ Eric Schiermeyer*_____
ERIC SCHIERMEYER

# EXHIBIT A

James D. Gilson (5472)
Cole P. Crowther (16432)
**DENTONS DURHAM JONES PINEGAR P.C.**
111 S. Main, Suite 2400
Salt Lake City, Utah 84111
Telephone: (801) 415-3000
Facsimile: (801) 415-3500
james.gilson@dentons.com
cole.crowther@dentons.com

*Attorneys for Counterclaimant Blox Lending, LLC*

<div style="border:1px solid black">
If you do not respond to this document within applicable time limits, judgment could be entered against Counterclaim Defendants as requested.
</div>

## IN THE DISTRICT COURT OF THE THIRD JUDICIAL DISTRICT
## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| CODEX UNITED, LLC, a Utah limited liability company, BLOCKCHAIN UNITED MINING SERVICES, INC., a Wyoming corporation, and CONNECT UNITED, INC., a Wyoming corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>PROFIT VAULT VC1, LLC, aka PROFIT VAULT JV 1, LLC, a Utah limited liability company, BLOX LENDING LLC, a Utah limited liability company, TREASURY MANAGEMENT SERVICES, LLC, a Utah limited liability company, JASON R. ANDERSON, an individual, JACOB ANDERSON, an individual, GORDON ANDERSON, an individual, EMILY TABOR EADS, an individual, and DOES 1 through 10,<br><br>Defendants, | **THIRD AMENDED COUNTERCLAIM BY BLOX LENDING, LLC**<br><br>Case No. 210903079<br><br>Judge Lawrence |

BLOX LENDING, LLC, a Utah limited
liability company,

        Counterclaimant,

vs.

BLOCKCHAIN UNITED MINING
SERVICES, INC., a Wyoming corporation;
CONNECT UNITED, INC., a Wyoming
corporation; WRIGHT THURSTON, an
individual; BLOCKCHAIN GAME
PARTNERS, INC., a Wyoming corporation
dba GALA GAMES; BLOCK BROTHERS,
LLC, a Utah limited liability company, and
TRUE NORTH UNITED INVESTMENTS,
LLC, a Utah limited liability company, and
DOES 1 through 10,

        Counterclaim Defendants.

## THIRD AMENDED COUNTERCLAIM BY BLOX LENDING, LLC

Pursuant to Utah R. Civ. P. 15, and the Court's Order dated July 13, 2023,

Counterclaimant Blox Lending, LLC ("Blox"), hereby submits its Third Amended Counterclaim

against Counterclaim Defendants Blockchain United Mining Services, Inc., now known as

Blockchain United Mining Services DAO, LLC ("BUMS"), Connect United, Inc., now known as

Connect United DAO, LLC ("Connect United"), Wright Thurston, an individual ("Thurston"),

Block Brothers, LLC ("Block Brothers"), Blockchain Game Partners, Inc., doing business as

Gala Games ("Gala Games"), and True North United Investments, LLC ("True North" and

together with BUMS, Connect United, Thurston, Block Brothers, and Gala Games the

"Counterclaim Defendants"), and alleges as follows:

1

## PARTIES

1.      Blox is, and at all times material hereto has been, a limited liability company organized and existing under the laws of the State of Nevada, maintaining its principal place of business in Draper, Utah.

2.      Thurston is, and at all times material hereto has been, an individual residing in Wasatch County, State of Utah, and sometimes does business as BUMS, Connect United, Gala Games, Block Brothers, and True North (collectively, the "Thurston Entities"), and is a founder, principal, owner, and agent of the Thurston Entities.

3.      BUMS purports to be a Wyoming limited liability company, but maintains or maintained its principal place of business in Wasatch County, Utah, and was formerly known as Blockchain United Mining Services, Inc.

4.      Connect United purports to be a Wyoming limited liability company, but maintains or maintained its principal place of business in Wasatch County, Utah, and was formerly known as Connect United, Inc.

5.      Gala Games was or is a Wyoming corporation, and conducts business in Wasatch County, Utah.

6.      Block Brothers was or is an entity organized under the laws of the State of Utah and maintains or maintained its principal place of business in Wasatch County, Utah.

7.      True North was or is an entity organized under the laws of the State of Utah and maintains or maintained its principal place of business in Wasatch County, Utah. According to its certificate of organization, Thurston is True North's sole manager.[1]

8.      Does 1 through 10 are individuals or entities whose names and residences are presently unknown but who participated in the wrongful acts alleged in this Third Amended Counterclaim, or who are otherwise alter-egos, successors, or transferees of the existing Counterclaim Defendants. To the extent necessary, Blox will amend this Third Amended Counterclaim when further information is learned about these individuals and/or entities.

## JURISDICTION AND VENUE AND TIER

9.      This Court has personal jurisdiction over Counterclaim Defendants because Thurston is an individual residing in Utah, Block Brothers and True North are Utah companies, BUMS and Connect United have asserted claims in the same case and are or were companies that conducted business in Utah, and because Gala Games conducts business in Utah.

10.     This Court has subject matter jurisdiction over this action pursuant to Utah Code §§ 78A-5-102(1) and 78B-3-205.

11.     Venue lies in the Third Judicial District Court pursuant to Utah Code §§ 78B-3-304 and 307.

12.     This case is a Tier 3 matter as described in Rule 26(c)(3) of the Utah Rules of Civil Procedure.

---

[1] While the definitions for the terms "Thurston Entities" and "Counterclaim Defendants" includes True North and are used throughout this Third Amended Counterclaim, Blox is not asserting any direct liability against True North. Rather, consistent with the Court's Order dated July 13, 2023, at this time Blox's claims against True North are based on the allegations that it is an alter ego of Thurston and is thus jointly liable with Thurston to the full extent that Thurston is liable. Blox reserves its right to later assert that True North is also the alter ego of the other Thurston Entities.

## GENERAL ALLEGATIONS

13.     Each of the claims for relief set forth in this Third Amended Counterclaim is alleged against each Counterclaim Defendant. Each Counterclaim Defendant participated in the conduct at issue, either directly and/or through Thurston, and each is jointly and severally liable for the claims.

### *Thurston and the Thurston Entities' Actions*

14.     Thurston is a principal, founder, owner, and agent of the each of the Counterclaim Defendant entities BUMS, Connect United, Gala Games, Block Brothers, and True North (collectively, the "Thurston Entities").

15.     In their Amended Complaint in this action, BUMS and Connect United admit and allege at paragraphs 40-41 that Thurston was an agent and/or representative of "Blockchain United and/or Connect [United]."

16.     Thurston and each of the Thurston Entities shared a common office at 125 West Main Street, #1122, Midway, Utah (the "Midway Office"), which Thurston operated, and in which he conducted business on behalf of himself and each of the Thurston Entities.

17.     In August and September of 2020, Blox acquired 672 Bitmain s-17PRO and s-19pro machines ("Bitmain Miners") that had originated from Thurston and from each of the Thurston Entities, for a total cost of $3,067,500, as follows:

    a.     On August 6, 2020, Blox purchased 226 Bitmain Miners from Thurston and the Thurston Entities by wiring $672,500 to Block Brothers, as directed by Thurston;

4

b.       On September 18, 2020, Blox purchased 246 Bitmain Miners from Profit Vault VC1, LLC by agreement to pay $738,000 in cash and $762,000 in future GALA rewards;

c.       On September 20, 2020, Blox acquired 200 Bitmain Miners from TMS by settling a debt owed by TMS to Blox for $895,000.

18.       The Bitmain Miners were fully functional and were used and owned by Blox to mine Bitcoin ("BTC") cryptocurrency, and as of October 1, 2020, were producing approximately 0.42369 BTC per day.

19.       In or around September 2020, Thurston (on behalf of himself and the Thurston Entities) represented to Jason Anderson and Jake Anderson of Blox that Thurston and the Thurston Entities had developed new and improved cryptocurrency mining equipment, which mined GREEN and GALA cryptocurrency rewards and NFTs, which equipment Thurston called a "Smart Box," which Thurston claimed were more profitable and used significantly less electricity than the Bitmain Miners owned by Blox.

20.       On September 10, 2020, Thurston met with Jason Anderson and Jake Anderson (the "September 10 Meeting") at Thurston's Midway Office. At the September 10 Meeting, Thurston showed them a purported beta test version of the Smart Box, and represented that it was fully functional, and that it had finished the development phase and was in the production phase of manufacturing hundreds of Smart Boxes.

21.       Thurston represented that each Smart Box contained five active nodes (hard drives), half that mined GREEN rewards and half that mined GALA rewards and NFTs.

5

22.     Previously in the summer of 2020, Thurston made similar representations to

others, including to Gordon Anderson, that he and the Thurston Entities had Smart Boxes already

operating, including 2,000 "ready to go" as of June 15, 2020, and sent photographs to Gordon

Anderson dated June 4 and June 15 2020, purporting to show functioning Smart Boxes.

23.     Below is a true copy of the text messages dated June 4, 2020 and June 15, 2020

between Thurston and Gordon Anderson:





24.     Blox has since learned that the purported Smart Boxes Thurston showed to Jason Anderson and Jacob Anderson of Blox and others were sham devices with blinking lights meant to deceive investors into believing the Smart Boxes were fully operating, when the truth was that the devices did not perform any of the claimed functions.

25.     During the September 10 Meeting, Thurston also represented that each Smart Box had a market value at $5,000 each, but that they were willing to sell them to Blox for $2,000 each.

26.     Thurston further represented that he and the Thurston Entities would together give a $5,000 trade in value to Blox for each of its Bitmain Miners, and give a credit of $3,000 each. That credit would be applied toward monthly license fees and the balance would be refunded at the time of the Smart Box delivery.

27.     At the September 10 Meeting, Thurston showed Jason Anderson and Jacob Anderson of Blox a spreadsheet on his computer titled "Green Start Fund" that included a tab

7

titled "Sheet1," which stated "bitmain s-17 or better" miners would be "traded 1 for 1," with each being traded for a "smart box + 5 blockbot node licenses," and that each would receive a "credit towards lease or BTC when refinanced."

28.    Below is a true copy of the picture the Andersons took of Thurston's computer screen showing that spreadsheet:



29.    This same spreadsheet also included a tab titled "orders," which showed the delivery schedule for Smart Boxes. It shows that within 30 days (by October 15), 400 Smart Boxes would be delivered, and within 34 days (by October 31), 1,000 Smart Boxes would be delivered, with another 10,000 delivered within 60 days.

30.     Below is a true copy of the picture the Andersons took of Thurston's computer screen showing that spreadsheet:



31.     Thurston and the Thurston Entities offered and promised to exchange all 672 of Blox's Bitmain Miners for 672 fully functional Smart Boxes according to this timetable:  Blox to transfer and deliver its 672 Bitmain Miners to Thurston and the Thurston Entities on or about October 1, 2020; Thurston and the Thurston Entities to transfer and deliver 200 Smart Boxes to Blox within two weeks thereafter (by October 15, 2020), together with the credit of $3,000 each ($600,000 USD); Thurston and the Thurston Entities to transfer and deliver the remaining 472 Smart Boxes to Blox by December 1, 2020, together with the credit of $3,000 each, less the amount already applied to monthly licensing fees (the "Transfer and Exchange Agreement").

SLC_6242227.4

32.     These key terms of the Transfer and Exchange Agreement were discussed and agreed upon in multiple oral conversations and email messages between Thurston and his representatives and with Jason and Jacob Anderson, and in multiple drafts of a written Transfer and Exchange Agreement.

33.     The parties understood and agreed that time was of the essence in the Transfer and Exchange Agreement because each day that the mining equipment is operating it is generating valuable Bitcoin or GREEN and GALA cryptocurrency rewards and NFTs for the operator.

34.     On September 11, 2020, Thurston represented to Blox that he sold "19k smart boxes yesterday and collected funds on 600 so far" and that he could "produce 24,400 by dec 31st this year."

35.     However, Blox later learned that less than 60 Smart Boxes were ever manufactured and only 328 Smart Boxes were ever sold, excluding the 672 Smart Boxes sold to Blox.

36.     On September 20, 2020, ten days after the September 10 Meeting, Thurston represented to Jason Anderson and Jacob Anderson via text message that each Smart Box was earning $100 per day. Thus, Thurston represented that the 672 Smart Boxes, each earning $100 per day, would earn $2,016,000 per month.

37.     Below is a true copy of the September 20, 2020 text messages from Thurston to Jacob and Jason Anderson:

SLC_6242227.4



38.     Thurston and the Thurston Entities' representations and promises were made orally and in writing, by Thurston on behalf of himself and each of the Thurston Entities, including but not limited to at the following times and places:  Meetings at Thurston's Midway Office on August 21, 2020, September 4, 2020, and September 10, 2020, with Thurston present along with Jason Anderson and Jake Anderson.

39.     Thurston and the Thurston Entities made their material representations and promises to Blox, knowing they were false or with a reckless disregard for the truth, for the purpose of inducing Blox to transfer their 672 Bitmain Miners to Defendants.

40.     Thurston's and the Thurston Entities' material false representations and omissions include, but are not limited to, the following:

a.     Misrepresenting that Thurston and the Thurston Entities had developed new and improved fully functioning cryptocurrency mining equipment, called Smart Boxes, which operated faster and with significantly less electricity than Bitmain Miners;

11

b.      Misrepresenting that Thurston and the Thurston Entities had over 2,000 Smart Boxes ready to ship and that they could manufacture 5,000 per month as soon as orders were made;

c.      Misrepresenting that Thurston and the Thurston Entities would be able to deliver 200 fully functioning Smart Boxes to Blox by October 15, 2020, and an additional 472 by December 1, 2020;

d.      Misrepresenting that as of September 20, 2020, the Smart Boxes were earning $100 each per day, which would result in $2,016,000 in earnings per month for the 672 Smart Boxes purchased by Blox,

e.      Misrepresenting that Thurston had sold thousands of Smart Boxes and collected on 600 of those;

f.      Omitting to disclose that the so-called Smart Boxes were not functional, but instead, in reality, the sham machines that Thurston displayed to Blox were merely a fan and blinking lights that performed no functions;

g.      Omitting to disclose that the so-called Smart Boxes had not been fully developed or manufactured;

h.      Omitting to disclose that the so-called Smart Boxes would not be available for delivery to Blox in accordance with the promised timetable (200 by October 15, 2020, 472 by December 1, 2020), knowing that time was of the essence;

i.      Omitting to disclose that Thurston and the Thurston Entities were insolvent and were not willing or able to issue a $3,000 rebate payment for each Smart

12

Box, nor were they willing to apply the credit to the monthly licensing fees until the Smart Boxes were delivered;

      j.     Omitting to disclose that Thurston and the Thurston Entities could not or would not pay rewards daily automatically into the Blox wallets or accurately account for rewards and NFTs earned with source documents and blockchain records for each of the GALA and GREEN nodes Blox paid activation for.

      41.     In reliance on Thurston's and the Thurston Entities' false representations and promises as set forth above, Blox accepted their offer and entered into the Transfer and Exchange Agreement with Thurston and the Thurston Entities.

      42.     Blox fully performed its promise under the Transfer and Exchange Agreement by transferring and delivering its 672 Bitmain Miners to Thurston and the Thurston Entities on or about October 1, 2020.

      43.     To date, Thurston and the Thurston Entities have failed to perform any of its promises under the Transfer and Exchange Agreement, despite numerous demands by Blox.

      44.     Defendants have not delivered any Smart Box mining equipment machines in accordance with the timetable agreed upon, or at any other time.

      45.     Thurston and the Thurston Entities have not returned Blox's Bitmain Miners to Blox.

      46.     Thurston and the Thurston Entities kept the cryptocurrency rewards and NFTs and failed to remit the GREEN and GALA rewards and NFTs daily into Blox's private wallet as they had promised. Only three manual deposits were made to Blox wallets in October 2020, and that was done without any accounting to support the amount of rewards earned or the supporting

SLC_6242227.4

documents, including the blockchain showing that all of the rewards Blox should have earned were actually deposited.

47.     Thurston and the Thurston Entities have not paid Blox the fair market value of its 672 Bitmain Miners that they received from Blox on October 1, 2020, or given Blox, the $3,000 credit toward monthly licensing fees as agreed, nor have they returned the Bitmain Miners to Blox. Instead, they have, on information and belief:

    a.      Utilized 672 Bitmain Miners themselves to generate over 155 BTC for themselves; and/or

    b.       Resold Blox's 672 Bitmain Miners to others and retained the proceeds from those sales for personal gain.

48.     Despite knowing that they were unable to transfer replacement mining equipment to Blox, Thurston and the Thurston Entities deprived Blox of the benefit of the use of their 672 Bitmain Miners, loss of at least 155 BTC to date, and received and utilized the significant economic benefits of the use of those machines themselves, and during a time period when the market price of BTC was significantly increasing.

49.     Had Blox retained their 672 Bitmain Miners from October 1, 2020 to the present date (calculated as of October 10, 2021), given that they were collectively producing approximately 0.42369 BTC per day, Blox would have earned 158.46006 BTC, which, at the current value of BTC of $56,527.48 (as of October 10, 2021), results in approximately **$8,957,347.87** that Thurston and the Thurston Entities have wrongfully taken from Blox.

50.     Had Thurston and the Thurston Entities been honest, Blox would not have transferred their 672 Bitmain Miners to Thurston and the Thurston Entities.

14

51.     Thurston and the Thurston Entities have wrongfully taken Blox's 672 Bitmain Miners for their personal gain and benefit.

52.     Thurston and the Thurston Entities represented that all the rewards and NFTs generated by the Smart Boxes would belong to Blox as the operator, and the rewards would be paid daily for GREEN and weekly for GALA, and deposited automatically into Blox's private account wallets and verified over blockchain, provided that Blox paid the 30 day operator licenses required to activate the GREEN and GALA rewards and NFTs, which license fees would be applied from the more than $2 million credit owed to Blox due to the transfer of Blox's 672 Bitmain Miners.

53.     On or about October 4, 2020, Blox paid to Thurston and the Thurston Entities $134,400 ($200 for each of the 672 Smart Boxes) to activate a total of 3,360 node licenses for 30 days on all 672 Smart Boxes that Defendants were to provide Blox (5 nodes per Smart Box, to wit: 1,680 GALA and 1,680 GREEN). Thurston told Blox that he would run these licenses remotely until their Smart Boxes arrived, and would apply the over $2 million rebate credit to license fees until the rebate was paid when Smart Boxes were delivered. Thus, Thurston had total control over receipt of the rewards and NFTs.

54.     On October 5, 2020, Thurston represented in a text message to Jason Anderson and Jacob Anderson that Blox would receive a daily report from GALA and deposits every Monday, and that GREEN would deliver deposits daily.

55.     Below is a true copy of the October 5, 2020 text message between Thurston and Jacob and Jason Anderson:

SLC_6242227.4



56.     However, Blox never received any reports directly from GREEN or GALA, and never received rewards directly either.

57.     Instead, Thurston and the Thurston Entities received Blox's GALA and GREEN rewards and directed them to be deposited into Thurston's own account, and then Thurston transferred a lesser number of those rewards into accounts for Blox.

58.     Instead of receiving 5 node licenses for each of Blox's 672 Bitmain Miners as promised, which would have been a total of 3,360 node licenses, Blox only received 1,344 node licenses (672 GREEN nodes and 672 GALA nodes). Thurston's own records and reports provided to Blox confirm that no more than 672 GREEN nodes and 672 GALA nodes were running for Blox during the period of October 4 through November 3, 2020.

59.     During the period of October 4 through November 3, 2020, according to the reports given by Thurston to Blox, the 672 GREEN nodes produced 288,015 GREEN tokens each.

60.    If Thurston and the Thurston Entities had delivered the missing 2,016 node licenses for the month of October as required (which would have been another 1,008 GALA nodes and 1,008 GREEN nodes), Blox would have earned another 290,318,120 GREEN tokens (as well as additional GALA tokens). The current value of these missing tokens (as of October 4, 2021) is $0.0166 for each GREEN token, resulting in a current value of approximately **$4,819,280.79** in GREEN tokens.

61.    Further, according to GALA Games data available at www.app.gala.games/distribution?date=1633828409864, Blox is able to see the blockchain information and determine the GALA earned per point, which shows that 1,035,770.34 GALA rewards per point were earned from October 4, 2020 through October 9, 2021.

62.    When multiplied by 1,680 points (5 per Smart Box), Blox should have earned 1,619,204,731.20 GALA as of October 9, 2021. Taking the October 4, 2021 value of $0.11 for each GALA token, results in approximately **$178,112,520.43** in damages.

63.    Additionally, Blox should have earned another approximately 888,336 GALA Game Items during the period of October 4 through November 3, 2020, which are valued at $3.99 each.

64.    Thurston and the Thurston Entities wrongfully retained these rewards and failed to deliver them to Blox.

65.    Thurston and the Thurston Entities also failed to deliver all the Game Items earned by Blox. A report sent on October 19, 2020 to Blox by Thurston and the Thurston Entities' representative Aly Austin shows that between October 4 and October 18, 2020, Blox's GALA nodes earned 267,456 game items.

17

66. Below is a true copy of the October 19, 2020 report:

| Blox Lending Node Report | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Date** | **Day** | **Gala** | **Status** | | | **Game Items** | **Status** | |
| 10/4/20 | Sunday | 10,517 | Distributed | | | 38 | Pending | |
| 10/5/20 | Monday | 10,280 | Distributed | 17,307,360.00 | Gala | 36 | Pending | 25,536.00 Game Items |
| 10/6/20 | Tuesday | 9,595 | Distributed | | | 35 | Pending | |
| 10/7/20 | Wednesday | 9,034 | Distributed | | | 34 | Pending | |
| 10/8/20 | Thursday | 7,126 | Distributed | | | 34 | Pending | |
| 10/9/20 | Friday | 9,427 | Pending | | | 34 | Pending | |
| 10/10/20 | Saturday | 8,852 | Pending | | | 35 | Pending | |
| 10/11/20 | Sunday | 8,736 | Pending | | | 36 | Pending | |
| 10/12/20 | Monday | 8,217 | Pending | | | 39 | Pending | |
| 10/13/20 | Tuesday | 8,922 | Pending | 57,372,672.00 | Gala | 40 | Pending | 241,920.00 Game Items |
| 10/14/20 | Wednesday | 6,201 | Pending | | | 34 | Pending | |
| 10/15/20 | Thursday | 7,979 | Pending | | | 33 | Pending | |
| 10/16/20 | Friday | 8,612 | Pending | | | 32 | Pending | |
| 10/17/20 | Saturday | 9,327 | Pending | | | 38 | Pending | |
| 10/18/20 | Sunday | 9,103 | Pending | | | 39 | Pending | |

67. Yet on the Blox Lending Node Report sent by Thurston and the Thurston Entities' representative Jen Miller on November 6, 2020, it states in the yellow "Total Items" row that for the entire month of October 2020, Blox only earned 7,512 game items.

68. Below is a true copy of the Blox Lending Node Report:



69. The report states that these game items were worth $3.99 at the time.

18

70.     Thurston and the Thurston Entities improperly retained and failed to deliver to Blox all of the game items they earned, including the remaining 259,994 game items earned from October 4 to October 18, which have a value of approximately **$1,037,176.56**.

71.     Upon information and belief, Blox earned a similar amount of game items during the remaining 15 days from October 19 to November 3, 2020, resulting in another approximately 267,456 game items that Thurston and the Thurston entities failed to deliver, which had a value of $3.99 each, and results in damages of approximately **$1,067,149.44**.

72.     Additionally, because the agreed upon $3,000 credit for each of the 672 Bitmain Miners was never paid to Blox by Thurston or the Thurston Entities, Blox had a credit of $2,016,000 on the books with Thurston ($3,000 x 672 Bitmain Miners).

73.     Due to this credit, the monthly licensing fee of $134,400 could not have been due for at least 15 months (not before February 4, 2022), and Blox should have been earning rewards up to the present date. Given that Blox should have earned what now amounts to tens of millions of dollars for rewards and game items for only one month (October 4 to November 3, 2020), Blox's damages for the remaining eleven months and counting is, upon information and belief, many times that number.

74.     Blox has sustained and will yet sustain significant damages from Thurston and the Thurston Entities' wrongful actions, in an amount to be proven at trial, including:

      a.     Not less than **$8,957,347.87** for BTC mined by the 672 Bitmain Miners that Blox delivered to Thurston and the Thurston Entities on October 1, 2020;

      b.     Not less than **$3,067,500** for the value of the Bitmain Miners delivered by Blox to Thurston and the Thurston Entities;

   c.  Not less than **$4,819,280.79** in GREEN rewards earned during the time period of October 4, 2020 through November 3, 2020 that Thurston and the Thurston Entities wrongfully retained and failed to deliver to Blox

   d.  Not less than **$178,112,520.43** for GALA rewards earned during the period of October 4, 2020 through October 9, 2021, that Thurston and the Thurston Entities wrongfully retained and failed to deliver to Blox;

   e.  Not less than **$3,544,460.64** for the approximately 888,336 GALA Game Items earned during the period of October 4 through November 3, 2020, which are valued at $3.99 each;

   f.  Not less than **$2,104,326** for the approximately 527,450 missing game items that Blox earned that Thurston and the Thurston Entities failed to deliver and wrongfully retained; and

   g.  An amount to be determined at trial for the time period from November 4, 2020 to the present (and up until February 2022), that the rewards and game items should have been accruing to Blox.

75.  Counterclaim Defendants unilaterally deleted the 672 nodes in Blox's online account with Gala Games, together with Blox's GALA rewards, shortly after Blox filed its October 18, 2021 Rule 26 disclosures in this action.

76.  In or around March of 2021, Blox once again demanded that Thurston and the Thurston Entities comply with the parties' agreement and deliver the rewards and fees owed to Blox, but Thurston failed to do so. Thurston changed the settings of his messages on March 29, 2021 to "disappear," as shown in the true copy of the text message thread below:

<div align="center">20</div>



***Additional Alter Ego Allegations***

77.     In addition to their direct participation in the conduct at issue in performing each of the acts and omissions alleged herein, each Counterclaim Defendant also acted as the agent of the Counterclaim Defendant, or each ratified such acts, or both.

78.     Thurston is a principal, founder, owner, and agent of the each of the Thurston Entities.

79.     Thurston acknowledges in his LinkedIn bio that he is Gala Games' Co-founder and an officer. At one point, he was the registered Secretary for Gala Games.

80.     Thurston and each of the Thurston Entities shared a common office in Midway, Utah, which Thurston operated and in which he conducted business on behalf of himself and each of the Thurston Entities.

SLC_6242227.4

81.     Thurston directed that Blox send payment to his entity Block Brothers (which Blox did), even for transactions that purportedly involved Thurston personally or the other Thurston Entities.

82.     BUMS, Connect United, Gala Games, Block Brothers, and True North each commingled funds with Thurston and each other through bank accounts set up in the name of Gala Games and Block Brothers.

83.     At all relevant times, BUMS and Connect United did not have a bank account but used the bank accounts in the name of Gala Games and Block Brothers.

84.     At Thurston's direction, any revenue that BUMS or Connect United were purportedly to receive, including payments made by Blox, was deposited into Block Brothers and/or Gala Games' bank accounts.

85.     BUMS and Connect United were undercapitalized and insolvent at all relevant times.

86.     At Thurston's direction, all funds deposited into the bank accounts in the name of Block Brothers or Gala Games were used to cover Block Brothers' or Gala Games' expenses or transferred to True North and/or agents of the Thurston Entities.

87.     True North used Block Brothers's bank account to hold True North's funds and then would make withdrawals to pay the Thurston Entities' employees or "independent contractors" with those funds.

88.     The Thurston Entities and agents have taken contradictory positions on whether their agents are employees or independent contractors of the Thurston Entities.

22

89.     In 2020 and 2021, Block Brothers relied almost exclusively on routine deposits of hundreds of thousands of dollars a month by True North, to remain in operation and was otherwise undercapitalized and insolvent.

90.     In 2020 and 2021, there were at least 167 wire transfers between True North and Block Brothers and numerous checks paid to True North from Block Brothers.

91.     In 2020 and 2021, there were also significant deposits and payments involving True North and Block Brothers from Gala Games' bank account.

92.     BUMS and Connect United are both listed as parties to draft, incomplete agreements with Blox relating to the Smart Boxes, which neither entity signed, which drafts were prepared by Thurston's counsel, and the drafts do not clearly specify the respective roles of BUMS or Connect United.

93.     BUMS was registered as a Wyoming corporation on April 1, 2019. Between on or about June 9, 2020 and August 19, 2021 (during the time of Blox's dealings with Counterclaim Defendants as alleged herein), BUMS was an inactive, administratively dissolved Wyoming corporation, without a registered agent. On March 9, 2022, BUMS converted to a Wyoming limited liability company, and on March 11, 2022 changed its name to Blockchain United Mining Service DAO, LLC.

94.     Connect United was registered as a Wyoming corporation on November 21, 2019. On the same dates as BUMS, on March 9, 2022, Connect United converted to a Wyoming limited liability company, and on March 11, 2022 changed its name to Connect United DAO, LLC. Connect United stated in a March 11, 2022 filing with the Wyoming Secretary of State that Connect United "is a decentralized autonomous organization."

95.     Gala Games was registered as a Wyoming corporation on November 21, 2019. Its only registered officer with the Wyoming Secretary of State until on or about November 10, 2020 was Utah attorney Jared Moss, with an email address of jared@blockchainjedi.com, who at times has also represented Thurston and was paid by True North from funds held in bank accounts in the name of Block Brothers.

96.     BUMS, Connect United, Gala Games, and True North use or have used the same registered Treasurer or Fiscal Agent, namely Jonathan Bextel.

97.     Block Brothers was registered as a Utah limited liability company on October 12, 2017. During 2017 and 2018, Thurston was registered as its sole manager. At some time prior to February 5, 2021, Block Brothers was administratively dissolved by the Utah Department of Commerce, Division of Corporations & Commercial Code, but was reinstated on that date.

98.     In the dealings at issue with Blox, Thurston did not maintain clear distinctions between himself and the Thurston Entities in how the responsibilities and benefits of the transactions at issue were allocated and matched. Thurston treated himself and the Thurston Entities as interchangeable.

99.     Thurston's longtime accountant, Jennifer Miller, testified in deposition that Thurston's involvement with BUMS and Connect United is through True North.

100.    True North owns and controls the other Thurston Entities and is controlled by Thurston according to its counsel, Ken Cuccinelli.

101.    True North was and is a member of BUMS.

102.     Thurston directed True North to pay employees and/or independent contractors of the other Thurston Entities with funds held in bank accounts in the name of Block Brothers and Gala Games.

103.     The Thurston Entities alleged they do not have any employees but use independent contractors.

104.     True North, at Thurston's direction, also controlled the transfer and distribution of cryptocurrency and other related rewards to the Thurston Parties' employees and/or independent contractors.

105.     On information and belief, the transfer and distribution of cryptocurrency and other related rewards to pay employees and/or independent contractors and Blox, came from a cryptocurrency wallet controlled and owned by Thurston and/or True North.

106.     The employees and/or independent contractors for the Thurston Entities do not have any agreements with True North and have not provided services to True North.

107.     Yet, the employees and/or independent contractors of BUMS, Connect United, Gala Games, and Block Brothers received 1099 Forms from True North and/or Block Brothers for the years 2018-2021.

108.     Block Brothers' purported owner and manager, Steven Waters, recently testified in deposition that Block Brothers does not have employees, but it made routine payments to roughly 30 different employees and/or independent contractors who worked for different companies, such as BUMS, Connect United, and Gala Games.

109.     However, in 2020, Block Brothers applied for and received $568,942.52 from the United States government through the Paycheck Protection Program ("PPP"), after falsely

SLC_6242227.4

representing to the bank that it has 35 employees and an average monthly payroll of $227,581.01.

110.    Block Brothers made the same misrepresentations in 2021 when it applied for and received a second PPP loan in the amount of $670,674.77.

111.    Specifically, Block Brothers represented to the bank in connection with its PPP applications that certain agents of BUMS, Connect United, Gala Games, and True North were in fact employees of Block Brothers, despite those agents: not having any agreements with Block Brothers; not having performed any work for Block Brothers; not having received a W-2 from Block Brothers; and many of those agents having testified in this action that they were not employees but were independent contractors of various Thurston Entities.

112.    Block Brothers represented to CCBank that all of the Thurston Entities operate as a single unit in order to procure the PPP funds.

113.    Block Brothers received the PPP funds in April 2020 and March 2021 and transferred those PPP funds to True North.

114.    The PPP funds Block Brothers received were commingled with Thurston and each of the Thurston Entities' funds and were used to purchase vehicles and other gifts for the Thurston Entities' employees and/or independent contractors.

115.    Blox's GALA and GREEN rewards that were due to Blox under its agreement with Thurston, were arranged by Thurston to be first deposited into his own account, and then Thurston transferred a lesser number of those rewards into an account for Blox at Gala Games and Connect United, respectively.

116.    Thurston set up this arrangement because the GREEN nodes do not actually mine GREEN and were merely used to perpetuate fraud by Thurston and the Thurston Entities. *See S.E.C. v. Green United, LLC et al.* (Case No. 2:23-CV-00159), filed on March 3, 2023, in the United States District Court, District of Utah.

117.    Thurston used True North to initiate transfers of GALA and GREEN rewards to Blox and the other Thurston Entities, as reflected in True North's accounting records.

118.    True North, through Thurston, controlled Gala Games as it relates to Gala Games' involvement with Blox.

119.    True North paid for the manufacturing of all manufactured Smart Boxes (less than 60).

120.    Thurston's control and disregard of the corporate form by all the Counterclaim Defendants was manifest by Thurston directing the transfers of nodes, licenses, and GALA and GREEN rewards, from Gala Games and Connect United, to himself, and then transferring a smaller amount of nodes, licenses, and GALA and GREEN rewards back to Gala Games and Connect United to an account for Blox, for equipment transactions also involving BUMS and Block Brothers.

121.    Thurston's control and the disregard of the corporate form by all the Counterclaim Defendants was further manifest by the Counterclaim Defendants unilaterally taking and deleting Blox's Gala nodes, and GALA rewards from Blox's online account with Gala Games shortly after Blox filed its October 18, 2021, Rule 26 disclosures in this action.

122.    Similar unauthorized withdrawals occurred by the Counterclaim Defendants in defendant Profit Vault' account with Gala Games.

123.     Each of the Thurston Entities were not adequately capitalized at the times applicable to this dispute.

124.     On three separate occasions between August and December 2020, Thurston sought large loans from Jason Anderson, and also from others, claiming that he and the Thurston Entities needed additional funds to pay for the development of the Smart Boxes.

125.     Thurston and the Thurston Entities failed to pay the promised rewards and failed to deliver the promised Smart Boxes.

126.     Thurston's actions in connection with the Thurston Entities and Blox were as though he were a one-man corporation.

127.     Other officers or directors of the Thurston Entities, if they existed, were absent or non-functioning, at least in regard to the transactions at issue in this action.

128.     Thurston used the Thurston Entities as a façade for his personal benefit and operations.

129.     The Thurston Entities failed to observe corporate formalities, and failed to maintain corporate records.

130.     The Counterclaim Defendants deleted emails and other regular business records and correspondence.

131.     There exists a unity of interest, ownership, and control between Thurston and the Thurston Entities such that the separate personalities of the Thurston Entities and Thurston as an individual no longer exists, such that each of the Thurston Entities is the alter ego of Thurston and each of the other Thurston Entities.

28

132.    Each of Thurston and the Thurston Entities acted with an awareness of their wrongdoing, and realized that their conduct would substantially assist in the accomplishment of their wrongful conduct.

133.    Thurston, and the Thurston Entities, are the agents, employees, or assignees of each other, and in doing the actions or inactions alleged herein, acted within the course and scope of their relationships with each other, and with the full knowledge and consent of each other.

134.    Thurston exercised control and dominion over the Thurston Entities with a disregard for the separate legal status of those entities in order to defraud Blox and to avoid accountability for complying with the terms of Transfer and Exchange Agreement as alleged herein.

135.    The Thurston Entities used shared offices, email accounts, credit cards, and bank accounts.

136.    The Thurston Entities did not hold separate meetings or keep separate records.

137.    Thurston and the Thurston Entities acted wrongfully together to Blox's detriment.

138.    Adherence to the fiction of the Thurston Entities as separate entities distinct from each other and from Thurston would permit an abuse of the corporate form, would sanction fraud, promote injustice, or an inequitable result would follow.

## FIRST CLAIM FOR RELIEF
### (Fraud/Intentional Misrepresentation)

139.    Blox realleges and incorporates the allegations contained in the foregoing paragraphs as though set forth in their entirety herein.

140.    Counterclaim Defendants' actions involving Blox as alleged herein constitute fraud and intentional misrepresentation.

29

141.    Among the material misrepresentations and omissions made Counterclaim Defendants are the following:

a.      Misrepresenting that Counterclaim Defendants had developed new and improved fully functioning cryptocurrency mining equipment, called Smart Boxes, which operated faster and with significantly less electricity than Bitmain Miners;

b.      Misrepresenting that Counterclaim Defendants had over 2000 Smart Boxes ready to ship and that they could manufacture 5000 per month as soon as orders were made;

c.      Misrepresenting that Counterclaim Defendants would be able to deliver 200 fully functioning Smart Boxes to Blox by October 15, 2020, and an additional 472 by December 1, 2020;

d.      Misrepresenting that as of September 20, 2020, the Smart Boxes were earning $100 each per day, which would result in $2,016,000 in earnings per month for the 672 Smart Boxes purchased by Blox,

e.      Omitting to disclose that the so-called Smart Boxes were not functional, but instead, in reality, the sham machines that Thurston displayed to Blox were merely a fan and blinking lights that performed no functions;

f.      Omitting to disclose that the so-called Smart Boxes had not been fully developed or manufactured;

g.      Omitting to disclose that the so-called Smart Boxes would not be available for delivery to Blox in accordance with the promised timetable (200 by October 15, 2020, 472 by December 1, 2020), knowing that time was of the essence;

30

h.      Omitting to disclose that Counterclaim Defendants were insolvent and were not willing or able to issue a $3,000 rebate payment for each Smart Box, nor were they willing to apply the credit to the monthly licensing fees until the Smart Boxes were delivered;

i.      Omitting to disclose that Counterclaim Defendants could not or would not pay rewards daily automatically into the Blox wallets or accurately account for rewards and NFTs earned with source documents and blockchain records for each of the GALA and GREEN nodes Blox paid activation for.

142.    Counterclaim Defendants' statements and omissions were false or misleading and they knew at the time that they were false and misleading.

143.    Blox reasonably relied on these misstatements and omissions to their detriment, and to make their decisions to invest with Counterclaim Defendants.

144.    As a direct and proximate result Counterclaim Defendants' misstatements and omissions, Blox has been damaged in an amount to be proven at trial.

145.    Counterclaim Defendants' conduct was willful, intentional, or was done with a reckless disregard of Blox's rights, and they are therefore also liable to Blox for punitive damages to punish and deter defendants from such conduct, in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF
**(Negligent Misrepresentation)**

72.     Blox realleges and incorporates the allegations contained in the foregoing paragraphs as though set forth in their entirety herein.

SLC_6242227.4

73.     In the alternative, Counterclaim Defendants' misrepresentation and omissions were made negligently.

74.     Counterclaim Defendants owed a duty to Blox to be truthful and accurate in their statements and representations to Blox, and to disclose all material information relating to the proposed transactions involving Blox's Bitmain Miners and its money.

75.     Counterclaim Defendants breached their duty to Blox by making false statements to, and omitting material information from, Blox, including but not limited to the following:

a.     Misrepresenting that Counterclaim Defendants had developed new and improved fully functioning cryptocurrency mining equipment, called Smart Boxes, which operated faster and with significantly less electricity than Bitmain Miners;

b.     Misrepresenting that Counterclaim Defendants had over 2000 Smart Boxes ready to ship and that they could manufacture 5000 per month as soon as orders were made;

c.     Misrepresenting that Counterclaim Defendants would be able to deliver 200 fully functioning Smart Boxes to Blox by October 15, 2020, and an additional 472 by December 1, 2020;

d.     Misrepresenting that as of September 20, 2020, the Smart Boxes were earning $100 each per day, which would result in $2,016,000 in earnings per month for the 672 Smart Boxes purchased by Blox,

e.     Omitting to disclose that the so-called Smart Boxes were not functional, but instead, in reality, the sham machines that Thurston displayed to Blox were merely a fan and blinking lights that performed no functions;

32

f.      Omitting to disclose that the so-called Smart Boxes had not been fully developed or manufactured;

g.      Omitting to disclose that the so-called Smart Boxes would not be available for delivery to Blox in accordance with the promised timetable (200 by October 15, 2020, 472 by December 1, 2020), knowing that time was of the essence;

h.      Omitting to disclose that Counterclaim Defendants were insolvent and were not willing or able to issue a $3,000 rebate payment for each Smart Box, nor were they willing to apply the credit to the monthly licensing fees until the Smart Boxes were delivered;

i.      Omitting to disclose that Counterclaim Defendants could not or would not pay rewards daily automatically into the Blox wallets or accurately account for rewards and NFTs earned with source documents and blockchain records for each of the GALA and GREEN nodes Blox paid activation for.

146.    Counterclaim Defendants either knew at the time that they were making these statements and omissions that they were false and misleading, or failed to use reasonable care to determine whether the representations were true.

147.    Counterclaim Defendants were in a better position than Blox to know the facts, and Counterclaim Defendants had a financial interest in the transaction.

148.    Counterclaim Defendants intended for Blox to rely on these statements and omissions.

149.    Blox reasonably relied on these misstatements and omissions to their detriment, and to make their decisions to invest with Counterclaim Defendants.

150.     As a direct and proximate result of Counterclaim Defendants' misstatements and omissions, Blox has been damaged in an amount to be proven at trial.

151.     Counterclaim Defendants' conduct was done with a reckless disregard of Blox's rights, and they are therefore also liable to Blox for punitive damages to punish and deter Counterclaim Defendants from such conduct, in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
### (Alternative Claim for Conversion)

152.     Blox realleges and incorporates the allegations contained in the foregoing paragraphs as though set forth in their entirety herein.

153.     Counterclaim Defendants took Blox's 672 Bitmain Miners on the condition and trusting that they would exchange that equipment with 672 better, more efficient mining equipment called Smart Boxes. In violation of that trust, Counterclaim Defendants converted Blox's 672 Bitmain Miners to their own benefit and self-enrichment, or for other purposes not authorized by Blox.

154.     Counterclaim Defendants took Blox's $134,400 payment for monthly license fees, and failed to remit to Blox the rewards generated from those licenses.

155.     Counterclaim Defendants took and deleted Blox's GALA rewards and nodes from Blox's online account with Gala Games shortly after October 18, 2021.

156.     As a result of such acts of conversion, Blox has been damaged in an amount to be proven at trial.

157.     Counterclaim Defendants' conduct was willful, intentional, or was done with a reckless disregard of Blox's rights, and they are therefore also liable to Blox for punitive damages to punish and deter them from such conduct, in an amount to be determined at trial.

34

## FOURTH CLAIM FOR RELIEF
**(Breach of Contract)**

158.    Blox realleges and incorporates the allegations contained in the foregoing paragraphs as though set forth in their entirety herein.

159.    Counterclaim Defendants entered into the Transfer and Exchange Agreement with Blox as described herein, which was a legally binding contract between the parties.

160.    Blox performed all the terms and conditions of the Transfer and Exchange Agreement.

161.    Counterclaim Defendants breached their promises and obligations as set forth herein, by, among other things, failing to deliver 200 Smart Box mining equipment machines and $600,000 in cash back rebate in accordance with the Oct 2020 timetable agreed upon, or at any other time.

162.    Counterclaim Defendants breached their promises and obligations by accepting $134,400 payment for monthly license fees and failing to deliver all the rewards on a daily basis or to account for the three days of rewards that were paid.

163.    As a result of Counterclaim Defendants' breaches, Blox has been damaged in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

164.    Blox realleges and incorporates the allegations contained in the foregoing paragraphs as though set forth in their entirety herein.

165.    Counterclaim Defendants entered into the Transfer and Exchange Agreement with Blox as described herein, which was a legally binding contract between the parties.

SLC_6242227.4

166.     The parties' agreement, like all contracts, contains the unwritten or implied promise that the parties would deal with each other fairly and in good faith and not intentionally do anything to injure each other's right to receive the benefits of the contract.

167.     Blox fully performed all the terms and conditions that it was obligated to perform under the Transfer and Exchange Agreement.

168.     Counterclaim Defendants violated the implied covenant by acting inconsistent with the agreed common purpose and justified expectations of Blox as set forth herein, and by, among other things:

a.     Failing to be open and honest with Blox about its inability to perform its obligations under the Transfer and Exchange Agreement both before and after accepting Blox's Bitmain Miners;

b.     Retaining possession of Blox's Bitmain Miners without providing the promised Smart Boxes or rewards in exchange, all during a time when the price of cryptocurrency was increasing;

c.     Accepting payment by Blox of the $134,400 Reward License Fees without disclosing that it would not account or pay Blox the rewards associated with those licenses.

d.     Failing to pay or apply the agreed upon credit of $3,000 for each Smart Box, which credit would have kept the licenses running up until February of 2022, and rewards would have continued to accrue to Blox.

169.     As a result of Counterclaim Defendants' breaches, Blox has been damaged in an amount to be proven at trial.

SLC_6242227.4

## SIXTH CLAIM FOR RELIEF
### (Unjust Enrichment, in the alternative to Breach of Contract)

170.     Blox realleges and incorporates the allegations contained in the foregoing paragraphs as though set forth in their entirety herein.

171.     Blox conferred a benefit upon Counterclaim Defendants in the form of use of 672 Bitmain Miners.

172.     Counterclaim Defendants knew of and appreciated the benefit conferred upon them by Blox.

173.     Counterclaim Defendants accepted and retained the benefit under circumstances, which make it inequitable for them to retain the benefit without payment of its value.

174.     As a result of Counterclaim Defendants' unjust enrichment, Blox has been damaged in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
### (Accounting)

175.     Blox realleges and incorporates the allegations contained in the foregoing paragraphs as though set forth in their entirety herein.

176.     Identifying the full extent of Blox's damages is dependent upon the information in Counterclaim Defendants' possession or control.

177.     Blox is entitled to an accounting, including copies of all source documents, of the proceeds that Counterclaim Defendants derived from the use of Blox's 672 Bitmain Miners, either in BTC earned or proceeds from Counterclaim Defendants' resale of that equipment.

178.     Blox is further entitled to an accounting, including copies of all source documents, relating to the Gala, Green and Gala NFT rewards that were produced in the month

SLC_6242227.4

of Oct 2020 from the 3,360 node licenses that Blox paid $134,400 to Counterclaim Defendants to activate, including how the reward deposits were calculated including the blockchain to validate the earnings.

179.   Consequently, Blox seeks an order compelling Counterclaim Defendants to provide a full accounting to Blox as to the disposition of the Bitmain Miners, the money and BTC derived therefrom, the reward deposits, including copies of all source documents relating to that accounting, and the blockchain to validate the earnings.

## EIGHTH CLAIM FOR RELIEF
### (Receipt of Stolen Property, in the alternative to Breach of Contract)

180.   Blox realleges and incorporates the allegations contained in the foregoing paragraphs as though set forth in their entirety herein.

181.   Counterclaim Defendants received, retained, disposed, withheld, concealed, or aided in the concealing or withholding of property belonging to Blox, to wit: the 672 Bitmain Miners, the bitcoin generated from those miners, the $134,400 license fee payment, and the rewards generated that should have been given to Blox, in violation of Utah Code section 76-6-408(2).

182.   Counterclaim Defendants engaged in such conduct knowing or believing that this property belonged to Blox and did not belong to Counterclaim Defendants, and intending to deprive Blox of that property.

183.   As a result of Counterclaim Defendants' receipt, retaining, disposing, withholding, and concealing of that property, Blox has been harmed in an amount to be determined at trial.

SLC_6242227.4

184.     Pursuant to Utah Code section 76-6-412(2), Counterclaim Defendants are responsible for three times the amount of actual damages sustained by Blox, and are also liable to Blox for its costs of suit and reasonable attorneys' fees.

## JURY DEMAND

Blox demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Blox demands judgment against Counterclaim Defendants, jointly and severally, as follows:

1.     Actual and consequential damages in an amount to be proven at trial including:

a.     Not less than **$8,957,347.87** for BTC mined by the 672 Bitmain Miners that Blox delivered to Thurston and the Thurston Entities on October 1, 2020;

b.     Not less than **$3,067,500** for the value of the Bitmain Miners delivered by Blox to Thurston and the Thurston Entities;

c.     Not less than **$4,819,280.79** in GREEN rewards earned during the time period of October 4, 2020 through November 3, 2020 that Counterclaim Defendants wrongfully retained and failed to deliver to Blox;

d.     Not less than **$178,112,520.43** for GALA rewards earned during the period of October 4, 2020 through October 9, 2021, that Counterclaim Defendants wrongfully retained and failed to deliver to Blox;

e.     Not less than **$3,544,460.64** for the approximately 888,336 GALA Game Items earned during the period of October 4 through November 3, 2020, which are valued at $3.99 each;

39

f.      Not less than **$2,104,326** for the approximately 527,450 missing game items that Blox earned that Counterclaim Defendants failed to deliver and wrongfully retained; and

g.      An amount to be determined at trial for the time period from November 4, 2020 to the present (and up until February 2022), that the rewards and game items should have been accruing to Blox.

2.      Pre and post judgment interest, costs, attorney fees, and any other relief available to Blox at law or in equity;

3.      Punitive damages in an amount to be determined at trial;

4.      Pursuant to Utah Code section 76-6-412(2), for three times the amount of actual damages sustained by Blox;

5.      For an accounting as to the disposition of Blox's 672 Bitmain Miners and the funds that defendants' derived from the sale and use of that equipment, including copies of all source documents relating to that accounting;

6.      For an accounting of all the rewards earned in October 2020 including copies of all source documents relating to that accounting;

7.      For an injunction to be entered that, among other things, compels Counterclaim Defendants to: 1) immediately transfer to Blox all of the GREEN and GALA rewards and NFTs earned by the 3,360 nodes operating per month from October 4, 2020 to the present; 2) return all of Blox's Bitmain Miners and the proceeds from the use or sale of that equipment, back to Blox; and 3) prohibit Counterclaim Defendants from spending, transferring, secreting, or depositing of Blox's funds paid to defendants or that was gained by the use of Blox's 672 Bitmain Miners;

40

8.      For an injunction to be entered that, among other things, each of the Thurston

Entities is the alter ego of Thurston and each of the other Thurston Entities; and

9.      Such other relief as the court deems appropriate under the circumstances.

DATED this 27th day of July 2023.

<div align="right">

**DENTONS DURHAM JONES PINEGAR P.C.**

</div>

By:  /s/ *James D. Gilson*
       James D. Gilson
       Cole P. Crowther
       *Attorneys for Counterclaimant*

<div align="center">

**CERTIFICATE OF SERVICE**

</div>

I hereby certify that on this 27th day of July 2023, a true and correct copy of the

foregoing was filed with the Court's electronic filing system and thereby served on counsel of

record.

/s/ *Angie Stettler*

SLC_6242227.4