Paul W. Shakespear (14113)
Cameron Cutler (15116)
Natalie Beal (18311)
SNELL & WILMER L.L.P.
15 West South Temple
Suite 1200
Gateway Tower West
Salt Lake City, Utah  84101
Telephone:  801.257.1900
Facsimile:  801.257.1800
Email: pshakespear@swlaw.com
        ccutler@swlaw.com
        nbeal@swlaw.com

Abram I. Moore (*pro hac vice pending*)
Christian A. Zazzali (*pro hac vice pending*)
K&L GATES LLP
70 West Madison St., Suite 3100
Chicago, IL 60602
Telephone: 312.781.6010
Facsimile: 312.827.8000
Email: abe.moore@klgates.com
        christian.zazzali@klgates.com

*Attorneys for Plaintiff Eric Schiermeyer*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

---

| | |
|---|---|
| ERIC SCHIERMEYER, Derivatively on Behalf of Nominal Defendant, BLOCKCHAIN GAME PARTNERS, INC. D/B/A GALA GAMES,<br><br>Plaintiff,<br><br>vs.<br><br>WRIGHT THURSTON and TRUE NORTH UNITED INVESTMENTS, LLC,<br><br>Defendants,<br><br>and<br><br>BLOCKCHAIN GAME PARTNERS, INC. D/B/A BGP GAMES,<br><br>Nominal Defendant. | **MOTION TO FREEZE ASSETS, FOR AN ACCOUNTING, AND FOR EXPEDITED DISCOVERY AND MEMORANDUM IN SUPPORT AND REQUEST FOR IMMEDIATE HEARING**<br><br>Case No. 2:23-cv-00589-HCN-DAO<br><br>Judge Howard C. Nielson<br><br>Magistrate Judge Daphne A. Oberg |

Plaintiff Eric Schiermeyer, derivatively and on behalf of Nominal Defendant Blockchain Game Partners, Inc. ("Gala Games" or the "Company"), moves the Court under Rule 65 of the Federal Rules of Civil Procedure for the entry of a temporary restraining order and preliminary injunction **freezing certain digital assets** stolen by Defendants Wright Thurston ("Thurston") and True North United Investments, LLC ("True North") (collectively "Defendants"), ordering Defendants to **provide an immediate accounting** of the stolen assets, and permitting **expedited discovery**. Plaintiff seeks emergency relief in order to protect Gala Games' ability to recover digital assets that Defendants stole from Gala Games.

In support of his Motion, Plaintiff states as follows:

## I.      INTRODUCTION

This matter arises from the intentional misconduct of Defendant Thurston and True North (a company under Thurston's control), including stealing cryptocurrency from Gala Games in the form of 8,645,014,077 GALA tokens (the "Stolen GALA") and going to extraordinary lengths to hide, dissipate, exchange, and/or liquidate more than **$130,000,000** worth of the Stolen GALA.  Plaintiff brings this Motion in an effort to stop the further dissipation of the Stolen GALA and locate the Stolen GALA (and/or any tokens for which it has been exchanged).[1]  Specifically, Plaintiff seeks an order preventing Defendants from further dissipating the Stolen GALA, ordering Defendants to provide an immediate accounting

---

[1] As set forth more fully below, in an effort to dissipate the Stolen GALA, Thurston has already engaged in a complex scheme to exchange the Stolen GALA for numerous other cryptocurrencies, making the assets harder to trace.  As used herein, unless otherwise specified and for ease of reference, the "Stolen GALA" refers to both the actual GALA tokens stolen from Gala Games and the other cryptocurrencies for which Thurston has exchanged the Stolen GALA.

of the Stolen GALA, and permitting Plaintiff to obtain expedited discovery from Defendants and the centralized exchanges into which Thurston has moved the Stolen GALA.  Such an Order is necessary to maintain Plaintiff's ability to locate, preserve and recover the Stolen GALA, and ultimately obtain equitable relief for Gala Games in this matter (in the form of disgorgement and return of the Stolen GALA).

In an effort to locate the Stolen GALA, counsel for Plaintiff retained Kroll Associates, Inc. ("Kroll"), an investigative firm.  (*See* Kroll Report, attached as **Exhibit A**.)  Kroll determined that Thurston has engaged in a complex multi-layered web of hundreds of transactions, commingling the Stolen GALA with other assets and moving or exchanging it in small increments, in order to dissipate the Stolen GALA, similar to money laundering.  (*See id.* at 15.)  A visual representation of this web of transfers of the Stolen GALA between various virtual "wallets" is below:



(See Ex. A, Kroll Report at Annex 1.)

Thurston's dissipation tactics "have the effect of obscuring the origin of funds and may make it possible to avoid triggering value-based thresholds for Suspicious Activity Reports" and also "help[] to obscure where funds have been sent to make it harder to recover them." (*See id.* at 17.)  These dissipation tactics also support emergency relief.

While Kroll was able to trace these transfers using blockchain scanning tools up to a point, but once the Stolen GALA is transferred to wallets in centralized exchanges, or Virtual Asset Service Providers ("VASPs"), visibility is lost.  (Ex. A at 6.)  For example, Kroll determined that Thurston transferred approximately $108,000,000 worth of Stolen GALA to two U.S.-based VASPs: Coinbase and Genesis.  (*See id.*, Table 2.)  Once the Stolen GALA enters the VASPs, Kroll (or any similarly situated forensic firm) cannot trace the stolen funds further without legal intervention.  (*Id.*)  Said another way, the chart on the previous page, each strand in the spider web of transactions ultimately ends in a wallet on a VASP—at which point Defendants have effectively hidden the assets from public view.

Additionally, Thurston has recently transferred GALA to OKX, a Seychelles-based exchange which warns that it is not "available in United State due to local laws and regulations." (Brink Decl. ¶ 27-29.)

Emergency injunctive relief is warranted here.  Defendants do not dispute that they took the Stolen GALA.  Thus, Plaintiff is likely to succeed on the merits of his claims because the evidence demonstrates that the Stolen GALA belonged to Gala Games.  Further, Defendants have already demonstrated a willingness to dissipate and hide the Stolen GALA, and irreparable harm will be caused by the loss of these assets.  Finally, the balance of harms tips in Plaintiff's

favor, as preserving the *status quo* of the location of the Stolen GALA will, at worst, cause Defendants to be unable to access assets to which they have no right.  Finally, the public interest is served by dissuading theft, facilitating the recovery of stolen funds, and preserving the integrity of digital assets.

In all, these circumstances necessitate an immediate hearing and an order: (1) freezing the Stolen GALA, including restraining Thurston (and any entity under his direct or indirect control) from further selling, transferring, or otherwise disposing of the Stolen GALA; (2) ordering Thurston to provide an accounting of the Stolen GALA within 14 days; and (3) permitting limited expedited discovery.

## II.       STATEMENT OF FACTS

The facts stated in the Verified Complaint are incorporated as though fully set forth herein.  In addition, a number of key facts are particularly pertinent to the present Motion:

### A.       Thurston stole 8,645,014,077 of Gala Games' GALA tokens.

Prior to February 3, 2021, Gala Games kept its treasury of GALA in numerous wallets (the "Company Savings Wallets").  (Verified Compl. at ¶ 58-59; Allen Decl. at ¶ 7.)  Plaintiff and Thurston only were given the private keys to the Company Savings Wallets.  (Verified Compl. at ¶ 59; Allen Decl. at ¶ 8.)

On February 3, 2021, in a series of 43 rapid transactions, Thurston and/or True North (at Thurston's direction) transferred 8,645,014,077 of Gala Games' GALA tokens from 43 of Company Savings Wallets into 43 separate wallets controlled by Thurston and/or True North (the "Thurston Wallets").  (Verified Compl. at ¶ 64; Ex. A, Kroll Report at 3; Allen Decl. at ¶ 9; Brink Decl. at ¶ 22.)  Gala Games has no access to the Thurston Wallets where the Stolen GALA

was transferred. (Verified Compl. at ¶ 64.)

Plaintiff confronted Thurston, who explained that he had simply moved the Stolen GALA to the Thurston Wallets for safe keeping.  (*Id*. at ¶ 65; Brink Decl. at ¶ 24; Allen Decl. at ¶ 10.) Plaintiff demanded that Thurston return the Stolen GALA to Company Savings Wallets, but Thurston refused.  (Verified Compl. at ¶ 66.)

The Stolen GALA was roughly equal to the total amount of GALA in circulation at that time.  (*Id*. at ¶ 67; Brink Decl. at 25.)  If Thurston sold all of the Stolen GALA (or "dumped it" in the market), the Gala Games ecosystem would have collapsed, as the total GALA in circulation would have more than doubled.  *Id*.  Likewise, blowing the whistle on Thurston—or otherwise threatening to take action—could have caused him to liquidate all of the Stolen GALA (known as a "rug pull").  (Verified Compl. at ¶ 68.)  Thurston effectively held Gala Games hostage.

### B.   Thurston transferred more than $130,000,000 worth of the Stolen GALA into VASPs.

More than a year after transferring the Stolen GALA into the Thurston Wallets (allegedly for "safekeeping"), in 2022, Thurston and/or True North (at Thurston's direction) began quietly moving the Stolen GALA out of the Thurston Wallets in a complex and obfuscatory web of transactions.  (*Id*. at ¶ 72; Ex. A at Annex 1.)  The majority of these transactions occurred between September 2022 and May 2023, unbeknownst to Plaintiff.  (Ex. A at 9.)  The complex web of transactions Thurston and/or True North devised to transfer the Stolen GALA had the effect of obfuscating the location of the Stolen GALA and preventing Gala Games from recovering its stolen assets.  (Ex. A at 17.)

Thurston and/or True North could have simply transferred the Stolen GALA directly

from the Thurston Wallets to a centralized exchange, minimizing the effort and gas fees expended.  (Verified Compl. at ¶ 74.)  Instead, they directed hundreds of transfers and exchanges of the Stolen GALA to and from hundreds of wallets, paying a gas fee for each transfer and exchange.  (*Id*.)

Each of the transfers of Stolen GALA (or the cryptocurrency for which it was exchanged) is visible on the Ethereum blockchain—up to a point.  (*Id*. at ¶ 75; Ex. A at 6.)  When the digital asset is transferred to a centralized exchange, or VASP (e.g. Coinbase or Kraken), "blockchain technology and the VASP digital security structure make it impossible to trace these assets further."  (*Id.*)  Instead, records of transactions are held by those VASPs and are generally not publicly available in the absence of "compelled disclosure."  (*Id.*)

Nearly all of the Stolen GALA (or the cryptocurrency for which it was exchanged) ultimately ended up at a VASP.  (Verified Compl. at ¶ 76; Ex. A at 6-8.)  The total value of the Stolen GALA (or the cryptocurrency for which it was exchanged) at the time it reached a VASP was at least $130,129,779.60.  (Verified Compl. at ¶ 76; Ex. A at 6-7.)

**C.    The Stolen GALA belonged to Gala Games.**

Based on recent communications, Plaintiff expects that Defendants will admit all of the above facts, but that Defendants will take the position that the Stolen GALA belonged to True North.  In fact, the Stolen GALA belonged to Gala Games, and Defendants have been unable to provide a single piece of evidence suggesting otherwise.

By way of background, the Stolen GALA originated from daily "emissions" of GALA. (Verified Compl. at ¶ 56-64; Decl. Brink at ¶ 22.)  Every day, a specified number of GALA tokens are emitted.  (Decl. Brink at ¶ 4.)  A portion of those tokens are distributed to any

owners of "GALA Nodes" who have operated their nodes at their option in the prior 24 hours. (Verified Compl. at ¶ 38; Decl. Brink at ¶ 4.)  The remaining GALA from each daily emission is distributed to Gala Games.  (Verified Compl. at ¶ 37; Decl. Brink at ¶ 4.)

Prior to July 21, 2021, Gala Games received 75% of the daily GALA emission. (Verified Compl. at ¶ 38; Decl. Brink at ¶ 6.)  Defendants know that Gala Games received a portion of the daily GALA distribution and, upon information and belief, this distribution model was adopted from prior companies founded by Thurston.  (Verified Compl. at ¶ 88.) Indeed, in February 2021, Thurston himself distributed via email a document entitled "Gala - Distribution & Nodes," which states that the daily distribution should be divided "into a 75 / 25 split with *75% going to the product company wallet* and 25% available for participants rewards."  (Brink Decl. at ¶ 7, Exhibit 1 (emphasis added).)

On March 18, 2021, Gala Games published a public online post entitled *A Proposal: Node Reward Restructuring*, explaining, in part: "Currently, as explained in numerous places, the division of the distribution is 25% to the node owners, and 75% to the curatorship of Gala Games for Ecosystem Development, etc."  (Brink Decl. at ¶ 8, Exhibit 2.)  On July 21, 2021, the node owners voted on, and approved, the proposal to increase their share of the daily distribution from 25% to 50%.  (*Id*. at ¶ 10.)  After that date, Gala Games received 50% of the daily GALA emission.  (*Id*. at ¶ 11.)   Thurston owns GALA Nodes and had notice and an opportunity to vote on this proposal in 2021.  (*Id*. ¶ 9.)  He did not object or argue that no GALA was to be distributed to the Company or that the portion of GALA distributed to the Company was somehow his.

Further, underline(every day), Thurston himself receives, via email, the GALA daily distribution

report that shows the portion of the total daily GALA (now 50%) that is distributed to the "**company**"—not to him or True North.  (Decl. Brink at ¶ 12, with example at Ex. 3 thereto.) Thurston personally has never suggested that the daily distribution report was inaccurate or that his or True North's GALA was somehow being wrongly reflected on these daily reports as "company" GALA.  (*Id*. ¶ 16.)

On July 7, 2022, Gala Games posted publicly about the daily GALA distribution, for the second time, presenting options that included: "Option 1: Continue with a 50/50 Split in the Distribution between Founders Nodes **and Gala Games**."[2]  The public post even includes a graph showing the amount of GALA that had been distributed to Gala Games (referred to in the chart as "Gala").  (*Id*.)

Further, numerous industry third parties providing analyses of the Gala Nodes disclosed that a portion of the daily distribution of GALA went to Gala Games.  For example, Bitstamp Learn published an article describing the nature of the distribution: "Each day, a pre-specified amount of new GALA tokens is distributed – half to Founder's Nodes and half to the Gala Games Conservatorship, which acts as **the treasury for Gala Games**."[3]  CoinMarketCap, a market data aggregator, similarly described a 50/50 split between Founder's Node operators and Gala Games "where it is reserved for future ecosystem growth and/or project funding."[4]

Gala Games' portion of the daily distribution of GALA is transferred to a wallet with an address ending in 8c42 (the Company's "Central Wallet").  (Decl. Brink ¶ 15.)  Over time, the balance of GALA in the Company's Central Wallet approached 20 billion.  (Decl. Brink ¶ 17;

---

[2] https://blog.gala.games/gala-founders-nodes-omnibus-proposal-v2-def7f52fca48
[3] https://www.bitstamp.net/learn/cryptocurrency-guide/what-is-gala-games/
[4] https://coinmarketcap.com/currencies/gala/

Decl. Allen ¶ 6.)  This balance came from the daily distribution of GALA to Gala Games and also from the Company's sales of items like Gala Nodes.  (Decl. Brink ¶ 22.)  This concentration of GALA elevated Gala Games' risk of "hackers" and other cybersecurity threats.  (Decl. Allen ¶ 7.)  In order to keep Gala Games' GALA more secure, in September 2020 a total of 19.9 billion GALA from the Central Wallet was transferred into dozens of smaller Gala Games wallets (the "Company Savings Wallets").  (*Id.*)

Gala Games accounting reports record the wallets that constitute Gala Games' treasury.  (Verified Compl. at ¶ 87.)  These reports, available to Defendants, have always recorded the Company Savings Wallets as owned by Gala Games.  *Id.*  In addition, Gala Games provides to Coin Gecko and Coin Market Cap (websites that aggregate data regarding digital asset companies) lists of Gala Games' wallets that hold Gala Games' GALA.  (Decl. Brink ¶¶ 19-20.)

On February 3, 2021, Defendants transferred 8,645,014,077 GALA **from the Company Savings Wallets** into 43 separate wallets controlled solely by Defendants, without disclosure to, or permission or authorization from, Gala Games.  (Verified Compl. at ¶¶ 64-66; Ex. A at 4.)  The Stolen GALA is directly traceable to the GALA that had accumulated in the Company's Central Wallet over time from Gala Games' portion of the daily distribution of GALA and the Company's sales of items.  (Brink Decl. ¶ 22.)  Defendants have refused to return the Stolen GALA.

> **D.** **Thurston is being sued for fraud in numerous cases with damages exceeding $200,000,000 and has evidenced a pattern of nondisclosure in litigation.**

Thurston has a long history of litigation evidencing a pattern of allegedly defrauding

investors, shareholders, and others.  (Verified Compl. at ¶¶ 15-27.)  Most recently, the SEC has

sued Thurston and True North for defrauding investors out of $18 million in historical schemes

Defendants were engaged in separate and apart from Gala Games.  (*Id*. ¶¶ 116-127.)

In a separate lawsuit pending against Thurston and True North in Utah, investors who

Thurston allegedly defrauded in yet another scheme are seeking more than $200 million in

damages.  (*Id*. ¶¶ 92-115.)  In that case, Thurston resisted turning over his electronic devices in

Utah and sitting for a deposition in Utah by arguing that he is now a full-time resident of Puerto

Rico.  (Exhibit B p.3, fn 3.)[5]

In another lawsuit relating to one of Thurston's failed companies, he has engaged in

litigation for six years over a single issue: whether a subpoena for records served by the receiver

of the failed company **was validly served upon him**.  (Verified Compl. at ¶¶ 17-19, Case No.

2:18-mc-00023.)  The court in that case found that Thurston evaded service and provided a false

address.  (Exhibit C.)

### III.    ARGUMENT

District courts have wide discretion to fashion appropriate equitable remedies.  *Klein-*

*Becker USA, LLC v. Englert*, 711 F.3d 1153, 1163 (10th Cir. 2013) (noting "disgorgement of

profits" as an equitable remedy); *Hughes Tool Co. v. Meier*, 489 F. Supp. 354 (D. Utah 1977)

(ordering an accounting of funds "entrusted" to defendant); *Lovesac Co. v. www.lovessac.com*,

No. 2:22-cv-00056-JNP, 2022 WL 504192, at *10 (D. Utah Feb. 18, 2022) (granting equitable

---

[5] Ultimately, Thurston took the position that he and the numerous blockchain-related companies
he controls own only *two electronic devices*: a single telephone and a single laptop. (Exhibit B.)
Thurston contends that he has not owned a computer since 2021 and that that computer was
somehow irreparably damaged.  (Exhibit B p. 1, fn 1.)

relief in the form of an asset freeze).  Appropriate equitable relief includes "[a]sset-based remedies in restitution" that "permit [a] dispossessed owner to follow converted property through subsequent changes of form and to recover the product from the wrongdoer or a transferee who is not a bona fide purchaser." *Restatement (Third) of Restitution and Unjust Enrichment* § 40 cmt. e, (2011); *AAAG-Cal., LLC v. Kisana*, 439 F. Supp. 3d 1265, 1274 (D. Utah 2020).[6]

Here, an Order: (a) freezing the Stolen GALA; (b) requiring an immediate accounting of the Stolen GALA; and (c) authorizing expedited discovery is necessary to preserve the *status quo* and ultimately ensure that Plaintiff may obtain relief on behalf of Gala Games.

### A. An asset freeze is necessary to preserve the *Status Quo* and enjoin Defendants from further dissipating the Stolen GALA.

Plaintiff seeks an Order restraining Defendants from further dissipating the Stolen GALA and freezing the wallets on the VASPs into which Defendants transferred the Stolen GALA. An asset freeze is warranted in this case because Plaintiff is seeking equitable relief and there is a high likelihood that Defendants will dissipate the Stolen GALA before any relief can be obtained.  "A request for equitable relief invokes the district court's inherent equitable powers to

---

[6] Plaintiff is seeking equitable relief, including in the form of disgorgement of and restitution for the Stolen GALA and a constructive trust over the Stolen GALA. This equitable relief is available under Plaintiff's claims for breach of fiduciary duties (Count I), conversion (Count II), fraud (Count III), and unjust enrichment (Count IV).  See e.g., *The SCO Grp., Inc. v. Novell, Inc.*, No. CIV. 2:04CV139DAK, 2007 WL 2684537, at *5 (D. Utah Sept. 7, 2007) (in breach of fiduciary duty claims, equitable relief such as disgorgement of ill-gotten gains or monies improperly withheld is available); *AAAG-Cal., LLC v. Kisana*, 439 F. Supp. 3d 1265, 1274 (D. Utah 2020) ("equitable relief is available against a person who obtains a benefit by an act of trespass or conversion") (citing *Restatement (Third) of Restitution and Unjust Enrichment* § 40 (2011)) (internal citations omitted); *Rawlings v. Rawlings*, 240 P.3d 754 (Utah 2010) (affording equitable relief in unjust enrichment action).

order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief." *Klein-Becker USA, LLC v. Tahini*, No. 2:07-cv-00521- DB, 2008 WL 11340043, at *3 (D. Utah Aug. 15, 2008) (quoting *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995)).  Courts may preliminarily freeze assets upon a showing of "a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Id.; DP Creations, LLC v. Reborn Baby Mart*, No. 2:21-CV-00574-JNP, 2021 WL 11585915, at *6 (D. Utah Nov. 22, 2021).

A temporary restraining order and preliminary injunction is warranted where "(1) the moving party will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood that the moving party will eventually prevail on the merits. *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986).

      **1.**    **The Company will suffer irreparable injury absent an order enjoining further dissipation of the Stolen GALA.**

As a matter of law, "the taking of property generally constitutes irreparable injury that will justify an injunction." *AAAG-Cal.,* 439 F. Supp. 3d at 1279.  Defendants' taking of the Stolen GALA thus constitutes irreparable injury.  Further, the type of "asset based remedies" Plaintiff seeks "permit the dispossessed owner to follow converted property through subsequent changes of form and to recover the product from the wrongdoer or a transferee who is not a bona fide purchaser." *Id.* (finding "Plaintiff is substantially likely to establish an equitable right to the proceeds of" the sales of stolen property) (citing *Restatement (Third) of Restitution and Unjust*

*Enrichment* § 40, cmt. e, (2011).  That is, Plaintiff has an equitable right to recover the proceeds of the Stolen GALA in whatever form they may take.

Further, where, as here, the property stolen is cryptocurrency, courts have found that the likelihood of irreparable injury is greatly enhanced.  "[D]istrict courts have found . . . the risk of irreparable harm to be likely in matters concerning fraudulent transfers of cryptocurrency due to the risk of anonymous and speedy asset dissipation." *Jacobo  v. Doe*, No. 22-0672, 2022 WL 2052637, at *5 (E.D. Cal. June 7, 2022); citing *Heissenberg v. Doe*, No. 9:21-cv-80716-RKA, 2021 WL 8154531, at *2 (S.D. Fla. Apr. 23, 2021) (finding irreparable harm likely if a temporary restraining order were not granted due to the "speed and potential anonymity of cryptocurrency transactions"); *Martinangeli v. Akerman, LLP*, No. 1:18-cv-23607-UU, 2018 WL 6308705, at *2 (S.D. Fla. Sept. 14, 2018) (same); *Fed. Trade Comm'n v. Dluca*, No. 18-60379-CIV, 2018 WL 1830800, at *3 (S.D. Fla. Feb. 28, 2018) (cryptocurrency poses "a heightened risk of asset dissipation," supporting a finding of likelihood of immediate and irreparable harm); *accord Sergey Gaponyuk, Plaintiff, v. Evgeny Alferov, et al., Defendants.*, No. 223CV01317KJMJDP, 2023 WL 4670043, at *3 (E.D. Cal. July 20, 2023) (holding that cryptocurrency assets pose distinct likelihood of irreparable harm); *Astrove v. Doe*, No. 22-CV-80614-RAR, 2022 WL 2805345, at *2 (S.D. Fla. June 17, 2022) (granting TRO and preliminary injunction where stolen crypto assets were traced to VASPs/centralized exchanges); *Williams v. Doe*, No. 21-CV-03074-RK (W.D. Mo. Apr. 23, 2021), ECF No. 47 (preliminary injunction entered against defendant, ordering freeze of defendant's cryptocurrency assets).

The risk of further dissipation of the Stolen GALA in this case is sharpened by Defendants' prior conduct.  *See Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009)

(defendants "own prior conduct establishes a likelihood that in the absence of an asset freeze and accounting, Plaintiffs will not be able to recover the improperly diverted funds and will thus be irreparably harmed"). As determined by Kroll:

> The Traced Assets were moved in over 1200 transactions, each of which takes time and has a cost. Large amounts of tokens were split into smaller amounts before their deposit into VASPs through a multilayering of transactions. The Traced Assets were also co-mingled with other assets. These features can have the effect of obscuring the origin of assets and may make it possible to avoid triggering value-based thresholds for Suspicious Activity Reports by VASPs. It also helps to obscure where assets have been sent to make it harder to recover them.

(Exhibit A.) Further, Thurston has recently transferred GALA to a foreign exchange, OKX. (Brink Decl. ¶ 29.)

This complex web of commingling and multilayering cryptocurrency via hundreds of transfers is evidence of intentional dissipation of the Stolen GALA. *See United States v. Drage*, 681 F. App'x 654 (10th Cir. 2017) (finding that "very unusual activity" of repeatedly transferring funds "from one bank account to another, co-mingling the proceeds with other monies in the bank accounts" supported an inference of criminal intent to conceal funds); *see also, United States v. Sterlingov*, 573 F. Supp. 3d 28 (D.D.C. 2021) (defendant alleged to engage in illicit cryptocurrency laundering by "disassociating incoming bitcoin from particular Bitcoin addresses or transactions and then comingling that bitcoin with other incoming bitcoin prior to conducting further transactions"); *United States v. Westine*, 21 F.3d 429 (6th Cir. 1994) (affirming a money laundering conviction against defendant because "[defendant's] establishment of a multi-layered banking structure to transfer and disperse the defrauded funds signifies a clear intent to conceal the fraud proceeds").

Further, Thurston is exposed to hundreds of millions of dollars in potential liability in other litigation in which the SEC and investors have accused him of fraud. (Verified Compl. at ¶¶ 116-127.) It is likely that he will attempt to use the Stolen GALA to fund his defense and/or pay any settlement or judgment in those cases. This also supports a finding of irreparable injury. *See AAAG-California, LLC v. Kisana,* 439 F. Supp. 3d 1265, 1280 (D. Utah 2020) (finding likelihood of irreparable injury where "because Defendants have stolen Plaintiff's property right, absent a preliminary injunction, Plaintiff must compete for these limited assets with other general creditors—even for assets derived from the sale of the cars"); *Tri-State,* 805 F.2d at 355 ("difficulty in collecting a damage judgment may support a claim of irreparable injury").

In short, there is compelling evidence that Gala Games is likely to suffer irreparable harm absent a court-order prohibiting Defendants from further transferring, selling or exchanging the Stolen GALA (or any proceeds therefrom).

      **2.**      **The threatened injury to Plaintiff outweighs whatever damage the asset freeze may cause Defendants.**

While Gala Games would be severely prejudiced—indeed, irreparably harmed—if Thurston further dissipates the Stolen GALA, Thurston faces no such prejudice should this Court order an injunction. An order preventing Thurston from further dissipating the Stolen GALA will, at most, prevent Thurston from moving the Stolen GALA to yet more accounts and wallets. Said differently, the order will simply maintain the *status quo*, including the current location and amounts of the Stolen GALA, until Plaintiff is able to assess—and ultimately recover—the valuable assets that were stolen from Gala Games. *See Ohlin v. Defendant 1*, No. 3:23CV8856-TKW-HTC, 2023 WL 3676797, at *3 (N.D. Fla. May 26, 2023) (ordering an asset freeze and reasoning that "maintaining the assets within the [identified wallets] is perhaps Plaintiff's only

realistic chance at a future recovery in this case, and Defendants will suffer at worst a temporary

inability to move assets that it appears they have no right to possess").

### 3.      Freezing the Stolen GALA is not adverse to the public interest.

An order preventing any further transfer of the Stolen GALA is justified to promote the

rule of law and "confidence in cryptocurrency transactions."  *Ohlin,* No. 3:23CV8856-TKW-

HTC, 2023 WL 3676797, at *3.  The Northern District of Texas in *Licht* similarly found that:

> [A]n injunction would serve the public interest because it will dissuade would-
> be fraudsters from stealing, laundering illegal proceeds, and preying [on
> victims.]  It will also prohibit Defendants from profiting from their scheme,
> ensuring they lack resources and incentives to perpetrate similar schemes in
> the future.  And to the extent the Court's order will freeze wallets owned by
> people other than Defendants, that inconvenience does not outweigh the public
> interest in stopping Defendants' unlawful scheme, and the temporary freeze is
> justified because [Plaintiff's] money has been traced to every account he asks
> the Court to freeze until trial.

*Licht*, No. 3:23-CV-1018-X, 2023 WL 4504585, at *3.

Here, Plaintiff is asking to restrain Defendants from further dissipating the Stolen GALA

as well as requesting a freeze on the 979 wallets on the VASPs into which Defendants

transferred the Stolen GALA.  *Astrove v. Doe*, No. 22-CV-80614-RAR, 2022 WL 2805345, at *2

(S.D. Fla. June 17, 2022) (collecting cases where "courts across the country likewise routinely

issue freeze and transfer orders that extend to both defendants and third parties with custody or

control over such assets").  Public interest is served by dissuading theft, facilitating the recovery

of stolen funds, and preserving the integrity of financial transactions, including financial

transactions involving cryptocurrency.

**4.** **Plaintiff is likely to succeed on the merits.**

"The Tenth Circuit has adopted the Second Circuit's liberal definition of the 'probability of success' requirement." *Tri-State*, 805 F.2d at 358 (quoting *Otero Savings & Loan Association v. Federal Reserve Bank*, 665 F.2d 275 (10th Cir.1981)). "When the other three requirements for a preliminary injunction are satisfied, it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.* (internal citations omitted).

Plaintiff has done far more than raise "fair ground[s] for litigation"—he demonstrates a strong likelihood of success on the merits. Because it is not disputed that Defendants took the Stolen GALA, Plaintiff need only demonstrate that the Stolen GALA belonged to Gala Games in order to succeed with his claims on behalf of the Company. Each of the underlying claims flows from this single fact.

As set forth above in Section II(C) above, the overwhelming evidence demonstrates that the Stolen GALA belonged to Gala Games. The Stolen GALA is directly traceable to the GALA from the Company's Central Wallet, which was generated from two sources: (1) sales of Company assets like Gala Nodes; and (2) the daily distribution of GALA from node owners into the Central Wallet (specifically designated as the "company" wallet in the Daily Distribution Reports). It was consistently and publicly reported that a portion of the daily emission of GALA went to Gala Games. Thurston himself circulated this distribution model for Gala Games in early 2021. The Central Wallet and the Company Savings Wallets were publicly reported to market data aggregators as holding Gala Games' own GALA. There was no mistake on the part of anyone, much less a Company founder, that the Stolen GALA belonged to Gala Games.

Further, if the Stolen GALA actually belonged to Defendants, Thurston would not have secretly and rapidly moved the GALA from Company Savings Wallets into the Thurston Wallets, would not have claimed to have done so in order to keep Gala Games' GALA "secure" or "for safe keeping," and would not have silently moved the Stolen GALA through a complex web of transactions in order to obfuscate the whereabouts of the Stolen GALA. He would have simply informed Gala Games that he intended to transfer his own GALA, and then done so.

In short, the evidence that the Stolen GALA belonged to Gala Games is overwhelming, and Plaintiff is likely to succeed in proving it. At the very least, this issue is fair ground for litigation. Therefore, Plaintiff is likely to succeed in proving that Thurston breached his fiduciary duties, that Defendants converted the Stolen GALA, and that Defendants were unjustly enriched.

## B.  Defendants should provide an accounting of the Stolen GALA within seven days.

In order to identify and locate the Stolen GALA and proceeds and preserve Plaintiff's ability to secure the equitable return of those stolen assets, the Court should order Defendants to perform an immediate accounting. A court in its discretion may order the equitable remedy of an accounting. *Peter D. Holdings, LLC v. Wold Oil Properties, LLC*, No. 20-8050, 2022 WL 351164, at *6 (10th Cir. Feb. 7, 2022). "[A]n action for an accounting may be legal or equitable[] depending upon the facts set out in the pleadings. The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is . . . the absence of an adequate remedy at law." *Failor v. MegaDyne Med. Prods.*, 2009 UT App 179, ¶13-14, 213 P.3d 899 (UT App. 2009) (finding an accounting cause of action was one grounded in equity when the complaint demonstrated the complex nature of the case, alleged that the

defendant had unjustly retained funds to which it was not entitled, and that it failed to disclose

those funds) (internal citations and quotations omitted); *see also Springfield  Fin. v. Lilley*, No.

2:14-CV-00679-EJF, 2016 WL 4275642, at *5 (D. Utah Aug. 12, 2016*)* (denying motion to

dismiss accounting claim when complaint properly alleged that the defendant personally

benefitted from "siphoning" plaintiff's funds); *Dairy Queen v. Wood*, 369 U.S. 469, 477 (1962)

(an accounting is "cognizable at law" where the "accounts between the parties are of such a

complicated nature that only a court of equity can satisfactorily unravel them") (internal

quotations omitted).

 *Hughes Tool Company v. Meier*, 489 F. Supp. 354 (D. Utah 1977), is instructive.  There,

the court ordered the defendant to account for how disbursements of funds "entrusted to

[defendant's] care were expended and used and any credits to which he may be entitled." *Id.* at

369.  The *Hughes* court cites *Rosenak v. Poller*, 290 F.2d 748 (D. C. Cir.1961), which explained:

> An accounting is a species of compulsory disclosure, predicated upon the
> assumption that the party seeking relief does not have the means to determine
> how much -- or, in fact, whether -- any money properly his is being held by
> another. The appropriate remedy, particularly where the determinations may be
> detailed and complex, is an order to account in a proceeding in which the burden
> of establishing the non-existence of money due to the plaintiff rests upon the
> defendant. Because of the very nature of the remedy, that burden cannot rest upon
> plaintiff, but must shift to the defendant once facts giving rise to a duty to account
> have been alleged and admitted.

*Rosenak*, 290 F.2d at 750.

 The *Hughes* court ultimately held that its prior decision ordering an accounting was

warranted: defendant had "secretly divert[ed] funds" for "the use and benefit of himself and his

agents and co-conspirators and to the damage of plaintiff;" that there was "no legal basis under

which defendant could have properly received for his own use and benefit any of such money;"

and that the defendant "must account for the funds entrusted to his care in relation to these transactions." *Hughes*, 489 F. Supp. at 369.

A similar order is warranted in this case.  Here, Plaintiff asks this Court to order Defendants to furnish an accounting, sworn on oath, detailing the transfers of the Stolen GALA and the present location of the Stolen GALA and any and all proceeds of the Stolen GALA in whatever form those proceeds may take.

**C.     Expedited discovery is warranted.**

Rules 30(a), 33(b) and 34(b) of the Federal Rules of Civil Procedure provide for expedited discovery in appropriate circumstances.  *See* Advisory Committee Notes to the 1993 amendments to Rule 26(d) ("[Expedited discovery] will be appropriate in some cases, such as those involving requests for a preliminary-injunction.").

Here, Plaintiff seeks to subpoena the VASPs into which Thurston transferred the Stolen GALA, in order to further trace the stolen assets, returnable in 14 days; and take limited discovery from Defendants in advance of a hearing on Plaintiff's application for a preliminary injunction, including interrogatories, document requests and a deposition of Wright Thurston.

Absent such expedited discovery, any efforts to attempt to freeze assets may be futile and any ultimate recovery precluded.  Plaintiff therefore respectfully requests that the Court enter an Order allowing Plaintiff to take narrowly tailored discovery on an expedited basis.

**IV.     CONCLUSION**

For the foregoing reasons, Plaintiff Eric Schiermeyer respectfully requests that this Court grant his expedited Motion for an asset freeze, an accounting, and expedited discovery, and all other and further relief the Court deems just and necessary.

DATED this 1ˢᵗ day of September, 2023.

SNELL & WILMER L.L.P.


/s/ Paul W. Shakespear
Paul W. Shakespear
Cameron Cutler
Natalie Beal

 K&L GATES LLP
Abram I. Morre
Christian A. Zazzali

*Attorneys for Plaintiff Eric Schiermeyer*