Paul W. Shakespear (14113)
Cameron Cutler (15116)
Natalie Beal (18311)
SNELL & WILMER L.L.P.
15 West South Temple
Suite 1200
Gateway Tower West
Salt Lake City, Utah 84101
Telephone: 801.257.1900
Facsimile: 801.257.1800
pshakespear@swlaw.com
ccutler@swlaw.com
nbeal@swlaw.com

Abram I. Moore (pro hac vice pending)
Christian A. Zazzali (pro hac vice pending)
K&L GATES LLP
70 West Madison St., Suite 3100
Chicago, IL 60602
Telephone: 312.781.6010
Facsimile: 312.827.8175
abe.moore@klgates.com
christian.zazzali@klgates.com

*Attorneys for Plaintiff Eric Schiermeyer*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ERIC SCHIERMEYER, Derivatively on Behalf of Nominal Defendant, BLOCKCHAIN GAME PARTNERS, INC. D/B/A GALA GAMES,<br><br>Plaintiff,<br><br>vs.<br><br>WRIGHT THURSTON and TRUE NORTH UNITED INVESTMENTS, LLC,<br><br>Defendants,<br><br>BLOCKCHAIN GAME PARTNERS, INC. D/B/A GALA GAMES,<br><br>Nominal Defendant. | **FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Case No. 2:23-cv-00589-HCN<br><br>Hon. Howard C. Nielson, Jr. |

## FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Eric Schiermeyer ("Plaintiff"), by and through his undersigned attorneys, hereby

submits this Verified Shareholder Derivative Complaint (the "Derivative Complaint") on behalf

of and for the benefit of Blockchain Game Partners, Inc. ("Gala Games" or "Company") and states as follows:

## SUMMARY OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of Gala Games against Wright Thurston and his investment vehicle, True North United Investments, LLC ("True North").  Thurston is one of two directors of Gala Games and he controls True North, a 40.927% shareholder in the Company.

2.      In early 2021, Thurston and/or True North stole cryptocurrency from Gala Games, in the form of 8,645,014,077 GALA tokens ("GALA").  GALA is the core utility token for the Gala Games ecosystem developed by the Company.

3.      When confronted about his theft of Company GALA, Thurston falsely stated that he simply intended to hold the GALA in secure wallets for the benefit of Gala Games.  However, last year Thurston and/or True North began moving the stolen tokens from those wallets and exchanging or selling them in a complex web of obfuscatory transactions.  He was able to exchange, hide or sell approximately $130,000,000 worth of the stolen GALA before Gala Games could stop him.

4.      Thurston also stole licenses to operate "nodes" on the Gala ecosystem from the Company.  These nodes can be operated to earn valuable GALA tokens.  Thurston sold those stolen node licenses to others while keeping the proceeds of those sales for himself and/or True North.  Thurston and True North have been sued by the purchasers of those stolen licenses, who have accused Thurston of defrauding them.

5.     The United States Securities and Exchange Commission (the "SEC") also sued Thurston and True North earlier this year, alleging that Thurston defrauded purchasers of "Green Boxes" by falsely representing that they mined an energy-efficient GREEN crypto token and making other fraudulent representations.

6.     Indeed, Thurston has founded numerous companies, most of which have ended up in litigation, insolvent, bankrupt, and/or sued by the SEC. Gala Games appears to be the only legitimate enterprise in which Thurston has an interest, although Thurston has no involvement in the day-to-day operations of the Company.  In fact, while Plaintiff has dutifully managed the Company's operations and Thurston has been an absentee director, Thurston has now effectively paid himself, via theft, more than ten times the total compensation Plaintiff has received from the Company.

7.     In this action, Plaintiff, who has been a shareholder in Gala Games since its inception, seeks disgorgement of or restitution for the millions of dollars' worth of cryptocurrency stolen by Thurston and/or True North, compensation for the damage Thurston has caused Gala Games, and removal of Thurston as a director of Gala Games.  Today, Gala Games suffers from its association with Thurston.

## JURISDICTION AND VENUE

8.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because (i) complete diversity exists between Plaintiff, the Company and Defendant Thurston, and (ii) the amount in controversy exceeds $75,000.  This is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

9.      This Court has jurisdiction over each Defendant named herein.  Thurston resides in this District, and True North is a Utah limited liability company with its principal place of business in this District.  The Company has sufficient minimum contact with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because Defendants reside in this District and a substantial portion of the transactions and wrongs complained of herein, including Defendant Thurston's participation in the wrongful acts detailed herein occurred in this District.

## PARTIES

11.     Nominal Defendant Gala Games is incorporated under the laws of Wyoming and maintains its principal place of business at 680 S Cache Street, Suite 100, Jackson, Wyoming, 83001.  Gala Games develops and provides decentralized games in which players own their own content.

12.     Plaintiff is domiciled in and is a citizen of California.  Plaintiff is currently a director and shareholder of Gala Games and has continuously been a shareholder of Gala Games since the inception of the Company.  Plaintiff is also the President and Chief Executive Officer of the Company.  Prior to forming the Company, Plaintiff was the co-founder of Zynga, Inc., a successful social video game development company that went public in 2011 and was acquired last year in a deal valued at $12.7 billion.

13.     Defendant Wright Thurston is domiciled in and is a citizen of Utah.  Thurston is currently a director of Gala Games.  Prior to forming the Company, Thurston was primarily

involved in multi-level marketing companies (e.g. "pyramid schemes") and founded a number of failed companies that spawned considerable litigation.

14.     True North is a Utah limited liability company with its principal place of business in Midway, Utah.  According to its Statement of Authority, Thurston was True North's sole manager when True North was formed.  In March 2022, Thurston's wife, Stephanie Thurston, replaced him as manager.  In June 2023, Thurston was again listed as the sole manager of True North.  As of June 2023, Thurston represented to the State of Utah that his address was 125 West Main #1122, Midway, Utah 84049.

15.     True North's members are: WWT Legacy Trust; SMT Legacy Trust; FRT LegacyTrust; TMT Legacy Trust; WJT Legacy Trust; TBT Legacy Trust; AMT Legacy Trust; and NET Legacy Trust. Each of these traditional trusts was formed in and exists under the laws of the State of Utah, upon information and belief for the purpose of accomplishing donative transfers. Thurston, who is domiciled in and is a citizen of Utah, has a fiduciary relationship with these trusts as the trustee for each.

## FACTS

**A.     Thurston's history of failed companies, alleged fraud, and litigation**

16.     Thurston is a person who comes across as earnest and convincing.  He does favors for people.  In online profile pictures, he often appears cuddling his wife.  He calls himself a "dedicated member of his community" who "frequently volunteers with his church."  This persona has enabled him to fool many people, at least initially, and he has enriched himself through his pattern of deception.

17.     ***Firstline Security, Inc.***  Thurston formed Firstline Security, Inc. in or about 2002. Firstline was accused of recruiting college students to sell its products door-to-door by falsely promising that the students would appear on reality television shows and potentially win one million dollars.[1]  The California Department of Consumer Affairs revoked Firstline's license to operate in California.  The company filed for bankruptcy in 2008.

18.     ***Elevate, Inc.***  Thurston was a founder and CEO of Elevate, Inc., a multi-level marketing company in the business of selling solar energy products.  The shareholders of this company sued Thurston for fraud in 2016.  (Superior Court of California, County of Los Angeles, Case No. BC644655.)

19.     According to a filing in a federal court in Nevada, Thurston purportedly resigned from Elevate in 2015 but remained in "functional control of Elevate, its records, and its litigation." (See D. Nev. Case No. 17-cv-01924, Doc. No. 2.)  In 2017, that Nevada court found that Elevate, Inc. "abandoned its business and has failed within a reasonable time to take steps to dissolve" and appointed a shareholder of Elevate as a custodian with the right to obtain any and all of the company's financial records.

20.     The custodian of Elevate subpoenaed financial records from Thurston in 2017. Rather than produce the financial information, Thurston has engaged in six years of litigation over whether that subpoena was validly served.  (D. Utah Case No. 2:18-mc-00023.)  The court in that case found that Thurston had evaded service and provided a false residential address.  (See *Id*. at Dkt. 34.)  On July 10, 2023, the court ordered Thurston to produce responsive documents.

---

[1] *See, e.g.,* ABC 7 News, *Reality show contestants duped into selling*, (Mar. 8, 2008), https://abc7news.com/archive/5954507/.

21.     **Elevate Solar, Inc.**  Elevate Solar, Inc. appears to have been a subsidiary of Elevate, Inc., involved in multi-level marketing.  As one online commenter noted about this company: "Wright Thurston will not tell you the truth or make anything clear. He moves from place to place scamming clients and investors. He does not pay his employees and then moves to a new town. He takes investors' money and then moves to a new town."[2]

22.     **Elevate  Communications,  LLC**.  In  2008,  Thurston  founded  Elevate Communications, a multi-level marketing company that sold bundled telephone, television and internet services.  By 2009, the company had been sued by its creditors, was insolvent, and ceased active operations.

23.     An online commenter who claimed to have been a salesperson for Elevate Communications wrote: "After [customers] were contracted, Elevate's service crashed and these poor people's homes and business were locked in to lousy service that never worked.  Wright ran away to another state taking the equipment he could carry and all the money of the investors. Wright Thurston Jr. is not to be trusted in any form of business.  I know him personally and have spent a lot of time with him.  He has ruined the lives of thousand[s] of young people as well as seasoned investors."[3]

24.     **Block United, LLC.**  Thurston formed a cryptocurrency mining company called Block United, LLC with a partner in 2017.  At least two default judgments were entered against

---

[2] BehindMLM, *Elevate Solar Review: Confusing solar panel installations*, (Jul. 10, 2015), https://behindmlm.com/mlm-reviews/elevate-solar-review-confusing-solar-panel-installations/.

[3] I Speak of Dreams, *A New Scam Targeting College Students*, (Jul. 21, 2007), https://lizditz.typepad.com/i_speak_of_dreams/2007/07/my-pal-karoli-1.html.

that company for failing to pay its bills, including judgment for nearly one million dollars owed to Rocky Mountain Power.  (See D. Utah Case No. 2:19-cv-00302.)

25.     According to an appellate court filing by Thurston's partner in Block United, "[a] number of disputes subsequently arose [with Thurston] concerning, among other things, *the whereabouts of a large number of Bitcoin* as well as the management and operation of the company."  (See *Thurston v. Block United, LLC*, 2021 UT App. 80.)  Litigation ensued and the parties immediately settled.

26.     According to public records, while Blockchain United upheld its end of the settlement agreement, paying Thurston specified sums of money and assets, Thurston "continually declined to sign the required dismissal and release papers."  He initially premised his "delay on being too busy," then claimed he needed more information, then claimed he was fraudulently induced into settling.

27.     The company moved to enforce the settlement agreement, and the court held oral argument on the motion.

> There, the court asked Thurston why, if his intention was to rescind the settlement agreement, he had 'kept all the money . . . paid as part of' that same agreement. Thurston answered that, 'unless the court order[ed] otherwise,' his intention was to keep the proceeds he received under the settlement agreement because it *'was never [Block United's] in the first place' and was instead 'always [his].'*

The court disagreed, found that Thurston's claim that he was defrauded was entirely baseless, and enforced the settlement agreement.  The appellate court affirmed and ordered Thurston to pay Block United's attorneys' fees.  (See *Thurston v. Block United, LLC*, 2021 UT App. 80.)

28.     In March 2022, Thurston purchased a $40 million house on the Caribbean island of Puerto Rico.

**B.      Formation of the Company, the GALA token, and the Gala Games ecosystem**

29.     In early 2019, Plaintiff and Thurston formed Gala Games.  At the time, Plaintiff was not aware of Thurston's history of litigation, failed companies, and alleged fraud.

30.     The Company developed the Gala Games platform, a blockchain-based gaming infrastructure.  The currency used in the games is the GALA token, which is used for in-game purchases and as a medium of exchange between players in the Gala Games ecosystem.

31.     A blockchain is a distributed ledger shared among a computer network's nodes, which are linked together in a peer-to-peer network.  The computer nodes work together to create and maintain a public digital ledger of transactions in a way that makes it difficult or impossible to change, hack, or cheat the system's records.

32.     The nodes of a blockchain check and validate each other by a consensus mechanism before adding a transaction to the distributed ledger.  Once the nodes add a "block," or transaction, to the "chain," or ledger, the block cannot be changed.

33.     GALA is an "ERC-20" token, which means that it is created using the Ethereum blockchain pursuant to its technical standard for creating fungible tokens.  Transfers of ERC-20 tokens, like GALA, are recorded on the Ethereum blockchain and are visible to the public using online tools like Etherscan.

34.     Transactions on the Ethereum blockchain generally require the payment of "gas" — a small amount of the native Ethereum token: Ether or "ETH."  The "gas" is paid as an incentive

to an Ethereum node owner to process a transaction.  The price of the "gas" required for a given transaction fluctuates depending on how busy the Ethereum network is.

35.     Unlike Ethereum nodes, which process and validate token transactions (including minting and transfers of GALA), Gala Nodes currently provide computational resources required to perform actions requested by the GALA network and also provide storage for the GALA network.  The Gala Nodes are therefore the core of the Gala Games ecosystem.

36.     Gala Nodes are available to the public to purchase.  When a person buys a Gala Node, they receive software and a license from the Company to operate the Gala Node.  The number of available Gala Nodes is capped at 50,000.

37.     Owners of Gala Nodes are able to "mint" GALA as a reward for operating their nodes and supporting the Gala Games ecosystem.  Node owners are also able to vote regarding certain matters that affect the Gala Games ecosystem.

38.     Every day, there is an emission of GALA, and the amount of GALA emitted is dependent upon the then-current circulating supply of GALA (previously, GALA was emitted pursuant to a set emission schedule).  That daily emission of GALA is distributed in part to the Gala Node owners and in part to the Company.

39.     Prior to July 21, 2021, 25% of the daily emission of GALA was distributed to the Gala Node owners and 75% was distributed to the Company.  The Gala Node owners then voted to change that distribution, and since July 21, 2021, the daily emission of GALA has been distributed evenly (50/50) between the Company and Gala Node owners.

40.     The portion of the daily emission of GALA that is distributed to Gala Node owners is distributed among GALA Node owners whose nodes have been active for the minimum required time during the previous 24-hour period.

41.     GALA distributed to a Gala Node owner is sent into the owner's "treasure chest" as a mint allowance.  The GALA does not exist on a blockchain until the owner "mints" the GALA from the treasure chest, at which time it is written to the Ethereum-based blockchain (this minting requires the payment of gas and puts the GALA into the circulating supply).

42.     The GALA distributed to the Company is distributed into a Company account, or "wallet."  A cryptocurrency wallet is software that allows a user to communicate with the blockchain system, and that provides its user with a private key that may be used to authorize a "spend" or transaction of assets controlled by that wallet to another address on the blockchain.

43.     The Company's GALA is used to fund various Company purposes, including administration and ecosystem development.

44.     Since at least January 2023, the Company planned to upgrade from GALA v1 tokens to GALA v2 tokens and published the rationale for the upgrade in its 2023 Vision Paper in January 2023.  The 2023 Vision Paper was publicly announced and widely distributed.

45.     As promised in its 2023 Vision Paper, the forthcoming GALA v2 implementation was publicly announced on April 18, 2023 and took place on May 15, 2023.

## C.     Management of the Company

46.     Since the Company's inception, Plaintiff and Thurston have been the only two directors of the Company.

47.     Plaintiff is the President and Chief Executive Officer of the Company and under the Company bylaws exercises general supervision over the business of the corporation and over its several officers.

48.     Since the Company's formation, Plaintiff has dutifully managed the operations of the Company and performed his obligations to act in the best interest of the Company.

49.     Thurston has held the nominal title of "Chief Blockchain Officer."   Thurston himself has admitted that he does not act in the capacity of Chief Blockchain Officer and recently resigned.

50.     Thurston was involved in the Company early on.  He initially implemented a multi-level marketing structure for the sale of Gala Nodes, similar to the sales structure he implemented in his prior failed businesses.  The Company has since moved away from Thurston's model and no longer has a multi-level marketing structure.

51.     Indeed, much of the Company's effort over the past several years has been to move away from problematic ideas or structures implemented by Thurston in the early days of the Company.

52.     At the inception of the Company, Thurston (or a company under his control) received 7,000 Gala Nodes and Plaintiff also received roughly 7,000 Gala Nodes.

53.     Thurston and Plaintiff agreed not to operate these nodes, as this concentration of nodes in two founders was contrary to the Company's foundational goal of decentralization (i.e. thousands of Gala Nodes operated by thousands of node owners, providing computational resources and making decisions about the protocols governing the Gala Games ecosystem).

54.     Apart from directing the preparation of the Company's annual tax returns, Thurston has had no legitimate involvement with the Company for years, by his own choice.

55.     Thurston has not been involved in the day-to-day operations of the Company.  In fact, Thurston has been an absentee director.

56.     In recent years, Thurston was virtually unreachable for many months at a time, failing to respond to communications from Plaintiff or the Company regarding corporate issues.

**D.     Thurston's theft and dumping of the Company's GALA tokens**

57.     In the early days of the Company, the Company kept its GALA tokens (received from sales on its website and from its portion of the daily distribution) in a single wallet that the Company used to engage in day-to-day business.  The Company accumulated billions of GALA in this wallet, which caused concern that it could be viewed as a target for hackers.

58.     On September 12, 2020, the Company moved 19,972,134,815 of the Company's GALA from the single Company wallet into many Company wallets.  The sole purpose of moving the Company's GALA into these wallets was to keep the Company's assets more secure.  This was analogous to moving funds from a checking account to multiple savings accounts.

59.     When the Company moved its GALA into these numerous wallets (the "Company Savings Wallets"), Plaintiff and Thurston were given the private keys to those Company wallets.

60.     The Company Savings Wallets sat untouched between September 2020 and February 2021.

61.     Then the Company discovered that one of the Company Savings Wallets was empty.

62.     Upon examination, the Company discovered that many of the Company Savings Wallets holding the Company's GALA were empty.

63.     In total, Gala Games learned that 8,645,014,077 of the Company's GALA tokens were missing from the Company Savings Wallets (the "Stolen GALA").

64.     It initially appeared that the Company Savings Wallets had been hacked by an outside threat actor.  But it was not a hacker who stole the GALA.  It was Thurston and/or his company True North.

65.     Specifically, on February 3, 2021, in a series of 43 rapid transactions, Thurston and/or True North (at Thurston's direction) transferred the Stolen GALA from 43 of the Company Savings Wallets into 43 separate wallets controlled by Thurston and/or True North (the "Thurston Wallets").  Gala Games has no access to the Thurston Wallets into which the Stolen GALA was transferred.

66.     Gala Games personnel confronted Thurston, who explained that he had simply moved the Stolen GALA to the Thurston Wallets for safe keeping.

67.     Plaintiff demanded that Thurston return the Stolen GALA to the Company Savings Wallets, but Thurston refused.

68.     The Stolen GALA represented approximately 20% of the total GALA minted and more than 100% of the total amount of GALA in circulation at that time (according to market data aggregators, which deduct the issuing company's holdings from circulating supply).  If Thurston sold all of the Stolen GALA ("dumped" it in the market), the Gala Games ecosystem would have collapsed, as the total GALA in circulation would have more than doubled.

69.     Thurston effectively held the Company hostage.  Blowing the whistle on Thurston could have caused him to liquidate the Stolen GALA (known as a "rug pull").

70.     The Company was forced to rely upon Thurston's representation that he intended to act as a secure custodian of the Company GALA, and Plaintiff refrained from contacting the authorities or filing suit at that time.

71.     Instead, the Company tracked the Thurston Wallets to see if Stolen GALA was moved from those wallets.

72.     Thurston's statements that he intended to keep the Company's GALA secure were false.

73.     More than a year after having transferred the Stolen GALA into the Thurston Wallets, in 2022 Thurston and/or True North (at Thurston's direction) began quietly moving the Stolen GALA out of the Thurston Wallets in a complex and obfuscatory web of transactions.  The vast majority of these transactions occurred between September 2022 and May 2023.

74.     The complex web of transactions Thurston and/or True North used to transfer the Stolen GALA was intended to obfuscate the location of the Stolen GALA and prevent the Company from recovering its stolen assets.

75.     Thurston and/or True North could have simply transferred the Stolen GALA directly from the Thurston Wallets to a centralized exchange, minimizing the effort and gas fees expended.  Instead, they directed hundreds of transfers and exchanges of the Stolen GALA to and from hundreds of wallets, paying a fee for each transfer and exchange.

76.     Each of the transfers of Stolen GALA (or the cryptocurrency for which it was exchanged) is visible on the Ethereum blockchain — up to a point.  When the digital asset is

transferred to a centralized exchange (e.g. Coinbase or Kraken), it is no longer visible via a blockchain explorer.  Instead, records of transactions are held by those centralized exchanges and are generally not publicly available in the absence of court process requiring disclosure.

77.   Nearly all of the Stolen GALA (or the cryptocurrency for which it was exchanged) ultimately ended up at a centralized exchange.  The total value of the Stolen GALA (or the cryptocurrency for which it was exchanged) at the time it reached a centralized exchange was at least $130,129,779.60.

78.   Plaintiff sent numerous messages to Thurston asking him why he was moving GALA tokens and demanding that he stop selling the Stolen GALA and return the remaining Stolen GALA to the Company.

79.   Thurston first responded that he was selling some of the GALA tokens in order to purchase ammunition for firearms.  Then he stopped responding.

80.   Ultimately, Plaintiff sent Thurston a text message, stating, "[your] selling GALA on coinbase is being watched by our community and it's hurting the business. you need to stop. we never agreed that you would do this. please send the funds to the company bank account."

81.   Again, Thurston failed to respond.  Thurston ignored all demands to return the Stolen GALA and kept selling the Stolen GALA.

82.   Unable to secure the Stolen GALA from Thurston and unable to make any public disclosures regarding the Stolen GALA without the fear of initiating a panic, the Company was forced to seek an engineering solution to the problem at hand.

83.     That solution involved the issuance of GALA v2 in May 2023.  When GALA v2 was issued, it was distributed into the wallets of users who held GALA v1 on a one-for-one basis on most platforms.

84.     When GALA v2 was issued to replace GALA v1, the GALA v2 tokens were not deposited into the Thurston Wallets and he was left with obsolete GALA v1 tokens in those wallets.  After that, Thurston was no longer able to sell the Stolen GALA from the Thurston Wallets.

85.     By taking this action, the Company was able to mitigate some of the damage caused by Thurston and to prevent Thurston from further enriching himself by transferring, exchanging and liquidating the Stolen GALA.  At that time, Thurston and/or True North had already moved approximately half of the 8.6 billion stolen tokens, valued at approximately $130 million dollars at the time.

86.     Thurston's story regarding the tokens he stole from the Company has been inconsistent.  He initially claimed that he had moved the Stolen GALA from the Company Savings Wallets merely to keep the assets secure for the Company.  Other times, when asked about the Stolen GALA, he has pretended not to know anything about it.

87.     It appears that Thurston's new story is that the GALA he stole from the Company treasury actually belonged to him or True North.  Like so much of what Thurston has said over the years, this story is entirely false.

88.     The Company's accounting reports (accessible by Thurston) have always reflected the Company Savings Wallets as belonging to Gala Games.

89.     Further, the Company's public-facing statements have always and consistently stated that a portion of all GALA goes to the Company (not to Thurston or True North). Indeed, upon information and belief, Thurston's other companies have utilized the same model of token distribution.

90.     Finally, if the Stolen GALA actually belonged to Thurston, he would not have secretly and rapidly moved the GALA from the Company Savings Wallets into the Thurston Wallets, would not have claimed that he did so in order to keep the Company's GALA secure, and would not have engaged in a complex web of transactions in order to obfuscate the whereabouts of the Stolen GALA.

91.     Thurston's claim that Company assets actually belonged to him, rather than to the Company, echoes the similar claim he made in the Block United litigation (which claim was rejected by the court and Thurston was ordered to pay the company's attorneys' fees).

92.     Plaintiff has demanded that Thurston return the Stolen GALA and any proceeds therefrom and Thurston has refused.

**E.     Thurston's theft of Gala Node licenses and alleged defrauding of investors in "Smart Boxes"**

93.     Thurston has also stolen Gala Node licenses from the Company and sold the stolen licenses to third parties for his own enrichment.

94.     In or around November 2021, Plaintiff noted that the Company's GALA distribution report showed a new licensee named Jason Anderson ("Anderson") with 672 operational Gala Nodes earning GALA tokens.

95.     At the time, Anderson had more active Gala Nodes that anyone else on the distribution reports.

96.     Upon examining the records for this licensee, the Company discovered that there was no sales information in the system for the licenses under which Anderson was operating.

97.     The Company found that a false entry had been made in the system, in which Anderson's 672 node licenses (the "Stolen Licenses") were activated without anyone having paid for them.

98.     The Company disabled the Stolen Licenses because it again appeared that the Company had been hacked by an outside threat actor.

99.     In fact, it was not an outside hacker who stole these Gala Node licenses; it was Thurston who directed that that the false entry be made.

100.    The Company ultimately learned that there was a lawsuit between Thurston and Anderson's company, Blox Lending, LLC ("Blox"), pending in Utah.  (District Court of the Third Judicial Circuit, Salt Lake County, Case No. 210903079.)

101.    Blox, like many others who had done business with Thurston, had sued Thurston for fraud.  Many of Thurston's other ventures (including Gala Games) were included as "alter ego" defendants.  The allegations tell a familiar story of Thurston's deception.  (Blox Third Amended Counterclaim attached as **Exhibit A**.)

102.    According to the Blox Counterclaim, Thurston falsely represented to Blox that he had "developed new and improved cryptocurrency mining equipment, which mined GALA, GREEN, and GALA NFT cryptocurrency rewards."  *Id*. ¶ 20.

103.    Thurston allegedly called the equipment a "Smart Box," and falsely claimed that it was superior to the existing Bitcoin mining equipment owned by Blox.  *Id.*

104.    Thurston allegedly promised to provide Smart Boxes plus a rebate to Blox in exchange for the Bitcoin mining equipment then owned by Blox.  According to Blox's Counterclaim, Thurston texted Anderson pictures of phony boxes with blinking lights, falsely claiming that they were operable Smart Boxes.  *Id.* ¶¶ 24-25.

105.    Blox alleges that the promised Smart Boxes were never delivered, and claims damages of approximately $200 million.  *Id.* ¶74

106.    Blox also alleges that it paid Thurston $134,400 for licenses to operate nodes on the fraudulent Smart Boxes, which appear to have been the Stolen Licenses.  Thurston told Blox that he would run the Stolen Licenses remotely for Blox until the Smart Boxes arrived.  *Id.* ¶ 52.

107.    According to Blox, Thurston operated the 672 promised GALA Nodes on Blox's behalf for a period of time but conveyed only a portion of the GALA rewards that they earned to Blox.  *Id.* ¶¶ 52-56.  As set forth above, the Company disabled these Stolen Licenses once it discovered them.

108.    Thurston was never authorized to sell GALA Nodes or the Stolen Licenses to Anderson or Blox.

109.    The Company never received any proceeds from the sale of GALA Nodes or the Stolen Licenses to Anderson or Blox.

110.    The Blox lawsuit, which associates the Company with one of Thurston's many fraudulent schemes, has caused the Company reputational damage.

111.    Incredibly, Thurston failed to disclose to the Company that it had been sued in the Blox lawsuit and instead hired attorneys to represent both himself and the Company (from whom he had stolen the GALA Node licenses).

112.    When the Company learned of the Blox lawsuit it retained its own counsel.

113.    The lawsuit has caused the Company to incur legal fees and face potential legal exposure based upon Thurston's alleged conduct.

114.    Another plaintiff, Derrick Hope ("Hope"), has also sued Thurston in Utah for selling Gala Node licenses.

115.    Hope alleged that he paid Thurston $400,000 in exchange for, among other things, mining equipment and 268 Gala Node licenses.

116.    The Company never received any portion of the funds paid by Hope to Thurston and never authorized Thurston to sell Gala Node licenses to Hope.

**F.    Thurston is sued by the SEC for alleged defrauding investors in "Green Boxes"**

117.    Thurston has improperly used Gala Games's reputation to promote Green United, LLC ("Green"), a venture Thurston founded, falsely promoting Green as a venture related to the Company.

118.    The Securities and Exchange Commission ("SEC") has sued Thurston, alleging that Thurston defrauded investors in Green.  That case is pending.  (*SEC v. Green United, LLC et al.*, Case No. 2:23-CV-00159, D. UT).

119.    Specifically, the SEC alleges that, from April 2018 until at least December 2022, Thurston "raised more than $18 million through the sale of investments in the form of so-called Green Boxes" and "Green Nodes" by "falsely stat[ing] that these products mined a crypto asset

called GREEN on a purported blockchain called the 'Green Blockchain'."  (Complaint, ¶ 2, *SEC v. Green United, LLC et al.*, Case No. 2:23-CV-00159, D. UT.)

120.   The SEC alleges that GREEN was not even a mineable crypto asset and that the "Green Blockchain" promoted by Thurston did not exist.  *Id.* ¶ 3.  The SEC further alleges that Thurston created the total supply of GREEN tokens in 2018 through a smart contract on the Ethereum blockchain.  *Id.* ¶ 45.

121.   Upon information and belief, Thurston supported his alleged fraudulent scheme by exchanging some portion of the Stolen GALA for GREEN tokens to pay off investors in his Green scheme.

122.   In order to lure investors into Green, Thurston relied upon his association with Gala Games, used the Gala Games name to promote Green, and falsely suggested that Gala Games was somehow involved with the Green entity.

123.   Indeed, Green was not the only questionable venture that Thurston falsely associated with Gala Games in an effort to lure investors.  He has promoted his entire "Connect United, Inc." family of companies, including "Give Blockchain," "Liberty Blockchain," "Elevate Blockchain," "Win Blockchain," "Switch Blockchain," "Element Blockchain," "Galvan Blockchain," and "Grow Blockchain," by falsely associating them (or instructing others to falsely associate them) with Gala Games.  On information and belief, each of these entities has a business model similar to Green's.

124.   Just as Green purported to solve environmental problems, many of Thurston's other entities purport to use blockchain technology to address a social or environmental issue, promising

investors that by purchasing nodes in these companies they would be performing a social good. These companies typically utilize a multi-level marketing business model.

125.    Gala Games is not, and has never been, in any way associated with Green or any of Thurston's other ventures - including any of the Connect United, Inc. family of entities.

126.    As a result of the false association of Gala Games with Thurston's other schemes, Plaintiff and the Company have been forced to field inquiries from numerous parties regarding Gala Games's potential involvement with Thurston's allegedly-illicit ventures, when in fact there is no such involvement.

127.    On June 8, 2023, Coinbase sent the Company a series of questions concerning the SEC's lawsuits against Thurston and inquiring about the Company's continued involvement with Thurston.  After Thurston stole and began liquidating the Stolen GALA, Coinbase refused to support the GALA v2 upgrade.

128.    Thurston's allegedly fraudulent conduct has caused significant damage to the Gala Games reputation, brand, and goodwill.

**G.    Plaintiff's demand upon the Company to take action against Thurston**

129.    Under the Company bylaws, an action cannot be taken by the Gala Games board of directors without the affirmative vote of Thurston, as one of two directors of the Company.

130.    On June 6, 2023, Plaintiff, as a shareholder in the Company, served a demand on the Company to take action against Thurston as a director of the Company and called for a vote of the Company's board of directors (consisting of Plaintiff and Thurston) on June 8, 2023.

131.   On June 7, 2023, Plaintiff and Thurston, through counsel, agreed to postpone the June 8, 2023 special meeting until June 15, 2023 so that counsel could discuss resolving the matters set forth in Plaintiff's demand.

132.   On June 16, 2023, Plaintiff and Thurston, through counsel, agreed to postpone the June 15, 2023 special meeting until June 22, 2023 so that counsel could discuss resolving the matters set forth in Plaintiff's demand.

133.   On June 21, 2023, Plaintiff and Thurston, through counsel, agreed to postpone the June 15, 2023 special meeting until June 29, 2023 so that counsel could discuss resolving the matters set forth in Plaintiff's demand;

134.   Plaintiff and Thurston, through counsel, then agreed to postpone the June 29, 2023 special meeting until July 18, 2023 so that counsel could discuss resolving the matters set forth in Plaintiff's demand;

135.   On July 18, 2023, Plaintiff and Thurston, through counsel, agreed that the directors could record their votes on the proposals in Plaintiff's demand in writing.

136.   On August 3, 2023, Thurston, through counsel, sent a written proposal confirming (a) that Thurston voted against calling for a shareholder vote to remove Thurston as a director and (b) that Thurston voted against the Company filing a lawsuit against Thurston as demanded by Plaintiff.

137.   Any demand that Thurston vote to take action against himself was futile.

138.   Because Thurston has demonstrated that he can and will attempt to dissipate and hide the Stolen GALA, irreparable injury to the Company would result from any further delay in filing this action.

## COUNT I -- (DERIVATIVE CLAIM) BREACH OF FIDUCIARY DUTIES

139.    Plaintiff restates, realleges, and incorporates by reference the foregoing paragraphs as if the same were set forth herein verbatim.

140.    As a director, Thurston owes fiduciary duties of care, good faith, loyalty, and candor to the Company.

141.    Thurston breached his fiduciary duties by his actions recounted herein, including but not limited to:

        a.    Misusing his access to the Company Savings Wallets in order to transfer approximately 8,645,014,077 GALA tokens from the Company Savings Wallets to the Thurston Wallets;

        b.    Making false statements to the Company and Plaintiff regarding his intent to keep the Stolen GALA as a secure custodian for the Company;

        c.    Refusing to return the Stolen GALA to the Company;

        d.    Selling or exchanging billions of the Stolen GALA and keeping the proceeds to enrich himself directly and/or indirectly (including via his company, True North);

        e.    Failing and refusing to return the proceeds received from his unauthorized sale and/or transfer of the Stolen GALA;

        f.    Using his position and control to improperly sell GALA licenses to third parties without Company authorization;

        g.    Failing and refusing to return the proceeds received from his unauthorized sale of the Stolen Licenses;

h.      Concealing from the Company the fact that he sold GALA licenses and kept the proceeds of the sale for himself;

i.       Concealing from the Company the fact that Blox sued Thurston and the Company for selling the Stolen Licenses;

j.       Misusing his position of control to promote his "Green" venture using the Company's reputation, brand, and goodwill; and

k.      Damaging Gala Games's brand by associating the Company with the alleged conduct in the lawsuits investors and the SEC brought against Thurston.

142.    The foregoing breaches of fiduciary duties have caused harm to the Company.

143.    As a direct and proximate result of Thurston's breaches of his fiduciary duties to the Company, the Company is entitled to a disgorgement of ill-gotten gains from Thurston and companies under his control (including True North), the imposition of a constructive trust over any and all ill-gotten gains; the recovery of direct damages from Thurston in an amount to be proven at trial but believed to be in excess of $130 million, to incidental and consequential damages, to pre-judgment and post-judgment interest, to attorneys' fees, and to such other and further relief as the Court deems just and proper.

## COUNT II -- (DERIVATIVE CLAIM) CONVERSION

144.    Plaintiff restates, realleges, and incorporates by reference the foregoing paragraphs as if the same were set forth herein verbatim.

145.    Thurston and/or True North intentionally deprived the Company of its GALA tokens and licenses by knowingly exercising control over them without authorization.

146.    The Company owned the GALA tokens in the Company treasury and the node licenses that cannot be distributed without Company authorization.

147.    Thurston and/or True North converted the Company's property for his own use and gain.

148.    The Company demanded that Thurston and/or True North return the GALA tokens and he refused.

149.    Neither Thurston nor True North has ever returned the Stolen GALA or the proceeds of the sale of Stolen Gala or the Stolen Licenses to third parties.

150.    Thurston and True North's actions deprived the Company of possession and use of its tokens and licenses.

151.    Thurston and/or True North was unjustly enriched and the Company was damaged by Thurston's conversion.

152.    The Company is entitled to restitution in the amount that Thurston and/or True North was unjustly enriched as a result of their wrongful conduct.  This amount includes, but is not limited to, the proceeds Thurston and/or True North received from his sale of the Stolen GALA and licenses.

## COUNT III -- (DERIVATIVE CLAIM) FRAUD

153.    Plaintiff restates, realleges, and incorporates by reference the foregoing paragraphs as if the same were set forth herein verbatim.

154.    Thurston made knowingly false statements of fact to the Company.  Specifically, in phone calls to Plaintiff and others at the Company in early 2021, Plaintiff falsely stated that he

had moved GALA tokens from the Company wallets to his own wallets in order to act as a secure custodian of the Company assets.

155.    Thurston's statements that he intended to keep the Company's assets secure were knowingly false.

156.    After making these false statements, Thurston began selling the Stolen GALA and keeping the proceeds for himself.

157.    Thurston's false statements regarding acting as a secure custodian of the Stolen GALA were made with the intent to deceive the Company or with reckless disregard for the truth.

158.    The Company justifiably relied on Thurston's false statements.

159.    In reliance on Thurston's insistence that he intended to act as a secure custodian of the Company's tokens, the Company did not contact the appropriate authorities to report the theft of GALA and Plaintiff refrained from making demand of the Company to file an action against Thurston.

160.    Thurston's fraudulent statements provided him a personal benefit to the detriment and financial loss of the Company.

## COUNT IV -- (DERIVATIVE CLAIM) UNJUST ENRICHMENT

161.    Plaintiff restates, realleges, and incorporates by reference the foregoing paragraphs as if the same were set forth herein verbatim.

162.    By taking the Stolen GALA and Stolen Licenses from the Company, Defendants conferred a benefit upon themselves.

163.    Defendants are aware that they have received the benefit of the Stolen GALA and Stolen Licenses.

164.     It would be unjust to allow the Defendants to retain the benefit of the Stolen GALA and Stolen Licenses without requiring payment to the Company for the Stolen GALA and Stolen Licenses or the return of the Stolen GALA and proceeds of the Stolen Licenses.

165.     Society's reasonable expectations of security of property would be defeated if Defendants were permitted to retain the benefit of the Stolen GALA and Stolen Licenses.

## COUNT V -- (DERIVATIVE CLAIM) EQUITABLE ACCOUNTING

166.     Plaintiff restates, realleges, and incorporates by reference the foregoing paragraphs as if the same were set forth herein verbatim.

167.     Thurston owed the Company fiduciary duties as a director.

168.     Thurston breached those fiduciary duties as set forth herein, including by taking the Stolen GALA from the Company and taking the Stolen Licenses from the Company and selling them to third parties for his own gain.

169.     After taking the Stolen GALA, Thurston dissipated the Stolen GALA in a complex web of transactions.

170.     Thurston has failed to disclose amounts or property that he received in exchange for selling the Stolen Licenses.

## COUNT VI -- (DERIVATIVE CLAIM) REMOVAL OF THURSTON AS DIRECTOR

171.     Plaintiff restates, realleges, and incorporates by reference the foregoing paragraphs as if the same were set forth herein verbatim.

172.     Since 2019, Plaintiff has been a shareholder of the Company.  Plaintiff is currently a shareholder of the Company, and has been a shareholder of the Company during all of the events complained of herein.

173.    Thurston is a director of the Company.

174.    On June 6, 2023, Plaintiff issued a written demand to the Company seeking, among other things, removal of Thurston as a director.

175.    As set forth above, Thurston (through counsel) confirmed that he voted against calling for a shareholder vote to remove himself as a director.

176.    Removal of Thurston as a director is in the best interests of the Company and its shareholders because Thurston engaged in fraudulent conduct with respect to the Company, grossly abused the position of director and intentionally inflicted harm on the Company, and has demonstrated a pattern of fraudulent conduct that has damaged the Company's reputation as set forth herein, including in the following ways:

a.    Thurston harmed the Company by stealing 8,645,014,077 GALA tokens from the Company treasury, selling a substantial portion of the Stolen GALA without authorization, and keeping the proceeds for himself.

b.    Thurston harmed the Company by stealing GALA licenses, selling them without authorization, and keeping the proceeds for himself.

c.    Thurston harmed the Company by falsely associating the Company with his allegedly fraudulent "Smart Box" venture.

d.    Thurston harmed the Company by using the Company's reputation, brand, and goodwill to promote the "Green" venture, which the SEC is prosecuting as fraudulent, without the Company's authorization.

e.      Thurston's continued involvement in the Company harms the Company as
his involvement calls the Company's legitimacy into question by third parties,
including, but not limited to, Coinbase, the largest exchange in the United States.

177.    As described above, Thurston, in his capacity as a director of the Company, has
improperly stolen corporate assets for his own use, used the Company's property and resources
for his own personal benefit and individual advantage to the detriment and financial loss of the
Company.

178.    As described above, Thurston has repeatedly and knowingly acted outside of the
scope of his authority and without Board approval to the financial loss and detriment of the
Company and Plaintiff.

179.    Considering Thurston's course of conduct and the inadequacy of other remedies,
removal as a director is in the best interest of the Company.

WHEREFORE, Plaintiff prays the Court enter judgment against Defendants Thurston
and True North and grant the following relief:

1.  Ordering Defendants to return the Stolen GALA and any proceeds from the exchange
    or sale of the Stolen GALA;

2.  Ordering Defendants to pay restitution to the Company in the amounts of their ill-
    gotten gains, including the amounts received in exchange for stolen GALA tokens
    and Stolen Licenses;

3.  Imposing a constructive trust over any and all ill-gotten gains held by Thurston and/or
    True North;

4. An award of actual damages suffered by the Company resulting from Defendants' misconduct, including the conversion of GALA tokens and licenses, fraud, and breaches of fiduciary duties to the Company;

5. Ordering that Thurston be removed as a director of the Company;

6. An award of pre-judgment and post-judgment interest as permitted by law;

7. An award of punitive damages;

8. An award of the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

9. Ordering Thurston to prepare an accounting of the Stolen GALA and any proceeds from the exchange or transfer of the Stolen GALA; and

10. Ordering Thurston to prepare an accounting of the proceeds of the Stolen Licenses.

11. Such other and further relief the Court deems just and proper.

## <u>JURY TRIAL DEMAND</u>

Plaintiff demands a trial by jury for all issues so triable.

DATED this 5th day of September, 2023.

SNELL & WILMER L.L.P.


/s/ Paul W. Shakespear
Paul W. Shakespear
Cameron Cutler
Natalie Beal

 K&L GATES LLP
Abram I. Moore
Christian A. Zazzali

*Attorneys for Plaintiff Eric Schiermeyer*

## <u>VERIFICATION</u>

Pursuant to Section 28 U.S.C. § 1746, I, Eric Schiermeyer, declare under penalty of perjury that I have read the foregoing Verified Complaint, and do hereby verify that the factual statements contained therein are true, based on my personal knowledge, information, and/or belief, and upon my position as President and Chief Executive Officer of Blockchain Game Partners, Inc.

Dated: September 5, 2023

<u>*/s/ Eric Schiermeyer*                        </u>
ERIC SCHIERMEYER