John Huber (Utah Bar No. 7226)
Daniel Wadley (Utah Bar No. 10358)
Marc Rasich (Utah Bar No. 9279)
Alexander Baker (Utah Bar No. 17163)
**GREENBERG TRAURIG, LLP**
222 South Main Street, Suite 1730
Salt Lake City, Utah 84101
Telephone: (801) 478-6900
 john.huber@gtlaw.com
wadleyd@gtlaw.com
marc.rasich@gtlaw.com
bakera@gtlaw.com

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ERIC SCHIERMEYER, Derivatively on Behalf of Nominal Defendant, BLOCKCHAIN GAME PARTNERS, INC. D/B/A GALA GAMES,<br><br>     Plaintiff,<br><br>vs.<br><br>WRIGHT W. THURSTON and TRUE NORTH UNITED INVESTMENTS, LLC,<br><br>     Defendants,<br><br>   and<br><br>BLOCKCHAIN GAME PARTNERS, INC. D/B/A BGP GAMES,<br><br>     Nominal Defendant. | **OPPOSITION TO MOTION TO FREEZE ASSETS, FOR AN ACCOUNTING, AND FOR EXPEDITED DISCOVERY**<br><br><br>Case No. 2:23-cv-00589-HCN-DAO<br><br>Judge Howard C. Nielsen<br><br>Magistrate Judge Daphne A. Oberg |

## I.   INTRODUCTION

Eric Schiermeyer's central claim—the alleged theft of Blockchain Game Partners ("BGP" or the "Company") assets (in the form of "GALA" tokens) by Wright Thurston—rests on a single fact that the evidence clearly refutes. Schiermeyer has alleged that GALA tokens were removed from a "corporate treasury" that never existed. In the 2021 calendar year when the alleged diversion took place, BGP's own tax return—signed by Schiermeyer himself in October 2022—showed that BGP held about $300,000 worth of GALA at the beginning of 2021, and none at the end of the year. Schiermeyer signed the 2021 BGP tax return knowing that any material misstatement could subject him to felony prosecution. If the false allegation of Thurston diverting GALA tokens from the "corporate treasury" were true, there would still have been billions of GALA remaining, yet Schiermeyer himself declared there were none.

Similarly, BGP had a corporate valuation done by a third party in March 2022. At that time, the third party indicated that BGP had accumulated approximately 500 million GALA tokens among BGP's numerous other holdings of cryptocurrencies, not the roughly ten billion that would have been present had Schiermeyer's fictional story about a "treasury" been true.

Schiermeyer's fabrication of a "corporate treasury" that forms the foundation of Schiermeyer's claims, coupled with little more than false smears of Thurston, stands in stark contrast to the publicly available evidence that Schiermeyer intentionally destroyed billions of GALA tokens in May 2023 over Thurston's objections and with no permission from the Board of Directors of BGP.  Such destruction was so extraordinary (destroying approximately $600 million of value) that numerous exchanges that had hosted GALA tokens for purchase and sale immediately de-listed GALA tokens as a result.

1

## II.    SUMMARY OF ARGUMENT

Three months ago, Thurston, one of two directors of nominal party Blockchain Game Partners, d/b/a Gala Games, demanded that BGP's other director and company president, Schiermeyer, cease using BGP assets for personal benefit and return to following basic corporate governance procedures such as obtaining explicit Board or shareholder approval before taking corporate action. Apparently believing the adage "the best defense is a good offense," Schiermeyer responded by making incredible, unsubstantiated, and false allegations of theft that lead to this lawsuit and the motion for a temporary restraining order (the "Motion") seeking to freeze assets of 979 unidentified third parties based on alleged actions (in which Schiermeyer himself participated) that took place more than *two and a half years ago*. There is no support for the Motion. It should be denied.

Schiermeyer has not established, and cannot establish, even one of the four elements necessary to obtain the extraordinary relief of a TRO. Instead, the inescapable facts establish that the alleged "theft" was simply moving GALA (a cryptocurrency) controlled by Thurston from one wallet to another. *Schiermeyer knew Thurston had moved the GALA when it occurred, and Schiermeyer himself took custody of his share and then did the exact same thing two months later*. The GALA transferred by Thurston was earned by and belonged to True North, the entity that Thurston manages on behalf of his heirs, just like the majority of the GALA Schiermeyer transferred was earned by and belonged to Schiermeyer. There is no evidence to support the claim that the GALA moved by Thurston and Schiermeyer belonged to a BGP "treasury." There is no such treasury. No treasury was created in the founding documents. The possibility of creating a treasury was never brought to, let alone approved by, the Board of Directors or

2

shareholders of BGP. There is no smart contract (a digital contract that automatically moves digital assets according to software code) governing its creation, the amounts authorized to be deposited in the treasury, or the terms and conditions of its use—all of which would be common, if not necessary, preconditions to the creation of a treasury in a decentralized, transparent blockchain company like BGP. And BGP does not own any nodes—the vehicles through which new GALA is minted and distributed among the GALA community.

Further, the billions of GALA Schiermeyer now claims belong in the BGP "treasury" are not reflected anywhere in official corporate documents. The tokens do not appear in any tax returns—including returns verified and signed by Schiermeyer. They also do not appear in either of the two 409A valuations of BGP prepared by independent business valuation experts in 2021 and 2022, notwithstanding the fact that *if the GALA truly belonged in the fictitious treasury, it would have amounted to hundreds of millions of dollars*—and likely would have been BGP's most valuable asset. The GALA does not appear in those records because, again, there never was a BGP treasury. This was an intentional and informed decision by the founders based in large part on advice from attorneys retained to provide guidance on this issue. If BGP mined and sold GALA directly to the public, it would have significantly increased the risk that the GALA distribution of GALA as a digital token would be considered a securities transaction under federal and state securities laws. Schiermeyer's current claims are figments of his imagination, not claims on which he has established a substantial likelihood of success on the merits.

Similarly, Schiermeyer provides no credible excuse for waiting *two and half years* to bring this "emergency" Motion. There is none. Schiermeyer, in addition to moving his own billions of GALA to his own wallets within months of Thurston doing so, knew simultaneously

(as did anyone else who cared to look at the blockchain) that Thurston had moved his GALA to different wallets. Yet Schiermeyer did nothing—until Thurston sent a cease-and-desist letter in May 2023. He never objected to the transfer. He made no demands[1] that Thurston return the alleged "stolen" GALA in any Board meeting, of which there were several, or in any official capacity. He made no effort to secure the GALA and made no complaints internally or to any law enforcement agency. He did nothing because the transfer was entirely consistent with his own actions and the fact that the GALA was never BGP's to begin with. Schiermeyer now alleges to have been "held hostage" by Thurston all this time, worried that any objection on his part would have caused Thurston to dump the GALA into the market, causing the market for GALA to implode. This allegation too is unsupported and unbelievable. Had Thurston stolen nearly half of the 19 billion GALA held in some fictious treasury over two and a half years ago—a portion of which Schiermeyer alleges held a value of $130 million—certainly there would be some actual, contemporaneous evidence that individuals within the company were alarmed. There is none. The transfer was no theft.

---

[1] The only reference to any actual communication between Schiermeyer and Thurston regarding the sale of Gala is found in ¶ 80 of the Amended Complaint. Yet even that reference is undated, vague and, based on the quotation, not relevant to the issues alleged here. As it turns out, the message was apparently sent in December 2022, nearly two years after the transfer at issue here, and purports to be an objection by Schiermeyer to Thurston selling Gala on Coinbase, which he claims was being watched by the community and was hurting the business. But neither Thurston nor True North had an account on Coinbase. He was not selling Gala on that platform, a point which he made in his response to Schiermeyer. And there is no indication whatsoever from the text that Schiermeyer is lodging a (belated) objection to the February 2021 transfer of Gala by Thurston. It is upon these thin reeds that Schiermeyer claims entitlement to billions of Gala.

Schiermeyer also has not established that money damages are not sufficient or that Thurston would not have the resources to pay any judgment should Schiermeyer's fantasy come true. GALA is a cryptocurrency. It is traded on secondary markets. It has a value that can be calculated and paid in fiat currency. The loss of GALA, even a lot of it, is compensable in monetary damages.[2] What is more, despite Schiermeyer's efforts to defame Thurston, there is no actual evidence that Thurston could not pay a damages award in the highly unlikely event that a judgment was to be entered against him.[3]

In short there is no imminent threat of irreparable injury that justifies imposition of a temporary restraining order.

The public interest and balance of the hardships factors also weigh heavily against the requested restraining order. Through this action, Schiermeyer seeks to freeze the assets of 979 different wallets through multiple Virtual Asset Service Providers ("VASPs"). Neither Thurston nor True North own or control those wallets or the VASPs which handled the transactions. They are owned and controlled by third parties entirely unrelated to the parties to this litigation. As such, neither the VASPs nor the owners of those wallets are before the Court. Freezing the crypto-bank accounts of hundreds of people without their knowledge or opportunity to be heard

_____

[2] In stark contrast to the claims in this Motion, by Schiermeyer's own admission, BGP has destroyed the value of any of True North's existing Gala, amounting to billions of Gala, through the admitted and intentional burning that he orchestrated in connection with the v2 Gala token upgrade discussed below. This burning is part of the factual basis for the claims brought by True North in its complaint against Schiermeyer and BGP.

[3] Green United and Wright Thurston moved to dismiss the SEC's Complaint. On September 8, 2023, the district court heard the motion and agreed to dismiss the SEC's claim against Thurston, with leave to amend, and reserved ruling on the remainder of defendants' motion pending submission of further materials.

is against the public interest. Further, the hardship it could cause far outweighs the hardship

Schiermeyer might endure waiting to see if he might recover anything on his claims.

Finally, Schiermeyer is not entitled to the relief he seeks because he comes to the Court

with unclean hands. He has repeatedly refused to follow basic corporate governance principles,

taking actions with Board or shareholder approval. He has usurped corporate opportunities, such

as creating companies to exploit BGP business plans and intellectual property but installed

himself, not BGP, as the majority shareholder. And what is worse, he has used BGP and

shareholder resources for his own personal benefit including to purchase real estate in such far

flung areas as Costa Rica and Hawaii. As these acts reveal, Schiermeyer often acts for his own

personal gain at the expense of BGP and its shareholders. This case and this Motion are yet

further examples of that unfortunate fact. The Court should not reward Schiermeyer's unlawful

behavior by granting him the requested extraordinary equitable relief.

Schiermeyer's Motion should be denied.

## III.    STATEMENT OF FACTS

### A.    Creation of Gala Games

BGP, under the moniker "Gala Games," is a fully registered Wyoming corporation that

operates a decentralized gaming platform on a proprietary blockchain called GALA (the "Gala

Blockchain").[4] *See* TN Compl. ¶¶ 11, 26. It is located at the website https://app.gala.games. The

Gala Blockchain is run through a network of nodes that rewards node operators with digital

---

[4] True North and Schiermeyer executed the Founders Agreement, dated January 1, 2019, with each party becoming a 50% owner of the corporation. *See* Founders Agreement at 1, Wright Thurston Declaration ("Thurston Decl.") Ex. A; True North Complaint ("TN Compl.") ¶ 97, attached as Exhibit 1.

rewards ("GALA") and non-fungible tokens ("Gala NFTs") that are stored in wallets controlled

by the node operators. *See* TN Compl. ¶¶ 17, 29. A "node" is computer software (granted by a

license to operate) that processes transactions on the blockchain in exchange for "rewards," *i.e.*,

"GALA tokens." *See* TN Compl. ¶ 16 n.1.

BGP was specifically designed as a decentralized organization that does not own nodes

itself—all of the node licenses are owned privately, by node operators. *See, e.g.*, Brant Frank

Declaration ("Frank Decl.") ¶¶ 10-11; Steven Miller Declaration ("S. Miller Decl.") ¶ 4;

Thurston Decl. ¶¶ 3, 6. As summarized in an April 9, 2021 legal analysis of the company, BGP's

own attorneys observed:

> Gala Games does not have any direct control over the Gala Blockchain. It does not
> operate any nodes, it does not own any GALA or Gala NFTs, and it does not
> exercise voting control. The Founders, though, own a large number of nodes (and
> currently operate a small fraction of their nodes), own a significant amount of
> GALA and Gala NFTs (earned through their node operation), and can exercise the
> voting rights associated with their nodes.[5]

This was the understanding in 2021, and it reflects the reality that BGP (by design) owned no

nodes and generated no GALA. Accordingly, since it owned no nodes, and since it never

generated its own GALA tokens, no Company treasury was ever required or created, on account

of the fundamental structure of the enterprise. *See, e.g.*, Frank Decl. ¶¶ 10-11; S. Miller Decl.

¶ 4; Thurston Decl. ¶¶ 3, 10. Notably, the same legal opinion discussed above verified that the

Company's node-based structure was as set up in such a way that it would not run afoul of the

---

[5] Due to the obvious sensitivities raised in connection with the protected nature of this
legal advice, a copy of this legal analysis by the law firm Murphy & McGonigle has not been
attached to this filing. Nevertheless, Schiermeyer was included in the distribution of the legal
analysis and the subsequent discussions, is in possession of the legal analysis, and is familiar
with its contents.

securities laws and regulations. Consistent with that opinion, neither the Board of Directors nor the shareholders or BGP ever took up the issue of, let alone authorized the creation of, a company Treasury. *See, e.g.*, Thurston Decl. ¶¶ 3, 10. There were never any Board discussions, let alone any resolutions authorizing a treasury or similar structure.  Moreover, no smart contract was ever established governing the creation, amount of, or conditions for using any assets in, a BGP treasury. *See, e.g.*, Frank Decl. ¶¶ 10-11; Thurston Decl. ¶ 10. Instead, BGP was intended to operate and did operate based on revenue generated through node sales, in-game operations and, if necessary, additional capital contributions by shareholders. *See, e.g.*, Jennifer Miller Declaration ("J. Miller Decl.") ¶¶ 6, 16; Thurston Decl. ¶ 9.

Thurston and Schiermeyer partnered to integrate True North's blockchain technology with gaming software. BGP's base technology, node software mining technology, blockchain referral network, and other blockchain-related assets (as well as the greater share of the financing) were contributed through True North and Thurston. *See* TN Compl. ¶ 30. Schiermeyer provided BGP with his understanding of mobile games, video game models, experienced game-design staff, and gaming market experience. *Id.* ¶ 31.

B. **BGP's Early Operations**

During the first two years of BGP's operation, both Thurston and Schiermeyer participated in the direction and oversight of BGP's growing operations, and both contributed millions of dollars (both in USD and cryptocurrency) to develop BGP. *See id.* ¶¶ 27-28. In exchange, BGP allocated 14,000 nodes between True North and Schiermeyer (split according to their shares in BGP, *i.e.*, 50/50). *See id.* ¶ 28. Consistent with the intent of the parties, the 14,000 nodes acquired by True North and Schiermeyer were their personal property and were used to

mine GALA that they independently owned and controlled like all other node owners. *See, e.g.*, J. Miller Decl. ¶ 4; Thurston Decl. ¶¶ 3, 6.

Node sales opened up to the public in or around February 2019, and the nodes individually owned by True North and by Schiermeyer started earning GALA in or about July 22, 2019. *See* TN Compl. ¶ 33. Consistent with BGP's intent not to be a custodial blockchain, *see* Frank Decl. ¶ 10, the rewards generated by the 14,000 nodes owned by True North and Schiermeyer were initially deposited and maintained in a shared a wallet as to which both True North and Schiermeyer each independently held the private keys. Their early practice of maintaining one wallet to stockpile GALA tokens made sense to both Thurston and Schiermeyer because GALA did not hold any value initially—blockchain projects have few early adopters, and thus do not hold value early on, and the technology needed some additional upgrades to make the process smoother for both shareholders. *See, e.g.*, Frank Decl. ¶ 11; J. Miller Decl. ¶¶ 5, 7. But this practice did not change their understanding that they each owned the GALA tokens generated by their own nodes, and none of these nodes or rewards were owned by the Company. Between July 2019 and July 2020, approximately 25 billion GALA tokens were generated by all of the nodes in the network. *See, e.g.*, J. Miller Decl. ¶ 7. Any GALA that was mined by node owners other than True North or Schiermeyer was deposited directly into that node owner's private wallet. *See, e.g.*, J. Miller Decl. ¶ 4; Thurston Decl. ¶¶ 3, 6.

As BGP's underlying technology improved, True North and Schiermeyer moved the business operations to the Ethereum blockchain. *See, e.g.*, J. Miller Decl. ¶ 7. Around that time,

BGP turned off the nodes it was hosting in its data center, and enabled node owners to run the licensed node software on their own computers.

In or about January 2021, Schiermeyer and Thurston made the decision to spread the GALA that had initially been maintained in a single wallet into 100 different wallets. They made the decision to spread this distribution amongst 100 wallets because Thurston and Schiermeyer realized that the stockpiled wallet posed a security risk: because the company was growing, and because the GALA tokens had become valuable, the potential loss of tokens due to hacking was great, *see, e.g.*, J. Miller Decl. ¶ 4—and such loss would not only impact their personal holdings, but also public perceptions of the security of the Company.

### C.    Acquisition of SandBox and Distributions

In February 2021, BGP finalized the purchase of Sandbox Games. *See* TN Compl. ¶ 38. In connection with the acquisition, the founders (Thurston and Schiermeyer) agreed to a distribution of GALA that included the former owners of Sandbox. *Id.* ¶ 37. Consistent with that decision, in or about the first quarter of 2021, following the distribution that resulted from BGP's acquisition of Sandbox, Thurston (through True North) and Schiermeyer each separated around 8.6 billion GALA which they independently owned because of the mining operation of their individual nodes into wallets they individually controlled. *Id.* ¶ 38. True North moved its 8.6 billion GALA in February 2021 to wallets it alone controlled; Schiermeyer moved his 8.6 billion GALA several month later, in April 2021, to wallets to which he alone held keys. *See, e.g.*, J. Miller Decl. ¶ 13. Schiermeyer also took control of all remaining GALA and NFTs (including those owned by True North and others) by separating them into wallets to which Schiermeyer

alone held the keys. *See* TN Compl. ¶ 38. Schiermeyer knew of the movement of True North's GALA when it happened.

At no time, either during or after the distribution, or the movement of True North's GALA to private wallets, did Schiermeyer or anyone else object that the distribution was unlawful, or that the distribution amounted to theft of corporate assets, *i.e.*, that BGP owned the distributed GALA. At no time, until Thurston sent Schiermeyer his May 2023 cease and desist letter, did Schiermeyer or any other shareholder, director, officer, or agent of BGP make any claims or statements regarding missing Company assets from a Company treasury. Nor could they, as BGP is a decentralized organization that has never owned its own nodes, never generated its own GALA, nor created or owned its own treasury. *See, e.g.*, Frank Decl. ¶¶ 10-11; S. Miller Decl. ¶ 4; Thurston Decl. ¶¶ 3, 6.

BGP has followed Generally Accepted Accounting Principles ("GAAP") since its inception, and accordingly, all the Company's assets were and continue to be listed on its accounting and tax documents. No "treasury" is depicted among BGP's assets. For instance, BGP did not claim to have a 22 billion GALA treasury (or even the 13 billion GALA that would have remained after the True North transfer if such a treasury truly existed) on its 2020 and 2021 tax returns signed on behalf of the company by Schiermeyer himself. *See, e.g.*, Tax Returns, Thurston Decl. Exs. E, F. Similarly, BGP commissioned 409A valuations of the fair market value of the Company in 2021 and 2022. *See* 409A Valuations, Thurston Decl. Exs. G, H. Neither of these valuations reflect billions of GALA tokens—likely constituting the most valuable asset of the company, if they existed—in any supposed BGP treasury.

### D.   Plaintiff's Misconduct

In contrast to the straightforward, legal movement and subsequent use of True North's earned GALA, Schiermeyer has been engaging in numerous actions that were ultra vires and detrimental to BGP and its shareholders—actions accomplished without the prerequisite BGP Board or shareholder vote and approval (including True North's vote). *See* TN Compl. ¶ 23 (Bylaws § 4.05 states that the President may only act as "authorized by the board of directors").

For example, over at least the last twelve months, Schiermeyer has exercised unilateral control over the operations, assets, and profits of BGP. During that time, Schiermeyer has flouted BGP's founding and charter documents, has covertly acted and engaged in transactions on behalf of BGP, and has used BGP's assets and earnings, often for his own personal benefit, without the consent of BGP's Board or its shareholders. *See id.* ¶ 40.

For example, Schiermeyer:

- Caused BGP to send millions of dollars of cryptocurrency to Jason Brink, BGP's President of Blockchain, for unapproved and unknown reasons.

- Caused BGP to distribute valuable NFTs to himself and select BGP employees, without Board or shareholder approval. By design, those NFTs should have been randomly distributed to members of the Gala community.

- Misappropriated millions of dollars of BGP funds, including, using company funds for buying and renting real estate for personal use, transferring company assets into his own name or the names of entities that he owns or controls, using company funds to hire architects, construction companies, and designers for personal real estate, and moving company funds into personal accounts.

*See id.* ¶ 41. Most egregiously and as admitted by Schiermeyer himself, *see* Schiermeyer Complaint ("ES Compl.") ¶¶ 81-84, in or about April 2023, without disclosure to, authorization of, or oversight by the Board, Schiermeyer directed BGP to replace all GALA tokens on a one-

to-one basis with a new version ("GALA v2 tokens"), referred to as an "upgrade."[6] BGP

publicly announced the v1 tokens would be "upgraded" to v2 tokens automatically. TN Compl.

¶ 42. Contrary to the public announcement, Schiermeyer did not cause BGP to "upgrade" all

GALA tokens; rather, Schiermeyer directed BGP to (a) refrain from replacing billions of the v1

tokens held by True North and other shareholders, and (b) deposit the replacement tokens to

wallets controlled by Schiermeyer personally. *Id.* ¶ 43. Schiermeyer's GALA "upgrade" caused

substantial harm to BGP's value by, among other things, causing cryptocurrency exchange

Coinbase to delist GALA and rendered worthless all GALA held by other GALA-holders whose

tokens were not accessible to BGP at the time of conversion. *Id.* ¶ 44.

   In his Complaint, Schiermeyer himself admitted that the upgrade and burn was done to

destroy all of True North's GALA in an effort to render that specific GALA valueless. *See* ES

Compl. ¶¶ 81-84. Schiermeyer also explained that, as a result of the burn, Thurston "was left

with obsolete Gala vl tokens." *Id.* ¶ 83. Upon information and belief, at or around the same time,

Schiermeyer caused BGP to burn billions of GALA v2 tokens belonging to BGP's shareholders,

again without Board approval and without the knowledge of or a vote by the shareholders. *See*

TN Compl. ¶ 45. In total, Schiermeyer caused BGP to burn around 21 billion GALA v2 tokens,

including many replacement tokens belonging to BGP's shareholders, including True North, all

of which amounted to the destruction of more than $600 million in assets. *See id.*

---

   [6] "Burning" tokens refers to the permanent removal of tokens from circulation, which is
typically accomplished by transferring tokens to a "burn address," *i.e.*, a wallet from which they
can never be retrieved. In effect, burning tokens results in their destruction and consequently
destroys their value.

Also troubling is the fact that, as has come to light, Schiermeyer, directly or through Brink and Allen, have in recent months been steadily liquidating millions upon millions of dollars of GALA from the supposed "treasury" to fund corporate operations. *See* J. Miller Decl. ¶¶ 24-26. This activity not only potentially violates the federal securities laws, it is likely causing substantial harm to the Company, its holdings, and to the value of the GALA token—the very harm Schiermeyer claims stopped him from taking any action against Thurston two and a half years ago.

This pattern of misappropriation, self-dealing, and destruction of shareholder value compelled True North to file suit on August 31, 2023, in an effort to hold Schiermeyer responsible for his ongoing breaches of fiduciary duty and to halt the damage he continues to inflict on BGP. Schiermeyer filed a shareholder derivative complaint against BGP, Thurston, and True North on the same day. On September 1, 2023, Schiermeyer filed the instant Motion.

## IV.   LEGAL STANDARD

"The Tenth Circuit requires a movant to establish four elements as the basis for issuance of a TRO or preliminary injunction: (1) the moving party will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the moving party outweighs any damage to the opposing party; (3) the injunction, if issued, will not be adverse to the public interest; and (4) a substantial likelihood exists that the moving party will prevail on the merits." *Bauchman by & Through Bauchman v. W. High Sch*., 900 F. Supp. 248, 250 (D. Utah 1995) *aff'd*, 132 F.3d 542 (10th Cir. 1997) (*citing SCFC ILC, Inc. v. Visa USA, Inc*., 936 F.2d 1096, 1098 (10th Cir. 1991)). Moreover, the irreparable injury element must also include a showing of immediacy— that the movant "will be *immediately* injured if his proposed temporary restraining order does not

issue *now*." *Pines v. EMC Mortg. Corp.*, 2008 WL 4844751, at *2 (D. Utah Nov. 7, 2008)

(emphasis added); *see also Barnes v. United States*, 137 F. App'x 184, 191 (10th Cir. 2005)

("Because [the movant] has not provided specific facts showing an *imminent* and irreparable

injury, we deny his motion for a temporary restraining order.") (emphasis added).

 "Because a temporary restraining order 'is an extraordinary remedy, the right to relief

must be clear and unequivocal.'" *Stuber v. Lucky's Auto Credit, LLC*, 478 F. Supp. 3d 1205,

1208 (D. Utah 2020) (citing *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th

Cir. 2003)). It is a "heavy burden" to demonstrate entitlement to this "extraordinary remedy."

*Gardner v. Long*, 2020 WL 1325338, at *5 (D. Utah Mar. 20, 2020).

## V.   ARGUMENT

 Schiermeyer has fallen woefully short of establishing a clear and unequivocal right to his

requested relief. In fact, he fails to establish even one of the required elements for obtaining a

TRO. As discussed in detail below, he waited two and a half years before seeking relief and has

no credible excuse for the delay. He seeks to freeze assets based on alleged harm that is fully

compensable in monetary damages. And he has failed to support his claim, the alleged theft of

more than 8 billion GALA, with evidence necessary to establish a substantial likelihood of

success on the merits. To the contrary, the sparse and self-serving evidence Schiermeyer relies

on is more than met by the indisputable evidence, including tax returns, 409A valuations, and

opinions of BGP's counsel, that establishes that Schiermeyer's claims are based on a false

premise—the existence of a company "treasury." What is worse, Schiermeyer seeks to freeze

assets of parties not before the Court, and arrives at Court with anything but clean hands.

A.     **<u>Schiermeyer Cannot Establish a Threat of Imminent Irreparable Harm</u>**

1.     **<u>There Is No Imminent Threat of Injury</u>**

Schiermeyer waited roughly two and a half years after the alleged theft that is at issue before he filed this action and brought this Motion. *See* ES Compl. ¶ 64. This substantial delay rebuts any claim of imminent or immediate harm absent the requested relief. "[D]elay in seeking injunctive relief undercut[s] [an] irreparable-harm claim." *Keybank Nat'l Ass'n v. Williams*, 2022 WL 402379, at *5 (10th Cir. Feb. 10, 2022) (affirming the district court so holding, "because waiting to seek an injunction until one year after Appellees started working for Newmark and just days before their non-compete provisions expired showed no 'sense of urgency'"). Indeed, delay "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

Here, Schiermeyer unreasonably and unnecessarily delayed bring this action and filing this Motion. Thurston's movement of True North's 8.6 billion GALA from jointly controlled wallets to individually controlled wallets occurred in February 2021. *See* ES Compl. ¶ 64. This movement of GALA has always been publicly viewable through the Ethereum blockchain. It happened after conversations between Thurston and Schiermeyer about taking distributions of the GALA True North and Schiermeyer had earned by operating their respective nodes. *See* Thurston Decl. ¶ 12 & Ex. D. Indeed, Schiermeyer commented around the time that the increasing value of the GALA would make them "billionaires." *Id.* Further, *Schiermeyer moved his own 8.6 billion GALA into wallets he alone controlled in April 2021—two months later. See, e.g.*, J. Miller Decl. ¶ 13. Thurston and Schiermeyer had additional conversations about the

movement of GALA after the fact, but they were simply to confirm that the movement was initiated by Thurston and not the result of a hack. At no time did Schiermeyer, Brink or Allen, tell Thurston that they felt the transfer was wrongful, or that the movement constituted a theft.

Schiermeyer now claims to have been held hostage because of the amount of GALA over which Thurston exercised control would have doubled the amount of GALA in circulation should he have decided to dump it. *See* Pl.'s Mot. at 7. Thus, according to Schiermeyer, he was powerless to do anything but wait to see what Thurston did. This excuse is not credible. First, as Schiermeyer admits, 8.6 billion GALA did not double the actual amount of GALA in circulation. It represented only a total of 25% of the then-circulating GALA. Schiermeyer moved an equivalent amount into his own private wallets within two months of the transactions about which he now complains. *See, e.g.*, J. Miller Decl. ¶ 13. So he also had the ability to "pull the rug out." Of course, that did not happen.

Second, if Schiermeyer truly believed BGP was being held hostage, there surely would be some evidence of that fact other than vague, unsupported, after-the-fact declarations. Where is the contemporaneous email, text, Signal message, or other form of exchange between Schiermeyer and his employees, Brink and Allen, suggesting shock at the alleged theft or frustration about being held hostage? Where is the contemporaneous communication with regulators about the alleged theft? Where is the contemporaneous proof of efforts to seek advice of any kind about how to respond to what Schiermeyer now claims to be a catastrophic theft of BGP's GALA? There is no proof because there was no theft, and there is no irreparable harm.

Third, both Thurston and Schiermeyer had access to all the GALA in the wallets at issue and, thus, could have "pulled the rug" out from under BGP at any time but didn't. *See, e.g.*, J. Miller Decl. ¶¶ 5, 7-8. Nor would they as two of its largest shareholders and its largest investors.

Fourth, Schiermeyer's actions establish he did not really feel powerless or that he was being held hostage. Instead, as he readily admits, he "engineered" a way to destroy the value of True North's GALA—he simply burned it. *See* ES Compl. ¶¶ 81-84.[7] Thus, there is no credible excuse for the two-and-a-half-year delay, only an explanation: the True North GALA did not belong to BGP. BGP did not have the right to control it or control how it was used. *See, e.g.*, Frank Decl. ¶¶ 10-11; S. Miller Decl. ¶ 4; Thurston Decl. ¶¶ 3, 6. And Schiermeyer knew (and knows) it. This action and this Motion are after-the-fact figments of Schiermeyer's imagination designed to distract from his own ultra vires acts. Schiermeyer's inexcusable delay alone is reason to deny the Motion. *See, e.g.*, *Keybank*, 2022 WL 402379, at *2, *5 (finding delay of one year in seeking injunctive relief "heavily weighs" against finding imminent, irreparable harm).

Schiermeyer's delay has also rendered the relief he seeks moot. First, Schiermeyer's burn of True North's v1 GALA destroyed the value of any GALA in 17 of the wallets identified in the report attached to the Motion. *See* Thurston Decl. ¶ 13. In other words, the GALA in the 17 identified wallets is worthless. *See* ES Compl. ¶ 83. Second, the Motion "request[s] a freeze on the 979 wallets on the VASPs into which Defendants transferred the Stolen GALA." Pl.'s Mot. at 18. But neither True North nor Thurston own or have any control over the 979 identified wallets. *See, e.g.*, Frank Decl. ¶ 13. Thus, the dissipation about which Schiermeyer so

_____

[7] This "self-help" is the subject of True North's complaint against Schiermeyer in this Court. *See True North United Investments v. Eric Schiermeyer*, Case No. 2:23-cv-00590-CMR.

vehemently warns against already occurred, rendering the Motion moot. "To the extent [a] harm has already occurred, it cannot be rectified with a temporary restraining order." *Kearns v. Shukla*, 2008 WL 4186214, at *2 (W.D. Okla. Sep. 5, 2008).

Further, the owners of those 979 wallets are not before the Court, have not been provided notice, and have not had the opportunity to respond. Schiermeyer effectively seeks to freeze the bank accounts of 979 accountholders who have nothing to do with the dispute and over which this Court does not necessarily have jurisdiction. Thus, the relief requested is unworkable on its face and is essentially moot. *Cf. Cody Labs., Inc. v. Sebelius*, 446 F. App'x 964, 967 (10th Cir. 2011) ("A case becomes moot 'when it is impossible to grant any effectual relief.'") (quoting *Chihuahuan Grasslands Alliance v. Kempthorne*, 545 F.3d 884, 891 (10th Cir. 2008)).

## 2.    Schiermeyer Has Not Established an Irreparable Injury

In addition to failing to establish a need for, or availability of, the requested immediate relief, Schiermeyer also fails to establish that any harm he might suffer is irreparable. GALA is a cryptocurrency. It has an exchange traded value. Experts can determine the maximum value of a particular cryptocurrency (in this case GALA) over a period of time. Thus, if there were any cognizable loss in this case, establishing the amount would reduce to a math problem. Schiermeyer all but admits as much, conceding that he burned much of True North's GALA and valuing the amounts he was not able to burn at $130 million dollars. *See* ES Compl. ¶¶ 81-84. In such cases,[8] when the ultimate relief sought is readily calculable and monetarily redressable, the

---

[8] The crypto-related cases cited by Plaintiff in his attempt to show a risk of irreparable injury are inapposite, since they focus on the risk of dissipation as a justification to find irreparable harm. *See* Pl.'s Mot. at 15. As stated above, although fully lawful, the alleged "dissipation" has

alleged loss is not irreparable—and a temporary restraining order is not warranted.[9] *See Kearns*, 2008 WL 4186214, at *2 ("The ability of plaintiffs to quantify and compute their monetary losses establishes that the harm they allegedly suffered is not irreparable in nature."); *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) ("It is . . . well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by monetary damages."); *MyGym, LLC v. Engle*, 2006 WL 3524474, at *10 (D. Utah Dec. 6, 2006) ("Harm is irreparable when it cannot be measured and is not compensable with monetary damages.") (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corporation*, 356 F.3d 1263 (10th Cir. 2004)).

---

already occurred, and Plaintiff has not demonstrated Defendants' inability to pay a damages award in the event one was issued.

[9] Plaintiff cites to a prior decision by this Court that is distinguishable from the circumstances here. In *AAAG-California, LLC v. Kisana,* 439 F. Supp. 3d 1265 (D. Utah 2020), this Court confronted a situation where (a) actual physical property was involved (*i.e.*, non-fungible, subjectively valuable vehicles), and (b) the defendants at issue "claim[ed] to have only one bank account with a balance of less than $2800"—underscoring the fact that monetary damages would not likely be sufficient to remedy the alleged conversion, *id.* at 1280. Here, again, any finding of loss would come down to determining the monetary value of the transferred Gala tokens at issue. Moreover, although Plaintiff has vaguely alluded to Mr. Thurston being "exposed to hundreds of millions of dollars in potential liability in other litigation in which the SEC and investors have accused him of fraud," Pl.'s Mot. at 17, such insinuations in no way suffice for the showing Plaintiff would need to make of an inability to pay damages on Mr. Thurston's part. *See, e.g.*, *Lane v. Buckley*, 643 F. App'x 686, 688 (10th Cir. 2016) (affirming denial of injunction based on lack of irreparable harm where the plaintiff had provided no proof of defendant's inability to pay on a judgement absent the injunction); *Digital Ally, Inc. v. Culp McAuley, Inc.*, 2022 WL 2390194, at *10 (D. Kan. July 1, 2022) (denying injunctive relief when plaintiff provided "no meaningful evidence" that defendant would be unable to satisfy a subsequent money judgement absent the injunctive relief). The existence of other actions does not somehow demonstrate a party's financial insolvency or liability, and the actions referenced here in no way suggest such conclusions here.

**B.      Schiermeyer Has Not Established a Substantial Likelihood of Success on His Claim that BGP Owns True North's GALA**

In addition to failing to establish an imminent, irreparable injury, Schiermeyer also has not established and cannot establish a substantial likelihood of success on the merits. Despite Schiermeyer's claims to the contrary, True North's GALA was not "stolen" from BGP treasury. Instead, the facts establish that True North owned the GALA at issue and no BGP treasury exists.

Simply put, Thurston as manager of True North, moved GALA earned and owned by True North's nodes from one set of wallets to another. *See* TN Compl. ¶ 38. *Schiermeyer admits that he knew Thurston had moved the GALA when it occurred, and Schiermeyer did the exact same thing two months later. See, e.g.*, J. Miller Decl. ¶ 13. There is no evidence to support the claim that the GALA moved by Thurston and Schiermeyer belonged to a BGP "treasury." There is no such treasury. No treasury was created in the founding documents. *See* Founders Agreement, Thurston Decl. Ex. A; Shareholder Agreement, Thurston Decl. Ex. B. The possibility of creating a treasury was never brought to, let alone approved by, the Board of directors or shareholders of BGP. *See, e.g.*, Thurston Decl. ¶¶ 3, 10. There is no smart contract governing its creation, the amounts authorized to be deposited in the treasury, or the terms and conditions of its use—all of which would be common, if not necessary, preconditions to the creation of a treasury in a decentralized blockchain company like BGP. *See, e.g.*, Frank Decl. ¶¶ 10-11; Thurston Decl. ¶ 10. And BGP does not own any nodes. *See* TN Compl. ¶ 29.

Further, the billions of GALA Schiermeyer now claims belong in the BGP "treasury" are not reflected anywhere in corporate documents. They do not appear in any tax returns— including returns verified and signed by Schiermeyer. *See, e.g.*, Tax Returns, Thurston Decl. Exs. E, F. In fact, the 2021 tax return reflects less than one billion GALA. *See id.* If

Schiermeyer's allegations were true, the tax returns would reflect at least ten billion GALA, but they do not.

Similarly, the billions of GALA supposedly in the treasury also do not appear in either of the two 409A valuations of BGP prepared by independent business valuation experts in 2021 and 2022. *See* 409A Valuations, Thurston Decl. Exs. G, H. *If the GALA truly belonged in the fictitious treasury, it would have amounted to hundreds of millions of dollars*—likely BGP's most valuable asset. Yet it does not appear in those documents.

The GALA does not appear in those records because, again, there never was a BGP treasury. This was an intentional and informed decision by Thurston and Schiermeyer based in large part on advice from attorneys retained to provide guidance on this issue. *See supra* Section II.A & n.5. If BGP mined and sold GALA directly to the public, it would have significantly increased the risk that the GALA distribution would be considered a securities transaction under federal and state laws. *See id.* As summarized in the April 9, 2021 legal analysis of the operations of the company, BGP's own attorneys observed that "Gala Games does not have any direct control over the Gala Blockchain. It does not operate any nodes, it does not own any GALA or Gala NFTs, and it does not exercise voting control. The Founders, though, own a large number of nodes (and currently operate a small fraction of their nodes), own a significant amount of GALA and Gala NFTs (earned through their node operation), and can exercise the voting rights associated with their nodes." Schiermeyer was included in the distribution of this legal analysis, was included in discussions regarding its contents, and never contested the observation of BGP's own attorneys—contemporaneous with the events underlying this action—regarding

the nature of BGP's GALA holdings. Schiermeyer's claims are figments of his imagination, not claims on which he has shown a substantial likelihood of success on the merits.[10]

### C.   The Balance of Injuries Weighs Heavily Against Injunctive Relief

Despite Schiermeyer's claims to the contrary, the balance of hardships weighs against imposition of the requested relief. As discussed above, there is no injury on Schiermeyer's side of the scale. The GALA at issue was not Company GALA; the transfers were legitimate; any such alleged injury is full redressable via compensatory relief; and Schiermeyer himself demonstrated how little weight he ascribed to the alleged harm by waiting over two and a half years to make such a claim.

The same cannot be said about the other side of the scales. Thurston and True North owned the GALA at issue, and had every right to safeguard, transfer, and transact with it within the bounds of applicable law. There is no basis to freeze any assets that Thurston or True North possess (though, as stated above, the Motion is actually focused on freezing third-party assets), and any resultant asset freeze would only wreak unjustified and untold harm on Thurston in obstructing his legitimate need to safeguard and transact business with such funds and other assets. For instance, if any cryptocurrency in his possession were frozen, that would of course render him completely unable to ensure the continued value of such holdings in the face of any market volatility or downturn that may arise in the future. *See, e.g.*, *Kahn v. Kahn*, 147 Misc. 2d

---

[10] Even if the Court were to countenance some of Schiermeyer's representations, at best, the Court would be confronted with a series of competing he-said-she-said claims. In such a situation, the Motion must fail for lack of a showing of a *substantial* likelihood of success on the merits. S*ee Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016) (a relaxed test for injunctive relief would be inconsistent with Supreme Court precedent).

954, 958 (N.Y. Sup. Ct. 1990) ("Moreover, we must take into account the volatile nature of most of the parties' assets and consider whether restraints on these assets would do more harm than good. The courts have demonstrated a particular understanding of the issue of restraints placed upon the disposition of the types of assets that are most affected by the financial market."). There is no basis for such a drastic outcome here.

### D.  The Requested Relief Would Not Be in the Public Interest

As discussed above, the relief Schiermeyer is requesting would entail freezing the 979 wallets on the VASPs that Plaintiff identified, wallets controlled by individuals or entities that are not tied to True North or Thurston, *see, e.g.*, Frank Decl. ¶ 13, that are not credibly alleged to have participated in the acts that form the basis of this lawsuit and are not necessarily subject to this Court's jurisdiction. Freezing those assets without notice and the opportunity to be heard would not comport with the principles of Due Process. The requested injunctive relief would clearly not serve the public interest here. *See, e.g.*, *Huntley v. Vbit Techs. Corp.*, Civil Action 22-1164-CFC-SRF (D. Del. Aug. 10, 2023) (report and recommendation) (noting that the cryptocurrency in question had been distributed to multiple wallets held by "numerous people or entities" and that "[t]his evidence shows that any freeze on these assets is likely to impact nonparties to the litigation," and holding accordingly that "granting the extraordinary and drastic remedy of a temporary restraining order or preliminary injunction is not warranted").

### E.  Schiermeyer Is Not Entitled to His Requested Relief Because He Comes to the Court with Unclean Hands

Finally, Schiermeyer comes to the court with unclean hands, and thus, is undeserving of equitable relief. The doctrine of unclean hands is based in the principle that "equity will not aid a party whose conduct has been unlawful, unconscionable, or inequitable." *CGC Holding Co.,*

*LLC v. Broad & Cassel*, 773 F.3d 1076, 1214 (10th Cir. 2014). This principle is an "ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Derma Pen, LLC v. 4EverYoung Ltd.*, 76 F. Supp. 3d 1308, 1321 (D. Utah 2014).

As discussed in detail above, Schiermeyer has engaged in a pattern of egregious misconduct to the detriment of the Company and its shareholders. *See, e.g.*, TN Compl. ¶ 41. He has ignored corporate formalities and rules of corporate governance; has consistently taken actions without Board or shareholder approval; and has persistently engaged in self-dealing and sought personal enrichment at the Company's great expense. *See id.* ¶¶ 40-54. Given these facts, Schiermeyer simply does not come to the Court with the clean hands necessary to prevail.

### F.   There is No Basis for Expedited Accounting or Discovery

Because Schiermeyer cannot show any threat of irreparable harm, a substantial likelihood of success on the merits, or any of the other elements required to obtain a temporary restraining order, there is no basis for an order requiring Thurston or True North to make an accounting or for the parties to engage in expedited discovery.[11] *Cf., e.g.*, *Intermountain Elecs., Inc. v. CONSPEC Controls, Inc.*, 2009 WL 2176978, at *3 (D. Utah July 22, 2009) (denying the request for expedited discovery as moot, since the motion for preliminary injunction was denied).

## VI.   CONCLUSION

For the foregoing reasons, the Motion should be denied in its entirety.

---

[11] "[A] party seeking expedited discovery in advance of a Rule 26(f) conference has the burden of showing good cause for the requested departure from usual discovery procedures." *Living Scriptures v. Doe(s)*, 2010 WL 4687679, at *1 (D. Utah Nov. 10, 2010) (citation omitted). Plaintiff has made no such showing.

DATED this 11th day of September 2023.

GREENBERG TRAURIG LLP

/s/*Marc Rasich*
Marc Rasich
John Huber
Daniel Wadley
Alexander Baker

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on 11 September 2023, a true and correct copy of the foregoing was

filed with the Court's electronic filing system and thereby served on counsel of record.

Paul W. Shakespear
Cameron Cutler
Natalie Beal
SNELL & WILMER LLP
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, UT 84101
pshakespear@swlaw.com
ccutler@swlaw.com
nbeal@swlaw.com

Abram L. Moore
Christian A. Zazzali
K&L GATES LLP
70 West Madison Street, Suite 3100
Chicago, IL 60602
abe.moore@klgates.com
christian.zazzali@klgates.com

GREENBERG TRAURIG, LLP

/s/ *Lindsey Wharton*

# EXHIBIT 1

John W. Huber (7226)
Marc T. Rasich (9279)
Daniel J. Wadley (10358)
Alexander Baker (17163)
GREENBERG TRAURIG LLP
222 S. Main Street, Suite 1730
Salt Lake City, UT 84101
Telephone: 801.478.6900
john.huber@gtlaw.com
marc.rasich@gtlaw.com
wadleyd@gtlaw.com
bakera@gtlaw.com

*Attorneys for Plaintiff True North United Investments, LLC*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| TRUE NORTH UNITED INVESTMENTS, LLC, a Utah limited liability company, individually and derivatively on Behalf of BLOCKCHAIN GAME PARTNERS, INC., a Wyoming Corporation, d/b/a GALA GAMES; | **VERIFIED COMPLAINT FOR DIRECT AND DERIVATIVE ACTION** |
| Plaintiff, | Case No. 2:23-cv-00590-CMR |
| v. | Magistrate Judge Cecilia M. Romero |
| ERIC SCHIERMEYER, | |
| Defendant, | |
| -and- | |
| BLOCKCHAIN GAME PARTNERS, INC., a Wyoming Corporation, d/b/a GALA GAMES, | |
| Nominal Defendant | |

*ACTIVE 688127843v2*

Plaintiff True North United Investments, LLC ("True North"), through its attorneys, directly and derivatively on behalf of Blockchain Game Partners, Inc. d/b/a "Gala Games" ("BGP") brings this complaint against Defendant Eric Schiermeyer, for corporate waste, conversion, unjust enrichment, and removal of Schiermeyer as a director and president of BGP. True North alleges the following on information and belief, except as to the allegations specifically pertaining to True North, which are based on actual knowledge:

**INTRODUCTION**

1.      This action arises out of the unlawful scheme and course of conduct pursuant to which Schiermeyer, without board or shareholder knowledge or approval: (a) caused BGP to sell off and waste millions of dollars in company assets, including "burning off" approximately $600 million in Gala and shareholder assets; (b) caused BGP to lend millions of BGP funds to himself for personal interests; (c) usurped corporate opportunities by forming entities in Switzerland and Dubai to pursue business opportunities that rightfully belong to BGP (and inserting himself as the controlling shareholder); (d) caused BGP to operate without notice to or input from True North's manager and BGP director, Wright Thurston, thus eliminating Thurston's ability to help guide BGP to the benefit of the company and its shareholders; (e) caused BGP to operate with materially-defective financial controls and/or to provide materially incomplete or incorrect information to Thurston; (f) caused BGP to fail and refuse to provide True North and Thurston with corporate records despite repeated requests; and (g) engaged in systematic, intentional, and deceptive behavior to the detriment of BGP and its shareholders.

2.      True North brings certain claims derivatively, because, for the reasons detailed below, the BGP board, as currently composed, cannot do so, and cannot consent to such claims.

3.      Schiermeyer's actions have been ongoing and have seriously damaged – and threaten to further damage – BGP. Those actions also have caused and threaten to continue to cause damage to the rights and interests of True North and various other minority shareholders arising under the Founders Agreement and from its position as a 44.762% shareholder of BGP.

4.      Schiermeyer's malfeasance, mismanagement, and self-dealing have resulted in hundreds of millions of dollars in damage to BGP's reputation and company and shareholder assets.  Unless enjoined, Schiermeyer's continuing disregard for the interests of the company and its shareholders threatens to imminently and irreparably harm BGP.

5.      By this action, True North seeks to rectify the harm to the company caused by Schiermeyer's actions.

## THE PARTIES

6.      True North United Investments, LLC is a Utah limited liability company organized and existing under the laws of the state of Utah, with its principal place of business in Wasatch County, Utah.  True North is now, and since the founding of the company, always has been a shareholder of BGP.

7.      True North's members are: WWT Legacy Trust; SMT Legacy Trust; FRT Legacy Trust; TMT Legacy Trust; WJT Legacy Trust; TBT Legacy Trust; AMT Legacy Trust; and NET Legacy Trust.

8.      Each above trust was formed in and exists under the laws of the State of Utah.

9.      Thurston is the trustee for all the above trusts. He resides in Dorado, Puerto Rico.

10.      Upon information and belief, Defendant Eric Schiermeyer is an individual residing in the state of California.  Schiermeyer has been a BGP director since its inception in

January 2019 and has been its President since around 2021.

11.     Nominal party Blockchain Game Partners, Inc. is a Wyoming corporation organized and existing under the laws of the state of Wyoming, with its principal place of business in Jackson, Wyoming, doing business as "Gala Games."

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over the claims herein pursuant to 28 U.S.C. §§ 1332 and 1367.

13.     This Court has personal jurisdiction over Schiermeyer pursuant to the Founders Agreement in which Schiermeyer "expressly stipulate[d] that any and all disputes . . . shall be litigated in the state or federal courts of Salt Lake City, Utah, USA" and "consent[ed] to personal jurisdiction in those courts."  *See* Founders Agreement; *see also* Blockchain Game Partners, Inc. Shareholder Agreement § 14.3.  Further, this Court has personal jurisdiction over Schiermeyer because, among other reasons, Schiermeyer has injured True North in this District. The exercise of jurisdiction over Schiermeyer comports with federal due process.

14.     Venue is proper under 28 U.S.C. § 1391(a) and (b) and pursuant to the Founders Agreement and the Blockchain Game Partners, Inc. Shareholder Agreement.

15.     This action is not a collusive action to confer jurisdiction that this Court would otherwise lack.

## FACTUAL ALLEGATIONS

### A.  The Founders Agreement and BGP Bylaws.

16.     On or about January 1, 2019, True North and Schiermeyer founded BGP, and "several affiliated companies and entities" (collectively, the "BGP Companies") which were

formed or would be formed to build upon blockchain technology previously owned and developed by True North. These entities were intended to (a) develop and hold intellectual property rights and licenses, (b) develop and operate video games on a public ledger blockchain, (c) develop and establish a blockchain rewards system for video games, (d) sell software and hardware blockchain nodes[1] for the games, (e) host software and hardware nodes, and (f) other affiliated services and products. *See* Founders Agreement.

17.     Pursuant to the Founders Agreement, the parties agreed that BGP would earn revenue, cryptocurrency, digital assets, and rewards, common, rare, and legendary game items (Non-Fungible Tokens, or "NFTs"), and other consideration from, and hold equal stock or other equity interests in, each of the "BGP Companies" (collectively, the "Ownership"). *Id.*

18.     The parties agreed to "equitably share and participate in the Ownership derived from the BGP Companies to vest immediately: Eric [Schiermeyer] – 50%; and True North – 50%." *Id.* BGP's 100,000,000 Preferred Shares were accordingly divided between Schiermeyer and True North with each receiving 50,000,000 shares.

19.     Importantly, True North and Schiermeyer agreed "not to circumvent or compete with the BGP Companies in a manner to earn income, hold ownership, vote, or earn rewards from the services and products of the BGP Companies in a manner to squeeze out or diminish the rights and Ownership of any other party to this Agreement." Founders Agreement.

20.     In addition to the Founders and Shareholder's agreements, BGP's actions are governed by its Bylaws. As to directors, the Bylaws provide that "[t]he board of directors shall

---

[1] A "node" is computer software (granted by a license to operate) that confirms, verifies, and processes transactions on the blockchain, in exchange for "rewards."

have the control and general management of the affairs and business of the corporation.  Such

directors shall in all cases act as a board, regularly convened, by a majority, and they may adopt

such rules and regulations for the conduct of their meetings and the management of the

corporation."  Bylaws § 3.01.

      21.    Since BGP's inception, the directors have always been Wright Thurston and Eric

Schiermeyer.

      22.    Relevant provisions of the Bylaws include:

> **3.05   Director Meetings.**  The annual meeting of the board of directors shall be
> held each year immediately following the annual meeting of the shareholders.
> Other regular meetings of the board of directors shall from time to time by
> resolution be prescribed.  No further notice of such annual or regular meeting of
> the board of directors need b[e] given.

> **3.06   Special Meetings.**  Special meetings of the board of directors may be
> called by or at the request of the president of the corporation or any director.  The
> person or persons authorized to call special meetings of the board of directors
> may fix any place, either within or without the State of Wyoming, as the place for
> holding any special meeting of the board of directors.

> **3.07   Notice.**  Notice of any special meeting shall be given at least twenty-four
> hours previous thereto by written notice if personally delivered, or five
> days previous thereto if mailed or emailed to each director.

> **3.09   Quorum and Manner of Acting.**  A super majority (75%) of the directors
> shall constitute a quorum for the transaction of business at any meeting and the
> act of a majority of the directors present at any meeting at which a quorum is
> present shall be the act of the board of directors. . . . The directors shall act only as
> a board and the individual directors shall have no power as such....

> **3.11   Voting.**  At all meetings of the board of directors, each director is to have
> one vote, irrespective of the number of shares of stock that director holds.

      23.    All actions of officers are subject to the direction of the board of directors.  For

example, while there is a "President" that serves as the chief executive officer of the corporation,

the President's general supervision over the business of the corporation is subject to "the control

of the board of directors." Bylaws § 4.05.  In fact, the President may only act as "authorized by

the board of directors."  *Id.*

24.     Accordingly, under the Founders Agreement and sections 3.09 and 4.05 of the

Bylaws, all control of the corporation requires the authorization of both Thurston and

Schiermeyer as the two directors on the board.

25.     Schiermeyer currently serves as BGP's President.

**B.  BGP Launches "Gala Games."**

26.     BGP commonly does business as "Gala Games."  Since its founding, Gala Games

has grown to become a successful blockchain video game and entertainment company, with

millions of dollars in annual revenue and hundreds of employees.

27.     During the first two years of its operation, both Thurston and Schiermeyer

participated in the direction and oversight of the company's growing operations and increasing

number of employees.

28.     True North and Schiermeyer both contributed millions of dollars (both in the form

of USD and cryptocurrency) to develop Gala Games.  In exchange, BGP allocated 14,000 nodes

between True North and Schiermeyer (split according to their shares in BGP, i.e., 50/50).

29.     These BGP nodes confirm, verify, and process transactions on the blockchain in

exchange for rewards, in this case tokens called "Gala" or the "Gala token."

30.     BGP's base technology, node software mining technology, blockchain referral

network, customer service, blockchain non-custodial wallet technology, daily rewards

distribution engine, proof of action protocol (that tracks users' actions and sends the data to

BGP's blockchain formula), mining dashboard, and tracking for individual users and blockchain

functions, as well as the greater share of financing, were contributed through True North and Thurston.

31.     Schiermeyer provided BGP with his understanding of mobile games, video game models, experienced game staff, and market experience.

32.     Thurston and Schiermeyer partnered to create innovative action points and integrate True North's technology with gaming software.

33.     Nodes individually owned by True North and Schiermeyer started earning Gala rewards in July 2019. The first distribution on the Etherium blockchain was in September 2020.

34.     On September 12, 2020, Schiermeyer received his initial distribution of 2.3 billion Gala from his node rewards which were deposited into his private wallet[2] to which he alone held the private keys.

35.     On the same date, True North received his initial distribution of 1.9 billion Gala from his node rewards which were deposited into True North's private wallet to which True North alone held the private keys

36.     After the initial distributions, any remaining and all additional Gala and NFTs earned by True North and Schiermeyer would be stored in wallets controlled solely by Schiermeyer.

37.     On or about February 2021, BGP finalized the purchase of Sandbox Games. Shortly after the acquisition, the founders agreed to another distribution that included the former owners of Sandbox.

---

[2] A "wallet" is a blockchain storage account used to store cryptocurrency and other digital assets (like a bank account).  Wallets can be accessed using a "key" which operates much like a password for access to an online account.

38.     In or about the first quarter of 2021, following the distribution that resulted from BGP's acquisition of Sandbox, True North and Schiermeyer each separated around 8.6 billion Gala which they individually owned into wallets they individually controlled. Schiermeyer, however, took control of all remaining Gala and NFTs (including those owned by True North and others) by separating them into wallets to which Schiemeyer alone held the keys.

39.     Despite repeated concerns raised by Thurston and requests from BGP shareholders for distributions/payment, Shiermeyer continued to hold these Gala and NFT and even sold some for his personal benefit.

### C. Schiermeyer Uses BGP Assets for Personal Gain, Acts on Behalf of BGP Without Board Approval And "Burns" Off Millions of Gala Tokens

40.     Over at least the last twelve (12) months, Schiermeyer has exercised unilateral control over the operations, assets, and profits of BGP. During that time, Schiermeyer has flouted BGP's founding and charter documents and has covertly acted and engaged in transactions on behalf of BGP and used BGP's assets and earnings, often for his own personal benefit, without the consent of BGP's board or its shareholders.

41.     For example, Schiermeyer:

- Caused BGP to send millions of dollars of cryptocurrency to Jason Brink, BGP's President of Blockchain, for unapproved and unknown reasons.

- Caused BGP to distribute valuable NFTs to himself and select BGP employees, without board or shareholder approval.  By design, those NFTs should have been randomly distributed to members of the Gala community.

- Caused BGP to intentionally destroy hundreds of millions of dollars of asset value by "burning" Gala tokens.[3]

---

[3] "Burning" tokens refers to the permanent removal of tokens from circulation, which is typically accomplished by transferring tokens to a "burn address," i.e., a wallet from which they can never be retrieved.  In effect, burning tokens results in their destruction and consequently destroys their value.

- Misappropriated millions of dollars of BGP funds, including, using company funds for buying and renting real estate for personal use, transferring company assets into his own name or the names of entities that he owns or controls, using company funds to hire architects, construction companies, and designers for personal real estate, moving company funds into personal accounts.

- Caused BGP to pay $5 million towards an installment purchase of a corporate jet for Schiermeyer's personal benefit despite the BGP board previously agreeing to sell the jet/BGP's position.

42.     In or about April 2023, without disclosure to, authorization of, or oversight by the board, Schiermeyer directed BGP to replace all Gala tokens on a one-to-one basis with a new version ("Gala v2 tokens").  BGP publicly announced the v1 tokens would be "upgraded" to v2 automatically.

43.     Contrary to the public announcement, Schiermeyer did not cause BGP to "upgrade" all Gala tokens. In fact, upon information and belief, Schiermeyer directed BGP *not* to replace billions of the v1 tokens held by True North and other shareholders.  Instead, Schiermeyer directed BGP to deposit the replacement tokens to wallets controlled by Schiermeyer personally.

44.     Schiermeyer's Gala "upgrade" caused substantial harm to BGP's value by, among other things, causing crypto-currency exchange Coinbase to delist Gala and rendered worthless all Gala held by other Gala holders whose tokens were not accessible to BGP at the time of conversion. It also directly damaged True North and the others who lost all the value in their Gala v1.

45.     Upon information and belief, at or around the same time, Schiermeyer caused BGP to burn billions of Gala v2 tokens belonging to BGP's shareholders, again without board

approval and without the knowledge of or a vote by the shareholders.  In total, Schiermeyer caused BGP to burn around 21 billion Gala v2 tokens, including many replacement tokens belonging to BGP's shareholders. The burn destroyed more than $600 million in assets.

46.     For example, by burning True North's Gala v2 tokens, i.e., the replacement tokens, Schiermeyer effectively converted 5 billion Gala v1 tokens in True North's wallets worth around $00.030 each and then destroyed their value completely.

47.     As a result, True North lost the equivalent of about $151 million in Gala tokens.

48.     Schiermeyer's burn also further destroyed BGP value by effectively centralizing control and power over the Gala ecosystem in Schiermeyer which is antithetical to one of BGP's core principles regarding the development of the larger Gala ecosystem and community.[4]

49.     Schiermeyer's decision to replace v1 tokens with Gala v2 and to burn off Gala tokens were not explained to, nor approved or overseen by, the BGP board or its shareholders. Nevertheless, after a public announcement of Schiermeyer's actions, Thurston repeatedly informed BGP's corporate counsel that Schiermeyer's actions violated the companies' organizing documents, but BGP's corporate counsel took no corrective action.

50.     Upon information and belief, while Schiermeyer burned off True North's Gala tokens (and Gala tokens belonging to other shareholders), Schiermeyer reserved some Gala v2 tokens for himself.  Schiermeyer also granted himself sole control over company wallets receiving future v2 tokens and other digital assets.

51.     Upon information and belief, Schiermeyer further breached his fiduciary duties by

---

[4] Decentralization and transparency are key principles behind all blockchain projects. Burning essentially centralized control in fewer community members as BGP and Schiermeyer became the two largest holders of Gala token by a substantial margin.

using company funds to buy and rent real estate for personal use, transferring company assets
into his own name (via entities that he created), hiring architects, construction companies, and
designers for personal real estate, and moving funds into his personal accounts.

52.     Moreover, while the company board unanimously voted on January 11, 2023, to
liquidate non-crypto assets because of a general downturn in the value of various
cryptocurrencies within the digital assets economy, Schiermeyer instead directed an installment
payment of $5,000,000 to be made to purchase a Gulfstream airplane in April 2023 for his
personal use.  This expenditure was not disclosed to or approved by the board, and contradicted
the board's vote to liquidate (not purchase) physical property.

53.     Schiermeyer's conduct was, upon information and belief, deceptive and
intentional, as the "financial statements" provided by Schiermeyer to Thurston as director were
inaccurate and omitted significant financial information and details about Schiermeyer's
transactions including the failure to disclose accurately the creation of new BGP companies, real
estate transactions for the benefit of Schiermeyer, and the conversion of Gala.

54.     Upon information and belief, Schiermeyer later directed the company controller
not to share any financial information with director Thurston and deleted Thurston from internal
company communication channels.

55.     Thurston, as director, has attempted to discuss these and other matters with
Schiermeyer and has made multiple attempts to call board meetings, to meet with Schiermeyer,
and to obtain information about Schiermeyer's activities.  Schiermeyer has rejected all of
Thurston's good faith attempts to confer.

**D. Schiermeyer Breaches the Duty of Loyalty and Usurps Corporate Opportunities.**

56.     To maximize the value of the BGP intellectual property and to expand the Gala ecosystem into other markets, BGP's board discussed on several occasions Gala Music and Gala Film. Both potential enterprises were intended and agreed to be wholly owned subsidiaries of BGP. All funding, staffing, intellectual property for these new entities came from BGP.

57.     In its January 2023 meeting, the board approved in concept exploring a path to move forward with Gala Music first. No decisions were made to form the companies or to move forward pending resolution on issues regarding ownership, funding, overall structure, and business plans.

58.     Thurston attempted to address these issues with Schiermeyer at the BGP board meeting on April 6, 2023, but Schiermeyer lied to Thurston by denying that any foreign entities had been created – when in fact the music entity had been formed months earlier.

59.     Unbeknownst to Thurston, upon information and belief, Schiermeyer formed Gala Music in Switzerland and, without board approval, authorization, or consent, unilaterally installed himself as the largest shareholder. He also formed a sales entity in Dubai and again unilaterally installed himself as its largest shareholder. In each case, Schiemeyer excluded BGP, True North, and the many other BGP shareholders from any ownership. Schiermeyer breached his fiduciary duty of loyalty and was unjustly enriched by taking a BGP opportunity for himself.

60.     Upon information and belief, Schiermeyer has or intends to transfer or use much of BGP's current business, tech platform, assets, and intellectual property to benefit the foreign legal entities, yet Schiermeyer has effectively removed BGP, True North, and other shareholders from the benefits of the expanded platforms and revenues flowing from these entities.

61.     Schiermeyer's actions have not inured to the benefit of BGP or its shareholders.

62.     To the contrary, Schiermeyer's refusal to answer calls, respond to communications, attend meetings, provide information about his unilateral actions, or to take any cooperative action to protect BGP and its shareholders from the conversion, waste, or destruction of BGP assets has greatly damaged BGP and its shareholders, including True North.

63.     Schiermeyer's creation of the separate foreign legal entities to pursue opportunities rightfully belonging to BGP will further damage BGP's shareholders by diminishing the value of BGP as a company.

**E.    Schiermeyer Exercises Control of the Nodes.**

64.     Upon information and belief, Schiermeyer recently announced that BGP would distribute 8,000 nodes to BGP's employees. At the same time, Thurston, upon information and belief, understands that Schiermeyer intends to shut off True North's nodes, depriving True North of significant assets.  While Thurston is not opposed to providing additional benefits and incentives to BGP employees, including where appropriate, in the form of nodes the plan for doing so was never disclosed to or approved by the board or shareholders.

65.     Each node currently can generate a certain amount of value in the form of various digital assets each day.

66.     By shutting off True North's nodes, Schiermeyer would deprive True North of the opportunity to generate valuable digital assets over time.

67.     Schiermeyer's unilateral – and improper – conversion/shutting off of True North's nodes is not his first removal of nodes, however, as he has done so at least twice before.  For example, in 2021, Schiermeyer shut off 500 nodes that True North previously gave to Liberty

United, a blockchain company, in exchange for services rendered.

**F. Derivative and Demand Futility.**

68.     True North brings the First, Second, Third and Fourth Claims for Relief derivatively on behalf of BGP to redress injuries suffered and to be suffered by BGP as a direct result of Scheirmeyer's breaches of his fiduciary duties, was of corporate assets, unjust enrichment, and gross abuse of his position as director and officer of the company.

69.     True North will adequately and fairly represent the interests of BGP in enforcing and prosecuting its rights.

70.     Based on the facts set forth in this Complaint, applicable law, and the longstanding rule that equity does not compel a useless and futile act, prefiling demand upon the BGP board to institute action against Schiermeyer, would be futile and therefore is excused.

71.     BGP's bylaws require a 2/3 majority vote for the BGP board to act. There are only two BGP directors – Thurston and Schiermeyer.  Thus, the required super majority of the board cannot exercise independent and objective judgment in deciding whether to bring this action or vigorously pursue it because Schiermeyer participated personally in the wrongful conduct described herein and personally benefitted from the wrongful conduct described herein. Approving the initiation and vigorous prosecution of this derivative action would require Schiermeyer to approve suing himself, rendering any request for board approval futile.

72.     Any ability to resolve this deadlock by shareholder vote is similarly futile. The Bylaws require a supermajority vote (75% of shares) for any action to be taken by the shareholders, but True North and Schiermeyer are both own about 44% of the outstanding shares.  Thus, it would be futile to seek to hold a shareholder's meeting to remove Shiermeyer as

a director and president of BGP or to attempt to direct the board to initiate and vigorously

prosecute this action as it would require Schiermeyer to approve filing and pursuing a suit

against himself.

## FIRST CLAIM FOR RELIEF
### (Derivative Claim for Breach of Fiduciary Duty)

73.     True North incorporates and realleges the allegations set forth above as though

fully set forth herein.

74.     Schiermeyer owed and owes BGP and its shareholders fiduciary obligations.  By

reason of his fiduciary relationship, Schiermeyer owed and owes BGP and its shareholders the

highest obligation of candor, good faith, fair dealing, loyalty, and due care.

75.     Schiermeyer violated and breached his fiduciary duty of candor, good faith, fair

dealing, loyalty, and due care.  Schiermeyer violated his fiduciary duty by, among other acts

herein described, (a) destroying company and shareholder assets, (b) converting company funds

for personal use, (c) wasting company funds, (d) launching competing companies and omitting

True North and other BGP shareholders as shareholders with the same percentage interests in

those entities (e) cutting Thurston out of the management of BGP without notice or shareholder

vote, and (f) causing BGP to provide incomplete, false or misleading financial information to

True North and Thurston; and (g) causing BGP to fail and refuse to provide True North or

Thurston access to or copies of accurate and complete company records.  Schiermeyer did so

unilaterally and for his personal benefit, in knowing or reckless disregard for the interests of

BGP and its shareholders. These actions were disloyal, unlawful self-dealing, and could not have

been a good faith exercise of prudent business judgment nor were they taken to protect and

promote BGP's interests.

76.     As a direct and proximate result of Schiermeyer's breach of his fiduciary obligations, BGP and its shareholders have sustained significant damages, in an amount to be proven at trial but which exceeds $600 million.

77.     BGP has no adequate remedy at law and, unless Schiermeyer is preliminarily and permanently enjoined from further breaching his obligations to the company, BGP will continue to suffer imminent and irreparable harm.

## SECOND CLAIM FOR RELIEF
### (Derivate Claim for Waste of Corporate Assets)

78.     True North incorporates and realleges the allegations set forth above as though fully set forth herein.

79.     As a result of Schiermeyer's unilateral and unauthorized conduct, BGP burned more than approximately 20.9 billion Gala tokens belonging to its shareholders and others in the Gala community worth more than $600 million.  As a further result of Schiermeyer's unilateral conduct, BGP (at Schiermeyer's direction) contributed at least $5 million in an installment payment for a corporate jet for Schiermeyer's personal use.  Schiermeyer's actions on behalf of BGP have resulted not just in the loss of millions of corporate assets but irreversible damage to BGP's reputation and standing.

80.     As a result of the waste of corporate assets, Schiermeyer is liable to BGP and its shareholders in an amount to be proven at trial which exceeds $600 million.

81.     BGP has no adequate remedy at law and, unless Schiermeyer is preliminarily and permanently enjoined from further breaching his obligations to the company, BGP will continue to suffer imminent and irreparable harm.

**THIRD CLAIM FOR RELIEF**
**(Derivative Claim for Unjust Enrichment)**

82.     True North incorporates and realleges the allegations set forth above as though

fully set forth herein.

83.     By his wrongful actions, Schiermeyer was unjustly enriched at the expense of and

to the detriment of BGP and its shareholders (including True North).  As described herein,

Schiermeyer was unjustly enriched by converting company assets for personal use and by

burning shareholder Gala tokens while retaining huge amounts of Gala for personal use. BGP

received no benefit from Schiermeyer's waste of company assets, or his use of company

confidential information and financial assets for his personal gain. To the contrary, BGP was

substantially harmed by those acts.

84.     True North, as a shareholder and representative of BGP, seeks restitution from

Schiermeyer and seeks an order of this Court disgorging all profits, benefits, and other

compensation obtained by Schiermeyer from his wrongful conduct and fiduciary breaches. A

constructive trust for the benefit of BGP should be imposed on all benefits gained or to be gained

by Schiermeyer as a result of his wrongful acts.

85.     BGP has no adequate remedy at law and, unless Schiermeyer is preliminarily and

permanently enjoined from further breaching his obligations to the company, BGP will continue

to suffer imminent and irreparable harm.

**FOURTH CLAIM FOR RELIEF**
**(Direct and Derivative Claim for Judicial Removal**
**of Schiermeyer as Director of BGP)**

86.      True North incorporates and realleges the allegations set forth above as though

fully set forth herein.

87. The Wyoming Business Corporation Act ("WBCA") Section 17-16-809 provides the Court with the authority to remove a director when "[t]he director engaged in fraudulent conduct with respect to the corporation or its shareholders, grossly abused the position of director, or intentionally inflicted harm on the corporation" and "[c]onsidering the director's course of conduct and the inadequacy of other available remedies, removal would be in the best interest of the corporation."

88. WBCA Sections 17-17-140 and 17-17-141 further provide the Court with the authority, upon the petition of a shareholder, to remove a director of the corporation, if "[t]he directors or those in control of the corporation are deadlocked in the management of the corporation's affairs, the shareholders are unable to break the deadlock, and the corporation is suffering or will suffer irreparable injury or the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders generally because of the deadlock."

89. Schiermeyer's unilateral and unauthorized conduct described herein has greatly damaged BGP and its shareholders, including by the destruction of more than $600 million in company and shareholder assets, conversion of company funds and other assets for personal use, and by launching competing companies and unilaterally inserting himself as majority shareholder.

90. Thurston, as director of BGP, has tried in vain to schedule meetings with Schiermeyer regarding his actions and the future of the company. Thurston has further requested meetings and the adoption of resolutions to remove Schiermeyer as director of BGP. Schiermeyer has rejected various proposals and requests, resulting in a deadlock between the two directors.

91.     True North and Schiermeyer are also the two largest shareholders, each holding about 44% of the outstanding shares of the company.

92.     To break any director deadlock, however, a supermajority (75%) vote of shareholders is required.  Because of True North and Schiermeyer's deadlock, and their large ownership of shares, the shareholders cannot break the directors' deadlock regarding the management of the company and how to proceed.

93.     Accordingly, judicial removal of Schiermeyer is necessary to protect the company and its shareholders and to break the deadlock currently existing between BGP's directors and shareholders.

94.     WBCA Sections 17-17-140 and 17-17-141 similarly authorize, on the same grounds, the removal of an officer of the company.

95.     True North, as 44% shareholder, and derivatively on behalf of BGP, seeks an order of this Court pursuant to WBCA Sections 17-16-809, 17-17-140, and 17-17-141 for Schiermeyer to be removed as director and President of BGP.

## FIFTH CLAIM FOR RELIEF
### (Direct Claim for Breach of Contract)

96.     True North incorporates and realleges the allegations set forth above as though fully set forth herein.

97.     As described herein, True North and Schiermeyer executed the Founders Agreement dated January 1, 2019, with each party to become a 50% owner of the corporation. The Founders Agreement further provided that neither party shall "circumvent or compete with the BGP Companies in a manner to earn income, hold ownership, vote, or earn rewards from the services and products of the BGP Companies in a manner to squeeze out or diminish the rights

and Ownership of any other party to this Agreement."

98.    True North has fully performed its contractual obligations under the Founders Agreement.

99.    As described herein Schiermeyer has breached the agreement by taking unilateral (i.e., *not* supermajority) action as director of BGP and as co-founder to squeeze True North out of, and/or diminish True North's rights and Ownership in, BGP and the BGP Companies.

100.    True North has suffered and will continue to suffer damages in an amount to be determined at trial, but which are at least in excess of $75,000.  In addition, as True North's damages cannot be adequately compensated through monetary relief, True North seeks preliminary and permanent injunctive relief requiring Schiermeyer to abide by the terms of the Founders Agreement.

101.    Because Schiermeyer threatens to continue his wrongful acts including by turning off or redistributing True North's BGP nodes which would cause True North additional, imminent, and irreparable harm, he must be preliminarily and permanently enjoined from further breaching the Founders Agreement.

### SIXTH CLAIM FOR RELIEF
### (Direct Claim for Conversion)

102.    True North incorporates and realleges the allegations set forth above as though fully set forth herein.

103.    As a result of Schiermeyer's decision to replace all Gala v1 tokens (held in True North's private wallet) with Gala v2 tokens (deposited into a wallet controlled by Schiermeyer), Schiermeyer converted about $151 million worth of Gala tokens belonging to True North. Schiermeyer then burned the Gala v2 tokens that should have been provided to True North.

104.     Schiermeyer had no right to claim or exercise ownership over any Gala tokens belonging to True North (whether v1 or v2 tokens).

105.     Schiermeyer has therefore willfully and intentionally converted True North's property, resulting in damage to True North.

106.     As a direct and proximate result of Schiermeyer's conversion of True North's property (the Gala tokens), True North has been damaged in an amount not less than $151 million.

107.     Schiermeyer's conversion constitutes acts that result from willful and malicious or intentionally fraudulent conduct or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of True North, entitling True North to an award of punitive damages against Schiermeyer, in an amount sufficient to punish the conduct in accordance with the law.

### PRAYER FOR RELIEF

WHEREFORE, True North demands judgment as follows:

A.     On the First, Second, and Third Claims for Relief, (i) for judgment against Schiermeyer for shareholders' benefit in an amount according to proof but no less than $600 million in monetary damages; and, in addition to monetary relief, (ii) an order directing Schiermeyer to account for damages he caused and all profits, special benefits, and unjust enrichment he obtained through his wrongful conduct, (iii) for a preliminary and permanent injunction prohibiting Schiermeyer from using BGP's property (intellectual and otherwise) to benefit competing companies; and (iv) ordering Schiemeyer to perform his fiduciary duties to BGP and its shareholders.

B.      On the Fifth and Sixth Claims for Relief, for judgment against Schiermeyer for True North's benefit in an amount according to proof but in no event less than $150 million in monetary damages; and, in addition to monetary relief, for a preliminary and permanent injunction ordering Schiermeyer to abide by the terms of the Founders Agreement.

C.      On the Sixth Claim for Relief, for an order awarding punitive damages on account of Schiermeyer's willful and malicious conversion of True North's property in an amount to be determined at trial.

D.      On the Fourth Claim for Relief, for an order preliminarily and permanently removing Schiermeyer as both director and President/Chief Executive Officer (and/or any other role) of BGP.

E.      An order awarding True North, as prevailing party, reasonable attorneys' fees as deemed appropriate by the Court.

F.      An award of costs to True North, as the prevailing party, as deemed appropriate by the Court.

G.      Pre-judgment and post-judgment interest at the maximum rate provided by law.

H.      Such other and further relief as this Court may deem appropriate under the circumstances.

**JURY DEMAND**

True North demands a trial by jury.


DATED: August 31, 2023



GREENBERG TRAURIG, LLP

/s/ *Marc T. Rasich*
Marc T. Rasich
John W. Huber
Daniel J. Wadley
Alexander Baker

*Attorneys for Plaintiff*
*True North United Investments, LLC*

## <u>VERIFICATION</u>

I, Wright Thurston, as Manager of True North United Investments, LLC, declare as follows:

True North is the plaintiff in this action. True North and its representatives are familiar with the allegations contained in the Complaint, and hereby authorizes the filing of the Complaint. I verify that the foregoing is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 06/14/2023 | 4:06 PM PDT
_____

DocuSigned by:
44B1EF571FD3413...

Wright Thurston, on behalf of
True North United Investments, LLC

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| **I. (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| True North United Investments, LLC | Eric Schiermeyer |

| **(b)** County of Residence of First Listed Plaintiff **Wasatch County** | County of Residence of First Listed Defendant **San Diego County** |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* <br> NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)* <br> Greenberg Traurig (801) 478-6900 <br> 222 S. Main St., Ste. 1730, SLC, UT 84101 | Attorneys *(If Known)* |
|---|---|

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [x] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [x] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance <br> [ ] 120 Marine <br> [ ] 130 Miller Act <br> [ ] 140 Negotiable Instrument <br> [ ] 150 Recovery of Overpayment & Enforcement of Judgment <br> [ ] 151 Medicare Act <br> [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) <br> [ ] 153 Recovery of Overpayment of Veteran's Benefits <br> [x] 160 Stockholders' Suits <br> [ ] 190 Other Contract <br> [ ] 195 Contract Product Liability <br> [ ] 196 Franchise | **PERSONAL INJURY** <br> [ ] 310 Airplane <br> [ ] 315 Airplane Product Liability <br> [ ] 320 Assault, Libel & Slander <br> [ ] 330 Federal Employers' Liability <br> [ ] 340 Marine <br> [ ] 345 Marine Product Liability <br> [ ] 350 Motor Vehicle <br> [ ] 355 Motor Vehicle Product Liability <br> [ ] 360 Other Personal Injury <br> [ ] 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY** <br> [ ] 365 Personal Injury - Product Liability <br> [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability <br> [ ] 368 Asbestos Personal Injury Product Liability <br> **PERSONAL PROPERTY** <br> [ ] 370 Other Fraud <br> [ ] 371 Truth in Lending <br> [ ] 380 Other Personal Property Damage <br> [ ] 385 Property Damage Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881 <br> [ ] 690 Other | [ ] 422 Appeal 28 USC 158 <br> [ ] 423 Withdrawal 28 USC 157 <br> **INTELLECTUAL PROPERTY RIGHTS** <br> [ ] 820 Copyrights <br> [ ] 830 Patent <br> [ ] 835 Patent - Abbreviated New Drug Application <br> [ ] 840 Trademark <br> [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 375 False Claims Act <br> [ ] 376 Qui Tam (31 USC 3729(a)) <br> [ ] 400 State Reapportionment <br> [ ] 410 Antitrust <br> [ ] 430 Banks and Banking <br> [ ] 450 Commerce <br> [ ] 460 Deportation <br> [ ] 470 Racketeer Influenced and Corrupt Organizations <br> [ ] 480 Consumer Credit (15 USC 1681 or 1692) <br> [ ] 485 Telephone Consumer Protection Act <br> [ ] 490 Cable/Sat TV <br> [ ] 850 Securities/Commodities/ Exchange <br> [ ] 890 Other Statutory Actions <br> [ ] 891 Agricultural Acts <br> [ ] 893 Environmental Matters <br> [ ] 895 Freedom of Information Act <br> [ ] 896 Arbitration <br> [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision <br> [ ] 950 Constitutionality of State Statutes |
| **REAL PROPERTY** <br> [ ] 210 Land Condemnation <br> [ ] 220 Foreclosure <br> [ ] 230 Rent Lease & Ejectment <br> [ ] 240 Torts to Land <br> [ ] 245 Tort Product Liability <br> [ ] 290 All Other Real Property | **CIVIL RIGHTS** <br> [ ] 440 Other Civil Rights <br> [ ] 441 Voting <br> [ ] 442 Employment <br> [ ] 443 Housing/ Accommodations <br> [ ] 445 Amer. w/Disabilities - Employment <br> [ ] 446 Amer. w/Disabilities - Other <br> [ ] 448 Education | **PRISONER PETITIONS** <br> **Habeas Corpus:** <br> [ ] 463 Alien Detainee <br> [ ] 510 Motions to Vacate Sentence <br> [ ] 530 General <br> [ ] 535 Death Penalty <br> **Other:** <br> [ ] 540 Mandamus & Other <br> [ ] 550 Civil Rights <br> [ ] 555 Prison Condition <br> [ ] 560 Civil Detainee - Conditions of Confinement | **LABOR** <br> [ ] 710 Fair Labor Standards Act <br> [ ] 720 Labor/Management Relations <br> [ ] 740 Railway Labor Act <br> [ ] 751 Family and Medical Leave Act <br> [ ] 790 Other Labor Litigation <br> [ ] 791 Employee Retirement Income Security Act <br> **IMMIGRATION** <br> [ ] 462 Naturalization Application <br> [ ] 465 Other Immigration Actions | **SOCIAL SECURITY** <br> [ ] 861 HIA (1395ff) <br> [ ] 862 Black Lung (923) <br> [ ] 863 DIWC/DIWW (405(g)) <br> [ ] 864 SSID Title XVI <br> [ ] 865 RSI (405(g)) <br> **FEDERAL TAX SUITS** <br> [ ] 870 Taxes (U.S. Plaintiff or Defendant) <br> [ ] 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

| **VI. CAUSE OF ACTION** | Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*: <br> U.S.C. Section 1332 <br> Brief description of cause: <br> Breach of Fiduciary Duty, Corporate Waste, Conversion, Unjust Enrichment, Breach of Contract |
|---|---|

| **VII. REQUESTED IN COMPLAINT:** | [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. | DEMAND $ ███████ | CHECK YES only if demanded in complaint: <br> JURY DEMAND: [x] Yes [ ] No |
|---|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** | *(See instructions):* | JUDGE | DOCKET NUMBER |
|---|---|---|---|

| DATE <br> 8-31-2023 | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____