# EXHIBIT B

**BLOCKCHAIN GAME PARTNERS, INC**.

**SHAREHOLDER AGREEMENT**

This Shareholder Agreement ("*Agreement*") dated effective as of January 1, 2019, is entered into by and among Blockchain Game Partners, Inc., a Wyoming corporation (the "*Company*"), and each of the Shareholders listed on Schedule A (each a "*Shareholder*" and collectively the "*Shareholders*").

In consideration of the mutual promises and benefits contained herein, the Shareholders and the Company hereby agree as follows:

1.      **General Restriction**. Each Shareholder agrees and covenants that it will not, without the prior written consent of Shareholders holding an aggregate of not less than a super majority (75%) of the outstanding Shares of the Company (including the Shares proposed to be transferred), sell, pledge, lien, encumber, distribute or otherwise transfer or dispose of, and will not permit to be sold, encumbered, liened, attached, distributed or otherwise disposed of or transferred in any manner, either voluntarily or by operation of law, all or any portion of the Shares now owned or hereafter acquired by such Shareholder, except in accordance with and subject to the terms of this Agreement.

2.      **Exempt Transfer**. A Shareholder may transfer, either as a gift or through a sale, Shares owned by such Shareholder to (a) a trust for the benefit of such Shareholder or a spouse or lineal descendant of such Shareholder, and (b) an entity, such as a family limited liability company, over which such Shareholder retains exclusive control, or (c) any other transfer authorized by the super majority of Shareholders (each a "*Permitted Transferee*"). The parties agree that the terms of this Agreement affecting the mandatory or discretionary rights of sale and purchase of the Shares shall also apply to the Shares that may be transferred or owned by any Permitted Transferee. Notwithstanding the verbiage used herein indicating that the various purchase rights or obligations apply to Shares then owned or held by a Shareholder, in the event that the Shares of a Shareholder become available for purchase or are required to be purchased by the other Shareholders or the Company pursuant to the terms of this Agreement, then the purchase rights or obligations of the other Shareholders or the Company, as the case may be, shall also apply to all of the Shares held by the Permitted Transferee.

3.      **Vesting.** As set forth in Exhibit A, a Shareholder shall become vested in Shares of the Company pursuant to a vesting period. Any of the Unvested Shares may be repurchased by the Company in accordance with Section 4 below if the Shareholder no longer actively participates in the Company as a director, officer or employee of the Company or upon any of the triggering events set forth in Section 4 below. Notwithstanding the vesting schedule in Exhibit A, each Shareholder shall become fully vested in the Shares upon the consummation of a sale of 50% or more of the issued Shares, or a sale of substantially all of the assets of the Company to an unrelated third party by way of merger, sale, consolidation, or otherwise. In the event the Company pursues an initial public offering of its common stock, any Unvested Shares shall (a) be exchanged for stock options of equivalent value based upon the implied enterprise

1

value of the Company at the date of the initial public offering, (b) be exchanged for other securities of the Company under terms determined by the Company, or (c) any other consideration shall be given by the Company to the Shareholder to preserve Shareholder's economic interest in the Unvested Shares.

4.  **Right of First Refusal**.

4.1.    The Company has a right to repurchase any Unvested Shares in accordance with this section. If a Shareholder at any time proposes to transfer any or all of the Shares now owned or hereafter acquired by him to any person other than a Permitted Transferee, whether by sale, gift, involuntarily, by operation of law, or otherwise, such Shareholder (referred to in this Section as the "*Selling Shareholder*") shall first give written notice of such proposed transfer (the "*Proposed Transfer*") to the Company, which notice shall contain an offer to sell such Shares to the Company at the lesser of (a) the same terms and conditions applicable to the Proposed Transfer, or (b) the Purchase Price (as defined in Section 7). The notice shall state the name of the proposed transferee and all of the terms and conditions of the Proposed Transfer.

4.2.    Upon receipt of such notice, the Company shall deliver a copy of such notice to each of the other Shareholders. The Company shall have a period of 30 days after receipt of the notice in which to elect to purchase all or any part of such offered Shares.

4.3.    If the Company does not elect to purchase all of the offered Shares, the remaining Shareholders shall have the right to purchase, on the same terms and conditions applicable to the Proposed Transfer, all or any part of the offered Shares that were not purchased by the Company. This right shall be exercisable for a period of 30 days after the Company's right to purchase has terminated. In exercising their right to purchase, the purchasing Shareholders may divide the Shares to be purchased in any manner to which they all agree. In the absence of unanimous agreement, the Shares to be purchased shall be divided among the Shareholders electing to purchase the Shares in proportion to their respective percentage of Shares held in the Company as of the date of the Proposed Transfer.

4.4.    A Shareholder or the Company, as the case may be, shall exercise the purchase right by giving written notice to the Selling Shareholder, to any other Shareholder having the right to purchase the offered Shares, and, if the person exercising the purchase option is a Shareholder, to the Company, specifying the Shares elected to purchase. If a party fails to give notice to the appropriate parties within the applicable period of election to purchase any or all of the offered Shares entitled to purchase, such party shall be deemed to have waived its purchase right. The closing of a purchase and sale shall occur on or before the 30th day following the effective date of the notice by which a party elects to purchase such Shares.

4.5.    Any offered Shares not purchased pursuant to the foregoing provisions may be transferred by the Selling Shareholder to the proposed transferee named in the Proposed Transfer. However, if such transfer is not completed within 30 days following the termination of the Company's or Shareholders' right to purchase, a new offer must be made to the Company

2

before the Selling Shareholder can transfer any portion of his Shares to the proposed transferee, and the provisions of this Section shall again apply to such Proposed Transfer.

5.      **Right of Co-Sale.** Each Shareholder shall have the right, but not the obligation, to be included in any Proposed Transfer to any third party purchaser at the terms and purchase price, and the Company's and other Shareholder right of first refusal of Section 3 shall apply to each Selling Shareholder. If a Shareholder fails to elect to participate in any Proposed Transfer within fourteen (14) days of such notice of Proposed Transfer, the Shareholder shall be deemed to have waived its right of co-sale.

6.      **Bankruptcy**. If any of the Shares shall be levied upon, sequestered, administered by a receiver or a trustee in bankruptcy, the holder thereof shall give the Company prompt written notice of such occurrence. The Company and other Shareholders shall then have the option to exercise their right of first refusal to purchase such Shares in accordance with Section 3.

7.      **Delivery of Shares; Termination of Rights as Shareholder**. Upon the closing of a purchase of Shares hereunder, and upon payment of the consideration to be paid by the applicable purchaser at such closing, the Selling Shareholder shall promptly assign and deliver the applicable Shares to the purchaser. All transfer taxes and expenses shall be paid by the Selling Shareholder. After transfer of the shares, the Selling Shareholder shall no longer have any rights as a holder of such Shares sold and transferred.

8.      **Purchase Price**. Unless expressly provided otherwise herein, the purchase price (the "*Purchase Price*") of each Share of the Company that the Company or a Shareholder elects to purchase pursuant to the provisions of Section 3 of this Agreement shall be equal to the lesser of (i) the price per Share as agreed upon by the Selling Shareholder and purchaser (company or purchasing Shareholder) or (ii) the value of the Company divided by the number of all issued and outstanding Shares as of the date of the Proposed Transfer. The value of the Company shall be determined by one qualified independent appraiser with expertise in the blockchain industry selected by the Company, which appraisal shall be conducted as soon as practicable after the Company receives the Proposed Transfer notice from the Selling Shareholder. The Company shall pay the cost of such appraisal.

9.      **Payment of Purchase Price**. Unless the Selling Shareholder and the purchasers of Shares agree otherwise, the purchase price of any Shares purchased by the Company or other Shareholders pursuant to this Agreement shall be paid in full at the closing, or as negotiated and agreed to by the Selling Shareholder, which may include a promissory note in principal amount equal to the Purchase Price plus simple annual interest for a term of 3 years. The promissory note shall provide for 36 equal monthly payments with accrued simple interest at the prime rate published in the Wall Street Journal five business days prior to the date of the closing. Unless otherwise required by law, payments made on such promissory notes shall be applied first to collection costs, then to accrued interest, and finally to principal.

10.      **Term**. This Agreement shall terminate with respect to the Shares of the Company upon the occurrence of any of the following events with respect to the Company: (a) the Company ceases operations; (b) the bankruptcy, receivership, or dissolution of the Company; or or (c) the written agreement of all of the Shareholders and the Company to terminate this Agreement.

11.      **Additional Shareholders**. Any person who becomes a Shareholder of any Shares shall be required to affix its signature, indicating the date thereof, in the space provided at the end of this Agreement and thereafter shall have all the rights and obligations of a Shareholder under this Agreement. No Shares shall be issued or transferred on the books of the Company until all applicable provisions of this Agreement have been complied with, including without limitation the execution of this Agreement by the recipient of such Shares as a Shareholder hereunder.

12.      **No Right to Employment**. Notwithstanding anything contained herein to the contrary, the parties all acknowledge and agree that no Shareholder shall have a right of employment with any Company by reason of being a Shareholder or a party to this Agreement. Furthermore, nothing in this Agreement shall interfere with or otherwise restrict in any way the rights of any Company (or any parent or subsidiary of any Company employing or retaining any Shareholder) or of any Shareholder employed by any Company, which rights are hereby expressly reserved by each, to terminate such Shareholder's employment at any time and for any reason, with or without cause.

13.      **Confidentiality**.  The Company and each Shareholder now owns and will hereafter develop, compile, and own certain proprietary products, techniques, trade secrets, software, and confidential information, whether reduced to writing or not and whether or not patentable or protectable by copyright law or otherwise, which have great value in its business ("*Confidential Information*"). Each Shareholder agrees that such Shareholder will keep confidential and will not disclose, divulge, or use for any purpose (other than to monitor its investment in the Company) any Confidential Information obtained from the Company or any other Shareholder, unless such confidential information (a) is known or becomes known to the public in general (other than as a result of a breach of this section by such Shareholder), (b) is or has been independently developed or conceived by such Shareholder without use of the Company's or Shareholder's confidential information, or (c) is or has been made known or disclosed to such Shareholder by a third party without a breach of any obligation of confidentiality such third party may have to the Company; provided, however, that a Shareholder may disclose confidential information (i) to its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services in connection with monitoring its investment in the Company; (ii) to any prospective purchaser of any Share or derivative instrument linked to any Share, from such Shareholder, if such prospective purchaser agrees to be bound by the provisions of this section; (iii) to any affiliate, partner, member, shareholder, or wholly owned subsidiary of such Shareholder in the ordinary course of business, provided that such Shareholder informs such person that such information is confidential and directs such person to maintain the confidentiality of such information; or (iv) as may otherwise be required by law, regulation, rule, court order or subpoena, provided that such Shareholder promptly

4

notifies the Company of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure, if legally permissible and practicable.

14.    **General Provisions**.

14.1.    Each Shareholder represents that it is acquiring and holding the Shares for its own account for investment and not with a view to, or for sale in connection with, any distribution thereof. Each Shareholder understands that the Shares have not been registered under the Securities Act, or applicable state securities laws in reliance upon exemptions therefrom and the representations made herein and may not be transferred or sold without registration under the Securities Act or applicable state securities laws and, if requested by the Company, an opinion of counsel, satisfactory to the Company, that such registration is not required.

14.2.    This Agreement shall be governed by the laws of the State of Wyoming in all respects.

14.3.    In the event of any dispute, claim, question, or disagreement arising from or relating to this Agreement or the breach thereof, the parties may agree to first attempt mediation before a single mediator, administered by the International Centre for Dispute Resolution under its mediation rules, to be held in any location agreed to by the parties, or Salt Lake City, Utah, USA. Notwithstanding the foregoing, each Shareholder agrees that it may bring suit in any court of law to enjoin infringement or other misuse of confidential information or intellectual property rights of the Company or any Shareholder. The Parties expressly stipulate that any and all disputes beyond mediation, shall be litigated in the state or federal courts of Salt Lake City, Utah, USA. The Parties consent to personal jurisdiction in those courts. The prevailing party in any court action shall be entitled to costs and reasonable attorneys' fees.

14.4.    This Agreement may be executed simultaneously in two or more counterparts, by original or facsimile signature, each of which shall be deemed to be an original and all of which together shall constitute but one and the same instrument.

14.5.    This Agreement sets forth the entire agreement among the parties hereto. No provision of this Agreement shall be altered, amended, or revoked except by an instrument in writing signed by the Company and the Shareholders.

14.6.    All notices under the provisions of this Agreement shall be given by registered mail and shall be effective when deposited in the United States mail, postage prepaid, addressed to the registered office of the Company or the address on file for the Shareholder, or such other address as the Company or Shareholder may provide to the other parties.

14.7.    A Shareholder shall have no further rights under this Agreement when the Shareholder ceases to own any Shares.

14.8.    This Agreement shall extend to and be binding upon the successors, assigns, heirs and legal representatives of the parties hereto.

14.9.    References to a Shareholder, including references by use of a pronoun, shall be deemed to include masculine, feminine, singular, plural, individuals, trusts, companies, partnerships, or corporations where applicable.

14.10.  In the event that any part of this Agreement, as from time to time amended, is found to be void, the remaining provisions of this Agreement, as from time to time amended, shall nevertheless be binding with the same force and effect as if the void part were deleted.

The parties executed this Agreement to be effective for all purposes as of the date first set forth above.

Eric Schiermeyer

By: _____
Eric Schiermeyer

True North United Investments, LLC

By: _____
Wright W. Thurston, Manager

6

## <u>SCHEDULE A</u>

## SHAREHOLDERS & VESTING SCHEDULE

| <u>Shareholders</u> | <u>Shares</u> | <u>Vesting Date</u> |
|---|---|---|
| Eric Schiermeyer | 50,000,000 Preferred | January 1, 2019 |
| True North United Investments, LLC | 50,000,000 Preferred | January 1, 2019 |

7