# Exhibit A



# Project Domino

September 14, 2023

Prepared for
**K&L Gates LLP**

Counsel for
**Eric Schiermeyer**

Status
**Supplemental Report**

10100 Santa Monica Blvd.
Suite 1100
Los Angeles, CA 90067
USA

**Kroll.com**

Certain Kroll companies provide investigative services.
See www.kroll.com/licensing for state licensing information.



# Contents

1    Introduction .................................................................................................................3



# 1   Introduction

This supplemental report has been prepared at the request of counsel for Eric Schiermeyer for proceedings, in response to points made in the Defendant's Memorandum.



## 2   Observations

Regarding the trace, we remain confident in the evidence we provided you in the Additional Report, for which this is supplemental.

We make the following observations about the trace:

1. In our report we identified 984 individual deposits made to VASPs, to a total of 269 blockchain deposit addresses. It is very unlikely that there are 269 separate accounts held at the VASPs linked to those deposit addresses. Many VASPs create a new deposit address for every transaction, either at the request of the account holder or automatically.

2. A high proportion of the Traced Asset fund flows end up co-mingling into the same blockchain addresses.

3. The Traced Assets are co-mingled with Gala that comes from blockchain address 0xb84b9c91357b0029658064989007a6654868c47f. This address has been funded by sometimes daily deposits of GALA from the GALA Genesis Address, in a way consistent with the distribution of GALA to GALA node operators (see section 2.9.2 of our report).

4. It is theoretically possible for a transfer of ownership to take place in a way that does not appear on the blockchain, for example a digital asset being transferred for a fiat USD amount that is transferred off-chain. However this is extremely rare, due to the level of trust this kind of transaction requires. Blockchain transactions are not reversible so there is a risk that the second transaction in the sequence does not take place leaving one party with both the digital asset and the cash. This risk is increased if the parties are not known to each other.



**About Kroll**

Kroll is the world's premier provider of services and digital products related to governance, risk and transparency. We work with clients across diverse sectors in the areas of valuation, expert services, investigations, cyber security, corporate finance, restructuring, legal and business solutions, data analytics and regulatory compliance. Our firm has nearly 5,000 professionals in 30 countries and territories around the world. For more information, visit www.kroll.com.

10100 Santa Monica Blvd.
Suite 1100
Los Angeles, CA 90067
USA

+1 212 593 1000

kroll.com

[Select or enter report status]

# Exhibit B

 **Wallet Watcher** APP 11:26 AM                                    Friday, May 12th ⌄
WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be6617fb39f56 has changed.
ETH: Was 0.000784704253137, now 0.01146857475935884
GALA: Was 0.0, now 0.0

WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be6617fb39f56 has changed.
ETH: Was 0.01146857475935884, now 0.000784704253137
GALA: Was 0.0, now 0.0

 **Wallet Watcher** APP 11:33 AM
WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be6617fb39f56 has changed.
ETH: Was 0.000784704253137, now 0.01146857475935884
GALA: Was 0.0, now 0.0

WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be6617fb39f56 has changed.
ETH: Was 0.01146857475935884, now 0.000784704253137
GALA: Was 0.0, now 0.0

WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be6617fb39f56 has changed.
ETH: Was 0.000784704253137, now 0.01146857475935884
GALA: Was 0.0, now 0.0

WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be6617fb39f56 has changed.
ETH: Was 0.01146857475935884, now 0.000784704253137
GALA: Was 0.0, now 0.0

 **Travis Allen** 11:44 AM
I've updated the node URL which should bypass the load balancer. If it stops cycling through these messages, thats a

Monday, May 15th ⌄

 **Jason Brink** 8:35 PM
I am looking forward to never looking at this channel again.

 **Eric Schiermeyer** 8:42 PM
same

Wednesday, May 17th ⌄

 **Eric Schiermeyer** 4:04 AM
nothing to report....

 **Jason Brink** 4:51 AM
you motherfucker. I woke up and saw the notification for here and was like "NO...WHAT?!?!"

Friday, May 19th ⌄

 **Jason Brink** 1:38 PM
party zebra (1 MB) ⌄



WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has cha   **Friday, May 12th** ⌄
ETH: Was 0.01146857475935884, now 0.000784704253137
GALA: Was 0.0, now 0.0

WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.000784704253137, now 0.000784704253137
GALA: Was 0.0, now 160210398.0

WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.000784704253137, now 0.000784704253137
GALA: Was 160210398.0, now 0.0

 **Wallet Watcher** `APP` 11:10 AM
WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.000784704253137, now 0.000784704253137
GALA: Was 0.0, now 160210398.0

WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.000784704253137, now 0.000784704253137
GALA: Was 160210398.0, now 0.0

 **Eric Schiermeyer** 11:11 AM
did this break?

 **Wallet Watcher** `APP` 11:13 AM
WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.000784704253137, now 0.01146857475935884
GALA: Was 0.0, now 0.0

 **Travis Allen** 11:13 AM
Weird...

The GALA was drained 4 days ago across 4 transactions

 **Wallet Watcher** `APP` 11:14 AM
WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.01146857475935884, now 0.000784704253137
GALA: Was 0.0, now 0.0

 **Travis Allen** 11:14 AM
I'm not sure I even remember where this code lives.

 **Wallet Watcher** `APP` 11:15 AM
WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.000784704253137, now 0.01146857475935884
GALA: Was 0.0, now 0.0

WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.01146857475935884, now 0.000784704253137
GALA: Was 0.0, now 0.0

WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.000784704253137, now 0.01146857475935884
GALA: Was 0.0, now 0.0

WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.01146857475935884, now 0.000784704253137
GALA: Was 0.0, now 0.0

 **Travis Allen** 11:20 AM
@Adam Price it is using `https://eth.gala.games` as the ETH node which I believe is an ALB. Is it possible that one of the nodes behind that ALB is b
which node it is routed to?

 **Jason Brink**  8:53 AM                                              Monday, May 8th
Gotta get some more gas in there to help the stealing.

 **Wallet Watcher**  APP  9:42 AM
WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.033908823041965772, now 0.026736805998413644
GALA: Was 112210398.0, now 50210398.0

WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.026736805998413644, now 0.020089708222062884
GALA: Was 50210398.0, now 0.0

WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.020089708222062884, now 0.000784704253137
GALA: Was 0.0, now 0.0

                                                                            Friday, May 12th

 **Wallet Watcher**  APP  10:45 AM
WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.000784704253137, now 0.000784704253137
GALA: Was 0.0, now 160210398.0

WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.000784704253137, now 0.000784704253137
GALA: Was 160210398.0, now 0.0

WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.000784704253137, now 0.01146857475935884
GALA: Was 0.0, now 0.0

WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.01146857475935884, now 0.000784704253137
GALA: Was 0.0, now 0.0

WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.000784704253137, now 0.01146857475935884
GALA: Was 0.0, now 0.0

WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.01146857475935884, now 0.000784704253137
GALA: Was 0.0, now 0.0

WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.000784704253137, now 0.000784704253137
GALA: Was 0.0, now 160210398.0

WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.000784704253137, now 0.000784704253137
GALA: Was 160210398.0, now 0.0

 **Jason Brink**  10:57 AM
wtf?

 **Wallet Watcher**  APP  11:01 AM

 **Wallet Watcher** `APP` 1:50 PM
WARNING: Balance for account 0xe30a7474de5b88d1a7ed8fe220f1b6775218a556 has changed.
ETH: Was 0.0, now 0.02626768
GALA: Was 211391923.0, now 211391923.0

 **Jason Brink** 3:32 PM
I can't wait for this to be over...

Once a week this fucker steals 200m

 **Eric Schiermeyer** 3:33 PM
fuck him...when he loses the lawsuit he will replace all this gala at the new higher price

 **Wallet Watcher** `APP` 5:24 PM
WARNING: Balance for account 0xe30a7474de5b88d1a7ed8fe220f1b6775218a556 has changed.
ETH: Was 0.02626768, now 0.019723951507516
GALA: Was 211391923.0, now 13391923.0

WARNING: Balance for account 0xe30a7474de5b88d1a7ed8fe220f1b6775218a556 has changed.
ETH: Was 0.019723951507516, now 0.000229639787202
GALA: Was 13391923.0, now 0.0

Friday, May 5th

 **Wallet Watcher** `APP` 4:09 PM
WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.0, now 0.02007322
GALA: Was 210210398.0, now 210210398.0

 **Wallet Watcher** `APP` 4:26 PM
WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.02007322, now 0.01146857475935884
GALA: Was 210210398.0, now 160210398.0

 **Jason Brink** 5:43 PM
just a bit more than a week...

 **Eric Schiermeyer** 6:11 PM
speeding up

Sunday, May 7th

 **Wallet Watcher** `APP` 9:32 PM
WARNING: Balance for account 0xd2faaa23bf29e1ca36f54728355be5617fb39f56 has changed.
ETH: Was 0.01146857475935884, now 0.007116843041965772
GALA: Was 160210398.0, now 112210398.0

Monday, May 8th

 **Jason Brink** 6:39 AM
Motherfucker

 **Wallet Watcher** `APP` 8:48 AM



**Wallet Watcher** APP 6:12 PM
WARNING: Balance for account 0x9584f7512cb58bd06d10424654d7c83421bff3aa has changed.
ETH: Was 0.01104054, now 0.007872002397575512
GALA: Was 219598142.0, now 116598142.0

WARNING: Balance for account 0x9584f7512cb58bd06d10424654d7c83421bff3aa has changed.
ETH: Was 0.007872002397575512, now 0.006819924613056456
GALA: Was 116598142.0, now 64598142.0

WARNING: Balance for account 0x9584f7512cb58bd06d10424654d7c83421bff3aa has changed.
ETH: Was 0.006819924613056456, now 0.004765367719723048
GALA: Was 64598142.0, now 5798142.0

WARNING: Balance for account 0x9584f7512cb58bd06d10424654d7c83421bff3aa has changed.
ETH: Was 0.004765367719723048, now 0.003789455015821328
GALA: Was 5798142.0, now 0.0

**Wallet Watcher** APP 6:39 PM
WARNING: Balance for account 0x9584f7512cb58bd06d10424654d7c83421bff3aa has changed.
ETH: Was 0.003789455015821328, now 0.000121393496154
GALA: Was 0.0, now 0.0

Wednesday, April 19th ⌄



**Wallet Watcher** APP 8:50 PM
WARNING: Balance for account 0xf18b80e8c3137c9b9002bb53e3c5e6f3af61cb2e has changed.
ETH: Was 0.095512448898167768, now 0.00049009012353
GALA: Was 0.0, now 0.0



**Jason Brink** 8:50 PM
Aaaaaand here we go again....

Saturday, April 22nd ⌄



**Wallet Watcher** APP 12:58 PM
WARNING: Balance for account 0x3bf983989f00020944782e39866eafdb707c5597 has changed.
ETH: Was 0.0, now 0.02670519
GALA: Was 214098773.0, now 214098773.0



**Wallet Watcher** APP 1:04 PM
WARNING: Balance for account 0x3bf983989f00020944782e39866eafdb707c5597 has changed.
ETH: Was 0.02670519, now 0.02159940887099288
GALA: Was 214098773.0, now 101098773.0

WARNING: Balance for account 0x3bf983989f00020944782e39866eafdb707c5597 has changed.
ETH: Was 0.02159940887099288, now 0.016262491572209328
GALA: Was 101098773.0, now 14098773.0

WARNING: Balance for account 0x3bf983989f00020944782e39866eafdb707c5597 has changed.
ETH: Was 0.016262491572209328, now 0.014123354325016656
GALA: Was 14098773.0, now 0.0

WARNING: Balance for account 0x3bf983989f00020944782e39866eafdb707c5597 has changed.
ETH: Was 0.014123354325016656, now 0.000273467040609

ETH: Was 0.01499050, now 0.018857125279025416
GALA: Was 219013075.0, now 89013075.0



**Jason Brink** 3:31 PM
here we go again (2 MB) ▾



▢ Posted using /giphy | GIF by Fantastic Beasts: The Secrets of Dumbledore



**Wallet Watcher** `APP` 3:32 PM
WARNING: Balance for account 0x912c322895db6ac99ecba4240c097e1d6f33590a has changed.
ETH: Was 0.010837123299623416, now 0.008900117340404312
GALA: Was 89013075.0, now 21013075.0

WARNING: Balance for account 0x912c322895db6ac99ecba4240c097e1d6f33590a has changed.
ETH: Was 0.008900117340404312, now 0.000285337156167
GALA: Was 21013075.0, now 0.0

<span style="float:right">Friday, March 10th ▾</span>



**Wallet Watcher** `APP` 7:51 PM
WARNING: Balance for account 0x63599156394cd76108df1e116f7db22f78eb9c02 has changed.
ETH: Was 0.0, now 0.0136167
GALA: Was 218856829.0, now 218856829.0



**Wallet Watcher** `APP` 8:51 PM
WARNING: Balance for account 0x63599156394cd76108df1e116f7db22f78eb9c02 has changed.
ETH: Was 0.0136167, now 0.007147637532763252
GALA: Was 218856829.0, now 138856829.0

<span style="float:right">Saturday, March 11th ▾</span>



**Wallet Watcher** `APP` 12:18 PM
WARNING: Balance for account 0x63599156394cd76108df1e116f7db22f78eb9c02 has changed.
ETH: Was 0.007147637532763252, now 0.005639214482116764
GALA: Was 138856829.0, now 0.0



**Jason Brink** 4:12 PM
aaaaand there we go...more gone

<span style="float:right">Monday, April 3rd ▾</span>



**Wallet Watcher** `APP` 5:39 PM

...can we confirm he isn't moving this? Could he have some hanky stea...

Monday, January 2nd ⌄


**Eric Schiermeyer** 6:12 PM
can you ask him


**Wallet Watcher** APP 6:12 PM
WARNING: Balance for account 0x79bef339a8c3f738d24836c851132ea005399bff has changed.
ETH: Was 0.015694967324828768, now 0.015025397454389688
GALA: Was 50317343.0, now 0.0


**Jason Brink** 6:12 PM
lol


**Wallet Watcher** APP 6:13 PM
WARNING: Balance for account 0x79bef339a8c3f738d24836c851132ea005399bff has changed.
ETH: Was 0.015025397454389688, now 0.000090708340464
GALA: Was 0.0, now 0.0


**Eric Schiermeyer** 6:13 PM
where is it going?


**Jason Brink** 6:16 PM
To two separate addresses, one of which the ETH from that wallet was just sent to...which means he's probably goi

Will keep an eye on it

He isn't responding to my message on Whatsapp


**Eric Schiermeyer** 6:19 PM
he hasn't responded to me either

Tuesday, January 31st ⌄


**Wallet Watcher** APP 10:09 AM
WARNING: Balance for account 0x2877d85027ce04f0c95647622774a17eb5eadaaf has changed.
ETH: Was 0.0, now 0.0188476
GALA: Was 215617127.0, now 215617127.0


**Wallet Watcher** APP 10:54 AM
WARNING: Balance for account 0x2877d85027ce04f0c95647622774a17eb5eadaaf has changed.
ETH: Was 0.0188476, now 0.016391574770054416
GALA: Was 215617127.0, now 78617127.0

WARNING: Balance for account 0x2877d85027ce04f0c95647622774a17eb5eadaaf has changed.
ETH: Was 0.016391574770054416, now 0.01409138374238648
GALA: Was 78617127.0, now 0.0

WARNING: Balance for account 0x2877d85027ce04f0c95647622774a17eb5eadaaf has changed.
ETH: Was 0.01409138374238648, now 0.000161411372955
GALA: Was 0.0, now 0.0

Wednesday, February 15th


**Wallet Watcher** APP 3:26 PM
WARNING: Balance for account 0x912c322895db6ac99ecba4240c097e1d6f33590a has changed.
ETH: Was 0.0, now 0.01497638
GALA: Was 219013075.0, now 219013075.0

WARNING: Balance for account 0x74c52ca2e118a3edc7be629bcaa3b70966b80e1f has ( **December 1st, 2022** ⌄
ETH: Was 0.016827555798417912, now 0.016200675611302328
GALA: Was 41806245.0, now 28606245.0

WARNING: Balance for account 0x74c52ca2e118a3edc7be629bcaa3b70966b80e1f has changed.
ETH: Was 0.016200675611302328, now 0.015924307210618028
GALA: Was 28606245.0, now 28606245.0

WARNING: Balance for account 0x74c52ca2e118a3edc7be629bcaa3b70966b80e1f has changed.
ETH: Was 0.015924307210618028, now 0.008161515751254212
GALA: Was 28606245.0, now 0.0

WARNING: Balance for account 0x74c52ca2e118a3edc7be629bcaa3b70966b80e1f has changed.
ETH: Was 0.008161515751254212, now 0.000097929617562
GALA: Was 0.0, now 0.0

**December 16th, 2022** ⌄

 **Wallet Watcher** APP 4:04 PM
WARNING: Balance for account 0xc859c9ec5facea9a442cd0616abeb9cd699ed5ca has changed.
ETH: Was 0.0, now 0.01285523
GALA: Was 216352292.0, now 216352292.0

WARNING: Balance for account 0xc859c9ec5facea9a442cd0616abeb9cd699ed5ca has changed.
ETH: Was 0.01285523, now 0.009967966043944004
GALA: Was 216352292.0, now 29002292.0

WARNING: Balance for account 0xc859c9ec5facea9a442cd0616abeb9cd699ed5ca has changed.
ETH: Was 0.009967966043944004, now 0.000170194236072
GALA: Was 29002292.0, now 0.0

**December 20th, 2022** ⌄

 **Jason Brink** 2:42 PM
This is being dumped right now

**December 22nd, 2022** ⌄

 **Wallet Watcher** APP 5:04 PM
WARNING: Balance for account 0x79bef339a8c3f738d24836c851132ea005399bff has changed.
ETH: Was 0.0, now 0.01646307
GALA: Was 210317343.0, now 210317343.0

 **Jason Brink** 5:04 PM
Hes getting ready to dump again...

FUCK

**Monday, January 2nd** ⌄

 **Wallet Watcher** APP 6:10 PM
WARNING: Balance for account 0x79bef339a8c3f738d24836c851132ea005399bff has changed.
ETH: Was 0.01646307, now 0.015694967324828768
GALA: Was 210317343.0, now 50317343.0

**Jason Brink** 6:11 PM

## 🔒 watched_wallets

You created this private channel on April 15th, 2021. This is the very beginning of the 🔒 watched_wallets

[ ✏️ Add description ]   [ 👥 Add people ]   [ ✉️ Send emails to channel ]

November 11th, 2022 ⌄

 **Wallet Watcher** `APP` 1:14 PM
WARNING: Balance for account 0x34b2d6ce94e21b213d5c794bfa6122bce402453c has changed.
ETH: Was 0.0, now 0.025
GALA: Was 199588190.0, now 199588190.0

 **Wallet Watcher** `APP` 1:20 PM
WARNING: Balance for account 0x34b2d6ce94e21b213d5c794bfa6122bce402453c has changed.
ETH: Was 0.025, now 0.024163924527493416
GALA: Was 199588190.0, now 185588190.0

WARNING: Balance for account 0x34b2d6ce94e21b213d5c794bfa6122bce402453c has changed.
ETH: Was 0.024163924527493416, now 0.023264320932592888
GALA: Was 185588190.0, now 147088190.0

WARNING: Balance for account 0x34b2d6ce94e21b213d5c794bfa6122bce402453c has changed.
ETH: Was 0.023264320932592888, now 0.02143802403060356
GALA: Was 147088190.0, now 52383855.0

WARNING: Balance for account 0x34b2d6ce94e21b213d5c794bfa6122bce402453c has changed.
ETH: Was 0.02143802403060356, now 0.0204842783385278
GALA: Was 52383855.0, now 0.0

November 14th, 2022 ⌄

 **Wallet Watcher** `APP` 12:19 PM
WARNING: Balance for account 0x34b2d6ce94e21b213d5c794bfa6122bce402453c has changed.
ETH: Was 0.0204842783385278, now 0.000109513881057
GALA: Was 0.0, now 0.0

December 1st, 2022 ⌄

 **Wallet Watcher** `APP` 4:01 PM
WARNING: Balance for account 0x74c52ca2e118a3edc7be629bcaa3b70966b80e1f has changed.
ETH: Was 0.0, now 0.02
GALA: Was 185706245.0, now 185706245.0

WARNING: Balance for account 0x74c52ca2e118a3edc7be629bcaa3b70966b80e1f has changed.
ETH: Was 0.02, now 0.019405865993911624
GALA: Was 185706245.0, now 173206245.0

WARNING: Balance for account 0x74c52ca2e118a3edc7be629bcaa3b70966b80e1f has changed.
ETH: Was 0.019405865993911624, now 0.018836610501797136
GALA: Was 173206245.0, now 140206245.0

WARNING: Balance for account 0x74c52ca2e118a3edc7be629bcaa3b70966b80e1f has changed.
ETH: Was 0.018836610501797136, now 0.017508281003684072
GALA: Was 140206245.0, now 89106245.0

Exhibit C



# In depth

## A look at current financial reporting issues

Release date: December 2019

No. 2019-05

### Cryptographic assets and related transactions: accounting considerations under IFRS

**At a glance**

Cryptographic assets, including cryptocurrencies such as Bitcoin, have generated a significant amount of interest recently, given their rapid increases in value and volatility. As activity in cryptographic assets has increased, it has attracted regulatory scrutiny across multiple jurisdictions.

At issue is how to recognise, measure and disclose activities associated with the issuances of, and the investment in, the various types of cryptographic assets. Since there are no accounting standards that specifically address cryptographic assets, one must look at the existing IFRS and apply a principles-based approach. In this publication, we highlight some of the accounting questions that are currently being debated and share our views on how IFRSs could be applied.

The issues that arise are diverse and highly dependent on specific facts and circumstances. While the examples and considerations illustrate generic principles, cryptographic asset transactions are rapidly evolving. As guidance and practices in this area evolve, this publication might be updated from time to time and expanded to capture further areas of interest (such as crypto mining). We therefore recommend that you consult your professional advisers or the authors of this publication for the latest developments.

---

**What's inside?**

Introduction: page 2

Cryptographic assets held by an entity: page 4

Initial Coin Offerings and related issues: page 11

Fair value considerations for cryptographic assets: page 16

Disclosures: page 21

---



## 1. Introduction

### 1.1. Background

Cryptographic assets are transferable digital representations that are designed in a way that prohibits their copying or duplication. The technology that facilitates the transfer of cryptographic assets is referred to as a 'blockchain' or distributed ledger technology. Blockchain is a digital, decentralised ledger that keeps a record of all transactions that take place across a peer-to-peer network and that enables the encryption of information. Cryptographic assets and the underlying technology provide opportunities to digitise a variety of 'real world' objects. The benefits of digitisation (such as ease of access, transfer, etc) have resulted in cryptographic assets growing from an obscure curiosity to a technology that is proliferating into a variety of business uses.

There is no legal definition of cryptographic assets, as there is for securities in various jurisdictions; however, some cryptographic assets can legally be considered securities by local regulators. It is important to note that there are various subsets of cryptographic assets. Cryptographic assets are used for a variety of purposes, including as a means of exchange, as a medium to provide access to blockchain-based goods or services, and as a way to raise funding for an entity developing activities in this area.

One of the most commonly known subsets of cryptographic assets are cryptocurrencies, which are mainly used as a means of exchange and share some characteristics with traditional currencies. The markets are evolving fast, but currently two of the most prominent cryptocurrencies are Bitcoin and Ether.

These transformative technologies have not gone unnoticed by the standard setters. The topic of digital currencies was identified as a potential new project for the IASB in 2015 through the Board's Agenda Consultation process. However, the Board decided not to act immediately but to continue to monitor developments.

As part of that process, the Accounting Standards Advisory Forum ('ASAF'), an IFRS Foundation advisory forum consisting of representatives from national and supra-national accounting standard setters, discussed digital currencies at a meeting in December 2016. The debate was focused on the classification of a cryptographic asset from the holder's perspective. Conversations have continued in various accounting standards boards, but no formal guidance has been issued by the IASB at this point.

At the July 2018 Board meeting, the IASB reached an agreement to ask the IFRS Interpretations Committee ('IFRS IC') to consider guidance for the accounting of transactions involving cryptocurrencies, possibly in the form of an agenda decision on how an entity might walk through the existing IFRS requirements.

In June 2019, the IFRS IC published its agenda decision on 'Holdings of Cryptocurrencies', and it considered a subset of cryptographic assets with the following characteristics:

a.   a digital or virtual currency recorded on a distributed ledger that uses cryptography for security;
b.   not issued by a jurisdictional authority or other party; and
c.   does not give rise to a contract between the holder and another party.

The IFRS IC concluded that IAS 2, 'Inventories', applies to such assets where they are held for sale in the ordinary course of business. If IAS 2 is not applicable, an entity applies IAS 38, 'Intangible Assets', to holdings of cryptocurrencies.

There are many judgemental areas that will require further investigation as entities determine the applicable accounting treatment and as the technologies and markets continue to develop. For some topics, no uniform or definitive answers currently exist.

### 1.2. Frequently used terms

Some terms used in relation to cryptographic assets will also be used in this publication. This section explains these terms.

<u>Coin/Token</u>

A cryptographic asset might be described as either a 'token' or a 'coin'. The difference is based on the asset's functionality but, in practice, the terms can be used interchangeably, because no universally accepted definition of either exists. Currently, the term 'coin' generally refers to a cryptographic asset that has the express purpose of acting solely as a medium of exchange, while the term 'token' refers to an asset that gives the holder additional functionality or utility. The rights conveyed by a token are typically set out in a whitepaper or similar document by the issuing organisation.

Whitepaper

A whitepaper is a concept paper authored by the developers of a platform, to set out an idea and overall value proposition to prospective investors. The whitepaper commonly outlines the development roadmap and key milestones that the development team expects to meet.

Platform

The term 'platform' refers to software that provides a utility or services to users of the software. To facilitate the use of the software, users must own or use a particular coin or token.

Initial Coin Offering

Initial Coin Offerings or 'ICOs' have become a prevalent means for developers to sell blockchain tokens or coins to investors. When an ICO is undertaken, the issuer receives consideration in the form of cash or another cryptographic asset (most commonly, a cryptocurrency such as Bitcoin or Ether). In exchange, the developer might issue (or promise to issue) a digital token to the parties that provided contributions for the development of the digital token.

It should be noted that ICOs might be subject to local securities law, and significant regulatory considerations might apply.

Fiat currency

A fiat currency denotes paper money or coins of little or no intrinsic value in themselves and not convertible into gold or silver, but made legal tender by fiat (order) of the government (such as US Dollar or Euro).

## 1.3. Relevant characteristics for accounting purposes

For the purposes of determining which accounting standard applies and discussing the related accounting issues, it is useful to classify cryptographic assets into defined subsets based on their characteristics.

A single, generally accepted framework for the classification of these varied cryptographic assets does not currently exist. There is consequently no generally applied definition of a cryptographic asset. This reflects the broad variety of features and bespoke nature of the transactions in practice. However, based on our observations, there are some characteristics that can be used to classify cryptographic assets into similar types. We believe that similar types of cryptographic asset should be accounted for in a similar way.

The characteristics that we observe being most relevant for classifying cryptographic assets for accounting purposes are:

- the primary purpose of the cryptographic asset; and
- how the cryptographic asset derives its inherent value.

Although a range of other characteristics exist, we view these as not being fundamental to determining a common accounting treatment.

Based on the characteristics detailed above, we have defined four specific subsets of cryptographic assets, as set out in the following table:

| Subset | Purpose | Inherent Value |
|---|---|---|
| Cryptocurrency | Cryptocurrencies are digital tokens or coins based on blockchain technology, such as Bitcoin. They currently operate independently of a central bank and are intended to function as a medium of exchange. | None – derives its value based on supply and demand. |
| Asset-backed token | An asset-backed token is a digital token based on blockchain technology that signifies and derives its value from something that does not exist on the blockchain but instead is a representation of ownership of a physical asset (for example, natural resources such as gold or oil). | Derives its value based on the underlying asset. |
| Utility token | Utility tokens are digital tokens based on blockchain technology that provide users with access to a product or service, and they derive their value from that right. Utility tokens give holders no ownership in a company's platform or assets and, although they might be traded between holders, they are not primarily used as a medium of exchange. | Value is derived from the demand for the issuer's service or product. |
| Security token | Security tokens are digital tokens based on blockchain technology that are similar in nature to traditional securities. They can provide an economic stake in a legal entity: sometimes a right to receive cash or another financial asset, which might be discretionary or mandatory; sometimes the ability to vote in company decisions and/or a residual interest in the entity. | Value is derived from the success of the entity, since the holder of the token shares in future profits or receives cash or another financial asset. |

It should also be noted that some cryptographic assets might exhibit elements of two or more of the identified subclasses. These result in hybrid cryptographic assets that will have to be assessed further. This document focuses on cryptographic assets that carry simple features, instead of hybrid tokens.

> **PwC observations:**
>
> Before determining the accounting treatment of a transaction from the issuer's or owner's perspective, it is important to understand the purpose and utility of the cryptographic asset. There is diversity of rights and obligations associated with cryptographic assets. Reading the whitepaper can provide insights into the terms/characteristics of the cryptographic asset that might result in differences in the accounting model applied.

## 2.   Cryptographic assets held by an entity

### 2.1. General observations

IFRS does not include specific guidance on the accounting for cryptographic assets and there is no clear industry practice, so the accounting for cryptographic assets could fall into a variety of different standards. Consideration should also be given to the entity's purpose for holding the cryptographic assets to determine the accounting model. We explore below the accounting standards and other considerations that might be relevant to the subsets of cryptographic assets.

**2.2. Cryptocurrencies held for own account**

**2.2.1. Applicable standard**

A few standards come to mind when considering the accounting for cryptocurrencies held by an entity for its own account.

<u>Cash or a currency</u>

IFRS contains no explicit definition of the terms 'cash' or 'currency'. There might be an argument that, for accounting purposes, the words 'cash' and 'currency' are interchangeable. IAS 32, 'Financial Instruments: Presentation', makes a connection between currency and cash, and IAS 21, 'The Effects of Changes in Foreign Exchange Rates', makes a connection between cash, currency and monetary items.

Judgement is therefore required to determine whether cryptocurrencies can be considered cash or a currency.

Cryptocurrencies do not have some of the common properties of cash and currency, especially:

- cryptocurrencies are not legal tender and mostly are not issued or backed by any government or state; and
- cryptocurrencies are currently not capable of setting prices for goods and services directly. In other words, cryptocurrencies might be accepted to settle some transactions, but they are not directly related to the setting of prices for goods or services in an economy.

The assessment should consider the facts and circumstances for each cryptocurrency. At the time of writing (November 2019), we have not seen a cryptocurrency that could be considered cash or a currency under IFRS. We note that Venezuela has launched a government-backed cryptocurrency; companies holding units of this cryptocurrency might need to consider whether it meets the definition of cash or a currency by taking into account the factors described above, as well as any relevant legal and regulatory questions regarding its validity.

<u>Financial asset – other than cash</u>

Holding a unit of a cryptocurrency typically does not give the holder a contractual right to receive cash or another financial asset, nor does the cryptocurrency come into existence as a result of a contractual relationship. Moreover, cryptocurrencies do not provide the holder with a residual interest in the assets of an entity after deducting all of its liabilities. Therefore, cryptocurrencies that we have seen so far (November 2019) do not meet the definition of a financial asset.

<u>Property, plant and equipment</u>

Cryptocurrencies do not fall into the scope of IAS 16, 'Property, Plant and Equipment', because they are not tangible items.

<u>Inventory</u>

IAS 2 does not require inventories to be in a physical form, but inventory should consist of assets that are held for sale in the ordinary course of business. Inventory accounting might be appropriate if an entity holds cryptocurrencies for sale in the ordinary course of business. An entity that actively trades the cryptocurrencies, purchasing them with a view to their resale in the near future and generating a profit from fluctuations in the price or traders' margin, might consider whether the guidance in IAS 2 for commodity broker-traders should be applied.

However, if the entity holds cryptocurrencies for investment purposes (that is capital appreciation) over extended periods of time, it would likely not meet the definition of inventory.

---

**PwC observations:**

If it is determined, based on the entity's business model, that inventory accounting is appropriate, inventories would typically be measured at the lower of cost and net realisable value. An entity that holds cryptocurrencies to sell them in the near future, generating a profit from fluctuations in prices or traders' margin, might apply the commodity broker-trader exception in IAS 2. The term 'commodity' is not defined in IAS 2, but a broker-trader that concluded a cryptocurrency was a commodity would measure the inventory at fair value less cost to sell, with changes in fair value recognised in profit or loss.

---

<u>Intangible asset</u>

If a cryptocurrency does not meet the definition of any of the above categories, it will likely meet the definition of an intangible asset under IAS 38, 'Intangible Assets', because:

- it is a resource controlled by an entity (that is, the entity has the power to obtain the economic benefits that the asset will generate and to restrict the access of others to those benefits) as a result of past events and from which future economic benefits are expected to flow to the entity;
- it is identifiable, because it can be sold, exchanged or transferred individually;
- it is not cash or a non-monetary asset; and
- it has no physical form.

IAS 38 applies to all intangible assets except those excluded specifically from its scope (for example, inventories).

### 2.2.2. Measurement considerations

The analysis above suggests that there are a number of different asset standards that might apply for cryptocurrencies.

The chart below summarises the different possible classifications and their associated measurement considerations:

| Applicable standard | Initial measurement | Subsequent measurement | Movements in carrying amount |
|---|---|---|---|
| Inventory (IAS 2)<br><br>- Other | Cost | Lower of cost and net realisable value | Movements above cost<br><br>- N/A<br><br>Movements below cost<br><br>- Profit and loss |
| Inventory (IAS 2)<br><br>- Commodity broker-trader exception | Cost | Fair value less costs to sell | Profit and loss |
| Intangible assets (IAS 38)<br><br>- Revaluation model (accounting policy choice but requires existence of active market) | Cost | Fair value less any accumulated amortisation and impairment* | Movements above cost<br><br>- Other comprehensive income<br><br>Movements below cost<br><br>- Profit and loss |
| Intangible assets (IAS 38)<br><br>- Cost model | Cost | Cost less any accumulated amortisation and impairment* | Movements above cost<br><br>- N/A<br><br>Movements below cost<br><br>- Profit and loss |

* in most cases, no amortisation is expected for cryptocurrencies

> **PwC observations:**
>
> The range of possible classifications, as well as their associated measurement, indicates the importance of understanding the nature and characteristics of the cryptocurrency, as well as the entity's business model/purpose for holding the asset. This increases the importance of implementing specific accounting policies and ensuring their consistent application to similar transactions, as well as appropriate disclosures. Where an entity can evidence the existence of clearly distinguished portfolios of similar assets held for different purposes, different treatments might apply within an entity.

## 2.3. Cryptographic assets other than cryptocurrencies held for own account

### 2.3.1. Applicable standard

A similar thought process will apply when considering the accounting for cryptographic assets other than cryptocurrencies. Those cryptographic assets include security tokens, asset-backed tokens and utility tokens (together referred to as 'crypto tokens') held by an entity for own account.

<u>Cash or a currency</u>

Crypto tokens are issued not as a general-purpose medium of exchange, but to provide holders with other rights, including rights to goods or services or certain underlying physical assets.

Judgement is required to determine whether crypto tokens can be considered cash or a currency. However, since crypto tokens generally lack the properties of cash (described in section 2.2.1 above), they are unlikely to be considered cash or a currency under IFRS.

<u>Financial asset – other than cash</u>

Certain crypto tokens give the holder a right to cash or a financial asset. This could be based on future performance of a platform, a residual interest in net assets, or the value of an underlying asset. However, further consideration is needed to verify whether such rights and obligations are legally enforceable, since financial assets can only arise from a legally enforceable contractual relationship.

Unless crypto tokens provide the holder with a right to cash or another financial asset, they will not meet the definition of a financial asset.

For the classification and measurement of crypto tokens that meet the definition of a financial asset, entities should follow the guidance in IFRS 9, 'Financial Instruments'.

<u>Property, plant and equipment</u>

Cryptographic assets do not fall into the scope of IAS 16, because they are not tangible items.

<u>Inventory</u>

IAS 2 does not require inventories to be in a physical form, but inventory should consist of assets that are held for sale in the ordinary course of business. Inventory accounting might be appropriate if an entity holds cryptographic assets for sale in the ordinary course of business. An entity that actively trades the cryptographic assets, purchasing them with a view to their resale in the near future and generating a profit from fluctuations in the price or traders' margin, might consider whether the guidance in IAS 2 for commodity broker-traders should be applied.

However, if the entity holds crypto tokens for investment purposes (that is, capital appreciation) over extended periods of time, it would likely not meet the definition of inventory.

Measurement guidance for crypto tokens that meet the definition of inventory can be found in section 2.2 above.

Intangible asset

Depending on the rights associated with a crypto token, it could potentially also meet the definition of an intangible asset under IAS 38 if:

- it is a resource controlled by an entity (that is, the entity has the power to obtain the economic benefits that the asset will generate and to restrict the access of others to those benefits) as a result of past events and from which future economic benefits are expected to flow to the entity;
- it is identifiable, because it can be sold, exchanged or transferred individually;
- it is not cash or a non-monetary asset; and
- it has no physical form.

IAS 38 applies to all intangible assets except those excluded specifically from its scope (for example, inventories).

Measurement guidance for crypto tokens that meet the definition of an intangible asset can be found in section 2.2 above.

Prepayment

Crypto tokens might provide the holder with a right to future goods or services. These tokens are a prepayment for future goods or services. A prepayment for future goods or services might meet the definition of an intangible asset.

Where the prepayment does not meet the definition of an intangible asset, the accounting will be similar to the accounting for other prepaid assets.

Measurement guidance for crypto tokens that meet the definition of an intangible asset can be found in section 2.2 above.

Underlying asset

In some situations, crypto tokens provide the holder with an interest in an underlying asset. The underlying assets might be commodities (such as gold or oil), intangible assets (such as a licence or a patent), artwork or real estate. While some asset-backed tokens represent a real claim on the asset itself, others have no ability to redeem the actual underlying.

Where the crypto token represents a contractual right to receive cash equivalent to the value of the underlying asset, it might meet the definition of a financial asset. If the crypto token represents a right to the asset itself, it might be accounted for in a manner similar to the underlying asset.

Crypto tokens that are accounted for in a manner similar to the underlying asset will be measured following the relevant accounting standard for the underlying asset.

**2.3.2. Application to categories of crypto tokens**

When applying the thought process set out above to the categories of crypto tokens described in section 1.3 above, general observations can be summarised as follows:

*(1) Crypto tokens with the characteristics of asset-backed tokens*

Asset-backed tokens might give the holder a right to an underlying asset. These tokens could be used to transfer the ownership of underlying assets without physically moving them. It is a means to transact the underlying asset at minimal cost. As a result, the accounting will likely be driven by the nature of the underlying asset and the relevant accounting standard.

*(2) Crypto tokens with the characteristics of utility tokens*

Utility tokens usually give the holder a right to future goods or services. These tokens are a prepayment for goods or services. A prepayment for goods or services might meet the definition of an intangible asset and IAS 38 could be applied. Where it does not meet the definition of an intangible asset, it is accounted for similar to other prepaid assets.

*(3) Crypto tokens with the characteristics of security tokens*

Security tokens might give the holder a right to cash, based on the platform's future profits or a residual interest in the net assets. Such rights might be discretionary or mandatory, and they might be accompanied by the ability to vote to impact decisions relating to the underlying platform. A contractual right to cash or another financial asset might exist in these circumstances, in which case these security tokens meet the definition of a financial asset subject to IFRS 9.

*(4) Crypto tokens with hybrid characteristics*

Crypto tokens exhibiting elements of two or more subclasses require further analysis, and judgement is required to determine the applicable accounting treatment. Factors to consider will include the interaction of contractual clauses, and their substance and relevance in the context of the overall characteristics of the token.

### 2.4. Cryptographic assets held on behalf of third parties

### 2.4.1. Practical observations and resulting challenges

Cryptographic assets might also be held by an entity on behalf of its customers. Some examples are:

- An entity that operates a trading platform that enables its customers to exchange different cryptographic assets, or to exchange fiat currency for a cryptographic asset.
- An entity (such as a bank or similar financial services entity) that offers custodian services for its customers' cryptographic assets. In this case, customers lodge cryptographic assets with the entity for safe keeping.

Arrangements for holding such cryptographic assets vary. In most cases, there will be some indication (such as a contract, or a statement in a whitepaper) that the cryptographic asset is held on behalf of customers, and that sets out what customers need to do to access or use the cryptographic asset. The other features of the arrangement might vary, including (but not limited to) the following:

- The ability of the entity to 'borrow' the cryptographic assets to use for its own purposes. Even if such a right is not explicitly contained in the arrangement with the customers, it might be implicit, depending on the degree of segregation of the customers' assets (see below).
- The degree of segregation of cryptographic assets held on behalf of customers from cryptographic assets 'owned' by the entity.
- The claims of customers in the event that the entity is liquidated. They might vary or be unclear. Customers might have the status of unsecured creditors, with no preferential claim on the cryptographic assets held by the entity on their behalf.
- The security of the assets. Cryptographic assets held on behalf of customers might be held in either a 'hot wallet' (connected to the internet), a 'cold wallet' (not connected to the internet, and harder to access) or a 'warm wallet' (offline, but easier to connect to than a cold wallet, often through the use of hardware). The customer or the entity might hold, and might be able to use, the private key to the wallet.
- The degree to which the exchange/the entity/the customer is able to identify specific misappropriated cryptographic assets through the blockchain technology.
- Whether cryptographic assets held on behalf of others are held in an account/wallet of the entity or in an account/wallet at a third party.
- The relevant law or regulations for cryptographic assets held on behalf of others; or, in some cases, whether there are specific laws and regulations governing such cryptographic assets.
- The extent to which the rights and obligations of the parties are clear or contractually enforceable (for example, if contained in a whitepaper). In many cases, external legal opinions might help to establish these. However, laws and regulations governing cryptographic assets are still developing, and so legal opinions might not prove conclusive.

The key accounting question is whether or not such holdings of cryptographic assets on behalf of customers should be recorded on or off the entity's balance sheet under IFRS.

### 2.4.2. Factors to consider when determining the accounting treatment

There is no IFRS that directly provides guidance on whether an entity's holding of cryptographic assets on behalf of others should be presented on its balance sheet. We believe that such entities should consider the general guidance in IAS 8, 'Accounting Policies, Changes in Accounting Estimates and Errors', in developing an accounting policy for such assets.

This requires consideration of existing IFRS dealing with similar and related issues and the definitions in the Conceptual Framework (the 'Framework').

The Framework defines 'asset' and 'liability' as follows:

| | |
|---|---|
| 'An asset is a present economic resource controlled by the entity as a result of past events. An economic resource is a right that has the potential to produce economic benefits.' | 'A liability is a present obligation of the entity to transfer an economic resource as a result of past events.' |

In determining whether an asset and liability should be recognised on the balance sheet of the entity holding the cryptographic asset on behalf of customers, an entity considers:

- Whether it has the right (explicit or implicit) to 'borrow' the cryptographic assets to use for its own purposes. If the entity has such a right, it would seem that the definition of an asset set out above is met.
- The rights of customers to cryptographic assets held on their behalf if the entity is liquidated. In particular, if customers would have the status of unsecured creditors with no preferential claim on the cryptographic assets held by the entity on their behalf, this is a strong indicator that the cryptographic assets and the corresponding liability should be recognised on the balance sheet, because the Framework definition of a liability would seem to be met.

In practice, the level of segregation of the customers' assets from the entity's assets is critical in determining which assets should be recognised on balance sheet (own assets and customer's assets that are not segregated) and which assets should be off balance sheet (assets that are segregated and that the entity holds as a custodian). Factors to consider include:

- Whether the rights and obligations of the entity and its customers are set out in a contract or whitepaper (if any); whether the rights and obligations are contractually enforceable; and whether external legal opinions are available as evidence. Enforceability is assessed in the context of specific laws and regulations addressing cryptographic assets, to the extent that such laws and regulations exist, and in the context of other laws and regulations where they do not.
- Whether there is a reconciliation between the cryptographic assets held by the entity on behalf of the customers and the individual holdings of each customer, as reflected in their account statement. Similarly, whether there is a reconciliation between the transactions in cryptographic assets carried out in the market and the orders executed on behalf of the individual customers, to assess whether each transaction could be attributed to the relevant customer. Also, how frequently such reconciliation is performed.
- Traceability to a dedicated blockchain address (not all transactions can be individually traced to a dedicated blockchain address). If the cryptographic asset is traceable to a dedicated blockchain address of the customer, this is more likely to indicate segregation.
- Whether the cryptographic asset is held in an account/wallet of the entity or at a third party, and whether the third party keeps a record of cryptographic assets held on behalf of customers. If the cryptographic asset is held in an account/wallet at a third party, this is more likely to indicate segregation.
- Whether the entity holds customers' cryptographic assets in hot or cold wallets. An entity might allow customers to hold some amounts in a hot wallet for frequent trading, and some other amounts from the same customer in a cold wallet for safe-keeping. Whether the customer or the entity holds and is able to use the private key to the wallet might also be relevant. If the cryptographic asset is held in cold wallets, and the private key is held and can only be used by the customer, this is more likely to indicate segregation.

Given the above and the lack of an IFRS that specifically deals with this issue, assessing whether cryptographic assets held on behalf of the customers should be on or off balance sheet is a matter of judgement, and it might vary depending on the facts and circumstances listed above. As a result, there is not a 'one size fits all' answer.

### 3.   Initial Coin Offerings and related issues

**3.1. Practical market observations**

An Initial Coin Offering ('ICO') is a form of fundraising that harnesses the power of cryptographic assets and blockchain-based trading. Similar to a crowdfunding campaign, an ICO allocates tokens instead of shares to investors/subscribers. These ICO tokens typically do not represent an ownership interest in the entity, but they often provide access to a platform (if and when developed) and can often be traded on a crypto exchange. The population of ICO tokens in an ICO is generally set at a fixed amount.

Each ICO is bespoke and will have unique terms and conditions. It is critical for issuers to review the whitepaper or underlying documents accompanying the ICO token issuance, and to understand what exactly is being offered to investors/subscribers. In situations where rights and obligations arising from a whitepaper or their legal enforceability are unclear, legal advice might be needed, to determine the relevant terms.

ICOs might be considered to be securities by a securities regulator, but it is important to note that there is no uniform global view. As a result, issuers should monitor regulatory developments closely and consider the impact that any changes might have on financial reporting.

**3.2. Accounting for token pre-sale agreements**

Entities looking to raise funds via an ICO sometimes make use of a 'Simple Agreement for Future Tokens' ('SAFT') to attract seed investors and lock in funding from interested parties in private sales prior to a public sale. A SAFT is an early-stage investment, pre-ICO, where the investor provides upfront funding to the issuer in exchange for a promise to receive a variable number of tokens on a successful ICO. The number of tokens to be received by the SAFT investor usually depends on the ICO token price on issuance. As an incentive for investing in the pre-ICO entity, the SAFT issuer will typically settle the SAFT using an ICO token price that is discounted by a predefined amount (for example, a 10% discount to the ICO token price at issuance). Thus, on a successful ICO, the SAFT investor will receive a number of tokens equal to the value of what was originally invested, plus a return equal to the specified discount on the ICO token.

Terms of a SAFT can vary, impacting the determination of the accounting treatment. Factors to consider include (but are not limited to) the characteristics/features that the tokens will have, and the rights to which the future holders will be entitled.

**An illustrative example:**

One common form of SAFT is a SAFT on utility tokens that entitles the investor to a discounted price for tokens compared to other investors at the time of an ICO. Typically, the SAFT terminates if the ICO does not happen on or by a stated date, at which time the entity is required to return to the investor the amount originally invested (or a portion thereof). The success of an ICO is not within the control of the entity – for example, the ICO is abandoned if the minimum fundraising goal (sometimes referred to as a 'soft cap') is not achieved. A SAFT holder does not have the right to redeem its SAFT prior to the stated date.

If the utility tokens underlying the SAFT clearly entitle the holder to future goods and services, those tokens would not be considered a financial instrument. It follows that, from the perspective of the issuer, a SAFT to deliver a utility token might be viewed as not within the scope of IFRS 9, because it is usually not a contract *"to buy or sell a non-financial item that can be settled net in cash or another financial instrument, or by exchanging financial instruments, as if the contracts were financial instruments"*. [IFRS 9 para 2.4]. In such a case, the SAFT might be viewed as a customer's prepayment for future goods and services under IFRS 15, 'Revenue from Contracts with Customers'.

However, on the basis that the occurrence of a successful ICO is beyond the control of the entity, and the characteristics of the tokens to be issued might be unclear, some might view the SAFT as containing a financial obligation, because it represents a contractual obligation to deliver cash if the ICO does not occur by the stated date. In such a case, the SAFT might be viewed as a financial liability of the issuer in accordance with IAS 32 at initial recognition. There might also be other embedded features which require further assessment, such as embedded derivatives based on the specific terms of the arrangement.

> **PwC observations:**
>
> Facts and circumstances will need to be carefully evaluated in determining which view appropriately reflects the overall substance and economics from the issuer's perspective.

### 3.3. Accounting for ICOs by the issuer

When an ICO is undertaken, the issuing entity receives consideration. The form of the consideration varies (for example, cash or another cryptographic asset) and, for accounting purposes, it is key to understand the economics and characteristics of the transaction.

It is possible that an ICO could create a joint arrangement requiring further analysis based on IFRS 11, 'Joint Arrangements'. The fact that the subscribers provide the majority of the funding might suggest that the arrangement is a collaboration between the ICO entity and the subscriber. However, the subscribers are typically passive, which suggests that the arrangement might not provide the parties with joint control. Some issuers might grant, to subscribers, veto rights over the future direction of the project; these are typically protective in nature and, in most cases, they will not create joint control.

Where consideration for the ICO is not in the form of cash but another cryptographic asset, the transaction might be an exchange of similar goods or services. An exchange of similar goods might mean that no accounting is needed. However, we believe that it is unlikely that an ICO will be an exchange of 'similar goods or services', because no two cryptographic assets are generally alike.

Assuming that there is an exchange transaction and that the arrangement does not create joint control, the consideration received by the ICO entity is recorded as the debit side of the journal entry. Depending on the form of the consideration, this might involve the thought process explained in sections 2.2 and 2.3 above.

However, the key challenge for issuing entities is determining the accounting for the ICO token issued (that is, the credit side of the journal entry). This will depend on the nature of the ICO token issued, as well as the guidance of the applicable accounting standard.

The following figure provides a possible analysis framework of accounting models to consider when determining the nature of, and accounting for, the issued ICO token. Consideration of the contract terms is needed, to understand the obligations of the issuer:



Financial liability

An issuer of an ICO token should assess whether a token meets the definition of a financial liability. Specifically, an entity would consider the definition in IAS 32, which states that a financial liability is:

- a contractual obligation:
    - to deliver cash or another financial asset to another entity; or
    - to exchange financial assets or financial liabilities with another entity under conditions that are potentially unfavourable to the entity; or
- a certain contract that will or might be settled in the entity's own equity instruments, such as those that violate the principle stated in paragraph 11 of IAS 32 (commonly known as the 'fixed-for-fixed' principle).

If the ICO token is a financial liability, the accounting would follow the applicable guidance in IFRS 9.

Many ICO tokens will not meet the definition of a financial liability, but there are situations where the terms and conditions might provide for a refund of proceeds up to the point of achieving a particular milestone. There might be situations in which the contract creates a financial liability, at least up to the point at which the refund clause falls away.

Equity instrument

An equity instrument is any contract that evidences a residual interest in the assets of an entity after deducting all of its liabilities. [IAS 32 para 11]. Typically, ICO tokens do not provide the holders with such a residual interest; for example, they do not give the holders rights to residual profits, dividends, or entitlement to proceeds on winding up or liquidation. These ICO tokens might therefore lack the characteristics of an equity instrument. Careful consideration is needed to assess whether the rights to the cash flows only relate to a specific project or whether, in substance, they provide rights to residual cash flows of the ICO entity.

Revenue transaction/prepayment for future goods and services

The issuing entity should consider whether the ICO token issued is, in substance, a contract with a customer that should be accounted for under IFRS 15.

IFRS 15 would apply if (1) the recipient of the ICO token is a customer, (2) there is a 'contract' for accounting purposes, and (3) the performance obligations associated with the ICO token are not within the scope of other standards.

Appendix A to IFRS 15 defines a customer as *"a party that has contracted with an entity to obtain goods or services that are an output of the entity's ordinary activities in exchange for consideration"*.

To determine whether a contract with a customer exists, an entity should consider whether the whitepaper, purchase agreement and/or other accompanying documents create 'enforceable rights or obligations'. [IFRS 15 App A]. To be a contract with a customer for the purposes of IFRS 15, such rights should be legally enforceable. This assessment might be challenging where the documentation provided by the issuer is not well defined. Entities should further evaluate all of the criteria in paragraph 9 of IFRS 15, to determine if a contract with a customer exists.

---

**PwC observations:**

Whitepapers are not the same as a standard legal contract or other offering documents (such as a prospectus or offering memorandum). Entities should carefully examine the whitepaper or similar document, to make sure that there are, in fact, legally enforceable rights. Clauses that disclaim any legal obligation by the issuer require further investigation. In some situations, additional legal advice might be needed.

---

In many circumstances, issuers might use the consideration received in the ICO to develop a software platform. Hosting and maintaining the specific platform is often an integral part of the ICO's future business model. The token could provide the holder with access to the platform, which might be operated as part of the entity's ordinary activities.

This might result in the holders meeting the definition of 'customers', from the perspective of the ICO entity; accordingly, the proceeds from the ICO could be revenue of the issuing entity, which will likely be initially deferred.

Determining the performance obligations, how they are satisfied and the period over which to recognise revenue will be judgemental and will depend on the specific facts and circumstances of the ICO offering.

<u>Consider other relevant guidance</u>

Where none of the above considerations appear to be relevant, the hierarchy in IAS 8 should be considered in determining the appropriate accounting treatment. We believe that it is unlikely that issuers will receive consideration without taking on an obligation to the subscribers. Even if the arrangement does not give rise to a financial instrument or a promise to deliver goods or services to a customer, there is likely to be a legal or constructive obligation to the subscriber. This might result in the issuer recognising a provision in accordance with IAS 37.

### 3.4. Accounting for a purchase of goods or services by the ICO entity in exchange for ICO tokens issued

### 3.4.1. General considerations

Some issuers of ICO tokens might choose to keep some tokens generated through the ICO, to use as a means of payment for goods or services. Examples of the use of such ICO tokens include obtaining services in developing or operating the entity's platform, or to remunerate/incentivise employees. This is explored further in the following sections.

When an ICO entity allocates a specified number of ICO tokens for the purpose of its own use, it should consider the accounting for the generation of the ICO tokens itself.

The generation of ICO tokens for own use does not generate proceeds for the ICO entity. The act of generating ICO tokens is not, in itself, an exchange transaction.

Generating ICO tokens is similar to a retail store printing vouchers for discounts on future purchases at the store and not distributing them to customers. Therefore, it seems appropriate that such an event would not be considered for accounting purposes. This situation changes once the vouchers are provided to third parties in exchange for consideration – or, in accounting terms, once an exchange transaction takes place.

An ICO entity would not usually account for the generation of tokens until an exchange transaction has occurred.

### 3.4.2. Own cryptographic assets exchanged for third party services

Sometimes, ICO tokens are provided to third parties for services, such as developing a platform. The observations summarised in this section cover situations in which the receiving party is determined to be a third party (and not an employee, as defined in IAS 19, 'Employee Benefits').

In order to determine the appropriate accounting treatment for an exchange transaction that takes place between an ICO entity and a third party, it is important to obtain a detailed understanding of the economic substance of the exchange.

Generally, the accounting will follow:

- the substance of what the ICO entity receives in return for cryptographic assets (debit side of the journal entry); and
- the characteristics of ICO tokens generated and delivered by the entity.

When determining the debit side of the journal entry, an entity would consider the nature of the goods or services received and whether there are costs that can be capitalised as an asset, or if the costs are to be recognised as an expense. For example, if the payment is to develop software, can the costs be capitalised as part of the intangible, based on the applicable IFRS guidance, or should they be expensed (for example, research and development guidance under IAS 38)?

The credit side of the entry is determined by the obligations that the entity incurred as a result of issuing the ICO tokens. This assessment determines the applicable standard, based on the promises associated with the ICO tokens. The thought process of the assessment will be aligned with the considerations described in section 3.3 above.

For example, where the ICO tokens provide an entitlement promise to deliver future goods or services to a customer (such as a discount on future services provided by the ICO entity), the credit side of the journal entry should be determined based on IFRS 15. In this case, the revenue from providing the ICO tokens should be measured at the fair value of the goods and services received by the ICO entity.

### 3.4.3. Own ICO tokens exchanged for employee services

Some ICO entities might reward their employees in the form of a specific number of tokens generated through the ICO. IAS 19 or IFRS 2, 'Share-based Payment', might need to be considered.

When assessing the accounting treatment of such arrangements, an entity considers the characteristics of the ICO tokens generated.

Unless the ICO tokens meet the definition of an equity instrument of the ICO entity (that is, a contract that has a residual interest in the assets of the ICO entity after deducting all of its liabilities), the arrangements would not meet the definition of a share-based payment arrangement under IFRS 2. Instead, they would fall within the scope of IAS 19 as a non-cash employee benefit.

IAS 19 will then determine the recognition, as well as the measurement, of the employee benefit, as shown in the following example:

---

**An illustrative example:**

An ICO entity rewards named employees in the form of a specific number of utility tokens generated (and currently held) by the ICO entity. Based on the nature and characteristics of the utility tokens, the entity concludes that they are, in substance, a contract with a customer that should be accounted for under IFRS 15, with the employee being the customer in this situation. The reward is 'paid' shortly after the end of the financial year in which the ICO was successfully executed to the employees who:

a) contribute to the success of the ICO; and
b) stay in their jobs until the end of the financial year in which the ICO was successfully executed.

Recognition:
The ICO entity determines that the substance of the arrangement is an exchange of employee services for goods and services to be delivered by the entity. This is accounted for as a short-term employee benefit [IAS 19 paras 11, 19–23] and non-cash consideration for goods and services. [IFRS 15 paras 66–69].

The arrangement includes a condition that the employees should remain in their jobs at the ICO issuer during the vesting period. The ICO entity should recognise a liability and short-term employee benefit expense over the vesting period. The liability will be reclassified as deferred revenue when the employees obtain the right to access the utility tokens on their digital accounts.

This treatment is also consistent with the definition of a contract liability in IFRS 15, which states that a contract liability arises when the entity has received the consideration. In this case, this is when the employee services have been provided.

Measurement:
The ICO entity recognises the undiscounted amount that it expects to pay in exchange for the services provided by the employees as a liability and an expense. [IAS 19 para 11]. The ICO entity could measure the amount that it expects to pay by using the fair value of the utility tokens to be delivered to the employees, or by using the estimated cost of the goods or services that it expects to deliver in the future.

Journal entries:

| As service provided over vesting period | When utility tokens issued from ICO |
|---|---|
| Dr Employee costs | Dr Short-term employee benefit liability |
| Cr Short-term employee benefit liability | Cr Deferred revenue |

---

**PwC observations:**

The circumstances of each transaction will need to be carefully evaluated in determining which view appropriately reflects the overall substance and economics, from the issuer's perspective especially, regarding the measurement of the benefits provided.

## 4.   Fair value considerations for cryptographic assets

### 4.1. The fair value hierarchy of IFRS 13

The fair value of a cryptographic asset might be accounted for or disclosed in financial statements. Fair value might be needed in a variety of situations, including:

| | |
|---|---|
| inventory held by a broker-trader applying fair value less costs to sell accounting | expense for third party services paid for in cryptographic assets |
| cryptographic assets classified as intangible assets in cases where the revaluation model is used | expense for employee services paid for in cryptographic assets |
| revenue from the perspective of an ICO issuer | cryptographic assets acquired in a business combination |
| disclosing the fair value for cryptographic assets held on behalf of others | cryptographic assets held by an investment fund (either measured at fair value or for which fair value is disclosed) |

IFRS 13, 'Fair Value Measurement', defines fair value as *"the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date"*, and it sets out a framework for determining fair values under IFRS.

Fair values are divided into a three-level fair value hierarchy, based on the lowest level of significant inputs used in valuation models, as follows:

- **Level 1:** quoted prices in active markets for identical assets or liabilities that the entity can access at the measurement date;
- **Level 2:** observable inputs other than level 1 inputs; and
- **Level 3:** unobservable inputs.

Generally, IFRS 13 gives precedence to observable inputs over unobservable inputs. If a valuation is not based on level 1 inputs at the reporting date (for example, because there is not an active market at the date or time of reporting), the value will need to be determined using a valuation model. The objective in such valuations should be to estimate what the exit price of the entity's position at the valuation date would be.

It should be noted that the hierarchy level of a cryptographic asset might evolve over time. For example, it is possible that a cryptographic asset that was previously valued using level 3 inputs might become traded in an active market, or vice versa.

IFRS 13 contains a number of disclosure requirements, depending on the level of the measurement hierarchy that a fair value measurement falls into, as well as the measurement basis used in the financial statements.

Given that markets for cryptographic assets are rapidly evolving, determining the fair value of cryptographic assets can be complex. IFRS 13 notes that, in making disclosures about fair value, the following factors should be considered:

- the level of detail necessary to satisfy the disclosure requirements;
- how much emphasis to place on each of the various requirements;
- how much aggregation or disaggregation to undertake; and
- whether users of financial statements need additional information to evaluate the quantitative information disclosed.

If the specific disclosures required by the standard are insufficient to meet the objective of helping users to assess the fair values, IFRS 13 requires additional information to be disclosed to meet that objective.

Many cryptographic assets show a high volatility of prices, and markets might remain open 24/7. So the time at which a reporting entity values the cryptographic asset might be important. For example, is the valuation time 11:59 PM at the end of the reporting period, or the close of business on that day? How is the valuation time determined in groups with subsidiaries in different time zones? This might represent a significant accounting policy, in which case it would also have to be disclosed in the notes to the financial statements.

**4.2. Suggested approach to determine the valuation of a cryptographic asset ('CA')**



### 4.3. Determining an active market

The first step in considering the fair value of a cryptographic asset is to determine if an active market exists for that cryptographic asset at the measurement date (in other words, whether a level 1 valuation can be performed).

Appendix A to IFRS 13 defines an active market as one *"in which transactions for the asset or liability take place with sufficient frequency and volume to provide pricing information on an ongoing basis"*.

A benchmark for evaluating the depth of a market could include active trading days within a given time period. The average daily turnover ratio, which is calculated by dividing the average daily trading volume by the total amount of cryptographic assets outstanding, is a metric for volume that could also be considered.

IFRS 13 does not define specific thresholds that need to be exceeded with regard to frequency (such as active trading days) and volume (such as turnover ratio) to determine if an active market exists. This means that the conclusion requires professional judgement.

Many large traditional shares have a turnover rate of less than 1% every day. Those shares would likely still be considered to be traded in an active market if there are sufficient active trading days within a given period.

Data available from CoinMarketCap1 ('CMC') for December 2018, for the five cryptographic assets with the highest market capitalisation, suggested average daily turnover ratios between 4% and 41%, with active trading every day. Looking purely at that quantitative information, it would likely be possible to conclude that active markets exist for these cryptographic assets.

However, further analysis of the underlying data suggests that some other qualitative factors might need to be considered:

1. reliability of data in general (see section 4.4 below); and
2. trading pairs (see section 4.5 below).

In some cases, there might be several markets for a particular cryptographic asset that meet the definition of an active market, and each of those markets might have different prices at the measurement date. In these situations, IFRS 13 requires the entity to determine the principal market for the asset.

The principal market will be the market with the greatest volume and level of activity for the relevant cryptographic asset which the entity holding the cryptographic asset can access. While CMC includes data from numerous exchanges, many exchanges serve regional markets and might not be an option for a principal market for a specific entity. IFRS 13 also contains a tiebreaker, if there is not a clear principal market (that is, because there are several markets with approximately the same level of activity). In the case of a tie, IFRS 13 defaults to the most advantageous market within the group of active markets to which the entity has access with the highest activity levels.

Paragraph 17 of IFRS 13 states that *"an entity need not undertake an exhaustive search of all possible markets to identify the principal market […], but it shall take into account all information that is reasonably available. In the absence of evidence to the contrary, the market in which the entity would normally enter into a transaction to sell the asset […] is presumed to be the principal market […]"*.

Once a principal market is identified, it is still necessary to investigate the pricing mechanisms used by the market to ensure that the pricing is based on orderly transactions in accordance with paragraphs 15 and B37–B44 of IFRS 13.

An entity might purchase cryptographic assets outside an exchange, in a private placement (for example, purchase from a liquidity provider). In that case, the purchase price is an entry price, and so it is not the relevant valuation basis for measurement of the cryptographic assets. The fair value of assets held is based on an exit price in accordance with paragraphs 9 and B2 of IFRS 13.

**4.4 Reliability of data**

In a presentation from a market participant to the SEC, trading data from one of the principal market sources was analysed, and it was suggested that, after comparing trading data from a prominent provider among the different crypto- and 'traditional' exchanges and performing other analysis over available data, there were indicators of various exchanges reporting inflated trading data.

This In depth does not comment on that report, but the report does highlight that, when obtaining trading data used for an assessment of frequency and volume, it is crucial to consider the source of the data. Data from regulated exchanges is generally considered more reliable than from an unregulated exchange, but it is necessary to consider the regulation criteria and if there is any surveillance over the trading data.

---

[1] https://coinmarketcap.com/

### 4.5 Trading pairs

A level 1 fair value input is defined in Appendix A to IFRS 13 as *"Quoted prices (unadjusted) in active markets for identical assets or liabilities that the entity can access at the measurement date"*. A cryptographic asset is often exchanged for another cryptographic asset ('crypto to crypto'), instead of being exchanged into a traditional currency ('fiat') ('crypto to fiat'). These crypto to crypto exchanges are usually included in the trading prices and volumes of a given cryptographic asset published by data provider websites. The trading prices used in these instances seem to be results from an implicit conversion of the cryptographic asset into fiat, at a rate under discretion of the respective exchange or the publisher of the data.

In our view, an active market for a certain cryptographic asset exists only when crypto to fiat exchanges published by reliable sources exist. Crypto to crypto exchanges should not be considered when determining if there is an active market.

In practice, there are exchanges that do not offer the possibility for crypto to fiat trades at all. In this instance, an entity might exchange a cryptographic asset for another cryptographic asset, and then exchange the second cryptographic asset into fiat at another exchange. This means that it is possible for a market to exist for a cryptographic asset in which there is frequency and volume of trades, but that this market is not an active market under IFRS 13.

While generally, under IFRS 13, the market predominantly used by the entity to sell a cryptographic asset should be considered the principal market, a market that does not exchange crypto to fiat cannot be the principal market, because it is not an active market under IFRS 13.

For example, if an entity would like to determine if active markets exist for Bitcoin, it would consider all exit trades (Bitcoin/fiat) from exchanges to which it has access. The entity could then consider the active trading days and average turnover ratio, and conclude on the sufficiency of frequency and volume in accordance with IFRS 13, to determine whether the exchange was the principal market.

**An illustrative example:**

Assume that two cryptographic assets, asset A and asset B, exist. Assets A and B are frequently converted into each other, based on a market where there are observable exchange ratios. Assets A and B are not considered foreign currencies within the scope of IAS 21.

Asset A is readily convertible to cash in an active market, but there is no active market where asset B can be converted to cash. In valuing asset B, would the transactions converting asset B to asset A on the active market be observable transactions that qualify for level 1 fair value measurements?

There is not an active market, and hence not a level 1 fair value in the entity's functional currency (fiat), for asset B. This is because there is no active market where asset B can be directly converted to cash. Moreover, converting asset B to cash, via conversion to asset A, will generally incur costs or a spread that will be a non-level 1 input, and it will take time, during which the fair values of the assets might change. Since measurement in the fair value hierarchy requires the lowest level of significant inputs to the 'entire measurement' [IFRS 13 para 73], the 'entire measurement' in this case cannot be a level 1 fair value measurement.

Although the definition of an active market does not refer to fiat currency, the presumption is that, in order to qualify as a level 1 fair value measurement, the transaction should be measured in a fiat currency. Such fiat currency might be a foreign currency translated under IAS 21 to the reporting entity's functional currency. However, for financial reporting purposes, the valuation needs to be established in some unit that qualifies as a foreign or functional currency under IAS 21.

Any cryptographic assets that are not directly convertible into fiat at an active market do not fulfil the criteria of a fair value level 1 asset, as defined by paragraphs 76–78 of IFRS 13, because there will always be some additional implied fee or spread to exchange into fiat.

Where this implied fee or spread is observable (for example, because the cryptographic asset held is convertible into fiat through another cryptographic asset, which trades into fiat in an active market), the fair value of the cryptographic asset held will likely qualify as a level 2 asset in the fair value hierarchy.

Cryptographic assets that cannot be readily converted to fiat will likely qualify as a level 3 asset.

Two other issues that arise in determining if there is an active market are:

- In some cases, there might be significant price fluctuations between markets. These could result in a difference between the price in the principal (or most advantageous) market and the actual price received, and hence in day one gains or losses, when using a fair value model. The existence of such price differences would not, of itself, be an indicator that there is no active market.
- Some cryptographic assets aim to be backed by a fiat currency – for example, for one cryptographic token to represent the value of US$1. However, because these cryptographic assets are not considered a foreign or functional currency in the definition of IAS 21, they are treated no different to other cryptographic assets with regard to determining if an active market exists.

### 4.6. Valuation in the absence of an active market

### 4.6.1. Valuation techniques and inputs

Many cryptographic assets will not have an active market as described by IFRS 13, and so they will need to be valued using a valuation technique.

An appropriate valuation technique is one that estimates an orderly transaction price to sell the asset or to transfer a liability at the measurement date under current market conditions.

In some cases, multiple valuation approaches should be used. The appropriate valuation technique should consider how a market participant would determine the fair value of the cryptographic asset being measured.

In many cases, the market approach (para B5 of IFRS 13) will be the most appropriate technique for a cryptographic asset, because this would be used by a market participant. However, there might be particular facts and circumstances where an entity could demonstrate that a market participant would use a different approach. The cost approach (para B8 of IFRS 13) or the income approach (para B10 of IFRS 13) is likely to be rare in practice.

In determining an appropriate valuation technique, IFRS 13 indicates that the technique should be appropriate in the circumstances, and it should maximise the use of relevant observable inputs and minimise the use of unobservable inputs.

For a cryptographic asset, observable inputs might include information obtained on bilateral transactions outside an active market, certain quotes from brokers, and other information, given that many markets are still unregulated.

Where broker quotes are used, these should be carefully evaluated. Broker quotes can be derived from models rather than being based on observable market transactions. At this time (November 2019), it does not yet appear that broker quotes are being widely used in this sector.

In general, a valuation model should be applied consistently from period to period. The market for cryptographic assets is evolving rapidly, and so valuation techniques used by market participants are also likely to evolve. IFRS 13 permits an entity to change valuation techniques (or change weightings amongst multiple valuation techniques) where the change results in a measurement that is equally, or more, representative of fair value, in the circumstances. Factors such as the following might result in changing valuation techniques:

- new markets develop;
- new information becomes available;
- information previously used is no longer available;
- valuation techniques improve; or
- market conditions change.

### 4.6.2. Calibration of valuation techniques

IFRS 13 contains certain restrictions on determining fair values at initial recognition where this results from an arm's length transaction. This is because the acquisition transaction represents an observable transaction for the cryptographic assets.

**An illustrative example:**

A cryptographic asset not traded in an active market is purchased in an arm's length transaction, without other elements, for CU100 at the beginning of the day on 1 June.

At the end of 1 June, the entity uses a valuation technique and determines that the value is CU104. Prior to considering the CU4 increase in fair value, the entity would firstly re-evaluate the appropriateness of the valuation technique/model used. Secondly, the entity would be required to determine whether the model was calibrated to the transaction price of CU100 paid at the beginning of 1 June, as set out in paragraph 64 of IFRS 13. That is, the valuation model would need to be run at the acquisition time, to determine whether the transaction price differed from CU100.

Now assume that the output of the valuation model (using unobservable inputs) is CU102 at the acquisition time, even though only CU100 was paid. In this case, the entity would likely consider that the difference between the valuation technique and the fair value at the beginning of the day amounted to CU102 – CU100 = CU2.

Therefore, at the measurement time (the end of the day, in this example) the output of the valuation technique would be adjusted for that difference, to arrive at a fair value of CU104 – CU2 = CU102.

The more time that passes between the initial transaction date and the measurement date, the less relevant the initial transaction price might become. However, in measuring the cryptographic asset, entities should ensure that their valuation method provides a sensible result in the light of IFRS 13's calibration requirement.

It is important to note that not all appraisal reports obtained from third party valuation experts take into account these calibration requirements. When relying on a third-party appraisal, an entity would need to ensure that the methodology used by the appraiser is consistent with all aspects of IFRS 13, including its calibration requirements.

The transaction price paid by the entity might also be relevant to the valuation of other units of the same cryptographic asset held at the measurement date.

## 5.  Disclosures

The accounting treatment of cryptographic assets and related transactions requires significant judgement and a thorough understanding of the underlying facts and circumstances, because there is no accounting standard specifically addressing the accounting for those types of asset. Therefore, there are no disclosure requirements specifically designed for cryptographic assets and related transactions.

However, that does not mean that no or limited disclosures are appropriate for cryptographic assets and related transactions. Apart from the fact that this is a judgemental area, the main reason for transparency around the relevant facts and circumstances is that cryptographic assets and related transactions are a topic of significant interest for all stakeholders (especially shareholders, analysts and regulators). This becomes even more important, given that those users might have different local expectations.

As a result, entities should ensure that their financial statements contain clear and robust disclosures. Those will include some of the applicable generic disclosures required by IFRS, depending on the accounting classification by the issuer/holder.

The following table summarises some of the more common topics for disclosure. However, this list is not exhaustive and will need to be tailored to develop disclosures that are specific to the entity and the relevant facts and circumstances:

| Topic | Examples |
|---|---|
| Involvement with cryptographic assets and related transactions, including purpose for transactions | • Description of the cryptographic assets held, including their characteristics<br>• Business model for holding cryptographic assets<br>• Details of ICO transactions undertaken (cash and non-cash transactions)<br>• Success of project, especially with regard to the promises included in ICO whitepaper |
| Accounting policies, and judgements made in applying them (IAS 1 paras 117(b), 122) | • Accounting standard applied to cryptographic assets held<br>• Measurement basis<br>• On/off balance sheet treatment of cryptographic assets held for third parties, including rationale<br>• Recognition of ICO proceeds (especially nature of credit in an ICO issuance)<br>• Possible future regulatory developments, including changes in accounting standards and/or interpretations |
| Sources of estimation uncertainty (IAS 1 para 125) | • Non-level 1 fair values<br>• Pattern of recognition of deferred revenue |
| Events after the reporting period (IAS 10) | • Major change in the value of cryptographic assets held<br>• Achieving/not achieving an ICO or other significant milestone (such as key performance obligations) |
| Fair value of cryptographic assets (IFRS 13) | • Fair value of cryptographic assets held<br>• Level of the fair value hierarchy within which the fair value measurements are categorised<br>• Description of the valuation techniques and inputs used to determine fair value<br>• Inputs used to determine fair value measurement, especially considerations around determination of the principal or most advantageous market and reliability and sources of data used<br>• A discussion of the sensitivity to unobservable inputs |
| Risks and how they are managed (IFRS 7 – although not necessarily applicable – could be useful guidance) | • Nature and extent of risks arising from the holding of cryptographic assets<br>• Risk management process, strategies and actions |

Since this is an evolving area of accounting, entities should closely monitor developments, so that they can align their disclosures with market expectations and requirements.

**Authored by:**

**Ryan Leopold**
Partner – Canada
Email: ryan.e.leopold@pwc.com

**Pascal Vollmann**
Senior Manager – Germany
Email: pascal.vollmann@pwc.com

**Contributors:**

**Scott Bandura**
Partner – Canada
Email: scott.bandura@pwc.com

**Yvonne Kam**
Partner – Hong Kong
Email: yvonne.kam@cn.pwc.com

**Gary Berchowitz**
Partner – South Africa
Email: gary.berchowitz@pwc.com

**Elizabeth Paul**
Partner – USA
Email: elizabeth.paul@pwc.com

**Thomas Campione**
Senior Manager – Luxembourg
Email: thomas.campione@lu.pwc.com

**Anuj Puri**
Director – Hong Kong
Email: anuj.puri@hk.pwc.com

**Tony de Bell**
Partner – United Kingdom
Email: tony.m.debell@pwc.com

**Sandra Thompson**
Partner – United Kingdom
Email: sandra.j.thompson@pwc.com

**Yoonki Karen Hong**
Partner – South Korea
Email: ykhong@samil.com

**Didrik Thrane-Nielsen**
Partner – Norway
Email: didrik.thrane-nielsen@pwc.com

**Kevin C. Jackson**
Director – USA
Email: kevin.c.jackson@pwc.com

**Bastian Stolzenberg**
Senior Manager – Switzerland
Email: bastian.stolzenberg@ch.pwc.com

**Bronte MH Jim**
Senior Manager – Hong Kong
Email: bronte.mh.jim@hk.pwc.com

**Stuart Wills**
Manager – United Kingdom
Email: stuart.k.wills@pwc.com

**Katie Woods**
Director – United Kingdom
Email: katie.woods@pwc.com

**PwC clients who have questions about this In depth should contact their engagement partner.**

This content is for general information purposes only, and should not be used as a substitute for consultation with professional advisors.

© 2019 PwC. All rights reserved. PwC refers to the PwC network and/or one or more of its member firms, each of which is a separate legal entity. Please see www.pwc.com/structure for further details.

Exhibit D



From: **Wright Thurston** <wright@gala.games>
Date: Tue, Mar 9, 2021 at 2:39 PM
Subject: Re: BGP 2019-2020 Tax Filing
To: pia <pia@gala.games>
Cc: Jennifer Miller <jenniferkimballmiller@gmail.com>, Jen Miller <jen@blockchainjedi.com>, Eric
Schiermeyer <eric@gala.games>, Jason Brink <j.brink@gala.games>

jen can you answer all of these asap

On Tue, Mar 9, 2021 at 9:02 AM pia <pia@gala.games> wrote:
    Hi Wright,

    The accountant is the owner of Computis (the crypto accounting software). She is helping me set up the
    accounting software and Quickbooks accounting as well. She is currently viewing the Quickbooks file sent by
    Jen and have some questions. If the Utah accountants can join the meeting on Wednesday meeting (10 am
    MST) that would be awesome.

    Some of the questions we have yesterday include:

    1. What are the wallets that are tracked? I think there is a wallet
    address, 0xF872507274a7455F369BB3a010C712557CC036fF that we aren't sure what is the purpose of this
    wallet and how it fit with the wallet architecture. I think the architecture I have is after Oct 2020. We want to
    understand how it was before Oct 2020.

    2. The mining equipment purchase/selling is done in ETH. She wants to know which wallet it came from, etc.
    so that she can tie in the system.

    Basically, we need all the wallet address that is used in BCG so we can link them in the software and get an
    accurate accounting.

    Thank you.

    Best regards,

    Pia

-------- Original message --------
From: Wright Thurston <wright@gala.games>
Date: 3/9/21 07:14 (GMT-08:00)
To: Pia Brink <pia@gala.games>
Cc: Jennifer Miller <jenniferkimballmiller@gmail.com>, Jen Miller <jen@blockchainjedi.com>, Eric
Schiermeyer <eric@gala.games>, Jason Brink <j.brink@gala.games>
Subject: Re: BGP 2019-2020 Tax Filing

We have an accounting firm in Utah doing our taxes. They are done but are adding in another tax credit from
software development.  We need to jump on wed with them to answer some questions to finalize 2019 -2020
taxes and get them filed this week.

Did we hire another in house accountant or are you referring to our utah accountants? If we have more in house
accounting staff lets have them join our wed meetings.

Did we get computus software up and running?

Thanks,

Wright

On Mon, Mar 8, 2021 at 3:09 PM Pia Brink <pia@gala.games> wrote:

Hi Jen,

Would you have any free timeslot this week to discuss about the company's 2019-2020 financial? I took a
look at the Quickbooks with the accountant and she has some questions. I'm thinking that if we can take the
time to sit together and address the questions, things will go much faster.

Let me know what time/date works for you.

Thank you!

Best regards,

Pia

On Wed, Mar 3, 2021 at 10:44 PM Pia Brink <pia@gala.games> wrote:

Hi Jen,

Thank you so much! I got the 2021 Quickbook Pro so I think it should be compatible. I will try to load the
files tomorrow.

Let me know whether the meeting tomorrow on the tax returns will impact these files. If not, I will use them
as our starting point.

Best regards,

Pia

On Wed, Mar 3, 2021 at 7:55 PM Jennifer Miller <jenniferkimballmiller@gmail.com> wrote:

attached is the quickbooks file.  You'll need quickbooks Pro 2018 or higher or online to open.

Not sure what you are running.  The PW is Morgan22

Wright and I have a call tomorrow at 1:00 to hopefully finally wrap up the tax returns for both 2019 and 2020.

Call me if you have any questions with the file.  I booked the B8 miner sale transaction in Jan 2021 when it took place. That is included in the QB file.

Jen

On Mon, Mar 1, 2021 at 11:52 AM pia <pia@gala.games> wrote:
  Hi Jen,

  Just want to follow up on the Quickbook company file. Is the tax for 2019-2020 for Gala all done?

  Thank you!

  Pia


  -------- Original message --------
  From: Jennifer Miller <jenniferkimballmiller@gmail.com>
  Date: 2/24/21 10:39 (GMT-08:00)
  To: Pia Brink <pia@gala.games>
  Cc: Jen Miller <jen@blockchainjedi.com>, Wright Thurston <wright@gala.games>, Eric Schiermeyer <eric@gala.games>, Jason Brink <j.brink@gala.games>
  Subject: Re: BGP 2019-2020 Tax Filing

  They are wrapping up the tax return.  They are working through getting the exact number for the R&D credits for 2019 and 2020.  I'll hopefully have another update later today or tomorrow.  This is my number one priority.  I can certainly get you the quickbooks files I have. I'll try and email but may need to upload some other way depending on how large the file is.

  Jen

  On Tue, Feb 23, 2021 at 10:58 AM Pia Brink <pia@gala.games> wrote:
    Hi Jen,

    How's the BGP 2019-2020 Tax filing going?

    If it's done, can I have a copy of the financial & transactional journal and QuickBooks Company Backup file?

    We will continue to use the Quickbooks to handle accounting but getting your files will help us with the starting point.

    Thank you so much!

    Best regards,

Pia

*This email is intended only for the individual or entity to which it is addressed and may contain information that is confidential, privileged, and exempt from disclosure under applicable law. If you are not the intended recipient, please notify the sender immediately and delete this email from your system. Any unauthorized use, disclosure, copying, or distribution of this email or its contents is strictly prohibited.*

Exhibit E

From: **Jarett Knapp** <jknapp@gala.games>
Date: Tue, Feb 1, 2022 at 5:19 PM
Subject: Re: Gala - Crypto Considerations
To: Todd Chesla (US) <todd.s.chesla@pwc.com>
Cc: Delwin Lau (US) <delwin.lau@pwc.com>, Wright Thurston <wright@gala.games>, Jesse Hynes
<jhynes@gala.games>, Angela McCarthy <angela@gala.games>


Ok thanks. Let us know if we can get some preliminary feedback on the crypto related pieces this week.

Best,
Jarett

On Tue, Feb 1, 2022 at 4:12 PM Todd Chesla (US) <todd.s.chesla@pwc.com> wrote:
Hi Jarett,

We are working through those considerations on our side and will coordinate with the team to get something
on the calendar for this group to discuss. The early version of the workplan may have not left us enough time
to sort through and prep on all the issues so we will revert asap.

Thanks,
Todd


**Todd S Chesla**
PwC | Principal - International Tax
San Francisco | +1 (754) 264 1590
PricewaterhouseCoopers LLP
pwc.com


On Tue, Feb 1, 2022 at 3:46 PM Jarett Knapp <jknapp@gala.games> wrote:
Todd & Delwin,

We wanted to follow up on next steps with Rebecca regarding some of the crypto and blockchain elements we previously discussed, including the treatment of GALA we receive from the node distribution (minted and unminted), revenue we receive through new coins (e.g. TOWN), etc.

The work plan shows early Feb as the next touchpoint on all of this, and wanted to see if you know where things stand and next steps.

Thanks,
Jarett

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

In the event the content of this email includes Tax advice, the content of this email is limited to the matters specifically addressed herein and is not intended to address other potential tax consequences or the potential application of tax penalties to this or any other matter.

PricewaterhouseCoopers LLP is a Delaware limited liability partnership.  This communication may come from PricewaterhouseCoopers LLP or one of its subsidiaries.

*This email is intended only for the individual or entity to which it is addressed and may contain information that is confidential, privileged, and exempt from disclosure under applicable law. If you are not the intended recipient, please notify the sender immediately and delete this email from your system. Any unauthorized use, disclosure, copying, or distribution of this email or its contents is strictly prohibited.*

Exhibit F

From: **Jarett Knapp** <jknapp@gala.games>
Date: Thu, Jan 27, 2022 at 1:45 AM
Subject: Re: Gala <> PwC UK
To: Todd Chesla (US) <todd.s.chesla@pwc.com>
Cc: Delwin Lau (US) <delwin.lau@pwc.com>, Angela McCarthy <angela@gala.games>, Andrew Weisz (US) <andrew.weisz@pwc.com>, Rebecca Lee (US) <rebecca.e.lee@pwc.com>, Mazhar Wani (US) <mazhar.wani@pwc.com>, Wright Thurston <wright@gala.games>, Jesse Hynes <jhynes@gala.games>

Hey team,

I just wanted to touch base on a few of the high priority items in the tax structuring section of the attached deck that had a late Jan target date in the timeline. Should we be expecting the HoldCo matrix and int'l global structure feasibility deck this week, and if so, should we look to have follow up discussions next week?

Thanks,
Jarett

On Wed, Jan 26, 2022 at 1:34 PM Jarett Knapp <jknapp@gala.games> wrote:
Hey Todd - wanted to quickly follow up on the burning of TOWN and if recognizing that as a tax loss is possible. Again, the only TOWN we have is TOWN we have received as revenue.

Thanks and let us know.
Jarett

On Mon, Jan 24, 2022 at 7:17 PM Jarett Knapp <jknapp@gala.games> wrote:
Thanks Todd for the quick reply.

I think the first issue is how we treat TOWN revenue overall, and at what point did it / does it become real revenue (listed on uniswap, other exchange, etc), but can hopefully tackle the questions in parallel.

Thanks team,
Jarett

On Mon, Jan 24, 2022 at 7:14 PM Todd Chesla (US) <todd.s.chesla@pwc.com> wrote:

Hi Jarett,

Looping in Rebecca and Mazhar as well. We will discuss internally and get back to you.

Thanks,
Todd

**Todd S Chesla**
PwC | Principal - International Tax
San Francisco | +1 (754) 264 1590
PricewaterhouseCoopers LLP
pwc.com

On Mon, Jan 24, 2022 at 7:02 PM Jarett Knapp <jknapp@gala.games> wrote:
Hey team,

One follow up that came out of an internal conversation today. TOWN coin is currently only distributed to players who earn the coin and founders node owners based on a % that players earn (roughly 5%). The real point is that Gala only received TOWN in the form of revenue - no daily distro goes to Gala like we do with GALA coin.

Our question is - what are the overall implications of burning TOWN coin we have taken in as revenue? Could that be written off for tax purposes?

Happy to discuss live if helpful - would be great if I can get back to the c-suite on this question quickly.

Thanks,
Jarett

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

In the event the content of this email includes Tax advice, the content of this email is limited to the matters specifically addressed herein and is not intended to address other potential tax consequences or the potential application of tax penalties to this or any other matter.

PricewaterhouseCoopers LLP is a Delaware limited liability partnership.  This communication may come from PricewaterhouseCoopers LLP or one of its subsidiaries.

*This email is intended only for the individual or entity to which it is addressed and may contain information that is confidential, privileged, and exempt from disclosure under applicable law. If you are not the intended recipient, please notify the sender immediately and delete this email from your system. Any unauthorized use, disclosure, copying, or distribution of this email or its contents is strictly prohibited.*

Exhibit G

**Summary**

The top priority is locking down financials so we can pursue investment and prepare for continued growth with streamlined processes in place. To that effect, there are two key areas I am focusing on:

1. Understanding previous 2020/2021 transactions and entries to ensure past and future financials are as accurate as possible. Provide revised reports for 409A valuation, if necessary

2. Consolidate bookkeeping in a GL software, expand the chart of accounts for more detail, and make financials GAAP compliant as of JAN 2021

For a deeper dive, see TLDR format below:

## Priority Items

1. **Resolve questions related to 2020/21 financials:**
   a. Computis is showing a $1m+ difference in net rev in 2020 vs what was reported on the 2020 tax returns.
      i. After a discussion with Wright and Jen, Computis identified an error in the way they were recording newly minted Gala. Posted 3 large transactions at FMV to claim fee rev in error. Computis is currently reviewing their data for additional possible errors and adjusting previous transactions.
      ii. These adjustments will result in material changes to the 2020/2021 financials. Revisions should be submitted to Carta.

   b. We are also having trouble identifying initial capital contributions tying back to the loans paid back to Eric & Wright in Apr, May, and June.
      i. Jen to provide a workpaper detailing Wright & Eric's contributions supporting the payback amounts

2. **Unable to regularly access bitcoin transactions in Bitrue account and Trezor hard wallet.**
   a. Zabo is actively working on an integration for Bitrue. Computis should be able to retrieve transactions without assistance from Eric/Jason within 2-3 months
   b. We still need a process in place to retrieve Trezor bitcoin transactions from the Hard Wallet

3. **With input from exec team, expand Chart of Accounts to include more specific cost/revenue centers by division**
   a. Specific revenue and cost centers would aid significantly in budgeting, forecasting, performance analysis

4.  **Financials/Bookkeeping is currently cash basis and not GAAP compliant:**
    a.  Once we have an expanded COA and Computis has finalized financials through 06/30/21 it will be necessary to go back to Jan, review and reclass expense and revenue entries as needed. This will include items like splitting out payroll taxes, admin PR fees, and 401k contributions from wages, creating payables for accruals, amortizing software subscriptions and service contracts, reclassing FF&E to fixed assets, etc.
    b.  Will utilize vendor center in QB for AP as of 07/01 and will maintain financial tracking spreads for transactions prior to 07/01/21
    c.  Move the Sandbox bank account to Gala company file, so we no longer need to combine financials.

5.  **Iron out REV/Share terms**
    a.  Does it make sense to create separate entities for the partnership agreements?
    b.  Are we sharing net revenue or gross revenue?
    c.  Are we tracking just project revenue and in what detail?
    d.  How and when do we convert to stable coin or USD?
    e.  Are there Gala expenses that should be allocated to the partnerships?
    f.  How often are we required to disburse rev share?

6.  **Close Sandbox office**
    a.  Lease ends 08/14/21
    b.  Majority of FF&E has been sold and/or removed
    c.  Services/utilities have been shut-off or assumed

## Areas to improve process, efficiency, and compliance

1.  **Combine Sandbox and Gala books, record AP in GL software and eliminate manual spreadsheets. Increase chain scrapes and crypto gain/loss JE to twice per month**
    a.  Transactions are currently recorded in 3 places: Sandbox Games company file, financial tracking spreadsheets and Gala Games company file: vendor transaction histories unavailable in QB.

2.  **AP Automation:**  AP software integrates with accounting system to receive invoices electronically, input, route to managers for approval, records approvals and provides a central storage location for invoices
    a.  Reviewing/Demo'ing software:
        i.  Beanworks: QB specific $375-500/mo

3. **Establish a fixed asset policy, asset tracking, and a depreciation schedule**
   a. per Computis we can capitalize FF&E on the financials and expense up to a $1m on taxes -not verified

4. **Complete bookkeeping in house on a daily basis**
   a. Gala Bookkeeping is currently completed by Computis @ 150/hr in addition to being tracked on the Financial tracking spreadsheets. I have worked out a process with Computis to identify transactions already in the GL software. If a transaction is AP related, they will record the crypto side of the transaction in addition to providing the gain/loss journal entries

5. **Project dashboards providing KPIs, deviations, and forecasting. Budgets and modeling tools to evaluate the profitability of potential projects/partnerships**

## Questions

1. Do we need to record unsold NFTs as inventory?
   a. Yes, but value will be recorded as cost of minting, or COGS

2. Can ADP handle Canadian payroll for significantly less than DEEL?

3. Are we facing any compliance issues in regard to our foreign employees?

4. How can we improve treasury management to earn more and limit risk?

5. What tax strategies are available to us to minimize our liability?

6. Is an employee reimbursement software necessary?

   a. At this time, I don't think it's a necessary expense. Employees can snap pics of receipts after noting the expense category and send periodically to finance. Finance will convert to pdfs and process each pay period.

7. Would we benefit from a cost and process perspective from a corporate account with a tech supplier?
   a. From a cost perspective, opinions mixed. Per McCarthy, hardware seems to be difficult to come by and often needs to be sourced from various suppliers.
   b. From a process perspective, McCarthy's preference is to order his team members computers himself versus spend the same amount of time completing a form detailing the necessary specs. This is not the case with every manager as Operations has been asked in the past to assist with the ordering process

      c.   Another option is to allow the employees to purchase their own equip and submit for reimbursement

      d.   A corporate account would require a credit application



From: **Angela McCarthy** <angela@gala.games>
Date: Tue, Jul 27, 2021 at 3:04 PM
Subject: Finance overview
To: Eric Schiermeyer <eric@gala.games>, Wright Thurston <wright@gala.games>, Sarah Buxton <sarah@gala.games>, Pia Brink <pia@gala.games>, Michael McCarthy <mccarthy@sandbox-games.com>


Hi All

I've attached a document I use to keep track of issues, concerns, priorities, etc. It's a good overview of what I've been working on. For your benefit I've added a very concise summary of my priorities at the top.

Please let me know if you have any questions or feedback.

Thanks,

Angela

*This email is intended only for the individual or entity to which it is addressed and may contain information that is confidential, privileged, and exempt from disclosure under applicable law. If you are not the intended recipient, please notify the sender immediately and delete this email from your system. Any unauthorized use, disclosure, copying, or distribution of this email or its contents is strictly prohibited.*

# Exhibit H



From: **Sarah Buxton** <sarah@gala.games>
Date: Wed, Jun 2, 2021 at 3:28 PM
Subject: Re: Blockchain Game Partners, Inc. dba Gala Games | Carta Implementation
To: Pia Brink <pia@gala.games>


Hey lovely,

Just to note Eric doesn't want GALA counted as part of valuation process - wants to discount from balance sheet for purpose of this

S


**Sarah Buxton**
sarah@gala.games
Timezone: London, UK (GMT)

Read about Gala Games in the WSJ
Join our community on Discord



The content of this message is confidential. If you have received it by mistake, please inform us by an email reply and then delete the message. It is forbidden to copy, forward, or in any way reveal the contents of this message to anyone. The integrity and security of this email cannot be guaranteed over the Internet. Therefore, the sender, will not be held liable for any damage caused by the message.

On 2 Jun 2021, 23:22 +0100, Pia Brink <pia@gala.games>, wrote:

Hi Marina,

Thank you so much for your help.

I'm trying to fill in the information for 409A valuation. Will Dan able to help me? Our company holds both cryptocurrency and cash. When the valuation ask for "Cash Balance" should I include the cryptocurrency holdings too? maybe based on the End of day value at the valuation date?

Thank you!

Pia

On Wed, Jun 2, 2021 at 12:55 PM Marina Rezende <marina.rezende@carta.com> wrote:

Hi Pia,

Thank you for all your help during the implementation process! It was a pleasure working with you and I hope my services have met your expectations.

I am happy to announce that your account is now live and your securities have been issued.

You will soon receive a short survey regarding my efficiency as your implementation manager as well as Carta as a platform.
I would really appreciate your score - feel free to leave any comments or suggestions!

**Below is a list of resources which will ensure you get the most out of Carta:**

How do I request a 409A?

You can now request a 409A valuation through Carta by navigating to Compliance --> 409A --> Request Carta 409A. If you have any valuations-specific questions, please reach out to val-operations@carta.com or (650) 457-6657.

I need help!

Moving forward, please submit a case via Carta's Help Center. Learn more about Carta's Help Center. You can also press "h" on your keyboard for a help box.

Also, I'm looping in your account manager Dan Clarke, who will be able to assist you from now on if you have any questions regarding your subscription details.

Wish you all the best! :)

--

**Marina Rezende**
Implementation manager

2



On Wed, Jun 2, 2021 at 4:38 PM Pia Brink <pia@gala.games> wrote:
Hi Marina,

We already requested activation. Do I need to wait for people to accept their shares and/or other internal Carta processes? Please let me know what I should do next to start the 401A valuation process.

Thank you!

Best regards,

Pia

On Wed, Jun 2, 2021 at 7:39 AM Marina Rezende <marina.rezende@carta.com> wrote:
Hi Pia,

Thanks for your email!

Eric and Wright were sent emails to let them know they have securities to sign. Eric has signed, so we are only missing signatures from Wright. Would you like me to reach out to him with instructions?

You will be able to request activation as soon as the securities are signed.

Best,
Marina

On Tue, Jun 1, 2021 at 8:14 PM Pia Brink <pia@gala.games> wrote:
Hi Marina,

Thank you for your confirmation. I already accept and review the shares. How do I send out the securities for Eric and Wright to sign? Maybe it already sent out automatically?

I can't click "Request Activation" to send out the securities to the shareholders.

Let me know what I need to do next. I will ask Eric and Wright to watch out for emails from Carta.

Pia

On Tue, Jun 1, 2021 at 2:54 PM Marina Rezende <marina.rezende@carta.com> wrote:
  Hi Pia,

  Thanks for reaching out! In Carta, outstanding shares are shares that have been issued and are valid, so it
  is correct to have 111,111,111 shares outstanding.

  Please let me know if you have any other questions or need any help completing step 4 of the setup
  guide.

  Best,
  Marina

On Tue, Jun 1, 2021 at 12:25 PM Pia Brink <pia@gala.games> wrote:
  Hi Marina,

  Thank you for your help. I think we just got the consent for Carta Go-Live yesterday. For the Cap Table
  verification, I have a quick question. The system is correct that we have 300M shares authorized and
  111,111,111 issued. But wouldn't that mean the outstanding equal to 300M minus 111,111,111 or
  188,888,889 shares?

  Does outstanding means shares that are not issued out? Maybe I'm confused about the vocab used in the
  system.

  Thank you!

  Best regards,

  Pia

On Fri, May 28, 2021 at 11:32 AM Marina Rezende <marina.rezende@carta.com> wrote:
  Hi Pia and Jesse,

  Thank you for the clarification, I have deleted the convertible notes, as you can see here.

  With that, I am happy to announce that **your account has been moved to the 4th and last
  step of the process**. In order to conclude it we will need only to complete the following tasks on the
  setup guide:

  **1) Consent For Carta Go-Live**
  We are still missing Wright Thurston's signature on the board consent. Would you like me to reach
  out to him with instructions to sign?

  **2) Complete your Account Setup**
  Please complete the following tasks on **step 4** of the setup guide:

1. **Click on "Review"** next to Verify Cap Table (I generated a report that might be useful for the final review, you can download it here, under the Report folder - file is titled blockchain-game-partners-inc_2021-05-28_summary_cap_ledgers.xlsx);
2. **Click on "Go to task"** next to Sign Securities (To be completed by Eric and Wright as signatories);
3. **Click "Request"** and I will receive a notification to activate your account.

I would like to remind you that when I activate, emails will automatically be sent to stakeholders letting them know they have securities available to accept on Carta.

As a reminder, please see here the heads up email templates. It's best if the heads up is sent before your account goes live.

Please let me know if you have any questions or if there's anything that needs to be adjusted on the platform. I'll be happy to help!

Best,
Marina

On Thu, May 27, 2021 at 3:01 PM Pia Brink <pia@gala.games> wrote:
Hi Marina,

I think that's my fault. I uploaded the note but I think it's different. That's more like a promissory notes NOT convertible notes.

Please delete the two convertible notes in the cap table.

Thank you so much!

Best regards,

Pia

On Thu, May 27, 2021 at 10:51 AM Marina Rezende <marina.rezende@carta.com> wrote:
Hi Jesse,

Should I delete the two convertible notes that were added to the cap table (you can check them here)?

Please note that those convertible notes were also uploaded to the Data room, under the Convertible Promissory Notes folder.

As soon as you confirm I will make the modification.

Best,
Marina

On Thu, May 27, 2021 at 1:06 PM Jesse Hynes <jhynes@gala.games> wrote:
Hi Marina:

Just to jump in, I don't believe there are any convertible notes.

Rather, my understanding is that when the company was created there was 00 mil preferred shares and 200 mil common shares.  However, the preferred stock was converted to common (making 300mil total common.

Best,
Jesse

On Thu, May 27, 2021 at 11:44 AM Marina Rezende <marina.rezende@carta.com> wrote:
Hi Pia,

Thanks for your email!

With this, we enabled fractionals and I was able to migrate your data to Carta. You can check out your summary cap table here and all other securities by navigating to Securities > Shares/Convertible Notes.

Please review and let me know if there are any changes to be made.

I'm currently working on setting the rest of the account so we can move to the final stage. Below there is a list of the last details I'll need to finish it:

- Can you send a (blank) template for your Convertible Notes?
- Can you please confirm if the Convertibles Notes have a maturity date? I just need your confirmation if they don't.
- Can you please indicate who will be the signatory for the Convertibles, Option grants and Warrants?

We are also missing Wright Thurston's signature on the board consent for Carta Go-live. Would you like me to reach out to him with instructions?

As soon as I have those we will be able to move to the final step of the onboarding.

Please let me know if you have any questions and I will be happy to help.

Best,
Marina

On Wed, May 26, 2021 at 7:13 PM pia <pia@gala.games> wrote:
Yes, please!

Pia


-------- Original message --------
From: Marina Rezende <marina.rezende@carta.com>
Date: 5/26/21 14:55 (GMT-08:00)
To: Pia Brink <pia@gala.games>
Cc: Sarah Buxton <sarah@gala.games>, Jesse Hynes <jhynes@gala.games>
Subject: Re: Blockchain Game Partners, Inc. dba Gala Games | Carta Implementation

Hi Pia,

Yes, it can be revised later. Should we enable two decimal points?

Thanks!

Best,
Marina


On Wed, May 26, 2021 at 6:11 PM Pia Brink <pia@gala.games> wrote:
Hi Marina,

Can this be revised later? I'm thinking 2 decimal points should be enough for us. However, it might change in the future.

Thank you.

Best regards,

Pia

On Wed, May 26, 2021 at 2:09 PM Marina Rezende <marina.rezende@carta.com> wrote:
Hi Pia,

Thanks for your email! Can you please confirm how many decimals you would like us to enable?

As soon as I have this information I will be able to import the spreadsheet and move forward to step 3 of the process.

Best,
Marina

On Wed, May 26, 2021 at 3:22 PM Pia Brink <pia@gala.games> wrote:
Hi Marina,

Please **turn on the Fractional shares setting** for us. As for the email addresses, I think it's already in the "Common Share" tab but here are their emails:

Eric Schiermeyer: **eric@gala.games**
True North United Investments, LLC: **wright@gala.games**

Let me know if you need additional information from us.

Thank you!

Best regards,

Pia

On Wed, May 26, 2021 at 10:50 AM Marina Rezende <marina.rezende@carta.com> wrote:
Hi Pia,

Thanks for your patience, as our team is experiencing a backlog of projects - we are working diligently to reduce our response time.

Also, thank you for filling out the spreadsheet. We can add all issued shares as common shares, so the spreadsheet is filled out correctly.

In order to import it to Carta, we are missing **email addresses** for the convertible note holders (Eric Schiermeyer and True North United Investments, LLC). Can you please send those to me?

I also need to know if we should round the **fractional shares** up or down, or if I should enable fractional shares in Carta.

As a reminder, please note that Carta does not fully support those. Here are the limitations once we enable fractional shares:

- Enabling fractional shares is irreversible. You will not be able to go back to whole numbers.
- Future stock splits cannot be processed.
- No secondary transactions, e.g. Tenders, Repricings, etc.
- Cannot use share class conversion on any account with fractional shares.
- The Round Modeling/Waterfall/Scenario Modeling tool will round those fractional shares down to be a whole number again, so will not be accurately reported.

Please let me know how I should proceed and I will make the modifications to the spreadsheet and import it to Carta as soon as I have your response.

Best,
Marina

On Wed, May 26, 2021 at 2:34 PM Pia Brink <pia@gala.games> wrote:
Hi Marina,

Just want to follow up on this. Is the excel file that I prepared ok? Can you help me with the next step? I can't process to the next step without completing this step I think.

We still need to do the 409A valuation ASAP.

Thank you.

Best regards,

Pia

On Tue, May 25, 2021 at 5:41 PM Pia Brink <pia@gala.games> wrote:
Hi Marina,

I didn't hear from you today so I tried putting this sheet together. Can we use this as our current stock status? I attached the file that you want me to add additional information with this email.

Thank you.

Best regards,

Pia

On Tue, May 25, 2021 at 9:23 AM pia <pia@gala.games> wrote:
Hi Marina,

Thank you for your patience with us. Here is our current situation and I'm not sure how to fill in the template. Can you please suggest?

The original Articles of Incorporation contemplate 200,000,000 Common Shares and 100,000,000 Preferred Shares for a total of 300,000,000 authorized shares.

The original Shareholder Agreement shows that Eric and True North (Wright's shares) were each issued 50,000,000 Preferred Shares.

However, the Articles of Incorporation do not provide the distinctions and preferences of Preferred Shares compared to Common Shares (as required by Wyoming law). In the Written Consent dated Feb 12, 2021, the Directors and Shareholders of BGP approved the

reclassification of the 100,000,000 issued Preferred Shares to Common Shares. We will file this amendment with WY state this week.

There are now a total of 300,000,000 authorized common shares and 0 authorized preferred shares. Of the 300,000,000 authorized common shares, 111,111,111 are issued and the other 188,888,889 are outstanding.

The breakdown of the shareholding structure is attached. Should we put all of them as common shares based on this scenario?

Thank you!

Pia

-------- Original message --------
From: Marina Rezende <marina.rezende@carta.com>
Date: 5/21/21 13:25 (GMT-08:00)
To: sarah@gala.games, Pia Brink <pia@gala.games>
Subject: Re: Blockchain Game Partners, Inc. dba Gala Games | Carta Implementation

Hi Sarah and Pia,

Thank you for your time earlier today. It was great talking to you and I hope I was able to outline clearly for you how the rest of the setup works.

I've now uploaded the onboarding spreadsheet we reviewed into the Data Room. It's saved under the OBS Exchange Folder (file is titled **blockchain-game-partners-inc_onboarding_spreadsheet.05.20.21**).

Please review the areas highlighted in <mark>YELLOW</mark> that need to be filled in. For this version, these items include the following:

- **Common Certificates tab:** Needs **email addresses**, **quantities**, **issue dates** and **rule 144 date** (Carta defaults it to the same as the issue date unless you tell us otherwise), cash paid (if applicable) & **price per share** filled in for each of the shareholders.
  We also need you to confirm with your legal team if you will use Carta's default **legend** (you can check it on the Legends tab) or provide a specific one to be added. Please also let me know if there is a **vesting schedule** for those shares.

- **Convertible Notes tab:** Here we just need **emails** and **maturity dates** for each of the convertibles.

Any other fields in the spreadsheet that aren't highlighted won't be required, and just optional if you want to include additional/applicable information. Also, **it's important that we don't change the spreadsheet other than filling in the cells** (so please don't add OR delete any columns or tabs – rows are fine though), in order for it to be uploaded correctly back into Carta.

Once you've gone through and completed the spreadsheet with all the needed info, please upload your version to the Data Room and notify me so I can move your account to the next steps.

As we discussed, can you please also check with your legal team what are the **rights and preferences** that differentiate the common shares and the preferred shares, since the company's original certificate of incorporation (saved under the Original Governing/Incorporation Document and All Amendments folder, titled BGP.WY.Articles of Incorporation.1.16.19 (4).pdf) mentions those two different share classes?

As for the **fractional shares**, please note that Carta does not fully support them. Here are the limitations once we enable fractional shares:

- Enabling fractional shares is irreversible. You will not be able to go back to whole numbers.
- Future stock splits cannot be processed.
- No secondary transactions, e.g. Tenders, Repricings, etc.
- Cannot use share class conversion on any account with fractional shares.
- The Round Modeling/Waterfall/Scenario Modeling tool will round those fractional shares down to be a whole number again, so will not be accurately reported.

Please let me know if I should enable this or if you prefer rounding the shares up or down.

Also, please let me know if you have any questions and feel free to schedule a new call using this link whenever is convenient for you.

I look forward to hearing from you!

Best,
Marina

On Tue, May 18, 2021 at 10:15 AM Marina Rezende <marina.rezende@carta.com> wrote:

Hi Sarah,

Marina here! I will be your dedicated onboarding manager with Carta. Thank you for signing up! W to be working with you.

Here is your setup guide, where you'll find the next steps for your implementation process. I see yo completed most of the tasks on step 1 and uploaded company documents.

Based on the documents you uploaded, I began working on step 2 of the implementation process, to build your onboarding spreadsheet (an Excel file that we use to migrate the company's data to C now uploaded a first draft into your Data Room and saved it under the OBS Exchange folder (file is *blockchain-game-partners-inc_onboarding_spreadsheet.05.18.21.xlsx*).

In order to discuss the information on it, complete what is missing, and talk about next steps, pleas*link* to schedule our kick-off call. It is highly recommended that you invite your paralegal to this initi

*Please be aware of the following key points:*

- *In order to ensure data security, we kindly request that you send all attachments that conta to our team by uploading these documents into the onboarding documents folder located in company data room for shared access.*

- *To complete your onboarding in the final step of the process, you must electronically sign a all active securities to your stakeholders, as per SEC transfer agent requirements.*

- *To begin a 409A valuation, you must first complete your onboarding through to activation o account.*

- *Carta employees are not authorized to give legal or financial advice.*

- *I will respond within one business day of any request.*

- *The speed of the onboarding process is contingent upon you and your team providing all o necessary documents and data points.*

- *Prior to account activation a board consent is required to be executed through Carta to for approve the company's usage of Carta: 'Heads up' email template - For Board Members.*

If you have any questions or concerns, please don't hesitate to reach out.

Carta Onboarding FAQ

Warm regards,

\-\-
**Marina Rezende**
Implementation manager



**Marina Rezende**
Implementation manager



This communication is intended only for the recipient to whom it is addressed.  It may contain information that is privileged and confidential.  Nothing contained in this email constitutes tax, legal, insurance or investment advice, nor does it constitute a solicitation or an offer to buy or sell any security or other financial instrument.  If you are not the intended recipient of this message, any use, dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify the sender and permanently delete all copies that you may have.

**Marina Rezende**
Implementation manager



This communication is intended only for the recipient to whom it is addressed.  It may contain information that is privileged and confidential.  Nothing contained in this email constitutes tax, legal, insurance or investment advice, nor does it constitute a solicitation or an offer to buy or sell any security or other financial instrument.  If you are not the intended recipient of this message, any use, dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify the sender and permanently delete all copies that you may have.

**Marina Rezende**
Implementation manager



This communication is intended only for the recipient to whom it is addressed.  It may contain information that is privileged and confidential.  Nothing contained in this email constitutes tax, legal, insurance or investment advice, nor does it constitute a solicitation or an offer to buy or sell any security or other financial instrument.  If you are not the intended recipient of this message, any use, dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify the sender and permanently delete all copies that you may have.

**Marina Rezende**
Implementation manager



This communication is intended only for the recipient to whom it is addressed.  It may contain information that is privileged and confidential.  Nothing contained in this email constitutes tax, legal, insurance or investment advice, nor does it constitute a solicitation or an offer to buy or sell any security or other financial instrument.  If you are not the intended recipient of this message, any use, dissemination,

distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify the sender and permanently delete all copies that you may have.

This communication is intended only for the recipient to whom it is addressed.  It may contain information that is privileged and confidential.  Nothing contained in this email constitutes tax, legal, insurance or investment advice, nor does it constitute a solicitation or an offer to buy or sell any security or other financial instrument.  If you are not the intended recipient of this message, any use, dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify the sender and permanently delete all copies that you may have.

--

**Jesse Hynes**



Join the BEST Discord on the Internet: http://secure-web.cisco.com/15-ZaT536hMB8_cxcfrSe2g-ER6E_SUWTIer_gl6Jis5nlXZA6n865GfVZLTF3-SNZYmub0BDnfJkauGlz_YQaHrwvbSQ32cp_bIlgY2nxnkYUaSy0fM60EtBXAujeHhulQUJVrfX9M8iDdRoXb7MspK4VxBT486QCjclEpzgr1wk1bfih0Ji0_nvBobXilyvC9xVFdOmumshiXKQN1o9K7w6XbU0FaqZFeZ9EUTM9nJaV2z5DHPuNVFmFZjXrbyg/http%3A%2F%2Fgalagames.chat

**Marina Rezende**
Implementation manager



This communication is intended only for the recipient to whom it is addressed.  It may contain information that is privileged and confidential.  Nothing contained in this email constitutes tax, legal, insurance or investment advice, nor does it constitute a solicitation or an offer to buy or sell any security or other financial instrument.  If you are not the intended recipient of this message, any use, dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify the sender and permanently delete all copies that you may have.

**Marina Rezende**
Implementation manager



This communication is intended only for the recipient to whom it is addressed.  It may contain information that is privileged and confidential.  Nothing contained in this email constitutes tax, legal, insurance or investment advice, nor does it constitute a solicitation or an offer to buy or sell any security or other financial instrument.  If you are not the intended recipient of this message, any use, dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify the sender and permanently delete all copies that you may have.

**Marina Rezende**
Implementation manager



This communication is intended only for the recipient to whom it is addressed.  It may contain information that is privileged and confidential.  Nothing contained in this email constitutes tax, legal, insurance or investment advice, nor does it constitute a solicitation or an offer to buy or sell any security or other financial instrument.  If you are not the intended recipient of this message, any use, dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify the sender and permanently delete all copies that you may have.

**Marina Rezende**
Implementation manager



This communication is intended only for the recipient to whom it is addressed.  It may contain information that is privileged and confidential.  Nothing contained in this email constitutes tax, legal, insurance or investment advice, nor does it constitute a solicitation or an offer to buy or sell any security or other financial instrument.  If you are not the intended recipient of this message, any use, dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify the sender and permanently delete all copies that you may have.

**Marina Rezende**
Implementation manager



This communication is intended only for the recipient to whom it is addressed.  It may contain information that is privileged and confidential.  Nothing contained in this email constitutes tax, legal, insurance or investment advice, nor does it constitute a solicitation or an offer to buy or sell any security or other financial instrument.  If you are not the intended recipient of this message, any use, dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify the sender and permanently delete all copies that you may have.

*This email is intended only for the individual or entity to which it is addressed and may contain information that is confidential, privileged, and exempt from disclosure*

15

*under applicable law. If you are not the intended recipient, please notify the sender immediately and delete this email from your system. Any unauthorized use, disclosure, copying, or distribution of this email or its contents is strictly prohibited.*

Exhibit I



From: **Wright Thurston** <wright@gala.games>
Date: Wed, May 5, 2021 at 1:43 PM
Subject: Re: Tax Returns 19/20
To: Eric Schiermeyer <eric@gala.games>
Cc: Jen Miller <jen@blockchainjedi.com>, Pia Brink <pia@gala.games>


I executed them for bgp and the accountants have them now to file for 2019 + 2020.

Jen - can you follow up and make sure the accountants file ASAP.

Thanks!!

Wright


Sent from my iPhone


On May 5, 2021, at 1:08 PM, Eric Schiermeyer <eric@gala.games> wrote:

Probably send it to Wright since you and he were working on it

Sent from my iPhone


On May 4, 2021, at 2:55 PM, Jen Miller <jen@blockchainjedi.com> wrote:


Let me know which one of you wants to sign and they can send the docusign.

Jen
<2020_Tax_Return_-_Blockchain_Game_Partners_LL.pdf>
<2019_Tax_Return_-_Blockchain_Game_Partners_LL.pdf>

*This email is intended only for the individual or entity to which it is addressed and may contain information that is confidential, privileged, and exempt from disclosure*

*under applicable law. If you are not the intended recipient, please notify the sender immediately and delete this email from your system. Any unauthorized use, disclosure, copying, or distribution of this email or its contents is strictly prohibited.*