Paul W. Shakespear (14113)
Cameron Cutler (15116)
Natalie Beal (18311)
SNELL & WILMER L.L.P.
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, Utah  84101
Telephone:  801.257.1900
Facsimile:  801.257.1800
Email: pshakespear@swlaw.com
           ccutler@swlaw.com
           nbeal@swlaw.com

Abram I. Moore (admitted *pro hac vice*)
Christian A. Zazzali (admitted *pro hac vice*)
K&L GATES LLP
70 West Madison St., Suite 3100
Chicago, IL 60602
Telephone: 312.781.6010
Facsimile: 312.827.8000
Email:   abe.moore@klgates.com
            christian.Zazzali@klgates.com

*Attorneys for Plaintiff Eric Schiermeyer*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ERIC SCHIERMEYER, Derivatively on Behalf of Nominal Defendant, BLOCKCHAIN GAME PARTNERS, INC. D/B/A GALA GAMES,<br><br>Plaintiff,<br><br>vs.<br><br>WRIGHT THURSTON and TRUE NORTH UNITED INVESTMENTS, LLC,<br><br>Defendants,<br><br>BLOCKCHAIN GAME PARTNERS, INC. D/B/A GALA GAMES,<br><br>Nominal Defendant. | **PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO FREEZE ASSETS, FOR AN ACCOUNTING, AND FOR EXPEDITED DISCOVERY AND MEMORANDUM IN SUPPORT AND REQUEST FOR IMMEDIATE HEARING**<br><br>Case No. 2:23-cv-00589-HCN-DAO<br><br>Judge Howard C. Nielson<br><br>Magistrate Judge Daphne A. Oberg |

1

## TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................................................. 1

II.   DEFENDANTS' FACTUAL CONTENTIONS LACK MERIT AND DO NOT
      CREDIBLY SUPPORT DEFENDANTS' POSITION .......................................... 3

      A.    The response to Thurston's theft and dumping of the Stolen GALA ................... 3

      B.    Thurston's contention that the parties agreed to each take 8.6 billion
            GALA from the Company Savings Wallets is false and based upon a
            message that is grossly misrepresented ................................................................ 5

      C.    Thurston's contention that there was no Company treasury is disproven by
            his own statements acknowledging the existence of the Company treasury
            of GALA and the Company's wallet directory ..................................................... 7

            1.    GALA that Thurston earned from operating his Gala Nodes has
                  always been distributed into the Thurston Node Wallet and never
                  into the Company Central Wallet ............................................................... 8

            2.    The draft legal memorandum upon which Thurston relies was
                  based upon falsehoods provided to the attorneys by Thurston
                  himself, as demonstrated by contemporaneous evidence. ...................... 11

            3.    The Company's tax returns do not evidence Defendant's
                  ownership of the Stolen GALA. ............................................................... 13

            4.    The Company's 409A valuations are not evidence of lack of
                  ownership of the Stolen GALA. ............................................................... 16

III.  PLAINTIFF HAS ESTABLISHED THAT A TRO IS WARRANTED ....................... 17

      A.    Plaintiff has established a substantial likelihood of success on the merits .......... 17

      B.    Plaintiff and Gala Games will suffer irreparable harm absent a TRO ................. 17

      C.    The threatened injury outweighs any harm the TRO would cause
            Defendants ......................................................................................................... 21

      D.    The injunction will not adversely affect the public interest ................................ 21

      E.    Defendants' "unclean hands" arguments are utterly baseless and legally
            insufficient to excuse their theft of the Stolen GALA. ........................................ 22

IV.   CONCLUSION ...................................................................................................... 23

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

AAAG-California, LLC v. Kisana,
439 F. Supp. 3d 1265 (D. Utah 2020)......................................................................19

*Fed. Trade Comm'n v. Dluca*,
No. 18-cv-60379-CIV, 2018 WL 1830800 (S.D. Fla. Feb. 28, 2018)*, report
and recommendation adopted,* No. 0:18-CV-60379-KMM, 2018 WL 1811904
(S.D. Fla. Mar. 12, 2018).............................................................................................20

*Frank Brunckhorst v. G. Heileman Brewing*,
875 F. Supp. 966 (E.D.N.Y. 1994)..........................................................................19

*Gaponyuk v. Alferov*,
*No.* 2:23-cv-01317, 2023 WL 4670043 (E.D. Cal. July 20, 2023)........................19

*Heissenberg v. Doe*,
No. 21-cv-80716, 2021 WL 8154531 (S.D. Fla. Apr. 23, 2021)...........................19

*Jacobo v. Doe*,
No. 22-0672, 2022 WL 2052637 (E.D. Cal. June 7, 2022)..............................17, 19

*Licht v. Ling*,
No. 3:23-CV-1018-X, 2023 WL 4504585 (N.D. Tex. June 20, 2023)...................21

*One Source Indus., Inc. v. Parkinson*,
No. 2:13-CV-41 TS, 2014 WL 549392 (D. Utah Feb. 11, 2014)...........................23

*Suja, Life, LLC v. Pines Int'l, Inc.*,
No. 16CV985, 2016 WL 6157950 (S.D. Cal. Oct. 24, 2016)................................19

*Sunrise Financial, Inc. v. Painewebber, Inc.*,
4 F. Supp. 2d 1035 (D. Utah 1998).......................................................................22

*Torpe v. Aurora Loan Servs., LLC*,
No. 2:11-CV-00971-DN, 2014 WL 3891518 (D. Utah Aug. 7, 2014)..................22

ii

Plaintiff Eric Schiermeyer, derivatively and on behalf of Nominal Defendant Blockchain Game Partners, Inc. ("Gala Games" or the "Company"), for his reply in support of his motion for the entry of an Order freezing certain stolen assets taken by Defendants Wright Thurston ("Thurston") and True North United Investments, LLC ("True North") (collectively "Defendants"), ordering Defendants to provide an immediate accounting of the stolen assets, and permitting expedited discovery of third parties regarding the whereabouts of the stolen assets, states as follows:

## I.       INTRODUCTION

Thurston does not dispute that he took the Stolen GALA and does not dispute the accuracy of the Kroll report setting forth in detail the subsequent dissipation of the Stolen GALA via a complex scheme of multi-layering and commingling assets via hundreds of small transfers. Defendants fail to offer any explanation whatsoever for this scheme, which resembles a pattern of criminal money laundering.  It would not be credible to claim that such a diamond-shaped flow of assets occurred without being orchestrated by Defendants and others working in concert with them. (See Supplemental Kroll Report attached hereto as Exhibit A.) Indeed, Defendants make no such claim and offer not a single detail about a single transfer of the Stolen GALA. Instead, Defendants carefully claim only that they do not "own or control" accounts associated with any of the wallets at the VASPS where the trace of the Stolen GALA ends.[1] It is hard to imagine a more appropriate situation in which to require a freeze and **immediate accounting** of the Stolen GALA.

---

[1] Notably, Defendants assert that they do not "own or have any control over the 979 identified wallets" on the VASPs where the Stolen GALA landed. (Opp. at p. 18.) However, there are actually only 269 such wallets identified by Kroll. (*See* Revised Kroll Report, Dkt No. 25.)

1

Moreover, the Court should reject Defendants' argument that it is too late to freeze the Stolen GALA because the dissipation has "already occurred." (Opp. at 19.) It is impossible to know what further dissipation of the Stolen GALA has occurred or is ongoing because it has been deposited into VASPs into which there is no visibility. Further, there is no finality to dissipation of assets, it can and likely will continue until the Court orders a freeze. Moreover, Defendants' contention that Plaintiff slept on his rights before seeking relief is belied by the history of the Stolen GALA - as Thurston effectively held the Company hostage and did not begin liquidating the Stolen GALA for over a year after stealing it.  After that, Plaintiff took action to stop the dissipation, then engaged in settlement discussions with Thurston, through counsel. This action was filed immediately upon the termination of those settlement discussions.

On the merits, Defendants do not dispute that, if the Stolen GALA belonged to the Company, then Plaintiff is likely to succeed with his claims for breach of fiduciary duty and conversion. Further, Defendants agree that the Stolen GALA originated from the Company Central Wallet and were transferred to the Company Savings Wallets before Thurston moved the Stolen GALA to the Thurston Wallets.

Thus, the factual dispute is simply over whether the GALA that was in the Company Central Wallet belonged to Defendants or belonged to the Company. On one hand, Defendants contend that the GALA in the Company Central Wallet consisted of "rewards generated by the 14,000 nodes owned by True North and Schiermeyer." (Opp. p. 9.) On the other hand, Plaintiff contends that the GALA in the Company Central Wallet was received from the daily emission of GALA, under which a portion of the daily emission of GALA (first 25%, later 50%) was distributed to Gala Node owners who had recently operated their nodes while the remaining portion of the daily emission (first 75%, later 50%) was distributed to the Company into the Company Central Wallet for Company

2

purposes (the "Distribution Model"). If the evidence demonstrates that Plaintiff is correct, then the Stolen GALA belonged to the Company and Plaintiff succeeds on the merits.

Defendants' position, that the Company did **not** receive a fixed percentage of the daily emission of GALA into the Company treasury, is belied by all of the documentary evidence before the Court (including substantial additional information set forth herein).

## II.   DEFENDANTS' FACTUAL CONTENTIONS LACK MERIT AND DO NOT CREDIBLY SUPPORT DEFENDANTS' POSITION

### A.   The response to Thurston's theft and dumping of the Stolen GALA

Thurston claims that nobody ever objected to his taking of the Stolen GALA in 2021 or his liquidation of the Stolen GALA in 2022-2023. (Opp. p. 11.)  This is false. In the initial call with Thurston in April 2021, Thurston represented that he took the Stolen GALA in order to keep it secure for the Company. (Schiermeyer Decl. ¶7.) More than a year later, when Thurston began moving the Stolen GALA out of the Thurston Wallets, Plaintiff messaged him:



[2]

---

[2] When Thurston wrote that he was moving GALA "to buy ammo from liberty," he was referring to Liberty United DAO, LLC, a Thurston-controlled entity that provided armed physical security for Company employees (primarily Thurston himself).

4889-6185-3823

Notably, the July 28, 2022 message above corroborates the parties' April 2021 discussion, as Plaintiff reiterates that the "8billion gala" held by Thurston "are the company reserves."[3]

The Company then created a script and Slack channel to monitor any movement of the Stolen GALA out of the Thurston Wallets. In late 2022, there was a frenzy of alerts in the channel, followed by messages from Jason Brink that "Hes getting ready to dump again" and "this is being dumped right now." (Screenshots of Slack Channel attached hereto as Exhibit B.) After additional GALA was moved, Plaintiff wrote to Brink on January 2, 2023: ". . . can we confirm he isn't moving this? Could he have some flunky stealing from him or something? . . . can you ask him(?)" (*Id.*) Brink responded "He isn't responding to my message on WhatsApp" and Plaintiff confirmed "he hasn't responded to me either." (*Id.*)

Starting in late 2022, as Thurston's liquidation of the Stolen GALA increased, Plaintiff initiated the effort to stop the bleeding of the Stolen GALA by replacing GALA v1 with GALA v2. (*See* Verif. Compl. ¶ 82; Schiermeyer Decl. ¶16-18.) This involved creating the contract for GALA v2 and integrating the new token onto the platform. (Schiermeyer Decl. ¶16.) This took several months. (*Id.*)

---

[3] Between the first two copied messages, Thurston offered a meandering, false, and inconsistent response that included the statements "I don't have access to any company reserves. The only gala I have is from our early node/miner rewards. You had the same and then the node rewards have been going to your holding tank since then. I have moved gala several Times to pay media + education groups, and liberty sponsored projects related to kids. I also sent 200m a few weeks ago that Jarret confirmed he got .We should get together and audit, separate our personal holdings, and other staff holdings and NFT's. You and I still have personal holdings I believe for both nft + gala in the bigger holdings based on our ownership." Plaintiff responded by confirming that Thurston did indeed have "8billion gala that are the company reserves." Thurston did not respond to this. (Schiermeyer Decl. ¶11.)

On the Company Slack channel, Plaintiff and Brink continued to express concern as Thurston's liquidation of Stolen GALA continued, and on April 22, 2023, Plaintiff wrote "when he loses the lawsuit he will replace all this gala at the new higher price." (*Id.*)

Notably, Thurston raised no concerns about Plaintiff's management of the Company **until May 2023** (*see* Opp. at p. 4)—**after** the numerous messages above about the Stolen GALA. This was an obvious attempt to retaliate and muddy the waters in advance of the day of reckoning over his theft.

In May 2023, the Company implemented GALA v2, preventing Thurston from further liquidation of the Stolen GALA that remained in the Thurston Wallets (but not the 3.1 billion Stolen GALA that he had already removed from those wallets). (Verified Compl. ¶¶ 81-84; Schiermeyer Decl. ¶16.) Between May 2023 and the filing of this suit, the parties attempted to negotiate a settlement. When those negotiations failed, Plaintiff brought this suit.  (Schiermeyer Decl. ¶18.)

**B.     Thurston's contention that the parties agreed to each take 8.6 billion GALA from the Company Savings Wallets is false and based upon a message that is grossly misrepresented.**

Thurston also claims that he discussed with Mr. Schiermeyer the fact that both he and Mr. Schiermeyer were going to take 8.6 billion GALA from the Company "weeks earlier" and that in response Mr. Schiermeyer "commented to me that 'we were going to be billionaires.'" (Thurston Decl. ¶ 12 and Ex. D.) This is false and based on grossly misrepresented evidence. Thurston cites only an undated screenshot of a WhatsApp message in which Mr. Schiermeyer stated "we may already be billionaires **on this deal**." (*Id*. at Ex. D (emphasis supplied).) The message was sent on February 11, 2021, and the **deal** was the Company's purchase of Sandbox Games, which was finalized on February

5

12, 2021, the very next day.[4] (Schiermeyer Decl. ¶23.) This is obvious from the context, as the preceding and anteceding messages relate to finalizing that acquisition. Indeed, the same day Thurston responded, "I think if sandbox [is] good taking [over] the milestones we are good to go and can execute this afternoon." (*Id.*) The fact that Thurston (and his counsel) attempts to mischaracterize a message about the Sandbox Games acquisition as a message condoning his theft of Company GALA speaks volumes about his credibility and the strength of his position.

Defendants also falsely state that Thurston and Plaintiff "each separated around 8.6 billion GALA which they independently owned because of the mining operation of their individual nodes into wallets they individually controlled." (Opp. p. 10.) First, the Stolen GALA did not originate from Thurston or Plaintiff operating their Gala Nodes, because it did not come from either Thurston's or Plaintiff's registered node wallets, it came from the Company Central Wallet (discussed below). Second, when Plaintiff discovered that 8.6 billion GALA was missing from the Company Savings Wallets (roughly two months after the theft occurred), Plaintiff immediately moved the remaining Company GALA out of those wallets **solely to prevent further theft of Company assets**. (Schiermeyer Decl. ¶6.) In sharp contrast to Thurston's dissipation of the 8.6 billion GALA he stole and liquidated

---

[4] Jennifer Miller, a long-time Thurston acolyte, states that GALA was transferred from the Company Savings Wallets to the Sandbox shareholders' wallets to fund this acquisition. (J. Miller Decl. ¶ 14.) This is not evidence that the GALA in the Company Savings Wallets belonged to Defendants. Ms. Miller, who admits that she stopped performing work for the Company in 2020, then somehow declares that "this [2021] transaction was recorded as coming from the BGP shareholder's personal Gala holdings, True North and Scheirmeyer respectively." (*Id.*; *see also* ¶ 16.) She states nothing about who did this purported "recording" or what entities' records supposedly reflect these capital contributions, and there are no such capital contributions recorded on any capital table maintained by the Company. (Schiermeyer Decl. ¶32.) Indeed, elsewhere Defendants appear to contend that these transfers constitute a "distribution of GALA that included the former owners of Sandbox." (Opp. p. 10.)

for his own enrichment, the remaining Company GALA that Plaintiff moved out of the Company Savings Wallets into wallets that Thurston could not control was used exclusively for Company purposes.[5] (*Id.*)

    **C.    Thurston's contention that there was no Company treasury is disproven by his own statements acknowledging the existence of the Company treasury of GALA and the Company's wallet directory.**

Thurston now argues that the Company's treasury of GALA "never existed," is a "fictional story" and is a "fabrication." (Opp. at p. 1.) However, Thurston himself repeatedly pushed for "treasury management" meetings, in which he hoped to convince the Company to borrow against its substantial GALA holdings.

- On February 26, 2021, Thurston messaged Plaintiff: "Call me to catch up on . . . **Treasury management**." (Schiermeyer Decl. ¶19, Ex. A.)

- The same day, he messaged "I seriously think we could make 1-5m per month with good **treasury management**." (*Id.*)

- On February 4, 2021, Thurston messaged that a Genesis Global Capital employee "wants to push the accounting software and **treasury management** call to Friday . . . ." (*Id.*)[6]

---

[5] Jennifer Miller identifies a single transaction in which GALA was sent from a Company Savings Wallet to Plaintiff's personal wallet on December 31, 2020. (J. Miller Decl. ¶ 9.) As evidenced on the Ethereum blockchain, four minutes after this transfer, almost the same amount of GALA was initiated to add liquidity to the Uniswap GALA pool. (2d Brink Decl. ¶31, citing blockchain evidence.) In short, blockchain evidence shows that these tokens were through Plaintiff's wallet for the benefit of the Company. Defendants cite no other evidence of any other distribution of GALA from Company wallets to Plaintiff's wallet.

[6] Genesis, sued by the SEC earlier this year, offered investors "an opportunity to loan their crypto assets to Genesis in exchange for Genesis' promise to pay interest." SEC.gov | SEC Charges Genesis and Gemini for the Unregistered Offer and Sale of Crypto Asset Securities through the Gemini Earn Lending Program.

- On February 11, 2021, Thurston messaged that he "wanted to go over **treasury management**/private keys + hard wallets move . . . ." (*Id.*)

In the meetings regarding "treasury management," Thurston pushed for the Company to borrow against the Company's treasury of GALA. (Schiermeyer Decl. ¶20; 2d Brink Decl. ¶21.) He stated: "I have connections where we can make 3% monthly holding our crypto . . . I also have potential lending sources for gala as well." (Schiermeyer Decl. ¶ 21, at Ex. A.) He also messaged Plaintiff with a link to an article about Grayscale Investments, stating: "I am going to work on getting gala on here. These are the guys I have been talking with about [lending] against crypto." (*Id.*)[7] The Company did not follow Thurston's "treasury management" proposal, and instead held its GALA in the Company Savings Wallets, from which Thurston took the Stolen GALA. (Schiermeyer Decl. ¶21.)

Further, the Company maintains a "wallet directory" in the form of a shared Excel file, which lists the cryptocurrency wallets associated with the Company as well as who has access to the wallets and the purpose of the wallets. (2d Brink Decl. ¶22 and Ex. E) That directory lists the "purpose" of numerous wallets—**including all of the Thurston Wallets into which Defendants transferred the Stolen GALA**—as "Hold Company Gala Reserve." (*Id.*)

1. **GALA that Thurston earned from operating his Gala Nodes has always been distributed into the Thurston Node Wallet and never into the Company Central Wallet**

Defendants cannot dispute that the Stolen GALA originated from the Company Central Wallet (address 0x38 . . . 8c42), as this is evidenced on the Ethereum blockchain

---

[7] Notably, Thurston's suggestion of ascribing value to self-generated tokens and borrowing against those tokens was a core component of the well-publicized downfall of the FTX exchange.

8

and described in the Kroll Report. Instead, they falsely claim that the Company Central Wallet was actually a "shared wallet" between True North and Plaintiff, and was intended to hold "the rewards generated by the 14,000 nodes owned by True North and Schiermeyer." (Opp. at p. 9; Frank Decl. at ¶ 11.) Thurston further contends that, in contrast, "GALA that was mined by node owners **other than True North or Schiermeyer** was deposited directly into that node owner's private wallet." (*Id*. (emphasis added).) Defendants' position is demonstrably false. All GALA that was earned by any Gala Node owner -- **including Thurston and Plaintiff** -- for operation of their nodes was distributed into the particular Gala Node owner's wallet address registered with the Company. This GALA came from the percentage of the daily GALA emission that was allocated for all node owners (first 25%, then 50%), while the remaining percentage of the daily GALA emission (first 75%, then 50%) was allocated for the Company and distributed to the Company Central Wallet.

Incredibly, Thurston makes no attempt whatsoever to explain the evidence cited in the Motion, including (a) statements published by the Company setting forth the 75/25 and 50/50 distribution models; (b) a distribution model document that Thurston *himself* circulated in 2021 setting forth "a 75 / 25 split with 75% going to the product company wallet and 25% available for participants rewards"; (c) the daily distribution emails received by Thurston and others setting forth the distribution of 75%, then 50% of the daily GALA to the "company"; (d) industry publications explaining that every day half of the GALA is distributed to "the treasury for Gala Games"; and (e) reporting to third party data aggregators that the Company Savings Wallets held the Company's GALA.

There is much more evidence that the daily emission of GALA was split between the Company and Gala Node owners, with the Company's portion distributed to the Company Central Wallet. The GALA distributed to the Company Central Wallet has never

9

been GALA that was earned by Thurston for the operation of his Gala Nodes. The Company's records (specifically, the node database) show that Thurston has a separate wallet address that is registered to his Gala Nodes, which receives all rewards generated by Thurston's Gala Nodes (0xB84B9c91357B0029658064989007A6654868c47F) (the "Thurston Node Wallet"). (2d Brink Decl. at ¶4, Ex. A)  Indeed, the Company's daily email setting forth the distribution of GALA includes the Thurston Node Wallet address and specifies that it is owned by Wright Thurston (not True North). (2d Brink Decl. at ¶28, Ex. B.) The daily distribution email shows when GALA is distributed to the Thurston Node Wallet for operation of Thurston's Gala Nodes. (2d Brink Decl. at ¶28, Ex. B) Further, as part of the initial distribution of GALA in June 2020, Thurston received a distribution of 1.9 billion GALA into the Thurston Node Wallet for operation of his GALA Nodes prior to that date.[8] (*Id*.) Because Plaintiff's operation of his own Gala Nodes exceeded Thurston's operation of his Gala Nodes prior to the initial distribution, the initial distribution into Plaintiff's Node Wallet was larger—2.3 billion GALA.[9] (*Id*.) The

---

[8] Prior to June 2020, the Company tracked operation of each registered Gala Node to ensure that each Gala Node owner received the GALA to which they were entitled when the GALA Node distribution system became operational. (Brink Decl. ¶35; Schiermeyer Decl ¶ 25.) The initial distribution of GALA occurred in June 2020. (*Id*.)

[9] Although Defendants do not appear to argue that the Stolen GALA was a distribution of Company assets to shareholders according to their interest in the Company, the Initial Distribution and subsequent deposits of GALA into their node wallets disproves any such contention. Any Company distribution to True North and Plaintiff according to their shareholding would be equal, as they held an equal number of shares. The distributions of GALA into their respective node wallets evidences that Thurston and Plaintiff received GALA according to their node operation behavior, not according to their interest in the Company. This is also evidenced by the fact that Thurston's Gala Nodes are registered to him, personally, not to True North (the shareholder in the Company).

Company Central Wallet received 17.7 billion GALA—**exactly 75% of the total initial distribution**. (*Id*.) This is all evidenced on the Ethereum blockchain. (*Id*.)

Defendants contend that no smart contract governs the Company treasury, but in fact the code governing the distribution of GALA specifically states that a fixed percentage of the daily distribution goes to the "company." Specifically, an August 2020 version of the actual underlying code that operated to distribute GALA on a daily basis states that "0.75" of the "dailyDistributionAmount" goes to "company" and "0.25" goes to "users." (2d Allen Decl.)

Moreover, the GALA in the Company Central Wallet (and later the Company Savings Wallets into which Company GALA was transferred) was always used for Company purposes. (Schiermeyer Decl. at ¶6.)

All of this documentary evidence is in perfect alignment with Plaintiff's contentions and directly conflicts with Defendants' contentions that no 75/25 or 50/50 distribution model existed and that GALA distributed to the Company Central Wallet somehow consisted of rewards for his operation of Gala Nodes.

> **2.** **The draft legal memorandum upon which Thurston relies was based upon falsehoods provided to the attorneys by <u>Thurston himself</u>, as demonstrated by contemporaneous evidence.**

Thurston quotes a "legal analysis of the company" in which he claims "BGP's own attorneys observed" that "Gala Games . . . does not own any GALA or Gala NFTs." (Opp. p. 7.) This memorandum is marked "DRAFT" and was never finalized because it was based upon inaccurate information provided by Thurston. (2d J. Brink Decl. at ¶23-25, Ex.

G (note Appendix of sources of factual information).)[10] The Company's then-General

Counsel, Jesse Hynes, forwarded the draft to Plaintiff and Jason Brink, noting that it was

not final and "as you'll note, a good number of these facts that they were provided with

aren't accurate (including some big facts)." (2d Brink Decl. ¶23-25, Ex. F.) Mr. Brink then

provided his comments in writing, sent via an April 13, 2021 email to Thurston,

Schiermeyer, and Jesse Hynes. (*Id*. at Ex. G.) Mr. Brink warned that "a very large chunk

of what was in the paper in terms of the Facts are not representative of reality." (*Id*.) In

comment bubbles in the memorandum, Mr. Brink identified more than twenty separate

factual inaccuracies that Thurston had provided to counsel, including the statement "Gala

Games . . . does not own any GALA or Gala NFTs," to which Mr. Brink responded "[t]his

is not factually accurate." (*Id.*) Indeed, it appeared that Thurston simply invented

inaccurate facts that he believed would cause the attorneys to arrive at a conclusion he

favored.

The Company's General Counsel then sent Mr. Brink's comments about factual

inaccuracies to the law firm that prepared the memorandum, stating, "[h]ere is a

breakdown from Jason with comments regarding the facts." (*Id*.) Importantly, the

Company's General Counsel separately called out one key factual matter that had to be

addressed:

> ". . . I think its important that its reflected right that while **right
> now all gala created each night and any NFTs created go 25%
> to the node network and 75% to gala games, they are not being
> "minted" by the nodes themselves** (everything is on Ethereum
> blockchain and the nodes do not connect themselves to the Eth
> blockchain)."

---

[10] A version of the draft memorandum with all legal advice and analysis redacted is attached to the
Second Brink Declaration, and Plaintiff does not waive any attorney-client privilege as to the legal
analysis.

(*Id*.) This fact - that 75% of the daily distribution of GALA was distributed to the Company - which the Company's General Counsel called out as "important," is the very fact that Defendants hope to disprove in their Opposition (incredibly, relying upon the erroneous document that the Company's General Counsel sought to correct).

The law firm responded "**Wright [Thurston] asked me to hold off on updating the memo (or trying to update the facts)** until he's able to set up another call with [the firm] to talk to some of his other counsel." (*Id*.)[11] The inaccurate memorandum was never finalized. This chain of events evidences only that the Company received 75% of the daily distribution of GALA. Again, the contemporaneous documentation proves the falsity of Thurston's contentions.

### 3. The Company's tax returns do not evidence Defendant's ownership of the Stolen GALA.

Defendants repeatedly argue that the Company's tax returns do not reflect a value for the GALA that was distributed to the Company as part of the daily distribution. However, Defendants cite no authority for their assumption that Daily Distribution GALA (created by the Company itself, with no basis) ***should be*** (or, as Defendants would have this Court believe, ***must be***) reflected on those tax returns if it was owned by the Company.  Indeed, Price Waterhouse Cooper has published a whitepaper entitled *Cryptographic assets and related transactions: accounting considerations under IFRS*, which concludes that "there are no accounting standards that specifically address cryptographic assets" and therefore "the issues that arise are diverse and highly dependent

---

[11] This caused the Company's General Counsel to email Plaintiff and Mr. Brink that "[i]t seems that Wright has put the whole thing on hold and has some other lawyers looking into this and/or working it out" and "I cannot protect us if there is this kind of chain of command where I have no clue what is going on with 90% of our lawyers (or Wright's lawyers) and the work that I deem important can just be stopped without speaking with me." (*Id*.)

on specific facts and circumstances." (PWC Whitepaper attached hereto as Exhibit C.) Where a company generates and holds its own tokens, PWC notes that this "is similar to a retail store printing vouchers for discounts on future purchases at the store and not distributing them to customers" and notes that this "would not be considered for accounting purposes" until the vouchers "are provided to third parties in exchange for consideration -- or, in accounting terms, once an exchange transaction takes place." (*Id.* at p. 14.)

There is no evidence that the Company records newly-minted Daily Distribution GALA as revenue or as an asset upon receipt of the GALA. This is a purely internal transaction, with nothing on the other side of the ledger, and GAAP would arguably preclude the Company from recording it. Upon information and belief, the Company recognizes revenue or expenses associated with GALA only when it sells GALA to fund operations, receives GALA as payment for Gala Nodes or NFTs, or uses GALA to purchase something from a third party.[12]

Moreover, the preparation of the Company's tax returns has always been managed by Thurston himself, working with his accountants in Utah and Price Waterhouse Cooper.[13] (March 19, 2021 email from Thurston stating, "[w]e have an accounting firm in Utah doing our taxes" attached as Exhibit D.) Plaintiff had little visibility into the decisions made by Thurston and the accountants about how to account

---

[12] Upon information and belief, the GALA that was reflected on the Company's tax returns was GALA that the Company received as revenue from sales.

[13] Defendants claim that the Company's 2020 and 2021 tax returns were both signed by Mr. Schiermeyer. (Opp. at p. 11.) However, they attach an unsigned 2020 tax return. (Thurston Decl. Ex. E.) In fact, it appears that the Company's 2019 and 2020 tax returns were signed by Mr. Thurston. (*See* May 5, 2021 email from Wright Thurston with the subject "Tax Returns 19/20" in which Thurston states "I executed them for bgp and the accountants have them now to file for 2019 + 2020" attached hereto as Exhibit I.).

for the Daily Distribution GALA. (Schiermeyer Decl. at ¶29.) However, in February 2022, Company employee Jarrett Knapp (in an email including Thurston, but not Plaintiff) wrote to PWC:

> We wanted to follow up on next steps with Rebecca regarding some of the crypto and blockchain elements we previously discussed, **including the treatment of GALA we receive from the node distribution (minted and unminted)**, revenue we receive through new coins (e.g. TOWN), etc.

(February 1, 2022 email from Jarrett Knapp attached as Exhibit E) This evidences both that the Company received GALA from the daily distribution and that its tax treatment was discussed with PWC. Indeed, in another email from Knapp to PWC, he asked about the tax implications of burning a separate cryptocurrency (TOWN) that the Company had received as revenue. (January 24, 2022 email attached as Exhibit F.)  He wrote: "The real point is that Gala only received TOWN in the form of revenue - **no daily distro goes to Gala like we do with GALA coin**" (*Id*. emphasis added.) Again, more evidence that the Company received a daily distribution of GALA.

Further, in July 2021, the Company's Chief Financial Officer, Angela McCarthy, circulated a document evidencing that the Company accounted for its Daily Distribution GALA differently than the GALA it received as revenue. (July 27, 2021 email and attachment attached hereto as Exhibit G  In that document the CFO noted that there was an error in the 2020 tax returns:

> After a discussion with Wright and Jen, Computis [the Company's bookkeeper] identified an error **in the way they were recording newly minted Gala**. Posted 3 large transactions at FMV to claim fee rev in error. Computis is currently reviewing their data for additional possible errors and adjusting previous transactions.

(*Id*.) This shows that Computis had **erroneously** recorded newly-minted Daily Distribution GALA at fair market value to claim fee revenue. In other words, the Company was **not** recording its Daily Distribution GALA on its books at fair market value. This could explain the tax treatment of the Daily Distribution GALA arrived at by Thurston and the outside accountants.

In summary, Defendants offer no basis whatsoever for any contention that the Company's treasury of Daily Distribution GALA should have been reflected differently on the Company's tax returns, much less that Plaintiff's signature on one of the Company's three tax returns somehow evidences his acquiescence that the Company did not own the Daily Distribution GALA.

### 4. The Company's 409A valuations are not evidence of lack of ownership of the Stolen GALA.

The Company's GALA, created internally and with no cost basis, was deliberately excluded from the 409A valuation process. In June 2021, the Company employee entering financial information for the valuation process requested clarification regarding how the Company's "cryptocurrency holdings" and cash should be treated. (June 2, 2021 email exchange attached hereto as Exhibit H.) Another Company employee responded: "Just to note Eric doesn't want GALA counted as part of valuation process - wants to discount from balance sheet for purpose of this." (*Id*.) In short, the absence of the Company's GALA from the 409A valuation is not evidence of lack of ownership; to the contrary, Plaintiff specifically directed that the Company GALA be excluded from the valuation process.

16

## III.     PLAINTIFF HAS ESTABLISHED THAT A TRO IS WARRANTED

Plaintiff has shown—and Defendants have failed to refute—that a TRO is warranted as Plaintiff has established: (1) a substantial likelihood of success on the merits of its claims against Defendants; (2) irreparable harm absent a TRO; (3) that the threatened injury outweighs any harm the TRO would cause Defendants; and (4) that the injunction will not adversely affect the public interest. Additionally, no eleventh-hour "unclean hands" argument undermines this.

### A.     Plaintiff has established a substantial likelihood of success on the merits

For all of the reasons set forth above in detail, it is clear that the Stolen GALA that was distributed to the Company Central Wallet belonged to the Company, not to Thurston or True North.  For purposes of the present Motion, this is the only relevant inquiry, and Plaintiff has overwhelmingly established a substantial likelihood of success on the merits as to this inquiry.

### B.     Plaintiff and Gala Games will suffer irreparable harm absent a TRO

This is a quintessential case involving a "heightened risk of asset dissipation," which is sufficient to show irreparable harm. *Jacobo  v. Doe*, No. 22-0672, 2022 WL 2052637, at *5 (E.D. Cal. June 7, 2022). Defendants argue that there is no imminent threat of injury because of Plaintiff's "delay" in seeking injunctive relief. Defendants are wrong. In fact, as detailed above, Plaintiff did not delay in seeking injunctive relief.  Rather, Plaintiff's prompt and prudent actions can be summarized as follows:

- In **mid-April 2021**, Plaintiff discovered that roughly 8.6 billion GALA tokens that were held in the Company Savings Wallets had been moved out of those wallets and quickly moved into 43 separate wallets on February 21, 2021.  (Schiermeyer Decl. ¶5.)

- **Within hours** of learning that the Stolen GALA had been moved, Plaintiff directed Gala Games to move the remaining GALA out of the Company Savings Wallets believing that they had been compromised and seeking to prevent further theft of the Company's GALA.  (*Id*. at ¶6.)

- In this **same timeframe**, Plaintiff spoke with Thurston, who explained that he had moved the Stolen GALA from the Company Savings Wallets into the "Thurston Wallets."  Thurston told Plaintiff that he had moved the Stolen GALA into the Thurston Wallets for safe keeping.  Plaintiff told him to move the GALA back into the Company Savings Wallets and he refused.  (*Id*. at ¶7.)

- When Plaintiff discovered that Thurston took the Stolen GALA, he went into **damage control mode**.  Plaintiff directed Gala Games engineers to track any movement of the Stolen GALA out of the Thurston Wallets, and they created a Slack channel that provided alerts when Stolen GALA was moved.  (*Id*. at ¶8.)

- **In July 2022**, for the first time, the channel showed that GALA had moved from the Thurston Wallets.  Plaintiff sent a message to Thurston asking him why he was "moving GALA from the Company reserves."  (*Id*.)  Thurston obfuscated and changed the subject.  Plaintiff sought further clarity, stating: "you have 8billion gala that are the company reserves and some of it moved today. why?"  Thurston never responded to this message.  (*Id*. at ¶11.)

- A few months later, in **late 2022**, the Slack channel tracking the Thurston Wallets started showing multiple alerts. Jason Brink and Plaintiff exchanged messages in the Slack channel expressing concern about the liquidation of the Stolen GALA.  At that time, Thurston alone had the private keys to wallets holding billions of the Company's GALA and could have liquidated it immediately, causing the Gala Games ecosystem to collapse (known as a "rug pull").

- On **December 28, 2022**, Plaintiff sent another message to Thurston, demanding that he stop selling Company GALA on Coinbase and that he "send the funds to the company bank account."  (*Id*. at ¶13.)  Thurston deflected.

- Days later, on **January 2, 2023**, the Company Slack channel again alerted us that GALA was moved out of the Thurston Wallets.  Given Thurston's prior denial that he was responsible, Plaintiff wrote to Jason Brink in the Slack channel ". . . can we confirm [Thurston] isn't moving this? Could he have some flunky stealing from him or something? . . . can you ask him(?)"  Mr. Brink and Plaintiff both messaged Thurston, but he refused to respond.  (*Id*. at ¶15.)

- Throughout this time, Plaintiff was hesitant to provoke Thurston in any way for concern that he might liquidate or dissipate the Stolen GALA immediately.  (*Id*. at ¶16.)

18

- Gala Games initiated the **creation of GALA v2 at the end of 2022**, and it was not ready for implementation until May 2023. By implementing **GALA v2 in May 2023**, Gala Games was able to ensure that Thurston's liquidation of Company GALA from the Thurston Wallets would stop - and successfully prevented his liquidation of 5.1 billion of the 8.6 billion Stolen GALA. (*Id*. at ¶16-17.)

- Having successfully stopped the bleeding of the Stolen Gala by issuing GALA v2, Plaintiff then engaged in settlement negotiations with Thurston through counsel, which extended through **August 31, 2023**.[14]

In sum, the fact that some time has passed, largely due to Defendants' own obfuscation and misstatements, does not make the threat of dissipation of the crypto assets any less imminent now; if anything, there is more urgency given that lawsuits have been filed and the dispute between the parties has escalated.

Defendants also argue that the harm is not irreparable because damages will be "readily calculable and monetarily redressable." ECF No. 20, at 21. However, Defendants seek relief in equity -- a return of the Company's stolen property.  As a matter of law, "the taking of property generally constitutes irreparable injury that will justify an injunction." AAAG-California, LLC v. Kisana, 439 F. Supp. 3d 1265, 1279 (D. Utah 2020).

Defendants also fail to dispute the significant body of case law cited by Plaintiffs that cryptocurrency poses "a heightened risk of asset dissipation" that justifies an order of injunctive relief.  *Jacobo*, No. 22-0672, 2022 WL 2052637, at *5 (granting ex parte motion for temporary restraining order seeking to freeze cryptocurrency assets); *Gaponyuk v. Alferov, No.* 2:23-cv-01317, 2023 WL 4670043, at *2 (E.D. Cal. July 20, 2023) (granting ex parte motion to freeze several accounts, and noting "the risks that cryptocurrencies may rapidly become lost and untraceable"); *Heissenberg v. Doe*, No. 21-

---

[14] A plaintiff's delay in bringing a motion for preliminary injunctive relief does not weigh against a finding of irreparable harm where the parties were engaged in settlement discussions. See *Frank Brunckhorst v. G. Heileman Brewing*, 875 F. Supp. 966, 984 n.27 (E.D.N.Y. 1994); *Suja, Life, LLC v. Pines Int'l, Inc.*, No. 16CV985, 2016 WL 6157950, at *15 (S.D. Cal. Oct. 24, 2016).

cv-80716, 2021 WL 8154531, at *2 (S.D. Fla. Apr. 23, 2021) (granting ex parte motion

for temporary restraining order, and noting: "Because of the speed and potential

anonymity of cryptocurrency transactions, the Plaintiff is likely to suffer immediate and

irreparable injury if a temporary restraining order is not granted"); *Fed. Trade Comm'n v.*

*Dluca*, No. 18-cv-60379-CIV, 2018 WL 1830800, at *2 (S.D. Fla. Feb. 28, 2018), *report*

*and recommendation adopted*, No. 0:18-CV-60379-KMM, 2018 WL 1811904 (S.D. Fla.

Mar. 12, 2018) (granting ex parte temporary restraining order and asset freeze, noting that

"[t]he use of cryptocurrency in the programs promoted by Defendants poses a heightened

risk of asset dissipation").

      Plaintiff will suffer irreparable harm if the Court does not issue the relief

requested. Specifically, it is highly likely that Thurston will seek to further conceal and

dissipate the Stolen GALA before this litigation is resolved; this is only heightened by his

patterns and practices to date and the nature of the cryptocurrency assets at issue.  ECF

No. 9 at 16 (Kroll Report articulating that Thurston's actions "can have the effect of

obscuring the origin of assets" and  obscuring where assets have been sent to make it

"harder to recover them").  Defendants fails to offer any meaningful response to this—and

thus concede that there is a high risk that the assets will be concealed and/or dissipated in a

manner that makes it impossible to account for them later.

      In short, there is a significant risk that Thurston will further dissipate the stolen

assets, or transfer those funds to into untraceable cryptocurrency assets or offshore entities

organized in unknown locations if an injunction does not issue. Plaintiff (and Kroll) can

only trace the Stolen Gala to a point: assets will have to be frozen and an order for an

accounting issued in order to preserve the status quo and gain further transparency into the

location and amount of the Stolen Gala—and Gala Games will suffer irreparable harm if

such a freeze and an accounting are not granted.

### C.      The threatened injury outweighs any harm the TRO would cause Defendants

Defendants argue that Plaintiff will suffer no injury if the TRO does not issue; conversely, Defendants claim "any resultant asset freeze would only wreak unjustified and untold harm on Thurston in obstructing his legitimate need to safeguard and transact business with such funds and other assets" (while confusingly also arguing that the assets at issue don't belong to Defendants but to third parties).

In fact, Defendants will suffer no injury if the Stolen GALA is frozen pending an accounting and limited discovery. Conversely, if an asset freeze does not issue, Plaintiff may lose the opportunity to recover in equity the assets that have been taken.  The balance of equities therefore weighs in favor of Plaintiff.

### D.      The injunction will not adversely affect the public interest

Defendants argue the public interest and balance of the hardships factors also "weigh heavily against the requested restraining order." (Memorandum at p. 5.)  In ostensible support of this position, Defendants claim that Plaintiff is attempting to freeze the assets of 979 different wallets that "[n]either Thurston or True North control" and that it would be against public interest to "freeze the crypto-bank accounts of hundreds of people without their knowledge or opportunity to be heard." (*Id.*)

This is absurd. Of course, Plaintiff does not seek to freeze the assets of hundreds of random individuals. This would serve no purpose whatsoever. The accounts Plaintiff seeks to freeze have been diligently traced to Defendants, and Defendants' position here (that Thurston and/or True North do not—or perhaps may *no longer*—control these wallets) only highlights the importance of both an asset freeze and an accounting. Such an order is not against the public interest and should be granted (and even freezing the assets of unrelated individuals is, in some instances, warranted). *Licht v. Ling*, No. 3:23-CV-1018-

X, 2023 WL 4504585, at *3 (N.D. Tex. June 20, 2023) (an injunction would serve the public interest because it will dissuade would-be fraudsters from stealing, laundering illegal proceeds, and preying on victims and prohibit Defendants from profiting from their scheme; and, "to the extent the Court's order will freeze wallets owned by people other than Defendants, that inconvenience does not outweigh the public interest in stopping Defendants' unlawful scheme").

E.     **Defendants' "unclean hands" arguments are utterly baseless and legally insufficient to excuse their theft of the Stolen GALA.**

In an effort to muddy the waters, Thurston makes a handful of baseless allegations about alleged misconduct by Plaintiff. These are supported by nothing other than citations to his own verified complaint. Thurston vaguely complains that Plaintiff, the President and CEO, has "exercised unilateral control" over Company operations. (Opp. at p. 12.) Apart from actions taken to stop Thurston from continuing to dissipate the Stolen GALA from the Thurston Wallets (which actions were appropriate because the Stolen GALA belonged to the Company), Thurston includes three bullet points of generalized accusations that are entirely unrelated to the taking of the Stolen GALA and therefore cannot form the basis of an unclean hands defense.

The doctrine of unclean hands "applies when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation." Id. (quotation marks and citation omitted) (emphasis added); *Sunrise Financial, Inc. v. Painewebber, Inc.*, 4 F. Supp. 2d 1035, 1043 (D. Utah 1998) ("The unclean hands defense bars a plaintiff's pursuit of a cause of action if the plaintiff is guilty of misconduct in a transaction directly related to that cause of action concerning the opposite party."). In other words, "[t]he misconduct must be sufficiently related to the claim for a defendant to effectively invoke the unclean hands doctrine." *Torpe v. Aurora*

*Loan Servs., LLC*, No. 2:11-CV-00971-DN, 2014 WL 3891518, at *4 (D. Utah Aug. 7, 2014); *see One Source Indus., Inc. v. Parkinson*, No. 2:13-CV-41 TS, 2014 WL 549392, at *3 (D. Utah Feb. 11, 2014) (rejecting unclean hands defense based on "conduct apparently unrelated to this lawsuit.").

Here, the alleged actions on which Defendants base their unclean hands defense (and which are further addressed and refuted in the Declaration of Eric Schiermeyer and the Second Declaration of Jason Brink) are not immediately or sufficiently related to the underlying claims so as to afford Defendants the opportunity to invoke the unclean hands doctrine.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff Eric Schiermeyer respectfully requests that this Court grant his motion and all other and further relief the Court deems just and necessary.

DATED this 13th day of September, 2023.

SNELL & WILMER L.L.P.

/s/ *Paul W. Shakespear*
Paul W. Shakespear
Cameron Cutler
Natalie Beal

 K&L GATES LLP
Abram I. Morre
Christian A. Zazzali

*Attorneys for Plaintiff Eric Schiermeyer*

4889-6185-3823