John W. Huber (Utah Bar No. 7226)
Daniel J. Wadley (Utah Bar No. 10358)
Marc T. Rasich (Utah Bar No. 9279)
Alexander Baker (Utah Bar No. 17163)
**GREENBERG TRAURIG, LLP**
222 South Main Street, Suite 1730
Salt Lake City, Utah 84101
Telephone: (801) 478-6900
john.huber@gtlaw.com
wadleyd@gtlaw.com
marc.rasich@gtlaw.com
bakera@gtlaw.com

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ERIC SCHIERMEYER, Derivatively on Behalf of Nominal Defendant, BLOCKCHAIN GAME PARTNERS, INC. D/B/A GALA GAMES,<br><br>          Plaintiff,<br><br>vs.<br><br>WRIGHT W. THURSTON and TRUE NORTH UNITED INVESTMENTS, LLC,<br><br>          Defendants,<br><br>     and<br><br>BLOCKCHAIN GAME PARTNERS, INC. D/B/A BGP GAMES,<br><br>          Nominal Defendant. | **SUR REPLY IN SUPPORT OF OPPOSITION TO MOTION TO FREEZE ASSETS, FOR AN ACCOUNTING, AND FOR EXPEDITED DISCOVERY**<br><br><br>Case No. 2:23-cv-00589-HCN-DAO<br><br>Judge Howard C. Nielsen<br><br>Magistrate Judge Daphne A. Oberg |

## SUMMARY OF ARGUMENT

In their Opposition, Defendants Wright Thurston ("Thurston") and True North United Investments ("True North") (together "Defendants") argued that the Motion must be denied because Schiermeyer failed to establish a clear and unequivocal right to the requested relief. Defendants also established that Schiermeyer was not entitled to relief because he came to the Court with unclean hands. In reply, Schiermeyer spends 3/4 of his 25 pages (and even more space in the three more declarations and multitude of exhibits attached thereto) introducing new material and assertions he claims support his Motion. But try as he might, Schiermeyer still fails to establish a single element necessary to succeed on his Motion.

First, Schiermeyer introduces new material in the form of partial text messages to support his claim that his 2.5-year delay in bringing the Motion was excusable. But all those one-sided text messages do is discredit the claim that the delay occurred because he was too scared to file a complaint or bring this Motion. There is no credible excuse for the delay.

Second, Schiermeyer goes to great lengths trying to establish the existence of a "treasury." His efforts fail. Schiermeyer cannot point to a board resolution, a shareholder vote, or any other agreement to create a treasury. The references to distributions to the "Company" or treasury management are easily explained as part of the Mainnet test of the distribution software or routine requests that the Company discuss its cash and financial management. There never has been such a treasury.

Third, Schiermeyer suggests that the balance of harms and public policy favor granting the Motion because the new Kroll report identifies only 269 (rather than 970+) wallets he seeks to freeze. But regardless of the number, Schiermeyer does nothing to establish that the identified

1

wallets are owned or controlled by Thurston or True North. He does nothing to establish that the only assets in the wallets are tied to True North's GALA. A reduction in the number of wallets at issue does not justify freezing the assets of 269 wallets not owned or controlled by True North or Thurston and whose owners are not before the Court.

Finally, Schiermeyer suggests that his unclean hands are not sufficiently tied to his requested relief to warrant denial of the Motion. Not true. Schiermeyer has ignored corporate formalities and burned billions of GALA (at issue) belonging the True North and others— without board or shareholder approval with the intent to harm Thurston and True North. It is hard to imagine a closer tie.

## ARGUMENT

### I.    <u>Schiermeyer's New Material Does Not Establish Imminent and Irreparable Injury</u>

Schiermeyer's new assertions do not establish a threat of imminent and irreparable harm. Rather, they only highlight that Schiermeyer inexplicably waited 2.5 years to file this Motion and that, in the unlikely event his claims succeed, a monetary damages award will be sufficient.

Schiermeyer introduces several one-sided, out of context messages and several internal Slack communications seeking to establish that he immediately challenged Thurston's transfer of True North GALA at the time it occurred. But those texts are taken out of context[1] and

---

[1] The text message screenshots are not from the relevant period, do not include express objections to the February 2021 transfer, and only depict Schiermeyer questioning Thurston about moving his GALA at various points. The July messages simply ask why some of the February 2021-transferred GALA moved again. The other messages do not concern the February 2021 transfer, but discuss other movements of Thurston's personal GALA. *See* Pl.'s Reply at 4.

conveniently remove Thurston's responses, one of which Schiermeyer buried in a footnote on the next page. There, Thurston provides the context Schiermeyer seeks to avoid:

> I don't have access to any company reserves. The only gala I have is from our early node/miner rewards. You had the same and then the node rewards have been going to your holding tank since then. I have moved gala several times to pay media + education groups, and liberty sponsored projects related to kids. I also sent 200m a few weeks ago that Jarret confirmed he got. We should get together and audit, separate our personal holdings, and other staff holdings and NFT's. You and I still have personal holdings I believe for both nft + gala in the bigger holdings based on our ownership.

Pl.'s Reply at 5 n.3. In another omitted response, this time to the text claiming Thurston was selling GALA on coinbase, *see id.* at 4, Thurston remarked: "a little confused by your text, I have never sold Gala on coinbase . . . and I also don't have any company Gala," *see* Wright Thurston's Second Declaration ("2d Thurston Decl.) ¶ 6 & Ex. A. He also acknowledged that Schiermeyer' bulk sale of GALA was hurting its price and the Company. *Id.* The most these texts and Slack messages[2] establish is (1) there is a dispute of fact about the merits of Schiermeyer's claim (which Schiermeyer admits, *see* Pl.'s Reply at 3) and (2) there is no truth to Schiermeyer's claim that he was too afraid to confront Thurston about the transfer.

These messages show Schiermeyer was not worried that Thurston would "pull the rug" on the Company or that Thurston was holding it hostage. If he was, why repeatedly confront Thurston and then announce plans to burn and then proceed to burn billions of GALA including the 5.5 billion GALA in the True North wallets? The answer is: he was not scared to confront Thurston and did not believe that he was holding BGP hostage. There is no excuse for his delay.

---

[2] The Slack messages serve Schiermeyer no better than the texts because they are not communications to Thurston (*i.e.*, alleged attempts to object to the movement of his GALA) and reflect no fear of being held hostage.

Schiermeyer also fails to establish that any harm is irreparable. In the unlikely event Schiermeyer succeeds on any of his claims, the harm is compensable through monetary damages. Schiermeyer suggests that GALA are property and thus BGP can only be made whole by the return of the specific GALA allegedly taken. *See* Pl.'s Reply at 20. But GALA are not unique like a Picasso or specific cars. They are fungible. Their value is calculable. Further, the fact that Schiermeyer burned—literally destroyed—5.5 billion of the GALA in True North's possession, and billions more beyond that, belies the claim that the GALA are unique property the theft of which can be compensated only by their "return."

In the end, all of Schiermeyer's additional assertions cannot distract from an inescapable point: if Schiermeyer truly believed Thurston's February 2021 GALA transfer was unlawful, he *failed to seek any legal recourse throughout that intervening two and a half years*. Even crediting him the few months of fruitless settlement discussions that the Parties engaged in immediately preceding the filing of Schiermeyer's Complaint and Motion, that still leaves him with more than two years of delay. *See Huntley v. Vbit Techs. Corp.*, Civ. Action 22-1164-CFC-SRF (D. Del. Aug. 10, 2023) (report and recommendation) (stating that plaintiffs' nine-month delay in seeking a TRO establishes that "any alleged harm lacks the urgency and immediacy required to grant the extraordinary relief requested"). There is no immediate,[3] irreparable[4] harm, and neither the screenshots nor Slack messages change that result.

---

[3] Schiermeyer claims Defendants "fail to dispute" the cryptocurrency cases he cites regarding dissipation, Pl.'s Reply at 20, but this is not true. Defendants directly addressed how distinguishable they are, as the alleged dissipation already occurred. *See* Opp. Br. at 19-20 n.8.

[4] In his reply, Schiermeyer does not contest the fact that the damages are "readily calculable and monetarily redressable"—and thus are not irreparable. *See* Pl.'s Reply at 20. Furthermore, the single case that Schiermeyer cites in support of granting injunctions when

II.   **Schiermeyer's New Material Does Not Establish a Substantial Likelihood of Success**

In his Reply, Schiermeyer introduces information and assertions that he claims support the existence of a treasury and Thurston's acceptance and agreement of that point. As discussed below, however, Schiermeyer's new material is knowingly taken out of context and does not establish the existence of a board or shareholder-approved, properly governed BGP treasury. At best, the material establishes a genuine factual dispute about the ownership of the GALA at issue—a fact central to Schiermeyer's claims. *See* Pl.'s Reply at 3.

Schiermeyer makes much of the initial distribution of GALA to Thurston (1.9 billion) and Schiermeyer (2.3 billion) and the 17.7 billion distributed to BGP. *See* Pl.'s Reply at 11-12. But as Schiermeyer well knows but fails to disclose, the initial distribution was simply part of a test of the software designed to ensure that it was working correctly, *see* 2d Thurston Decl. ¶¶ 4-5, not to reflect the accurate amount of GALA earned or to establish a 17.7 billion GALA treasury. Indeed, the initial distribution also included the owners of SandBox (who had started working with BGP but whose business had not yet been officially acquired and who had not purchased nodes personally); and it included other individuals who also did not own any nodes. It was not, and was never meant to be, the standard set for distribution of GALA during BGP's

---

property is taken is about tangible property in the form of specific cars. *AAAG-California, LLC v. Kisana*, 439 F. Supp. 3d 1265, 1269 (D. Utah 2020). Indeed, the case is clear that such relief is appropriate for "tangible," "identifiable," and "specific property." *Id.* at 1274. In contrast, GALA is much more like a stock, and courts have denied TROs seeking stock freezes because "[s]hares of stock are as fungible as bushels of wheat." *Solar Integrated Roofing Corp. v. Ballew*, No. 22-CV-0028-BAS-JLB, 2022 WL 902602, at *7 (S.D. Cal. Mar. 28, 2022) (denying application for TRO to freeze shares of stock because damages were "primarily pecuniary in nature" and money damages would suffice) (quoting *C.R.A. Realty Corp. v. Fremont Gen. Corp.*, 5 F.3d 1341, 1343 (9th Cir. 1993)).

routine operations. This, in part, is why Thurston and Schiermeyer agreed to create a separate two billion GALA games acquisition fund to be funded by the GALA they each received in their personal wallets during the test. *See id.* ¶ 5. If the entire 17.7 billion GALA belonged to BGP to do with as it wished, there would be no reason to create such a fund. It is also why, when closing the SandBox acquisition, Schiermeyer and Thurston reduced the payment to the owners of SandBox by the amount of GALA they received during the test—they owned no nodes and had done no work to earn the GALA. *See id.* ¶ 13.

Similarly misdirected are Schiermeyer's statements about the 75/25 split in GALA during the test distribution. Pl.'s Reply at 10-12. Schiermeyer again fails to disclose that the 75/25 split at the time of the test distribution r*eflects the actual distribution of nodes between True North/Thurston and Schiermeyer (who combined owned more than 75% of the nodes) and the rest of the node owners (who owned about 25% of the nodes).* *See* 2d Thurston Decl. ¶ 7. Further, because of the instability of the software, Thurston and Schiermeyer agreed not to operate their nodes after migration to the Ethereum blockchain while they worked to stabilize the system. *See id.* ¶ 14. Thus, the 75/25 split of distributed GALA maintained the actual percentage of the node split between Thurston and Schiermeyer on the one hand, and other node owners on the other hand. This continued through the reduction from 75/25 to 50/50 when, as the Company sold additional nodes, the distribution of nodes between the founders and the community grew closer to 50/50. *See id.* ¶ 8. Considering all the facts, the existence of the test distribution and the direct distributions of GALA to Schiermeyer and Thurston individual wallets as part of that test do not establish the existence of a community-disclosed, board-approved, multi-billion GALA treasury—with no evidence of limits or controls—as Schiermeyer argues.

6

Similarly, the existence of the 75/25 split of distributed GALA after the test distribution (regardless of how Schiermeyer's unilateral label for the wallet, *see id.* ¶¶ 12-13) mirrors actual node ownership and likewise does not reflect the existence or approval of a treasury, *see id.* ¶¶ 7-8. Indeed, Thurston has demanded to no avail that Schiermeyer disable the automatic distribution split ever since Thurston and Schiermeyer turned their owned nodes back on, as there was no longer justification for that coded split. *See id.* ¶¶ 9-11.

Schiermeyer also contends that, because Thurston requested several meetings to discuss "treasury management" and suggested several ways to optimize the GALA in BGP's wallets, he has admitted the existence and approval of a more than 17 billion GALA treasury with effectively no limits on its use. Pl.'s Reply at 8-9. This too is misdirection. A simple internet search reveals that "treasury management" refers to "the act of managing a company's daily cash flows and larger-scale decisions when it comes to finances."[5] 2d Thurston Decl. ¶ 15. That Thurston repeatedly requested that BGP leadership meet to discuss cash management does not mean he has admitted the existence and approval (as a board member) of a multi-billion GALA fund that is accumulated every day, at the rate of 75 out of every 100 (later reduced to 50 out of every 100) GALA minted. *See id.* ¶ 16-17. Indeed, one text message Schiermeyer cites clarifies that Thurston is talking about managing BGP's accounting and potentially licensing third-party software to do so: "Genesis Global Capital employee 'wants to push the accounting software and treasury management call to Friday.'" Pl.'s Reply at 8. Absent from any of the texts Schiermeyer

---

[5] *See, e.g.*, https://www.moderntreasury.com/learn/treasury-management.

cites is a single instance in which Thurston acknowledges the existence of or approval for a BGP treasury or "conservatorship" (another Schiermeyer term for the "treasury," Pl.'s Mot. at 10).

Schiermeyer also discounts the inconvenient reality that BGP's tax returns and 409A valuations did not refer to billions of GALA owned by BGP. He does so by suggesting that the tax returns were initiated by Thurston and the 409A valuations intentionally omitted (at Schiermeyer's direction) the multi-billion-dollar GALA treasury. *See* Pl.'s Reply at 14-17. But Schiermeyer's efforts at misdirection fall short. First, each document reflects *some* GALA as Company assets, they just do not show all the GALA Schiermeyer alleges BGP held. The GALA reflected on the tax returns is limited to the modest revenue-generated GALA (comparatively a fraction of what Schiermeyer alleges was contained in the "treasury")—GALA received by BGP in the sale of nodes or through in-game purchases. The absence of the treasury GALA in the tax returns and 409A valuations is not because of some overriding accounting question. Rather, as a decentralized, non-custodial company that mints GALA only when work is performed, BGP has no GALA other than the revenue GALA and any GALA the shareholders may provide through capital calls—like the one in June 2022—a month before Thurston's plan to "pull the rug" was purportedly underway.

Second, Schiermeyer argues that he instructed the experts conducting the 409A valuation not to include the billions of GALA in the treasury. *See* Pl.'s Reply at 17. This excuse is implausible—there is only reason to artificially devalue a company is fraud. Further, neither valuation includes any disclaimer that they are ignoring the billions of GALA at the direction of Schiermeyer. It strains credulity to contend that two valuation experts simply ignored this, without any reference to the Company's largest asset.

Third, Schiermeyer's position on the recognition of the GALA conflicts with the recent guidance from the Financial Accounting Standards Board (*see, e.g.*, https://tinyurl.com/35pxfj7f), both of which establish that GALA should be recognized.

Finally, Schiermeyer seeks to avoid the import of the legal memo by noting that there were factual inaccuracies in the draft. *See* Pl.'s Reply at 12-14. Notably missing, however, is any evidence challenging the fact that BGP does not own nodes or that the lack of node ownership was intentional in the context of a non-custodial, decentralized blockchain enterprise such as BGP. While the draft may include some inaccurate details, it does not take away from its central conclusion—BGP was organized intentionally to avoid ICO concerns under the Howey test: the Company would neither mint GALA out of thin air to fund operations, nor own the software nodes like those it was selling to the ecosystem community. *See* 2d Thurston Decl. ¶ 17. There is not and never has been a treasury. BGP was never intended to have a treasury. The way Schiermeyer currently operates BGP was neither intended nor approved by Thurston as a director or as manager of the 42% shareholder. Schiermeyer's approach creates substantial legal risk for the Company. Schiermeyer has missed the forest for the trees in his analysis.

In sum, as Schiermeyer admits, at best, there is a factual dispute "over whether the GALA . . . belonged to Defendants or belonged to the Company." *See* Pl.'s Reply at 1. This fails to establish a substantial likelihood of success on the merits.

III.   **Schiermeyer's New Assertions Do Not Establish that the Balance of Hardships or Public Interest Factors Weigh in His Favor**

Schiermeyer's Reply fails to justify how freezing the assets of many unidentified third parties is in the public interest and shifts the balance of the hardships in his favor. Schiermeyer tries to deflect from the unfairness of freezing third party wallets by stating that there are only

269 wallets identified by Kroll that should be frozen, not 979 wallets. *See* Pl.'s Reply at 2 n.1. But this does not change the fact that freezing the assets of *any* third parties is unfair, especially when Defendants have no control or ownership of the assets at issue. *See Huntley v. Vbit Techs. Corp.*, Civ. Action 22-1164-CFC-SRF (D. Del. Aug. 10, 2023) (report and recommendation) (noting that even though an expert had traced lost crypto assets to certain wallets, freezing those wallets was unwarranted because the assets in question were held by "numerous people or entities" and plaintiffs' evidence could not prove "how much of the assets held by these wallets are owned and/or controlled by [the defendant]"). The 269 wallets are neither owned nor controlled by Thurston or True North. Schiermeyer has provided no evidence to the contrary. Thus, the public interest weighs against the requested asset freeze.

Finally, despite Schiermeyer's new assertions, the balance of equities is not in his favor. While he claims the contrary, Schiermeyer's unclean hands are inextricably linked with the claims at issue in this Motion, as seen in Schiermeyer's intentional burning of the very GALA he seeks to recover—a fact which Schiermeyer himself introduced into these proceedings.

## CONCLUSION

For these reasons, and those stated in the Opposition Brief, the Motion should be denied.

DATED: September 19, 2023

*/s/ Marc Rasich*
Marc T. Rasich
John W. Huber
Daniel J. Wadley
Alexander Baker

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 19 September 2023, a true and correct copy of the foregoing

was filed with the Court's electronic filing system and thereby served on counsel of record.

Paul W. Shakespear
Cameron Cutler
Natalie Beal
SNELL & WILMER LLP
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, UT 84101
pshakespear@swlaw.com
ccutler@swlaw.com
nbeal@swlaw.com

Abram L. Moore
Christian A. Zazzali
K&L GATES LLP
70 West Madison Street, Suite 3100
Chicago, IL 60602
abe.moore@klgates.com
christian.zazzali@klgates.com

GREENBERG TRAURIG, LLP

/s/ *Lindsey Wharton*