# UNITED STATES DISTRICT COURT
# DISTRICT OF UTAH

| | |
|---|---|
| ERIC SCHIERMEYER, Derivatively and on Behalf of Nominal Defendant, BLOCKCHAIN GAME PARTNERS, INC. D/B/A GALA GAMES, <br><br>Plaintiff, <br><br>v. <br><br>WRIGHT THURSTON and TRUE NORTH UNITED INVESTMENTS, LLC, <br><br>Defendants, <br><br>and <br><br>BLOCKCHAIN GAME PARTNERS, INC. D/B/A GALA GAMES, <br><br>Nominal Defendant. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY RELIEF** <br><br><br>Case No. 2:23-cv-589-HCN-DAO <br><br><br>Howard C. Nielson, Jr. <br>United States District Judge |

Plaintiff Eric Schiermeyer brings this shareholder-derivative action on behalf of Blockchain Game Partners, Inc., which does business as Gala Games, against Defendant Wright Thurston, asserting that Mr. Thurston stole millions of dollars' worth of cryptocurrency tokens from Gala Games.[1] Mr. Schiermeyer requests a temporary restraining order and a preliminary injunction (1) freezing certain digital assets that he says can be traced to the alleged theft, (2) ordering Mr. Thurston to provide an immediate accounting of those assets, and (3) permitting expedited discovery. *See* Dkt. No. 9. The court denies this request.[2]

---

[1] Mr. Schiermeyer also names as a defendant Mr. Thurston's "investment vehicle," True North United Investments, LLC. Dkt. No. 14 ¶ 1. For simplicity, the court will refer to the defendants collectively as "Mr. Thurston."

[2] The court has determined that a hearing is not necessary, and instead decides Mr. Schiermeyer's motion for preliminary relief "based upon the parties' written memoranda." DUCivR 7-1(g).

I.

Mr. Schiermeyer and Mr. Thurston are the two directors, and large shareholders, of Gala Games, a company that administers a "blockchain-based gaming infrastructure." Dkt. No. 14 ¶ 30. Among other things, Gala Games oversees distribution of a cryptocurrency called "GALA tokens," which players can trade with one another or use to make purchases within the company's games. *See* Dkt. No. 14 ¶ 30.

This dispute arose after Mr. Thurston moved 8.6 billion GALA tokens—allegedly worth approximately $130 million—out of digital wallets to which both Mr. Schiermeyer and he had access, and into wallets to which only he had access. *See* Dkt. No. 14 ¶¶ 65, 85. Mr. Schiermeyer maintains that the GALA tokens were *company* property, and therefore calls this theft, *see* Dkt. No. 36 at 2–3; Mr. Thurston contends that *he* owned the tokens, and thus was merely moving what was rightfully his, *see* Dkt. No. 27 at 21–23.[3]

Although Mr. Thurston moved the tokens in February 2021, Mr. Schiermeyer represents that he did not discover what had happened until that April. *See* Dkt. No. 40 ¶ 5. Mr. Schiermeyer then moved the remaining tokens into wallets to which Mr. Thurston did not have access and began tracking the tokens Mr. Thurston had taken. *See* Dkt. No. 40 ¶¶ 6–8.

More than a year later, in July 2022, Mr. Schiermeyer noticed that Mr. Thurston had begun moving the tokens out of his private wallets—an activity that allegedly continued for the next several months. *See* Dkt. No. 40 ¶¶ 8–15. Mr. Schiermeyer represents that he was concerned that Mr. Thurston was moving the tokens from private wallets (where he could track the tokens)

---

[3] Mr. Thurston moved approximately half of the tokens out of the wallets to which both he and Mr. Schiermeyer had access. *See* Dkt. No. 40 ¶¶ 3, 5. Mr. Thurston maintains that he owned the tokens that he moved and that Mr. Schiermeyer owned the tokens that he left behind. *See* Dkt. No. 28 ¶ 12.

to centralized exchanges (where he could not), and that Mr. Thurston might precipitately liquidate these tokens, causing the value of the remaining GALA tokens to plummet. *See* Dkt. No. 14 ¶¶ 68, 76. So, at the end of 2022, Mr. Schiermeyer began developing a new cryptocurrency token, GALA v2. His plan was to replace all of the original GALA tokens—except those Mr. Thurston had taken—with GALA v2, which would render worthless any of the tokens Mr. Thurston had taken but not yet sold. *See* Dkt. No. 14 ¶¶ 83–85.

Mr. Schiermeyer rolled out GALA v2 in May 2023. *See* Dkt. No. 40 ¶ 17. Although Mr. Thurston may have liquidated as many as 3.5 billion GALA tokens before the rollout, going forward he could no longer do anything with the remaining 5.1 billion now-outdated tokens he had taken. The parties then engaged in unsuccessful settlement negotiations until Mr. Schiermeyer filed this action at the end of August. *See* Dkt. No. 40 ¶ 18; Dkt. No. 2.

## II.

Preliminary injunctive relief—whether a temporary restraining order or a preliminary injunction—"is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Such relief is "the exception rather than the rule" and will be granted only if "the movant's right to relief [is] clear and unequivocal." *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (cleaned up). A party seeking such relief "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20; *see also Johnson v. Bowles*, No. 2:22-cv-573, 2022 WL 4109687, at *2 (D. Utah Sept. 8, 2022).

Among these requirements, "the single most important prerequisite" to preliminary injunctive relief is "a showing of probable irreparable harm." *First Western Capital Mgmt. Co. v.*

3

*Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (cleaned up). A party's harm is *irreparable* "when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001). Further, a party seeking preliminary relief must show more than the mere "possibility" of such harm—rather, he must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Finally, "[t]he party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (cleaned up). Meeting these stringent requirements is not "an easy burden to fulfill." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 356 F.3d 1256, 1262 (10th Cir. 2004) (cleaned up).

Thus, before the court will even consider the merits of Mr. Schiermeyer's claims, the balance of the equities, or the public interest, Mr. Schiermeyer "must first demonstrate" that, absent preliminary relief, he will "likely" suffer an irreparable injury: harm for which damages could not compensate. *Malamed*, 874 F.3d at 1141; *accord IBC Advanced Techs., Inc. v. 6th Wave Innovations Corp.*, No. 2:19-cv-826, 2020 WL 491262, at *2 (D. Utah Jan. 30, 2020). This he has not done.

### A.

At the outset, the court must consider Mr. Schiermeyer's request for preliminary relief against the backdrop of the nearly two-and-a-half-year delay between when he first discovered the alleged theft of the GALA tokens and when he finally moved for a temporary restraining order and a preliminary injunction.

"As a general proposition, delay in seeking preliminary relief cuts against finding irreparable injury." *Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Social and Rehabilitation Services*, 31 F.3d 1536, 1543–44 (10th Cir. 1994) (cleaned up); *see also GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984). To be sure, "delay is but one factor in the irreparable harm analysis." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009); *see also Fish v. Kobach*, 840 F.3d 710, 753 (10th Cir. 2016). Yet undue delay can still weigh heavily against a party seeking preliminary relief. After all, such relief is "generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). It follows that "[d]elay in seeking enforcement of those rights [ ] tends to indicate at least a reduced need for such drastic, speedy action." *Id.* As the Tenth Circuit has put it, delay "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *GTE Corp.*, 731 F.2d at 678 (cleaned up); *see also Utah Gospel Mission v. Salt Lake City Corp.*, 316 F. Supp. 2d 1201, 1220–1222 (D. Utah 2004) ("Plaintiffs' delay belies any irreparable injury to their rights.").

Here, Mr. Schiermeyer's delay in requesting emergency injunctive relief undercuts his argument that he urgently needs that relief to avoid a likely, imminent, and irreparable harm. By his own admission, Mr. Schiermeyer discovered Mr. Thurston's theft in April 2021. *See* Dkt. No. 40 ¶ 5. Yet he did not seek preliminary relief from the courts until September 2023. *See* Dkt. No. 9. Mr. Schiermeyer could have involved the judiciary at any point during this two-and-a-half-year period but chose not to do so.

Mr. Schiermeyer argues that his delay in filing suit was justified because he "was hesitant to provoke Thurston in any way for concern that he might liquidate or dissipate the Stolen

5

GALA immediately," which he asserts could have "caus[ed] the Gala Games ecosystem to collapse." Dkt. No. 36 at 19. But Mr. Schiermeyer's own reply brief cites a host of communications that belie any notion that he was "hesitant to provoke" Mr. Thurston.

By Mr. Schiermeyer's own admission, "[w]ithin hours" of learning of the alleged theft in April 2021, he confronted Mr. Thurston, demanding that he "move the GALA back into the Company Savings Wallets." Dkt. No. 36 at 18–19; *see also* Dkt. No. 40 at ¶¶ 6–7. Three months later, in July, Mr. Schiermeyer confronted Mr. Thurston again, sending him a text message stating: "you have 8billion gala that are the company reserves and some of it moved today. why?" Dkt. No. 36 at 19; *accord* Dkt. No. 40 ¶ 11. And that December—still more than nine months before this suit was filed—Mr. Schiermeyer sent Mr. Thurston another text message, "demanding that he stop selling the Company GALA . . . and that he 'send the funds to the company bank account.'" Dkt. No. 36 at 19 (quoting Dkt. No. 40 ¶ 13). Two days later, Mr. Schiermeyer and his employee, Jason Brink, "both messaged Thurston" yet again about the continuing sales and the alleged theft. Dkt. No. 36 at 18; *accord* Dkt. No. 40 ¶ 15; *see also* Dkt. No. 36 at 5. In short, the record does not support Mr. Schiermeyer's assertion that he waited two-and-a-half years to file suit because he was worried about provoking Mr. Thurston.

The record does, however, suggest a different reason for the delay: Mr. Schiermeyer did not bring this action promptly upon learning of Mr. Thurston's actions—either the initial transfer of the tokens to Mr. Thurston's wallets or even the subsequent movement of those tokens—because he was engaged in self-help. Shortly after discovering the alleged theft, Mr. Schiermeyer says that he "went into damage control mode." Dkt. No. 40 ¶ 8. He moved the remaining GALA tokens to wallets under his control and then began tracking the 8.6 billion tokens that Mr. Thurston had taken. *See* Dkt. No. 40 ¶¶ 6–8. Finally, in May 2023, Mr. Schiermeyer rolled out a

new version of the GALA tokens—GALA v2—that, in his own words, "stopped the bleeding," *see* Dkt. No. 40 ¶ 18, because Mr. Thurston could no longer use any of the remaining 5.1 billion tokens that he had not already liquidated.

It thus appears that Mr. Schiermeyer delayed recourse to the courts until the emergency was contained and the risk of further harm largely averted. Yet the "purpose" of preliminary relief "is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without [its] issuance." *Schrier v. Univ. of Co.*, 427 F.3d 1253, 1267 (10th Cir. 2005); *accord Crumbl LLC v. Dirty Dough LLC*, No. 2:22-cv-318, 2023 WL 5180370, at *8 (D. Utah Aug. 11, 2023).

**B.**

Further, it is "well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm," because "such losses are compensable by money damages." *Heideman*, 348 F.3d at 1189. In this case, not only has the alleged wrong already occurred, the asserted injury resulting from that wrong is an economic loss: Mr. Schiermeyer says his company's cryptocurrency tokens were taken, and he wants them back. Further, the asserted loss is *limited*, *specific*, and *readily ascertainable*. Given the rollout of GALA v2, Mr. Thurston cannot liquidate any more of the tokens that he took. So Mr. Schiermeyer's requested order would serve only to ensure that he can recover the value of the 3.5 billion tokens that have already been liquidated—assuming, of course, that he prevails on the merits of his claims.

Even so, Mr. Schiermeyer invokes this court's statement in *AAAG-California, LLC v. Kisana* that "the taking of property generally constitutes an irreparable injury that will justify an injunction." Dkt. No. 36 at 20 (quoting 439 F. Supp. 3d 1265, 1279 (D. Utah 2020)). But that case concerned tangible property (specifically, vehicles) and it expressly recognized that a

7

different rule governs "claims involving nonunique"—that is, fungible—"property." 439 F. Supp. 3d at 1274 n.9. While some property, like a particular parcel of land or a specific vehicle, may be unique and have subjective value making it difficult to adequately compensate with damages, fungible property—for instance, currency or stock shares sold on the open market—presents no such difficulties. *See Alpha Cap. Anstalt v. Shiftpixy, Inc.*, 432 F. Supp. 3d 326, 339–40 (S.D.N.Y. 2020). And cryptocurrency tokens are the epitome of fungible property: Their entire purpose is to provide an analogue for traditional currency, and they are traded on public exchanges with posted conversion rates to the dollar.[4]

True, a plaintiff's economic loss may still be irreparable if he can show that the defendant will not have the money to pay for the loss after trial. *See Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986). For instance, preliminary injunctive relief might be justified if a defendant were facing imminent insolvency and the injunction would preserve assets that the plaintiff could recover after a trial on the merits. *See CRP/Extell Parcel I, L.P. v. Cuomo*, 394 F. App'x 779, 781–82 (2d Cir. 2010).

Mr. Schiermeyer appears to argue along these lines, citing a smattering of district court opinions for the proposition that "cryptocurrency poses 'a heightened risk of asset dissipation' that justifies an order of injunctive relief." Dkt. No. 36 at 20 (quoting *Jacobo v. Doe*, No. 1:22-cv-672, 2022 WL 2052637, at *3 (E.D. Cal. June 7, 2022)); *see also Gaponyuk v. Alferov*, No. 2:23-cv-1317, 2023 WL 4670043, at *2 (E.D. Cal. July 20, 2023); *Heissenberg v. Doe*, No. 21-

---

[4] Of course, blockchain technology makes each specific cryptocurrency token "unique" in a certain technical sense. But bills of currency and stock certificates are also individually numbered. While these serial numbers make each token, bill, or certificate identifiable, all are, of course, still fungible. There is no reason why someone would prefer one token to another of the same category, just as there is no reason—rare collectibles aside—why someone would prefer any given one-dollar bill or share of Amazon stock to one with a different serial number.

CIV-80716, 2021 WL 8154531, at *2 (S.D. Fla. Apr. 23, 2021); *Fed. Trade Comm'n v. Dluca*, No. 18-60379-CIV, 2018 WL 1830800, at *2 (S.D. Fla. Feb 28, 2018); *report and recommendation adopted*, 2018 WL 1811904 (S.D. Fla. Mar. 12, 2018).

But, to the extent Mr. Schiermeyer correctly characterizes these decisions, this court finds them unpersuasive. Under controlling Supreme Court precedent, a plaintiff seeking preliminary relief must show that "irreparable injury is *likely* in the absence of an injunction"—not merely that such injury is a "possibility." *Winter*, 555 U.S. at 22. It may well be the case that cryptocurrencies present heightened dissipation risks: For instance, "cryptocurrencies may rapidly become lost or untraceable," *Gaponyuk*, 2023 WL 4670043, at *2, given "the speed and potential anonymity of cryptocurrency transactions." *Heissenberg*, 2021 WL 8154531 at *2. Yet just because it is *easy* for a defendant to dissipate assets does not make it *likely* that he will do so.

More critically, even if the particular GALA tokens that Mr. Thurston took and allegedly liquidated are difficult to trace, that is of little consequence. As discussed, cryptocurrency tokens are fungible and easy to value. To show that he is likely to suffer irreparable injury, Mr. Schiermeyer must therefore demonstrate that Mr. Thurston would *likely* be unable to pay an award of money damages after a trial. Even assuming that the missing GALA tokens will never be recovered, Mr. Schiermeyer has not provided any evidence that Mr. Thurston lacks enough other resources to compensate Gala Games for its alleged loss, or that Mr. Thurston is dissipating those other resources. Absent such evidence, the court concludes that Mr. Schiermeyer cannot show irreparable harm. For, as the Second Circuit has persuasively explained, "insolvency may render otherwise compensable harm irreparable" only where the plaintiff shows "that the risk of insolvency is likely and imminent." *CRP/Extell Parcel I*, 394 F. App'x at 782.

* * *

For the foregoing reasons, Plaintiff's motion for a temporary restraining order and a preliminary injunction is **DENIED**.

**IT IS SO ORDERED**.

Dated this 9th day of October, 2023.

BY THE COURT:

_____
Howard C. Nielson, Jr.
United States District Judge