John W. Huber (Utah Bar No. 7226)
Daniel J. Wadley (Utah Bar No. 10358)
Marc T. Rasich (Utah Bar No. 9279)
Alexander Baker (Utah Bar No. 17163)
**GREENBERG TRAURIG, LLP**
222 South Main Street, Suite 1730
Salt Lake City, Utah 84101
Telephone: (801) 478-6900
*john.huber@gtlaw.com*
*wadleyd@gtlaw.com*
*marc.rasich@gtlaw.com*
*bakera@gtlaw.com*

*Attorneys for Defendants, Counterclaimant, and Crossclaim Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ERIC SCHIERMEYER, Derivatively on Behalf of Nominal Defendant, BLOCKCHAIN GAME PARTNERS, INC. D/B/A GALA GAMES, <br> Plaintiff, <br> vs. <br> WRIGHT W. THURSTON and TRUE NORTH UNITED INVESTMENTS, LLC, <br> Defendants, <br><br> and <br> BLOCKCHAIN GAME PARTNERS, INC. D/B/A BGP GAMES, <br> Nominal Defendant. | **ANSWER TO FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND FIRST AMENDED COUNTERCLAIMS AND CROSSCLAIMS** <br><br> **JURY TRIAL DEMANDED** <br><br><br> Case No. 2:23-cv-00589-HCN-DAO <br><br> Judge Howard C. Nielson <br><br> Magistrate Judge Daphne A. Oberg |
| TRUE NORTH UNITED INVESTMENTS, LLC, Derivatively on Behalf of Nominal Defendant, BLOCKCHAIN GAME PARTNERS, INC. D/B/A GALA GAMES, <br> Counterclaimant, <br> vs. <br> ERIC SCHIERMEYER, <br> Counterdefendant, | |

|  and<br>BLOCKCHAIN GAME PARTNERS, INC.<br>D/B/A BGP GAMES,<br>     Nominal Counterdefendant. | |
|---|---|
| TRUE NORTH UNITED INVESTMENTS,<br>LLC,<br>     Crossclaim Plaintiff,<br>vs.<br>BLOCKCHAIN GAME PARTNERS, INC.<br>D/B/A BGP GAMES,<br>     Crossclaim Defendant. | |

## DEFENDANTS' ANSWER

On January 1, 2019, Plaintiff Eric Schiermeyer signed a simple two-page "Founders Agreement" with Defendant Wright Thurston ("Thurston") via Defendant, Counterclaimant, and Crossclaim Plaintiff True North United Investments, LLC, ("True North," collectively with Thurston, "Defendants"). Both were experienced businessmen, coming respectively from the worlds of gaming (Schiermeyer) and blockchain (Thurston is a blockchain technologist). They envisioned a 50-50 partnership wherein they would "form and operate Blockchain Game Partners, Inc." ("BGP" or the "Company") and affiliated companies for several specific purposes, including to:

> (a) develop and hold intellectual property rights and licenses, (b) develop and operate games to be published on a public ledger blockchain, (c) develop and operate a cryptocurrency exchange for the games, (d) sell software and hardware blockchain nodes for the games, (e) host software and hardware nodes, and (e) other affiliated services and products.

The two founders (and their affiliated companies) would "earn revenue, cryptocurrency, digital assets and rewards, legendary items, hold stock or other equity interests, and other

1

consideration (collectively 'Ownership') from each of the BGP Companies." From the outset, they "intend[ed] to equitably share and participate in the Ownership derived from the BGP Companies to vest immediately: Eric - 50%; and True North - 50%."

They also promised not to do anything that would "circumvent or compete" with their common enterprise. More to the point, they shook hands over not doing anything "to squeeze out or diminish the rights and Ownership of any other party to this Agreement." Each of them was entitled to "earn dividends, distributions, salary, compensation or other benefits as a shareholder, owner, director, manager, member, officer, or employee of any of the BGP Companies," and these benefits were "personal rights."

The Parties also signed a Shareholders Agreement on the same day. Their respective interests could not be sold save via a super-majority vote—thereby ensuring that Schiermeyer and Thurston (True North) were joined at the hip going forward.

Put simply, BGP's business was borne of their common vision to build and operate a novel gaming ecosystem with the Gala platform on Thurston's innovative blockchain technology. For a while, this arrangement flourished. But things have changed. Schiermeyer has wantonly disregarded the letter and spirit of his partnership with Thurston and True North by securing sole operating control of the Gala ecosystem in a manner that has harmed Thurston and True North, other shareholders, and the underlying community of third parties that support that ecosystem.

The assertions Schiermeyer makes in his Amended Complaint constitute a masterclass in gaslighting. He accuses Thurston of theft, yet Schiermeyer is the thief. He accuses Thurston of looting the business, yet Schiermeyer controls, manipulates, and drains its assets. He says Thurston is hiding assets, yet he refuses Thurston's request to have a third party to conduct an audit. He

asserts that Thurston liquidated corporate assets for his own benefit, yet Schiermeyer is operating parallel competing businesses in the shadows using corporate assets that belong to the common venture. And Schiermeyer has resorted to impermissible self-help to punish Thurston for challenging Schiermeyer's control, denying Thurston and True North the ability to "earn dividends, distributions, salary, compensation or other benefits" as a co-owner of the business.

In sum, it is Schiermeyer, not Thurston, who has violated the central precept of their Founders Agreement to not "squeeze out or diminish the rights and Ownership of any other party to this Agreement." In this action, Thurston and True North seek to bring transparency and justice to Schiermeyer's reckless parade of fraudulent, wrongful actions.

Thus, Thurston and True North, by and through the undersigned counsel, hereby respond to Schiermeyer's First Amended Verified Shareholder Derivative Complaint as follows:

## SUMMARY OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of Gala Games against Thurston and his investment vehicle, True North Investments, LLC ("True North"). Thurston is one of two directors of Gala Games, and he controls True North, a 40.927% shareholder in the Company.

**ANSWER:**   Defendants admit that the Complaint purports to be a derivative action for the benefit of BGP and admit that Thurston is one of two directors of BGP and that True North owns over 40% of the outstanding shares in BGP, as reflected specifically in the Carta database. Defendants deny that True North is Thurston's "investment vehicle," and that he "controls" True North. Defendants deny that any claims alleged in the Complaint are meritorious.

2.     In early 2021, Thurston and/or True North stole cryptocurrency from Gala Games, in the form of 8,645,014,077 GALA tokens ("GALA"). GALA is the core utility token for the Gala Games ecosystem developed by the Company.

**ANSWER:**    Defendants admit that GALA tokens ("GALA") are the core utility tokens for the Gala Games ecosystem but deny that the Company was the sole developer of that ecosystem and deny that Defendants stole any cryptocurrency from BGP. Except as expressly admitted, Defendants deny the allegations in this paragraph.

3.     When confronted about his theft of Company GALA, Thurston falsely stated that he simply intended to hold the GALA in secure wallets for the benefit of Gala Games. However, last year Thurston and/or True North began moving the stolen tokens from those wallets and exchanging or selling them in a complex web of obfuscatory transactions. He was able to exchange, hide or sell approximately $130,000,000 worth of the stolen GALA before Gala Games could stop him.

**ANSWER:**    Defendants admit that they moved GALA to private wallets and have exchanged or sold approximately 3 billion GALA tokens that were owned by True North and held in those wallets between approximately 2021 and 2023. Defendants expressly deny stealing any GALA or making any efforts to obfuscate any transactions involving the exchange or sale the GALA belonging to True North. Defendants affirmatively assert (as described in the below counterclaims) that Schiermeyer "burned" approximately 5.5 billion GALA belonging to True North in these specific wallets (as well as billions of additional GALA belonging to True North and other shareholders held in other wallets or accounts), in an admitted scheme designed to

destroy the value of True North's GALA. Except as expressly admitted, Defendants deny the allegations of this paragraph.

4.      Thurston also stole licenses to operate "nodes" on the Gala ecosystem from the Company. These nodes can be operated to earn valuable GALA tokens. Thurston sold those stolen node licenses to others while keeping the proceeds of those sales for himself and/or True North. Thurston and True North have been sued by the purchasers of those stolen licenses, who have accused Thurston of defrauding them.

**ANSWER:**      Defendants admit that BGP uses software licenses called "nodes" to perform work the result of which earns GALA tokens and admit that Defendants have been the subject of litigation concerning certain node licenses. Defendants deny that they stole any node licenses, and deny that they kept proceeds of sales from a stolen node licenses for themselves. Except as expressly admitted, Defendants deny the allegations of this paragraph.

5.      The United States Securities and Exchange Commission (the "SEC") also sued Thurston and True North earlier this year, alleging that Thurston defrauded purchasers of "Green Boxes" by falsely representing that they mined an energy-efficient GREEN crypto token and making other fraudulent representations.

**ANSWER:**      Defendants admit that the SEC sued Thurston (True North was merely a "relief defendant"), among many others, related to alleged securities violations, and note that on September 8, 2023, the Honorable Bruce Jenkins dismissed the fraud charges that the SEC brought against Thurston. Except as expressly admitted, Defendants deny the allegations of this paragraph.

6.      Indeed, Thurston has founded numerous companies, most of which have ended up in litigation, insolvent, bankrupt, and/or sued by the SEC. Gala Games appears to be the only legitimate enterprise in which Thurston has an interest, although Thurston has no involvement in the day-to-day operations of the Company. In fact, while Plaintiff has dutifully managed the Company's operations and Thurston has been an absentee director, Thurston has now effectively paid himself, via theft, more than ten times the total compensation Plaintiff has received from the Company.

**ANSWER:**   Defendants admit that Thurston has been a part of founding a number of companies but deny that most of them have ended up insolvent, bankrupt, or sued by the SEC. Defendants assert (as explained in Defendants' counterclaims) that, while Thurston is a founder of BGP, the source of the majority of the IP behind the Company, and one of its primary sources of capital, Schiermeyer has systematically isolated him, ignored his advice and counsel, disregarded basic requirements of proper corporate governance and taken actions against the best interest of the Company, its shareholders, and the Gala community. Except as expressly admitted, Defendants deny the allegations of this paragraph.

7.      In this action, Plaintiff, who has been a shareholder in Gala Games since its inception, seeks disgorgement of or restitution for the millions of dollars' worth of cryptocurrency stolen by Thurston and/or True North, compensation for the damage Thurston has caused Gala Games, and removal of Thurston as a director of Gala Games. Today, Gala Games suffers from its association with Thurston.

**ANSWER:**   Defendants admit that Schiermeyer is a founder and shareholder of BGP and that he seeks disgorgement or restitution of certain cryptocurrency as well as the removal of

Thurston as a director of the Company, but Defendants deny that Schiermeyer is entitled to the requested relief or any relief whatsoever by way of the Amended Complaint. Instead, as stated in Defendants' Counterclaim, Schiermeyer, not Defendants, has breached his fiduciary duties, stolen millions of dollars from the Company, and put his own self-interests ahead of the interests of the Company, its shareholders, and the Gala community. Except as expressly admitted, Defendants deny the allegations of this paragraph.

<u>**JURISDICTION AND VENUE**</u>

8.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because (i) complete diversity exists between Plaintiff, the Company and Defendant Thurston, and (ii) the amount in controversy exceeds $75,000. This is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

**ANSWER:**   The allegations contained in this paragraph contain a legal conclusion to which no response is required. To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and, on that basis, deny them.

9.      This Court has jurisdiction over each Defendant named herein. Thurston resides in this District, and True North is a Utah limited liability company with its principal place of business in this District. The Company has sufficient minimum contact with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

**ANSWER:**   Defendants admit that True North is a limited liability company with a principal place of business in Wasatch County, Utah. Defendants deny that Thurston is a resident

of this District. Except as expressly admitted or denied, the allegations contained in this

paragraph contain a legal conclusion to which no response is required.

10.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because Defendants

reside in this District and a substantial portion of the transactions and wrongs complained of

herein, including Defendant Thurston's participation in the wrongful acts detailed herein

occurred in this District.

**ANSWER:**     The allegations contained in this paragraph contain a legal conclusion to

which no response is required. To the extent a response is required, Defendants lack knowledge

or information sufficient to form a belief about the truth of the allegations in this paragraph and,

on that basis, deny them.

<u>**PARTIES**</u>

11.     Nominal Defendant Gala Games is incorporated under the laws of Wyoming and

maintains its principal place of business at 680 S Cache Street, Suite 100, Jackson, Wyoming,

83001. Gala Games develops and provides decentralized games in which players own their own

content.

**ANSWER:**     Defendants admit the allegations of this paragraph.

12.     Plaintiff is domiciled in and is a citizen of California. Plaintiff is currently a

director and shareholder of Gala Games and has continuously been a shareholder of Gala Games

since the inception of the Company. Plaintiff is also the President and Chief Executive Officer of

the Company. Prior to forming the Company, Plaintiff was the co-founder of Zynga, Inc., a

successful social video game development company that went public in 2011 and was acquired

last year in a deal valued at $12.7 billion.

**ANSWER:** Defendants admit that Schiermeyer was a co-founder, an initial shareholder, and is a Director of BGP. Except as expressly admitted, Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in this paragraph and, on that basis, deny them.

13. Defendant Wright Thurston is domiciled in and is a citizen of Utah. Thurston is currently a director of Gala Games. Prior to forming the Company, Thurston was primarily involved in multi-level marketing companies (e.g. "pyramid schemes") and founded a number of failed companies that spawned considerable litigation.

**ANSWER:** Defendants deny that Thurston is domiciled in and is a citizen of Utah. Defendants admit that Thurston is one of two BGP Directors and that he has helped found numerous companies. Except as expressly admitted, Defendants deny the allegations of this paragraph.

14. True North is a Utah limited liability company with its principal place of business in Midway, Utah. According to its Statement of Authority, Thurston was True North's sole manager when True North was formed. In March 2022, Thurston's wife, Stephanie Thurston, replaced him as manager. In June 2023, Thurston was again listed as the sole manager of True North. As of June 2023, Thurston represented to the State of Utah that his address was 125 West Main #1122, Midway, Utah 84049.

**ANSWER:** Defendants admit True North is a Utah limited liability company and that Wright Thurston is currently the manager thereof. Thurston lives in Puerto Rico, while True North is located in Utah.

15.     True North's members are: WWT Legacy Trust; SMT Legacy Trust; FRT LegacyTrust; TMT Legacy Trust; WJT Legacy Trust; TBT Legacy Trust; AMT Legacy Trust; and NET Legacy Trust. Each of these traditional trusts was formed in and exists under the laws of the State of Utah, upon information and belief for the purpose of accomplishing donative transfers. Thurston, who is domiciled in and is a citizen of Utah, has a fiduciary relationship with these trusts as the trustee for each.

**ANSWER:**    Defendants deny that Thurston is domiciled in Utah. Otherwise, the trust documents speak for themselves.

## FACTS

**A.    Thurston's history of failed companies, alleged fraud, and litigation**

16.     Thurston is a person who comes across as earnest and convincing. He does favors for people. In online profile pictures, he often appears cuddling his wife. He calls himself a "dedicated member of his community" who "frequently volunteers with his church." This persona has enabled him to fool many people, at least initially, and he has enriched himself through his pattern of deception.

**ANSWER:**    Defendants admit that Thurston is dedicated member of his community and frequently volunteers for his church. Except as expressly admitted, Defendants deny the allegations of this paragraph.

17.     ***Firstline Security, Inc***. Thurston formed Firstline Security, Inc. in or about 2002. Firstline was accused of recruiting college students to sell its products door-to-door by falsely promising that the students would appear on reality television shows and potentially win one

million dollars. The California Department of Consumer Affairs revoked Firstline's license to operate in California. The company filed for bankruptcy in 2008.

**ANSWER:**    Defendants admit that Thurston was a founder of Firstline Security, Inc., which was formed in or about 2002. Firstline Security was one of the top smarthome security providers in America, and Thurston was one of the youngest CEOs on the Inc 500 list in 2007, and was also a finalist for the Ernst and young Entrepreneur of the Year award as well. Except as expressly admitted, Defendants deny the allegations of this paragraph.

18.    ***Elevate, Inc.*** Thurston was a founder and CEO of Elevate, Inc., a multi-level marketing company in the business of selling solar energy products. The shareholders of this company sued Thurston for fraud in 2016. (Superior Court of California, County of Los Angeles, Case No. BC644655.)

**ANSWER:**    Defendants admit that Thurston was a founder and CEO of Elevate, Inc, and that the company was involved in litigation. Except as expressly admitted, Defendants deny the allegations of this paragraph.

19.    According to a filing in a federal court in Nevada, Thurston purportedly resigned from Elevate in 2015 but remained in "functional control of Elevate, its records, and its litigation." (See D. Nev. Case No. 17-cv-01924, Doc. No. 2.) In 2017, that Nevada court found that Elevate, Inc. "abandoned its business and has failed within a reasonable time to take steps to dissolve" and appointed a shareholder of Elevate as a custodian with the right to obtain any and all of the company's financial records.

**ANSWER:**   Defendants note that Schiermeyer has done nothing more than (apparently) cherry-picking unsubstantiated quotes from court filings. Defendants further state that the court documents referenced speak for themselves.

20.     The custodian of Elevate subpoenaed financial records from Thurston in 2017. Rather than produce the financial information, Thurston has engaged in six years of litigation over whether that subpoena was validly served. (D. Utah Case No. 2:18-mc-00023.) The court in that case found that Thurston had evaded service and provided a false residential address. (*See Id*. at Dkt. 34.) On July 10, 2023, the court ordered Thurston to produce responsive documents.

**ANSWER:**   Defendants admit that Thurston received a subpoena for financial records, and that he litigated the legitimacy of that subpoena under the circumstances. Defendants note that the documents in that case speak for themselves, but deny all characterizations of Thurston contained in this paragraph. Except as expressly admitted, Defendants deny the allegations of this paragraph.

21.     ***Elevate Solar, Inc***. Elevate Solar, Inc. appears to have been a subsidiary of Elevate, Inc., involved in multi-level marketing. As one online commenter noted about this company: "Wright Thurston will not tell you the truth or make anything clear. He moves from place-to-place scamming clients and investors. He does not pay his employees and then moves to a new town. He takes investors' money and then moves to a new town."

**ANSWER:**   Defendants deny the allegations of this paragraph.

22.     ***Elevate Communications, LLC.*** In 2008, Thurston founded Elevate Communications, a multi-level marketing company that sold bundled telephone, television and

internet services. By 2009, the company had been sued by its creditors, was insolvent, and ceased active operations.

**ANSWER:**    Defendants admit that Thurston was a founder of Elevate Communications. Except as expressly admitted, Defendants deny the allegations of this paragraph.

23.    An online commenter who claimed to have been a salesperson for Elevate Communications wrote: "After [customers] were contracted, Elevate's service crashed and these poor people's homes and business were locked in to lousy service that never worked. Wright ran away to another state taking the equipment he could carry and all the money of the investors. Wright Thurston Jr. is not to be trusted in any form of business. I know him personally and have spent a lot of time with him. He has ruined the lives of thousand[s] of young people as well as seasoned investors."

**ANSWER:**    Defendants deny the allegations of this paragraph.

24.    ***Block United, LLC***. Thurston formed a cryptocurrency mining company called Block United, LLC with a partner in 2017. At least two default judgments were entered against that company for failing to pay its bills, including judgment for nearly one million dollars owed to Rocky Mountain Power. (See D. Utah Case No. 2:19-cv-00302.)

**ANSWER:**    Defendants admit that Thurston was a founder of Block United, LLC in 2017, and that default judgments were entered against the company for failing to pay power bills, such failure occurring following the takeover of Block United operations by the co-founder of the company. Except as expressly admitted, Defendants deny the allegations of this paragraph.

25.    According to an appellate court filing by Thurston's partner in Block United, "[a] number of disputes subsequently arose [with Thurston] concerning, among other things, the whereabouts of a large number of Bitcoin as well as the management and operation of the company." (See Thurston v. Block United, LLC, 2021 UT App. 80.) Litigation ensued and the parties immediately settled.

**ANSWER:**    Defendants admit that the Block United litigation was initiated and subsequently settled. Except as expressly admitted, Defendants deny the allegations of this paragraph.

26.    According to public records, while Blockchain United upheld its end of the settlement agreement, paying Thurston specified sums of money and assets, Thurston "continually declined to sign the required dismissal and release papers." He initially premised his "delay on being too busy," then claimed he needed more information, then claimed he was fraudulently induced into settling.

**ANSWER:**    Defendants deny the allegations of this paragraph.

27.    The company moved to enforce the settlement agreement, and the court held oral argument on the motion.

> There, the court asked Thurston why, if his intention was to rescind the settlement agreement, he had 'kept all the money . . . paid as part of' that same agreement. Thurston answered that, 'unless the court order[ed] otherwise,' his intention was to keep the proceeds he received under the settlement agreement because it '*was never [Block United's] in the first place*' and was instead '*always [his].*'

The court disagreed, found that Thurston's claim that he was defrauded was entirely baseless, and enforced the settlement agreement. The appellate court affirmed and ordered Thurston to pay Block United's attorneys' fees. (See Thurston v. Block United, LLC, 2021 UT App. 80.)

**ANSWER:**   Defendants deny the allegations of this paragraph.

28.   In March 2022, Thurston purchased a $40 million house on the Caribbean island of Puerto Rico.

**ANSWER:**   Defendants admit that Thurston purchased a house in Puerto Rico in March 2022. Defendants deny any implication that this transaction was in any way inappropriate. Rather, upon information and belief, without Board approval, Schiermeyer has himself misused and misappropriated millions of dollars of BGP's funds to his own benefit and the Company's great detriment, including using such funds to purchase and rent substantial real estate holdings for his own personal use, and using such funds to hire architects, construction companies, and designers in connection with his use of those personal real estate holdings.

**B.   Formation of the Company, the GALA token, and the Gala Games ecosystem**

29.   In early 2019, Plaintiff and Thurston formed Gala Games. At the time, Plaintiff was not aware of Thurston's history of litigation, failed companies, and alleged fraud.

**ANSWER:**   Defendants admit that Thurston and Schiermeyer formed BGP in 2019, but deny that Thurston has a history of "failed companies and alleged fraud" or that Schiermeyer was not aware of Thurston's background.

30.   The Company developed the Gala Games platform, a blockchain-based gaming infrastructure. The currency used in the games is the GALA token, which is used for in-game purchases and as a medium of exchange between players in the Gala Games ecosystem.

**ANSWER:**   Defendants admit the allegations of this paragraph and affirmatively allege that the intellectual property used to create the Gala Games blockchain ecosystem and infrastructure was provided by Thurston and his team.

31.     A blockchain is a distributed ledger shared among a computer network's nodes, which are linked together in a peer-to-peer network. The computer nodes work together to create and maintain a public digital ledger of transactions in a way that makes it difficult or impossible to change, hack, or cheat the system's records.

**ANSWER:**     Defendants admit the allegations of this paragraph and affirmatively allege that the intellectual property used to create the Gala Games blockchain ecosystem and infrastructure was provided by Thurston and his team.

32.     The nodes of a blockchain check and validate each other by a consensus mechanism before adding a transaction to the distributed ledger. Once the nodes add a "block," or transaction, to the "chain," or ledger, the block cannot be changed.

**ANSWER:**     Defendants admit the allegations of this paragraph and affirmatively allege that the intellectual property used to create the Gala Games blockchain ecosystem and infrastructure was provided by Thurston and his team.

33.     GALA is an "ERC-20" token, which means that it is created using the Ethereum blockchain pursuant to its technical standard for creating fungible tokens. Transfers of ERC-20 tokens, like GALA, are recorded on the Ethereum blockchain and are visible to the public using online tools like Etherscan.

**ANSWER:**     Defendants admit the allegations of this paragraph and affirmatively allege that the intellectual property used to create the Gala Games blockchain ecosystem and infrastructure was provided by Thurston and his team.

34.     Transactions on the Ethereum blockchain generally require the payment of "gas"— a small amount of the native Ethereum token: Ether or "ETH." The "gas" is paid as an

incentive to an Ethereum node owner to process a transaction. The price of the "gas" required for a given transaction fluctuates depending on how busy the Ethereum network is.

**ANSWER:** Defendants admit the allegations of this paragraph and affirmatively allege that the intellectual property used to create the Gala Games blockchain ecosystem and infrastructure was provided by Thurston and his team.

35. Unlike Ethereum nodes, which process and validate token transactions (including minting and transfers of GALA), Gala Nodes currently provide computational resources required to perform actions requested by the GALA network and also provide storage for the GALA network. The Gala Nodes are therefore the core of the Gala Games ecosystem.

**ANSWER:** Defendants admit the allegations of this paragraph and affirmatively allege that the intellectual property used to create the Gala Games blockchain ecosystem and infrastructure was provided by Thurston and his team.

36. Gala Nodes are available to the public to purchase. When a person buys a Gala Node, they receive software and a license from the Company to operate the Gala Node. The number of available Gala Nodes is capped at 50,000.

**ANSWER:** Defendants admit the allegations of this paragraph and affirmatively allege that the intellectual property used to create the Gala Games blockchain ecosystem and infrastructure was provided by Thurston and his team.

37. Owners of Gala Nodes are able to "mint" GALA as a reward for operating their nodes and supporting the Gala Games ecosystem. Node owners are also able to vote regarding certain matters that affect the Gala Games ecosystem.

**ANSWER:**    Defendants admit that node owners receive distributions of GALA token rewards in proportion with the number of nodes they have in operation, and that node owners are able to vote regarding certain matters that affect the Gala Games ecosystem. Defendants affirmatively allege that the intellectual property used to create the Gala Game blockchain ecosystem and infrastructure was provided by Thurston and his team. Except as expressly admitted, Defendants deny the allegations of this paragraph.

38.    Every day, there is an emission of GALA, and the amount of GALA emitted is dependent upon the then-current circulating supply of GALA (previously, GALA was emitted pursuant to a set emission schedule). That daily emission of GALA is distributed in part to the Gala Node owners and in part to the Company.

**ANSWER:**    Defendants admit that there is a daily distribution of GALA to node owners and that the GALA distributed on a given day is limited to a pre-determined amount, but that the current distribution methodology was never approved by the Board, the shareholders, or the node owners. Defendants deny that the Company receives or should receive a portion of the daily GALA distribution, as such a distribution would be contrary to the Company's decentralized and non-custodial model and was specifically prohibited at the Company's formation. Defendants affirmatively allege that the intellectual property used to create the Gala Game blockchain ecosystem and infrastructure was provided by Thurston and his team. Except as expressly admitted, Defendants deny the allegations of this paragraph.

39.    Prior to July 21, 2021, 25% of the daily emission of GALA was distributed to the Gala Node owners and 75% was distributed to the Company. The Gala Node owners then voted

to change that distribution, and since July 21, 2021, the daily emission of GALA has been distributed evenly (50/50) between the Company and Gala Node owners.

**ANSWER:**   Defendants affirmatively allege that node owners were always to be paid 100% of Gala distributions. Defendants deny the allegations in this paragraph.

40.     The portion of the daily emission of GALA that is distributed to Gala Node owners is distributed among GALA Node owners whose nodes have been active for the minimum required time during the previous 24-hour period.

**ANSWER:**   Defendants admit the allegations in this paragraph to the extent that they apply to node holders other than True North and Schiermeyer, and to the extent that they apply to when True North's and Schiermeyer's nodes have been turned on. Defendants affirmatively allege that there was an initial 75/25 split in GALA distribution during an early testing phase, which reflected the actual distribution of nodes between True North/Thurston and Schiermeyer (who, in combination, owned more than 75% of the nodes) and the rest of the node owners (who owned about 25% of the nodes). As explained in the Counterclaim, the 75% was distributed to Schiermeyer and True North according to their ownership percentage of the total Gala Nodes at the time (again, Schiermeyer and True North owned more than 75% of total nodes, and at that time they elected not run their nodes to ensure the stability of the system). Defendants admit that this 75/25 split continued through the reduction from 75/25 to 50/50 when, as the Company sold additional nodes, the ownership proportion of nodes between the founders and the community grew closer to 50/50.

41.     GALA distributed to a Gala Node owner is sent into the owner's "treasure chest" as a mint allowance. The GALA does not exist on a blockchain until the owner "mints" the

GALA from the treasure chest, at which time it is written to the Ethereum-based blockchain (this minting requires the payment of gas and puts the GALA into the circulating supply).

**ANSWER:**   Defendants admit the allegations of this paragraph, but only as of some time in 2021, and affirmatively allege that the intellectual property used to create the Gala Game blockchain ecosystem and infrastructure was provided by Thurston and his team.

42.     The GALA distributed to the Company is distributed into a Company account, or "wallet." A cryptocurrency wallet is software that allows a user to communicate with the blockchain system, and that provides its user with a private key that may be used to authorize a "spend" or transaction of assets controlled by that wallet to another address on the blockchain.

**ANSWER:**   Defendants admit that cryptocurrency wallets and their associated private keys are used to transact across the blockchain system. Defendants deny that the Company is distributed GALA, given that the Company owns no nodes. Except as expressly admitted, Defendants deny the allegations of this paragraph.

43.     The Company's GALA is used to fund various Company purposes, including administration and ecosystem development.

**ANSWER:**   Defendants deny that the Company is distributed GALA, given that the Company owns no nodes. Defendants affirmatively allege that Revenue streams used to support BGP's operations were to come from the following: (1) traditional "free to play" video game monetization, (2) initial sale of blockchain assets to players, (3) transaction fees on the resale of blockchain assets, and (4) shareholder loans or capital contributions to BGP. Except as expressly admitted, Defendants deny the allegations of this paragraph.

44. Since at least January 2023, the Company planned to upgrade from GALA v1 tokens to GALA v2 tokens and published the rationale for the upgrade in its 2023 Vision Paper in January 2023. The 2023 Vision Paper was publicly announced and widely distributed.

**ANSWER:** Defendants deny that the Company planned an upgrade from GALA v1 tokens to GALA v2 tokens. The "upgrade" was not discussed or approved by the Directors or shareholders of the Company. Instead, as Schiermeyer admits and as described in Defendants' counterclaims, the "upgrade" was specifically designed to deprive Defendants of GALA they had as owners of more than 7,000 nodes. Except as expressly admitted, Defendants deny the allegations of this paragraph.

45. As promised in its 2023 Vision Paper, the forthcoming GALA v2 implementation was publicly announced on April 18, 2023, and took place on May 15, 2023.

**ANSWER:** Defendants admit that Schiermeyer executed his plan to destroy billions of GALA tokens belonging to Defendants and others in May 2023, and he did so without Director or shareholder approval. Except as expressly admitted, Defendants deny the allegations of this paragraph.

**C.     Management of the Company**

46. Since the Company's inception, Plaintiff and Thurston have been the only two directors of the Company.

**ANSWER:** Defendants admit the allegations of this paragraph.

47. Plaintiff is the President and Chief Executive Officer of the Company and under the Company bylaws exercises general supervision over the business of the corporation and over its several officers.

**ANSWER:**   Defendants admit that Schiermeyer is the President and CEO of the Company and that he is obligated to exercise his authority consistent with the terms and conditions of the bylaws and under the direction of the Company Directors but, as described in the counterclaims, deny that he has done so. Except as expressly admitted, Defendants deny the allegations of the paragraph.

48.   Since the Company's formation, Plaintiff has dutifully managed the operations of the Company and performed his obligations to act in the best interest of the Company.

**ANSWER:**   Defendants deny the allegations of this paragraph.

49.   Thurston has held the nominal title of "Chief Blockchain Officer." Thurston himself has admitted that he does not act in the capacity of Chief Blockchain Officer and recently resigned.

**ANSWER:**   Defendants admit that Thurston has held the title of Chief Blockchain Officer until he resigned in light of Schiermeyer's unwillingness to follow Thurston's advice, despite Thurston having brought the blockchain-based intellectual property on which BGP operated to the Company. Except as expressly admitted, Defendants deny the allegations of this paragraph.

50.   Thurston was involved in the Company early on. He initially implemented a multi-level marketing structure for the sale of Gala Nodes, similar to the sales structure he implemented in his prior failed businesses. The Company has since moved away from Thurston's model and no longer has a multi-level marketing structure.

**ANSWER:**   Defendants admit that Thurston is a founder of BGP and has been involved in its management and operation since its founding, having provided significant

guidance and support (without salary) in his role with the Company for several years. Except as expressly admitted, Defendants deny the allegations of this paragraph.

51.     Indeed, much of the Company's effort over the past several years has been to move away from problematic ideas or structures implemented by Thurston in the early days of the Company.

**ANSWER:**    Defendants deny the allegations of this paragraph.

52.     At the inception of the Company, Thurston (or a company under his control) received 7,000 Gala Nodes and Plaintiff also received roughly 7,000 Gala Nodes.

**ANSWER:**    Defendants admit that True North received approximately 7,000 Gala Nodes at the inception of the Company, and that Schiermeyer received the same number of Gala Nodes at that time.

53.     Thurston and Plaintiff agreed not to operate these nodes, as this concentration of nodes in two founders was contrary to the Company's foundational goal of decentralization (i.e. thousands of Gala Nodes operated by thousands of node owners, providing computational resources and making decisions about the protocols governing the Gala Games ecosystem).

**ANSWER:**    Defendants admit that there was a period when Schiermeyer's nodes and True North's nodes were not operating beginning in the fall of 2020, in order to maintain the stability of the system. The ongoing manner of distribution of GALA to True North and Schiermeyer during this period was hard-wired and visible in the reward distribution formula. Schiermeyer's and True North's nodes were activated in June 2023. Except as expressly admitted, Defendants deny the allegations of this paragraph.

54. Apart from directing the preparation of the Company's annual tax returns, Thurston has had no legitimate involvement with the Company for years, by his own choice.

**ANSWER:** Defendants admit that Thurston was involved in aspects of BGP's business, but otherwise deny the allegations of this paragraph, and affirmatively assert that Schiermeyer has unlawfully cut Thurston out of the management of BGP without notice or shareholder vote and has caused BGP to operate without notice to or input from Thurston, thus eliminating Thurston's ability to help guide BGP to the benefit of the Company and its shareholders.

55. Thurston has not been involved in the day-to-day operations of the Company. In fact, Thurston has been an absentee director.

**ANSWER:** Defendants admit that Thurston has not had day-to-day responsibilities at BGP, which is why he never took a salary or benefits from the Company. Defendants otherwise deny the allegations of this paragraph, and affirmatively assert that Schiermeyer has unlawfully cut Thurston out of the management of BGP without notice or shareholder vote, and has caused BGP to operate without notice to or input from Thurston, thus eliminating Thurston's ability to help guide BGP to the benefit of the Company and its shareholders.

56. In recent years, Thurston was virtually unreachable for many months at a time, failing to respond to communications from Plaintiff or the Company regarding corporate issues.

**ANSWER:** Defendants deny the allegations of this paragraph, and affirmatively assert that Schiermeyer has unlawfully cut Thurston out of the management of BGP without notice or shareholder vote, and has caused BGP to operate without notice to or input from Thurston, thus

24

eliminating Thurston's ability to help guide BGP to the benefit of the Company and its shareholders.

**D.      Thurston's theft and dumping of the Company's GALA tokens**

57.     In the early days of the Company, the Company kept its GALA tokens (received from sales on its website and from its portion of the daily distribution) in a single wallet that the Company used to engage in day-to-day business. The Company accumulated billions of GALA in this wallet, which caused concern that it could be viewed as a target for hackers.

**ANSWER:**     Defendants deny that the Company has been distributed GALA, given that the Company owns no nodes. Defendants affirmatively assert that no "Company treasury" wallet has ever been established; BGP's "terms and conditions" have never contained language informing customers that BGP would establish or had established a "Treasury"; no Board of Directors or shareholders vote has ever been taken to approve the creation of a Treasury; BGP's tax filings indicate that there is not a Treasury; and no smart contract has ever been created to establish a Treasury, the maximum amount allowed, or the terms and conditions of it use.

58.     On September 12, 2020, the Company moved 19,972,134,815 of the Company's GALA from the single Company wallet into many Company wallets. The sole purpose of moving the Company's GALA into these wallets was to keep the Company's assets more secure. This was analogous to moving funds from a checking account to multiple savings accounts.

**ANSWER:** Defendants admit that on or about September 12, 2020, the decision was made to transfer True North's and Schiermeyer's personal GALA from joint wallets into wallets that they separately owned and controlled based, in part, on security concerns. Defendants deny that the Company has been directly distributed GALA, given that the Company owns no nodes.

Defendants affirmatively assert that no "Company treasury" wallet has ever been established; BGP's "terms and conditions" have never contained language informing customers that BGP would establish or had established a "Treasury"; no Board of Directors or shareholders vote has ever been taken to approve the creation of a Treasury; BGP's tax filings indicate that there is not a Treasury; and no smart contract has ever been created to establish a Treasury, the maximum amount allowed, or the terms and conditions of it use. Except as expressly admitted, Defendants deny the allegations of this paragraph.

59. When the Company moved its GALA into these numerous wallets (the "Company Savings Wallets"), Plaintiff and Thurston were given the private keys to those Company wallets.

**ANSWER:** Defendants admit that much of True North's and Schiermeyer's personal GALA was held in joint wallets to which they both had access via private keys, and that it was moved into subsequent wallets based, in part, on security concerns. Defendants affirmatively assert that much of their personal GALA was subsequently transferred to wallets over which Schiermeyer maintained sole control. Defendants deny that the Company has been directly distributed GALA, given that the Company owns no nodes. Defendants affirmatively assert that no "Company treasury" wallet has ever been established; BGP's "terms and conditions" have never contained language informing customers that BGP would establish or had established a "Treasury"; no Board of Directors or shareholders vote has ever been taken to approve the creation of a Treasury; BGP's tax filings indicate that there is not a Treasury; and no smart contract has ever been created to establish a Treasury, the maximum amount allowed, or the terms and conditions of it use. Except as expressly admitted, Defendants deny the allegations of this paragraph.

60.     The Company Savings Wallets sat untouched between September 2020 and February 2021.

**ANSWER:**     Defendants deny the allegations of this paragraph, and deny that the Company has been directly distributed GALA, given that the Company owns no nodes. Defendants affirmatively assert that no "Company treasury" wallet has ever been established; BGP's "terms and conditions" have never contained language informing customers that BGP would establish or had established a "Treasury"; no Board of Directors or shareholders vote has ever been taken to approve the creation of a Treasury; BGP's tax filings indicate that there is not a Treasury; and no smart contract has ever been created to establish a Treasury, the maximum amount allowed, or the terms and conditions of it use.

61.     Then the Company discovered that one of the Company Savings Wallets was empty.

**ANSWER:**     Defendants admit that they withdrew and moved personal GALA owned by True North from certain cryptocurrency wallets to other wallets. Except as expressly admitted, Defendants deny the allegations of this paragraph, including the existence of a "Company Savings Wallet."

62.     Upon examination, the Company discovered that many of the Company Savings Wallets holding the Company's GALA were empty.

**ANSWER:**     Defendants admit that they withdrew and moved personal GALA owned by True North from certain cryptocurrency wallets to other wallets. Except as expressly admitted, Defendants deny the allegations of this paragraph, including the existence of a "Company Savings Wallet."

63.     In total, Gala Games learned that 8,645,014,077 of the Company's GALA tokens were missing from the Company Savings Wallets (the "Stolen GALA").

**ANSWER:**    Defendants admit that they withdrew and moved personal GALA owned by True North from certain cryptocurrency wallets to other wallets. Except as expressly admitted, Defendants deny the allegations of this paragraph, including the existence of a "Company Savings Wallet."

64.     It initially appeared that the Company Savings Wallets had been hacked by an outside threat actor. But it was not a hacker who stole the GALA. It was Thurston and/or his company True North.

**ANSWER:**    Defendants admit that they withdrew and moved personal GALA owned by True North from certain cryptocurrency wallets to other wallets. Except as expressly admitted, Defendants deny the allegations of this paragraph, including the existence of a "Company Savings Wallet."

65.     Specifically, on February 3, 2021, in a series of 43 rapid transactions, Thurston and/or True North (at Thurston's direction) transferred the Stolen GALA from 43 of the Company Savings Wallets into 43 separate wallets controlled by Thurston and/or True North (the "Thurston Wallets"). Gala Games has no access to the Thurston Wallets into which the Stolen GALA was transferred.

**ANSWER:**    Defendants admit that they withdrew and moved personal GALA owned by True North from certain cryptocurrency wallets to other wallets. Except as expressly admitted, Defendants deny the allegations of this paragraph, including the existence of a "Company Savings Wallet."

66. Gala Games personnel confronted Thurston, who explained that he had simply moved the Stolen GALA to the Thurston Wallets for safe keeping.

**ANSWER:** Defendants admit that they withdrew and moved personal GALA owned by True North from certain cryptocurrency wallets to other wallets. Except as expressly admitted, Defendants deny the allegations of this paragraph.

67. Plaintiff demanded that Thurston return the Stolen GALA to the Company Savings Wallets, but Thurston refused.

**ANSWER:** Defendants admit that they withdrew and moved personal GALA owned by True North from certain cryptocurrency wallets to other wallets. Except as expressly admitted, Defendants deny the allegations of this paragraph, including the existence of a "Company Savings Wallet."

68. The Stolen GALA represented approximately 20% of the total GALA minted and more than 100% of the total amount of GALA in circulation at that time (according to market data aggregators, which deduct the issuing company's holdings from circulating supply). If Thurston sold all of the Stolen GALA ("dumped" it in the market), the Gala Games ecosystem would have collapsed, as the total GALA in circulation would have more than doubled.

**ANSWER:** Defendants admit that they withdrew and moved personal GALA owned by True North from certain cryptocurrency wallets to other wallets, and that his GALA represented a minority of the then-circulating GALA. Defendants affirmatively assert that Schiermeyer moved an equivalent amount into his own private wallets within two months of the transactions about which he now complains, so he as another large GALA holder also had the ability to dump his

29

GALA or engage in a "rug pull." Except as expressly admitted, Defendants deny the allegations of this paragraph.

69.     Thurston effectively held the Company hostage. Blowing the whistle on Thurston could have caused him to liquidate the Stolen GALA (known as a "rug pull").

**ANSWER:**     Defendants deny the allegations of this paragraph, and specifically deny that Thurston held the Company hostage, or that Schiermeyer had a credible fear that Thurston would engage in a "rug pull."

70.     The Company was forced to rely upon Thurston's representation that he intended to act as a secure custodian of the Company GALA, and Plaintiff refrained from contacting the authorities or filing suit at that time.

**ANSWER:**     Defendants deny the allegations of this paragraph, and specifically deny that Thurston held the Company hostage, or that Schiermeyer had a credible fear that Thurston would engage in a "rug pull."

71.     Instead, the Company tracked the Thurston Wallets to see if Stolen GALA was moved from those wallets.

**ANSWER:**     Defendants admit that they withdrew and moved personal GALA owned by True North from certain cryptocurrency wallets to other wallets. Except as expressly admitted, Defendants lack sufficient information or knowledge to form a belief as to the allegations contained in this paragraph and, on that basis, deny them.

72.     Thurston's statements that he intended to keep the Company's GALA secure were false.

**ANSWER:** Defendants deny that the Company has been distributed GALA, given that the Company owns no nodes. Defendants affirmatively assert that no "Company treasury" wallet has ever been established; BGP's "terms and conditions" have never contained language informing customers that BGP would establish or had established a "Treasury"; no Board of Directors or shareholders vote has ever been taken to approve the creation of a Treasury; BGP's tax filings indicate that there is not a Treasury; and no smart contract has ever been created to establish a Treasury, the maximum amount allowed, or the terms and conditions of it use.

73.     More than a year after having transferred the Stolen GALA into the Thurston Wallets, in 2022 Thurston and/or True North (at Thurston's direction) began quietly moving the Stolen GALA out of the Thurston Wallets in a complex and obfuscatory web of transactions. The vast majority of these transactions occurred between September 2022 and May 2023.

**ANSWER:** Defendants admit that they withdrew and moved personal GALA owned by True North from certain cryptocurrency wallets to other wallets. Except as expressly admitted, Defendants deny the allegations of this paragraph.

74.     The complex web of transactions Thurston and/or True North used to transfer the Stolen GALA was intended to obfuscate the location of the Stolen GALA and prevent the Company from recovering its stolen assets.

**ANSWER:** Defendants admit that they withdrew and moved personal GALA owned by True North from certain cryptocurrency wallets to other wallets. Except as expressly admitted, Defendants deny the allegations of this paragraph.

75.     Thurston and/or True North could have simply transferred the Stolen GALA directly from the Thurston Wallets to a centralized exchange, minimizing the effort and gas fees

expended. Instead, they directed hundreds of transfers and exchanges of the Stolen GALA to and from hundreds of wallets, paying a fee for each transfer and exchange.

**ANSWER:**    Defendants admit that they withdrew and moved personal GALA owned by True North from certain cryptocurrency wallets to other wallets. Except as expressly admitted, Defendants deny the allegations of this paragraph.

76.    Each of the transfers of Stolen GALA (or the cryptocurrency for which it was exchanged) is visible on the Ethereum blockchain — up to a point. When the digital asset is transferred to a centralized exchange (e.g. Coinbase or Kraken), it is no longer visible via a blockchain explorer. Instead, records of transactions are held by those centralized exchanges and are generally not publicly available in the absence of court process requiring disclosure.

**ANSWER:**    Defendants admit that they withdrew and moved personal GALA owned by True North from certain cryptocurrency wallets to other wallets. Except as expressly admitted, Defendants deny the allegations of this paragraph.

77.    Nearly all of the Stolen GALA (or the cryptocurrency for which it was exchanged) ultimately ended up at a centralized exchange. The total value of the Stolen GALA (or the cryptocurrency for which it was exchanged) at the time it reached a centralized exchange was at least $130,129,779.60.

**ANSWER:**    Defendants admit that they withdrew and moved personal GALA owned by True North from certain cryptocurrency wallets to other wallets. Except as expressly admitted, Defendants deny the allegations of this paragraph.

78.     Plaintiff sent numerous messages to Thurston asking him why he was moving GALA tokens and demanding that he stop selling the Stolen GALA and return the remaining Stolen GALA to the Company.

**ANSWER:**     Defendants admit that Thurston, via True North, withdrew and moved personal GALA owned by True North from certain cryptocurrency wallets to other wallets. Defendants deny that the Company has been distributed GALA, given that the Company owns no nodes. Defendants affirmatively assert that no "Company treasury" wallet has ever been established; BGP's "terms and conditions" have never contained language informing customers that BGP would establish or had established a "Treasury"; no Board of Directors or shareholders vote has ever been taken to approve the creation of a Treasury; BGP's tax filings indicate that there is not a Treasury; and no smart contract has ever been created to establish a Treasury, the maximum amount allowed, or the terms and conditions of it use. Except as expressly admitted, Defendants deny the allegations of this paragraph.

79.     Thurston first responded that he was selling some of the GALA tokens in order to purchase ammunition for firearms. Then he stopped responding.

**ANSWER:**     Defendants admit that Thurston told Schiermeyer in conversation that he had sold GALA and was buying firearms, but at no time did Thurston concede that any of such GALA belonged to BGP or any entity other than True North or Thurston personally. Except as expressly admitted, Defendants deny the allegations of this paragraph.

80.     Ultimately, Plaintiff sent Thurston a text message, stating, "[your] selling GALA on coinbase is being watched by our community and it's hurting the business. you need to stop. we never agreed that you would do this. please send the funds to the company bank account."

**ANSWER:**     Defendants admit the allegations of this paragraph, but affirmatively assert that Thurston responded as follows: "I don't have access to any company reserves. The only gala I have is from our early node/miner rewards. You had the same and then the node rewards have been going to your holding tank since then. I have moved gala several times to pay media + education groups, and liberty sponsored projects related to kids. I also sent 200m a few weeks ago [to BGP] that Jarret confirmed he got. We should get together and audit, separate our personal holdings, and other staff holdings and NFT's. You and I still have personal holdings I believe for both nft + gala in the bigger holdings based on our ownership."

81.     Again, Thurston failed to respond. Thurston ignored all demands to return the Stolen GALA and kept selling the Stolen GALA.

**ANSWER:**     Defendants deny the allegations of this paragraph, and affirmatively assert that Thurston responded as follows: "I don't have access to any company reserves. The only gala I have is from our early node/miner rewards. You had the same and then the node rewards have been going to your holding tank since then. I have moved gala several times to pay media + education groups, and liberty sponsored projects related to kids. I also sent 200m a few weeks ago [to BGP] that Jarret confirmed he got. We should get together and audit, separate our personal holdings, and other staff holdings and NFT's. You and I still have personal holdings I believe for both nft + gala in the bigger holdings based on our ownership."

82.     Unable to secure the Stolen GALA from Thurston and unable to make any public disclosures regarding the Stolen GALA without the fear of initiating a panic, the Company was forced to seek an engineering solution to the problem at hand.

**ANSWER:** Defendants deny the allegations of this paragraph. Defendants affirmatively assert that, rather than being forced to act, Schiermeyer engaged in self-help and "engineered" a scheme to burn and destroy all of True North's GALA by causing BGP to burn billions of GALA v2 tokens belonging to some of BGP's shareholders and node owners without Board approval and without the knowledge of or a vote by the shareholders.

83.     That solution involved the issuance of GALA v2 in May 2023. When GALA v2 was issued, it was distributed into the wallets of users who held GALA v1 on a one-for-one basis on most platforms.

**ANSWER:** Defendants admit the allegations of this paragraph, and affirmatively assert that Schiermeyer engaged in self-help and "engineered" a scheme to burn and destroy all of True North's GALA by causing BGP to burn billions of GALA v2 tokens belonging to some of BGP's shareholders and node owners without Board approval and without the knowledge of or a vote by the shareholders.

84.     When GALA v2 was issued to replace GALA v1, the GALA v2 tokens were not deposited into the Thurston Wallets and he was left with obsolete GALA v1 tokens in those wallets. After that, Thurston was no longer able to sell the Stolen GALA from the Thurston Wallets.

**ANSWER:** Defendants admit the allegations of this paragraph, and affirmatively assert that Schiermeyer engaged in self-help and "engineered" a scheme to burn and destroy all of True North's GALA by causing BGP to burn billions of GALA v2 tokens belonging to some of BGP's shareholders and node owners without Board approval and without the knowledge of or a vote by the shareholders.

85.     By taking this action, the Company was able to mitigate some of the damage caused by Thurston and to prevent Thurston from further enriching himself by transferring, exchanging and liquidating the Stolen GALA. At that time, Thurston and/or True North had already moved approximately half of the 8.6 billion stolen tokens, valued at approximately $130 million dollars at the time.

**ANSWER:**     Defendants admit that they withdrew and moved personal GALA owned by True North from certain cryptocurrency wallets to other wallets. Defendants deny that the Company has been distributed GALA, given that the Company owns no nodes. Defendants affirmatively assert that no "Company treasury" wallet has ever been established; BGP's "terms and conditions" have never contained language informing customers that BGP would establish or had established a "Treasury"; no Board of Directors or shareholders vote has ever been taken to approve the creation of a Treasury; BGP's tax filings indicate that there is not a Treasury; and no smart contract has ever been created to establish a Treasury, the maximum amount allowed, or the terms and conditions of it use. Except as expressly admitted, Defendants deny the allegations of this paragraph.

86.     Thurston's story regarding the tokens he stole from the Company has been inconsistent. He initially claimed that he had moved the Stolen GALA from the Company Savings Wallets merely to keep the assets secure for the Company. Other times, when asked about the Stolen GALA, he has pretended not to know anything about it.

**ANSWER:**     Defendants admit that they withdrew and moved personal GALA owned by True North from certain cryptocurrency wallets to other wallets. Defendants deny that the Company has been distributed GALA, given that the Company owns no nodes. Defendants

affirmatively assert that no "Company treasury" wallet has ever been established; BGP's "terms and conditions" have never contained language informing customers that BGP would establish or had established a "Treasury"; no Board of Directors or shareholders vote has ever been taken to approve the creation of a Treasury; BGP's tax filings indicate that there is not a Treasury; and no smart contract has ever been created to establish a Treasury, the maximum amount allowed, or the terms and conditions of it use. Except as expressly admitted, Defendants deny the allegations of this paragraph, including the existence of a "Company Savings Wallet."

87.     It appears that Thurston's new story is that the GALA he stole from the Company treasury actually belonged to him or True North. Like so much of what Thurston has said over the years, this story is entirely false.

**ANSWER:**     Defendants admit that they withdrew and moved personal GALA owned by True North from certain cryptocurrency wallets to other wallets. Defendants deny that the Company has been distributed GALA, given that the Company owns no nodes. Defendants affirmatively assert that no "Company treasury" wallet has ever been established; BGP's "terms and conditions" have never contained language informing customers that BGP would establish or had established a "Treasury"; no Board of Directors or shareholders vote has ever been taken to approve the creation of a Treasury; BGP's tax filings indicate that there is not a Treasury; and no smart contract has ever been created to establish a Treasury, the maximum amount allowed, or the terms and conditions of it use. Except as expressly admitted, Defendants deny the allegations of this paragraph.

88.     The Company's accounting reports (accessible by Thurston) have always reflected the Company Savings Wallets as belonging to Gala Games.

**ANSWER:** Defendants deny the allegations of this paragraph, specifically deny that the Company has been distributed GALA, given that the Company owns no nodes, and deny the existence of "Company Savings Wallets." Defendants affirmatively assert that no "Company treasury" wallet has ever been established; BGP's "terms and conditions" have never contained language informing customers that BGP would establish or had established a "Treasury"; no Board of Directors or shareholders vote has ever been taken to approve the creation of a Treasury; BGP's tax filings indicate that there is not a Treasury; and no smart contract has ever been created to establish a Treasury, the maximum amount allowed, or the terms and conditions of it use.

89.     Further, the Company's public-facing statements have always and consistently stated that a portion of all GALA goes to the Company (not to Thurston or True North). Indeed, upon information and belief, Thurston's other companies have utilized the same model of token distribution.

**ANSWER:** Defendants deny the allegations of this paragraph, specifically deny that the Company has been distributed GALA, given that the Company owns no nodes, and deny the existence of Company Savings Wallets. Defendants affirmatively assert that no "Company treasury" wallet has ever been established; BGP's "terms and conditions" have never contained language informing customers that BGP would establish or had established a "Treasury"; no Board of Directors or shareholders vote has ever been taken to approve the creation of a Treasury; BGP's tax filings indicate that there is not a Treasury; and no smart contract has ever been created to establish a Treasury, the maximum amount allowed, or the terms and conditions of it use.

90.     Finally, if the Stolen GALA actually belonged to Thurston, he would not have secretly and rapidly moved the GALA from the Company Savings Wallets into the Thurston Wallets, would not have claimed that he did so in order to keep the Company's GALA secure, and would not have engaged in a complex web of transactions in order to obfuscate the whereabouts of the Stolen GALA.

**ANSWER:**     Defendants admit that they withdrew and moved personal GALA owned by True North from certain cryptocurrency wallets to other wallets. Defendants deny that the Company has been distributed GALA, given that the Company owns no nodes. Defendants affirmatively assert that no "Company treasury" wallet has ever been established; BGP's "terms and conditions" have never contained language informing customers that BGP would establish or had established a "Treasury"; no Board of Directors or shareholders vote has ever been taken to approve the creation of a Treasury; BGP's tax filings indicate that there is not a Treasury; and no smart contract has ever been created to establish a Treasury, the maximum amount allowed, or the terms and conditions of it use. Except as expressly admitted, Defendants deny the allegations of this paragraph, including the existence of a "Company Savings Wallet."

91.     Thurston's claim that Company assets actually belonged to him, rather than to the Company, echoes the similar claim he made in the Block United litigation (which claim was rejected by the court and Thurston was ordered to pay the company's attorneys' fees).

**ANSWER:**     Defendants admit that they withdrew and moved personal GALA owned by True North from certain cryptocurrency wallets to other wallets. Defendants deny that the Company has been distributed GALA, given that the Company owns no nodes. Defendants affirmatively assert that no "Company treasury" wallet has ever been established; BGP's "terms

and conditions" have never contained language informing customers that BGP would establish or had established a "Treasury"; no Board of Directors or shareholders vote has ever been taken to approve the creation of a Treasury; BGP's tax filings indicate that there is not a Treasury; and no smart contract has ever been created to establish a Treasury, the maximum amount allowed, or the terms and conditions of it use. Except as expressly admitted, Defendants deny the allegations of this paragraph.

92.     Plaintiff has demanded that Thurston return the Stolen GALA and any proceeds therefrom and Thurston has refused.

**ANSWER:**    Defendants admit that they withdrew and moved personal GALA owned by True North from certain cryptocurrency wallets to other wallets. Defendants deny that the Company has been distributed GALA, given that the Company owns no nodes. Defendants affirmatively assert that no "Company treasury" wallet has ever been established; BGP's "terms and conditions" have never contained language informing customers that BGP would establish or had established a "Treasury"; no Board of Directors or shareholders vote has ever been taken to approve the creation of a Treasury; BGP's tax filings indicate that there is not a Treasury; and no smart contract has ever been created to establish a Treasury, the maximum amount allowed, or the terms and conditions of it use. Except as expressly admitted, Defendants deny the allegations of this paragraph.

### E.    Thurston's theft of Gala Node licenses and alleged defrauding of investors in "Smart Boxes"

93.     Thurston has also stolen Gala Node licenses from the Company and sold the stolen licenses to third parties for his own enrichment.

**ANSWER:**    Defendants deny the allegations of this paragraph.

94.     In or around November 2021, Plaintiff noted that the Company's GALA distribution report showed a new licensee named Jason Anderson ("Anderson") with 672 operational Gala Nodes earning GALA tokens.

**ANSWER:**     Defendants deny the allegations of this paragraph.

95.     At the time, Anderson had more active Gala Nodes that anyone else on the distribution reports.

**ANSWER:**     Defendants deny the allegations of this paragraph.

96.     Upon examining the records for this licensee, the Company discovered that there was no sales information in the system for the licenses under which Anderson was operating.

**ANSWER:**     Defendants deny the allegations of this paragraph.

97.     The Company found that a false entry had been made in the system, in which Anderson's 672 node licenses (the "Stolen Licenses") were activated without anyone having paid for them.

**ANSWER:**     Defendants deny the allegations of this paragraph.

98.     The Company disabled the Stolen Licenses because it again appeared that the Company had been hacked by an outside threat actor.

**ANSWER:**     Defendants deny the allegations of this paragraph.

99.     In fact, it was not an outside hacker who stole these Gala Node licenses; it was Thurston who directed that that the false entry be made.

**ANSWER:**     Defendants deny the allegations of this paragraph.

100.     The Company ultimately learned that there was a lawsuit between Thurston and

Anderson's company, Blox Lending, LLC ("Blox"), pending in Utah. (District Court of the

Third Judicial Circuit, Salt Lake County, Case No. 210903079.)

**ANSWER:**     Defendants admit that Thurston is engaged in litigation with Blox

Lending, LLC. Except as expressly admitted, Defendants deny the allegations of this paragraph.

101.     Blox, like many others who had done business with Thurston, had sued Thurston

for fraud. Many of Thurston's other ventures (including Gala Games) were included as "alter

ego" defendants. The allegations tell a familiar story of Thurston's deception. (Blox Third

Amended Counterclaim attached as Exhibit A.)

**ANSWER:**     Defendants admit that Thurston is engaged in litigation with Blox

Lending, LLC. Defendants affirmatively state that BGP has also been named as a defendant in

that action, not as an "alter ego" defendant, and that BGP has also been sued for fraud.

Defendants further state that the documents in that action speak for themselves. Except as

expressly admitted, Defendants deny the allegations of this paragraph.

102.     According to the Blox Counterclaim, Thurston falsely represented to Blox that he

had "developed new and improved cryptocurrency mining equipment, which mined GALA,

GREEN, and GALA NFT cryptocurrency rewards." Id. ¶ 20.

**ANSWER:**     Defendants state that the documents in the Blox litigation speak for

themselves. Defendants deny the allegations of this paragraph.

103.     Thurston allegedly called the equipment a "Smart Box," and falsely claimed that

it was superior to the existing Bitcoin mining equipment owned by Blox. Id.

**ANSWER:**     Defendants state that the documents in the Blox litigation speak for themselves. Defendants deny the allegations of this paragraph.

104.     Thurston allegedly promised to provide Smart Boxes plus a rebate to Blox in exchange for the Bitcoin mining equipment then owned by Blox. According to Blox's Counterclaim, Thurston texted Anderson pictures of phony boxes with blinking lights, falsely claiming that they were operable Smart Boxes. Id. ¶¶ 24-25.

**ANSWER:**     Defendants state that the documents in the Blox litigation speak for themselves. Defendants deny the allegations of this paragraph.

105.     Blox alleges that the promised Smart Boxes were never delivered, and claims damages of approximately $200 million. Id. ¶74

**ANSWER:**     Defendants state that the documents in the Blox litigation speak for themselves. Defendants deny the allegations of this paragraph.

106.     Blox also alleges that it paid Thurston $134,400 for licenses to operate nodes on the fraudulent Smart Boxes, which appear to have been the Stolen Licenses. Thurston told Blox that he would run the Stolen Licenses remotely for Blox until the Smart Boxes arrived. Id. ¶ 52.

**ANSWER:**     Defendants state that the documents in the Blox litigation speak for themselves. Defendants deny the allegations of this paragraph.

107.     According to Blox, Thurston operated the 672 promised GALA Nodes on Blox's behalf for a period of time but conveyed only a portion of the GALA rewards that they earned to Blox. Id. ¶¶ 52-56. As set forth above, the Company disabled these Stolen Licenses once it discovered them.

**ANSWER:**     Defendants state that the documents in the Blox litigation speak for themselves. Defendants deny the allegations of this paragraph.

108.    Thurston was never authorized to sell GALA Nodes or the Stolen Licenses to Anderson or Blox.

**ANSWER:**     Defendants deny the allegations of this paragraph.

109.    The Company never received any proceeds from the sale of GALA Nodes or the Stolen Licenses to Anderson or Blox.

**ANSWER:**     Defendants deny that they sold GALA Nodes to Anderson or Blox. Defendants deny the remaining allegations of this paragraph.

110.    The Blox lawsuit, which associates the Company with one of Thurston's many fraudulent schemes, has caused the Company reputational damage.

**ANSWER:**     Defendants deny the allegations of this paragraph.

111.    Incredibly, Thurston failed to disclose to the Company that it had been sued in the Blox lawsuit and instead hired attorneys to represent both himself and the Company (from whom he had stolen the GALA Node licenses).

**ANSWER:**     Defendants deny the allegations of this paragraph.

112.    When the Company learned of the Blox lawsuit it retained its own counsel.

**ANSWER:**     Defendants admit that the Blox litigation has named the Company as a defendant and that the Company is represented by counsel in that matter. Defendants deny the remaining allegations of this paragraph.

113.    The lawsuit has caused the Company to incur legal fees and face potential legal exposure based upon Thurston's alleged conduct.

**ANSWER:**   Defendants deny the allegations of this paragraph.

114.   Another plaintiff, Derrick Hope ("Hope"), has also sued Thurston in Utah for selling Gala Node licenses.

**ANSWER:**   Defendants admit that Thurston was engaged in litigation with Hope, which has been resolved. Defendants further state that the documents in the Hope litigation speak for themselves. Defendants deny the allegations of this paragraph.

115.   Hope alleged that he paid Thurston $400,000 in exchange for, among other things, mining equipment and 268 Gala Node licenses.

**ANSWER:**   Defendants admit that Thurston was engaged in litigation with Hope, which has been resolved. Defendants further state that the documents in the Hope litigation speak for themselves. Defendants deny the allegations of this paragraph.

116.   The Company never received any portion of the funds paid by Hope to Thurston and never authorized Thurston to sell Gala Node licenses to Hope.

**ANSWER:**   Defendants admit that Thurston was engaged in litigation with Hope, which has been resolved. Defendants further state that the documents in the Hope litigation speak for themselves. Defendants deny the allegations of this paragraph.

**F.     Thurston is sued by the SEC for alleged defrauding investors in "Green Boxes"**

117.   Thurston has improperly used Gala Games's reputation to promote Green United, LLC ("Green"), a venture Thurston founded, falsely promoting Green as a venture related to the Company.

**ANSWER:**    Defendants deny the allegations of this paragraph. Defendants affirmatively state that Green predates BGP, and the intellectual property used by BGP had been previously developed and deployed as part of the Green initiative.

118.    The Securities and Exchange Commission ("SEC") has sued Thurston, alleging that Thurston defrauded investors in Green. That case is pending. (SEC v. Green United, LLC et al., Case No. 2:23-CV-00159, D. UT).

**ANSWER:**    Defendants admit that the SEC named Thurston, among others, in the referenced action. Defendants further state that the Court has dismissed the SEC's fraud claims against Thurston in that action. Except as expressly admitted, Defendants deny the allegations of this paragraph.

119.    Specifically, the SEC alleges that, from April 2018 until at least December 2022, Thurston "raised more than $18 million through the sale of investments in the form of so-called Green Boxes" and "Green Nodes" by "falsely stat[ing] that these products mined a crypto asset called GREEN on a purported blockchain called the 'Green Blockchain'." (Complaint, ¶ 2, SEC v. Green United, LLC et al., Case No. 2:23-CV-00159, D. UT.)

**ANSWER:**    Defendants admit that the SEC named Thurston, among others, in the referenced action. Defendants further state that the Court has dismissed the SEC's fraud claims against Thurston in that action and that the pleadings in that case speak for themselves. Except as expressly admitted, Defendants deny the allegations of this paragraph.

120.    The SEC alleges that GREEN was not even a mineable crypto asset and that the "Green Blockchain" promoted by Thurston did not exist. Id. ¶ 3. The SEC further alleges that

Thurston created the total supply of GREEN tokens in 2018 through a smart contract on the Ethereum blockchain. Id. ¶ 45.

**ANSWER:**    Defendants admit that the SEC named Thurston, among others, in the referenced action. Defendants further state that the Court has dismissed the SEC's fraud claims against Thurston in that action and that the pleadings in that case speak for themselves. Except as expressly admitted, Defendants deny the allegations of this paragraph.

121.    Upon information and belief, Thurston supported his alleged fraudulent scheme by exchanging some portion of the Stolen GALA for GREEN tokens to pay off investors in his Green scheme.

**ANSWER:**    Defendants deny the allegations of this paragraph.

122.    In order to lure investors into Green, Thurston relied upon his association with Gala Games, used the Gala Games name to promote Green, and falsely suggested that Gala Games was somehow involved with the Green entity.

**ANSWER:**    Defendants deny the allegations of this paragraph.

123.    Indeed, Green was not the only questionable venture that Thurston falsely associated with Gala Games in an effort to lure investors. He has promoted his entire "Connect United, Inc." family of companies, including "Give Blockchain," "Liberty Blockchain," "Elevate Blockchain," "Win Blockchain," "Switch Blockchain," "Element Blockchain," "Galvan Blockchain," and "Grow Blockchain," by falsely associating them (or instructing others to falsely associate them) with Gala Games. On information and belief, each of these entities has a business model similar to Green's.

**ANSWER:**    Defendants deny the allegations of this paragraph.

124.    Just as Green purported to solve environmental problems, many of Thurston's other entities purport to use blockchain technology to address a social or environmental issue, promising investors that by purchasing nodes in these companies they would be performing a social good. These companies typically utilize a multi-level marketing business model.

**ANSWER:**    Defendants admit that Thurston is committed to utilizing the benefits of blockchain technology to address social and environmental issues and concerns around the world and to promote social welfare. Except as expressly admitted, Defendants deny the allegations of this paragraph.

125.    Gala Games is not, and has never been, in any way associated with Green or any of Thurston's other ventures - including any of the Connect United, Inc. family of entities.

**ANSWER:**    Defendants admit that BGP is not directly affiliated, by way of a corporate relationship, with Green or other Thurston-related ventures. Defendants affirmatively state that Connect United, Inc., owns many Gala nodes, and is therefore affiliated in that manner, at least, with BGP. Defendants further state that the intellectual property used to create the Gala Game blockchain ecosystem and infrastructure was provided by Thurston and his team, including the companies referenced in this paragraph. Except as expressly admitted, Defendants deny the allegations of this paragraph.

126.    As a result of the false association of Gala Games with Thurston's other schemes, Plaintiff and the Company have been forced to field inquiries from numerous parties regarding Gala Games's potential involvement with Thurston's allegedly illicit ventures, when in fact there is no such involvement.

**ANSWER:**    Defendants deny the allegations of this paragraph.

127.     On June 8, 2023, Coinbase sent the Company a series of questions concerning the SEC's lawsuits against Thurston and inquiring about the Company's continued involvement with Thurston. After Thurston stole and began liquidating the Stolen GALA, Coinbase refused to support the GALA v2 upgrade.

**ANSWER:**     Defendants deny the allegations of this paragraph, and upon information and belief, affirmatively state that concerns and problems expressed by exchanges and others are directly related to the illegal and improper GALA v2 upgrade designed by Schiermeyer to destroy billions of GALA belonging to True North and other Node owners.

128.     Thurston's allegedly fraudulent conduct has caused significant damage to the Gala Games reputation, brand, and goodwill.

**ANSWER:**     Defendants deny the allegations of this paragraph.

**G.     Plaintiff's demand upon the Company to take action against Thurston**

129.     Under the Company bylaws, an action cannot be taken by the Gala Games board of directors without the affirmative vote of Thurston, as one of two directors of the Company.

**ANSWER:**     Defendants admit the allegations of this paragraph.

130.     On June 6, 2023, Plaintiff, as a shareholder in the Company, served a demand on the Company to take action against Thurston as a director of the Company and called for a vote of the Company's board of directors (consisting of Plaintiff and Thurston) on June 8, 2023.

**ANSWER:**     Defendants admit the allegations of this paragraph, and affirmatively state that Thurston repeatedly requested Board meetings prior to June 2023 which Schiermeyer refused to hold.

131.     On June 7, 2023, Plaintiff and Thurston, through counsel, agreed to postpone the June 8, 2023 special meeting until June 15, 2023 so that counsel could discuss resolving the matters set forth in Plaintiff's demand.

**ANSWER:**     Defendants admit the allegations of this paragraph.

132.     On June 16, 2023, Plaintiff and Thurston, through counsel, agreed to postpone the June 15, 2023 special meeting until June 22, 2023 so that counsel could discuss resolving the matters set forth in Plaintiff's demand.

**ANSWER:**     Defendants admit the allegations of this paragraph.

133.     On June 21, 2023, Plaintiff and Thurston, through counsel, agreed to postpone the June 15, 2023 special meeting until June 29, 2023 so that counsel could discuss resolving the matters set forth in Plaintiff's demand;

**ANSWER:**     Defendants admit the allegations of this paragraph.

134.     Plaintiff and Thurston, through counsel, then agreed to postpone the June 29, 2023 special meeting until July 18, 2023 so that counsel could discuss resolving the matters set forth in Plaintiff's demand;

**ANSWER:**     Defendants admit the allegations of this paragraph.

135.     On July 18, 2023, Plaintiff and Thurston, through counsel, agreed that the directors could record their votes on the proposals in Plaintiff's demand in writing.

**ANSWER:**     Defendants admit the allegations of this paragraph.

136.     On August 3, 2023, Thurston, through counsel, sent a written proposal confirming;

(a)     that Thurston voted against calling for a shareholder vote to remove Thurston as a director and

(b)     that Thurston voted against the Company filing a lawsuit against Thurston as demanded by Plaintiff.

**ANSWER:**     Defendants admit the allegations of this paragraph, and affirmatively state that the opposite of each of the foregoing was also proposed and rejected (*i.e.*, that Schiermeyer be removed as a Director and that the Company file a lawsuit against Schiermeyer).

137.    Any demand that Thurston vote to take action against himself was futile.

**ANSWER:**     Defendants admit the allegations of this paragraph, and affirmatively state that any demand that Schiermeyer vote to take action against himself was futile.

138.    Because Thurston has demonstrated that he can and will attempt to dissipate and hide the Stolen GALA, irreparable injury to the Company would result from any further delay in filing this action.

**ANSWER:**     Defendants deny the allegations of this paragraph.

**COUNT 1 -- (DERIVATIVE CLAIM) BREACH OF FIDUCIARY DUTIES**

139.    Plaintiff restates, realleges, and incorporates by reference the foregoing paragraphs as if the same were set forth herein verbatim.

**ANSWER:**     No response required.

140.    As a director, Thurston owes fiduciary duties of care, good faith, loyalty, and candor to the Company.

**ANSWER:**     The allegations contained in this paragraph contain a legal conclusion to which no response is required.

141.     Thurston breached his fiduciary duties by his actions recounted herein, including but not limited to:

a.     Misusing his access to the Company Savings Wallets in order to transfer approximately 8,645,014,077 GALA tokens from the Company Savings Wallets to the Thurston Wallets;

b.     Making false statements to the Company and Plaintiff regarding his intent to keep the Stolen GALA as a secure custodian for the Company;

c.     Refusing to return the Stolen GALA to the Company;

d.     Selling or exchanging billions of the Stolen GALA and keeping the proceeds to enrich himself directly and/or indirectly (including via his company, True North);

e.     Failing and refusing to return the proceeds received from his unauthorized sale and/or transfer of the Stolen GALA;

f.     Using his position and control to improperly sell GALA licenses to third parties without Company authorization;

g.     Failing and refusing to return the proceeds received from his unauthorized sale of the Stolen Licenses;

h.     Concealing from the Company the fact that he sold GALA licenses and kept the proceeds of the sale for himself;

i.     Concealing from the Company the fact that Blox sued Thurston and the Company for selling the Stolen Licenses;

j.     Misusing his position of control to promote his "Green" venture using the Company's reputation, brand, and goodwill; and

k.      Damaging Gala Games's brand by associating the Company with the alleged conduct in the lawsuits investors and the SEC brought against Thurston.

**ANSWER:**    Defendants deny the allegations of this paragraph.

142.    The foregoing breaches of fiduciary duties have caused harm to the Company.

**ANSWER:**    Defendants deny the allegations of this paragraph.

143.    As a direct and proximate result of Thurston's breaches of his fiduciary duties to the Company, the Company is entitled to a disgorgement of ill-gotten gains from Thurston and companies under his control (including True North), the imposition of a constructive trust over any and all ill-gotten gains; the recovery of direct damages from Thurston in an amount to be proven at trial but believed to be in excess of $130 million, to incidental and consequential damages, to pre-judgment and post-judgment interest, to attorneys' fees, and to such other and further relief as the Court deems just and proper.

**ANSWER:**    Defendants deny the allegations of this paragraph.

## COUNT II -- (DERIVATIVE CLAIM) CONVERSION

144.    Plaintiff restates, realleges, and incorporates by reference the foregoing paragraphs as if the same were set forth herein verbatim.

**ANSWER:**    No response required.

145.    Thurston and/or True North intentionally deprived the Company of its GALA tokens and licenses by knowingly exercising control over them without authorization.

**ANSWER:**    Defendants deny the allegations of this paragraph.

146.    The Company owned the GALA tokens in the Company treasury and the node licenses that cannot be distributed without Company authorization.

**ANSWER:**     Defendants deny the allegations of this paragraph.

147.    Thurston and/or True North converted the Company's property for his own use and gain.

**ANSWER:**     Defendants deny the allegations of this paragraph.

148.    The Company demanded that Thurston and/or True North return the GALA tokens and he refused.

**ANSWER:**     Defendants deny the allegations of this paragraph.

149.    Neither Thurston nor True North has ever returned the Stolen GALA or the proceeds of the sale of Stolen Gala or the Stolen Licenses to third parties.

**ANSWER:**     Defendants deny the allegations of this paragraph.

150.    Thurston and True North's actions deprived the Company of possession and use of its tokens and licenses.

**ANSWER:**     Defendants deny the allegations of this paragraph.

151.    Thurston and/or True North was unjustly enriched, and the Company was damaged by Thurston's conversion.

**ANSWER:**     Defendants deny the allegations of this paragraph.

152.    The Company is entitled to restitution in the amount that Thurston and/or True North was unjustly enriched as a result of their wrongful conduct. This amount includes, but is not limited to, the proceeds Thurston and/or True North received from his sale of the Stolen GALA and licenses.

**ANSWER:**     Defendants deny the allegations of this paragraph.

## **COUNT III -- (DERIVATIVE CLAIM) FRAUD**

153.    Plaintiff restates, realleges, and incorporates by reference the foregoing paragraphs as if the same were set forth herein verbatim.

**ANSWER:**    No response required.

154.    Thurston made knowingly false statements of fact to the Company. Specifically, in phone calls to Plaintiff and others at the Company in early 2021, Plaintiff falsely stated that he had moved GALA tokens from the Company wallets to his own wallets in order to act as a secure custodian of the Company assets.

**ANSWER:**    Defendants deny the allegations of this paragraph.

155.    Thurston's statements that he intended to keep the Company's assets secure were knowingly false.

**ANSWER:**    Defendants deny the allegations of this paragraph.

156.    After making these false statements, Thurston began selling the Stolen GALA and keeping the proceeds for himself.

**ANSWER:**    Defendants deny the allegations of this paragraph.

157.    Thurston's false statements regarding acting as a secure custodian of the Stolen GALA were made with the intent to deceive the Company or with reckless disregard for the truth.

**ANSWER:**    Defendants deny the allegations of this paragraph.

158.    The Company justifiably relied on Thurston's false statements.

**ANSWER:**    Defendants deny the allegations of this paragraph.

159. In reliance on Thurston's insistence that he intended to act as a secure custodian of the Company's tokens, the Company did not contact the appropriate authorities to report the theft of GALA and Plaintiff refrained from making demand of the Company to file an action against Thurston.

**ANSWER:** Defendants deny the allegations of this paragraph.

160. Thurston's fraudulent statements provided him a personal benefit to the detriment and financial loss of the Company.

**ANSWER:** Defendants deny the allegations of this paragraph.

## COUNT IV -- (DERIVATIVE CLAIM) UNJUST ENRICHMENT

161. Plaintiff restates, realleges, and incorporates by reference the foregoing paragraphs as if the same were set forth herein verbatim.

**ANSWER:** No response required.

162. By taking the Stolen GALA and Stolen Licenses from the Company, Defendants conferred a benefit upon themselves.

**ANSWER:** Defendants deny the allegations of this paragraph.

163. Defendants are aware that they have received the benefit of the Stolen GALA and Stolen Licenses.

**ANSWER:** Defendants deny the allegations of this paragraph.

164. It would be unjust to allow the Defendants to retain the benefit of the Stolen GALA and Stolen Licenses without requiring payment to the Company for the Stolen GALA and Stolen Licenses or the return of the Stolen GALA and proceeds of the Stolen Licenses.

**ANSWER:** Defendants deny the allegations of this paragraph.

165.     Society's reasonable expectations of security of property would be defeated if Defendants were permitted to retain the benefit of the Stolen GALA and Stolen Licenses.

**ANSWER:**     Defendants deny the allegations of this paragraph.

## COUNT V -- (DERIVATIVE CLAIM) EQUITABLE ACCOUNTING

166.     Plaintiff restates, realleges, and incorporates by reference the foregoing paragraphs as if the same were set forth herein verbatim.

**ANSWER:**     No response required.

167.     Thurston owed the Company fiduciary duties as a director.

**ANSWER:**     Defendants admit the allegations of this paragraph.

168.     Thurston breached those fiduciary duties as set forth herein, including by taking the Stolen GALA from the Company and taking the Stolen Licenses from the Company and selling them to third parties for his own gain.

**ANSWER:**     Defendants deny the allegations of this paragraph.

169.     After taking the Stolen GALA, Thurston dissipated the Stolen GALA in a complex web of transactions.

**ANSWER:**     Defendants deny the allegations of this paragraph.

170.     Thurston has failed to disclose amounts or property that he received in exchange for selling the Stolen Licenses.

**ANSWER:**     Defendants deny the allegations of this paragraph.

## COUNT VI -- (DERIVATIVE CLAIM) REMOVAL OF THURSTON AS DIRECTOR

171.    Plaintiff restates, realleges, and incorporates by reference the foregoing paragraphs as if the same were set forth herein verbatim.

**ANSWER:**    No response required.

172.    Since 2019, Plaintiff has been a shareholder of the Company. Plaintiff is currently a shareholder of the Company, and has been a shareholder of the Company during all of the events complained of herein.

**ANSWER:**    Defendants admit the allegations of this paragraph.

173.    Thurston is a director of the Company.

**ANSWER:**    Defendants admit the allegations of this paragraph.

174.    On June 6, 2023, Plaintiff issued a written demand to the Company seeking, among other things, removal of Thurston as a director.

**ANSWER:**    Defendants admit that Schiermeyer issued a written demand to the Company seeking to remove Thurston as a Director but deny that Schiermeyer is entitled to that removal or to any other relief by way of the Complaint.

175.    As set forth above, Thurston (through counsel) confirmed that he voted against calling for a shareholder vote to remove himself as a director.

**ANSWER:**    Defendants admit the allegations of this paragraph.

176.    Removal of Thurston as a director is in the best interests of the Company and its shareholders because Thurston engaged in fraudulent conduct with respect to the Company, grossly abused the position of director and intentionally inflicted harm on the Company, and has

demonstrated a pattern of fraudulent conduct that has damaged the Company's reputation as set forth herein, including in the following ways:

a.       Thurston harmed the Company by stealing 8,645,014,077 GALA tokens from the Company treasury, selling a substantial portion of the Stolen GALA without authorization, and keeping the proceeds for himself.

b.       Thurston harmed the Company by stealing GALA licenses, selling them without authorization, and keeping the proceeds for himself.

c.       Thurston harmed the Company by falsely associating the Company with his allegedly fraudulent "Smart Box" venture.

d.       Thurston harmed the Company by using the Company's reputation, brand, and goodwill to promote the "Green" venture, which the SEC is prosecuting as fraudulent, without the Company's authorization.

e.       Thurston's continued involvement in the Company harms the Company as his involvement calls the Company's legitimacy into question by third parties, including, but not limited to, Coinbase, the largest exchange in the United States.

**ANSWER:**    Defendants deny the allegations of this paragraph.

177.    As described above, Thurston, in his capacity as a director of the Company, has improperly stolen corporate assets for his own use, used the Company's property and resources for his own personal benefit and individual advantage to the detriment and financial loss of the Company.

**ANSWER:**    Defendants deny the allegations of this paragraph.

178.    As described above, Thurston has repeatedly and knowingly acted outside of the scope of his authority and without Board approval to the financial loss and detriment of the Company and Plaintiff.

**ANSWER:**    Defendants deny the allegations of this paragraph.

179.    Considering Thurston's course of conduct and the inadequacy of other remedies, removal as a director is in the best interest of the Company.

**ANSWER:**    Defendants deny the allegations of this paragraph.

## AFFIRMATIVE DEFENSES

Without prejudice to the denials set forth in this Answer to Plaintiff's Complaint, and without admitting any allegations of the Complaint that are not otherwise specifically admitted, Defendants assert the following affirmative defenses:

### I.    FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

### II.    SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims, in part, or entirely, are based on actions and events that are barred by the doctrine of laches. Specifically, Schiermeyer waited more than two and a half years after the first instance of the alleged wrongdoing by Thurston to bring a suit.

### III.    THIRD AFFIRMATIVE DEFENSE

Plaintiff, by his own admissions and conduct, is judicially estopped from taking positions in this dispute that are contrary to admissions and positions he has taken in his pleadings that are to the contrary.

## IV.    FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because the Complaint fails to state Plaintiff's claims with sufficient specificity/particularity to put Defendants on notice of the nature of the claims asserted against them and any purported wrongdoing.

## V.    FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are brought in bad faith and with unclean hands, and are illegal to the extent the complaints and actions and financial distress of BGP are derived from Plaintiff's conduct of self-dealing and/or conduct designed to shift financial and other benefits from Thurston and True North to Schiermeyer, and/or other conduct that was designed by Plaintiff to exclude Thurston from financial and other benefits and to diminish the value of Thurston's assets.

## VI.    SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims against Defendants are or may be barred, in whole or in part, because Plaintiff failed to mitigate his damages, if any.

## VII.    SEVENTH AFFIRMATIVE DEFENSE

BGP's financial distress, if any, is the product of Plaintiff's self-dealing transactions and devises used by Plaintiff to divert funds and assets to himself and to entities owned and controlled by Plaintiff, and Plaintiff's reckless mishandling and misuse of BGP's assets and funds that have resulted in corporate waste and damage to BGP.

## VIII.    EIGHTH AFFIRMATIVE DEFENSE

The relief sought by Plaintiff is barred in whole or in part because the alleged damages sought are too speculative and uncertain.

## IX.  **NINTH AFFIRMATIVE DEFENSE**

Plaintiff's claims against Defendants are or may be barred, in whole or in part, because Plaintiff failed to honor his duties of good faith and fair dealing and failed to notify and seek approval from the BGP regarding multiple decisions that required Board approval that Plaintiff nevertheless unilaterally executed.

## X.  **TENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims against Defendants are or may be barred, in whole or in part, by the doctrine of estoppel.

## XI.  **ELEVENTH AFFIRMATIVE DEFENSE**

Plaintiff consented to and/or ratified Thurston's use of the allegedly stolen GALA because Plaintiff had been treating his portion of the GALA as his own property.

## XII.  **TWELFTH AFFIRMATIVE DEFENSE**

Plaintiff's claims for fraud, unjust enrichment, and equitable accounting are barred by the applicable statute of limitations and/or statute of repose.

## XIII.  **THIRTEENTH AFFIRMATIVE DEFENSE**

Plaintiff failed to exercise reasonable diligence and therefore any claims relating to alleged omissions or nondisclosures are barred by the doctrine of fraudulent concealment.

## XIV.  **FOURTEENTH AFFIRMATIVE DEFENSE**

Some or all of the Plaintiff's claims are barred under the doctrines of release and waiver.

## XV.  **FIFTEENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, because Plaintiff consented to the conduct about which he now complains.

## XVI.    SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by acts or omissions of persons over whom Thurston has no control or right of control.

## XVII.    SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Defendants' actions do not constitute conversion or improper means under federal or state law.

## PRAYER FOR RELIEF

WHEREFORE, Defendants pray for judgment as follows:

A. That Plaintiff take nothing by reason of its Amended Complaint or any claims stated therein;

B. That the Amended Complaint, and each purported claim contained therein, be dismissed with prejudice;

C. That judgment be entered in favor of Defendants;

D. That Defendants shall recover their costs, expenses, and fees, including reasonable attorneys' fees; and

E. That the Court grant such further relief as is just, proper, and equitable.

## TRUE NORTH'S FIRST AMENDED COUNTERCLAIMS AND CROSSCLAIMS

Counterclaimant and Crossclaim Plaintiff True North United Investments, LLC ("True North"), through its attorneys, directly and derivatively on behalf of Blockchain Game Partners, Inc. d/b/a "Gala Games" ("BGP" or the "Company"), brings these claims against Counterclaim

Defendant Eric Schiermeyer—individually,[1] and in his capacity as President of BGP—and

Counterclaim and Crossclaim Defendant BGP for breach of fiduciary duties, corporate waste,

unjust enrichment, equitable accounting, removal of Schiermeyer as a Director and officer of

BGP, appointment of a custodian, breach of contract, breach of the implied covenant of good

faith and fair dealing, conversion, tortious interference with contract, and for a declaratory

judgment. True North alleges the following on information and belief, except as to the

allegations specifically pertaining to True North, which are based on actual knowledge:

## INTRODUCTION

1.      This action arises out of the unlawful scheme and course of conduct by which

Schiermeyer, without Board or shareholder knowledge or approval: (a) caused BGP to sell off

and waste millions of dollars in Company and community assets, including "burning" about

$600 million in GALA and shareholder assets; (b) caused BGP to lend millions of BGP funds to

himself for personal interests; (c) usurped corporate opportunities by forming entities in

Switzerland and Dubai to pursue business opportunities that rightfully belong to BGP (and

inserting himself as the controlling shareholder of these ventures); (d) caused BGP to operate

without notice to or input from True North's manager and BGP Director, Wright Thurston, thus

---

[1] To the extent permitted by law, True North asserts the claims for relief listed herein against Schiermeyer in his personal capacity (for instance, to the extent his actions exceeded the scope of his authorized duties as Director, President, and CEO of BGP, to the extent his actions constituted intentional torts or criminal acts, etc.). *See, e.g.*, *Fed. Trade Comm'n v. Nudge, LLC*, 2022 WL 2132695, at *55 (D. Utah June 14, 2022) ("When the corporation's unlawful activity includes fraudulent or deceptive acts, an officer or director 'is individually liable for fraudulent acts or false representations of his own or in which he participates.'") (quoting *Armed Forces Ins. Exch. v. Harrison*, 2003 UT 14, ¶ 19 (Sup. Ct.); *ANR, Ltd. v. Chattin*, 89 B.R. 898, 905 (D. Utah 1988) ("Generally, a corporate officer or director is personally liable for injuries caused by his fraud, conversion or other intentional tort.").

eliminating Thurston's ability to help guide BGP to the benefit of the Company and its shareholders; (e) caused BGP to operate with materially defective financial controls and/or to provide materially incomplete or incorrect information to Thurston; (f) caused BGP to fail and refuse to provide True North and Thurston with corporate records despite repeated requests; (g) unjustifiably caused BGP to nominally "suspend," but actually convert and exert complete control over, all of True North's nodes, and (h) engaged in systematic, intentional, and deceptive behavior to the detriment of BGP and its shareholders.

2.     True North brings certain claims derivatively, because, for the reasons detailed below, the BGP Board, as currently composed, cannot do so and cannot consent to such claims.

3.     Schiermeyer's and BGP's actions are ongoing and have seriously damaged—and threaten to further damage—BGP. Those actions also have caused and threaten to continue to cause damage to the rights and interests of True North and various other minority shareholders arising under the Founders Agreement and from its position as an owner of over 40% of the outstanding shares in BGP, as reflected specifically in the Carta database.

4.     Schiermeyer's malfeasance, mismanagement, and self-dealing have resulted in hundreds of millions of dollars in damage to BGP's reputation and Company and shareholder assets. Unless enjoined, Schiermeyer's continuing disregard for the interests of the Company and its shareholders threatens to imminently and irreparably harm BGP.

5.     By this action, True North seeks to rectify the harm to the Company and to True North caused by Schiermeyer's and BGP's actions.

### THE PARTIES

6.     True North United Investments, LLC is a Utah limited liability company

organized and existing under the laws of the state of Utah, with its principal place of business in Wasatch County, Utah. True North is now, and since the founding of the Company, always has been a shareholder of BGP.

7.     True North's members are: WWT Legacy Trust; SMT Legacy Trust; FRT Legacy Trust; TMT Legacy Trust; WJT Legacy Trust; TBT Legacy Trust; AMT Legacy Trust; and NET Legacy Trust.

8.     Each above trust was formed in and exists under the laws of the State of Utah.

9.     Thurston is the trustee for all the above trusts. He resides in Puerto Rico.

10.     Upon information and belief, Defendant Eric Schiermeyer is an individual residing in the state of California. Schiermeyer has been a BGP Director since its inception in January 2019 and has been its President since around 2021.

11.     Nominal party Blockchain Game Partners, Inc. is a Wyoming corporation organized and existing under the laws of the state of Wyoming, with its principal place of business in Jackson, Wyoming, doing business as "Gala Games."

**JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction over the claims herein pursuant to 28 U.S.C. §§ 1332 and 1367.

13.     This Court has personal jurisdiction over Schiermeyer under the Founders Agreement in which Schiermeyer "expressly stipulate[d] that any and all disputes . . . shall be litigated in the state or federal courts of Salt Lake City, Utah, USA" and "consent[ed] to personal jurisdiction in those courts." *See* Founders Agreement; *see also* Blockchain Game Partners, Inc. Shareholder Agreement § 14.3. Further, this Court has personal jurisdiction over Schiermeyer

because, among other reasons, Schiermeyer has injured True North in this District. The exercise of jurisdiction over Schiermeyer comports with federal due process.

14.     This court has personal jurisdiction firstly because BGP has purposefully availed itself to the personal jurisdiction of this Court by filing its Complaint and thus consenting to the adjudication of its claims in this Court. This Court also has jurisdiction over BGP under the section 12.3 of the Terms and Conditions, which states that "[t]he User and GALA consent to personal jurisdiction in [Salt Lake City, Utah, USA]." *See* Terms and Conditions, § 12.3. In addition, this Court has personal jurisdiction over BGP because, among other reasons, BGP has injured True North in this District. The exercise of jurisdiction over BGP comports with federal due process.

15.     Venue is proper under 28 U.S.C. § 1391(a) and (b) and under the Founders Agreement, the Blockchain Game Partners, Inc. Shareholder Agreement, and BGP's Terms and Conditions.

16.     This action is not a collusive action to confer jurisdiction that this Court would otherwise lack.

## FACTUAL ALLEGATIONS

### A.     The Founders Agreement and BGP Bylaws

17.     On or about January 1, 2019, True North and Schiermeyer founded BGP and "several affiliated companies and entities" (collectively, the "BGP Companies") which were formed or would be formed to build on blockchain technology previously owned and developed by True North. These entities were intended to (a) develop and hold intellectual property rights and licenses, (b) develop and operate video games on a public ledger blockchain, (c) develop and

establish a blockchain rewards system for video games, (d) sell software and hardware blockchain nodes[2] for the games, (e) host software and hardware nodes, and (f) other affiliated services and products. *See* Founders Agreement.

18.     Under the Founders Agreement, the Parties agreed that BGP would earn revenue, cryptocurrency, digital assets, and rewards, common, rare, and legendary game items (non-fungible tokens, or "NFTs"), and other consideration from, and hold equal stock or other equity interests in, each of the "BGP Companies" (collectively, the "Ownership"). *Id.*

19.     The Parties agreed to "equitably share and participate in the Ownership derived from the BGP Companies to vest immediately: Eric [Schiermeyer] – 50%; and True North – 50%." *Id.* BGP's 100,000,000 Preferred Shares were accordingly divided between Schiermeyer and True North with each receiving 50,000,000 shares.

20.     Importantly, True North and Schiermeyer agreed "not to circumvent or compete with the BGP Companies in a manner to earn income, hold ownership, vote, or earn rewards from the services and products of the BGP Companies in a manner to squeeze out or diminish the rights and Ownership of any other party to this Agreement." Founders Agreement.

21.     In addition to the Founders and Shareholder's agreements, BGP's actions are governed by its Bylaws. As to Directors, the Bylaws provide that "[t]he board of directors shall have the control and general management of the affairs and business of the corporation. Such directors shall in all cases act as a board, regularly convened, by a majority, and they may adopt such rules and regulations for the conduct of their meetings and the management of the

---

[2] A "node" is computer software (granted by a license to operate) that confirms, verifies, and processes transactions on the blockchain in exchange for "rewards."

corporation." Bylaws § 3.01.

22.     Since BGP's inception, the Directors have always been Wright Thurston and Eric Schiermeyer.

23.     Relevant provisions of the Bylaws include:

> **3.05    Director Meetings.** The annual meeting of the board of directors shall be held each year immediately following the annual meeting of the shareholders. Other regular meetings of the board of directors shall from time to time by resolution be prescribed. No further notice of such annual or regular meeting of the board of directors need b[e] given.

> **3.06    Special Meetings.** Special meetings of the board of directors may be called by or at the request of the president of the corporation or any director. The person or persons authorized to call special meetings of the board of directors may fix any place, either within or without the State of Wyoming, as the place for holding any special meeting of the board of directors.

> **3.07    Notice.** Notice of any special meeting shall be given at least twenty-four hours previous thereto by written notice if personally delivered, or five days previous thereto if mailed or emailed to each director.

> **3.09    Quorum and Manner of Acting.** A super majority (75%) of the directors shall constitute a quorum for the transaction of business at any meeting and the act of a majority of the directors present at any meeting at which a quorum is present shall be the act of the board of directors. . . . The directors shall act only as a board and the individual directors shall have no power as such….

> **3.11    Voting.** At all meetings of the board of directors, each director is to have one vote, irrespective of the number of shares of stock that director holds.

24.     All actions of officers are subject to the direction of the Board of Directors. For example, while there is a "President" that serves as the chief executive officer of the corporation, the President's general supervision over the business of the corporation is subject to "the control of the board of directors." Bylaws § 4.05. In fact, the President may only act as "authorized by the board of directors." *Id.*

25.     Accordingly, under the Founders Agreement and sections 3.09 and 4.05 of the

Bylaws, all control of the corporation requires the authorization of both Thurston and Schiermeyer as the two Directors on the Board.

26.     Schiermeyer currently serves as BGP's President.

**B.     BGP Launches "Gala Games"**

27.     BGP commonly does business as "Gala Games." Since its founding, BGP has grown to become a successful blockchain video game and entertainment company with millions of dollars in annual revenue and hundreds of employees.

28.     During the first two years of its operation, both Thurston and Schiermeyer participated in the direction and oversight of the Company's growing operations and increasing number of employees.

29.     True North and Schiermeyer both contributed millions of dollars (both in the form of US dollars and cryptocurrency) to develop BGP. In exchange, BGP allocated 14,000 nodes between True North and Schiermeyer (split according to their shares in BGP, *i.e.*, 50/50).

30.     Consistent with the intent of the Parties, the 14,000 nodes acquired by True North and Schiermeyer were their personal property and were available to mine GALA. The nodes, together with any GALA mined by them, were independently owned and controlled by True North and Schiermeyer as was the case with all other node owners. BGP's Terms and Conditions memorialize the fact that "[w]hen a User purchases, earns, or receives any NFT or digital reward [from] the Smart Contract process [including GALA tokens, as defined in § 1.3 on "GALA Rewards"], the User owns completely and outright the NFT and/or digital reward."

31.     These BGP nodes confirm, verify, and process transactions on the blockchain in exchange for rewards, in this case tokens called "GALA" or the "GALA token."

32.     BGP's base technology, node software mining technology, blockchain referral network, customer service, blockchain non-custodial wallet technology, daily rewards distribution engine, proof of action protocol (that tracks users' actions and sends the data to BGP's blockchain formula), mining dashboard, and tracking for individual users and blockchain functions, as well as the greater share of financing, were contributed through and by True North and Thurston.

33.     Schiermeyer provided BGP with his understanding of mobile games, video game models, experienced game staff, and market experience.

34.     Thurston and Schiermeyer partnered to create innovative action points and integrate True North's technology with gaming software.

35.     Nodes individually owned by True North and Schiermeyer started earning GALA rewards in July 2019. The first distribution on the Ethereum blockchain was in September 2020.

36.     On September 12, 2020, Schiermeyer received his initial distribution of 2.3 billion GALA from his node rewards which were deposited into his private wallet[3] to which he alone held the private keys. On the same date, True North received its initial distribution of 1.9 billion GALA from its node rewards which were deposited into True North's private wallet to which True North alone held the private keys.

37.     The foregoing distribution was to be simply a test of the system; however, Schiermeyer refused to reset the system in lieu of treating the foregoing as a distribution instead

---

[3] A "wallet" is a blockchain storage account used to store cryptocurrency and other digital assets (like a bank account). Wallets can be accessed using a "key" which operates much like a password for access to an online account.

of a test. Thurston objected to Schiermeyer's actions because not all node owners had been informed of the commencement of distributions, and thus Schiermeyer and a small number of others were the only node owners receiving rewards.

38.     On or about February 2021, BGP finalized the purchase of Sandbox Games. Shortly after the acquisition, the founders agreed to another distribution that included the former owners of Sandbox.

39.     After the foregoing distributions, any remaining and all additional GALA and NFTs earned by True North and Schiermeyer were deposited into and stored in wallets controlled solely by Schiermeyer.

40.     In or about the first quarter of 2021, following the distribution that resulted from BGP's acquisition of Sandbox, True North and Schiermeyer separated approximately 8.6 billion GALA each which they individually owned into wallets they individually controlled. Schiermeyer, however, took control of all remaining GALA and NFTs (including those owned by True North and others) by separating them into wallets to which Schiermeyer alone held the keys.

41.     Despite repeated concerns raised by Thurston and requests from BGP shareholders for distributions/payment and to participate in the node/cryptocurrency aspect of the Gala community, Schiermeyer continued to hold these GALA and NFTs and even sold some for his personal benefit.

C.     **Schiermeyer Uses BGP Assets for Personal Gain, Acts on Behalf of BGP Without Board Approval and "Burns" Millions of GALA Tokens**

42.     Over at least the last twelve (12) months, Schiermeyer has exercised unilateral control over the operations, assets, and profits of BGP. During that time, Schiermeyer has flouted

BGP's founding and charter documents and has covertly acted and engaged in transactions on

behalf of BGP and used BGP's assets and earnings, often for his own personal benefit, without

the consent of BGP's Board or its shareholders.

43. For example, Schiermeyer:

- Caused BGP to send millions of dollars' worth of cryptocurrency to Canadian resident Jason Brink, BGP's President of Blockchain, for unapproved and unknown reasons.

- Caused BGP to distribute valuable NFTs to himself and select BGP employees, without Board or shareholder approval. By design, those NFTs should have been randomly distributed to members of the Gala community.

- Caused BGP to intentionally destroy hundreds of millions of dollars of asset value by "burning" GALA tokens.[4]

- Misappropriated millions of dollars of BGP funds, including, using Company funds for buying and renting real estate for personal use, transferring Company assets into his own name or the names of entities that he owns or controls, using Company funds to hire architects, construction companies, and designers for personal real estate, and moving Company funds into personal accounts.

- Caused BGP to pay $5 million towards an installment purchase of a corporate jet for Schiermeyer's personal benefit despite the BGP Board previously agreeing to sell the jet/BGP's position.

44. In or about April 2023, without disclosure to, authorization of, or oversight by the

Board, Schiermeyer directed BGP to replace all GALA tokens on a one-to-one basis with a new

version ("GALA v2 tokens"). BGP publicly announced the v1 tokens would be "upgraded" to v2

automatically.

---

[4] "Burning" tokens refers to the permanent removal of tokens from circulation, which is typically accomplished by transferring tokens to a "burn address," *i.e.*, a wallet from which they can never be retrieved. In effect, burning tokens results in their destruction and consequently destroys their value.

45.     Contrary to the public announcement, Schiermeyer did not cause BGP to "upgrade" all GALA tokens. In fact, by his own admission in this matter, Schiermeyer directed BGP *not* to replace billions of the v1 tokens held by True North as well as other shareholders, node owners, and simple GALA token holders who held their GALA tokens on non-participating exchanges. Instead, Schiermeyer directed BGP to deposit those replacement tokens into wallets controlled by Schiermeyer personally, and then he burned those tokens.

46.     Schiermeyer's GALA "upgrade" caused substantial harm to BGP's value by, among other things, causing cryptocurrency exchange Coinbase to delist GALA and rendered worthless all GALA held by other GALA holders whose tokens were inaccessible to BGP at the time of the conversion. It also directly damaged True North and the others who, by design of Schiermeyer, lost all the value in their GALA v1.

47.     At or around the same time, Schiermeyer caused BGP to burn billions of GALA v2 tokens belonging to BGP's shareholders, again without Board approval and without the knowledge of or a vote by the shareholders. In total, Schiermeyer caused BGP to burn approximately 21 billion GALA v2 tokens, including many replacement tokens belonging to BGP's shareholders and community members. It is estimated that the burn destroyed more than $600 million in assets.

48.     For example, by burning True North's GALA v2 tokens, *i.e.*, the replacement tokens, Schiermeyer effectively converted over 5 billion GALA v1 tokens in True North's wallets worth around $00.030 each and then destroyed their value completely.

49.     As a result, Schiermeyer destroyed the equivalent of over $150 million in True North's GALA tokens.

50.     Schiermeyer's burn also further destroyed BGP value by effectively centralizing control and power over the Gala ecosystem in Schiermeyer which is antithetical to one of BGP's core principles regarding the development of the larger Gala ecosystem and community.[5]

51.     Schiermeyer's decision to replace v1 tokens with GALA v2 and to burn GALA tokens were not explained to, nor approved or overseen by, the BGP Board or its shareholders. Nevertheless, after a public announcement of Schiermeyer's actions, Thurston repeatedly informed BGP's corporate counsel that Schiermeyer's actions violated the companies' organizing documents, but BGP's corporate counsel took no corrective action.

52.     Upon information and belief, while Schiermeyer burned True North's GALA tokens (and GALA tokens belonging to other shareholders and community members), Schiermeyer reserved some GALA v2 tokens for himself. Schiermeyer also granted himself sole control over Company wallets receiving future v2 tokens and other digital assets.

53.     Upon information and belief, Schiermeyer further breached his fiduciary duties by using Company funds to buy and rent real estate for personal use, transferring Company assets into his own name (via entities that he created), hiring architects, construction companies, and designers for personal real estate, and moving funds into his personal accounts.

54.     Moreover, while the Company Board unanimously voted on January 11, 2023, to liquidate non-crypto assets because of a general downturn in the value of various cryptocurrencies within the digital assets economy, Schiermeyer instead directed an installment

---

[5] Decentralization and transparency are key principles behind all blockchain projects. The burning of v1 GALA tokens essentially centralized control of GALA tokens (v2) with fewer community members, and perhaps not coincidentally left Schiermeyer as the largest holder of GALA tokens by a substantial margin.

payment of $5 million to be made toward buying a Gulfstream airplane in April 2023 for his personal use. This expenditure was not disclosed to or approved by the Board, and contradicted the Board's vote to liquidate (not buy) physical property.

55.     Schiermeyer's conduct was, upon information and belief, deceptive and intentional, as the "financial statements" provided by Schiermeyer to Thurston as Director were inaccurate and omitted significant financial information and details about Schiermeyer's transactions including the failure to disclose accurately the creation of new BGP companies, real estate transactions for the benefit of Schiermeyer, and the conversion of GALA.

56.     Upon information and belief, Schiermeyer later directed the Company controller not to share any financial information with Director Thurston and deleted Thurston from internal Company communication channels.

57.     Thurston, as Director, has attempted to discuss these and other matters with Schiermeyer and has made multiple attempts to call Board meetings, to meet with Schiermeyer, and to find out about Schiermeyer's activities. Schiermeyer has rejected Thurston's good faith attempts to confer.

**D.     Schiermeyer Breaches the Duty of Loyalty and Usurps Corporate Opportunities**

58.     To maximize the value of the BGP intellectual property and to expand the Gala ecosystem into other markets, BGP's Board discussed several times establishing and developing Gala Music and Gala Film. Both potential enterprises were intended and agreed to be wholly owned subsidiaries of BGP. All funding, staffing, and intellectual property for these new entities were to come from BGP.

59.     In its January 2023 meeting, the Board approved in concept exploring a path to

move forward with Gala Music first. No decisions were made to form the companies or to move forward a pending resolution on issues regarding ownership, funding, overall structure, and business plans.

60.     Thurston sought to address these issues with Schiermeyer at the BGP Board meeting on April 6, 2023, but Schiermeyer lied to Thurston by denying that any foreign entities had been created—when in fact the music entity had been formed months earlier.

61.     Unbeknownst to Thurston, upon information and belief, Schiermeyer formed Gala Music in Switzerland and, without Board approval, authorization, or consent, unilaterally installed himself as the largest shareholder. He also formed a sales entity in Dubai and again unilaterally installed himself as its largest shareholder. In each case, Schiermeyer excluded BGP, True North, and the many other BGP shareholders from any ownership. Schiermeyer breached his fiduciary duty of loyalty and was unjustly enriched by taking a BGP opportunity for himself.

62.     Upon information and belief, Schiermeyer has or intends to transfer or use much of BGP's current business, tech platform, assets, and intellectual property to benefit the foreign legal entities, yet Schiermeyer has effectively removed BGP, True North, and other shareholders from the benefits of the expanded platforms and revenues flowing from these entities.

63.     Schiermeyer's actions have not inured to the benefit of BGP or its shareholders.

64.     To the contrary, Schiermeyer's refusal to answer calls, respond to communications, attend meetings, explain his unilateral actions, or to take any cooperative action to protect BGP and its shareholders from the conversion, waste, or destruction of BGP assets has greatly damaged BGP and its shareholders, including True North.

65.     Schiermeyer's creation of the separate foreign legal entities to pursue

opportunities rightfully belonging to BGP will further damage BGP's shareholders by diminishing the value of BGP as a company.

### E.      Schiermeyer Exercises Control Over the Nodes

66.      Upon information and belief, Schiermeyer recently announced that BGP would distribute 8,000 nodes to BGP's employees. While Thurston is not opposed to providing additional benefits and incentives to BGP employees, including, where appropriate, in the form of nodes, the plan for doing so was never disclosed to or approved by the Board or shareholders. Moreover, on information and belief, BGP does not have 8,000 nodes remaining in its 50,000-node allocation (as dictated by the smart contract) to distribute to BGP employees.

67.      Each node (which has a separate and unique alphanumeric identifier) currently can generate some value in the form of various digital assets each day.

68.      On October 10, 2023 (the very next day after the TRO motion he filed in this action against Defendants was denied), Schiermeyer sent a letter to Thurston informing him that BGP had unilaterally "suspended"—*i.e., turned off*—True North's 7000 nodes. However, not only had the nodes been "suspended," but they were removed from True North's account, in a brazen act of conversion. The letter cites to the self-serving and unproven claims alleged in Schiermeyer's complaint as authority for this act, references old and irrelevant matters involving Blox Lending and Derrick Hope, and further justifies his termination by stating that Thurston's alleged "daily dumping of millions of GALA damages the Gala Games ecosystem."

69.      There was no Board proposal regarding this action, no authorization for Schiermeyer or BGP to take this step, and no effort to adhere to any type of corporate formality that would otherwise be expected and required for such action. Rather, Schiermeyer claimed that

under BGP's Terms and Conditions "the Company has full discretion to terminate node licenses if the node user has harmed Gala Games in any way."

70.     True North's Nodes have been operating without issue for over four months (both Schiermeyer and True North independently elected to turn on their nodes in June of this year). During that span they have generated millions of dollars' worth of GALA rewards.

71.     True North—like every node-owner is expressly permitted to do—has engaged in a number of transactions during those months and since the filing of this lawsuit without complaint or action by Schiermeyer or BGP. With this recent action, Schiermeyer and BGP have unilaterally shut off True North's nodes and are causing significant ongoing harm to True North and Thurston by restricting their right to control and monetize the Nodes.

72.     By shutting off and effectively stealing True North's nodes, Schiermeyer and BGP are depriving True North of the opportunity to generate substantial valuable digital assets over time.

73.     This unilateral and improper shutting off and stealing of True North's nodes is not the first "suspension" of nodes by Schiermeyer. In fact, Schiermeyer has done so at least twice before. For example, in 2023, Schiermeyer shut off 500 nodes that True North previously transferred to Liberty United, a blockchain company, in exchange for services rendered. In November of 2020, Schiermeyer also shut off 1,000 nodes owned by Connect United LLC with no notice or justification.

74.     Shortly before announcing the improper, unlawful "suspension" of True North's nodes, Schiermeyer announced a proposed distribution of 8,000 nodes to BGP employees. This number is uncannily the same number of Nodes held by True North (approximately 7,000 nodes)

and Connect (another Thurston-related entity owning approximately 1,000 nodes). The announcement is also eerily similar to the self-help action Schiermeyer employed in unilaterally burning and destroying billions of dollars of True North's and others' assets. And like the burn, the proposed distribution—which, at the going rate of approximately $100,000 per node amounts to giving away $800 million of potential income for BGP—is being taken without Board or shareholder approval. To the extent that this gesture presages an upcoming termination of True North's and Connect's 8,000 total nodes, it would constitute a devastating, tortious, even criminal act against True North's and Thurston's holdings. Alternatively, to the extent that this distribution does not correspond with the termination of True North and Connect's 8,000 nodes, then it would constitute a substantial increase in the total number of nodes (without BGP or other node owners benefiting from fair and adequate compensation) that would thus depreciate the value of the nodes held by existing node holders—all of whom provided substantial value for their nodes. But BGP likely could not do this, since the smart contract limits the number of nodes to 50,000, and upon information and belief there are less than 8,000 unclaimed nodes remaining.

## F.   Derivative and Demand Futility

75.     True North brings the First, Second, Third, Fourth, and Fifth, and Sixth Claims for Relief derivatively on behalf of BGP to redress injuries suffered and to be suffered by BGP as a direct result of Schiermeyer's breaches of his fiduciary duties, waste of corporate assets, unjust enrichment, and gross abuse of his position as Director and officer of the Company.

76.     True North will adequately and fairly represent the interests of BGP in enforcing and prosecuting its rights.

77.     Based on the facts set forth in this Complaint, applicable law, and the

longstanding rule that equity does not compel a useless and futile act, prefiling demand upon the BGP Board to institute action against Schiermeyer would be futile and is thus excused.

78.     BGP's bylaws require a 2/3 majority vote for the BGP Board to act. There are only two BGP Directors—Thurston and Schiermeyer. Thus, the required super majority of the Board cannot exercise independent and objective judgment in deciding whether to bring this action or vigorously pursue it because Schiermeyer participated personally in the wrongful conduct described herein and personally benefitted from the wrongful conduct described herein. Approving the initiation and vigorous prosecution of this derivative action would require Schiermeyer to approve suing himself, rendering any request for Board approval futile.

79.     Any possibility of resolving this deadlock by shareholder vote is similarly futile. The Bylaws require a supermajority vote (75% of shares) for any action to be taken by the shareholders, but True North and Schiermeyer are both own over 40% of the outstanding shares in BGP, as reflected specifically in the Carta database. Thus, it would be futile to seek to hold a shareholder's meeting to remove Schiermeyer as a Director and President of BGP or to attempt to direct the Board to initiate and vigorously prosecute this action as it would require Schiermeyer to approve filing and pursuing a suit against himself.

80.     Notwithstanding the futility of the demand process, as described above, and as referenced in Schiermeyer's Amended Complaint, between August 3 and August 7, 2023, counsel for Schiermeyer and Thurston agreed upon an action in lieu of a Board meeting in which both Directors confirmed that they would vote against removing themselves as members of the BGP Board and would vote against BGP initiating an action against themselves.

81.     Further, all of Thurston and True North's efforts at pursuing alternative resolution

of these issues have come to nought. Section 12.3 of BGP's Terms and Conditions notes that disputes "shall" be arbitrated (in the event the parties do not agree to mediate). On multiple occasions during the summer of 2023, before either party had filed a lawsuit against the other (in the proceeding months in which the Parties were engaging in settlement discussions), Thurston directed that his counsel propose that the Parties seek resolution via mediation and/or arbitration. Schiermeyer rejected each of these requests to pursue such alternatives.

<u>**FIRST CLAIM FOR RELIEF**</u>
**(Derivative Claim against Schiermeyer for Breach of Fiduciary Duty)**

82.     True North incorporates and realleges the allegations set forth above as though fully set forth herein.

83.     Schiermeyer owed and owes BGP and its shareholders fiduciary obligations. Because of his fiduciary relationship, Schiermeyer owed and owes BGP and its shareholders the highest obligation of candor, good faith, fair dealing, loyalty, and due care.

84.     Schiermeyer violated and breached his fiduciary duty of candor, good faith, fair dealing, loyalty, and due care. Schiermeyer violated his fiduciary duty and acted outside of the scope of his authorized capacity as Director, President, and CEO of BGP by, among other acts herein described, (a) destroying Company and shareholder assets (including by burning billions of GALA tokens to which True North was entitled); (b) converting Company funds for personal use; (c) wasting Company funds; (d) launching competing companies and omitting True North and other BGP shareholders as shareholders with the same percentage interests in those entities; (e) cutting Thurston out of the management of BGP without notice or shareholder vote; (f) causing BGP to provide incomplete, false or misleading financial information to True North and Thurston; (g) causing BGP to fail and refuse to provide True North or Thurston access to or

copies of accurate and complete Company records; and (h) unjustifiably causing BGP to nominally "suspend," but actually convert and exert complete control over, all of True North's nodes. Schiermeyer did so unilaterally and for his personal benefit, in knowing or reckless disregard for the interests of BGP and its shareholders. These actions were disloyal, unlawful self-dealing, and could not have been a good faith exercise of prudent business judgment nor were they taken to protect and promote BGP's interests.

85.     As a direct and proximate result of Schiermeyer's breach of his fiduciary obligations, BGP and its shareholders have sustained significant damages, in an amount to be proven at trial but which exceeds $600 million.

86.     BGP has no adequate remedy at law and, unless Schiermeyer is preliminarily and permanently enjoined from further breaching his obligations to the Company, BGP will continue to suffer imminent and irreparable harm, including BGP's liability for effecting an unlawful redistribution of GALA rewards rightfully belonging to True North.

## <u>SECOND CLAIM FOR RELIEF</u>
### (Derivative Claim against Schiermeyer for Waste of Corporate Assets)

87.     True North incorporates and realleges the allegations set forth above as though fully set forth herein.

88.     As a result of Schiermeyer's unilateral and unauthorized conduct, and due to directives from him that were outside of the scope of his authorized capacity as Director, President, and CEO of BGP, BGP burned more than approximately 20.9 billion GALA tokens belonging to its shareholders and others in the Gala community worth more than $600 million. As a further result of Schiermeyer's unilateral conduct, BGP (at Schiermeyer's direction) contributed at least $5 million in an installment payment for a corporate jet for Schiermeyer's

personal use. Schiermeyer's actions on behalf of BGP have resulted not just in the loss of

millions of corporate assets but irreversible damage to BGP's reputation and standing.

89.     As a result of the waste of corporate assets, Schiermeyer is liable to BGP and its

shareholders in an amount to be proven at trial which exceeds $600 million.

90.     BGP has no adequate remedy at law and, unless Schiermeyer is preliminarily and

permanently enjoined from further breaching his obligations to the Company, BGP will continue

to suffer imminent and irreparable harm.

### THIRD CLAIM FOR RELIEF
**(Derivative Claim against Schiermeyer for Unjust Enrichment)**

91.     True North incorporates and realleges the allegations set forth above as though

fully set forth herein.

92.     By his wrongful actions, Schiermeyer was unjustly enriched at the expense of and

to the detriment of BGP and its shareholders (including True North). As described herein,

Schiermeyer was unjustly enriched by acting outside of the scope of his authorized capacity as

Director, President, and CEO of BGP, in converting Company assets for personal use, nominally

"suspending" but actually converting True North's nodes (which as a node owner, benefits

Schiermeyer directly), and by burning shareholder GALA tokens while retaining huge amounts

of GALA for personal use. BGP received no benefit from Schiermeyer's waste of Company

assets, or his use of Company confidential information and financial assets for his personal gain.

To the contrary, BGP was substantially harmed by those acts.

93.     True North, as a shareholder and representative of BGP, seeks restitution from

Schiermeyer and seeks an order of this Court disgorging all profits, benefits, and other

compensation obtained by Schiermeyer from his wrongful conduct and fiduciary breaches. A

constructive trust for the benefit of BGP should be imposed on all benefits gained or to be gained by Schiermeyer as a result of his wrongful acts.

94.     BGP has no adequate remedy at law and, unless Schiermeyer is preliminarily and permanently enjoined from further breaching his obligations to the Company, BGP will continue to suffer imminent and irreparable harm.

### FOURTH CLAIM FOR RELIEF
**(Direct and Derivative Claim against Schiermeyer for an Equitable Accounting)**

95.     True North incorporates and realleges the allegations set forth above as though fully set forth herein.

96.     Schiermeyer owed and owes BGP and its shareholders fiduciary obligations. Because of his fiduciary relationship, Schiermeyer owed and owes BGP and its shareholders the highest obligation of candor, good faith, fair dealing, loyalty, and due care.

97.     Schiermeyer violated and breached his fiduciary duty of candor, good faith, fair dealing, loyalty, and due care. Schiermeyer violated his fiduciary duty and acted outside of the scope of his authorized capacity as Director, President, and CEO of BGP by, among other acts herein described, (a) destroying Company and shareholder assets (including by burning billions of GALA tokens to which True North was entitled); (b) converting Company funds for personal use; (c) wasting Company funds; (d) launching competing companies and omitting True North and other BGP shareholders as shareholders with the same percentage interests in those entities; (e) cutting Thurston out of the management of BGP without notice or shareholder vote; (f) causing BGP to provide incomplete, false or misleading financial information to True North and Thurston; (g) causing BGP to fail and refuse to provide True North or Thurston access to or copies of accurate and complete Company records; and (h) unjustifiably causing BGP to

nominally "suspend," but actually convert and exert complete control over, all of True North's nodes. Schiermeyer did so unilaterally and for his personal benefit, in knowing or reckless disregard for the interests of BGP and its shareholders. These actions were disloyal, unlawful self-dealing, and could not have been a good faith exercise of prudent business judgment nor were they taken to protect and promote BGP's interests.

98.      Although on numerous occasions Thurston (on behalf of True North) has requested financial information regarding the Company and Schiermeyer's commercial dealings mentioned above—information that Thurston and True North are due by virtue of Thurston's position as a Director of BGP and True North's status as a shareholder owning over 40% of the outstanding shares in BGP—and in each instance Schiermeyer has refused and failed to provide such information.

99.      BGP has no adequate remedy at law and, unless Schiermeyer is enjoined to provide True North with an equitable accounting, BGP will continue to suffer imminent and irreparable harm.

## FIFTH CLAIM FOR RELIEF
### (Direct and Derivative Claim Against Schiermeyer for Judicial Removal of Schiermeyer as Director, President, and CEO of BGP)

100.      True North incorporates and realleges the allegations set forth above as though fully set forth herein.

101.      The Wyoming Business Corporation Act ("WBCA") Section 17-16-809 provides the Court with the authority to remove a Director when "[t]he director engaged in fraudulent conduct with respect to the corporation or its shareholders, grossly abused the position of director, or intentionally inflicted harm on the corporation" and "[c]onsidering the director's

course of conduct and the inadequacy of other available remedies, removal would be in the best interest of the corporation."

102.    WBCA Sections 17-17-140 and 17-17-141 further provide the Court with the authority, upon the petition of a shareholder, to remove a Director of the corporation, if "[t]he directors or those in control of the corporation are deadlocked in the management of the corporation's affairs, the shareholders are unable to break the deadlock, and the corporation is suffering or will suffer irreparable injury or the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders generally because of the deadlock."

103.    Schiermeyer's unilateral and unauthorized conduct described herein—committed outside of the scope of his authorized capacity as Director, President, and CEO of BGP—has greatly damaged BGP and its shareholders, including by the destruction of more than $600 million in Company and shareholder assets, conversion of Company funds and other assets for personal use, and by launching competing companies and unilaterally inserting himself as majority shareholder.

104.    Thurston, as Director of BGP, has tried in vain to schedule meetings with Schiermeyer regarding his actions and the future of the Company. Thurston has further requested meetings and the adoption of resolutions to remove Schiermeyer as Director of BGP. Schiermeyer has rejected various proposals and requests, resulting in a deadlock between the two Directors.

105.    True North and Schiermeyer are also the two largest shareholders, each holding over 40% of the outstanding shares in BGP, as reflected specifically in the Carta database.

106.    To break any director deadlock, however, a supermajority (75%) vote of

shareholders is required. Because of True North and Schiermeyer's deadlock, and their large ownership of shares, the shareholders cannot break the directors' deadlock regarding the management of the Company and how to proceed.

107.     Accordingly, judicial removal of Schiermeyer is necessary to protect the Company and its shareholders and to break the deadlock currently existing between BGP's Directors and shareholders.

108.     WBCA Sections 17-17-140 and 17-17-141 similarly authorize, on the same grounds, the removal of an officer of the Company.

109.     True North, as a shareholder owning over 40% of the outstanding shares in BGP, and derivatively on behalf of BGP, seeks an order of this Court pursuant to WBCA Sections 17-16-809, 17-17-140, and 17-17-141 for Schiermeyer to be removed as Director, President, and CEO of BGP.

<u>SIXTH CLAIM FOR RELIEF</u>
**(Direct and Derivative Claim Against Schiermeyer for Judicial Appointment of a Custodian)**

110.     True North incorporates and realleges the allegations set forth above as though fully set forth herein.

111.     WBCA Section 17-16-748(a) authorizes the Court to appoint a custodian where either "[t]he directors are deadlocked in the management of corporate affairs, the shareholders are unable to break the deadlock, and irreparable injury to the corporation is threatened or being suffered[,]" or "the directors or those in control of the corporation are acting fraudulently and irreparable injury to the corporation is threatened or being suffered."

112.     Schiermeyer's unilateral and unauthorized conduct described herein—committed

outside of the scope of his authorized capacity as Director, President, and CEO of BGP—has greatly damaged BGP and its shareholders, including by the destruction of more than $600 million in Company and shareholder assets, conversion of Company funds and other assets for personal use, and by launching competing companies and unilaterally inserting himself as majority shareholder—all to the injury of BGP.

113.    Thurston, as Director of BGP, has tried in vain to schedule meetings with Schiermeyer regarding his actions and the future of the Company. Thurston has further requested meetings and the adoption of resolutions to remove Schiermeyer as Director of BGP. Schiermeyer has rejected various proposals and requests, resulting in a deadlock between the two Directors.

114.    True North and Schiermeyer are also the two largest shareholders, each holding over 40% of the outstanding shares in BGP, as reflected specifically in the Carta database.

115.    To break any director deadlock, however, a supermajority (75%) vote of shareholders is required. Because of True North and Schiermeyer's deadlock, and their large ownership of shares, the shareholders cannot break the directors' deadlock regarding the management of the Company and how to proceed.

116.    Accordingly, because Schiermeyer is and has been "acting fraudulently and irreparable injury to the corporation" has occurred and continues to be threatened, and because there is a director deadlock, judicial appointment of a custodian to act as President and CEO in place of Schiermeyer is necessary to protect the Company and its shareholders.

117.    WBCA Section 17-17-141 similarly authorizes, on the same grounds, the appointment of a custodian.

118.     True North, as shareholder owning over 40% of the outstanding shares in BGP,

and derivatively on behalf of BGP, seeks an order from this Court pursuant to WBCA Section

17-16-748(a)(i) appointing a custodian to act as President and CEO in place of Schiermeyer.

**SEVENTH CLAIM FOR RELIEF**
**(Direct Claim against Schiermeyer for Breach of Contract)**

119.     True North incorporates and realleges the allegations set forth above as though

fully set forth herein.

120.     As described herein, True North and Schiermeyer executed the Founders

Agreement dated January 1, 2019, with each party to become a 50% owner of the Company. The

Founders Agreement further provided that neither party shall "circumvent or compete with the

BGP Companies in a manner to earn income, hold ownership, vote, or earn rewards from the

services and products of the BGP Companies in a manner to squeeze out or diminish the rights

and Ownership of any other party to this Agreement."

121.     True North has fully performed its contractual obligations under the Founders

Agreement.

122.     As described herein Schiermeyer has breached the Founders Agreement and acted

outside of the scope of his authorized capacity as Director, President, and CEO of BGP by,

among other acts herein described, (a) destroying Company and shareholder assets (including by

burning billions of GALA tokens to which True North was entitled); (b) converting Company

funds for personal use; (c) wasting Company funds; (d) launching competing companies and

omitting True North and other BGP shareholders as shareholders with the same percentage

interests in those entities; (e) cutting Thurston out of the management of BGP without notice or

shareholder vote; (f) causing BGP to provide incomplete, false or misleading financial

information to True North and Thurston; (g) causing BGP to fail and refuse to provide True North or Thurston access to or copies of accurate and complete Company records; and (h) unjustifiably causing BGP to nominally "suspend," but actually convert and exert complete control over, all of True North's nodes—and he has committed such actions to squeeze True North out of, and/or diminish True North's rights and Ownership in, BGP and the BGP Companies.

123.    As a result of Schiermeyer's misconduct, True North has suffered and will continue to suffer damages in an amount to be determined at trial, but which are at more than $75,000. In addition, as True North's damages cannot be adequately compensated through monetary relief, True North seeks preliminary and permanent injunctive relief requiring Schiermeyer to abide by the terms of the Founders Agreement and to reverse the "suspension" of True North's nodes.

124.    Because Schiermeyer threatens to continue his wrongful acts including by keeping True North's nodes turned off or redistributing True North's nodes which would cause True North additional, imminent, and irreparable harm, he must be preliminarily and permanently enjoined from further breaching the Founders Agreement and from keeping True North's nodes "suspended" or shut off.

<u>**EIGHTH CLAIM FOR RELIEF**</u>
**(Direct Claim against Schiermeyer for Breach of the Implied Covenant of Good Faith and Fair Dealing)**

125.    True North incorporates and realleges the allegations set forth above as though fully set forth herein.

126.    Under Wyoming law, in every commercial contract there is an implied covenant

of good faith and fair dealing that obligates the parties to act in accordance with their agreed common purpose and each other's justified expectations, and to refrain from acting in a way that would injure the rights of the other party to receive the benefit of their bargain.

127.    As described herein Schiermeyer has breached the implied covenant of good faith and fair dealing inherent in the Founders Agreement and acted outside of the scope of his authorized capacity as Director, President, and CEO of BGP by, among other acts herein described, (a) destroying Company and shareholder assets (including by burning billions of GALA tokens to which True North was entitled); (b) converting Company funds for personal use; (c) wasting Company funds; (d) launching competing companies and omitting True North and other BGP shareholders as shareholders with the same percentage interests in those entities; (e) cutting Thurston out of the management of BGP without notice or shareholder vote; (f) causing BGP to provide incomplete, false or misleading financial information to True North and Thurston; (g) causing BGP to fail and refuse to provide True North or Thurston access to or copies of accurate and complete Company records; and (h) unjustifiably causing BGP to nominally "suspend," but actually convert and exert complete control over, all of True North's nodes—and he has committed such actions to squeeze True North out of, and/or diminish True North's rights and Ownership in, BGP and the BGP Companies, thereby frustrating True North's ability to receive the benefits of the Founders Agreement.

128.    As a result of Schiermeyer's misconduct, True North has suffered and will continue to suffer damages in an amount to be determined at trial, but which are at more than $75,000. In addition, as True North's damages cannot be adequately compensated through monetary relief, True North seeks preliminary and permanent injunctive relief requiring

Schiermeyer to abide by the terms of the Founders Agreement and to reverse the "suspension" of

True North's nodes.

129.    Because Schiermeyer threatens to continue his wrongful acts including by

keeping True North's nodes turned off or redistributing True North's nodes which would cause

True North additional, imminent, and irreparable harm, he must be preliminarily and

permanently enjoined from further breaching the Founders Agreement and from keeping True

North's nodes "suspended" or shut off.

**NINTH CLAIM FOR RELIEF**
**(Direct Claim against BGP for Breach of Contract)**

130.    True North incorporates and realleges the allegations set forth above as though

fully set forth herein.

131.    As described herein, BGP's Terms and Conditions purport to govern the use of

nodes to generate GALA tokens. These Terms & Conditions memorialize the fact that "[w]hen a

User purchases, earns, or receives any NFT or digital reward the Smart Contract process

[including GALA tokens, as defined in § 1.3 on "GALA Rewards"], the User owns completely

and outright the NFT and/or digital reward." They further acknowledge users' ability to sell or

transfer their GALA tokens via digital exchanges (involving digital platforms such as the

Ethereum network, MetaMask, and Coinbase—which would also encompass trading platforms

like Genesis).

132.    The suspension/termination provision of § 4.1 of BGP's Terms and Conditions

states the following:

> GALA may suspend or terminate the User's right to access or use GALA Services
> immediately and without notice if: (i) GALA determines the User's use of the
> GALA Services poses a security risk to GALA Services or any third party, could

93

adversely impact GALA, GALA Services, GALA Blockchain or any other GALA users, or could subject GALA, its affiliates, or any third party to liability, or could be fraudulent; (ii) the User is in breach of these Terms & Conditions; . . . or (v) for any other reason at GALA's discretion.

133.    True North has fully performed its contractual obligations under BGP's Terms and Conditions, and has not legitimately triggered any of the clauses of the suspension/termination provision.

134.    As described herein, BGP has breached its Terms and Conditions by, among other acts herein described, burning billions of GALA tokens to which True North was entitled, and unilaterally shutting *off* and effectively stealing True North's nodes in an apparent effort to diminish True North's GALA holdings. There is no justification for Schiermeyer's actions, as True North has done nothing wrong—and the provision's "any other reason at GALA's discretion" language cannot be legitimately invoked simply because nodes are generating GALA tokens and those tokens are being sold or traded in the marketplace.

135.    As a result of BGP's misconduct, True North has suffered and will continue to suffer damages in an amount to be determined at trial, but which exceed $75,000. In addition, as True North's damages cannot be adequately compensated through monetary relief, True North seeks preliminary and permanent injunctive relief requiring BGP to abide by its Terms and Conditions and to reverse the "suspension" of True North's nodes.

136.    Because BGP threatens to continue its wrongful acts including by keeping True North's nodes turned off and threatening to redistribute True North's nodes, which would cause True North additional, imminent, and irreparable harm, it must be preliminarily and permanently enjoined from further breaching its Terms and Conditions and from and keeping True North's nodes "suspended" or shut off.

**TENTH CLAIM FOR RELIEF**
**(Direct Claim against BGP for Breach of the Implied Covenant of Good Faith and Fair Dealing)**

137.    True North incorporates and realleges the allegations set forth above as though fully set forth herein.

138.    Under Wyoming law, in every commercial contract there is an implied covenant of good faith and fair dealing that obligates the parties to act in accordance with their agreed common purpose and each other's justified expectations, and to refrain from acting in a way that would injure the rights of the other party to receive the benefit of their bargain.

139.    BGP has breached the implied covenant of good faith and fair dealing inherent in its Terms and Conditions by, among other acts herein described, burning billions of GALA tokens to which True North was entitled, and unilaterally shutting *off* and effectively stealing True North's nodes in an apparent effort to diminish True North's GALA holdings, thereby frustrating True North's ability to receive the benefits of the Terms and Conditions. There is no justification for these actions, as True North has done nothing wrong—and the provision's "any other reason at GALA's discretion" language cannot be legitimately invoked simply because nodes are generating GALA tokens and those tokens are being sold or traded in the marketplace.

140.    As a result of BGP's misconduct, True North has suffered and will continue to suffer damages in an amount to be determined at trial, but which exceed $75,000. In addition, as True North's damages cannot be adequately compensated through monetary relief, True North seeks preliminary and permanent injunctive relief requiring BGP to abide by its Terms and Conditions and to reverse the "suspension" of True North's nodes.

141.    Because BGP threaten to continue its wrongful acts including by keeping True

North's nodes turned off and threatening to redistribute True North's nodes, which would cause True North additional, imminent, and irreparable harm, it must be preliminarily and permanently enjoined from further breaching its Terms and Conditions and from and keeping True North's nodes "suspended" or shut off.

## ELEVENTH CLAIM FOR RELIEF
### (Direct Claim against Schiermeyer and BGP for Conversion)

142.    True North incorporates and realleges the allegations set forth above as though fully set forth herein.

143.    As a result of Schiermeyer's decision to replace all GALA v1 tokens (held in True North's private wallet) with GALA v2 tokens (deposited into a wallet controlled by Schiermeyer)—an action that was committed outside of the scope of his authorized capacity as Director, President, and CEO of BGP—Schiermeyer and BGP (via Schiermeyer's asserted agency) converted over $150 million worth of GALA tokens belonging to True North. Schiermeyer then directed BGP to burn the GALA v2 tokens that should have been provided to True North.

144.    Neither Schiermeyer nor BGP had any right to claim or exercise ownership over any GALA tokens belonging to True North (whether v1 or v2 tokens).

145.    Schiermeyer and BGP have therefore willfully and intentionally converted True North's property, resulting in damage to True North.

146.    As a direct and proximate result of Schiermeyer and BGP's conversion of True North's property (the GALA tokens), True North has been damaged in an amount not less than $150 million.

147.    Further, as a result of Schiermeyer's unilateral decision to turn off and effectively

steal True North's nodes, Schiermeyer and BGP have converted and continue to convert both True North's nodes and the GALA that True North's nodes would have been generating, had they been left on.

148.    Schiermeyer and BGP's multiple instances of conversion constitute acts that result from willful and malicious or intentionally fraudulent conduct or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of True North, entitling True North to an award of punitive damages against Schiermeyer and BGP, in an amount sufficient to punish the conduct in accordance with the law.

149.    As a result of Schiermeyer and BGP improperly shutting-off and effectively stealing True North's nodes, True North has suffered and will continue to suffer damages in an amount to be determined at trial, but which exceed $75,000. In addition, as True North's damages from the turned-off nodes cannot be adequately compensated through monetary relief, True North seeks preliminary and permanent injunctive relief requiring Schiermeyer and BGP to refrain from converting True North's GALA tokens and to reverse the "suspension" of True North's nodes.

150.    Because Schiermeyer and BGP (via Schiermeyer's asserted agency) threaten to continue his wrongful acts including by keeping True North's nodes turned off and threatening to redistribute True North's nodes, which would cause True North additional, imminent, and irreparable harm, they must be preliminarily and permanently enjoined from further converting True North's GALA tokens and keeping True North's nodes "suspended" or shut off.

**TWELFTH CLAIM FOR RELIEF**
**(Direct Claim against Schiermeyer for Tortious Interference with Contract)**

151.    True North incorporates and realleges the allegations set forth above as though

fully set forth herein.

152.    As set forth above, BGP's Terms and Conditions purport to govern True North's use of BGP's software in connection with True North's GALA token-generating nodes.

153.    At all material times, Schiermeyer, as CEO and President of BGP, had knowledge of these contracts.

154.    As alleged herein, by acting outside of his role of CEO and President of BGP and by, for the improper purpose of retaliation, punishment, and personal financial harm, causing BGP to turn off, steal, and convert the proceeds of True North's nodes, Schiermeyer has intentionally and improperly interfered with and induced BGP's breach of these contracts.

155.    As a result of Schiermeyer interfering with these contracts and inducing BGP to improperly shut off and effectively steal of True North's nodes, True North has suffered and will continue to suffer damages in an amount to be determined at trial, but which exceed $75,000. In addition, as True North's damages from the turned-off nodes cannot be adequately compensated through monetary relief, True North seeks preliminary and permanent injunctive relief requiring Schiermeyer and BGP to refrain from converting True North's GALA tokens and to reverse the "suspension" of True North's nodes.

156.    Because Schiermeyer and BGP (via Schiermeyer's asserted agency) threaten to continue his wrongful acts including by keeping True North's nodes turned off and threatening to redistribute True North's nodes, which would cause True North additional, imminent, and irreparable harm, they must be preliminarily and permanently enjoined from further interfering with these contracts and from further inducing BGP to convert True North's GALA tokens and keep True North's nodes "suspended" or shut off.

**THIRTEENTH CLAIM FOR RELIEF**
**(Direct Claim against Schiermeyer and BGP for a Declaratory Judgment)**

157.    True North incorporates and realleges the allegations set forth above as though fully set forth herein.

158.    An actual, concrete, and justiciable controversy exists between True North, Schiermeyer, and BGP as to their respective rights, duties, status, or other legal relations with respect to True North's rights to own, operate, and receive benefits from its Gala nodes without disruption from Schiermeyer's ongoing, unilateral, and unlawful actions and efforts to interfere with, suspend, convert, block, terminate, or transfer such rights.

159.    Under 28 U.S.C. § 2201 and, to the extent they apply, Wyo. Stat. §§ 1-37-101 – 1-37-114 and Cal. Civ. Pro. §§ 1060 – 1062.5, and for the reasons stated herein, True North is entitled to a declaratory judgment that True North's nodes are its sole and exclusive property and that Schiermeyer has no lawful right to interfere with, suspend, convert, block, terminate, or transfer such property rights based upon, without limitation, the following:

   a.   Under the Founders Agreement and sections 3.09 and 4.05 of the Bylaws, all control of the corporation requires the authorization of both Thurston and Schiermeyer as the two Directors on the Board;

   b.   Under the Founders Agreement, True North and Schiermeyer are both obligated to not "circumvent or compete with the BGP Companies in a manner to earn income, hold ownership, vote, or earn rewards from the services and products of the BGP Companies in a manner to squeeze out or diminish the rights and Ownership of any other party to this Agreement";

   c.   Under § 4.05 of the Company Bylaws, while there is a "President" that serves as the chief executive officer of the corporation, the President's general supervision over the business of the corporation is subject to "the control of the board of directors," and the President may only act as "authorized by the board of directors";

   d.   The 14,000 nodes acquired by True North and Schiermeyer were their

personal property and were available to mine GALA as they chose under BGP's Terms and Conditions;

e.   BGP does not itself own any Gala nodes;

f.   True North and Schiermeyer owned and own the GALA rewards that have been, are, and will be generated by their nodes;

g.   True North owned and had the right to transfer the approximately 8.6 billion GALA from the joint wallet(s) to its own wallets;

h.   The over 5 billion GALA that BGP and Schiermeyer burned in or around April 2023 belonged to True North; and

i.   Schiermeyer owed and owes BGP and its shareholders fiduciary obligations, including the highest obligations of candor, good faith, fair dealing, loyalty, and due care, and therefore is duty bound to avoid acting and engaging in transactions on behalf of BGP and using BGP's assets and earnings for his own personal benefit, usurping corporate opportunities rightfully belonging to BGP, disregarding corporate formalities, and taking significant actions without the consent of BGP's Board or its shareholders.

160.   A declaratory judgment is necessary and appropriate to determine the rights and duties of the Parties.

## PRAYER FOR RELIEF

WHEREFORE, True North demands judgment as follows:

A.      On the First, Second, and Third Claims for Relief, (i) for judgment against Schiermeyer for shareholders' benefit in an amount according to proof but no less than $600 million in monetary damages; and, in addition to monetary relief, (ii) for a preliminary and permanent injunction prohibiting Schiermeyer from using BGP's property (intellectual and otherwise) to benefit competing companies; and (iii) ordering Schiermeyer to perform his fiduciary duties to BGP and its shareholders.

B.      On the First, Second, Third, and Fourth Claims for Relief, (i) an order directing Schiermeyer to account for damages he caused and all profits, special benefits, and unjust

enrichment he obtained through his wrongful conduct; (ii) an order for equitable tracing for all profits, special benefits, and unjust enrichment he obtained through his wrongful conduct; and (iii) an order imposing a constructive trust for all profits, special benefits, and unjust enrichment he obtained through his wrongful conduct.

C.      On the Fifth Claim for Relief, for an order preliminarily and permanently removing Schiermeyer as both Director and President/Chief Executive Officer (and/or any other role) of BGP.

D.      On the Sixth Claim for Relief, for an order appointing a custodian to act as President and CEO of BGP in place of Schiermeyer.

E.      On the Seventh, Eighth, Ninth, Tenth, Eleventh, and Twelfth Claims for Relief, for judgment against Schiermeyer for True North's benefit in an amount according to proof but in no event less than $150 million in monetary damages; and, in addition to monetary relief, for a preliminary and permanent injunction ordering Schiermeyer to abide by the terms of the Founders Agreement, to cause BGP to abide by its Terms and Conditions, and to reverse the "suspension" of True North's nodes.

F.      On the Eleventh Claim for Relief, for an order awarding punitive damages on account of Schiermeyer's willful and malicious conversion of True North's property and interference with True North's contracts with BGP in an amount to be determined at trial.

G.  On the Thirteenth Claim for Relief, a declaratory judgment stating that True North's nodes are its sole and exclusive property and that Schiermeyer has no lawful right to interfere with, suspend, convert, block, terminate, or transfer such property rights based upon, without limitation, the following:

a. Under the Founders Agreement and sections 3.09 and 4.05 of the Bylaws, all control of the corporation requires the authorization of both Thurston and Schiermeyer as the two Directors on the Board;

b. Under the Founders Agreement, True North and Schiermeyer are both obligated to not "circumvent or compete with the BGP Companies in a manner to earn income, hold ownership, vote, or earn rewards from the services and products of the BGP Companies in a manner to squeeze out or diminish the rights and Ownership of any other party to this Agreement";

c. Under § 4.05 of the Company Bylaws, while there is a "President" that serves as the chief executive officer of the corporation, the President's general supervision over the business of the corporation is subject to "the control of the board of directors," and the President may only act as "authorized by the board of directors";

d. The 14,000 nodes acquired by True North and Schiermeyer were their personal property and were available to mine GALA as they chose under BGP's Terms and Conditions;

e. BGP does not itself own any Gala nodes;

f. True North and Schiermeyer owned and own the GALA rewards that have been, are, and will be generated by their nodes;

g. True North owned and had the right to transfer the approximately 8.6 billion GALA from the joint wallet(s) to its own wallets;

h. The over 5 billion GALA that BGP and Schiermeyer burned in or around April 2023 belonged to True North; and

i. Schiermeyer owed and owes BGP and its shareholders fiduciary obligations, including the highest obligations of candor, good faith, fair dealing, loyalty, and due care, and therefore is duty bound to avoid acting and engaging in transactions on behalf of BGP and using BGP's assets and earnings for his own personal benefit, usurping corporate opportunities rightfully belonging to BGP, disregarding corporate formalities, and taking significant actions without the consent of BGP's Board or its shareholders.

H. An order awarding True North, as prevailing party, reasonable attorneys' fees as deemed appropriate by the Court.

I. An award of costs to True North, as the prevailing party, as deemed appropriate

by the Court.

J.      Pre-judgment and post-judgment interest at the maximum rate provided by law.

K.      Any other relief that this Court may deem appropriate under the circumstances.

## JURY DEMAND

True North demands a trial by jury.


DATED: November 16, 2023.


GREENBERG TRAURIG LLP

/s/*Marc Rasich*
Marc Rasich
John Huber
Daniel Wadley
Alexander Baker

*Attorneys for Defendants, Counterclaimant, and Crossclaim Plaintiff*

## <u>VERIFICATION</u>

I, Wright Thurston, as Manager of True North United Investments, LLC, declare as follows:

I, Wright Thurston, and True North are the Defendants, and True North is a Counterclaimant and Crossclaim Plaintiff in this action. True North and its representatives are familiar with the allegations and responses contained in the Answer and Counterclaim, and hereby authorize the filing of the Answer and Counterclaim. I verify that the responses and allegations in the foregoing Answer, Counterclaim and Crossclaim are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.


Date: <u>11/16/2023</u>          <u>*/s/ Wright Thurston*</u>

                                        Wright Thurston, on behalf of himself and
                                        True North United Investments, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on this 16 November 2023, a true and correct copy of the foregoing

was filed with the Court's electronic filing system and thereby served on counsel of record.

Paul W. Shakespear
Cameron Cutler
Natalie Beal
SNELL & WILMER LLP
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, UT 84101
pshakespear@swlaw.com
ccutler@swlaw.com
nbeal@swlaw.com

Abram L. Moore
Christian A. Zazzali
K&L GATES LLP
70 West Madison Street, Suite 3100
Chicago, IL 60602
abe.moore@klgates.com
christian.zazzali@klgates.com


GREENBERG TRAURIG, LLP

*/s/ Lindsey Wharton*
Lindsey Wharton