John W. Huber (Utah Bar No. 7226)
Daniel J. Wadley (Utah Bar No. 10358)
Marc T. Rasich (Utah Bar No. 9279)
Alexander Baker (Utah Bar No. 17163)
**GREENBERG TRAURIG, LLP**
222 South Main Street, Suite 1730
Salt Lake City, Utah 84101
Telephone: (801) 478-6900
*john.huber@gtlaw.com*
*wadleyd@gtlaw.com*
*marc.rasich@gtlaw.com*
*bakera@gtlaw.com*

*Attorneys for Defendants, Counterclaimant, and Crossclaim Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ERIC SCHIERMEYER, Derivatively on Behalf of Nominal Defendant, BLOCKCHAIN GAME PARTNERS, INC. D/B/A GALA GAMES, <br>　　　Plaintiff, <br> vs. <br> WRIGHT W. THURSTON and TRUE NORTH UNITED INVESTMENTS, LLC, <br>　　　Defendants, <br><br>　　and <br> BLOCKCHAIN GAME PARTNERS, INC. D/B/A BGP GAMES, <br>　　　Nominal Defendant. | **CONSOLIDATED REPLY IN SUPPORT OF MOTION FOR RESTRAINING ORDER TO MAINTAIN STATUS QUO AND REQUEST FOR IMMEDIATE HEARING** <br><br><br> Case No. 2:23-cv-00589-HCN-DAO <br><br> Judge Howard C. Nielson <br><br> Magistrate Judge Daphne A. Oberg |
| TRUE NORTH UNITED INVESTMENTS, LLC, Derivatively on Behalf of Nominal Defendant, BLOCKCHAIN GAME PARTNERS, INC. D/B/A GALA GAMES, <br>　　　Counterclaimant, <br> vs. <br> ERIC SCHIERMEYER, <br>　　　Counterdefendant, | |

and
BLOCKCHAIN GAME PARTNERS, INC.
D/B/A BGP GAMES,
          Nominal Counterdefendant.

TRUE NORTH UNITED INVESTMENTS,
LLC,
          Crossclaim Plaintiff,
vs.
BLOCKCHAIN GAME PARTNERS, INC.
D/B/A BGP GAMES,
          Crossclaim Defendant.

## SUMMARY OF ARGUMENT[1]

In its moving papers, True North asked this Court to restore the status quo—where both

True North and Schiermeyer exercised control over the 7,000 Founders nodes they each received

as founders of BGP—before Schiermeyer engaged in his latest extra-judicial self-help and

suspended True North's Nodes, then effectively stole them by removing them from True North's

account at BGP.[2]

In response, Schiermeyer and BGP claim that the TRO must be denied because (a) the

requested relief is a disfavored type of restraining order; (b) Wright Thurston, not True North,

owns the Nodes and, thus, True North has no standing; (c) the Founders Agreement is an

---

[1] True North submits this Consolidated Reply in response to the oppositions of both Schiermeyer
and BGP. As such, it has limited the Reply to 20 pages—the combined total allowed for
responses to each opposition individually.

[2] In an act that was surely a stunt for the benefit of this Court and other Gala node owners,
Schiermeyer elected to turn off his nodes as well. Of course, his nodes were not suspended by
BGP as (True North's were) and, even if they were, he can simply instruct the BGP to simply
turn them back on whenever he chooses. He has lost none of the possession or control he has
caused BGP (his *de facto* alter ego) to take from True North.

aspirational only non-compete agreement and, thus, Schiermeyer can act unfettered to deprive True North of all its rights and interests of ownership; (d) under the Terms and Conditions BGP, without limitation, can simply suspend or terminate any and all node owners' rights in their nodes (and the rewards that the nodes would generate); and (e) True North's harm is compensable in fiat currency and not irreparable. None of these arguments have merit.

First, there is no basis for imposing a heightened burden on True North. Regardless of the label Schiermeyer[3] seeks to attach to it, the relief requested in this Motion is prohibitory—prohibiting Schiermeyer from blocking True North's access to and control over the Nodes and True North's BGP account (i.e., turning the Nodes back on and returning True North's access to and control over them). None of Schiermeyer's semantic games can change that fact. Likewise, no matter how far back in time Schiermeyer seeks to go, the last peaceable status quo was True North controlling access to and the operation of its own Nodes, just like Schiermeyer and every other node owner enjoys (even if True North and Schiermeyer had agreed not to run their respective nodes for a period of time that ended in June). The TRO simply seeks a return to that state. Nothing more.

Second, True North owns the Nodes. The seminal agreement through which BGP was created and Schiermeyer and True North obtained their respective Founders' Nodes is the "Founders Agreement." While that Agreement is signed by Thurston, he signed as True North's manager. His signature does not change the fact that True North is the owner of the Nodes. Nor, despite Schiermeyer's claims to the contrary, does the single data entry field in a company-

---

[3] Because Schiermeyer treats BGP as his alter ego circumventing all forms of corporate governance, True North hereafter often refers to both Schiermeyer and BGP as "Schiermeyer."

created and company-maintained database table identifying Thurston as the contact for the 7,000 True North Nodes. The fact that a data entry point requires an individual to be associated with a node does not change the legal ownership of that node. Indeed, this is simply an unsupported, convenient, and incorrect argument conjured by Schiermeyer to oppose this Motion.[4]

Third, no semantic games can change the fact that Schiermeyer has both breached the Founders Agreement and caused BGP to breach the Terms and Conditions. The Founders Agreement provides that the two founders (Schiermeyer and True North) would "earn revenue, cryptocurrency, digital assets and rewards, legendary items, hold stock or other equity interests, and other consideration (collectively 'Ownership') from each of the BGP Companies." The digital assets and rewards are fully "vested" "personal property." And, under the Founders Agreement, the Nodes, and the digital assets they generate, are True North's fully vested personal property. Schiermeyer has no right to interfere with them.

The Agreement is not simply a non-compete. It also prohibits Schiermeyer from doing anything that would "circumvent" BGP "to squeeze out or diminish the rights and Ownership" of True North. Yet Schiermeyer has done exactly that: circumvented all forms of corporate

---

[4] Schiermeyer's effort to push ownership of the Nodes to Thurston is a subtle concession to the fact that True North has done nothing that could possibly support the extra judicial action taken by Schiermeyer in shutting off the Nodes. To the extent that Schiermeyer has concerns with Thurston, those concerns are the subject of the instant litigation. But True North has owned and controlled its Nodes for years, and Schiermeyer has failed to identify any action by True North that could support the punitive action here.

To the extent the Court requests it in the aid of granting the requested relief, True North can provide further proof of ownership and/or add alternative claims on behalf of Thurston. Nevertheless, there simply is no evidence to suggest that anyone other than True North owns its 7,000 Founders Nodes.

governance causing BGP to suspend the Nodes without basis or process to support his own personal vendetta in plain breach of the Founders Agreement.

Fourth, the Terms and Conditions likewise do not support Schiermeyer's *ultra vires* act. Each of the claimed acts of alleged wrongdoing occurred long before the suspension. Most of the claimed wrongs were already rejected as a viable basis for injunctive relief having occurred years ago. The sale of GALA generated from the Nodes had been occurring since at least June without interruption or complaint. And the discretion provided to BGP under the Terms and Conditions is not unfettered. Rather, at the very least it is subject to a requirement of good faith and fair dealing, which has clearly been breached in pursuit of Schiermeyer's personal interest. To hold otherwise would render BGP's consideration (the Nodes) for the millions of dollars in value provided by True North worthless and would render both the Founders Agreement and the Terms and Conditions illusory.

Fifth, unlike the harm in Schiermeyer's TRO, the harm addressed in True North's Motion is both ongoing and irreparable. Schiermeyer does not credibly contest that the Nodes are personal property and their loss irreparable. Nor could he, as the Nodes are unique personal property. Further, the losses of GALA (and other digital assets) are ongoing and compounding—GALA are being distributed every day pursuant to a smart contract and a complex and changing algorithm that is difficult if not impossible to retroactively recreate. The GALA that is minted is being distributed to tens of thousands unique node owners not before the Court. There is simply no reasonable means of getting it back once distributed. And the ability of Schiermeyer or BGP to pay for any damages, even if readily calculable (which they are not), is suspect. Schiermeyer

admits that BGP must sell millions of GALA a day just to partially fund its operations and at least one of BGP's contract partners has sued the company for failing to pay its debts.

In short, Schiermeyer's suspension and effective theft of the Nodes is unlawful, circumvents any form of corporate governance, and is causing True North imminent and irreparable harm. The Motion should be granted.

## ARGUMENT

### I.     True North Seeks Only a Return to the Status Quo

Schiermeyer and BGP attempt to shoehorn True North's request that BGP be required to return and turn back on the Nodes into all three of the "disfavored" injunction categories. *See* ES Opp. at 4-5; BGP Opp. at 15. But no heightened showing is required here.

While "preliminary injunctions that alter the status quo" are generally disfavored, *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1259 (10th Cir. 2005), the proposed TRO here is not seeking to alter but to *return to* the status quo. Schiermeyer argues that "[i]n any conceivable formulation of the last peaceable status quo, Thurston's Gala Nodes were dormant." ES Opp. at 4. This misses the point. The ability to turn on or off Gala nodes is a fundamental entitlement of all node owners. No matter how far back Schiermeyer wishes to go, in the last peaceable state *True North had control over its unsuspended Nodes, with the option of turning them on or off according to its own discretion*. Just like with Schiermeyer's own nodes, from the time True North's ownership of the Nodes vested (which was immediate under the Founders Agreement) until they were unlawfully suspended, True North controlled them, with the option of running them or not on any given day. Indeed, until Schiermeyer lost his TRO, both he and True North had been

running their respective nodes for months without dispute about their operation.[5]

Schiermeyer also suggests that the colloquial use of the word "mandatory" in the caption of True North's TRO Motion somehow establishes that the relief requested is a "mandatory" (term of art) injunction rather than a "prohibitory" one. It does not. Although the question of whether an injunction is mandatory or prohibitory is one that often vexes[6] courts, the issue is not semantics. Rather, as the Tenth Circuit has clarified "[w]e characterize an injunction as mandatory if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, *and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction*.'" *Schrier*, 427 F.3d at 1261 (emphasis added) (quoting *O Centro*, 389 F.3d at 979). Here, the requested TRO can obviously be styled as (and is) prohibitory—prohibiting Schiermeyer and BGP from further blocking True North's access to and control over the Nodes (i.e., turn the Nodes back on and return them to (or put them back in) True North's Gala Games account). *See CRST Van Expedited, Inc. v. J.B. Hunt Transp., Inc.*, 2006 WL 335765, at *13 (W.D. Okla. Feb. 14, 2006)

---

[5] Schiermeyer's assertion that it was the "recent [June 2023] activation of [the] nodes that triggered the suspension" is disingenuous. *See* ES Opp. at 16. He did not cause BGP to suspend the Nodes (thereby shutting them off) in June. Instead, he waited until October 10th, the day after losing his TRO, to do so and then alleged largely the same grounds for suspension (which took place years ago) that the Court rejected as grounds for his TRO given the passage of time.

[6] *See, e.g.*, *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1006 (10th Cir. 2004) ("There is no doubt that determining whether an injunction is mandatory as opposed to prohibitory can be vexing.") (Seymour, J., dissenting in part); *SRS Acquiom Inc. v. PNC Fin. Servs. Grp., Inc.*, 2020 WL 3256883, at *3 (D. Colo. Mar. 26, 2020) ("The Court admits that in many cases trying to resolve what constitutes a mandatory injunction versus a prohibitory one, or which side is seeking to alter the status quo feels more metaphysical than legal or factual.").

("The mere fact that a defendant on the receiving end of an injunction would actually have to do something (in this case, implement routine administrative measures) in order to see to it that the prohibitory provisions of the preliminary injunction are not violated does not convert an essentially prohibitory injunction into a mandatory injunction within the meaning of *Schrier* or the cases cited therein."). Granting True North's requested relief would not require the Court to engage in any ongoing supervision unless Schiermeyer invents yet another way to engage in extra-legal self-help.

True North's requested TRO also does not "afford the movant *all the relief* that it could recover at the conclusion of a full trial on the merits." *Schrier*, 427 F.3d at 1259. There are numerous other claims for relief in True North's counterclaims and crossclaims. In fact, as this Court knows, True North filed its own direct and derivative claims in a separate action well before Schiermeyer's further *ultra vires* act caused BGP to suspend wrongfully True North's Nodes. The suspension is only the most recent development in Schiermeyer's campaign of unlawful efforts to drain True North's assets of value. Moreover, the Tenth Circuit has explained that "a preliminary injunction falls into the all-the-relief category only if its effect, 'once complied with, cannot be undone'"—and the Court cannot "put the toothpaste back in the tube." *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 798 (10th Cir. 2019) (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1248 (10th Cir. 2001)). Here, the Court's order prohibiting Schiermeyer and BGP from further blocking True North's control of and access to its Nodes could be undone—the very fact that BGP was able to suspend and remove the Nodes from True North's account establishes this fact.

For these reasons, the TRO sought here is not a disfavored variety. Rather, it is a straightforward request to return the Parties to the status quo.

**II.     True North Has Established Each of the TRO Elements**

*1.   True North Has Established a Likelihood of Success on the Merits*

True North has established a strong likelihood of success on the merits that Schiermeyer and BGP have "unjustifiably fail[ed] to timely perform" their obligations under the Founders Agreement and the Terms and Conditions. *Sinclair Wyoming Refinery Co. v. A&B Builders, LTD.*, 2019 WL 13177803, at *3 (D. Wyo. Aug. 23, 2019) (quoting *Schlinger v. McGhee*, 268 P.3d 264, 268 (Wyo. 2012)). As this Court knows, the Founders Agreement—the foundational document governing the parties' relationship—makes clear that it is between Schiermeyer and True North, and that True North owns the Nodes at issue. Further, True North has done nothing to violate the Terms and Conditions between it and BGP and has only engaged in actions that all other node owners are allowed to engage in. In their responses, BGP and Schiermeyer deny that Schiermeyer breached the Founders Agreement and deny that BGP breached the Terms and Conditions. They are wrong on both fronts.

A.  Founders Agreement

In its Motion, True North argued that Schiermeyer breached the Founders Agreement by (1) unilaterally shutting off and effectively stealing True North's nodes, which breached the provision prohibiting either party from circumventing or competing with BGP in a manner that would squeeze out or diminish the rights and ownership of the other party; and (2) unilaterally burning True North's GALA, which Schiermeyer admits was done in order to diminish True North's GALA holdings and revenue. In response, Schiermeyer argues: (1) the Founders

Agreement is a vague noncompetition agreement that does not control the governance of Gala nodes in any fashion and does not address node ownership or operation; (2) Thurston, not True North, is the owner of the suspended Nodes, and thus True North lacks standing; (3) the Nodes are governed by the Terms and Conditions, not the Founders Agreement, and thus suspension of the Nodes pursuant to the Terms and Conditions could not breach the Founders Agreement; (4) True North's motion and briefing do not substantively address the elements of a breach of contract claim or make any valid argument that Schiermeyer breached any specific provision of the Founders Agreement; and (5) True North has not shown it is likely to prove that Schiermeyer's actions in directing suspension of the Nodes pursuant to the Company's discretion under the Terms and Conditions constituted a breach of the separate Founders Agreement. *See generally* ES Opp. None of these are valid.

First, the Founders Agreement is not a "vague noncompetition agreement." Rather, it is the *foundational* document governing the party's relationship and contains explicit language relating to nodes. The Agreement stipulates that both Schiermeyer and True North would be entitled to "acquire income, cryptocurrency, digital assets, rewards, legendary items, hold stock or other equity stakes, and other forms of compensation (collectively referred to as 'Ownership') from each of the Companies." The digital assets and rewards are considered completely "vested" and classified as the founder's exclusive "personal property." As per the terms of the Founders Agreement, nodes and the digital assets they produce are regarded as each party's "personal property" and are "vested" digital assets and rewards.

Second, True North owns the Nodes, as the Founders Agreement is between Schiermeyer and True North, and the Terms and Conditions are signed by Thurston as True North's Manager.

As discussed, the existence of a data entry field in a company-created, company-maintained database does not alter the legal ownership of the Nodes by True North. Data entry and colloquial language in text messages is of no import; executed and legally binding contractual agreements (i.e., the Founders Agreement) control.

Third, though some aspects of node ownership are governed by the Terms and Conditions (which Schiermeyer caused BGP to breach), the Founders Agreement unquestionably outlines the overarching rights and obligations of the two (and only) founders regarding the digital assets created by BGP, which includes nodes and node rewards. Once again: the Founders Agreement specifies that True North is entitled to "acquire income, cryptocurrency, digital assets, rewards, legendary items, hold stock or other equity stakes, and other forms of compensation (collectively referred to as 'Ownership') from each of the Companies." It is hard to imagine, even using Schiermeyer's imaginative thinking, a scenario in which this provision does not refer to nodes, which indisputably generate "cryptocurrency, digital assets, rewards, [and] legendary items[.]"

Fourth, despite Schiermeyer's claims to the contrary, True North explains in the Motion each of the elements of breach. *See* TRO Motion at 10–17. In short, the Motion establishes that Schiermeyer breached the Founders Agreement by circumventing BGP—acting without shareholder or board notice or approval—and shutting off True North's nodes with no legitimate justification. This act was spurious, taken in response to losing his own TRO, and taken in bad faith to diminish the rights and assets of True North. It is a breach of the express language of the

Founders Agreement which prohibits Schiermeyer from "circumventing" BGP in a manner "that "diminishes" True North's rights and interests.[7]

In short, there can be no doubt that Schiermeyer breached the Founders Agreement, and thus that True North was and is being harmed because of his decision to turn off True North's Nodes.

### B.  Terms and Conditions

In its Motion, True North argued that BGP breached the Terms and Conditions by suspending the Nodes despite True North's compliance with the Terms and Conditions; and invoked outdated, unrelated, and unsubstantiated allegations against Thurston that are insufficient to support punitive action against True North. In response, BGP and Schiermeyer argue that Thurston, not True North, owns the Nodes; that BGP has the unfettered right to suspend or terminate the Nodes for any reason or no reason at all; and that Thurston, not BGP, has breached the Terms and Conditions. *See* ES Opp. at 6, 12–17; BGP Opp. at 7. BGP and Schiermeyer are wrong.

First, as described above, and as established by the Founders Agreement, True North, not Thurston, is the owner of the Nodes. No entry in the database table or casual text exchange can change that fact.

---

[7] Schiermeyer's claim that causing BGP to suspend the Nodes, then remove them from True North's account cannot violate the terms of Founders Agreement because they were proper under the Terms and Conditions, is likewise specious. Given that Schiermeyer treats BGP as his alter ego, directing the company do something is akin to doing it himself and the result is the same— circumventing the proper corporate governance to achieve a personal goal—reducing True North's rights and interests in BGP.

Second, as described in detail in the Motion, none of the purported grounds for suspension are supported by credible argument or evidence. The allegedly improper acts identified were all taken by Thurston, not True North, and they are dated, unrelated, and unsupported. *See* TRO Motion at 12–13. The sale of GALA by True North has been occurring for four months without interruption or complaint and its sales of GALA pales in comparison to the ongoing sale by Schiermeyer and BGP to partially fund operations. *Id.* at 9. The claimed threat of a rug pull is, therefore, spurious.

The timing of Schiermeyer's *ultra vires* decision to cause BGP to suspend True North's Nodes is revealing: given that True North turned on the Nodes in June, as Schiermeyer admits, why did Schiermeyer wait to turn them off until the day after this Court denied Schiermeyer's TRO? The answer is simple: because he again brazenly decided to take matters into his own hands to artificially and extra-judicially achieve the goal of his failed TRO. But Schiermeyer's latest effort at self-help is just as unlawful as this first.

Third, the reliance on the catch-all provision of the Terms and Conditions that provides BGP free authority to suspend nodes is misplaced.[8] Under California law, parties to commercial contracts are not afforded unfettered discretion to act for any or no reason at all, even if an agreement suggests that they are entitled to do so. Instead, "the implied covenant of good faith is [] applied to contradict an express contractual grant of discretion when necessary to protect an agreement which otherwise would be rendered illusory and unenforceable." *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 806, 48 Cal. Rptr. 2d 747, 751 (1995). Indeed, "[i]t is well

---

[8] Schiermeyer cites to cases interpreting at-will employment contracts and lease agreements. Those cases are factually and legally inapposite.

settled that an implied covenant of good faith and fair dealing will be imposed to limit a party's discretion when necessary to protect an agreement that otherwise would be rendered illusory and unenforceable." *City of Chula Vista v. Stephenshaw*, 91 Cal.App. 5th 352, 429 (Cal. Ct. App. 2023). Here, the only consideration provided by BGP in this transaction were the Nodes. If, as argued, BGP (at Schiermeyer's direction) could suspend or terminate any or all node owners' nodes for any or no reason at all, despite receiving thousands and thousands of dollars in value as consideration for each such node, the agreements through which the Nodes were acquired and through which their use is controlled would be illusory and unenforceable. That is a "textbook case" in which "a promise to use good faith would necessarily be implied" to create the needed mutuality. *See Third Story Music, Inc.*, 41 Cal. App. at 808.[9] As described above and in the Motion, Schiermeyer and BGP have no legitimate basis for their actions and thus have breached the implied covenant of good faith and fair dealing in exercising the discretion afforded by the Terms and Conditions.

### 2. *True North has Made a Strong Showing of Irreparable Harm*

True North has already detailed in its Motion how this action is different from the TRO motion brought by Schiermeyer: namely, while Schiermeyer's claim was for alleged theft of a specific amount of fungible GALA at a finite, retrospective moment in time, the harm here involves unique property that generates variable value on a daily basis in a manner that cannot be readily recaptured after the fact. Nevertheless, Schiermeyer and BGP continue to argue that True

---

[9] True North filed its Amended Complaint on November 16, 2023, which contains additional claims against Schiermeyer and BGP, including a claim for breach of the implied covenant of good faith and fair dealing in both the Founders Agreement and the Terms and Conditions. *See* Docket No. 75.

North will suffer no irreparable harm here because (1) the Nodes are not unique; (2) any damages would be easy to calculate; and (3) any concerns about BGP's solvency are unfounded. Schiermeyer is wrong.

First, neither Schiermeyer nor BGP credibly disputes that the Nodes are unique property and that their loss is irreparable, which is a key point that distinguishes this action from Schiermeyer's TRO.  Indeed, Schiermeyer fails to sufficiently refute or address the fact that excluding someone from the use and benefit of his or her property constitutes an irreparable harm. Thus, this point should be deemed waived and/or conceded by Schiermeyer. *See Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768 (10th Cir. 2001) (affirming district court's summary judgment against plaintiff's claim because plaintiff had "abandoned [the] claim by failing to address it in his response to defendants' motion for summary judgment"); *see also Criner v. Ppf Amli 10020 Trainstation Circle, LLC,* No. 21-CV-02693-MEH, 2023 WL 6551516, at *16 (D. Colo. Sept. 26, 2023) (when plaintiff's response failed to address defendant's arguments on an issue, defendant was deemed to have conceded the issue) (citing *Phillips v. Calhoun*, 956 F.2d 949, 953-54 (10th Cir. 1992)). BGP addresses this unique property issue only briefly, claiming that a node's unique alphanumeric identifier makes it no different from a fungible stock certificate. But this logic is flawed. A stock certificate does nothing more than serve as a representative placeholder for value, while a node is a tool that actively collects and generates value and can be controlled and used at a holder's direction. Thus, restricting a Node holder's right to exercise that collecting and generative function is an infringement on a unique property right that is far different from a static stock certificate. Thus, irreparable harm exists here.

Second, Schiermeyer and BGP's claims that any damage from turning off the Nodes can be calculated with "simple math" is overly simplistic and misrepresents the nature of the Nodes. *See* BGP Opp. at 10. In reality, GALA are being distributed everyday pursuant to a smart contract and a complex and changing algorithm that is difficult if not impossible to retroactively recreate. Furthermore, Schiermeyer and BGP completely neglect the fact that the *trading price* of GALA cannot be reduced to such a simple equation. As noted in the Motion, cryptocurrency markets are extremely volatile, and the market price or value of a cryptocurrency can change even on a minute-to-minute basis. *See* TRO Motion at 8. These oscillations in the value of GALA each day, and even each hour, mean that had the Nodes been running, True North would have had millions of different opportunities to sell its GALA at millions of different price points. Thus, discerning the loss in value of this ongoing daily harm is a purely speculative endeavor that would be nearly impossible to calculate. Again, this situation is markedly different from the loss alleged by Schiermeyer in his TRO, in which the alleged theft of a specific amount of GALA that was sold into the market occurred at a finite, retrospective moment in time at which the exact trading price of the GALA could be identified and calculated.

Third, the risk of BGP lacking sufficient funds to compensate True North fully for the lost GALA and the use of its Nodes is a real and substantial risk. Even putting aside the actions for nonpayment brought by BGP's partners, Schiermeyer's reckless monthly dumping of GALA is more than sufficient to create a real and concrete risk of nonpayment. In their respective oppositions, neither Schiermeyer nor BGP address Schiermeyer's erratic and abusive mismanagement of the Company, including his unsustainable directive that BGP liquidate millions of dollars' worth of GALA each month. This dumping of GALA is not an uncertain or

subjective event, but a real occurrence that is happening regularly and draining the amount of funds available for True North's recovery. Thus, as analyzed above, by failing to address this dumping, Schiermeyer and BGP have effectively conceded this point.

> ### 3. *True North has Made a Strong Showing that the Balance of Harms and Public Interest Factors Favor a TRO*

Finally, True North has made a strong showing that without the requested injunctive relief, the balance of harms weighs heavily in True North's favor. As discussed above, the harm to True North in the absence of the requested relief is imminent and irreparable. In contrast, Schiermeyer and BGP have not shown any harm they will suffer if the injunctive relief is granted.

While Schiermeyer and BGP assert that turning True North's Nodes back on will harm both node owners and the system at-large, they fail to recognize that node owners receiving less GALA is not a bug—it's a feature. The system is designed to distribute the GALA between and among more nodes the number of nodes in operation is higher. It is a setup that node owners understood when they decided to purchase nodes and participate. These other node owners would not be prejudiced by having to share in the distribution with True North's Nodes. In fact, these other node owners are currently receiving a windfall under this system from True North's Nodes not being on.

Beyond this, Schiermeyer does not address his own daily GALA dumping. If True North selling off node-generated GALA is an egregious issue, it begs the question why Schiermeyer has no issue with himself (or BGP) allegedly harming the system in the same way. In the same vein, if True North turning on its Nodes is a concern, why did (a) Schiermeyer and BGP wait four months to turn off True North's Nodes, and (b) why did Schiermeyer turn his own nodes on

at that same time 4 months ago? Moreover, and importantly, the same amount of overall GALA will be distributed per day to the node owners, with no restrictions on the node owners' ability to sell the GALA into the market regardless of whether the True North's Nodes are turned on. In other words, the Gala community may themselves dump this very same GALA that Schiermeyer claims is problematic. As such, Schiermeyer's alleged "rug pull" justification for shutting off True North's Nodes is just a pretext.

Lastly, the GALA is being distributed daily to thousands of unique node owners not before the Court, which means that, when it comes time for True North to collect the GALA it is rightfully owed, there will be no viable way to get it back, and certainly no way to do so without impacting many blameless third parties. Thus, public policy suggests that turning the Nodes back on will have much less of a detrimental effect on third parties and would take minimal effort, while trying to recover True North's Gala after the fact would be complicated and challenging at best.

### 4. True North's Hands Are Clean

Schiermeyer asserts that the doctrine of unclean hands should preclude Thurston and True North from any relief because they have "stolen billions of GALA tokens from the Company and dissipated the GALA in a complex scheme of multi-layering and commingling, wrongfully enriching themselves to the tune of $130 million." *See* ES Opp. at 21. But this is merely an allegation, not an established fact supported by evidence. Regardless, Thurston did not steal any GALA, and the Terms and Conditions explicitly state that a node owner, running his node "owns completely and outright the NFT and/or digital reward[s]." Accordingly, any

assertion that True North cannot do *whatever it pleases* with the digital rewards generated by *its own nodes* is incorrect.

### III.   There Is No Need for a Security Bond

Schiermeyer and BGP assert that if the Court grants the TRO, it should require True North and Thurston to post a $700 million security bond in accordance with Federal Rule of Civil Procedure 65(c)—an amount that matches the approximate value of the suspended Gala Nodes. "[A]" trial court has 'wide discretion' in setting the amount of the preliminary injunction bond." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1158 (10th Cir. 2001). While there are no specific factors the trial court must consider, Utah Courts have considered (a) the need to preserve the status quo, and (b) the nature of the claimed harm and whether it is speculative. *EcoNova, Inc. v. DPS Utah*, 2012 U.S. Dist. LEXIS 169479, *47-48, 2012 WL 5944257.

Here, Schiermeyer and BGP claim that were they required to turn the Nodes back on, they would suffer harm matching the value of the suspended Nodes. They offer no other justification for the number. They have not demonstrated how turning the Nodes back on would result in harm to themselves or other node owners, let alone harm adding up to $700 million. Indeed, it strains credulity. Even they admit that either Thurston or True North own the Nodes. True North provided substantial consideration to acquire them. The potential loss described is True North's (or Thurston's under Schiermeyer's fictitious facts), not BGP's loss. Without more, the Court should grant the TRO without requiring a bond, which would restore the status quo and permit True North to exercise its rights over its own property.

## **<u>CONCLUSION</u>**

For these reasons, and those stated in the Motion, True North requests that the Court

grant the Motion and enter an order prohibiting Schiermeyer and BGP from interfering with True

North's access to and control over the Nodes (i.e., requiring them to immediately turn back on

and restore True North's account access and Nodes), and to refrain from terminating or

otherwise distributing the Nodes to BGP employees.

DATED: November 17, 2023

*/s/ Marc Rasich*
Marc T. Rasich
John W. Huber
Daniel J. Wadley
Alexander Baker

*Counsel for Defendants, Counterclaimant,*
*and Crossclaim Plaintiff*

19

## CERTIFICATE OF SERVICE

I hereby certify that on the 17 November 2023, a true and correct copy of the foregoing

was filed with the Court's electronic filing system and thereby served on counsel of record.

Paul W. Shakespear
Cameron Cutler
Natalie Beal
SNELL & WILMER LLP
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, UT 84101
pshakespear@swlaw.com
ccutler@swlaw.com
nbeal@swlaw.com

Abram L. Moore
Christian A. Zazzali
K&L GATES LLP
70 West Madison Street, Suite 3100
Chicago, IL 60602
abe.moore@klgates.com
christian.zazzali@klgates.com

David L. Mortensen
Monica S. Call
FOLEY & LARDNER LLP
95 S. State Street, Suite 2500
Salt Lake City, UT 84111
dmortensen@foley.com
mcall@foley.com

GREENBERG TRAURIG, LLP

/s/ *Lindsey Wharton*