Paul W. Shakespear (14113)
Cameron Cutler (15116)
Natalie Beal (18311)
SNELL & WILMER L.L.P.
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, Utah 84101
Telephone: 801.257.1900
Facsimile: 801.257.1800
Email: pshakespear@swlaw.com
       ccutler@swlaw.com
       nbeal@swlaw.com

Abram I. Moore (admitted *pro hac vice*)
Christian A. Zazzali (admitted *pro hac vice*)
K&L GATES LLP
70 West Madison St., Suite 3100
Chicago, IL 60602
Telephone: 312.781.6010
Facsimile: 312.827.8000
Email: abe.moore@klgates.com
       christian.zazzali@klgates.com

*Attorneys for Plaintiff Eric Schiermeyer*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| ERIC SCHIERMEYER, Derivatively on Behalf of Nominal Defendant, BLOCKCHAIN GAME PARTNERS, INC. D/B/A GALA GAMES,<br><br>Plaintiff,<br><br>vs.<br><br>WRIGHT THURSTON and TRUE NORTH UNITED INVESTMENTS, LLC,<br><br>Defendants,<br><br>BLOCKCHAIN GAME PARTNERS, INC. D/B/A GALA GAMES,<br><br>Nominal Defendant. | **SURREPLY IN OPPOSITION TO MOTION FOR MANDATORY RESTRAINING ORDER**<br><br>Case No. 2:23-cv-00589-HCN-DAO<br><br>Judge Howard C. Nielson<br><br>Magistrate Judge Daphne A. Oberg |

Plaintiff Eric Schiermeyer, derivatively and on behalf of Nominal Defendant Blockchain Game Partners, Inc. ("Gala Games" or the "Company"), respectfully files this surreply in opposition to Defendants' Consolidated Reply in Support of Motion for Mandatory Restraining Order to Maintain Status Quo and Request for Immediate Hearing (the "Reply") (Dkt. No. 76).

4870-1367-2595

I.  **Introduction**

In his Opposition to the Motion, Plaintiff identified fatal deficiencies in True North's counterclaims and the Motion. Thereafter, mid-briefing, True North filed amended counterclaims, amended the caption of its Motion (it no longer seeks a "MANDATORY" injunction), offered new arguments in its Reply, and made a number of bald factual claims that are unsupported by any citation to evidence. These eleventh-hour maneuverings change nothing. As set forth more fully below, True North fails to make a strong showing of irreparable harm, likelihood of success on the merits, or that a balancing of interests favors a mandatory injunction.

Notably absent from True North's Reply is any mention of a purported scheme to take Thurston's nodes and distribute them to Company employees, as was initially raised by True North in the Motion. This is yet another incendiary story from a Thurston declaration, cavalierly splashed throughout a federal filing, but then quickly and summarily disproven by documentary evidence and quietly abandoned.

The amended counterclaims, amended caption, and any allegations raised for the first time on Reply are of no consequence; the Motion should be denied.

II. **Argument**

    A.    **True North's amended caption does not change the nature of the requested injunction, which is disfavored.**

The caption of True North's Motion states that it is a "MOTION FOR **MANDATORY** RESTRAINING ORDER." (Dkt. No. 63 (emphasis added).) In its Reply, True North changed the caption to state "MOTION FOR RESTRAINING ORDER," arguing that the requested injunction is not actually mandatory and that its prior use of the word "mandatory" was "colloquial." (Dkt. No. 76, Reply, p. 6.) But there is no difference between the colloquial and

legal meaning. True North asks the Court to mandate that the Company "turn back on" the nodes (*i.e.*, that the Company be ordered to *do something*), not that the Company be prohibited from doing anything. (Dkt. No. 63, Motion, p. 18.) This is by definition a mandatory injunction, and True North does not dispute that mandatory injunctions are disfavored.

True North also wrongly argues that, when determining the last peaceable status quo, the Court should look to True North's legal rights (arguing that legally it had "the option of turning [the nodes] on or off according to its own discretion") rather than the reality of the existing status of the nodes. This is directly contrary to controlling precedent. *See, e.g., Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001) (in determining status quo, the court "looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights"). It is undisputed that the nodes were dormant in the last peaceable status quo, just as they are today.

True North does not dispute that the requested injunction would afford it all the relief it could recover at the conclusion of a trial on the merits *relating to the operation of Thurston's nodes*. Unrelated claims that could afford additional relief are irrelevant. Further, True North fails to explain how the wrongful distribution of GALA to Thurston, rather than to third-party Gala Node owners who would receive the GALA absent an injunction, could possibly be undone if it is proven at trial that the Company was entitled to suspend the nodes.

B. **True North's amendments and new arguments fail to support its claim to ownership of the suspended Gala Nodes**

True North concedes that the Company's records show that the suspended Gala Nodes are owned by Wright Thurston, but argues this is only because the Company "requires an individual to be associated with a node." (Dkt. No. 76, Reply, p. 3.) No evidence is cited for

this contention, and Thurston knows it is false. Another company he controls, Connect United, owns Gala Nodes that are registered not to any individual but to "Connect Gala Nodes." An excerpt from the Company's node database reflects this:



If True North owned nodes, its name could and would be reflected in the node database as well.

True North fails to produce a single record (*e.g.*, its own tax returns, any company financial statement, etc.) suggesting that it owns even a single Gala Node, much less $700 million worth that it claims. True North relies exclusively upon the Founders Agreement, arguing that it "makes clear . . . that True North owns the Nodes at issue." (Dkt. No. 76, Reply, p. 8.) True North argues (a) that the Founders Agreement refers to unspecified "digital assets" that would be earned by future entities, (b) that nodes generate "digital assets," and (c) that therefore the Founders Agreement somehow conveys ownership of (as yet nonexistent) Gala Nodes from the Company to True North. *Id*. The argument is hard to even follow. In fact, the Company did not convey Gala Nodes to True North in the Founders Agreement. The Company is not even a party to the agreement and there is no reference to Gala Nodes in the agreement (nor could there be, as Gala Nodes *did not yet exist*).

        C.      **True North identifies no irreparable injury it would suffer if the Gala Nodes remain suspended**

Faced with straightforward testimony demonstrating precisely how to ascertain the amount of lost GALA tokens at trial, True North argues that this calculation is "overly simplistic." (Dkt. No. 76, Reply, p. 15.) However, True North does not offer any contrary

*evidence* suggesting that this method is incorrect, and thus concedes that the amount of so-called "lost" GALA will be readily ascertainable at trial, should it succeed with its claims.

True North argues that establishing a value of the fixed amount of lost GALA "would be nearly impossible," because the market price fluctuates. *Id.* But each loss of GALA will occur at a finite moment of time that, at trial, will be retrospective. This is no different than valuing the billions of GALA Thurston stole from the Company, which True North argues *is* possible.

Further, True North does not identify any "loss" from the suspension of the Gala Nodes other than the purely economic loss of GALA the nodes would generate. Thus its argument that suspension of the nodes constitutes some separate infringement of a unique property right is unavailing. Indeed, True North's new contention that it has lost unique property is contrary to its requested injunction, which does not request the return of unique property, but rather that the Company be ordered to turn the nodes back on so they generate future or further GALA. (Motion at Dkt. No. 63, p. 18.)

Finally, True North concedes that there is no risk that *Plaintiff* will be unable to pay any judgment for economic loss arising from the node suspension. It argues instead that there is a "risk" that the Company may be unable to satisfy a judgment, but a mere "risk" is insufficient. (Dkt. No. 76, Reply, p. 15.) Even the purported "risk" is unsupported.[1] True North has no basis to argue that the Company will be unable to satisfy a judgment in the unlikely event that it succeeds with its claims regarding node suspension.

---

[1] True North argues that Plaintiff has somehow conceded that he is mismanaging the Company and that the Company's liquidation of GALA to fund operations means that it will likely be unable to satisfy a judgment. Plaintiff has conceded no such thing. (*See* Dkt. No. 68, Plaintiff's Response, p. 8 fn. 4; *id.* at p. 10.) Indeed, Plaintiff has addressed the few purported examples of "mismanagement" directly, and Defendants have produced *zero evidentiary basis* for these allegations. (*See* Dkt. No. 40, Decl. of E. Schiermeyer, ¶¶ 32-34.)

> D. **True North is not likely to succeed with its amended claims against Schiermeyer regarding the Gala Nodes**

While True North fails to identify the claims upon which it believes is likely to succeed on the merits, it appears that it is relying upon the following recently amended counterclaims: **Count Seven** (breach of a Founders Agreement); **Count Nine** (breach of the Gala Terms and Conditions); and **Count Ten** (a new claim of breach of the duty of good faith allegedly implied in the Founder Agreement). These amended counterclaims do not cure the deficiencies in the initial counterclaims.

> 1. **True North is not likely to succeed in its claims for breach of the Gala Terms and Conditions (Counts Nine and Ten)**

True North does not respond to the argument that Schiermeyer, as a nonparty to the Gala Terms and Conditions, is not personally liable for breach of those terms and conditions (Counterclaims Nine and Ten). Having conceded as much, True North cannot succeed on the merits of these claims against Schiermeyer.

On the other hand, if Thurston breached the Terms and Conditions, there is no dispute that the Company properly suspended the nodes. Rather than attempt to argue that Thurston *did not* breach the Gala Terms and Conditions (a difficult claim, in light of the voluminous evidence before the Court to the contrary), True North focuses almost exclusively on the time between the breaches and the suspension of the nodes. However, it is undisputed that there was no reason to suspend Thurston's nodes until he disrupted the status quo by turning them on in June 2023, and that the parties were involved in settlement discussions through August 31, 2023, when this action was filed. Thus, True North is left arguing that the Company should have suspended the nodes in September, rather than October. It cites no authority for its argument that *any* delay in

enforcing a contractual right constitutes a waiver, much less that a one month delay is somehow fatal.

Finally, True North argues — for the first time in its Reply — that the Gala Terms and Conditions would be "illusory" absent an implied duty of good faith limiting the Company's discretion to terminate or suspend a user's access to the Gala Services (including their license to operate Gala Nodes). In making this argument, True North ignores the actual Terms and Conditions and invents a contract under which "the only consideration provided by BGP" is nodes and the Company receives "thousands and thousands of dollars in value as consideration for each such node." (Dkt. No. 76, Reply, p. 13.) In fact, there is nothing in the Terms and Conditions about the purchase or sale of nodes in exchange for thousands of dollars.[2]

In any event, both the Company and users of Gala Services provide consideration sufficient to support a binding agreement. The Company provides access to the Gala Games ecosystem (including the GALA App, blockchain, website, and nodes) that it created, supports, develops, and maintains. In exchange for "using the website or applications, GALA Blockchain and any products, features and services provided thereon," users agree to abide by the Terms and Conditions. (*See* Dkt. No. 70, Brink Decl. Ex. A at p. 1.) That a user may effectively terminate this agreement (by no longer accessing the Gala Services) or the Company can terminate or suspend a user's access to the Gala Services does not render the agreement illusory. *See Sweet v. Google Inc.*, No. 17-CV-03953-EMC, 2018 WL 1184777, at *9 (N.D. Cal. Mar. 7, 2018) (finding that YouTube's terms, which allowed users to access the website and post videos

---

[2] The Terms and Conditions state that "GALA does not currently charge a fee for the GALA App, receiving, sending, or storing GALA" (*id.* at § 1.5.7) but that users "shall pay a one-time GALA Game Node license fee"— though the amount of that license fee is not stated (*id.* at § 2.1).

in exchange for a license to the content, were supported by adequate consideration and not illusory).[3]

### 2. True North is not likely to succeed in its claims for breach of the Founders Agreement (Count Seven)

True North greatly distorts the Founders Agreement, reframing it as a document that somehow: (a) conveyed (then-nonexistent) Gala Nodes from the (nonparty) Company to True North; (b) controls when those Gala Nodes may be suspended, and (c) exempts True North from the (unmentioned and at-the-time-nonexistent) Gala Terms and Conditions. On its face, the Founders Agreement is an agreement regarding the intended global structure of a network of companies that were never formed. The parties intended to share *ownership* in any such companies 50/50 and agreed not to compete with or circumvent these companies in a particular fashion. (Dkt. No. 28, Thurston Decl., Ex. A., Founders Agreement,) Following this intent, True North and Schiermeyer created Blockchain Game Partners, Inc., in which they each initially had a 50% shareholding. The foundational and controlling documents governing *the Company* (and its shareholders and assets, including Gala Nodes and Company GALA) are the Company Bylaws and Shareholders Agreement. (*See* Dkt. No. 75, Amended Counterclaims at ¶ 21 ("BGP's actions are governed by its Bylaws.") Nothing in the Founders Agreement governs the operations of the Company or how it controls access to its nodes.

---

[3] Further, True North brings separate claims for breach of the Terms and Conditions (Count Nine) and breach of the implied covenant of good faith and fair dealing in the Terms and Conditions (Count Ten). Because a fundamental element of both claims is the existence of a viable contract, True North has conceded (in Count Nine) that the Terms and Conditions constitute a viable contract *without* the implied covenant. In other words, True North has conceded that the Terms and Conditions are not illusory without the implied covenant, and therefore no covenant can be implied under California law.

4870-1367-2595

Further, as set forth in the Opposition, True North cannot identify a provision of the Founders Agreement that Schiermeyer breached by directing the Company to suspend Thurston's nodes. True North has amended its counterclaims and now argues that Schiermeyer "breached the Founders Agreement by circumventing BGP — acting without shareholder or board notice or approval — and shutting off True North's nodes with no legitimate justification." (Dkt. No. 76, Reply, p. 10.) This argument fails many times over.

First, the Founders Agreement prohibits only "circumvent[ing] . . . the BGP Companies in a manner to earn income, hold ownership, vote, or earn rewards from the services and products of the BGP Companies in a manner to squeeze out or diminish the rights and Ownership of any other party to this Agreement." (Dkt. No. 28, Thurston Decl., Ex. A, Founders Agreement, p. 1.) True North does not and cannot contend that Schiermeyer circumvented (*e.g.*, acted outside of the structure of) the Company, much less in a manner to earn anything at all from the Company or in a manner to earn something for himself at the expense of True North.

Second, True North fails to even respond to the fact that Gala Nodes are routinely terminated without board approval, and thus concedes that board approval is not necessary.

Third, by arguing that Schiermeyer is in breach because the Company turned off True North's nodes with "no legitimate justification," True North concedes that Schiermeyer *could* direct the Company to suspend the nodes *with* legitimate justification. True North can only be referring to the justification found in the Gala Terms and Conditions (it cites nothing else and the Founders Agreement certainly says nothing about this), thus conceding that those terms control here, not the Founders Agreement.

Because its claim for breach of an express term of the Founders Agreement fails, True North has now added a claim for breach of the covenant of good faith and fair dealing implied in the Founders Agreement (Counterclaim Eight).  However, True North does not analyze this claim at all, much less argue that it is likely to succeed on the merits of this claim.[4]  Nor could it.  Under Wyoming law, the implied covenant relates only to the transaction contemplated in the underlying contract, and must arise from the express obligations of the contract and cannot establish new, independent rights or duties not agreed upon by the parties.  *Fish Creek Cap., LLC v. Wells Fargo Bank, N.A.*, No. 11-CV-176-F, 2011 WL 13162236, at *3 (D. Wyo. July 21, 2011), aff'd, 485 F. App'x 924 (10th Cir. 2012).  The Founders Agreement has nothing to do with Gala Nodes or when they can and cannot be suspended, and thus any obligations relating to these nodes, including any covenant of good faith and fair dealing, cannot be implied.

### E. The balance of harms weighs against the mandatory injunction

True North concedes that if the Court orders the Company to reactivate the suspended nodes, thousands of third-party node owners will be deprived of GALA tokens they would otherwise earn.  True North does not argue that these third parties could ever be compensated if it is determined at trial that the Company correctly suspended, or was entitled to suspend, True North's nodes.  It simply argues that these "node owners receiving less GALA is not a bug—it's a feature." (Dkt. No. 76, Reply, p. 16.)  This misses the point entirely.  If there is a finding that True North is wrong, and that the Company *was* entitled to suspend the nodes, then it is not a feature of the ecosystem that True North took GALA from these third parties.  Nor is it a bug.  It is an injury to third parties that cannot be remedied and one that True North simply shrugs off.

---

[4] True North refers to the existence of the claim in a footnote, only.  (Dkt. No. 76, p. 13 fn. 9.)

  **F. The evidence before the Court of True North's unclean hands is substantial and voluminous.**

True North argues that Defendants' theft and liquidation of billions of the Company's GALA is "merely an allegation, not an established fact supported by evidence." (Dkt. No. 76, Reply, p. 17.) Defendants' theft was the subject of Plaintiff's motion for a temporary restraining order and Plaintiff has submitted numerous declarations, supported by substantial documentary evidence, establishing precisely this fact. (*See generally* Dkt. Nos. 9, 36, 38, 39.) While the Court did not reach the merits of this claim in its order (Dkt. No. 49), the evidence of Defendants' unclean hands is certainly before the Court and is overwhelming.

**III. Conclusion**

True North's new arguments, amended caption, and amendments to its counterclaims fail to remedy the deficiencies in its Motion. True North, a non-owner of Gala Nodes, has no standing to bring this Motion for a disfavored injunction, has failed to counter the evidence that any harm would be reparable economic harm, has failed to make a strong showing of likelihood of succeeding on the merits of its breach of contract claims, has failed to counter the evidence that third parties would be harmed if the injunction was issued, and has unclean hands. The Motion should be denied.

DATED this 27th day of November, 2023.

        SNELL & WILMER L.L.P.

        */s/ Paul W. Shakespear*
        Paul W. Shakespear
        Cameron Cutler
        Natalie Beal

        K&L GATES LLP
        Abram I. Moore
        Christian A. Zazzali

        *Attorneys for Plaintiff Eric Schiermeyer*