John W. Huber (Utah Bar No. 7226)
Daniel J. Wadley (Utah Bar No. 10358)
Marc T. Rasich (Utah Bar No. 9279)
Alexander Baker (Utah Bar No. 17163)
**GREENBERG TRAURIG, LLP**
222 South Main Street, Suite 1730
Salt Lake City, Utah 84101
Telephone: (801) 478-6900
*john.huber@gtlaw.com*
*wadleyd@gtlaw.com*
*marc.rasich@gtlaw.com*
*bakera@gtlaw.com*

Michael G. Rhodes (California Bar No. 116127)
*Admitted Pro Hac Vice*
**COOLEY LLP**
3 Embarcadero Center, 20th Floor.
San Francisco, CA 94111
Telephone: (415) 693-2000
*rhodesmg@cooley.com*

*Attorneys for Defendants, Counterclaimant, and Crossclaim Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ERIC SCHIERMEYER, Derivatively on Behalf of Nominal Defendant, BLOCKCHAIN GAME PARTNERS, INC. D/B/A GALA GAMES, <br>  Plaintiff, <br> vs. <br> WRIGHT W. THURSTON and TRUE NORTH UNITED INVESTMENTS, LLC, <br>  Defendants, <br> <br>  and <br> BLOCKCHAIN GAME PARTNERS, INC. D/B/A BGP GAMES, <br>  Nominal Defendant. <br><br><br> TRUE NORTH UNITED INVESTMENTS, LLC, Derivatively on Behalf of Nominal | **MOTION FOR PRELIMINARY INJUNCTION ORDERING THE TEMPORARY APPOINTMENT OF A CUSTODIAN TO ACT AS PRESIDENT, CEO, AND SOLE DIRECTOR OF BLOCKCHAIN GAME PARTNERS, INC.** <br><br><br> Case No. 2:23-cv-00589-HCN-DAO <br><br> Judge Howard C. Nielson <br><br> Magistrate Judge Daphne A. Oberg |

| | |
|---|---|
| Defendant, BLOCKCHAIN GAME PARTNERS, INC. D/B/A GALA GAMES,<br><br>　　　Counterclaimant,<br>vs.<br>ERIC SCHIERMEYER,<br>　　　Counterdefendant,<br><br>　and<br>BLOCKCHAIN GAME PARTNERS, INC. D/B/A BGP GAMES,<br>　　　Nominal Counterdefendant. | |
| TRUE NORTH UNITED INVESTMENTS, LLC,<br>　　　Crossclaim Plaintiff,<br>vs.<br>BLOCKCHAIN GAME PARTNERS, INC. D/B/A BGP GAMES,<br>　　　Crossclaim Defendant. | |

## SPECIFIC RELIEF SOUGHT AND THE GROUNDS THEREFORE

To break the current BGP Board and shareholder deadlock, Counterclaimant and

Crossclaim Plaintiff True North United Investments, LLC ("True North") moves the Court under

both Rule 65 of the Federal Rules of Civil Procedure and Wyoming Business Corporation Act

("WBCA") 17-16-748 for the entry of a preliminary injunction[1] ordering the appointment of a

custodian to temporarily take on the roles of (a) the President and CEO of Blockchain Game

Partners, Inc. ("BGP" or the "Company"), in place of Eric Schiermeyer, and (b) to take on the

---

[1] Plaintiff acknowledges that this Court has already expended considerable judicial time and resources in resolving the parties' prior TRO motions. With no desire to weary the Court unnecessarily, Plaintiff once more seeks the Court's consideration—this time in the form of a preliminary injunction motion, rather than a TRO motion—in light of (a) the irreparable harm that is being inflicted by the deadlock at BGP's helm and (b) the readily available statutory solution of a judicially appointed custodian.

role of sole[2] Director of BGP's Board, in place of current Directors Wright Thurston and Eric Schiermeyer. The Motion is made on the following grounds.

There are only two Directors of BGP: Schiermeyer and Thurston. All significant business decisions of BGP require Board approval, yet, as highlighted by this litigation, Schiermeyer and Thurston cannot agree on any aspect of the business and have sued each other allegedly for breaching their respective duties to BGP and its shareholders. BGP's shareholders are not in any better position to resolve the deadlock. Schiermeyer and True North each own approximately 43% of BGP stock and the shareholders collectively cannot act without a supermajority vote. *The BGP business that transpires occurs through ultra vires actions Schiermeyer takes or causes the Company to take without Board or Shareholder approval.*

According to the claims asserted by both Schiermeyer and True North, the Company has lost or is losing millions of dollars of GALA on an almost daily basis; the Company is vulnerable at any moment to a "rug pull" (the dumping of GALA by either party to this lawsuit); the Company has exposed and is exposing itself to significant and imminent liability to node owners, the SEC, and the IRS; and the Company is unable to pay its obligations as they come due—just to name but a few. Further, its intellectual property, the heart of the business model, is threatened by the transfer of those assets to entities (which belong to Schiermeyer, among others, but not BGP) that operate entirely overseas.

---

[2] This Motion proposes that the custodian be temporarily appointed as the sole Director— replacing both Schiermeyer and Thurston—because a sole directorship would encourage the custodian to act neutrally and independently in pursuing the Company's best interests, without the pressure to favor one side of this dispute over the other or to act as a judge in evaluating their respective claims. Moreover, given that the Company Bylaws require a 75% supermajority to form a quorum to transact Board business, the failure of either Schiermeyer or Thurston to attend a Board meeting would prevent the Board from functioning.

Imminent harm has been acknowledged by both sides and is the inevitable result of continued deadlock; True North is substantially likely to prevail on the merits of establishing the need for the appointment of a custodian; and the balance of harms and public interest favor this remedy. Thus, True North requests that Court grant the Motion and appoint a temporary custodian of BGP to carry out the powers and duties of President, CEO, and sole BGP Director during the pendency of this case.

## INTRODUCTION

Both sides in this case should be able to agree on one thing: BGP has suffered substantial harm and continues to be in jeopardy of irreparable injury because its founders, principals, and only members of the Board of Directors, Eric Schiermeyer and Wright Thurston, are deadlocked as to how to manage the business. From the outset, under their Founders Agreement, Schiermeyer and Thurston (through True North, which Thurston manages) agreed that BGP would be a joint enterprise in which each would have an equal say in the business. But as the Court has no doubt already ascertained from the spate of pleadings filed in this action, Schiermeyer is running the business as a sole proprietorship and has foreclosed Thurston from exercising his rights as a Director, major stockholder, and co-founder.[3] As such, the BGP Board is deadlocked, and the two Directors are completely at odds on how to move the BGP business

---

[3] By way of example, in his role as a Director of BGP, Thurston has repeatedly requested corporate information which had previously been regularly provided and would be expected to be provided to a corporate director. A partial list of materials which have been requested by Thurston but not provided by Schiermeyer over the last year includes but is not limited to: records relating to BGP properties; the formation of and ownership of BGP subsidiaries (or companies that should be subsidiaries); income statements, balance sheets, cash flows, and tax returns (for 2020 and 2022); information related to all BGP loans; agreements related to BGP's intellectual property; lists of litigation and investigations involving BGP; and information related to employees, their roles and compensation (including node distributions).

forward. However, Schiermeyer has used his position as CEO to functionally assume all powers of the Board of Directors, in addition to exercising complete control over BGP on a day-to-day basis as its CEO. Thus, Schiermeyer has used his CEO position to improperly seize all control (even to the exclusion of shareholders) over BGP.

Their underlying conflict is now joined in this lawsuit. True North alleges that Schiermeyer (as BGP's CEO) has unlawfully dissipated corporate assets and stripped True North of vested property rights, ignored principals of corporate governance, and is not running the business for the benefit of all stakeholders. On the other hand, Schiermeyer claims that Thurston is to blame for the corporation's current dire financial predicament.

In considering this Motion, the Court need not decide who is right. Under applicable Wyoming law, the solution to the current impasse is to appoint a neutral third-party custodian to oversee the business, account for and safeguard corporate assets, and steward the Company back to stability. By doing so, the Court can protect the underlying ecosystem in which BGP plays a central role and impose order and discipline on the ongoing operations of the business. In short, a custodian will solve the stalemate that now threatens to destroy BGP.

## FACTUAL BACKGROUND

### A.    The Founders Agreement and BGP's Bylaws

On or about January 1, 2019, True North and Schiermeyer ("Parties") founded BGP[4] and "several affiliated companies and entities" (collectively, the "BGP Companies") which were formed or would be formed to build on blockchain technology previously owned and developed by True North. True North's Answer and Amended Counterclaims and Crossclaims ¶ 17 (ECF

---

[4] BGP is a Wyoming company governed by Wyoming law. Thus, the Court should look to Wyoming law in deciding this Motion.

No. 75) (hereinafter "TN ACC," and incorporated here by reference). These entities were intended to (a) develop and hold intellectual property rights and licenses, (b) develop and operate video games on a public ledger blockchain, (c) develop and establish a blockchain rewards system for video games, (d) sell software and hardware blockchain nodes[5] for the games, (e) host software and hardware nodes, and (f) other affiliated services and products. *See* Ex. A, Founders Agreement at 1. Under the Founders Agreement, the Parties agreed that BGP would earn revenue; cryptocurrency; digital assets and rewards; common, rare, and legendary game items (non-fungible tokens, or "NFTs"); and would receive other consideration from, and would hold equal stock or other equity interests in, each of the "BGP Companies" (collectively, the "Ownership"). *Id.*

The Parties agreed to "equitably share and participate in the Ownership derived from the BGP Companies to vest immediately: Eric [Schiermeyer] – 50%; and True North – 50%." *Id.* BGP's 100,000,000 Preferred Shares were accordingly divided between Schiermeyer and True North with each receiving 50,000,000 shares. Importantly, True North and Schiermeyer agreed "not to circumvent or compete with the BGP Companies in a manner to earn income, hold ownership, vote, or earn rewards from the services and products of the BGP Companies in a manner to squeeze out or diminish the rights and Ownership of any other party to this Agreement." *Id.*

In addition to the Founders Agreement, BGP's actions are governed by its Bylaws. As to Directors, the Bylaws provide that "[t]he board of directors shall have the control and general management of the affairs and business of the corporation. Such directors shall in all cases act as

---

[5] A "node" is computer software (granted by a license to operate) that confirms, verifies, and processes transactions on the blockchain in exchange for "rewards."

a board, regularly convened, by a majority, and they may adopt such rules and regulations for the conduct of their meetings and the management of the corporation." Ex. B, Bylaws § 3.01.

Since BGP's inception, its Directors have always been Wright Thurston and Eric Schiermeyer.

Relevant provisions of the Bylaws include:

**3.09    Quorum and Manner of Acting.** A super majority (75%) of the directors shall constitute a quorum for the transaction of business at any meeting and the act of a majority of the directors present at any meeting at which a quorum is present shall be the act of the board of directors. . . . The directors shall act only as a board and the individual directors shall have no power as such.

**3.10    Removal of Directors.** Any one or more of the directors may be removed either with or without cause at any time by the vote or written consent of the shareholders representing two-thirds of the issued and outstanding stock of the corporation.

**3.11    Voting.** At all meetings of the board of directors, each director is to have one vote, irrespective of the number of shares of stock that director holds.

**4.05    President.** The president shall be the chief executive officer of the corporation and shall have general supervision over the business of the corporation and over its several officers, subject, however, to the control of the board of directors. The president may sign, with the treasurer or with the secretary or any other proper officer of the corporation authorized by the board of directors, certificates for shares of the capital stock of the corporation; may sign and execute in the name of the corporation deeds, mortgages, bonds, contracts or other instruments authorized by the board of directors, except in cases where the signing and execution thereof shall be expressly delegated by the board of directors or by these Bylaws to some other officer or agent of the corporation; and in general shall perform all duties incident to the duties of the president, and such other duties as from time to time may be assigned by the board of directors.

All actions of officers are subject to the direction of the Board of Directors. For example, while there is a President that serves as the chief executive officer of the Company, the President's general supervision over the business of the corporation is subject to "the control of the board of directors." *Id.* § 4.05. In fact, the President may only act and sign binding instruments as "authorized by the board of directors." *Id.*

Accordingly, under the Founders Agreement and §§ 3.09 and 4.05 of the Bylaws, all control of the corporation requires the authorization of both Thurston and Schiermeyer as the only two Directors on the Board.

As previously noted, Schiermeyer currently serves as BGP's President and CEO, and has not sought or received authorization of the Board of Directors for a long list of actions, and has thereby commandeered BGP and proceeded to run the Company on his own. Such action in turn exposes every material decision to attack as invalid or illegitimate—a situation of incalculable harm to BGP and its shareholders.

### B.      BGP Launches "Gala Games"

BGP commonly does business as "Gala Games." Since its founding, BGP has grown to become a successful blockchain video game and entertainment company with millions of dollars in annual revenue and hundreds of employees. TN ACC ¶ 27.

During the first two years of its operation, both Thurston and Schiermeyer participated in the direction and oversight of the Company's growing operations and increasing number of employees. *Id.* ¶ 28. True North and Schiermeyer both contributed millions of dollars (in US dollars and cryptocurrency) to develop BGP. *Id.* ¶ 29. In exchange, BGP allocated 14,000 nodes between True North and Schiermeyer (split according to their shares in BGP, *i.e.*, 50/50). *Id.*

Consistent with the intent of the Parties, the 14,000 nodes acquired by True North and Schiermeyer were their personal property and were available to mine GALA. *Id.* ¶ 30. The nodes, together with any GALA mined by them, were independently owned and controlled by True North and Schiermeyer as with all other node owners. *Id.* BGP's Terms and Conditions memorialize the fact that "[w]hen a User purchases, earns, or receives any NFT or digital reward the Smart Contract process [including GALA tokens, as defined in § 1.3 on "GALA Rewards"],

7

the User owns completely and outright the NFT and/or digital reward." Ex. C, Terms and

Conditions § 1.2.

### C. Both True North and Schiermeyer Assert Substantial Competing Claims of Alleged Misconduct and Theft of Assets

As the Court is aware, both sides have lodged serious allegations against each other.

These warring assertions and claims for relief (which are in some respects mirror images of one

another) are referenced summarily below only to demonstrate how deadlocked and dysfunctional

the relationship is between these Directors and controlling shareholders. Without appointment of

a neutral, third-party custodian, this schism and the current trajectory of BGP threatens the

undoing of the Company, the GALA cryptocurrency, and the Gala community itself.

### 1. True North Asserts that Schiermeyer Has Been Using BGP Assets for Personal Gain, Acting on Behalf of BGP Without Board Approval, and "Burning" Millions of GALA Tokens

As explained in True North's Answer and Amended Counterclaims and Crossclaims,

over at least the last 12 months, Schiermeyer has exercised unilateral control over the operations,

assets, and profits of BGP. TN ACC ¶ 42. During that time, Schiermeyer has flouted BGP's

founding and charter documents and has covertly acted and engaged in transactions on behalf of

BGP and used BGP's assets and earnings, often for his own personal benefit, without the consent

of BGP's Board or its shareholders, and in clear violation of his fiduciary duties. *Id.*

For example, Schiermeyer:

- Caused BGP to send millions of dollars' worth of cryptocurrency to Canadian resident Jason Brink, BGP's President of Blockchain, for unapproved and unknown reasons.

- Caused BGP to distribute valuable NFTs to himself and select BGP employees, without Board or shareholder approval. By design, those NFTs should have been randomly distributed to members of the Gala community.

- Caused BGP to intentionally destroy hundreds of millions of dollars of asset value

by "burning"[6] GALA tokens (including billions of tokens owned by True North).

- Misappropriated millions of dollars of BGP funds, including, using Company funds for buying and renting real estate for personal use, transferring Company assets into his own name or the names of entities that he owns or controls, using Company funds to hire architects, construction companies, and designers for personal real estate, and moving Company funds into personal accounts.

- Caused BGP to pay $5 million towards an installment purchase of a corporate jet for Schiermeyer's personal benefit despite the BGP Board previously agreeing to sell the jet/BGP's position.

- Transferred BGP's intellectual property, including its source code, to businesses in Dubai and Switzerland that Schiermeyer owns and/or controls[7] whose operations are largely conducted overseas.

- Caused BGP to daily liquidate immense amounts of GALA (many millions of dollars' worth of GALA per month) to fund the operations of the Company, in contravention of how the Company was designed to be funded, potentially amounting to an improper ICO, and in a manner that is likely harming the Company, its holdings, its community members, and the value of the GALA token itself.

- Unilaterally shut off and effectively stole True North's 7,000 nodes in a transparent effort to diminish True North's GALA holdings and revenue.[8]

---

[6] "Burning" tokens refers to the permanent removal of tokens from circulation, which is typically accomplished by transferring tokens to a "burn address," *i.e.*, a wallet from which they can never be retrieved. In effect, burning tokens results in their destruction and consequently destroys their value.

[7] Neither BGP nor any other of BGP's shareholders have been shown to possess any ownership interest in these related businesses.

[8] In his recent declaration submitted in response to True North's Motion for a TRO to reverse the suspension of its 7,000 nodes, Schiermeyer claimed that "[t]he decision to disable nodes has always been an operational decision made at or below the officer level. Thurston has never argued that board approval is required to disable a node." ES Opp. Br. to TN TRO Mot., ES Decl. ¶ 13. Schiermeyer appears to be referring to BGP employees' capacity to toggle on or off nodes in an operational or maintenance capacity—which has absolutely no bearing on Schiermeyer's or BGP's right to suspend and restrict access to owners' fully vested nodes without legitimate justification. Shutting down and effectively stealing almost 1/5 of the entire outstanding Gala nodes is not the kind of unilateral decision that Schiermeyer can make without Board approval.

- Blocked access to virtually all BGP-related information that Thurston sought by virtue of his roles as a Director, major shareholder, and co-founder.

*Id.* ¶ 43. As previously set forth in various briefing before this Court, Schiermeyer took (or caused BGP to take) many of these actions without prior notice to, let alone the approval of, Thurston (as the only other BGP Director). And, in those instances in which Thurston had any prior notice and raised concerns or requested Director meetings for discussion, his concerns and requests were ignored, and ES unilaterally proceeded with the planned actions despite the lack of Board approval.

In this way, Schiermeyer has wantonly disregarded the letter and spirit of his partnership with Thurston and True North by commandeering sole control of the Gala ecosystem in a manner that has harmed Thurston and True North, other shareholders, and the underlying community of third parties that support that ecosystem—and has put the Company itself in jeopardy. Accordingly, True North seeks, among other things, disgorgement/restitution, a constructive trust, an equitable accounting, damages, injunctive relief, removal of Schiermeyer as Director, President, and CEO of BGP, and judicial appointment of a custodian over BGP.

### 2. Schiermeyer Asserts that Thurston Has Stolen and Misused Company Assets and Defrauded Investors

As explained in Schiermeyer's Amended Complaint (ECF No. 14), Schiermeyer alleges that Thurston has violated his fiduciary duties, "engaged in fraudulent conduct with respect to

---

Taking away True North's (or any other node owner's) nodes takes away the right to vote in node votes and on governance issues—and that right is one of the central tenants of decentralization. This permits Schiermeyer to gag or usurp node-vote power, which robs node owners of the ability to vote to protect their interests. And even if it is unnecessary to reach the merits of many of the Parties' claims for purposes of this motion, Schiermeyer has admitted to this conduct, and the harm of this vote-muzzling is evident. A custodian is needed to prevent such abuses against any node owner's ability to participate in that voting process.

the Company, and grossly abused the position of director and intentionally inflicted harm on the

Company, and has demonstrated a pattern of fraudulent conduct that has damaged the

Company's reputation as set forth [t]herein, including in the following ways":

- Thurston harmed the Company by stealing 8,645,014,077 GALA tokens from the Company treasury, selling a substantial portion of the Stolen GALA without authorization, and keeping the proceeds for himself.

- Thurston harmed the Company by stealing GALA licenses, selling them without authorization, and keeping the proceeds for himself.

- Thurston harmed the Company by falsely associating the Company with his allegedly fraudulent "Smart Box" venture.

- Thurston harmed the Company by using the Company's reputation, brand, and goodwill to promote the "Green" venture, which the SEC is prosecuting as fraudulent.

- Thurston's continued involvement in the Company harms the Company as his involvement calls the Company's legitimacy into question by third parties, including, but not limited to, Coinbase, the largest exchange in the United States.

ES Am. Compl. ¶ 176. Schiermeyer also alleges, without proof, that Thurston has effectively

held the Company hostage, with the looming threat that he might liquidate the supposedly stolen

GALA via a "rug pull." Accordingly, Schiermeyer seeks, among other things,

disgorgement/restitution, a constructive trust, an equitable accounting, damages, injunctive relief,

and removal of Thurston as a Director of BGP's Board.

### D. The Parties Have Been Unable to Resolve the Deadlock, Resulting in Corporate Dysfunction and the Risk of Substantial Imminent Harm to the Company and Community

Thurston and True North's efforts at pursuing alternative resolution of these issues have

come to naught. Many times, during the summer of 2023, before either party had sued the other

(in the preceding months in which the Parties were engaging in settlement discussions), Thurston

directed that his counsel propose that the Parties seek resolution via mediation and/or arbitration. Schiermeyer rejected each of these requests to pursue such alternatives. TN ACC ¶ 81.

Similarly futile are and have been any attempts to resolve the deadlock via Board action or shareholder vote. As referenced above, BGP's Bylaws require a 75% supermajority to establish a quorum necessary to act and majority of the Directors at such a meeting at which there is a quorum for the BGP Board to act. § 3.09. There are only two BGP Directors— Thurston and Schiermeyer. Thus, the Board is and, for the foreseeable future, will remain irrevocably deadlocked and unable to exceed the threshold. Similarly, sections 2.07 and 2.15 of the Bylaws require a 75% supermajority vote for any action to be taken by the shareholders, but True North and Schiermeyer both own over 40% of the outstanding shares in BGP. Thus, it would be futile to hold a shareholder meeting to remove either Thurston as Director or Schiermeyer as Director and President of BGP, as it would require the Directors to approve pursuing such actions against themselves. And in fact, in August 2023 both Directors confirmed to one another via counsel that they would vote against removing themselves as members of the BGP Board and would vote against BGP initiating actions against themselves.

Unfortunately, this deadlock results in control of BGP being exercised entirely by Schiermeyer, without the deadlocked Board or shareholders being in a position to save BGP from Schiermeyer's reckless and potentially illegal actions—all of which have been taken under the guise of the authority of the CEO.

The Board deadlock has resulted in substantial corporate dysfunction, leading to even common corporate requests being disregarded or addressed in an untimely and insufficient way. Thurston, as Director of BGP, has tried in vain to schedule meetings with Schiermeyer regarding the current state and future of the Company. Schiermeyer has refused to answer calls, respond to

communications, schedule and attend meetings, or to take any cooperative action to protect BGP, its shareholders, and the Gala community as a whole. TN ACC ¶ 104. Moreover, many times Thurston (in his capacity as a Director) has requested financial information about the Company and Schiermeyer's commercial dealings, *id.* ¶ 56—information that Thurston is due by virtue of his position as a Director of BGP—and in each instance Schiermeyer and BGP have failed to provide the information.[9] In response to the most recent request, Schiermeyer and BGP refused unless Thurston agreed to sign a restrictive non-disclosure agreement that, based on information and belief, neither Schiermeyer nor any other officers or employees have been required to sign or signed.

A deadlocked company like BGP—particularly one whose officers refuse to follow even basic corporate governance principles—cannot lawfully operate. Indeed, the dysfunction is so severe that two top executives, James Osvald (the Company President of Gaming) and Sarah Buxton (the CEO and President of Gala Music) have recently quit. Given the c-suite nature of these roles, BGP would need any replacements approved by the Board—which will not realistically happen given the current deadlock. The Company needs a neutral custodian to ensure that standard corporate functions are performed, corporate formalities are followed, and that the Company is run for the benefit of all shareholders, node owners, and other stakeholders.

This directorial dilemma has resulted in and poses an increasing risk of substantial harm to BGP, its shareholders, and to the Gala community. While there are many things on which the two sides disagree, everyone appears to agree that the wellbeing of the Company is at stake. Both sides must recognize that dysfunction at the Board level inevitably will substantially harm BGP's

---

[9] *See supra* n.3.

stakeholders. Both sides must agree that the Company is facing real potential harm because of the deadlock and the GALA community is suffering as a result. The current level of dysfunction and *ultra vires* acts have put the Company's assets and its IP interests in peril, and it could be open to liability to node holders and enforcement actions by the SEC and IRS. The house is on fire. No matter who started it, an independent custodian is needed to douse the flames and start repairing the damage.[10]

Schiermeyer seems to argue that BGP is functioning properly with only him behind the wheel. But, while it is true that BGP is functioning in a technical sense, it is only because Schiermeyer has coopted for himself complete control of the Company, flouting BGP's founding and charter documents and essentially doing whatever he wants with the Company without regard to or consent from BGP's Board or its shareholders. However he may try to justify his actions, Schiermeyer cannot legitimately contest the fact that he has thrown these crucial corporate governance requirements to the wind—and a judicially appointed custodian is needed to anchor the Company and prevent it from being blown away in the maelstrom of this dispute.

## LEGAL STANDARD

"The Tenth Circuit requires a movant to establish four elements as the basis for issuance of a . . . preliminary injunction: (1) the moving party will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the moving party outweighs any damage to the opposing party; (3) the injunction, if issued, will not be adverse to the public interest; and (4) a

---

[10] Although Schiermeyer and BGP may well perform an about face and attempt to downplay the irreparable harms discussed above and in both Parties' prior briefing, such strategic contortions should not be countenanced. Moreover, this scenario provides sort of a Solomonic test: although both Thurston and Schiermeyer would like to control the Company, perhaps the prospect of them both officially stepping back in the face of a judicially appointed custodian will reveal which one truly cares about the wellbeing of BGP and its community.

substantial likelihood exists that the moving party will prevail on the merits." *Bauchman by & Through Bauchman v. W. High Sch.*, 900 F. Supp. 248, 250 (D. Utah 1995) *aff'd*, 132 F.3d 542 (10th Cir. 1997) (*citing SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991)). As noted in Schiermeyer's own TRO motion, "[d]istrict courts have wide discretion to fashion appropriate equitable remedies," ES TRO Mot. at 12—and such discretion should extend to the narrow and particularized relief sought here.

Under Wyoming law, the Court has the discretionary authority to appoint a custodian where "[t]he directors are deadlocked in the management of corporate affairs, the shareholders are unable to break the deadlock, and irreparable injury to the corporation is threatened or being suffered." Wyo. Stat. § 17-16-748(a)(i). Alternatively, the Court may appoint a custodian where "the directors or those in control of the corporation are acting fraudulently and irreparable injury to the corporation is threatened or being suffered." § 17-16-748(a)(ii). The WBCA places minimal limits on the Court's discretion to define a custodian's powers and responsibilities, indicating that a custodian "may exercise all of the powers of the corporation, through or in place of its board of directors, to the extent necessary to manage the business and affairs of the corporation." § 17-16-748(d)(i). The WBCA further indicates that a judicially appointed custodian can act "with all the powers and duties as the court directs." § 17-16-748(b)(i). Similarly, the WBCA provides broad discretion regarding who can be appointed as a custodian: "The court may appoint an individual or domestic or foreign corporation authorized to transact business in this state as a custodian or receiver and may require the custodian or receiver to post bond, with or without sureties, in an amount the court directs." § 17-16-748(c). Further, once appointed, a custodian should "carry on the business of the corporation until a full hearing is held." *Id.*

## ARGUMENT

Under either theory of this case advocated by the parties, BGP is suffering and will continue to suffer irreparable injury—if nothing else, at least as a result of the deadlock arresting any legitimate movement at the Board and shareholder levels. True North has identified this deadlock and has shown a substantial likelihood of success on the merits of establishing the need for the appointment of a custodian under either §§ 17-16-748(a)(i) or (ii). Further, the balance of harms and public interest favor this remedy.

### A.    BGP Has Sustained and Will Continue to Suffer Irreparable Injury Due to Mismanagement, Misuse of Company Assets, and Deadlock

Both sides of this dispute have asserted that BGP has been and will continue to be irreparably harmed by corporate gridlock, mismanagement, breach of fiduciary duties, and misuse of Company assets—either by Schiermeyer or Thurston. But again, the Court need not wade deeply into the merits of these warring characterizations, because irreparable injury is evident and inevitable from (a) the indisputable deadlock on the Board and shareholder levels, and (b) the uncontestable fact that, under the plain language of BGP's Bylaws, Schiermeyer has acted, and continues to act, as President and CEO without regard to Board or shareholders' authorization and corporate formalities with which he is contractually and duty-bound to comply. Perhaps the simplest example of this problem is that the CEO is only allowed to execute binding agreements based on authorization by the Board, which authorization has not existed during 2023. *See* Bylaws § 4.05.

Under the circumstances, the existent deadlock threatens irreparable harm in the form of a paralyzed Company, with officers and a Board unable lawfully to act and direct the operations of the Company regarding key business decisions (including hiring new officers after several

existing officers quit) without the requisite Director and shareholder consensus (via the required

majority and supermajority requirements).

BGP, however, has not been frozen in inaction. Instead, it has been barreling forward

according to the whims of a President and CEO that has brushed aside these corporate

governance requirements in his decision-making—irreparably harming BGP and the Gala

community. Although numerous pages could be spent recounting the many ways Schiermeyer

has engaged in systematic, intentional, and deceptive behavior to his own personal benefit and to

the detriment of BGP and its other shareholders and community members, that is unnecessary for

this Motion. The dysfunction in BGP's freewheeling operation and the irreconcilable Director

and shareholder deadlock suffices to establish the sort of irreparable harm inherently identified

by the application of WBCA § 17-16-748.

To date, True North has found just one case where the court was presented with and

granted a motion to appoint custodian under § 17-16-748. In *APEG Energy II, LP v. Veltri*,

Plaintiff APEG Energy sued the company's CEO David Veltri, who the plaintiff argued was

making poor and reckless decisions on behalf of the company. 2019 WL 2137386, at *2 (D.

Colo. May 16, 2019). Veltri convened a no-notice meeting of the board of directors, where he

and his ally on the board voted certain members of the board off the audit committee. *Id.* Before

this meeting, the audit committee had intervened in a case in which APEG Energy was a

defendant, and the committee's position as intervenor was contrary to Veltri's interests. *Id*; *see*

*U.S. Energy Corp., et al., v. APEG Energy II, LP, et al.*, Civil Action No. H-19-754 (S.D. Tex.).

Veltri's vote left just one member—Veltri's ally—on that committee. 2019 WL 2137386, at *2.

Veltri then sent the SEC a Form 8-K announcing the changes to the audit committee. *Id.* These

actions by Veltri risked a NASDAQ de-listing for the company and resulted in a time-sensitive

demand from NASDAQ that the company specify how it was to reconstitute a proper audit

committee and thus return to compliance with NASDAQ requirements. *Id.* The directors were

deadlocked as to how to proceed. *Id.*

To establish irreparable injury, Plaintiff asserted several realized and potential harms—

harms like those in the instant case—including the following:

- "[Defendant] continues to take actions on behalf of the Company, and the deadlocked board has been unable to stop him[, and he] . . . . is taking actions that require board consent without notifying the board, let alone obtaining its approval";

- "Defendant has commandeered the Company and proceeded to run the Company on his own";

- "Allowing a renegade CEO to remain at the Company's helm undermines the reputation of the Company in the minds of investors";

- "[L]oss of shareholder confidence almost certainly leads to a loss in market value"; and

- "[T]he Company continues to be irreparably harmed by the ongoing uncertainty of Defendant's authority to act on behalf of the Company. Each decision that Defendant continues to make on behalf of the Company is susceptible to attack as invalid or illegitimate. As Defendant continues to act on behalf of the Company, he leaves a growing trail of decisions that may be challenged as having no legal force and effect."

*APEG Energy II, LP v. Veltri*, 2019 WL 3841243, at *7 (D. Colo. Apr. 23, 2019). Not

surprisingly, the *APEG* Court found that these ongoing injuries, along with the potential

NASDAQ delisting, established irreparable harm. *Id.* at **7-8; 2019 WL 2137386, at *2. The

court decided to appoint a custodian under the WBCA, granted him all the powers and

responsibilities of CEO, and declined to circumscribe his powers because that would "easily lead

to more confusion." *Id.* at **3–4.

In *APEG Energy*, Veltri flouted rules and principles of corporate governance and

attempted to exploit a deadlocked situation to pursue his own personal agenda. Schiermeyer,

likewise, has commandeered the Company as a renegade CEO, which has imperiled the Company and its wellbeing in the eyes of shareholders and market participants. Moreover, although in *APEG Energy* the mere possibility of the company being delisted from NASDAQ because of the CEO's actions was a significant factor in the appointment of a custodian, here Schiermeyer's decision to "upgrade" GALA v1 to v2 actually caused Coinbase, the largest US-based exchange, to delist the cryptocurrency, resulting in substantial risks of harm to GALA stability and value, to BGP customers, and to shareholders. *See* TN ACC ¶ 46. Here, as in *APEG Energy*, "[t]he Court [should] find[] that [True North] has raised a real possibility of irreparable harm based on [Schiermeyer's] continued *ultra vires* leadership." 2019 WL 3841243, at *8. The Court should also "recognize[] that it would be highly unusual to allow an unauthorized corporate officer to continue holding him- or herself out as an authorized officer," and should consider the very real risk of "a growing trail of decisions that may be challenged as having no legal force and effect." *Id.*

In short, as in *APEG Energy*, irreparable harm is evident here. Appointment of a custodian will alleviate that harm as much as possible under the circumstances while allowing BGP to continue its operations pending resolution of this action.

### B. True North Is Substantially Likely to Succeed on the Merits of Establishing that BGP's Deadlock Dilemma Warrants the Appointment of a Custodian

As referenced above, Wyoming law empowers the Court to appoint a custodian where "[t]he directors are deadlocked in the management of corporate affairs, the shareholders are unable to break the deadlock, and irreparable injury to the corporation is threatened or being suffered." Wyo. Stat. § 17-16-748(a)(i). Here, the Board's deadlock is evident and inevitable, because its two members, Thurston and Schiermeyer, vigorously oppose one another in this suit. There is no realistic possibility that they could mutually agree on how to exercise their votes on

the Board. And as detailed above, irreparable injury is both threatened and being suffered as a result of this deadlock.

The harm factor is further established by the fact that BGP has sustained irreparable injury under either sides' theories of misconduct here. In fact, as stated above, the Court may appoint a custodian where "the directors or those in control of the corporation are acting fraudulently and irreparable injury to the corporation is threatened or being suffered." § 17-16-748(a)(ii). Again, both sides vehemently assert that the other has committed many acts of fraudulent misconduct in their capacities as Directors of the Board, so the Court can alternatively grant this custodial remedy under § 17-16-748(ii).

Accordingly, under either §§ 17-16-748(i) or (ii), the Court should appoint a custodian to serve as BGP's President, CEO, and sole Director.

### C.      The Balance of Harms and Public Interest Favor Appointment of a Custodian

Finally, there is no contest as to the balance of harms and public policy factors. BGP will suffer no harm—but instead will greatly benefit—from the appointment of a neutral, independent, and competent custodian committed to work in the best interests of the Company. And any cognizable injury that Schiermeyer will suffer by stepping back from his role as President and CEO of BGP is greatly outweighed by the massive aggregate interests of the Company as a whole, its many stakeholders, and the Gala community at large. In contrast, True North, BGP, and all shareholders will suffer significant harm from continued Board and shareholder deadlock and from the persistent operation of BGP and its President in clear contravention of BGP's fundamental rules of corporate governance. Public policy favors companies pursuing the best interests of their stakeholders and community members within the bounds of the law, including corporate governance requirements.

**D.    The Court Should Appoint Custodian to Act as BGP's Sole Director, President, and CEO**

For the benefit of BGP, its shareholders, and all other stakeholders, the Court should appoint a custodian authorized to perform the acts below, without the need for Court intervention:

- To act as President and CEO of BGP in accordance with § 4.05 of the Bylaws:

  > The president shall be the chief executive officer of the corporation and shall have general supervision over the business of the corporation and over its several officers, subject, however, to the control of the board of directors. The president may sign, with the treasurer or with the secretary or any other proper officer of the corporation authorized by the board of directors, certificates for shares of the capital stock of the corporation; may sign and execute in the name of the corporation deeds, mortgages, bonds, contracts or other instruments authorized by the board of directors, except in cases where the signing and execution thereof shall be expressly delegated by the board of directors or by these Bylaws to some other officer or agent of the corporation; and in general shall perform all duties incident to the duties of the president, and such other duties as from time to time may be assigned by the board of directors.

- To serve as the sole Director of the Board.

- To carry out all other duties as prescribed in the Company Bylaws.

- To provide regular reports on actions to the Court on a schedule to be set by the Court.

Finally, the appointment should be for the rest of this lawsuit, or until the Court is shown that the appointment of the custodian is no longer necessary.

To the extent the Court does not already have a preferred custodian, True North proposes the following appointment process: (1) each side will file with the Court its nominee for custodian along with a curriculum vitae and any other supporting materials not to exceed 5 pages within 5 business days of the Court's order granting the Motion and (2) each party will file any objections to the opposing party's nominee, limited to no more than 3 pages, within 5 business days after the nominations are filed.

### E.      No Security Bond Is Necessary

A court may "determine a bond is unnecessary to secure a preliminary injunction 'if there is an absence of proof showing a likelihood of harm.'" *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (quoting Continental Oil Co. v. Frontier Refining Co., 338 F.2d 780, 782 (10th Cir. 1964)). The Tenth Circuit has further emphasized that trial courts have "wide discretion under Rule 65(c) in determining whether to require security." *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003). Here, appointing a temporary custodian to break the current deadlock and safeguard BGP's and its shareholders' interests poses no threat of harm that would warrant a bond. Thus, no bond is necessary. *See Paparazzi, LLC v. Sorenson*, 2022 WL 1469459, at \*4 (D. Utah May 10, 2022) ("[T]he current record shows no damages that Defendants will sustain if wrongly enjoined . . . . Therefore, no bond is required.").

### CONCLUSION

Faced with a Board and shareholder deadlock, and Schiermeyer's wanton disregard for required corporate governance requirements in operating BGP, Wyoming Statute § 17-16-748 authorizes and justice calls for the Court to appoint a temporary custodian to serve as BGP's President, CEO, and sole member of the Board of Directors. The Court should grant True North's Motion and appoint custodian as expeditiously as possible.

DATED December 19, 2023

GREENBERG TRAURIG LLP
/s/ *Marc Rasich*
Marc Rasich
John Huber
Daniel Wadley
Alexander Baker

COOLEY LLP
Michael G. Rhodes

*Attorneys for Defendants, Counterclaimant, and Crossclaim Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of December 2023, a true and correct copy of the

foregoing was filed with the Court's electronic filing system and thereby served on counsel of

record.

Paul W. Shakespear
Cameron Cutler
Natalie Beal
SNELL & WILMER LLP
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, UT 84101
pshakespear@swlaw.com
ccutler@swlaw.com
nbeal@swlaw.com

Abram L. Moore
Christian A. Zazzali
K&L GATES LLP
70 West Madison Street, Suite 3100

Chicago, IL 60602
abe.moore@klgates.com
christian.zazzali@klgates.com

David L. Mortensen
Monica S. Call
FOLEY & LARDNER LLP
95 S. State Street, Suite 2500
Salt Lake City, UT 84111
dmortensen@foley.com
mcall@foley.com


GREENBERG TRAURIG, LLP

*/s/ Lindsey Wharton*