# Exhibit 2

John W. Huber (Utah Bar No. 7226)
Daniel J. Wadley (Utah Bar No. 10358)
Marc T. Rasich (Utah Bar No. 9279)
Alexander Baker (Utah Bar No. 17163)
**GREENBERG TRAURIG, LLP**
222 South Main Street, Suite 1730
Salt Lake City, Utah 84101
Telephone: (801) 478-6900
*john.huber@gtlaw.com*
*wadleyd@gtlaw.com*
*marc.rasich@gtlaw.com*
*bakera@gtlaw.com*

Michael G. Rhodes (California Bar No. 116127)
*Admitted Pro Hac Vice*
**COOLEY LLP**
3 Embarcadero Center, 20th Floor.
San Francisco, CA 94111
Telephone: (415) 693-2000
*rhodesmg@cooley.com*

*Attorneys for Defendants, Counterclaimant, and Crossclaim Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ERIC SCHIERMEYER, Derivatively on Behalf of Nominal Defendant, BLOCKCHAIN GAME PARTNERS, INC. D/B/A GALA GAMES, Plaintiff, vs. WRIGHT W. THURSTON and TRUE NORTH UNITED INVESTMENTS, LLC, Defendants, and BLOCKCHAIN GAME PARTNERS, INC. D/B/A BGP GAMES, Nominal Defendant. | **MOTION FOR PRELIMINARY INJUNCTION ORDERING THE TEMPORARY APPOINTMENT OF A CUSTODIAN TO ACT AS PRESIDENT, CEO, AND SOLE DIRECTOR OF BLOCKCHAIN GAME PARTNERS, INC.** |
| | Case No. 2:23-cv-00589-HCN-DAO |
| | Judge Howard C. Nielson |
| | Magistrate Judge Daphne A. Oberg |
| TRUE NORTH UNITED INVESTMENTS, LLC, Derivatively on Behalf of Nominal | |

Defendant, BLOCKCHAIN GAME
PARTNERS, INC. D/B/A GALA GAMES,

   Counterclaimant,

vs.

ERIC SCHIERMEYER,

   Counterdefendant,

 and

BLOCKCHAIN GAME PARTNERS, INC.
D/B/A BGP GAMES,

   Nominal Counterdefendant.

---

TRUE NORTH UNITED INVESTMENTS,
LLC,

   Crossclaim Plaintiff,

vs.

BLOCKCHAIN GAME PARTNERS, INC.
D/B/A BGP GAMES,

   Crossclaim Defendant.

## SPECIFIC RELIEF SOUGHT AND THE GROUNDS THEREFORE

To break the current BGP Board and shareholder deadlock, Counterclaimant and

Crossclaim Plaintiff True North United Investments, LLC ("True North") moves the Court under

both Rule 65 of the Federal Rules of Civil Procedure and Wyoming Business Corporation Act

("WBCA") 17-16-748 for the entry of a preliminary injunction[1] ordering the appointment of a

custodian to temporarily take on the roles of (a) the President and CEO of Blockchain Game

Partners, Inc. ("BGP" or the "Company"), in place of Eric Schiermeyer, and (b) to take on the

---

[1] Plaintiff acknowledges that this Court has already expended considerable judicial time and
resources in resolving the parties' prior TRO motions. With no desire to weary the Court
unnecessarily, Plaintiff once more seeks the Court's consideration—this time in the form of a
preliminary injunction motion, rather than a TRO motion—in light of (a) the irreparable harm
that is being inflicted by the deadlock at BGP's helm and (b) the readily available statutory
solution of a judicially appointed custodian.

role of sole[2] Director of BGP's Board, in place of current Directors Wright Thurston and Eric Schiermeyer. The Motion is made on the following grounds.

There are only two Directors of BGP: Schiermeyer and Thurston. All significant business decisions of BGP require Board approval, yet, as highlighted by this litigation, Schiermeyer and Thurston ███████████████████████████ have sued each other allegedly for breaching their respective duties to BGP and its shareholders. ███████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████

█████████████████████████████████

████████████████████████████████████

██████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

██████████████████

---

[2] This Motion proposes that the custodian be temporarily appointed as the sole Director—replacing both Schiermeyer and Thurston—because a sole directorship would encourage the custodian to act neutrally and independently in pursuing the Company's best interests, without the pressure to favor one side of this dispute over the other or to act as a judge in evaluating their respective claims. Moreover, given that the Company Bylaws require a 75% supermajority to form a quorum to transact Board business, the failure of either Schiermeyer or Thurston to attend a Board meeting would prevent the Board from functioning.

Imminent harm ███████████████████████████ is the inevitable result of
continued deadlock; True North is substantially likely to prevail on the merits of establishing the
need for the appointment of a custodian; and the balance of harms and public interest favor this
remedy. Thus, True North requests that Court grant the Motion and appoint a temporary
custodian of BGP to carry out the powers and duties of President, CEO, and sole BGP Director
during the pendency of this case.

**INTRODUCTION**

Both sides in this case should be able to agree on one thing: BGP has suffered substantial
harm and continues to be in jeopardy of irreparable injury because its founders, principals, and
only members of the Board of Directors, Eric Schiermeyer and Wright Thurston, are deadlocked
as to how to manage the business. From the outset, under their Founders Agreement,
Schiermeyer and Thurston (through True North, which Thurston manages) agreed that BGP
would be a joint enterprise in which each would have an equal say in the business. ████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████[3] As such, the BGP Board

is deadlocked, ████████████████████████████████████████████

_____

[3] ███████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
██████████████████████████████



Their underlying conflict is now joined in this lawsuit. ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

In considering this Motion, the Court need not decide who is right. Under applicable Wyoming law, the solution to the current impasse is to appoint a neutral third-party custodian to oversee the business, account for and safeguard corporate assets, and steward the Company back to stability. By doing so, the Court can protect the underlying ecosystem in which BGP plays a central role and impose order and discipline on the ongoing operations of the business. In short, a custodian will solve the stalemate that now threatens to destroy BGP.

## FACTUAL BACKGROUND

### A.     The Founders Agreement and BGP's Bylaws

On or about January 1, 2019, True North and Schiermeyer ("Parties") founded BGP[4] and "several affiliated companies and entities" (collectively, the "BGP Companies") which were formed or would be formed to build on blockchain technology previously owned and developed by True North. True North's Answer and Amended Counterclaims and Crossclaims ¶ 17 (ECF

---

[4] BGP is a Wyoming company governed by Wyoming law. Thus, the Court should look to Wyoming law in deciding this Motion.

No. 75) (hereinafter "TN ACC," and incorporated here by reference). These entities were intended to (a) develop and hold intellectual property rights and licenses, (b) develop and operate video games on a public ledger blockchain, (c) develop and establish a blockchain rewards system for video games, (d) sell software and hardware blockchain nodes[5] for the games, (e) host software and hardware nodes, and (f) other affiliated services and products. *See* Ex. A, Founders Agreement at 1. Under the Founders Agreement, the Parties agreed that BGP would earn revenue; cryptocurrency; digital assets and rewards; common, rare, and legendary game items (non-fungible tokens, or "NFTs"); and would receive other consideration from, and would hold equal stock or other equity interests in, each of the "BGP Companies" (collectively, the "Ownership"). *Id.*

The Parties agreed to "equitably share and participate in the Ownership derived from the BGP Companies to vest immediately: Eric [Schiermeyer] – 50%; and True North – 50%." *Id.* BGP's 100,000,000 Preferred Shares were accordingly divided between Schiermeyer and True North with each receiving 50,000,000 shares. Importantly, True North and Schiermeyer agreed "not to circumvent or compete with the BGP Companies in a manner to earn income, hold ownership, vote, or earn rewards from the services and products of the BGP Companies in a manner to squeeze out or diminish the rights and Ownership of any other party to this Agreement." *Id.*

In addition to the Founders Agreement, BGP's actions are governed by its Bylaws. As to Directors, the Bylaws provide that "[t]he board of directors shall have the control and general management of the affairs and business of the corporation. Such directors shall in all cases act as

---

[5] A "node" is computer software (granted by a license to operate) that confirms, verifies, and processes transactions on the blockchain in exchange for "rewards."

a board, regularly convened, by a majority, and they may adopt such rules and regulations for the

conduct of their meetings and the management of the corporation." Ex. B, Bylaws § 3.01.

Since BGP's inception, its Directors have always been Wright Thurston and Eric

Schiermeyer.

Relevant provisions of the Bylaws include:

**3.09    Quorum and Manner of Acting.** A super majority (75%) of the directors
shall constitute a quorum for the transaction of business at any meeting and the act
of a majority of the directors present at any meeting at which a quorum is present
shall be the act of the board of directors. . . . The directors shall act only as a board
and the individual directors shall have no power as such.

**3.10    Removal of Directors.** Any one or more of the directors may be removed
either with or without cause at any time by the vote or written consent of the
shareholders representing two-thirds of the issued and outstanding stock of the
corporation.

**3.11    Voting.** At all meetings of the board of directors, each director is to have
one vote, irrespective of the number of shares of stock that director holds.

**4.05    President.** The president shall be the chief executive officer of the
corporation and shall have general supervision over the business of the corporation
and over its several officers, subject, however, to the control of the board of
directors. The president may sign, with the treasurer or with the secretary or any
other proper officer of the corporation authorized by the board of directors,
certificates for shares of the capital stock of the corporation; may sign and execute
in the name of the corporation deeds, mortgages, bonds, contracts or other
instruments authorized by the board of directors, except in cases where the signing
and execution thereof shall be expressly delegated by the board of directors or by
these Bylaws to some other officer or agent of the corporation; and in general shall
perform all duties incident to the duties of the president, and such other duties as
from time to time may be assigned by the board of directors.

All actions of officers are subject to the direction of the Board of Directors. For example,

while there is a President that serves as the chief executive officer of the Company, the

President's general supervision over the business of the corporation is subject to "the control of

the board of directors." *Id.* § 4.05. In fact, the President may only act and sign binding

instruments as "authorized by the board of directors." *Id.*

Accordingly, under the Founders Agreement and §§ 3.09 and 4.05 of the Bylaws, all control of the corporation requires the authorization of both Thurston and Schiermeyer as the only two Directors on the Board.

As previously noted, Schiermeyer currently serves as BGP's President and CEO, ███████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████

**B.    BGP Launches "Gala Games"**

███████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████████████████████████████
██████████████████████████████████████████████████████



**C.** **Both True North and Schiermeyer Assert Substantial Competing Claims**







**D.**

███████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████ As referenced above, BGP's Bylaws require a 75% supermajority to

establish a quorum necessary to act and majority of the Directors at such a meeting at which

there is a quorum for the BGP Board to act. § 3.09. There are only two BGP Directors—

Thurston and Schiermeyer. Thus, the Board is and, for the foreseeable future, will remain

irrevocably deadlocked and unable to exceed the threshold. Similarly, sections 2.07 and 2.15 of

the Bylaws require a 75% supermajority vote for any action to be taken by the shareholders, but

True North and Schiermeyer both own over 40% of the outstanding shares in BGP. Thus, it

would be futile to hold a shareholder meeting to remove either Thurston as Director or

Schiermeyer as Director and President of BGP, as it would require the Directors to approve

pursuing such actions against themselves. ███████████████████████████

█████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

█████████████████████

████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████



A deadlocked company like BGP— ████████████████████████████

████████████████████████—cannot lawfully operate. ███████████████████

████████████████████████████████████

████████████████████████████████

█████████████████████████████ The Company needs a neutral custodian to ensure that standard corporate functions are performed, corporate formalities are followed, and that the Company is run for the benefit of all shareholders, node owners, and other stakeholders.

This directorial dilemma has resulted in and poses an increasing risk of substantial harm to BGP, its shareholders, and to the Gala community. While there are many things on which the two sides disagree, everyone appears to agree that the wellbeing of the Company is at stake. Both sides must recognize that dysfunction at the Board level inevitably will substantially harm BGP's

---

[9] *See supra* n.3.

stakeholders. Both sides must agree that the Company is facing real potential harm because of

the deadlock and the GALA community is suffering as a result.



[10]

## LEGAL STANDARD

"The Tenth Circuit requires a movant to establish four elements as the basis for issuance

of a . . . preliminary injunction: (1) the moving party will suffer irreparable injury unless the

injunction issues; (2) the threatened injury to the moving party outweighs any damage to the

opposing party; (3) the injunction, if issued, will not be adverse to the public interest; and (4) a

---

[10] ███████████████████████████████████████

███████████████████████ Moreover, this scenario provides sort of a Solomonic test: although
both Thurston and Schiermeyer would like to control the Company, perhaps the prospect of them
both officially stepping back in the face of a judicially appointed custodian will reveal which one
truly cares about the wellbeing of BGP and its community.

substantial likelihood exists that the moving party will prevail on the merits." *Bauchman by & Through Bauchman v. W. High Sch.*, 900 F. Supp. 248, 250 (D. Utah 1995) *aff'd*, 132 F.3d 542 (10th Cir. 1997) (*citing SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991)). As noted in Schiermeyer's own TRO motion, "[d]istrict courts have wide discretion to fashion appropriate equitable remedies," ES TRO Mot. at 12—and such discretion should extend to the narrow and particularized relief sought here.

Under Wyoming law, the Court has the discretionary authority to appoint a custodian where "[t]he directors are deadlocked in the management of corporate affairs, the shareholders are unable to break the deadlock, and irreparable injury to the corporation is threatened or being suffered." Wyo. Stat. § 17-16-748(a)(i). Alternatively, the Court may appoint a custodian where "the directors or those in control of the corporation are acting fraudulently and irreparable injury to the corporation is threatened or being suffered." § 17-16-748(a)(ii). The WBCA places minimal limits on the Court's discretion to define a custodian's powers and responsibilities, indicating that a custodian "may exercise all of the powers of the corporation, through or in place of its board of directors, to the extent necessary to manage the business and affairs of the corporation." § 17-16-748(d)(i). The WBCA further indicates that a judicially appointed custodian can act "with all the powers and duties as the court directs." § 17-16-748(b)(i). Similarly, the WBCA provides broad discretion regarding who can be appointed as a custodian: "The court may appoint an individual or domestic or foreign corporation authorized to transact business in this state as a custodian or receiver and may require the custodian or receiver to post bond, with or without sureties, in an amount the court directs." § 17-16-748(c). Further, once appointed, a custodian should "carry on the business of the corporation until a full hearing is held." *Id.*

15

## ARGUMENT

Under either theory of this case advocated by the parties, BGP is suffering and will continue to suffer irreparable injury—if nothing else, at least as a result of the deadlock arresting any legitimate movement at the Board and shareholder levels. True North has identified this deadlock and has shown a substantial likelihood of success on the merits of establishing the need for the appointment of a custodian under either §§ 17-16-748(a)(i) or (ii). Further, the balance of harms and public interest favor this remedy.

### A.     BGP Has Sustained and Will Continue to Suffer Irreparable Injury Due to ███████████████ Deadlock

Both sides of this dispute have asserted that BGP has been and will continue to be irreparably harmed by corporate gridlock, ████████████████████████████████ ████████████████████████████ But again, the Court need not wade deeply into the merits of these warring characterizations, because irreparable injury is evident and inevitable from (a) the indisputable deadlock on the Board and shareholder levels,



Perhaps the simplest example of this problem is that the CEO is only allowed to execute binding agreements based on authorization by the Board, ████████████████████████ ████ *See* Bylaws § 4.05.

Under the circumstances, the existent deadlock threatens irreparable harm in the form of a paralyzed Company, with officers and a Board unable lawfully to act and direct the operations of the Company regarding key business decisions ████████████████████████

███████████████ without the requisite Director and shareholder consensus (via the required

majority and supermajority requirements).



To date, True North has found just one case where the court was presented with and

granted a motion to appoint custodian under § 17-16-748. In *APEG Energy II, LP v. Veltri*,

Plaintiff APEG Energy sued the company's CEO David Veltri, who the plaintiff argued was

making poor and reckless decisions on behalf of the company. 2019 WL 2137386, at *2 (D.

Colo. May 16, 2019). Veltri convened a no-notice meeting of the board of directors, where he

and his ally on the board voted certain members of the board off the audit committee. *Id.* Before

this meeting, the audit committee had intervened in a case in which APEG Energy was a

defendant, and the committee's position as intervenor was contrary to Veltri's interests. *Id*; *see*

*U.S. Energy Corp., et al., v. APEG Energy II, LP, et al.*, Civil Action No. H-19-754 (S.D. Tex.).

Veltri's vote left just one member—Veltri's ally—on that committee. 2019 WL 2137386, at *2.

Veltri then sent the SEC a Form 8-K announcing the changes to the audit committee. *Id.* These

actions by Veltri risked a NASDAQ de-listing for the company and resulted in a time-sensitive

demand from NASDAQ that the company specify how it was to reconstitute a proper audit committee and thus return to compliance with NASDAQ requirements. *Id.* The directors were deadlocked as to how to proceed. *Id.*

To establish irreparable injury, Plaintiff asserted several realized and potential harms—harms like those in the instant case—including the following:

- "[Defendant] continues to take actions on behalf of the Company, and the deadlocked board has been unable to stop him[, and he] . . . . is taking actions that require board consent without notifying the board, let alone obtaining its approval";

- "Defendant has commandeered the Company and proceeded to run the Company on his own";

- "Allowing a renegade CEO to remain at the Company's helm undermines the reputation of the Company in the minds of investors";

- "[L]oss of shareholder confidence almost certainly leads to a loss in market value"; and

- "[T]he Company continues to be irreparably harmed by the ongoing uncertainty of Defendant's authority to act on behalf of the Company. Each decision that Defendant continues to make on behalf of the Company is susceptible to attack as invalid or illegitimate. As Defendant continues to act on behalf of the Company, he leaves a growing trail of decisions that may be challenged as having no legal force and effect."

*APEG Energy II, LP v. Veltri*, 2019 WL 3841243, at *7 (D. Colo. Apr. 23, 2019). Not surprisingly, the *APEG* Court found that these ongoing injuries, along with the potential NASDAQ delisting, established irreparable harm. *Id.* at **7-8; 2019 WL 2137386, at *2. The court decided to appoint a custodian under the WBCA, granted him all the powers and responsibilities of CEO, and declined to circumscribe his powers because that would "easily lead to more confusion." *Id.* at **3–4.

In *APEG Energy*, Veltri flouted rules and principles of corporate governance and attempted to exploit a deadlocked situation to pursue his own personal agenda. ▮▮▮▮▮▮▮▮



In short, as in *APEG Energy*, irreparable harm is evident here. Appointment of a custodian will alleviate that harm as much as possible under the circumstances while allowing BGP to continue its operations pending resolution of this action.

**B.    True North Is Substantially Likely to Succeed on the Merits of Establishing that BGP's Deadlock Dilemma Warrants the Appointment of a Custodian**

As referenced above, Wyoming law empowers the Court to appoint a custodian where "[t]he directors are deadlocked in the management of corporate affairs, the shareholders are unable to break the deadlock, and irreparable injury to the corporation is threatened or being suffered." Wyo. Stat. § 17-16-748(a)(i). Here, the Board's deadlock is evident and inevitable, because its two members, Thurston and Schiermeyer, vigorously oppose one another in this suit. There is no realistic possibility that they could mutually agree on how to exercise their votes on

the Board. And as detailed above, irreparable injury is both threatened and being suffered as a result of this deadlock.

The harm factor is further established by the fact that BGP has sustained irreparable injury under either sides' theories of misconduct here. In fact, as stated above, the Court may appoint a custodian where "the directors or those in control of the corporation are acting fraudulently and irreparable injury to the corporation is threatened or being suffered." § 17-16-748(a)(ii). ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████

Accordingly, under either §§ 17-16-748(i) or (ii), the Court should appoint a custodian to serve as BGP's President, CEO, and sole Director.

### C. The Balance of Harms and Public Interest Favor Appointment of a Custodian

Finally, there is no contest as to the balance of harms and public policy factors. BGP will suffer no harm—but instead will greatly benefit—from the appointment of a neutral, independent, and competent custodian committed to work in the best interests of the Company. And any cognizable injury that Schiermeyer will suffer by stepping back from his role as President and CEO of BGP is greatly outweighed by the massive aggregate interests of the Company as a whole, its many stakeholders, and the Gala community at large. In contrast, True North, BGP, and all shareholders will suffer significant harm from continued Board and shareholder deadlock ██████████

████████████████████████████████████████████████████████████████

████████████████████████ Public policy favors companies pursuing the best interests of their stakeholders and community members within the bounds of the law, including corporate governance requirements.

**D.      The Court Should Appoint Custodian to Act as BGP's Sole Director, President, and CEO**

For the benefit of BGP, its shareholders, and all other stakeholders, the Court should appoint a custodian authorized to perform the acts below, without the need for Court intervention:

- To act as President and CEO of BGP in accordance with § 4.05 of the Bylaws:

  > The president shall be the chief executive officer of the corporation and shall have general supervision over the business of the corporation and over its several officers, subject, however, to the control of the board of directors. The president may sign, with the treasurer or with the secretary or any other proper officer of the corporation authorized by the board of directors, certificates for shares of the capital stock of the corporation; may sign and execute in the name of the corporation deeds, mortgages, bonds, contracts or other instruments authorized by the board of directors, except in cases where the signing and execution thereof shall be expressly delegated by the board of directors or by these Bylaws to some other officer or agent of the corporation; and in general shall perform all duties incident to the duties of the president, and such other duties as from time to time may be assigned by the board of directors.

- To serve as the sole Director of the Board.

- To carry out all other duties as prescribed in the Company Bylaws.

- To provide regular reports on actions to the Court on a schedule to be set by the Court.

Finally, the appointment should be for the rest of this lawsuit, or until the Court is shown that the appointment of the custodian is no longer necessary.

To the extent the Court does not already have a preferred custodian, True North proposes the following appointment process: (1) each side will file with the Court its nominee for custodian along with a curriculum vitae and any other supporting materials not to exceed 5 pages within 5 business days of the Court's order granting the Motion and (2) each party will file any objections to the opposing party's nominee, limited to no more than 3 pages, within 5 business days after the nominations are filed.

### E.     No Security Bond Is Necessary

A court may "determine a bond is unnecessary to secure a preliminary injunction 'if there is an absence of proof showing a likelihood of harm.'" *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (quoting Continental Oil Co. v. Frontier Refining Co., 338 F.2d 780, 782 (10th Cir. 1964)). The Tenth Circuit has further emphasized that trial courts have "wide discretion under Rule 65(c) in determining whether to require security." *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003). Here, appointing a temporary custodian to break the current deadlock and safeguard BGP's and its shareholders' interests poses no threat of harm that would warrant a bond. Thus, no bond is necessary. *See Paparazzi, LLC v. Sorenson*, 2022 WL 1469459, at *4 (D. Utah May 10, 2022) ("[T]he current record shows no damages that Defendants will sustain if wrongly enjoined . . . . Therefore, no bond is required.").

### CONCLUSION

Faced with a Board and shareholder deadlock, ███████████████████████████ ████████████████████████████████████████ Wyoming Statute § 17-16-748 authorizes and justice calls for the Court to appoint a temporary custodian to serve as BGP's President, CEO, and sole member of the Board of Directors. The Court should grant True North's Motion and appoint custodian as expeditiously as possible.

DATED December 19, 2023

GREENBERG TRAURIG LLP
/s/ *Marc Rasich*
Marc Rasich
John Huber
Daniel Wadley
Alexander Baker

COOLEY LLP
Michael G. Rhodes

*Attorneys for Defendants, Counterclaimant, and Crossclaim Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of December 2023, a true and correct copy of the foregoing was filed with the Court's electronic filing system and thereby served on counsel of record.

Paul W. Shakespear
Cameron Cutler
Natalie Beal
SNELL & WILMER LLP
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, UT 84101
pshakespear@swlaw.com
ccutler@swlaw.com
nbeal@swlaw.com

Abram L. Moore
Christian A. Zazzali
K&L GATES LLP
70 West Madison Street, Suite 3100

Chicago, IL 60602
abe.moore@klgates.com
christian.zazzali@klgates.com

David L. Mortensen
Monica S. Call
FOLEY & LARDNER LLP
95 S. State Street, Suite 2500
Salt Lake City, UT 84111
dmortensen@foley.com
mcall@foley.com

GREENBERG TRAURIG, LLP

*/s/ Lindsey Wharton*

# EXHIBIT A

# FOUNDERS AGREEMENT

This Founders Agreement ("Agreement") is entered into this 1st day of January 2019 by and among Eric Schiermeyer and True North United Investments, LLC.

The Founders desire to form and operate Blockchain Game Partners, Inc. and several affiliated companies and entities, including but not limited to companies that will (a) develop and hold intellectual property rights and licenses, (b) develop and operate games to be published on a public ledger blockchain, (c) develop and operate a cryptocurrency exchange for the games, (d) sell software and hardware blockchain nodes for the games, (e) host software and hardware nodes, and (e) other affiliated services and products (collectively "BGP Companies").

The BGP Companies will earn revenue, cryptocurrency, digital assets and rewards, legendary items, hold stock or other equity interests, and other consideration (collectively "Ownership") from each of the BGP Companies. The parties intend to equitably share and participate in the Ownership derived from the BGP Companies to vest immediately: Eric - 50%; and True North - 50%. The parties agree not to circumvent or compete with the BGP Companies in a manner to earn income, hold ownership, vote, or earn rewards from the services and products of the BGP Companies in a manner to squeeze out or diminish the rights and Ownership of any other party to this Agreement.

Notwithstanding, each party to this Agreement may earn dividends, distributions, salary, compensation or other benefits as a shareholder, owner, director, manager, member, officer, or employee of any of the BGP Companies, which are personal rights and are not subject to be shared with the other parties to this Agreement.

This Agreement may be terminated by mutual consent of all parties. Any party to this Agreement may resign or terminate its affiliation with the BGP Companies at any time, and any vested Ownership shall remain with the party, and all unvested Ownership shall be divided to the remaining parties to this Agreement according to their prorata ownership set forth above.

This Agreement may be amended in writing by signed consent of all parties. No party may assign its rights or obligations without the prior written consent of all parties to this Agreement.

In the event of any dispute, claim, question, or disagreement arising from or relating to this Agreement or the breach thereof, the parties may agree to first attempt mediation before a single mediator, administered by the International Centre for Dispute Resolution under its mediation rules, to be held in any location agreed to by the parties, or Salt Lake City, Utah, USA.

Notwithstanding the foregoing, each party agrees that it may bring suit in any court of law to enjoin infringement or other misuse of confidential information or intellectual property rights of the BGP Companies or any party. The Parties expressly stipulate that any and all disputes beyond mediation, shall be litigated in the state or federal courts of Salt Lake City, Utah, USA. The Parties consent to personal jurisdiction in those courts. The prevailing party in any court action shall be entitled to costs and reasonable attorneys' fees.

Eric Schiermeyer

By:

Eric Schiermeyer

True North United Investments, LLC

By:

Wright W. Thurston, Manager

# EXHIBIT B

# BYLAWS
## OF
## BLOCKCHAIN GAME PARTNERS, INC.

## 1. OFFICES

**1.01    Registered Office and Registered Agent.**  The registered office of the corporation for is located at 1220 South Washington Street, Afton, Wyoming 83110. The registered agent for Wyoming is Rulon Gardner.

**1.02    Other Offices.**  In addition to the registered office, other offices may also be maintained by such other place or places, either within or without the State of Wyoming, as may be designated from time to time by the board of directors, where any and all business of the corporation may be transacted, and where meetings of the shareholders and of the directors may be held with the same effect as though done or held at said registered office.

## 2. SHAREHOLDER MEETINGS

**2.01    Annual Meetings.**  The annual meeting of the shareholders, commencing with the year 2019 shall be held at the registered office of the corporation, or at such other place as may be specified or fixed in the notice of such meetings in the month of or the month preceding the due date of the annual list of the officers and directors of the corporation at such time as the shareholders shall decide, for the election of directors and for the transaction of such other business as may properly come before said meeting.

**2.02    Notice of Annual Meetings.**  Unless notice is waived by the shareholders, the secretary shall mail, in the manner provided in Section 2.05 of these bylaws, or deliver a written or printed notice of each annual meeting to each shareholder of record entitled to vote, or may notify by email or other electronic means, at least ten and not more than sixty days before the date of such meeting.

**2.03    Place of Meeting.**  The board of directors may designate any place either within or without the State of Wyoming as the place of meeting for any annual meeting or for any special meeting of shareholders called by the board of directors.  A waiver of notice signed by all shareholders may designate any place either within or without the State of Wyoming, as the place for the holding of such meeting.  If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the registered office of the corporation in the State of Wyoming, except as otherwise provided in Section 2.06 of these bylaws, entitled "Meeting Without Notice."

**2.04    Special Meetings.**  Special meetings of the shareholders shall be held at the registered office of the corporation or at such other place as shall be specified or fixed in a notice thereof.  Such special shareholder meetings may be called at any time by the president or secretary, or by a majority of the board of directors then in office, and shall be called by the

president with or without board approval on the written request of the holders of record of at least fifty percent (50%) of the number of shares of the corporation then outstanding and entitled to vote, which written request shall state the object of such meeting.

**2.05    Notice of Meetings.**  Unless waived by the shareholders, written or printed notice stating the place, day and hour of the meeting and, in case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten nor more than sixty days before the date of the meeting, either personally or by mail or email, by or at the direction of the president or the secretary to each shareholder of record entitled to vote at such meeting.  If mailed, such notice shall be deemed to be delivered when deposited in the mail, addressed to the shareholder at his address as it appears on the records of the corporation, with postage prepaid. Any shareholder may at any time, by a duly signed statement in writing to that effect, waive any statutory or other notice of any meeting, whether such statement be signed before or after such meeting.

**2.06    Meeting Without Notice.**  If all the shareholders shall meet at any time and place, either within or without the State of Wyoming, or by electronic means whereby all shareholders may participate, and each consent to the holding of the meeting at such time and place, such meeting shall be valid without call or notice and at such meeting any corporate action may be taken.

**2.07    Quorum and Shareholder Acts.**  At all shareholders' meetings, the presence in person or by proxy of the holders of a super majority (75%) of the outstanding stock entitled to vote shall be necessary to constitute a quorum for the transaction of business, but a lesser number may adjourn to some future time not less than seven nor more than twenty-one (21) days later, and the secretary shall thereupon give at least three days notice by mail to each shareholder entitled to vote who is absent from such meeting.  Except where a higher percentage is expressly required by the bylaws or by law, an act of the holders of the super majority (75%) of voting shares that are present at a meeting is an act of the shareholders.

**2.08    Mode of Voting.**  At all shareholder meetings, the voting may be voice vote, or any other method demanded by a majority of shareholders present and entitled to vote at the meeting.

**2.09    Proxies.**  At any shareholder meeting, any shareholder may be represented and vote by a proxy or proxies appointed by an instrument in writing.  Execution may be accomplished by the signing of the writing by the shareholder or other persons authorized to sign on his behalf, or by causing the signature of the shareholder to be made by any reasonable means including, but not limited to, a facsimile or electronic signature.  In the event any such instrument in writing shall designate two or more persons to act as proxies, a majority of such persons present at the meeting, or, if only one shall be present, then that one shall have and may exercise all of the powers conferred by such written instrument upon all of the persons so designated unless the instrument shall otherwise provide.  No such proxy shall be valid after the expiration of six months from the date of its execution, unless the person executing it specified therein the length of time for which it is to continue in force, which in no case shall exceed one

year from the date of its execution. Subject to the above, any proxy duly executed is not revoked and continues in full force and effect until an instrument revoking it or a duly executed proxy bearing a later date is filed with the secretary of the corporation. At no time shall any proxy be valid which shall be filed less than one day before the commencement of the meeting.

**2.10    Voting Lists.** The Company Secretary or director in charge of the transfer books for shares of the corporation shall make, at least three days before each meeting of shareholders, a complete list of the shareholders entitled to vote at such meeting, which list for a period of two days prior to such meeting shall be kept on file at the registered office of the corporation and shall be subject to inspection by any shareholder at any time during the meeting. The original share ledger or transfer book, or duplicate thereof, shall be prima facie evidence as to who are the shareholders entitled to examine such list or share ledger or transfer book or to vote at any shareholder meeting.

**2.11    Closing Transfer Books or Fixing of Record Date.** For the purpose of determining shareholders entitled to notice or to vote for any meeting of shareholders, the board of directors of the corporation may provide that the stock transfer books be closed for a stated period but not to exceed in any case sixty (60) days before such determination. If the stock transfer books are closed for the purpose of determining shareholders entitled to notice of a shareholder meeting, such books shall be closed for at least fifteen days immediately preceding such meeting. In lieu of closing the stock transfer books, the board of directors may fix, in advance, a date in any case to be not more than sixty (60) days, nor less than ten (10) days prior to the date on which the particular action, requiring such determination of shareholders, is to be taken. If the stock transfer books are not closed and no record date is fixed for determination of shareholders entitled to notice of a meeting of shareholders, or shareholders entitled to receive payment of a dividend, the date of which notice of the meeting is mailed or the date on which the resolution of the board of directors declaring such dividend is adopted, as the case may be, shall be the record date for such determinations of shareholders.

**2.12    Voting of Shares.** Subject to the provisions of Section 2.14, each outstanding share entitled to vote shall be entitled to one vote upon each matter submitted to vote at a shareholder meeting.

**2.13    Voting of Shares by Certain Holders.** Shares standing in the name of another corporation or entity, domestic or foreign, may be voted by such officer, agent, or proxy as the governing documents for such entity or trust may prescribe.

Shares in the name of a deceased person may be voted by the shareholder's administrator or executor, either in person or by proxy. Shares standing in the name of a guardian, conservator or trust may be voted by such fiduciary either in person or by proxy, but no guardian, conservator, or trustee shall be entitled, as such fiduciary, to vote shares held without a transfer of such shares.

Shares standing in the name of a receiver may be voted by such receiver, and shares held by or under the control of a receiver may be voted by such receiver without the transfer thereof if

Page 3

authority so to do is contained in an appropriate order of the court at which such receiver was appointed.

A shareholder whose shares are pledged shall be entitled to vote such shares until shares have been transferred into the name of the pledgee, and thereafter the pledgee shall be entitled to vote the shares so transferred.

Shares of treasury stock of this corporation shall not be voted, directly or indirectly, at any meeting and shall not be counted in determining the total number of outstanding shares at any time, but shares held by the corporation it in a fiduciary capacity may be voted and shall be counted in determining the total number of outstanding shares at any given time.

**2.14   Election of Directors.**  Directors shall be elected by a super majority (75%) vote of shareholders.  At each election of directors, every shareholder entitled to vote at such election shall have the right to vote, in person or by proxy, the number of shares owned for as many persons as there are directors to be elected and for whose election the shareholder has a right to vote.  A shareholder does not have a right to cumulate votes for any one director.  A shareholder may only cast a vote for each director to be elected which does not exceed the number of shares owned by that shareholder.  Directors of this corporation shall not be elected otherwise.

**2.15   Informal Action by Shareholders.**  Any action required or permitted to be taken at a shareholder meeting may be taken without a meeting if a consent in writing setting forth the action so taken shall be signed by a super majority (75%) of the shareholders entitled to vote with respect to the subject matter thereof.

**2.16   Attendance by Conference Call.**  Shareholders may participate in a meeting of shareholders by means of a telephone conference or similar method of communication by which all persons participating in the meeting can hear each other.  Attendance by this method shall constitute presence in person at the meeting.

## 3. DIRECTORS

**3.01   General Powers.**  The board of directors shall have the control and general management of the affairs and business of the corporation.  Such directors shall in all cases act as a board, regularly convened, by a majority, and they may adopt such rules and regulations for the conduct of their meetings and the management of the corporation, as they may deem proper, not inconsistent with these bylaws, the Articles of Incorporation and the laws of the State of Wyoming.

**3.02   Number of Directors.**  The affairs and business of this corporation shall be managed by a board of directors consisting of at least two (2) persons who must be at least eighteen (18) years old.

**3.03    Election.**  The directors of the corporation shall be elected at the annual meeting of the shareholders, except as hereinafter otherwise provided for the filling of vacancies.  Each director shall hold office for a term of one year and until a successor shall have been duly chosen and shall have qualified, or until death, or until resignation or removal in the manner hereinafter provided.

**3.04    Vacancies in the Board.**  Any vacancy in the board of directors occurring during the year through death, resignation, removal or other cause, including vacancies caused by an increase in the number of directors, shall be filled for the unexpired portion of the director's term by the remaining directors.  A majority of the remaining directors shall constitute a quorum, at any regular or special meeting of the board called for the purpose of filling a vacancy on the board.

**3.05    Directors Meetings.**  The annual meeting of the board of directors shall be held each year immediately following the annual meeting of the shareholders.  Other regular meetings of the board of directors shall from time to time by resolution be prescribed.  No further notice of such annual or regular meeting of the board of directors need by given.

**3.06    Special Meetings.**  Special meetings of the board of directors may be called by or at the request of the president of the corporation or any director.  The person or persons authorized to call special meetings of the board of directors may fix any place, either within or without the State of Wyoming, as the place for holding any special meeting of the board of directors.

**3.07    Notice.**  Notice of any special meeting shall be given at least twenty-four hours previous thereto by written notice if personally delivered, or five days previous thereto if mailed or emailed to each director.  If mailed, such notice shall be deemed to have been delivered when deposited in the mail, with postage prepaid.  If notice is given by email, such notice shall be deemed to be delivered when the email is sent.  Any director may waive notice of any meeting.  The attendance of a director at any meeting shall constitute a waiver of notice of such meeting, except where a director attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened.

**3.08    Chairman.**  At all meetings of the board of directors, the president of the corporation shall serve as chairman, or in the absence of the president, the directors present shall choose by majority vote a director to preside as chairman.

**3.09    Quorum and Manner of Acting.**  A super majority (75%) of the directors shall constitute a quorum for the transaction of business at any meeting and the act of a majority of the directors present at any meeting at which a quorum is present shall be the act of the board of directors.  In the absence of a quorum, the majority of the directors present may adjourn any meeting from time to time until a quorum be had.  Notice of any adjourned meeting need not be given.  The directors shall act only as a board and the individual directors shall have no power as such.  Directors may participate in the meeting by telephone conference or similar methods of

Page 5

communication by which all persons participating in the meeting can hear each other. Such participation shall constitute presence in person at the meeting.

    **3.10   Removal of Directors.** Any one or more of the directors may be removed either with or without cause at any time by the vote or written consent of the shareholders representing two-thirds of the issued and outstanding stock of the corporation.

    **3.11   Voting.** At all meetings of the board of directors, each director is to have one vote, irrespective of the number of shares of stock that director holds.

    **3.12   Compensation.** By resolution of the board of directors, the directors may be paid their expenses, if any of attendance at each meeting of the board, and may be paid a fixed sum for attendance at meetings or a stated salary of directors. No such payment shall preclude any director from serving the corporation in any other capacity or receiving compensation.

    **3.13   Presumption of Assent.** A director of the corporation who is present at a meeting of the board of directors at which action on any corporate matter is taken, shall be conclusively presumed to have assented to the action taken unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as the secretary of the meeting before the adjournment thereof or shall forward such dissent by certified or registered mail to the secretary of the corporation immediately after the adjournment of the meeting. Such right to dissent shall not apply to a director who voted in favor of such action.

    **3.14   Director Committees**. The directors may create one or more committees and appoint members of the board of directors to serve on them. Each committee may exercise those aspects of the authority of the board of directors conferred upon such committee, but a committee may not: (a) authorize distributions to shareholders; (b) approve or propose to shareholders any action that must be approved by shareholders; (c) fill vacancies on the board of directors or any committee; (d) amend the articles of incorporation or the bylaws; (e) approve a plan of merger; or (f) authorize, approve, or ratify any action with respect to the issuance, sale, or any other action with respect to the shares of the Corporation.

## 4. OFFICERS

    **4.01   Number.** The officers of the corporation shall be a president, a treasurer and a secretary and such other or subordinate officers as the board of directors may from time to time elect. One person may hold the office and perform the duties of one or more of said officers. No officer need be a member of the board of directors.

    **4.02   Election, Term of Office, Qualifications.** The officers of the corporation shall be chosen by the board of directors and they shall be elected annually at the meeting of the board of directors held immediately after each annual meeting of the shareholders except as hereinafter otherwise provided for filling vacancies. Each officer shall hold his office until a successor has

been duly chosen and has qualified, or until death, or resignation or removal in the manner hereinafter provided.

      **4.03   Removal.** Any officer or agent elected or appointed by the board of directors may be removed by the board of directors at any time whenever in its judgment the best interests of the corporation would be served thereby, and such removal shall be without prejudice to the contract rights, if any, of the person so removed.

      **4.04   Vacancies.** All vacancies in any office shall be filed by the board of directors without undue delay, at any regular or special meeting of the directors.

      **4.05   President.** The president shall be the chief executive officer of the corporation and shall have general supervision over the business of the corporation and over its several officers, subject, however, to the control of the board of directors. The president may sign, with the treasurer or with the secretary or any other proper officer of the corporation authorized by the board of directors, certificates for shares of the capital stock of the corporation; may sign and execute in the name of the corporation deeds, mortgages, bonds, contracts or other instruments authorized by the board of directors, except in cases where the signing and execution thereof shall be expressly delegated by the board of directors or by these bylaws to some other officer or agent of the corporation; and in general shall perform all duties incident to the duties of the president, and such other duties as from time to time may be assigned by the board of directors.

      **4.06   Vice President.** If the board elects a vice president, such vice president shall in the absence or incapacity of the president, or as ordered by the board of directors, perform the duties of the president, or such other duties or functions as may be given by the board of directors from time to time.

      **4.07   Treasurer.** The treasurer shall have the care and custody of all the funds and securities of the corporation and deposit the same in the name of the corporation in such bank or trust company as the board of directors may designate; may sign or countersign all checks, drafts and orders for the payment of money and may pay out and dispose of same under the direction of the board of directors, and may sign or countersign all notes or other obligations of indebtedness of the corporation; may sign with the president or vice president, certificates for shares of stock of the corporation; shall at all reasonable times exhibit the books and accounts to any director or shareholder of the corporation under application at the office of the company during business hours; and shall perform all duties as from time to time may be assigned by the president or by the board of directors. The board of directors may at its discretion require that each officer authorized to disburse the funds of the corporation be bonded in such amount as the board deems adequate.

      **4.08   Secretary.** The secretary shall keep the minutes of the meetings of the board of directors and also the minutes of the meetings of the shareholders; shall prepare and serve all notices of the corporation and shall affix the seal of the corporation to all certificates of stock, when signed and countersigned by the duly authorized officers; may sign certificates for shares of stock of the corporation; may sign or countersign all checks, drafts and orders for payment of

money; shall have charge of the certificate book and such other books and papers as the board may direct; shall keep a stock book containing the names of all persons who are shareholders of the corporation, showing their places of residence, the number of shares of stock held by them respectively, the time when they respectively became the owners thereof, and the amount paid thereof; and shall perform all duties incident to the office of secretary and such other duties as from time to time may be assigned by the president or by the board of directors.

    **4.09    Other Officers.** The board of directors may authorize and empower other persons or other officers appointed to perform the duties and functions as officers of the corporation.

## 5. INDEMNIFICATION OF OFFICERS AND DIRECTORS

    Except as stated otherwise, the corporation shall indemnify all of its officers and directors, past, present and future, against any and all expenses incurred by them, and each of them including but not limited to legal fees, judgments and penalties which may be incurred, rendered or levied in any legal action brought against any or all of them for or on account of any act or omission alleged to have been committed while acting within the scope of their duties as officers or directors of this corporation. The corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation, or who is or was serving at the request of the corporation as a director, officer, employee or agent of the corporation. The corporation shall not indemnify any person against liability or litigation expense incurred on account of activities which were at the time taken known or believed to be in conflict with the best interests of the corporation. The corporation shall not indemnify any director with respect to any liability arising out of unlawful declaration of dividends or any transaction from which the director derived an improper personal benefit.

## 6. CONTRACTS, LOANS, CHECKS AND DEPOSITS

    **6.01    Contracts.** The board of directors may authorize any director, officer or agent to enter into any contract or execute and deliver any instrument in the name of and on behalf of the corporation, and such authority may be general or confined to specific instances.

    **6.02    Loans.** No loans shall be contracted on behalf of the corporation and no evidence of indebtedness shall be issued in its name unless authorized by the board of directors or approved by a loan committee appointed by the board of directors and charged with the duty of supervising investments. Such authority may be general or confined to specific instances.

    **6.03    Checks, Drafts, Etc.** All checks, drafts, orders for payment of money (including any cryptocurrency), notes or other evidences of indebtedness issued in the name of the corporation shall be signed or executed by such director, officer or agent of the corporation and in such manner as shall from time to time be determined by resolutions of the board of directors.

**6.04    Deposits.**  All funds of the corporation not otherwise employed shall be deposited from time to time to the credit of the corporation in such banks, trust companies, other depositories, or digital wallets as the board of directors may select.

## 7. CAPITAL STOCK

**7.01    Share Certificate.**  Unless required in the articles of incorporation, the board of directors may issues shares of stock of the corporation by certificate or without certificate. All shares shall be numbered in the order of their issue. Each shareholder must be provided a certificate signed and sealed by the corporation or a written statement containing at a minimum: (a) the name of issuing corporation and that it is organized under the laws of the State of Wyoming; (b) the name of the person or entity to which such share is issued; (c) the number and class of shares and designation of any series of the issued shares. If the corporation is authorized to issue different classes of shares or different series within a class, the written statements shall describe the designations, the relative rights, preferences, and limitations applicable to each class and the variations in rights, preferences, and limitations for each series.

**7.02    Restricted Transfer of Stock.**  The board of directors may impose restrictions on the transfer or registration of transfer of shares. A restriction on the transfer or registration of transfer of shares may: (a) obligate the shareholder to offer the corporation or other shareholders the first opportunity to acquire the restricted shares; (b) obligate the corporation or other shareholders to acquire the restricted shares; (c) require the corporation, the holders of any class of its shares, or any other person to approve the transfer of the restricted shares; or (d) prohibit the transfer of the restricted shares.

**7.03    Regulations.**  The board of directors may make such rules and regulations as it deems necessary that are not inconsistent with the bylaws or with the articles of incorporation, concerning the issue, transfer and registration of certificates for shares of stock of the corporation.

## 8. DIVIDENDS

**8.01    Identity of Shareholders.**  The corporation shall be entitled to treat the holder or registered owner of any share of stock as the holder in fact thereof, and accordingly, shall not be bound to recognize any equitable or other claim to or interest in such shares on the part of any other person, whether or not it shall have express or other notice thereof, except as expressly provided by the laws of Wyoming.

**8.02    Payment of dividends.**  Dividends on the capital stock of the corporation, subject to the provisions of the Articles of Incorporation, if any, may be declared by the board of directors at any regular or special meeting pursuant to law.

**8.03    Corporate Records.**  The board of directors may close the transfer books in its discretion for a period not exceeding fifteen (15) days preceding the date fixed for holding any shareholder meeting or the day appointed for the payment of a dividend.

**8.04    Reserves.**  Before payment of any dividend or making any distribution of profits, there may be set aside out of funds of the corporation available for dividends, such sum or sums as the directors may from time to time, in their absolute discretion, deem proper as a reserve fund to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or for any such other purpose as the directors deem necessary to protect the interest and purpose of the corporation, and the directors may modify or abolish any such reserve in the manner in which it was created.

## 9.  WAIVER OF NOTICE

Whenever any notice whatever is required to be given under the provisions of these bylaws, pursuant to the articles of corporation, or under the laws of the State of Wyoming, a waiver in writing signed by the person entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

## 10.  DOCUMENT COPIES

Except as provided in these bylaws or where otherwise limited by law, any photocopy, facsimile copy, or other reliable reproduction of any writing may be substituted for the original writing or any original signature affixed thereto for any corporate purpose for which the original could be used, provided that the copy or reproduction is a complete reproduction of the entire original writing.

## 11.  AMENDMENTS

Unless otherwise prescribed by law or the Articles of Incorporation, these Bylaws may be amended or altered at any meeting of the Board of Directors by affirmative vote of a super majority (75%) of the directors. Unless otherwise prescribed by law or the Articles of Incorporation, the super majority (75%) of Shareholders entitled to vote in respect of the election of directors, however, shall have the power to rescind, amend, alter or repeal any Bylaws and to enact Bylaws which, if expressly so provided, may not be amended, altered or repealed by the Board of Directors.

The undersigned, being the secretary of BLOCKCHAIN GAME PARTNERS, INC., hereby acknowledges that the above and foregoing bylaws were duly adopted as the bylaws of said corporation on the __15__ day of ____March____, 2019.

**IN WITNESS WHEREOF,** I have hereunto subscribed my name this __15__ day of ____March____, 2019.

____Wright Thurston____, Secretary

Page 10

# EXHIBIT C

**Terms and Conditions**
**Latest Update: July 21st, 2023**
These Terms and Conditions constitute the User Agreement and Terms of Service (hereafter the "Terms & Conditions") between Blockchain Game Partners Inc. dba Gala Games (referred to as "GALA" or the "Site") and any person, customer, or entity (referred as the "User") utilizing the website or applications, GALA Blockchain and any products, features and services provided thereon ("GALA Services"). These Terms & Conditions do not create any agency, partnership, or joint venture between GALA and User. By signing up for an account through GALA or any associated websites, APIs, or mobile applications, the User has read and consents to the Terms & Conditions. The User also agrees to GALA's Privacy Policy and User Conduct. These Terms & Conditions may be amended and updated from time to time at the sole discretion of GALA. Revised versions will be considered effective as of the date and time posted on the GALA Site.

**1. GALA SERVICES.**
GALA is a decentralized distributed application on a blockchain network, using smart contracts (each a "Smart Contract") to enable its Users to own, buy, sell, transfer, and share unique digital rewards that can be visualized on the GALA Site through the GALA App.

1.1 GALA Game Node. GALA Game Node is a computer software and hardware system connected to GALA. The GALA Game Node supports blockchain video games by maintaining the cryptography and confirming transactions on the GALA Blockchain through the GALA App. Used herein, "GALA Game Node" may represent either the node itself or a license the User obtains to run said node. The GALA Game Nodes when combined form the "GALA Game Node Network".

1.2 GALA Blockchain. The GALA Blockchain allows each User to store items, characters, digital rewards, and other attributes on the GALA Blockchain public ledger that allows for decentralized, immutable record of ownership. Each User owns the non-fungible token (an "NFT") for any of the in-game items on the GALA Blockchain. When a User purchases, earns, or receives any NFT or digital reward the Smart Contract process, the User owns completely and outright the NFT and/or digital reward. For the avoidance of doubt, the User acknowledges and agrees that while the User may own an NFT or digital reward, the underlying embedded intellectual property rights may be subject to certain licensing requirements, and GALA can only convey such rights to Users so long as GALA holds a valid license to the intellectual property. If such license terminates, GALA, and by extension the User, may not have any rights to the underlying embedded intellectual property in the User's NFTs or Platform Assets, and the underlying embedded intellectual property may be changed or removed at GALA's determination.

1.3 GALA Reward. Each User of any game on the GALA Blockchain or the Site or any game contained on the Site or associated websites, and associated GALA Game Node, may be able to earn or receive the GALA Reward. The "GALA Reward" consists of a representation of GALA token, or other game tokens and NFTs, reflected on the GALA Blockchain and/or GALA App and the Site, which may or may not be bridged to other blockchains (including but not limited to Ethereum) through a minting process solely at the option and action of the User.  When referencing the NFTs on the platform themselves in the singular and not specifically as a part of the GALA Reward, same shall be referred to herein as "Platform Asset." The GALA Reward is a digital reward and not a Security Token.  The GALA Reward is not being offered to investors and there is no Initial Coin Offering (ICO) to promote the GALA Reward. Like BTC (which is the digital reward generated from the Bitcoin blockchain), the GALA reward is created through a unique blockchain protocol. Each User that participates in the GALA Blockchain protocol shall receive 100% of the User's allocated GALA Reward and any other digital reward or NFT, which is deposited in the User's GALA App. The GALA Reward, any NFT, and any other digital reward may

reside solely within the GALA Blockchain, and may or may not have value. GALA cannot, and does not, control whether any of the GALA Reward, any NFT, and any other digital reward has monetary value on any other blockchain. On the GALA Blockchain, the Site, or any associated website, neither the GALA Reward nor NFT nor other digital reward may be exchanged for currency.

1.5 GALA App

1.5.1. GALA App must be used through a supported web browser on either desktop or mobile device. GALA will provide each User with a GALA App. GALA will never take custody or control over any NFT or digital reward stored in a User's GALA App. The GALA App does not store, send or receive any NFT or reward, but such transactions occur directly on the GALA Blockchain or other supported blockchains. Instead of the GALA App, the User may install and use any compatible digital app or electronic wallet provided by a third party company that safely connects to the GALA Blockchain.If the User is a current Gala wallet holder, the User will be able to connect to MetaMask wallet, however, the User's original Gala wallet will not be usable on the platform. MetaMask and other electronic wallets allow the User to purchase (either directly via Coinbase or via third party sites), store, and engage in transactions using Ethereum cryptocurrency. Ethereum requires the payment of a transaction fee ("Gas fee") for every transaction that occurs on Ethereum network. The User will need to pay a Gas fee for each transaction that occurs via MetaMask or any other similar third party company that provides an electronic wallet. GALA neither owns nor controls Metamask, Coinbase or any third party company, product or service that User may access, visit, or use. GALA will have no access or control over these payments or transactions, or ability to to reverse any payments or transactions. GALA will be not liable for acts or omissions of Metamask, Coinbase, or any other such third parties, nor will GALA be liable for any damage that you may suffer as a result of your transactions or any other interactions with any such third parties. A User may be able to use the GALA App or other compatible wallet to send and receive any NFT or digital reward with other users of the GALA Blockchain. GALA does not offer any User the ability to exchange one form of currency for any other form of currency (fiat or digital). GALA App is not a custodian, exchange or money transmitter.

1.5.2. When a User creates a GALA App, the GALA Blockchain software generates a cryptographic private key and public key pair that the User must use to send and receive any NFT or digital reward supported on the GALA Blockchain. The User is solely responsible for storing, outside of GALA's Services, a backup of any User's GALA App, private key(s), or transaction information that the User maintains in the GALA App or otherwise with the GALA Services. If the User does not backup the GALA App, the User may not be able to access the GALA in the event that GALA discontinues some or all of the GALA Services.

1.5.3. In order for a transaction to be validated on the GALA Blockchain, any GALA transaction through the GALA App must be confirmed and recorded in the distributed ledger associated with the GALA Blockchain. The GALA Blockchain is a decentralized, peer-to-peer network supported by the users of the GALA Blockchain, which is not owned, controlled or operated by GALA.

1.5.4. GALA has no control over any NFT or digital reward (including the GALA Reward) generated through the GALA Blockchain or the GALA App or Site, and cannot ensure that any transaction details a User submits via the GALA Services and GALA App or Site will be confirmed or processed on the GALA Blockchain. The User agrees and understands that the transaction details submitted by the User via the GALA Services and GALA App may not be completed or may be delayed by the GALA Blockchain or any supporting blockchain used to process the transaction. GALA does not guarantee that the GALA App can transfer title or right in any NFT or digital reward, and GALA makes no warranties of title of any kind. Once

transaction details have been submitted to the GALA Blockchain, GALA cannot assist the User to cancel or otherwise modify such transaction or details.

1.5.5. In the event of a fork of the GALA Blockchain or any other supported blockchain, GALA may not be able to support the User's activity related to GALA or any other supported NFT or reward. The User agrees and understands that in the event of a fork of the GALA Blockchain, any transaction associated with the GALA App or GALA Services may not be completed, may be partially completed, incorrectly completed, or substantially delayed. GALA is not responsible for any loss incurred by any User caused in whole or in part, directly or indirectly, by a fork of the GALA Blockchain.

1.5.6. With respect to the GALA App, GALA does not receive or store a User's GALA App password, or any keys, network addresses or transaction history. GALA cannot assist any User with GALA App password retrieval. The User is solely responsible for remembering, storing and keeping secret the User's GALA App PIN (password), keys and address. Any NFT or digital reward a User has stored within its GALA App may become inaccessible if the User does not know or keep secret its GALA App keys and PIN. Any third party with knowledge of one or more of a User's credentials (including, without limitation, a backup phrase, App identifier, PIN, or keys) can dispose of the NFT or digital rewards in the User's GALA App.

1.5.7. GALA does not currently charge a fee for the GALA App, receiving, sending, or storing GALA. However, GALA reserves the right to do so in the future, and in such case any applicable fees will be displayed prior to the User incurring such fee. Notwithstanding, the GALA Blockchain may have Blockchain Transaction Fees required to transact NFT or digital reward transactions through the GALA Blockchain. GALA may attempt to calculate for the User any Blockchain Transactions Fees, though such calculation may be inaccurate or excessive. The User may select a greater or lesser fee, and the User is solely responsible for paying any Blockchain Transaction Fees required on the GALA Blockchain. GALA will neither advance nor fund any Blockchain Transaction Fee on any User's behalf, nor be responsible for any excess or insufficient fee calculation.

1.5.8.  From time to time, there may be programs in place to allow User to receive a reward, in the form of Gala Reward, NFT, or otherwise, based on actions taken by the User, whether it be by referral or other program in place at the time ("Additional Rewards").  User understands that GALA makes no representations or warrants regarding the Additional Rewards.  Notwithstanding or limiting the foregoing, GALA further makes no representations or warrants surrounding the operation of any GALA Services or that said GALA Services/Additional Rewards will be error-free or uninterrupted.  User accepts the sole responsibility for taking any and all actions to obtain any Additional Rewards, and holds GALA harmless for any opportunity cost or losses that occur as a result of the non-receipt of anticipated Additional Rewards, monetary or otherwise.

1.5.9. Each User is permitted to have one (1) GALA App, unless an exception set forth herein applies. The sole exception to permitting a User to have more than one (1) GALA App is if the User is utilizing an additional GALA App for asset security purposes. For the avoidance of doubt, no more than one (1) Gala App shall be permitted for any other reason, including but not limited to, use in promotions and/or events, for personal gain, or frailest purposes.

If a User creates more than one (1) Gala App for any reason other than the sole exception stated herein GALA GAMES reserves the right to suspend User from the GALA App. Should GALA GAMES determine, in its sole discretion, that a User, directly or indirectly, holds, accesses or controls more than one GALA App, all of said User GALA Apps, including User's original GALA App, may be frozen pending investigation. Upon completion of the investigation, GALA GAMES may determine, in its sole discretion, to terminate the Users GALA App and User from GALA GAMES Platform. In addition, upon completion of the investigation, GALA GAMES may, in its

sole discretion, permit the User to keep multiple GALA Apps or consolidate GALA Apps. When a GALA App is frozen, the User may be prohibited from performing any transactions via the GALA App.

GALA GAMES shall not be responsible for any losses or damages resulting from a suspension and/or termination of a User's account for violating the Terms and Conditions.

1.5.10. For initial signup for the GALA App, all Users need to provide a valid email address and password. If a User receives an award of any type from GALA GAMES, the User must, when and as requested, supply GALA GAMES with additional identification information to verify the User's identity ("KYC Information") to receive the award. User represents that GALA GAMES has permission to share information with our designated KYC Partners ("KYC Partners") and all User KYC Information provided is true and accurate and shall immediately update such information in the User's GALA App or by notice to GALA GAMES, upon any changes to such information. GALA GAMES reserves the right to terminate Users GALA App, withhold any award and/or suspend performance hereunder immediately on determining: (i) any User KYC Information is false, inaccurate, misleading or out of date and/or (ii) User does not get approved by the KYC Partner.

1.6  GALA LAUNCHER

The User understands and acknowledges that by downloading the application entitled "Gala Launcher" that it has read and understood and agrees to be bound to the Limited Software Warranty and License Agreement.

**2. PAYMENT TERMS.**

2.1. Annual License and Monthly Service Fees.

The User shall pay a one-time GALA Game Node license fee. GALA or any of its affiliates or third parties may be the party that sells the software or hardware for any GALA Game Node.

2.2. Software License.

The User may be required to enter into a software license agreement with GALA or any third party for the use of any required software for each GALA Game Node. The User shall pay all associated software license fees.

2.3. Equipment Purchase.

The User may enter into an equipment purchase agreement as it relates to the purchase of any hardware for an GALA Game Node. The User is not required to purchase such hardware, but may use any equipment technology (e.g. computer, GPU, cell phone, or other technology) that can appropriately and safely access and connect to the GALA Blockchain.

2.4. Maintenance and Hosting Fees.

GALA does not maintain or host any GALA Game Node, but may refer the User to one or more third-party hosting companies that may or may not be affiliated with GALA. If the User elects and is part of a separate hosting agreement, the User may be required to pay certain data center operations, maintenance and power fees ("Maintenance Fees").

2.5. Blockchain Transaction Fees.

The delivery and receipt of any of the User's NFT or digital rewards through the GALA App may be subject to network or transaction fees charged by the blockchain associated with the User-selected algorithm ("Blockchain Transaction Fees"), which are non-refundable. Blockchain Transaction Fees are paid to emit, record, verify, and process a transaction on the blockchain. Any withdrawal or transfer of the User's NFT or digital reward are subject to Blockchain Transaction Fees.

2.6. Other Third-Party Fees.

Certain digital apps, app addresses, tools, and third-party software and devices ("Third-Party Fees") used by the User may also charge the User a fee, including a per transaction or transfer fee, which are non-refundable. The User is responsible for satisfying any such fee(s). The User

should note that any such fees may significantly reduce the User's rewards and therefore the User is responsible for managing the selection, use, rate and frequency of their receipt of rewards to any such Third-Party Fees.

2.7. Taxes.

The User is responsible for any taxes, and the User will pay for GALA Services without any reduction for taxes. If the User is required by law to withhold any taxes from its payments to GALA, the User must provide GALA with an official tax receipt or other qualified documentation to support such withholding, including value added tax ("VAT"), if applicable. The User will be liable to pay (or reimburse GALA) for any taxes, interest, penalties or fines which may arise from any mis-declaration made by the User. The User shall pay GALA for all taxes and governmental fees GALA is required to collect or pay upon sale or delivery of GALA Services.

POTENTIAL USERS OF NFTS OR DIGITAL REWARDS, INCLUDING BUT NOT LIMITED TO BITCOIN, ARE FOREWARNED OF POSSIBLE FINANCIAL LOSS AT THE TIME SUCH REWARDS ARE EXCHANGED FOR FIAT CURRENCY DUE TO AN UNFAVORABLE EXCHANGE RATE. MOREOVER, A FAVORABLE EXCHANGE RATE AT THE TIME OF EXCHANGE MAY RESULT IN A TAX LIABILITY. USERS SHOULD CONSULT A TAX ADVISOR REGARDING ANY TAX CONSEQUENCES ASSOCIATED WITH THE PURCHASE, SALE, TRADE, RECEIPT OR OTHER USE OF DIGITAL REWARDS.

2.8. CREDIT CARD PURCHASES

If User pays by credit card or certain other payment instruments, User may be provided with a third-party interface (hereinafter "Payment Processor"), to input, change, and update Users payment information to make payment. The processing of payments may be subject to the terms, conditions, and policies of the Payment Processors in addition to this agreement (Circle (https://support.usdc.circle.com/hc/en-us/articles/360001233386). All User rights and privileges with respect to Payment Processor are set out in the Circle Account User Agreement. GALA has no liability for fiat transactions, all of which liability rests with Payment Processor. GALA is not a custodian for Users' credit card or certain other payment instruments and is not responsible for the acts or omissions of the Payment Processor(s).

Users agree to pay GALA through the payment processors, all applicable fees and customer agrees and authorizes GALA and payment processor us to charge all sums including all applicable taxes to payment methods specified or linked to your account.

When Users provide payment information to Payment Processor or to one of its payment processors, User represent that User is the authorized User of the card, PIN, key, or account associated with that payment, and Users authorizes GALA and Payment Processor to charge User's credit card or to process User's payment with the chosen third-party payment processor for any payment, withdrawal, or fees incurred by you.

FOR PAYMENTS IN CRYPTOCURRENCY: PAYMENT PROCESSOR ONLY SUPPORTS USDC.

The User has read the Terms & Conditions and understands that by purchasing with a credit card, the item will not be claimed until at least fourteen (14) days from the date the purchase is completed.

Transaction Limits – User understands and acknowledges that Users use of the Services is subject to a transactional limit in a given time period. Such limits may vary, at our sole discretion.

Transactional Limits:

Single Transaction: $5,000

Daily: $5,000

Weekly: $10,000

Monthly: $40,000

"Charge Backs"

In the event of a charge back, GALA may, in its sole discretion, carry out one or more of the following actions:

User will be temporarily auto banned

User will not be eligible for daily distribution

2.9 Refunds.

All sales are final. GALA does not offer any refunds or money back guarantees on any or all GALA Services, unless otherwise specified herein. User recognizes and agrees that User will not be entitled to a refund for any purchase under any circumstances. THE COMPANY MAKES NO WARRANTIES REGARDING THE PERFORMANCE OR OPERATION OF THE WEBSITE or GALA Services.

**3. USER OBLIGATIONS**

3.1. Software and Equipment Allocation.

The User is responsible for the allocation of the User's software and equipment and selected optimization decisions. The User acknowledges that GALA is not responsible for the selection or timing of blockchain protocols, nor is GALA responsible for the protocols selected for use in connection with GALA Services. The User is solely responsible for these decisions and shall monitor and allocate strategies through the User's GALA App. The User acknowledges that the node transactions on any blockchain may vary and will not be uniform across each GALA Game Node.

3.2. Log-in Credentials.

The User represents and warrants that the User is responsible for the preservation of confidentiality of the User's login credentials on the GALA App and any other login for the GALA Services. Login credentials generated for the User by GALA are for the User's internal use only and the User is strictly prohibited from selling, transferring, or sub-licensing them to any other entity or person.

3.3. Blockchain Network Risk.

The User represents and warrants that the User accepts the risks of blockchain protocol and network, including instability, congestion, high transaction costs, hacking, network latency, information security, regulatory risk, and technological and operational error. The User understands these risks may result in delay or failure to process transactions and potentially high Blockchain Transaction Fees or Third Party Fees. The User represents and agrees that GALA is not responsible for any diminished GALA Services, related features, or capabilities resulting from blockchain network risk. In the event of a material increase or decrease to Blockchain Transaction Fees, Third Party Fees, or operational degradation, congestion, failure or other disruption of the blockchain network used by the User, GALA may, at its sole discretion and upon notice to the User, make any adjustments to the GALA Services.

3.4. Blockchain Modification Risk.

The User represents and warrants that the User is familiar with and accepts the risks associated with blockchain development and code changes. Blockchain technologies are still under development and may undergo significant changes over time. Blockchain contributors may make changes to features and specifications of the algorithm selected by the User, and may fork the GALA Blockchain protocol. Such changes may include or result in the elimination or support for specific algorithms and applications.

3.5. Trade Compliance.

User shall comply with all applicable import, re-import, sanctions, anti-boycott, export, and re-export control laws and regulations, including all such laws and regulations that apply to European Union and U.S. companies, such as the Export Administration Regulations, the

International Traffic in Arms Regulations, and economic sanctions programs implemented by the Office of Foreign Assets Control and the European Union's Common Foreign and Security Policy (collectively, "Trade Sanctions Laws"). The User represents and warrants that the User and the User's financial institutions, or any party that owns or controls the User or the User's financial institutions, are not subject to sanctions or otherwise designated on any list of prohibited or restricted parties, including but not limited to the lists maintained by the United Nations Security Council, the U.S. Government (e.g., the Specially Designated Nationals List and Foreign as Evaders List of the U.S. Department of Treasury, and the Entity List of the U.S. Department of Commerce), the European Union or its Member States, or other applicable government authority.

3.6 Compliance with Local Laws and Regulations.

User shall not attempt to purchase any GALA products restricted by local laws and regulations. GALA may from time to time geoblock or otherwise restrict access to this site as necessary to ensure compliance with laws and regulations. GALA is not responsible for any loss as a result of such compliance with local laws and regulations.

3.7 Ownership Restrictions.

User acknowledges and agrees that GALA, any game developer, or third party contact provider (or, as applicable, any licensors) own all legal right, title and interest in and to all elements of their respective intellectual property rights therein. The visual interfaces, graphics (including, without limitation, all art and drawings associated with the), design, systems, methods, information, computer code, software, services, "look and feel", organization, compilation of the content, code, data, and all other elements of any content provided on the Site, GALA App, or GALA Blockchain are protected by copyright, trade dress, patent, and trademark laws, international conventions, other relevant intellectual property and proprietary rights, and applicable laws. All such intellectual property are the property of its owners or licensors, and all trademarks, service marks, and trade names are proprietary to its owner or licensors. Except as expressly set forth herein, the use of the GALA Services and GALA App does not grant User any ownership of or any other rights with respect to any content, code, data, or other materials that you may access on or through the GALA App. When a User purchases or owns a Platform Asset, the User owns the underlying NFT completely for as long as the User owns the Platform Asset, subject to the terms and restrictions of this Agreement and any accompanying license restrictions for the Platform Asset. Ownership of the NFT is mediated entirely by the smart contract and Ethereum Network (or any other applicable network): at no point may GALA seize, freeze, or otherwise modify the ownership of the Platform Asset. The User acknowledges and agrees that while the User may own a Platform Asset, the underlying embedded intellectual property rights may be subject to certain licensing requirements, and GALA can only convey such rights to Users so long as GALA holds a valid license to the intellectual property. If such license terminates, GALA, and by extension the User, may not have any rights to the underlying embedded intellectual property in the User's owned Platform Asset, and the underlying embedded intellectual property may be changed or removed at GALA's determination.

3.8 Children.

USER AFFIRMS HE/SHE IS OVER THE AGE OF 18, AS THE GALA APP AND GALA SERVICES ARE NOT INTENDED FOR CHILDREN UNDER AGE 18.

3.9 User Conduct.

GALA values transparency and is committed to providing Users with the best experience levels. However, to protect GALA's Users and comply with our legal obligations, GALA reserves the right to take action, with or without advance notice, if

GALA believes the User has violated these Terms and Conditions. This may include but is not limited to: ban User; disable User ability to use the GALA Services in conjunction with buying NFTs available on Gala Site; disable User's ability to access GALA Services; and/or other actions. Notwithstanding the foregoing, if User breaches this Section 3.9, User will not be entitled to a refund for any GALA Services.

User agrees to not violate any law, contract, intellectual property or other third-party right, and that User is solely responsible for User's conduct and content, while accessing or using the GALA Services. User further agrees that User will not: (i) use or attempt to use another User's Account without authorization from such User; (ii) pose as another person or entity, or use a wallet to engage in a transaction on GALA App that is owned or controlled, in whole or in part, by any other person; (iii) confuse others, derive others' goodwill, or otherwise engage in name squatting; (iv) access GALA Services from a different blockchain address and/or email address if GALA has blocked any of User's other blockchain addresses and/or email addresses from accessing the GALA Services, unless User has GALA's written permission first; (v) distribute spam or unsolicited messages, including but not limited to, sending unwanted NFTs to other Users; (vi) use the GALA Services – including but not limited to through disseminating any software or interacting with any API – that could damage, disable, overburden, or impair the functioning of the GALA Services in any manner; (vii) bypass or ignore instructions that control access to the GALA Services, including but not limited to, attempting to circumvent any rate limiting systems by using multiple API keys, directing traffic through multiple IP addresses, or otherwise obfuscating the source of traffic User sends to GALA; (viii) use GALA Services for commercial purposes inconsistent with these Terms and Conditions or any other instructions given by GALA in the present or future; (ix) use any data mining, robot, spider, crawler, scraper, script, browser extension, offline reader, or other automated means or interface not expressly authorized by GALA to access the GALA Services, extract data, or otherwise interfere with or modify the rendering of GALA  pages or functionality;(x) reverse engineer, duplicate, decompile, disassemble, or decode any aspect of the GALA Services, or any action that might discover source code or bypass or circumvent measures employed to prevent or limit access to any service, product, license, area, or code of the GALA Services; (xi) sell or resell the GALA Services in a manner that violates any law or contract, or in a way that attempts to circumvent any GALA fee systems or rules;(xii) use the GALA Services or data collected from GALA Services for any advertising or direct marketing activity (including without limitation, email marketing, SMS marketing, and telemarketing) without our express authorization and approval; (xiii) use the GALA Services for, or in connection with, money laundering, terrorist financing, or other illicit financial activity, or in any way in connection with the violation of any law or regulation that applies to User or to GALA; (xiv) use the GALA Services, directly or indirectly, for, on behalf of, or for the benefit of, (a) any natural or legal person that is the subject of Sanctions; (b) any natural or legal person located in, ordinarily resident in, or organized under the laws of, any Embargoed Jurisdiction; or (c) any legal person owned or controlled, directly or indirectly, by any natural or legal person located in, ordinarily

resident in, or organized under the laws of, any Embargoed Jurisdiction; (xv) use the GALA Services to carry out any financial activities subject to registration or licensing, including but not limited to creating, offering, selling, or buying securities, commodities, options, or debt instruments; (xvi) user acknowledges that GALA does not offer any securities and User shall not use the GALA Services to create, sell, or buy NFTs or other items under the impression that it either gives owners or other Users rights to participate in an ICO or any securities offering, or that GALA Services are redeemable for securities, commodities, or other financial instruments; (xvii) use the GALA Services to engage in price manipulation, fraud, or other deceptive, misleading, or manipulative activity; (xviii) use the GALA Services to buy, sell, or transfer stolen items, fraudulently obtained items, items taken without authorization, and/or any other illegally obtained items; (xix) infringe or violate the intellectual property rights or any other rights of others; (xx) use the GALA Services for any illegal or unauthorized purpose, including creating or displaying illegal content, such as content that may involve unethical behavior, morally reprehensible actions, or encouraging or promoting any activity that violates these Terms and Conditions or any law, regulation or contract;(xxi) send, upload, distribute or disseminate any unlawful, defamatory, harassing, abusive, fraudulent, obscene, or otherwise objectionable content; (xxii) use the GALA Services in any manner that could interfere with, disrupt, negatively affect or inhibit other Users from fully enjoying the GALA Services; (xxiii) remove any copyright, trademark or other proprietary rights notices contained in or on the GALA App or GALA Blockchain or any part of it; (xxiv) reformat or frame any portion of the GALA App; (xxv) create user accounts by automated means or under false or fraudulent pretenses; (xxvi) trick, defraud, or mislead GALA or other Users, including but not limited to, for the purpose of attempting to learn sensitive account information; (xxvii) attempt to bypass any security measure of the Site; (xxviii) copy or adapt the Site; or, (xxix) disparage, tarnish, or otherwise harm, in GALA's sole discretion, GALA and/or the Site.

Notwithstanding the foregoing, it is in GALA's sole discretion to determine if User has violated any of the above User Conduct guidelines.

3.10 Representations Made By User.

User acknowledges and agrees that the Gala Services, including but not limited to the Gala Game Node and GALA Reward, ARE NOT being sold as an investment by or of GALA.  THE USER UNDERSTANDS THAT ANY REPRESENTATIONS MADE BY THE USER AT ANY TIME THAT ANY OF THE GALA SERVICES ARE AN INVESTMENT IN GALA (OR OTHERWISE, INCLUDING, BUT NOT LIMITED TO, IN GENERAL) TO OTHERS IN A DIRECT ATTEMPT TO MARKET GALA SERVICES IN COORDINATION WITH SUPPLYING USER'S REFERRAL LINK IS A DIRECT BREACH OF THE TERMS & CONDITIONS. A determination of same will be made at the sole discretion of GALA.

3.11  GALA GAME NODE REPRESENTATIONS

GALA and the User recognize that the SOLE AND ONLY purpose of the GALA Game Node is to support the Gala Games Node Ecosystem.  Nothing contained in this Agreement, exhibit to this Agreement, or any representation made outside of this Agreement, conveys on the User any ownership interests in GALA or its subsidiaries, or interests otherwise in the GALA (including, but not limited to voting rights in the GALA), nor any expectation of profits from the efforts of the GALA or its principals or subsidiaries.  The User understands that while it may from time to time receive rewards in line with the distribution schedule of the Node Ecosystem ("Distribution

Rewards") (subject to change), said reward is solely earned because of and as a direct result of work accomplished and performed by the User (i.e. work done by the GALA Game Node). The User recognizes that should the User never actually run the GALA Game Node, it will receive no rewards. GALA has no control of the method in which rewards are distributed to the GALA Game Node. It is anticipated that the GALA Game Node will be able to be sold or transferred in the future as Non-Fungible Tokens, however, GALA cannot and does not warrant or represent that the resale value of the Nodes will be higher than the purchase price should this event occur, nor that it will be legally possible to do so. Further, GALA cannot and does not warrant or represent that there will ever be a resale value or capability of the GALA Game Node.

3.12  Play to Earn Mechanisms

If the User elects to engage in any play to earn mechanism (including, but not limited to, any mechanism that permits the User to play any games or use any GALA Services on the GALA App, Site or otherwise), the User will be responsible to pay any and all sales, use, value-added or other taxes, duties and assessments now or hereinafter claimed or imposed by any governmental authority. The User will reimburse GALA for all national, federal, state, local, or other taxes and assessments of any jurisdiction, including value-added taxes and taxes as required by international tax treaties, customs or other import or export taxes, and amounts levied in lieu thereof based on charges set, services performed or payments made hereunder, as are now or hereafter may be imposed under the authority of any national, state, local or any other taxing jurisdiction; and (ii) shall not be entitled to deduct the amount of any such taxes, duties or assessments from payments made to us pursuant to these Terms. User is solely responsible for determining what, if any, taxes apply to User and play to earn mechanisms, and any other transactions conducted by the User. GALA does not act as a withholding tax agent in any circumstances.

User further understands and acknowledges that GALA is not responsible, and User accepts sole responsibility for any and all missed GALA Reward or otherwise, regardless of the source of any error, fault or otherwise.  Any and all play to earn mechanisms in place (including, but not limited to, the method, amounts or otherwise) are not permanent and may or may not be changed at the sole discretion of GALA at any time.

**4. TERMINATION**

4.1. General.

GALA may suspend or terminate the User's right to access or use GALA Services immediately and without notice if: (i) GALA determines the User's use of the GALA Services poses a security risk to GALA Services or any third party, could adversely impact GALA, GALA Services, GALA Blockchain or any other GALA users, or could subject GALA, its affiliates, or any third party to liability, or could be fraudulent; (ii) the User is in breach of these Terms & Conditions; (iii) the User initiated a chargeback or dispute with respect to any payment or purchase of the GALA Services; (iv) the User has ceased to operate in the ordinary course, made an assignment for the benefit of creditors or similar disposition assets, or become the subject of any bankruptcy, reorganization, liquidation, dissolution or similar proceeding; or (v) for any other reason at GALA's discretion.

4.2. Effect of Suspension.

If GALA suspends the User's right to access or use any portion or all of the GALA Services, the User shall remain responsible for all fees and charges the User incurs during the period of suspension, including any Maintenance Fees and Blockchain Transaction Fees; and the User may be in violation of the User's hosting agreement or the blockchain protocols, which may prevent or limit the User's entitlement or access to any results or rewards that may have occurred during the User's suspension of the GALA Services. User agrees to pay any fee charged by GALA to reconnect the GALA Services.

4.3. Effect of Termination.

If GALA terminates the User's right to access or use any portion or all of the GALA Services, then all of the User's rights under these Terms & Conditions immediately terminate and the User shall remain responsible for all fees owed to GALA incurred through the termination date.

**5. GOVERNANCE**

5.1. Advisory Board. The GALA Blockchain may have an advisory board.

5.2. Voting for GALA Blockchain Updates and Amendments. The GALA Blockchain may have voting protocols.

5.3. Consensus Nodes. The GALA Blockchain may have consensus nodes, which are the GALA Game Nodes that approve and validate transactions, and contribute to the security and stability of the network. Any User that owns an GALA Game Node involved in the consensus protocol may be rewarded from the GALA Blockchain and be able to charge Blockchain Transaction Fees.

5.4. Community and Decentralized Innovation. The GALA Blockchain invites any person or entity throughout the world to contribute to the GALA Blockchain, including coders, application developers, marketers, advertisers, and service and maintenance providers. Accepted amendments, updates, and innovation from individuals or groups of the GALA Blockchain community may be rewarded from the GALA Blockchain rewards.

**6. PUBLICITY**

The User is permitted to state publicly that it is a customer or user of GALA, consistent with any Trademark Guidelines which may be adopted by GALA from time to time. The User agrees to abide by the Privacy Policy and Code of Conduct of GALA.

**7. REPRESENTATIONS AND WARRANTIES**

Each party represents and warrants that: (i) it has full power, legal capacity,  and authority to enter into these Terms & Conditions; and (ii) it will comply with all laws and regulations applicable to its provision or use of GALA Services. If User provides any information that is untrue, inaccurate, not current, or incomplete, GALA has the right to suspend or terminate User's account and refuse any and all current or future use of the GALA Services.

USER ACKNOWLEDGES AND AGREES THAT USER DOES NOT RESIDE IN ANY REGION THAT EXPLICITLY BANS THE USE OF LOOT BOXES IN GAMES IN ACCORDANCE WITH GAMBLING LAWS.

**8. DISCLOSURES & RISKS**

8.1 Notification. GALA notifies each User of certain disclosures and risks associated with blockchain NFT and digital rewards and their associated technology and protocols. GALA Services are not an investment product, and no action, notice, communication by any means, or omission by GALA shall be understood or interpreted as such. GALA has no influence whatsoever on the GALA Blockchain, the transactions and consensus protocols, or the NFTs or digital rewards, including the GALA Reward. Ownership of a GALA App or Game Node or the use of GALA Services does not represent or constitute any ownership right or stake, share or security, debt or equivalent right, or any right to receive any future revenue or form of participation in or relating to any blockchain or digital reward, including the GALA Blockchain or GALA Reward.

8.2 Digital Rewards. Digital rewards are not considered legal tender, are not issued or backed by any government, and have fewer regulatory protections than traditional currency. Moreover, digital rewards are not insured against theft or loss by any insurance corporation or any investor protection, including the Federal Deposit Insurance Corporation or the Securities Investor Protection Corporation.

8.3 Market Risk. The value of NFTs and digital rewards are derived from supply and demand in the global marketplace, which can rise or fall independent of any government currency. Holding

NFTs and digital rewards carries exchange rate and other types of risk. The value of NFTs and digital rewards may be derived from the continued willingness of market participants to exchange traditional government currency for digital rewards, which may result in the potential for permanent and total loss of value of a particular digital reward should the market disappear. The volatility and unpredictability of the price and value of NFTs and digital rewards, relative to government currency, may result in significant loss over a short period of time. GALA cannot guarantee or warrant the value of any NFT, digital reward or blockchain, including the GALA Blockchain and GALA Reward, and explicitly warns the User that that there is no reason to believe that any NFT or blockchain reward will increase in value, and that they may hold no value, decrease in value, or entirely lose value.

8.4. Regulatory Risk. Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and value of virtual NFTs and blockchain rewards.  The regulatory status of cryptographic tokens, digital assets and blockchain technology is unclear or unsettled in many jurisdictions. It is difficult to predict how or whether governmental authorities will regulate such technologies. It is likewise difficult to predict how or whether any governmental authority may make changes to existing laws, regulations and/or rules that will affect cryptographic tokens, digital assets, blockchain technology and its applications.  Such changes could negatively impact the GALA Services in various ways, including, for example, through a determination that any of the above are regulated financial instruments that require registration. GALA may cease any distribution of any of the above, the development of the GALA Games platform or cease operations in a jurisdiction in the event that governmental actions make it unlawful or commercially undesirable to continue to do so.  The industry in which GALA operates is new, and may be subject to heightened oversight and scrutiny, including investigations or enforcement actions. There can be no assurance that governmental, quasi-governmental, regulatory or other similar types of (including banking) authorities will not examine the operations of GALA and/or pursue enforcement actions against GALA. Such governmental activities may or may not be the result of targeting GALA in particular. All of this may subject GALA to judgments, settlements, fines or penalties, or cause GALA to restructure its operations and activities or to cease offering certain products or services, all of which could harm GALA's reputation or lead to higher operational costs, which may in turn have a material adverse effect on the GALA Services.

8.5 Technology Risk. Virtual NFT and digital reward transactions may be irreversible and losses due to fraudulent or accidental transactions may not be recoverable. Some virtual transactions are deemed to be made when recorded on a public ledger, which may not necessarily be the date or time the user initiated the transaction. The nature of such virtual transactions may lead to an increased risk of fraud or cyber-attacks.

8.6 Changes to GALA Game Node Network.

GALA and User recognize that from time to time amendments will be made to the GALA Game Node Network.  GALA and User both specifically agree that GALA will, from time to time, present the GALA Game Node Network with proposed amendments (the "Proposed Amendments") that the Node Network will then vote on whether to implement or not (the "Governance Vote").  The User understands that the Proposed Amendments will be made at the discretion of GALA, and GALA owes the User no duty or obligation to make proposals in its best interests.  The User specifically understands that there may come a time when GALA proposes an amendment that is not in or in direct opposition to the User's best interests, financial or otherwise (including, but not limited to a change in the distribution calculation), and the User has no legal recourse against GALA should any Proposed Amendment be approved and implemented through the Governance Vote.  The User's only recourse is to vote against said Proposed Amendment.  GALA and the User both agree that one such Proposed Amendment

may be to change the specifications, including, but not limited to the internet connection, Random Access Memory, Central Processing Unit requirements, extra space, and any other requirements needed to run the Nodes (the "Specifications"). GALA and User further agree that while the Specifications may be minimal on the effective date of this Agreement, this is subject to change through the Proposed Amendment and the Governance Vote. While GALA does represent and covenant that the GALA Game Node will always be able to be run using the current specifications, GALA does not and cannot represent or covenant that any rewards earned (financial or otherwise) for doing so are not subject to change.

**9. DISCLAIMER**

EXCEPT AS EXPRESSLY PROVIDED FOR IN THESE TERMS & CONDITIONS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, GALA, ITS AFFILIATES, AND ITS SUPPLIERS DO NOT MAKE ANY OTHER WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR USE AND NON-INFRINGEMENT. GALA, ITS AFFILIATES, AND ITS SUPPLIERS ARE NOT RESPONSIBLE OR LIABLE FOR THE DELETION, FAILURE TO STORE, OR ANY LOSS OF ANY USER DATA, INCLUDING BLOCKCHAIN DATA, NFT AND DIGITAL REWARDS DERIVED, MAINTAINED, OR TRANSMITTED THROUGH USE OF GALA SERVICES. THE USER IS SOLELY RESPONSIBLE FOR SECURING ITS CUSTOMER DATA AND DIGITAL REWARDS. NEITHER GALA, ITS AFFILIATES, NOR ITS SUPPLIERS, WARRANTS THAT THE OPERATION OF GALA SERVICES, GALA BLOCKCHAIN, OR ANY OTHER SUPPORTED BLOCKCHAIN WILL BE ERROR-FREE OR UNINTERRUPTED. GALA, ITS AFFILIATES, AND ITS SUPPLIERS ARE NOT RESPONSIBLE OR LIABLE FOR ANY LOSSES OR OPPORTUNITY COSTS RESULTING FROM BLOCKCHAIN NETWORK AND PROTOCOL OR THIRD-PARTY SOFTWARE ISSUES, WHICH MAY IN TURN RESULT IN THE INABILITY TO PROCESS TRANSACTIONS ON ANY BLOCKCHAIN AT ALL OR WITHOUT INCURRING SUBSTANTIAL FEES.

**10. LIMITATION OF LIABILITY**

10.1. Limitation of Indirect Liability.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, GALA AND THE USER SHALL NOT BE LIABLE UNDER THESE TERMS & CONDITIONS FOR LOST REVENUES, OPPORTUNITY COSTS, OR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE DAMAGES, EVEN IF GALA KNEW OR SHOULD HAVE KNOWN THAT SUCH DAMAGES WERE POSSIBLE AND EVEN IF DIRECT DAMAGES DO NOT SATISFY A REMEDY. THIS LIMITATION OF LIABILITY DOES NOT APPLY TO VIOLATIONS OF GALA'S INTELLECTUAL PROPERTY RIGHTS, INDEMNIFICATION OBLIGATIONS, OR THE USER'S PAYMENT OBLIGATIONS.

10.2. Limitation of Amount of Liability.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER GALA NOR ITS AFFILIATES OR SUPPLIERS, MAY BE HELD LIABLE UNDER THESE TERMS & CONDITIONS FOR MORE THAN THE AMOUNT PAID BY THE USER TO GALA UNDER THESE TERMS & CONDITIONS FOR THE 12 MONTH PERIOD PRECEDING THE DATE THE CLAIM AROSE, MINUS ANY REWARDS GENERATED OR RECEIVED BY THE USER AS A RESULT OF THE USE OF GALA SERVICES.

**11. INDEMNIFICATION**

Unless prohibited by applicable law, the User will defend and indemnify GALA and its Affiliates against any settlement amounts approved by the User and damages and costs finally awarded against the User and its affiliates by a court of competent jurisdiction in any formal legal proceeding filed by an unaffiliated third party before a court or government tribunal (including any appellate proceeding) to the extent arising from the User's use of GALA Services.

**12. MISCELLANEOUS**

12.1. Assignment.

The User will not assign or otherwise transfer the User's rights and obligations under these Terms & Conditions, without the prior written consent of GALA, which may be unreasonably withheld. Any assignment or transfer in violation of this section will be void. At any time and without the need for User's consent, GALA may assign any obligation, right and these Terms & Conditions. Subject to the foregoing, these Terms & Conditions will be binding upon, and inure to the benefit of the parties and their respective permitted successors and assigns. The User may not merge these Terms & Conditions with any other agreements with which GALA may be a party.

12.2. Third-Party Communications.

GALA  disclaims all liability for any communications directed to you from any third-party directly or indirectly in connection with the Platform that you may receive, and any actions you may take or refrain from taking as a result of such communications. User is solely responsible for assessing and verifying the identity and trustworthiness of the source and content of such communications. GALA  assumes no responsibility for verifying, and makes no representations or warranties regarding, the identity or trustworthiness of the source or content of any such communications.

12.3. Disputes.

Any dispute, controversy, difference or claim arising out of or relating to these Terms & Conditions or relating in any way to the User's use of GALA sites or GALA Services, including the existence, validity, interpretation, performance, breach or termination thereof or any dispute regarding non-contractual obligations arising out of or relating to these Terms & Conditions the parties may agree to first attempt mediation before a single mediator, administered by the International Centre for Dispute Resolution under its mediation rules, to be held in any location agreed to by the parties, or Salt Lake City, Utah, USA in the English language. If the parties do not agree on mediation, the matter shall be referred to and finally resolved by arbitration before a single arbitrator to be held in Salt Lake City, Utah, USA administered by the International Centre for Dispute Resolution in accordance with International Dispute Resolution Rules. The decision of the arbitrator is final and binding on the parties, and enforceable in a court of competent jurisdiction. The prevailing party shall be entitled to costs and reasonable attorneys' fees for the arbitration. Notwithstanding the foregoing GALA and the User agree that GALA may bring suit in any court of law to enjoin infringement or other misuse of GALA's intellectual property rights. Any disputes that may arise beyond the scope of the arbitration provision shall be exclusively subject to the State or Federal Courts located in Salt Lake City, Utah, USA. The User and GALA consent to personal jurisdiction in those courts. CLASS ACTION WAIVER: TO THE EXTENT PERMISSIBLE BY LAW, ALL CLAIMS MUST BE BROUGHT IN A PARTY'S INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, COLLECTIVE ACTION, OR REPRESENTATIVE PROCEEDING (COLLECTIVELY "CLASS ACTION WAIVER"). THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS OR ENGAGE IN ANY CLASS ARBITRATION. USER ACKNOWLEDGES THAT, BY AGREEING TO THESE TERMS, EACH PARTY WAIVES THE RIGHT TO A TRIAL BY JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION.

12.4. Entire Agreement.

These Terms & Conditions sets out all the terms agreed between the parties and supersedes all other agreements between the parties relating to its subject matter. In entering into these Terms & Conditions, neither party has relied on, and neither party will have any right or remedy based on, any statement, representation or warranty (whether made negligently or innocently), except those expressly set out in these Terms & Conditions. The terms may be updated on GALA sites.

12.5. Force Majeure.

GALA and its affiliates will not be liable for any failure or delay in performance of obligation under these Terms & Conditions where the failures or delay results from any cause beyond reasonable control, including, but not limited to, acts of God, labor disputes or other industrial disturbances, electrical or power outages, utilities or other telecommunications failures, earthquake, storms or other elements of nature, blockages, embargoes, riots, acts or orders of government, acts of terrorism, or war. Force Majeure events include, but are not limited to, upgrades to the validation rules of a given blockchain (e.g., a "hard fork" or "soft fork").

12.6. Governing Law.

Any claim or dispute between the User and GALA arising out of or relating to the User's use of GALA sites, GALA Services, or these Terms & Conditions, in whole or in part, shall be governed by the laws of the State of California, USA without respect to its conflict of laws provisions. The 1980 United Nations Conventions on Contracts for the International Sale of Goods does not govern these Terms & Conditions.

12.7. Language.

All communications and notices made or given pursuant to these Terms & Conditions must be in the English language. If we provide a translation of the English language version of these Terms & Conditions, the English language version will control if there is any conflict.

12.8. Notices to the User and GALA.

GALA may provide any notice to the User under these Terms & Conditions by: (i) posting a notice on GALA Site; or (ii) sending a message to the email address associated with the User's account. Notices provided on GALA Site will be effective upon posting and notices provided by email will be effective when the email is sent. It is the User's responsibility to keep the User's email address current. To give GALA notice under these Terms & Conditions, the User must contact GALA by support@gala.games. GALA may update the address for notices by posting on the GALA Site.

12.9. Severability.

If any portion of these Terms & Conditions is held to be invalid or unenforceable, the remaining portions will remain in full force and effect.