John W. Huber (Utah Bar No. 7226)
Daniel J. Wadley (Utah Bar No. 10358)
Marc T. Rasich (Utah Bar No. 9279)
Alexander Baker (Utah Bar No. 17163)
**GREENBERG TRAURIG, LLP**
222 South Main Street, Suite 1730
Salt Lake City, Utah 84101
Telephone: (801) 478-6900
*john.huber@gtlaw.com*
*wadleyd@gtlaw.com*
*marc.rasich@gtlaw.com*
*bakera@gtlaw.com*

Michael G. Rhodes (California Bar No. 116127)
*Admitted Pro Hac Vice*
**COOLEY LLP**
3 Embarcadero Center, 20th Floor.
San Francisco, CA 94111
Telephone: (415) 693-2000
*rhodesmg@cooley.com*

*Attorneys for Defendants, Counterclaimant, and Crossclaim Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ERIC SCHIERMEYER, Derivatively on Behalf of Nominal Defendant, BLOCKCHAIN GAME PARTNERS, INC. D/B/A GALA GAMES,<br><br>          Plaintiff,<br><br>vs.<br><br>WRIGHT W. THURSTON and TRUE NORTH UNITED INVESTMENTS, LLC,<br><br>          Defendants,<br><br>     and<br><br>BLOCKCHAIN GAME PARTNERS, INC. D/B/A BGP GAMES,<br><br>          Nominal Defendant. | **OPPOSITION TO ERIC SCHIERMEYER'S MOTION TO DISMISS COUNTERCLAIMS**<br><br><br>Case No. 2:23-cv-00589-HCN-DAO<br><br>Judge Howard C. Nielson<br><br>Magistrate Judge Daphne A. Oberg |

TRUE NORTH UNITED INVESTMENTS, LLC,
Derivatively on Behalf of Nominal Defendant,
BLOCKCHAIN GAME PARTNERS, INC. D/B/A
GALA GAMES,

       Counterclaimant,

vs.

ERIC SCHIERMEYER,

       Counterdefendant,


  and

BLOCKCHAIN GAME PARTNERS, INC. D/B/A
BGP GAMES,

       Nominal Counterdefendant.


TRUE NORTH UNITED INVESTMENTS, LLC,

       Crossclaim Plaintiff,

vs.

BLOCKCHAIN GAME PARTNERS, INC. D/B/A
BGP GAMES,

       Crossclaim Defendant.

## **TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................. 1

II.   STATEMENT OF FACTS ..................................................................................... 2

III.  LEGAL STANDARD ............................................................................................ 3

IV.   ARGUMENT ......................................................................................................... 4

   A.   Schiermeyer's Challenges to the Derivative Claims Must Fail ........................ 4

      1.   True North Met the Pleading Requirements for Derivative Claims ............................ 4

      2.   True North Sufficiently Pled Injuries to BGP .......................................................... 10

      3.   True North Sufficiently Pled Schiermeyer's Breach of His Fiduciary Duties .......... 13

      4.   True North Sufficiently Pled Schiermeyer's Waste of Corporate Assets ................. 16

      5.   True North Sufficiently Pled Unjust Enrichment ...................................................... 18

      6.   True North Sufficiently Established the Need for an Equitable Accounting ............. 20

      7.   True North Pled Claims for Judicial Removal of Schiermeyer and the Appointment of
           a Custodian ................................................................................................................... 23

   B.   Schiermeyer's Challenges to the Direct Claims Must Fail ............................ 25

      1.   True North Sufficiently Pled Breach of the Founders Agreement ............................ 25

      2.   True North Sufficiently Pled Breach of the Implied Covenant of Good Faith and Fair
           Dealing ......................................................................................................................... 28

      3.   True North Sufficiently Pled Conversion .................................................................. 28

      4.   True North Sufficiently Pled Tortious Interference with BGP's Terms and Conditions
           31

      5.   True North Sufficiently Established the Need for Declaratory Relief ....................... 32

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Boland v. Engle*,
113 F.3d 706 (7th Cir. 1997) ...................................................9

*Caparos v. Morton*,
364 Ill. App. 3d 159 (2006) ...................................................12

*Davidson-Eaton v. Iversen*,
2022 WY 135, 519 P.3d 626 (Wyo. 2022) ...................................................19

*Delaware Cnty. Emps. Ret. Fund v. Sanchez*,
124 A.3d 1017 (Del. 2015) (discussing Delaware Chancery Rule 23.1, which
has the same "particularity" requirement as its Federal and Wyoming Rule
23.1 counterparts) ...................................................8

*Dias v. City & Cty. of Denver*,
567 F.3d 1169 (10th Cir. 2009) ...................................................3

*Disability Law Ctr. v. Utah*,
180 F. Supp. 3d 998 (D. Utah 2016) ...................................................3

*Enterprise Warehousing Solutions v. Capital One Services*,
2002 WL 406976 (N.D. Ill. Mar. 15, 2002) ...................................................19, 22

*Erickson v. Pardus*,
551 U.S. 89 (2007) ...................................................3, 27, 28

*Excel Constr., Inc. v. HKM Eng'g, Inc.*,
2010 WY 34 (Wyo. 2010) ...................................................28, 29

*Fritchel v. White*,
2019 WY 117 (Wyo. 2019) ...................................................9

*Gaines v. Stenseng*,
292 F.3d 1222 (10th Cir. 2002) ...................................................3, 27

*GFF Corp. v. Associated Wholesale Grocers, Inc.*,
130 F.3d 1381 (10th Cir. 1997) ...................................................7

*Giles v. General Motors Acceptance Corp.*,
494 F.3d 865 (9th Cir. 2007) ...................................................29

*Lichtie v. U.S. Home Corp.*,
655 F. Supp. 1026 (D. Utah 1987) ........................................................................31

*Nester v. Bank One Corp.*,
224 F. Supp. 2d 1344 (D. Utah 2002) ......................................................................7

*Odyssey Partners v. Fleming Co.*,
1998 WL 155543 (Del. Ch. Mar. 27, 1998) ...........................................................12

*Papilsky v. Berndt*,
59 F.R.D. 95 (S.D.N.Y. 1973) ..................................................................................9

*Pullman-Peabody Co. v. Joy Mfg. Co.*,
662 F. Supp. 32 (D.N.J. 1986) ...............................................................................17

*S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*,
2021 WL 621235 (S.D.N.Y. Feb. 17, 2021) ..........................................................31

*Scherer Const., LLC v. Hedquist Const., Inc.*,
2001 WY 23 (Wyo. 2001) .......................................................................................28

*Sigalit v. Kahlon*,
2023 WL 5609099 (S.D.N.Y. Aug. 30, 2023) ........................................................21

*Vanterpool v. Fed_n of Chiropractic Licensing Boards*,
2022 WL 16635391 (D. Colo. Nov. 2, 2022) .........................................................32

*VGS, Inc. v. Castiel*,
2003 WL 723285 (Del. Ch. 2003) ..........................................................................17

**Statutes**

Wyo. Stat. Ann. § 17-16-1605 ..................................................................................20

Wyo. Stat. § 17-16-742 .....................................................................................4, 7, 9

Wyoming Business Corporation Act ..........................................................................20

**Other Authorities**

Fed. R. Civ. P. 8 ..........................................................................................................3

Federal Rule of Civil Procedure 8 and 12(b)(6) .........................................................3

Federal Rules of Civil Procedure Rule 23.1 .......................................................4, 7, 9

Rule 12(b)(6) ...........................................................................................................................3

Wyoming Rule of Civil Procedure 23.1 .........................................................................9

Counterclaimant and Crossclaim Plaintiff True North United Investments, LLC ("True North"), through the undersigned counsel, submits the following Memorandum in Opposition to Counterdefendant Eric Schiermeyer's Motion to Dismiss Counterclaims ("Schiermeyer's Motion," cited hereinafter as "ES MTD") [Dkt. No. 90].

## I.        INTRODUCTION

As Eric Schiermeyer continues to use the deadlock of the two-person Board of Directors of Blockchain Game Partners, Inc. ("BGP") to recklessly destroy BGP's value for all of its shareholders and to drain the value from True North's assets, he simultaneously comes to this Court seeking dismissal of claims seeking to hold him accountable on behalf of those same shareholders. As with BGP's Motion, this Court should decline Schiermeyer's invitation to dismiss this case.

None of Schiermeyer's arguments dictate a different result. Schiermeyer's challenge to the validity of True North's derivative demand lacks merit in light of (a) the obvious and irreconcilable deadlock at BGP's helm, (b) True North's months of written demands for the Company to take suitable action, (c) the fact that both Party's derivative demand efforts mirrored one another, and (d) the Board resolution in which both Wright Thurston and Schiermeyer refused to authorize BGP to sue themselves. As for the derivative claims themselves, Schiermeyer's contention that True North failed to adequately plead its fiduciary breach, corporate waste, and unjust enrichments claims also lacks merit, as it ignores the numerous ways in which True North has asserted that Schiermeyer's tortious acts harmed BGP and its shareholders—and not just True North. True North has also sufficiently pled both that there are no other adequate remedies at law, and that the accounts at issue are sufficiently complicated to

warrant an equitable accounting. Moreover, Schiermeyer's attempt to characterize True North's requests for judicial removal of Schiermeyer and the appointment of a custodian as conclusory are themselves conclusory and disregard what True North actually pled.

As for the direct claims, Schiermeyer defeats his own challenge to True North's claim for breach of contract claim by acknowledging that "[t]he Founders Agreement prevents the two initial shareholders of the Company from acting *outside of the corporate structure* . . . in a way that provides one shareholder income or ownership from the Company's services and products at the expense of the other shareholder's ownership rights," ES MTD at 18—which is *precisely what he did*. Likewise, Schiermeyer cannot dislodge True North's breach of the implied covenant of good faith and fair dealing claim given that no "new independent obligations" are required to establish this breach. True North's conversion claim also withstands his challenges, because Schiermeyer and BGP were acting outside the bounds of the Terms and Conditions, and True North sufficiently pled its ownership of the nodes and GALA tokens at issue. Contrary to Schiermeyer's claims, True North has sufficiently pled that Schiermeyer was not a party to the Terms and Conditions agreement, and that his tortious interference with that agreement was committed outside the scope of his authority as Director, President, and CEO of BGP. And finally, True North's claim for declaratory relief is supported by valid underlying claims and would guide the Parties' future conduct, which is all that is required for such a remedy.

For these reasons, Schiermeyer's Motion must be denied in its entirety.

## II.     STATEMENT OF FACTS

Although a fulsome statement of facts is set forth in True North's Amended Counterclaims and Crossclaims (cited hereinafter as "TN Am. CC") [Dkt. No. 75], and is

incorporated by reference herein, certain factual allegations are excerpted and discussed further below to correct the selective recitations presented in Schiermeyer's Motion to Dismiss.

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 8 and 12(b)(6) impose a low pleading hurdle to cross. Typical notice pleading requires nothing more than a "short and plain statement" of a plaintiff's entitlement to relief. Fed. R. Civ. P. 8. In evaluating whether a claim is sufficient under Rule 12(b)(6), the reviewing court "must accept the allegations of the complaint as true and construe those allegations, and any reasonable inferences that might be drawn from them, in the light most favorable to [the] plaintiff." *Gaines v. Stenseng*, 292 F.3d 1222, 1224 (10th Cir. 2002).

In assessing a motion to dismiss for failure to state a claim, "the court need only satisfy itself that [the claimant has] pled a viable legal theory that entitles [it] to relief on the claim asserted, not that each of [the claimant's] asserted theories are viable in themselves." *Disability Law Ctr. v. Utah*, 180 F. Supp. 3d 998, 1007 n.5 (D. Utah 2016). Thus, a party is not required to assert a "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 547. In other words, "specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Importantly, the Tenth Circuit has recognized that "[g]ranting [a] motion to dismiss is a harsh remedy which must be cautiously studied . . . to effectuate the spirit of the liberal rules of pleading [and] protect the interests of justice." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009).

## IV.    ARGUMENT

### A.    Schiermeyer's Challenges to the Derivative Claims Must Fail

#### 1.    True North Met the Pleading Requirements for Derivative Claims

Schiermeyer asserts that "[e]ach of True North's derivative claims should be dismissed under Rule 23.1 of the Federal Rules of Civil Procedure because True North failed to plead that it made a written demand upon the Company to obtain the relief requested prior to asserting derivative claims in court, and Wyoming does not recognize demand futility as an excuse for True North's failure to make the required written demand." ES MTD at 4-5. It is ironic that Schiermeyer raises this challenge, since True North's stated efforts and futile demands mirror Schiermeyer's own. *See* ES Am. Compl. ¶¶ 136-37; TN Am. CC ¶¶ 78-81.

Like True North's assertions regarding written demand and futility, Schiermeyer's own Amended Complaint claims that he also made a written demand but that, because of the realities of having a two-member board, "[a]ny demand that Thurston vote to take action against himself was futile." ES Am. Compl. ¶¶ 136-37; *see also* TN Am. CC ¶¶ 78-81. Both True North and Schiermeyer are BGP shareholders that have lodged grievances with one another on behalf of the Company; both have submitted written demands that the Board take "suitable action," Wyo. Stat. § 17-16-742—which it has not and cannot do due to the deadlocked Board at BGP's helm—and both have acknowledged the sheer futility of expecting that the deadlocked Company and Board would take action against either Schiermeyer or Thurston since that would require either individual to agree to take actions against themselves. *See* ES Am. Compl. ¶ 137; *see also* TN Am. CC ¶¶ 77-79. Nevertheless, despite this futility, Thurston and True North have in fact made

numerous demands for "suitable action," written and otherwise, on BGP and its Board, all of which Schiermeyer and BGP either rejected or ignored. *See, e.g.*, TN Am. CC ¶ 81.

These efforts and the underlying claims for relief to which they correspond were stated with sufficient clarity and particularity in numerous places in True North's Amended Counterclaims, including the following (each of which involved written communications and/or demands from Thurston and True North):

- "Despite *repeated concerns raised by Thurston* and requests from BGP shareholders for distributions/payment and to participate in the node/cryptocurrency aspect of the Gala community, Schiermeyer continued to hold these GALA and NFTs and even sold some for his personal benefit." TN Am. CC ¶ 41 (emphasis added).

- "Schiermeyer's decision to replace v1 tokens with GALA v2 and to burn GALA tokens were *not explained to, nor approved or overseen by, the BGP Board or its shareholders*. Nevertheless, after a public announcement of Schiermeyer's actions, Thurston repeatedly informed BGP's corporate counsel that Schiermeyer's actions *violated the companies' organizing documents*, but BGP's corporate counsel took no corrective action." *Id.* ¶ 51 (emphasis added).

- "Thurston, as Director, has *attempted to discuss these and other matters with Schiermeyer and has made multiple attempts to call Board meetings, to meet with Schiermeyer, and to find out about Schiermeyer's activities*. Schiermeyer has rejected Thurston's good faith attempts to confer." *Id.* ¶ 57 (emphasis added).

- "Thurston *sought to address these issues* with Schiermeyer at the BGP Board meeting on April 6, 2023, but Schiermeyer lied to Thurston by denying that any foreign entities had been created—when in fact the music entity had been formed months earlier." *Id.* ¶ 60 (emphasis added).

- "Notwithstanding the futility of the demand process, as described above, and as referenced in Schiermeyer's Amended Complaint, between August 3 and August 7, 2023, counsel for Schiermeyer and Thurston agreed upon an action in lieu of a Board meeting in which *both Directors confirmed that they would vote against removing themselves as members of the BGP Board and would vote against BGP initiating an action against themselves.*" *Id.* ¶ 80 (emphasis added) (Thurston's proposed action against Schiermeyer, of course, concerned allegations asserted in True North's Amended Counterclaims).

- "Further, all of Thurston and True North's efforts at pursuing alternative resolution of these issues have come to nought. Section 12.3 of BGP's Terms and Conditions notes that disputes 'shall' be arbitrated (in the event the parties do not agree to mediate). On *multiple occasions* during the summer of 2023, before either party had filed a lawsuit against the other (in the proceeding months in which the Parties were *engaging in settlement discussions*), Thurston directed that his counsel *propose that the Parties seek resolution via mediation and/or arbitration. Schiermeyer rejected each of these requests to pursue such alternatives*." *Id.* ¶ 81 (emphasis added).

In addition to these references, the Court can refer to back to True North's opposition to Schiermeyer's TRO motion, which discussed a demand letter Thurston sent in May 2023 detailing the compounding instances of impropriety and demanding that the Company take action to stop it.[1] *See* TN Opp. to ES TRO at 4 ("Yet Schiermeyer did nothing—until Thurston sent a cease-and-desist letter in May 2023.").

Throughout the months that proceeded the filing of the instant suits, the Parties' written demand efforts so mirrored one another that the culminating demand communications (memorializing that Schiermeyer and Thurston confirmed they would not agree to sue themselves) were virtually identical—to the point where True North is perplexed that Schiermeyer ever even thought it was worth the Parties' and the Court's time and resources belaboring this point. These communications were alluded to in Schiermeyer's Amended Complaint and True North's Amended Counterclaims, *see* ES Am. Compl. ¶¶ 136-37; TN Am. CC ¶¶ 78-81, but they are attached here as exhibits. On June 6, 2023, the Parties exchanged essentially identical written demands. *See* Exhibits A and B. After the Parties postponed a Board

---

[1] True North did not attach this confidential communication to its publicly filed Amended Counterclaims. However, in light of the applicable standard requiring the Court to make factual inferences in True North's favor, the pleadings on this point in its Amended Counterclaims should suffice in any event.

meeting to address those demands numerous times, in a Board action taken in lieu of that meeting, *both Schiermeyer and Thurston memorialized their mirrored demands in joint document. See* Exhibits C and D.[2]

Overall, Thurston and True North have engaged in a veritable written campaign with Schiermeyer and BGP regarding the claims at issue in the months leading up to the filing of the instant lawsuits. And because Schiermeyer has usurped complete control of the Company, all the demands made to him, often copying BGP's in-house counsel on the communications, constitute demands of the Company under the circumstances. As called for in Wyo. Stat. §17-16-742, written demands have been made that the Company must take "suitable action" regarding Thurston and True North's grievances, and these demands have been clearly and continually "rejected"[3] by the Company as required by the provision. Taken together, these particularized[4] factual allegations satisfy the written demand provision and clearly pass muster.

---

[2] As for this Court's consideration of these exhibits, this Court has "broad discretion in determining whether or not to accept materials beyond the pleadings in connection with a motion to dismiss," and "[i]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim," then parties "may submit an indisputably authentic copy to the court" since the parties are "obviously on notice of their contents and the general rationale for conversion to summary judgment dissipates." *Nester v. Bank One Corp.*, 224 F. Supp. 2d 1344, 1345-46 (D. Utah 2002) (citing *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). Here, these communications are central to both Parties' claims on this issue, are referenced in but not attached to their pleadings, *see* ES Am. Compl. ¶¶ 136-37; TN Am. CC ¶¶ 78-81, and there can be no controversy surrounding the Court's assessment of these exhibits.

[3] Moreover, in light of Thurston's written demands from as far back as April and May of 2023, more than 90 days elapsed before True North first brought suit in September 2023—though that is not a necessary fact in light of Schiermeyer and BGP's consistent rejection of Thurston and True North's demands.

[4] "Although there is a heightened burden under Rule 23.1 to plead particularized facts, when a motion to dismiss for failure to make a demand is made, all reasonable inferences from the pled facts must nonetheless be drawn in favor of the plaintiff in determining whether the plaintiff has

Schiermeyer protests that "[t]his is not a mere technical pleading hurdle," but his arguments only attempt to muddy the waters on this point. He and BGP were given extensive notice[5] of Thurston and True North's concerns and potential legal claims in the months leading up to the filing of these dueling derivative actions, along with numerous demands that the Company must take corrective action. Despite his claims of hearing about some of True North's claims for the first time upon the filing of its complaint, this is either not true, or it refers to challenges to Schiermeyer's improper conduct that occurred *after* the filing of the Parties' complaints (*i.e.*, BGP's shutting off of all of True North's Gala nodes)—which of course could not have been raised in a pre-filing demand. And his laundry-list footnote feigning ignorance about what "suitable action" Thurston and True North could possibly want is absurd given that they spent months trying to tell Schiermeyer and BGP what should and should not be done in light of Schiermeyer's mounting fiduciary abuses.

And finally, although Schiermeyer points to other jurisdictions' authorities to assert that demand futility is not legally cognizable in Wyoming—despite the fact that Schiermeyer himself invoked demand futility in his own Amended Complaint, *see* ES Am. Compl. ¶ 137—Wyoming's own Supreme Court has acknowledged that it has not addressed whether demand

---

met its burden." *Delaware Cnty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1020 (Del. 2015) (discussing Delaware Chancery Rule 23.1, which has the same "particularity" requirement as its Federal and Wyoming Rule 23.1 counterparts). The relevant particularized facts here are numerous, and the inferences the Court must take in True North's favor are dispositive.

[5] This is not like the scenario in which a 2% shareholder of IBM is bringing grievances before the company's board of directors. In such a case, concerns with notice and the opportunity for suitable action are of course preeminent. Here, the two major shareholders—whose split interests amount to over 80% of the ownership of the Company—have spent months putting each other on notice of their many concerns and demands. Pointless gatekeeping based on Schiermeyer's one-sided impression of these derivative demand issues would serve no one.

futility might be available. *See Fritchel v. White*, 2019 WY 117, ¶ 25 (Wyo. 2019) ("We have never addressed demand futility in the context of a limited partnership, *nor have we addressed it in any helpful way in any other context* (i.e., limited liability companies *or corporations*), but other courts have.") (emphasis added). Moreover, although §17-16-742 does not reference futility, Wyoming Rule of Civil Procedure 23.1 (which is modelled after the federal rule) does appear to contemplate demand futility when it permits a plaintiff to state "the reasons for not obtaining the action or not making the effort."

From a practical standpoint, this case could be the posterchild for demand futility, as it is difficult to conceive of a situation in which demand would be more futile. Schiermeyer cites the *Boland* case for the proposition that requiring written demand could streamline things and result in an out-of-court resolution, but this is not true—and even *Boland* acknowledged that "courts would learn little from a board's decision not to pursue litigation if the board itself had personal interests against litigation." *Boland v. Engle*, 113 F.3d 706, 712 (7th Cir. 1997).

Schiermeyer's arguments seem to expect True North to have fully proved these allegations at this stage, but that is not the standard. *See Papilsky v. Berndt*, 59 F.R.D. 95, 98 (S.D.N.Y. 1973) ("[T]he Rule 23.1 requirement of particularity is directed solely to the face of the complaint, and should not provide a forum for resolution of factual issues however presented."). True North's particularized allegations have crossed this derivative demand threshold, and the Court's obligation to construe all factual inferences in True North's favor does not permit any other conclusion under the circumstances. Schiermeyer's assertion otherwise is a form-over-substance tactic that would ultimately serve neither the Parties' nor the Court's interests in efficient resolution of the claims at issue.

### 2. True North Sufficiently Pled Injuries to BGP

Before getting into specifics on True North's individual derivative claims, Schiermeyer asserts an overarching argument that "True North alleges that the complained-of actions caused injuries primarily to shareholders True North and Thurston—not to the Company," and therefore the claims "do not and cannot state . . . plausible derivative claim[s] for (unpled) injury to the Company." ES MTD at 9. Schiermeyer's assertion is not true. There are numerous places throughout True North's Amended Counterclaims in which injury to the Company is pled corresponding with each derivative claim—even if more individualized harms to True North are also implicated in that discussion. Such allegations include the following examples:

- "Schiermeyer, without Board or shareholder knowledge or approval: (a) caused BGP to sell off and waste millions of dollars in *Company* and community assets, including "burning" about $600 million in GALA and shareholder assets; (b) caused BGP to lend *millions of BGP funds* to himself for personal interests; (c) *usurped corporate opportunities* by forming entities in Switzerland and Dubai to pursue business opportunities that rightfully belong to BGP (and inserting himself as the controlling shareholder of these ventures); (d) caused *BGP to operate without notice to or input* from True North's manager and *BGP Director*, Wright Thurston, thus eliminating Thurston's ability to *help guide BGP to the benefit of the Company* and its shareholders; (e) caused *BGP to operate with materially defective financial controls* and/or to *provide materially incomplete or incorrect information to Thurston*;[6] (f) caused *BGP to fail and refuse to provide True North and Thurston with corporate records* despite repeated requests; (g) unjustifiably caused *BGP to nominally "suspend," but actually convert* and exert complete control over, all of True North's nodes,[7] and (h) engaged in systematic, intentional, and deceptive behavior to the *detriment of BGP and its shareholders*." TN Am. CC ¶ 1 (emphasis added).

---

[6] As discussed further below, *see infra* Section A.6, withholding information from a Director harms the Company as a whole, and not just the Director's personal interests.

[7] As discussed further below, *see infra* Section A.3, causing BGP to improperly suspend or convert shareholders' nodes harms the Company as a whole, and not just the individual shareholder's personal interests.

- "Schiermeyer's and BGP's actions are ongoing and have *seriously damaged—and threaten to further damage—BGP*. Those actions also have caused and threaten to continue to cause damage to the rights and interests of *True North and various other minority shareholders*" *Id.* ¶ 3 (emphasis added).

- "Schiermeyer's malfeasance, mismanagement, and self-dealing have resulted in *hundreds of millions of dollars in damage to BGP's reputation and Company and shareholder assets*. Unless enjoined, Schiermeyer's continuing *disregard for the interests of the Company and its shareholders threatens to imminently and irreparably harm BGP*." *Id.* ¶ 4 (emphasis added).

- "By this action, True North seeks to rectify the *harm to the Company* and to True North caused by Schiermeyer's and BGP's actions." *Id.* ¶ 5 (emphasis added).

- "Despite repeated concerns raised by Thurston and requests from BGP shareholders for distributions/payment and to participate in the node/cryptocurrency aspect of the Gala community, *Schiermeyer continued to hold these GALA and NFTs and even sold some for his personal benefit*." *Id.* ¶ 41 (emphasis added).

- "Misappropriated *millions of dollars of BGP funds*, including, using Company funds for buying and renting real estate for personal use, transferring Company assets into his own name or the names of entities that he owns or controls, using Company funds to hire architects, construction companies, and designers for personal real estate, and *moving Company funds into personal accounts*." *Id.* ¶ 43 (emphasis added).

- "Schiermeyer's GALA 'upgrade' *caused substantial harm to BGP's value* by, among other things, causing cryptocurrency exchange Coinbase to delist GALA and rendered worthless all GALA held by other GALA holders whose tokens were inaccessible to BGP at the time of the conversion." *Id.* ¶ 46 (emphasis added).

- "Schiermeyer's burn also further *destroyed BGP value* by effectively centralizing control and power over the Gala ecosystem in Schiermeyer which is *antithetical to one of BGP's core principles* regarding the development of the larger Gala ecosystem and community." *Id.* ¶ 50 (emphasis added).

- "Schiermeyer's decision to replace v1 tokens with GALA v2 and to burn GALA tokens were *not explained to, nor approved or overseen by, the BGP Board or its shareholders*. Nevertheless, after a public announcement of Schiermeyer's actions, Thurston repeatedly informed BGP's corporate counsel that

11

Schiermeyer's actions *violated the companies' organizing documents*, but BGP's corporate counsel took no corrective action." *Id.* ¶ 51 (emphasis added).

- "Moreover, *while the Company Board unanimously voted on January 11, 2023, to liquidate non-crypto assets* because of a general downturn in the value of various cryptocurrencies within the digital assets economy, Schiermeyer *instead directed an installment payment of $5 million to be made toward buying a Gulfstream airplane* in April 2023 for his personal use. This expenditure was *not disclosed to or approved by the Board, and contradicted the Board's vote* to liquidate (not buy) physical property." *Id.* ¶ 54 (emphasis added).

- "Schiermeyer's refusal to answer calls, respond to communications, attend meetings, explain his unilateral actions, or to take any cooperative action to protect BGP and its shareholders from the conversion, waste, or destruction of BGP assets has *greatly damaged BGP and its shareholders*, including True North." *Id.* ¶ 64 (emphasis added).

These are just *some* of the instances in which True North clearly alleged that Schiermeyer inflicted actionable harm upon BGP and its other shareholders collectively. Such injuries to BGP and its shareholders are discussed and referenced throughout the derivative counts, and each count incorporates the factual allegations presented in the rest of the Amended Counterclaims. *See id.* ¶¶ 82-118. The fact that True North has also alleged direct causes of action relating to uniquely individualized injuries that stand independent of its derivative claims on behalf of BGP does not somehow render its derivative claims deficient—even if those direct and derivative claims are in certain ways intertwined considering Schiermeyer's pattern of misconduct. *See Odyssey Partners v. Fleming Co.*, 1998 WL 155543, at *3 (Del. Ch. Mar. 27, 1998) ("[I]n some circumstances, the same conduct (or aspects thereof) may give rise to both derivative and direct claims."); *Caparos v. Morton*, 364 Ill. App. 3d 159, 169 (2006) ("Direct and derivative claims can arise from the same nucleus of facts . . . provided that sufficient facts are alleged in support of each theory."). Thus, as will be further explored in the Sections below, True North sufficiently pled injuries to BGP itself in connection with each of its derivative causes of action.

### 3.     True North Sufficiently Pled Schiermeyer's Breach of His Fiduciary Duties

Schiermeyer first asserts this injury-to-True North versus injury-to-BGP challenge in connection with the breach of fiduciary duty claim. *See* ES MTD at 8-12. As indicated above, however, True North plainly alleged injury to the Company resulting from his fiduciary abuses.

Schiermeyer cites to *Ltd. v. Wetrade Group, Inc.*, a Wyoming chancery court decision that recently addressed the direct vs. derivative distinction for a tech entity that, much like BGP, dealt in cryptocurrency. 2023 WL 7939772, at *2 (Wy. Ch. Nov. 07, 2023). In that case the court discussed several predominant derivative claims under Wyoming law, including (1) claim for breach of fiduciary duty, which is a duty owed to the entity itself; (2) corporate waste; (3) mismanagement; and (4) self-dealing. *See id.* at *3 (internal citations omitted). In discussing these types of derivative claims, the Court referenced other relevant Wyoming cases involving issues such as a director voiding elections of other directors, failure to reimburse a partnership for its own property, and failure to observe proper voting procedures. *Id*. at *2. These cases concerned misconduct very similar to the derivative fiduciary breaches asserted here.

In his attempt to avoid these obvious parallels, Schiermeyer either omits or mischaracterizes True North's factual assertions in attempting to establish that True North's breach of fiduciary duty claims are all conclusory and/or otherwise insufficient to allege a breach of fiduciary duty. To the contrary, however, True North made numerous allegations in which Schiermeyer's actions harmed BGP as an entity and all the other shareholders collectively.

For instance, True North alleged that Schiermeyer's GALA "upgrade" from v1 to v2 tokens substantially harmed BGP itself by causing Coinbase, a crypto-currency exchange, to delist GALA, cutting it off from prospective buyers. *See* TN Am. CC ¶ 46. This harmed the

Company itself along with all its shareholders. The burn[8] associated with this "upgrade" also harmed the Company itself by opening it up to many millions of dollars' worth of liability for the wanton destruction of such a vast amount of its (claimed) shareholders' digital assets. As a fiduciary, Schiermeyer is duty-bound to avoid imperiling the entire Company by unilaterally pursuing his own vindictive agenda in this way—though it has not stopped him from openly admitting this agenda in his public filings before this Court. *See*, *e.g.*, ES Am. Compl. ¶¶ 82-84.

Moreover, although it is true that some of Schiermeyer's fiduciary abuses—the burn, his improper suspension of shareholder nodes, and his walling out the only other Director from control of and information about BGP—involve particularized injuries to True North itself, they also implicate harms suffered by the Company as a whole. True North aside, these *ultra vires* actions have wrought untold harms in the form of severely degrading community confidence in BGP, in its management and wellbeing, and in the value and viability of the business and the GALA token itself. Such mismanagement of BGP has twisted it out of recognition considering the decentralized, non-custodial model that has been at the heart of BGP since its inception.

Other allegations are even more obvious in terms of their direct injury to the Company and the other shareholders collectively. True North alleged that Schiermeyer misappropriated millions of dollars in BGP funds for his own personal use. This personal use encompassed renting and/or purchasing real estate for personal use; hiring architects, designers, and construction companies to improve his personal real estate; transferring BGP funds into entities

---

[8] Schiermeyer attempts to reduce the harms associated with his burn of the GALA by comparing it to the loss of shareholder dividends, *see* ES MTD at 9-10, but the multidimensional harms of such a drastic abuse of his position cannot be limited in that way.

that he owns or controls; and transferring BGP funds into his personal accounts. *See*, *e.g.*, TN Am. CC ¶ 43. Likewise, True North alleged that Schiermeyer distributed valuable BGP NFTs to himself and select BGP employees without board or shareholder approval. These NFTs, by design, were supposed to be randomly distributed to the Gala community, which would have bolstered BGP's sales and engagement with the public. *See id.* Schiermeyer makes a half-hearted attempt at classifying these allegations as "conclusory," *see* ES MTD at 11, but what he is really saying is that True North has not offered evidentiary proof to conclusively establish these factual allegations. A motion to dismiss is not the place for such evidentiary submissions. True North has sufficiently pled these injuries to the Company.

As a final point, True North alleged that Schiermeyer formed Gala Music in Switzerland on or some months before April 6, 2023—an entity that the board intended as potential enterprise for BGP circa January 2023, but instead became an entity where Schiermeyer appointed himself as the largest shareholder (a sequence that was repeated with a sales entity in Dubai). TN Am. CC ¶¶ 58-65. Taking it a step further, True North also alleged that Schiermeyer (a) used or intended to use BGP funding, staffing, and intellectual property to create Gala Music, and yet, despite using these BGP resources, (b) BGP and its shareholders were excluded from any ownership. Although Schiermeyer protests that, since he was caught in the act, True North "does not (and cannot) allege" that Schiermeyer has *fully executed* his apparent plans to co-opt BGP assets from the Company and its shareholders, this *ignores the very language that he himself cites* from True North's Amended Counterclaims. True North clearly alleged that Schiermeyer "*has* or intends" to transfer those assets—and the fact that there is a disjunctive alternative here does not somehow invalidate the pleading at this stage. Notably, Schiermeyer stopped short of

denying that he has transferred any assets, but instead has falsely characterized True North's allegation. Even if he did deny it, the Court would simply be left with a factual dispute to be explored and resolved later in this litigation. It is also notable that Schiermeyer himself has unlawfully foreclosed True North and Thurston from receiving key Company information regarding such matters, so it should not be surprising that there are details that True North will uncover and develop through discovery in this matter.

Finally, at very least, (a) the use of the name "Gala" in Gala Music and Gala Film is clearly designed to take advantage of and profit off of the goodwill and brand recognition developed through BGP and the Gala blockchain—both of which would harm the Company and benefit those entities at BGP's expense—and (b) the establishment of these entities constitutes additional *ultra vires* acts that Schiermeyer committed without Board authorization that further reveals Schiermeyer's self-dealing and fiduciary disregard. Simply put, there is no deficiency with this pleading. *Cf. Bryson*, 534 F.3d at 1286 ("it may still suffice so long as the court can plausibly infer the necessary unarticulated assumptions").

On the face of True North's Amended Counterclaims, this derivative claim sufficiently alleges Schiermeyer's breach of his fiduciary duty and the resultant harms to the Company.

### 4.  True North Sufficiently Pled Schiermeyer's Waste of Corporate Assets

Schiermeyer asserts that True North failed to state a derivative claim for waste of corporate assets for three reasons: (1) there is no Wyoming case law establishing a claim for waste of corporate assets; (2) True North's allegations do not fit under the classic definition of corporate waste found in other jurisdictions; and (3) to the extent Wyoming law does recognize corporate waste, corporate waste is not a standalone claim, but instead is a variant of a claim for

breach of fiduciary duty, as outlined in *Wetrade*, 2023 WL 7939772, at *3. *See* ES MTD at 12-13. None of Schiermeyer's assertions have merit.

As an initial matter, the *Wetrade* court only addresses the corporate waste doctrine in passing, citing cases that characterize corporate waste as a derivative action. *Id*. at *3 (citing *Pullman-Peabody Co. v. Joy Mfg. Co.*, 662 F. Supp. 32, 35 (D.N.J. 1986); *VGS, Inc. v. Castiel*, 2003 WL 723285, *10 (Del. Ch. 2003)). *Wetrade* does not state (a) how Wyoming defines the doctrine, or (b) whether Wyoming law treats it as a distinct claim from breach of fiduciary duty. *See* 2023 WL 7939772, at *3. *Wetrade* is not dispositive.

As Schiermeyer asserts, jurisdictions that do expressly recognize corporate waste lean toward the definition found *In re Walt Disney Co. Derivative Litig.*, where "[a] claim of corporate waste will arise only in the rare, unconscionable case where directors irrationally squander or give away corporate assets" in an exchange that is "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." 906 A.2d 27, 74 (Del. 2006). However, in conjunction with this definition, *Sample v. Morgan* explains how corporate waste law holds utility at the pleadings stage:

> When pled facts support an inference of waste, judicial nostrils smell something fishy and full discovery into the background of the transaction is permitted. In the end, most transactions that actually involve waste are almost found to have been inspired by some form of conflicting self-interest. The doctrine of waste, however, allows a plaintiff to pass go at the complaint stage even when the motivations for a transaction are unclear by pointing to economic terms so one-sided as to create an inference that no person acting in good faith pursuit of the corporation's interests could have approved the terms.

941 A.2d 647, 670 (Del. 2006). At the complaint stage in this case, the facts sufficiently allege (a) that Schiermeyer burned and otherwise took GALA belonging to BGP shareholders for his

own gain and (b) that BGP did not receive adequate consideration for a jet sought for Schiermeyer's personal use.

While Schiermeyer relies on True North's wording that the $600 million worth of burned GALA belonged to shareholders, he simultaneously asserts in his Amended Complaint that Thurston engaged in "theft of Company GALA" amounting to "approximately $130,000,000." ES Am. Compl. ¶¶ 57-92. This contradictory fact pattern concerning whether BGP or True North owned the GALA at issue provides enough facts for the Court to draw inferences of corporate waste in True North's favor; Schiermeyer either took Thurston's GALA, *see* TN Am. CC ¶ 40, or he has taken GALA which belongs to BGP (according to his view of the facts), which he has misspent and squandered to BGP's detriment.

True North's allegations that Schiermeyer spent $5 million on a corporate jet for his personal use—despite the Board's unanimous decision *not* to pay the installment—*alone* is sufficient for the Court to infer corporate waste *à la* via his conflicting self-interest and BGP's lack of benefit from that expenditure. Such allegations involve self-dealing that should alarm judicial nostrils, and True North should be permitted to "pass go." *Sample*, 941 A.2d at 670.

### 5.    True North Sufficiently Pled Unjust Enrichment

Schiermeyer asserts that True North's unjust enrichment claim must be dismissed because (1) True North failed to contend that the "Plaintiff retained any benefit to the loss of ***the Company*** (any loss was to shareholder True North)"; (2) an unjust enrichment claim cannot lie with the nodes because an express contract governs the nodes; and (3) the allegation is conclusory. *See* ES MTD at 13-14. Again, Schiermeyer is completely off base.

Wyoming courts have characterized unjust enrichment as "an equitable remedy that is appropriate only when the party to be charged has received a benefit that in good conscience the party ought not to retain without compensation to the party providing the benefit." *Davidson-Eaton v. Iversen*, 2022 WY 135, ¶ 50, 519 P.3d 626 (Wyo. 2022). Other jurisdictions have expanded on this principle, stating:

> In order to state a claim for relief under the doctrine of unjust enrichment [], the plaintiff must show that the defendant: (1) received a benefit (2) to the plaintiffs detriment and (3) that the retention of the benefit by the defendant violates fundamental principals [sic] of justice, equity and good conscience. This cause of action is based on implied contract, or quasi-contract, theory.

*Enterprise Warehousing Solutions v. Capital One Services*, 2002 WL 406976, at *5 (N.D. Ill. Mar. 15, 2002) (internal citations omitted). In *Enterprise*, the court held that the investigation into the party's allegations went beyond the scope of a motion to dismiss, given that the allegations satisfied the notice pleading requirements. *Id*.

Schiermeyer asserts that because BGP's Terms and Conditions are an express contract that governs the True North's nodes, unjust enrichment does not apply to his improper suspension of the nodes. But as stated above, *see supra* Section A.2, Schiermeyer's prosecution of an *ultra vires* personal vendetta against Thurston does in fact harm the Company as a whole, and his arbitrary suspension of shareholder nodes, among other things, undermines the Community members' confidence in the Company and thus, the value of the Company's stock. Acting in this way without Board authorization and outside of required corporate formalities—to proportionally give himself access to that much more of the daily GALA generated that is not going to True North, *see* TN Am. CC 92—unjustly enriches Schiermeyer at the expense and injury of BGP. Moreover, BGP's Terms and Conditions are between the Company and node

holders like True North, and Schiermeyer is not a party to that agreement, so the Company-damaging aspects of his misconduct discussed above fall outside the terms of that agreement.[9]

Setting aside the node suspension issue, True North's other allegations—the Company harms associated with the burn/v2 upgrade, as well as his conversion of Company funds and assets for his own use—clearly suffice to plead claims for unjust enrichment. Schiermeyer cannot retain these benefits without just compensation to the Company. Determining the factual disputes surrounding these matters extends beyond the scope of a motion to dismiss. Therefore, Schiermeyer's motion to dismiss this claim should be denied.

### 6.   True North Sufficiently Established the Need for an Equitable Accounting

Schiermeyer contends that True North failed to state a claim for an equitable accounting for three reasons: (1) True North has an adequate remedy under Wyoming law; (2) True North did not claim that Schiermeyer was involved in any transactions with BGP; and (3) the accounts for which True North seeks an equitable accounting are not "so complicated that the Court must order an accounting." ES MTD at 14–15. All three assertions are incorrect.

First, True North asserted that there is no available adequate remedy at law. *See* TN Am. CC ¶ 99. This holds true even considering the existence of the provision in the Wyoming Business Corporation Act that allows a court to "order inspection and copying of the books, records and documents." *See* Wyo. Stat. Ann. § 17-16-1605. As other jurisdictions have reasoned, this is because "[t]he right to inspect company books and records is separate and

---

[9] If the Terms and Conditions do not apply, and if under Schiermeyer's own argument that the Founders Agreement is just some sort of non-compete, then at very least this allegation can proceed as an argument in the alternative.

independent from the right to an equitable accounting, which require[s] a person in possession of financial records to produce them, demonstrate how money was expended[,] and return pilfered funds in his or her possession." *Sigalit v. Kahlon*, 2023 WL 5609099, at *3 (S.D.N.Y. Aug. 30, 2023) (internal quotation marks and citation omitted). Thus, even if the Court ordered Schiermeyer to permit fellow Director Thurston to inspect the books and records to which he is entitled to review, that would not qualify as an adequate remedy at law—since it would not provide True North with all the relief to which it is due via a claim for an equitable accounting. True North's assertion that there is no available adequate remedy at law is sufficiently pled.

Second, contrary to Schiermeyer's assertions, True North contends in its counterclaims that Schiermeyer, as CEO of BGP, "engaged in transactions on behalf of BGP and used BGP's assets and earning, often for his own personal benefit, without the consent of BGP's Board or its shareholders." TN Am. CC ¶ 42. The counterclaims contain multiple examples, including allegations that Schiermeyer:

- Caused BGP to send millions of dollars' worth of cryptocurrency to Canadian resident Jason Brink, BGP's President of Blockchain, for unapproved and unknown reasons.

- Caused BGP to distribute valuable NFTs to himself and select BGP employees, without Board or shareholder approval. By design, those NFTs should have been randomly distributed to members of the Gala community.

- Caused BGP to intentionally destroy hundreds of millions of dollars of asset value by "burning" GALA tokens.

- Misappropriated millions of dollars of BGP funds, including, using Company funds for buying and renting real estate for personal use, transferring Company assets into his own name or the names of entities that he owns or controls, using Company funds to hire architects, construction companies, and designers for personal real estate, and moving Company funds into personal accounts.

- Caused BGP to pay $5 million towards an installment purchase of a corporate jet for Schiermeyer's personal benefit despite the BGP Board previously agreeing to sell the jet/BGP's position.

*Id.* ¶ 43. Thus Schiermeyer *is* BGP because he is unilaterally controlling its assets and acting on its behalf to his own benefit, and it is wrong to suggest that True North did not allege facts asserting "that Schiermeyer was involved in any particular transactions with the Company." ES MTD at 15.

Finally, Schiermeyer argues that for True North to establish a successful claim for an equitable accounting, it must show that "the 'accounts between the parties' are of such a 'complicated nature' that only a court of equity can satisfactorily unravel them." *Roberts v. Am.'s Wholesale Lender*, 2012 WL 1379203, at *9 (D. Utah Mar. 22, 2012), *report and recommendation adopted*, 2012 WL 1390188 (D. Utah Apr. 18, 2012), *aff'd*, 525 F. App'x 675 (10th Cir. 2013). But the question as to whether the accounts at issue "are complicated to the point where an accounting action is warranted, is a question that involves detailed inquiry into the facts," and a factual "inquiry into the merits of the claim for equitable accounting [is] inappropriate for consideration on a motion to dismiss." *Enterprise*, 2002 WL 406976, at *5.

Regardless, True North has alleged numerous facts that support an inference of the existence of sufficiently complicated accounts at issue. The bullet points listed above outline a complicated web of transactions involving both traditional fiat currency and cryptocurrency (which includes, among many other things, a first-of-its-kind global deletion of one version of a cryptocurrency and the introduction of a new version of that cryptocurrency into thousands of unique and encrypted digital wallets). The involvement of the GALA cryptocurrency in this case, the evolution of a novel business built on the Gala blockchain, and the convoluted corporate

structure of the entities at issue present a clear case of a "complicated" accounting. Accordingly, True North has adequately pled its derivative claim for an equitable accounting.

### 7.    True North Pled Claims for Judicial Removal of Schiermeyer and the Appointment of a Custodian

Not only did True North sufficiently plead for judicial removal of Schiermeyer as Director, President, and CEO of BGP, and for appointment of a custodian in its Amended Counterclaims, it also filed an entire motion solely focused on the need for the removal of Schiermeyer and the appointment a custodian to act in his place.[10] Ignoring the key facts and arguments that True North focused on both in that motion and in its Amended Counterclaims, Schiermeyer simply snipes at one of the multiple statutory provisions that True North cited as support for these claims, and attempts to characterize the other allegations as conclusory and insufficient. His arguments are without merit.

To begin with, Schiermeyer asserts that § 17-17-140 is inapplicable because BGP's articles of incorporation do not technically define the Company as a close corporation. *See* ES MTD at 12. But this provision is just one of a number of relevant and pertinent provisions that True North referenced in its Amended Counterclaims to illustrate the numerous grounds and bases upon which the Court can grant relief.[11] What is more, it is not even one of the provisions

---

[10] True North filed its Motion for Preliminary Injunction Ordering the Temporary Appointment of a Custodian to Act as President, CEO, and Sole Director of Blockchain Game Partners, Inc. [Dkt. No. 88] on December 19, 2023—one day *before* Schiermeyer filed his Motion to Dismiss. Yet, Schiermeyer does not mention True North's motion in his Motion to Dismiss.

[11] Although BGP's articles of incorporation technically omit the magic words "close corporation," for all intents and purposes the Company is a close corporation. Moreover, in addition to the other cited provisions, § 17-17-140 can at least serve as another decisional rubric that the Court can reference in exercising its equitable powers to craft an appropriate remedy for this situation as called for in these statutory provisions.

that is primarily relied upon in either Count Five or Six, which are, respectively: (1) § 17-16-809 (which provides the court with authority to remove a Director when "[t]he director engaged in fraudulent conduct with respect to the corporation or its shareholders, grossly abused the position of director, or intentionally inflicted harm on the corporation" and "[c]onsidering the director's course of conduct and the inadequacy of other available remedies, removal would be in the best interest of the corporation"); and (2) § 17-16-748 (which authorizes the Court to appoint a custodian where either "[t]he directors are deadlocked in the management of corporate affairs, the shareholders are unable to break the deadlock, and irreparable injury to the corporation is threatened or being suffered," or "the directors or those in control of the corporation are acting fraudulently and irreparable injury to the corporation is threatened or being suffered"). *See* TN Am. CC ¶¶ 100-18. Considering these provisions, True North has sufficiently pled a legal basis and all requisite elements for the Court to remove Schiermeyer and appoint a custodian.

To again recap some of the relevant assertions, True North has alleged that Schiermeyer engaged in various instances of fraudulent conduct in detail (*e.g.*, misappropriating millions of dollars of BGP funds), he abused the position of director (*e.g.*, caused BGP to pay $5 million towards an installment purchase of a corporate jet for Schiermeyer's personal benefit), and he intentionally inflicted harm on the corporation (*e.g.*, the burn of v1 GALA and the launching of competing companies). *See id.* ¶ 43. The counterclaims further explain that Thurston and Schiermeyer are deadlocked as the only two Directors on BGP's Board, and that Schiermeyer has acted unilaterally without Board approval, has ignored Thurston's attempts to convene Board meetings, has excluded Thurston from involvement in the Company's affairs and financial oversight, and has thus prevented the Board from functioning properly to oversee and safeguard

the Company. *See, e.g.*, *id.* ¶¶ 78, 79, 104, 113. As a result, the Board is paralyzed, unable to function as required, and unable to investigate or remedy the harms alleged in the counterclaims due to the irreconcilable schism between its two directors. Such unilateral actions have caused and continue to cause substantial and irreparable harms to BGP.[12]

In response to these allegations, the best that Schiermeyer can do is bluster that these allegations of misconduct and injury to BGP are "alleged in only the most conclusory fashion," and that True North "has failed to plead any facts showing that Schiermeyer has defrauded or intentionally harmed the Company." ES MTD at 16. For the reasons outlined above and elsewhere,[13] that is not true, and True North has sufficiently pled these claims for relief.

## B.   Schiermeyer's Challenges to the Direct Claims Must Fail

### 1.   True North Sufficiently Pled Breach of the Founders Agreement

As a threshold matter regarding Schiermeyer's challenge to True North's claim that he breached the Founders Agreement, Schiermeyer first argues that the Founders Agreement "appears to be an effort to create a noncompetition agreement between the initial two shareholders of the Company, True North and Plaintiff"—acting almost as if he has never seen

---

[12] It is worth emphasizing that BGP is not merely deadlocked as to one issue or another; it is structurally deadlocked as to *all issues* because it cannot function with the required Board approval that is mandated by its Bylaws. *See* TN Am. CC ¶¶ 23-25 ("[Under] sections 3.09 and 4.05 of the Bylaws, all control of the corporation requires the authorization of both Thurston and Schiermeyer as the two Directors on the Board."). BGP is a statutory corporation that requires a duly appointed and operating board to direct its affairs. Whether the Company can continue to function at a basic, inertial level is beside the point. The debilitating dysfunction at the Board level should constitute irreparable harm as a matter of law for BGP under the circumstances.

[13] True North respectfully refers the Court to its Motion for Preliminary Injunction Ordering the Temporary Appointment of Custodian to Act as President, CEO, and Sole Director of Blockchain Game Partners, Inc. for an in-depth view of True North's position on these issues.

the Agreement before. But the Founders Agreement is not just some "noncompetition agreement." Rather, it is the foundational document governing Schiermeyer and True North's relationship. It contains express language relating to their responsibilities to one another and to the Company and broader community. The Founders Agreement stipulates that both Schiermeyer and True North would be entitled to "acquire income, cryptocurrency, digital assets, rewards, legendary items, hold stock or other equity stakes, and other forms of compensation (collectively referred to as 'Ownership') from each of the Companies." TN Mot. Appt. Custodian Ex. A at 1. As per the terms of the Founders Agreement, nodes and the digital assets they produce are regarded as each party's "personal property" and are "vested" digital assets and rewards. *Id.* It also prohibits Schiermeyer from "circumvent[ing]" BGP "in a manner to earn income, hold ownership, vote, or earn rewards" from BGP "in a manner to squeeze out or diminish the rights and Ownership" of True North. *Id.*

Schiermeyer recites and breaks down this language in his Motion as if it somehow reveals its inapplicability to the present circumstances. But he succeeds only in articulating True North's point in his assertion that "[t]he Founders Agreement prevents the two initial shareholders of the Company from acting *outside of the corporate structure* . . . in a way that provides one shareholder income or ownership from the Company's services and products at the expense of the other shareholder's ownership rights." ES MTD at 18 (emphasis in original). *This is literally what True North has alleged*: Schiermeyer has acted "outside of the corporate structure" by circumventing all forms of corporate governance in causing BGP to suspend the nodes—thus reaping more income, proportional node ownership and node-voting influence, and rewards for himself—without proper justification to support his own personal vendetta to "to

squeeze out or diminish the rights and Ownership" of True North in plain breach of the Founders Agreement.[14] Moreover, the other fiduciary abuses referenced in this count of True North's Amended Counterclaims (*e.g.*, destroying Company and shareholder assets, converting and wasting Company funds, launching competing companies,[15] cutting Thurston out of the management of BGP, failing to provide him with accurate, requested information, and suspending True North's nodes) involve not only generalized harms to the Company, but also involve unique and particularized harms to True North that result in "squeez[ing] out or diminish[ing] [of its] rights and Ownership" in BGP as the other major shareholder and Director. Schiermeyer has circumvented the required corporate structure and Board voting process to his own gain and to True North's and the Company's great detriment.

There are many, many ways in which True North has pled and can ultimately prove that Schiermeyer has breached both the spirit and the express terms of the Founders Agreement. These allegations pass muster under the notice pleading standard. *See Erickson*, 551 U.S. at 93.

---

[14] To the extent that Schiermeyer's interpretation of this language differs from True North's, any ambiguity among feasible interpretations must be resolved in True North's favor at this stage. *See Gaines v. Stenseng*, 292 F.3d at 1224.

[15] Schiermeyer asserts that his "launching [of] competing companies" is the "only . . . allegation that could even potentially fit this bill," but he essentially argues that there is no harm in shell companies that have not yet competed with BGP or impermissibly transferred valuable assets that should be benefitting all of BGP's shareholders. ES MTD at 18-19. But as discussed above, *see supra* Section A.3, the very establishment of these companies was committed without proper authorization, and Schiermeyer's improper intent behind them could not be more clear. There was no legitimate, permissible use for those shell companies under the circumstances, and the fact that Schiermeyer has apparently recognized the need to dissolve at least one of them (*see* ES MTD at 7 n.2) in the face of the looming liability does not erase his plans to circumvent and compete with BGP in this way.

### 2.   True North Sufficiently Pled Breach of the Implied Covenant of Good Faith and Fair Dealing

Schiermeyer's challenge to True North's implied covenant of good faith and fair dealing claim essentially reduces to his argument that, contrary to Wyoming courts' articulation of the standard, True North has apparently sought to "establish new independent obligations upon the shareholders regarding management of the Company, director's inspection rights, operation of Gala Nodes, and management of circulating tokens." ES MTD at 19-20. This is simply not true. The preceding Section B.1 regarding Schiermeyer's breach of the Founders Agreement is based in the express terms of that agreement. The implied covenant of good faith and fair dealing inherent in all contracts "requires that neither party commit an act that would injure the rights of the other party to receive the benefit of their agreement." *Scherer Const., LLC v. Hedquist Const., Inc.*, 2001 WY 23, ¶ 19 (Wyo. 2001).

Schiermeyer has acted with dishonesty and bad faith time and again to frustrate the purpose and terms of the Founders Agreement—in a campaign to prevent True North from receiving the benefit of its bargain. No "new independent obligations" are required to establish this breach. This claim buttresses and alternatively supports the preceding claim for breach of contract, and it passes the pleading threshold. *See Erickson*, 551 U.S. at 93.

### 3.   True North Sufficiently Pled Conversion

True North has met its burden of pleading all the elements of a conversion claim required to survive a motion to dismiss. Schiermeyer's claims otherwise each fall short.

First, Schiermeyer asserts that True North failed to show a duty independent of the Terms and Conditions was violated. *See* ES MTD at 20. Schiermeyer relies exclusively on *Excel Construction, Inc. v. HKM Engineering, Inc.* for this notion. *See id.* (citing *Excel Constr., Inc. v.*

*HKM Eng'g, Inc.*, 2010 WY 34, ¶ 31 (Wyo. 2010)). But that reliance is misguided. Schiermeyer addresses this case's proposition that "recovery on a tort theory requires a showing that a duty independent of contract was violated." *Excel Constr., Inc*., 2010 WY 34, ¶ 31. However, the upshot of this rule (as noted by that court's reference to a relevant Ninth Circuit opinion) is that claims are "not barred [if] they relate[] to behavior outside the contract [that] violated [extra-contractual] obligation[s]"—for instance, duties arising "under [state] law." *Id.* ¶ 29 (discussing *Giles v. General Motors Acceptance Corp*., 494 F.3d 865 (9th Cir. 2007)). Here, Schiermeyer acted—as he *himself essentially admits*, *see* ES Am. Compl. ¶¶ 82-84—to burn and deprive Thurston and True North of the value of GALA rewards that True North owned outright, and to arbitrarily foreclose True North from accessing and reaping the benefits of its thousands of Gala nodes. This was not BGP acting in accordance with its duly enacted procedures of corporate governance, but it was Schiermeyer stepping outside of those bounds to pursue his own tortious agenda. This behavior was not supported by the Terms and Conditions between BGP and node holders like True North (to which Schiermeyer is not personally a party), but instead constituted behavior "outside the contract" committed to deprive True North of the value of its assets.

Schiermeyer also asserts that True North has failed to plead the required ownership element of a claim for conversion. *See* ES MTD at 20-21. But True North has asserted that it has valid ownership interests in its Gala nodes[16] and the GALA tokens that those nodes have

---

[16] Schiermeyer asserts that "the Terms and Conditions state that '[o]wnership' of Gala Nodes does not represent or constitute any 'ownership right.' ES MTD at 20–21. His argument that "ownership," as set forth in the Terms and Conditions, does not really mean "ownership" is baffling. In offering this made-for-litigation interpretation, Schiermeyer only quotes portions of the provision at issue, and does not acknowledge the broader context. The entire passage reads as follows:

generated, as supported by BGP's Terms and Conditions that memorialize the fact that "[w]hen a User purchases, earns, or receives any NFT or digital reward [from] the Smart Contract process [including GALA tokens, as defined in § 1.3 on "GALA Rewards"], the User owns completely and outright the NFT and/or digital reward." However, Schiermeyer contends that the only "purported" property that True North claims to have owned is the v1 GALA tokens (which, again, is incorrect considering True North's asserted node ownership). *See* ES MTD at 21. But this remark ignores both the plain language of True North's pleadings as well as the practical reality of the GALA v2 "upgrade." True North specifically alleged that v2 tokens *were* created to correspond with all its v1 tokens, but *Schiermeyer* "directed BGP to deposit those replacement tokens into wallets controlled by Schiermeyer personally, and then he burned those tokens." TN

---

8. DISCLOSURES & RISKS

8.1 Notification. GALA notifies each User of certain disclosures and risks associated with blockchain NFT and digital rewards and their associated technology and protocols. GALA Services are not an investment product, and no action, notice, communication by any means, or omission by GALA shall be understood or interpreted as such. GALA has no influence whatsoever on the GALA Blockchain, the transactions and consensus protocols, or the NFTs or digital rewards, including the GALA Reward. Ownership of a GALA App or Game Node or the use of GALA Services does not represent or constitute any ownership right or stake, share or security, debt or equivalent right, or any right to receive any future revenue or form of participation in or relating to any blockchain or digital reward, including the GALA Blockchain or GALA Reward.

Taken in context, this language concerns disclaiming that ownership of nodes entails an investment-like ownership interest in the Company. Thus, a better reading of the language set forth in the Terms and Conditions is that ownership of the nodes does not bestow an "ownership right . . . to receive any future revenue or form of participation in or relating to any blockchain or digital reward." That reading of the language is not the same thing as Schiermeyer's suggestion that node owners do not own their nodes. Nor is that interpretation at all consistent with the fact that Schiermeyer has used the term "node *owner*" throughout his pleadings, including the instant Motion to Dismiss. That said, at best, this disputed question of node ownership is a question for the trier of fact that should not be resolved at the motion to dismiss stage.

Am. CC ¶ 45. The whole concept of the v2 conversion, at least as it was publicized before Schiermeyer admitted his ulterior scheme, was that all node owners' GALA tokens would become v2 tokens, and their old v1 tokens would cease to have any value. Under the circumstances, True North has clearly pled it had an ownership interest in those v2 tokens that Schiermeyer withheld and then destroyed. Accordingly, despite Schiermeyer's arguments otherwise, True North has sufficiently pled conversion.

### 4. True North Sufficiently Pled Tortious Interference with BGP's Terms and Conditions

True North contends Schiermeyer tortiously interfered with those Terms and Conditions, as (a) he was not a party to that agreement, and (b) his tortious interference with that agreement was committed outside the scope of his authority as Director, President, and CEO of BGP. TN Am. CC ¶¶ 151–56. Schiermeyer argues that a corporate officer cannot interfere with his or her corporation's own contracts. He is incorrect.

As Schiermeyer explicitly admits in his Motion, a corporate officer can indeed be liable for tortiously interfering with a corporation's contracts if it is shown that the types of acts were "outside of the scope of the officer's authority and the officer acted entirely to further personal interests." ES MTD at 22 (citing *Lichtie v. U.S. Home Corp.*, 655 F. Supp. 1026, 1028 (D. Utah 1987)). As discussed above, *see, e.g.*, *supra* Section A.5, Schiermeyer's decision to enact the burn and suspend the nodes was committed outside the boundaries of the Terms and Conditions, and his vendetta against Thurston and True North has plainly been prosecuted "entirely to further personal interests." *Cf.*, *e.g.*, *S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 2021 WL 621235, at *6 (S.D.N.Y. Feb. 17, 2021) ("[E]ven where a contract permits discretion to a contracting

31

party, that party may not exercise that discretion arbitrarily or irrationally."). Thus, True North has stated a claim for tortious interference with a contract upon which relief can be granted.

### 5.     True North Sufficiently Established the Need for Declaratory Relief

As a final note, Schiermeyer seeks to dismiss Count thirteen for failure to state a claim for declaratory relief. To support his argument, he cites to case law that permits a motion to dismiss for declaratory judgment where (1) no substantive claim was asserted, and where (2) the judgment would only correct past wrongs, rather than define future legal rights. *See Vanterpool v. Fed'n of Chiropractic Licensing Boards*, 2022 WL 16635391, at *8 (D. Colo. Nov. 2, 2022).

Here, True North has asserted cognizable substantive claims, has provided particularized allegations for each claim, and has sought declaratory relief to guide the parties' future conduct regarding duties and obligations as discussed herein. Furthermore, these claims would govern Schiermeyer's and BGP's power to manage BGP shareholders' and node holders' property rights moving forward. Although there are factual disputes surrounding these claims, dismissing them at this juncture is premature, given that they have been adequately pled and True North is entitled to discovery on the claims in due course outside the scope of a motion to dismiss. Therefore, Schiermeyer's motion to dismiss on counterclaim thirteen should be denied.

*(Space intentionally left blank)*

**CONCLUSION**

For all the reasons set forth above, True North respectfully requests that Schiermeyer's

Motion be denied in its entirety.

DATED February 2, 2024

GREENBERG TRAURIG LLP
/s/ *Marc Rasich*
Marc Rasich
John Huber
Daniel Wadley
Alexander Baker

*Attorneys for Defendants, Counterclaimant, and*
*Crossclaim Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of February 2024, a true and correct copy of the

foregoing was filed with the Court's electronic filing system and thereby served on counsel of

record.

Paul W. Shakespear
Cameron Cutler
Natalie Beal
SNELL & WILMER LLP
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, UT 84101
pshakespear@swlaw.com
ccutler@swlaw.com
nbeal@swlaw.com

Abram L. Moore
Christian A. Zazzali
K&L GATES LLP
70 West Madison Street, Suite 3100
Chicago, IL 60602
abe.moore@klgates.com
christian.zazzali@klgates.com

David L. Mortensen
Monica S. Call
FOLEY & LARDNER LLP
95 S. State Street, Suite 2500
Salt Lake City, UT 84111
dmortensen@foley.com
mcall@foley.com

GREENBERG TRAURIG, LLP

*/s/ Lindsey Wharton*